**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**KANSAS CITY-LEAVENWORTH DIVISION**

JARED NALLY and THE INDIAN
LEADER ASSOCIATION,

        *Plaintiffs*,

    v.

RONALD J. GRAHAM, in his individual and
official capacity as President of Haskell
Indian Nations University;

HASKELL INDIAN NATIONS
UNIVERSITY;

TONY L. DEARMAN, in his official
capacity as Director of the Bureau of Indian
Education; and

THE BUREAU OF INDIAN EDUCATION,

        *Defendants*.

CIVIL ACTION NO.: <u>21-2113</u>

**JURY TRIAL DEMANDED**

---

## COMPLAINT FOR CIVIL-RIGHTS VIOLATIONS

### INTRODUCTION

1.    Plaintiffs Jared Nally and the Indian Leader Association bring this lawsuit because Haskell Indian Nations University is violating the First Amendment by retaliating against them for engaging in protected expression and journalistic activities and by enforcing a sweeping and vague policy on campus expression that was applied to Nally to impose an unconstitutional prior restraint. Nally is a student journalist and editor-in-chief of the award-winning student newspaper published by the Indian Leader Association, *The Indian Leader*.

1

2.      On October 16, 2020, Haskell President Ronald J. Graham issued Nally a "Directive" forbidding him from criticizing Haskell officials or requesting information from government agencies while identifying himself as a student journalist. After excoriating Nally for engaging in these protected journalistic activities, President Graham threatened disciplinary action if Nally failed to show Haskell officials "appropriate respect" by continuing to engage in these protected activities. The Directive invoked Haskell's Code of Student Conduct, which only allows student expression that is "consistent with Haskell's CIRCLE values." CIRCLE is an acronym that stands for Communication, Integrity, Respect, Collaboration, Leadership, and Excellence. For 90 days, Plaintiff operated under this prior restraint until President Graham informed Nally that he had intended to rescind the Directive after five weeks and attributed the additional delay to an "administrative mishap."

3.      Haskell continues to retaliate against Plaintiffs by withholding more than $10,000 from the newspaper's anticipated funds, without any notice or explanation. Even though the Indian Leader Association submitted its required renewal materials at the beginning of September, Haskell has failed to even recognize the group, instead imposing other financial and administrative hurdles to the operations of the *The Indian Leader*, the oldest Native American student newspaper in the country.

4.      This is not the first time Haskell has violated the First Amendment by retaliating against the Indian Leader Association. More than thirty years ago, this Court entered a preliminary injunction against Haskell after it temporarily stopped publication of *The Indian Leader* in retaliation for critical coverage, and then appointed an adviser who wrested editorial control of the paper from the students. This Court approved an ensuing settlement agreement that

2

prohibited Haskell from inhibiting the First Amendment rights of members of the Indian Leader Association.

5.      In bringing this lawsuit, Nally and the Indian Leader Association seek to hold Haskell's leadership accountable for flagrantly violating clearly established First Amendment rights. Defendants cannot punish the protected expression of student journalists like Nally—or any student—simply because officials find their expression, reporting, or commentary to lack "appropriate respect." The First Amendment protects student expression even when administrators or others might view it as lacking "integrity" or being disrespectful. *See, e.g.*, *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (holding that university may not censor student newspaper merely based on offensive content).

## JURISDICTION

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

7.      Plaintiffs bring their First and Fifth Amendment Claims for declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, the Declaratory Judgments Act, 28 U.S.C. §§ 2201–2202, as well as "directly under the constitution," *Porter v. Califano*, 592 F.2d 770, 781 (5th Cir. 1979).

8.      Plaintiffs bring their First Amendment claims for compensatory, nominal, and punitive damages under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Plaintiffs seek an award of damages for the reckless and callous violation of their clearly-established First Amendment rights.

## VENUE

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in Lawrence, Kansas, which is located in the Kansas City-Leavenworth Division of the District of Kansas.

10.     Venue is also proper in this judicial district under 28 U.S.C. § 1391(e)(1).

## THE PARTIES

**Plaintiffs**

11.     Jared Nally is a citizen of the United States and a resident of Lawrence, Kansas. He is an enrolled member of the Miami Tribe of Oklahoma and also of Volga German descent.

12.     In the fall of 2019, Nally transferred to Haskell Indian Nations University. In May 2020, he earned an Associate of Arts degree, *magna cum laude*. Nally is continuing his education at Haskell pursuing a Bachelor of Arts in Indigenous and American Indian Studies. At all times relevant to the Complaint, Nally has been a Haskell student.

13.     During his first semester, Nally started reporting for *The Indian Leader*, an editorially independent student media outlet at Haskell. In January 2020, Nally became the editor-in-chief of *The Indian Leader*. Nally has written over 60 articles for the student newspaper. At all times relevant to the Complaint, Nally has been a student journalist.

14.     The Indian Leader Association is an unincorporated student association that manages and publishes *The Indian Leader*. Founded in 1897, *The Indian Leader* is the oldest Native American student newspaper in the country and has won many awards. *The Indian Leader* serves the Haskell student body by communicating information that impacts student academics and campus life and serves the broader Haskell community by transmitting mainstream or local news and cultural issues across Indian Country.

15.     The goals of the Indian Leader Association are "to seek the truth and report the facts for the betterment" of the Haskell community, while complying with journalism ethics and standards. The Indian Leader Association also seeks "to promote Native American issues and provide an outlet for those stories to be told."

**Defendants**

16.     Defendant Ronald Graham serves as the President of Haskell Indian Nations University. President Graham manages and is responsible for the "development, dissemination and implementation of standards, policies and procedures for education programs" at Haskell. *See* Indian Affairs Manual, pt. 3, ch. 8; U.S. Department of the Interior Departmental Manual, pt. 130, ch. 8. Thus, President Graham is responsible for the promulgation, implementation, and enforcement of Haskell's Code of Student Conduct and its "CIRCLE" values, and exercises the authority of the federal government in carrying out these responsibilities. President Graham is sued in his individual and official capacities.

17.     Defendant Haskell Indian Nations University is a tribal university founded in 1884 and now operated by the United States. Located in Lawrence, Kansas, Haskell is one of only two post-secondary institutions directly operated by the Bureau of Indian Education, a division of the U.S. Department of the Interior. According to its website, the University's mission "is to build the leadership capacity of [its] students by serving as the leading institution of academic excellence, cultural and intellectual prominence, and holistic education that addresses the needs of Indigenous communities." Haskell requires that all students "either be an enrolled member of a federally recognized tribe eligible for education benefits from the Bureau of Indian Affairs, or be at least one-fourth total degree Indian blood direct descendant of an enrolled member of a tribe eligible for education benefits from the Bureau of Indian Affairs."

18.     Defendant Tony L. Dearman is the Director of the Bureau of Indian Education and has served in this position since November 2016. As Director, he is responsible for the management and direction of all education functions, including formulating policies and procedures, supervising all program activities, and approving the expenditure of funds appropriated for education functions. Director Dearman is also responsible for supervising President Graham. Director Dearman's duty location and office are located in Washington, DC. Director Dearman is sued in his official capacity only.

19.     Defendant the Bureau of Indian Education ("BIE") is a federal agency that directly operates Haskell. Formerly known as the Office of Indian Education Programs, the BIE was renamed and established on August 29, 2006. The Bureau falls under the U.S. Department of the Interior under the purview of the Office of the Assistant Secretary-Indian Affairs. BIE officials delegate responsibility for the "development, dissemination and implementation of standards, policies and procedures for education programs" at Haskell to President Graham. 25 C.F.R. § 33.4; Indian Affairs Manual, pt. 3, ch. 8. Thus, in managing Haskell, President Graham exercises the authority of the Bureau of Indian Education.

## FACTUAL ALLEGATIONS

20.     In 1988 and 1989, Haskell's violations of the First Amendment resulted in a settlement agreement that prohibited Haskell from imposing any prior restraint or inhibiting the free expression of the Indian Leader Association and guaranteed it editorial independence. Three decades later, Haskell is not only violating its obligations under the agreement but also the First Amendment.

21.     Haskell's Code of Student Conduct, specifically its policy on "Campus Expression," explicitly permits only student expression that complies with Haskell's "CIRCLE"

values, like respect. After Nally criticized administration officials and the university, President

Graham applied this policy to impose a prior restraint on Nally, threatening him with discipline if

he continued to criticize Haskell or engage in other protected activities. Haskell is also

withholding funding from the Indian Leader Association and imposing other financial and

administrative hurdles that continue to impede its operations. Despite being warned about these

constitutional violations, Haskell has continued to show reckless disregard for its students'

rights.

**Haskell Indian Nations University Has a Long History of Violating the First Amendment Rights of Student Journalists.**

22.     Three decades ago, Haskell's flagrant disregard for the First Amendment rights of

its student press forced the Indian Leader Association to seek redress in this Court.

23.     In the fall of 1988, Haskell administrators temporarily shut down publication of

*The Indian Leader* after it published a story alleging unethical conduct by the school's then-

President.

24.     Things escalated in March of the following year. After the faculty adviser of *The*

*Indian Leader* wrested editorial control of the paper from the students, the Indian Leader

Association and several student journalists and editors sued Haskell Indian Nations University

(then known as Haskell Indian Junior College) for violating their First Amendment rights. *Indian*

*Leader Ass'n v. U.S. Dep't of the Interior*, No. 89-4063-R (D. Kan.) (filed Mar. 30, 1989).

25.     The Honorable Richard Rogers, U.S. District Judge for the District of Kansas,

granted the Indian Leader Association a temporary restraining order prohibiting publication of

the newspaper issue put together by the faculty adviser.

26.     In September 1989, Haskell entered into a settlement agreement with the Indian

Leader Association. Order Approving Settlement Agreement, *Indian Leader Ass'n v. U.S. Dep't*

*of the Interior*, No. 89-4063-R (D. Kan. Sept. 19, 1989). A true and correct copy of this Court's order approving the settlement agreement and the 1989 Settlement Agreement is attached to this Complaint as Exhibit A.

27.     Under the 1989 Settlement Agreement, the Indian Leader Association and the Editorial Board of the newspaper have the right to editorial control over the contents of *The Indian Leader*.

28.     The students' right to full editorial control over *The Indian Leader* includes both the right to engage in journalistic pursuits free from censorship, as well as the right to access its Student Bank account.

29.     Specifically, the 1989 Settlement Agreement prohibits any kind of prior restraint or censorship of *The Indian Leader*, mandating that:

[N]o officer, agent, instructor or employee of Haskell shall:

(a)     censor, edit or modify the contents of *The Indian Leader* in violation of the First Amendment of the United States Constitution;

(b)     restrain, obstruct or prohibit the publication of *The Indian Leader* newspaper or otherwise inhibit the free expression of members of [the Indian Leader] Association in violation of the First Amendment of the United States Constitution; . . .

(c)     suspend the publication of *The Indian Leader* on the ground that a vacancy has arisen in the position of faculty adviser to *The Indian Leader* newspaper or the Association[;]

(d)     refuse any written request for disbursement of funds, reasonably related to the management or publication of *The Indian Leader*, . . . [or]

(e)     refuse to approve a Plan of Operation for the Association . . . .

Ex. A, Settlement Agreement, at 3–4, ¶ 3.

30.     Additionally, the 1989 Settlement Agreement sets forth requirements for the allocation of "monies which may be received or collected by Haskell on behalf of [the Indian

Leader] Association, such as the Association's allocation of student activity fees." For example, *The Indian Leader*'s funds must be held in the Haskell Student Bank and "shall be:

    (a)   the subject of a separate accounting . . . and assigned a separate account number;

    (b)   the subject of a monthly account statement prepared by the Haskell Student Bank . . . ; and

    (c)   disbursed in accordance with this Settlement Agreement and the . . . Plan of Operations."

*Id*. at 5, ¶ 6.

31.    Despite expressly acknowledging the obligations imposed by the 1989 Settlement Agreement, Haskell has resumed violating the First Amendment rights of its student journalists more than three decades later.

**Haskell's Code of Student Conduct Unconstitutionally Subordinates Students' First Amendment Rights to "CIRCLE" Values.**

32.    Haskell maintains a Code of Student Conduct that applies to all students—including student journalists engaged in protected newsgathering and reporting activities—as President Graham demonstrated when he invoked the code to impose a prior restraint on Nally under threat of discipline.

33.    Haskell established the Code of Student Conduct "in order to promote healthy decision-making and to protect the rights of all students."

34.    According to Haskell, all students are "responsible for contributing to the values of Haskell through support and adherence to the Code of Student Conduct."

35.    The Code of Student Conduct applies broadly to "conduct from the time of application to Haskell for admission through the actual awarding of a degree," including "conduct that occurs before classes begin, after classes end, on or off campus, during the academic year or during periods between semesters of actual enrollment."

36.     Additionally, in its section detailing the "Student Grievance Process," Haskell's Code of Student Conduct references the Office of Student Rights and instructs students to access its Student Complaint Policy and Procedures and the Student Complaint form on its website. But since at least October 19, 2020, the text of Haskell's Office of Student Rights website simply repeats the classic placeholder text "lorem ipsum" and related filler text. A true and accurate screenshot of this webpage, taken on March 1, 2021, is depicted below:



37.     In October 2014, Haskell adopted new "Institutional Values," known as "CIRCLE" values. "CIRCLE" is an acronym that stands for Communication, Integrity, Respect, Collaboration, Leadership, Excellence.

(a)     Haskell defines the CIRCLE value of "Communication" as "[t]o successfully convey ideas, opinion, information, results, images and creative expression using multiple strategies for diverse groups and stakeholder."

(b)     Haskell defines the CIRCLE value of "Integrity" as "[t]o conduct ourselves in ways that honor the sacrifices of our tribes on which treaty and trust responsibilities are based; and to carry out our responsibilities as students, staff, faculty, administrators, and regents by engaging in action based on the highest standard of conduct."

(c)     Haskell defines the CIRCLE value of "Respect" as "[t]o honor and promote the diversity of beliefs, rights, responsibilities, cultures, accomplishments of self and others, including our non-human relations."

(d)     Haskell defines the CIRCLE value of "Collaboration" as "[t]he willingness and ability to work successfully with others to accomplish the goals of the university and to meet the needs of our students, the tribes we represent and serve as well as our mission."

(e)     Haskell defines the CIRCLE value of "Leadership" as "[t]he willingness to acquire the knowledge and skills required to advocate for, and to advance the sovereignty and self-determination of tribes, Haskell and the students."

(f)    Haskell defines the CIRCLE value of "Excellence" as "[t]o strive toward the strongest level of accomplishment in our respective roles on behalf of Haskell, as students, staff, faculty, administration, and the Board of Regents."

38.    The CIRCLE values are not merely aspirational. Haskell incorporates the CIRCLE values into the Code of Student Conduct in its Campus Expression policy.

39.    Haskell's Campus Expression policy states: "Discussion and expression of all views is permitted, consistent with Haskell's CIRCLE values and subject only to the requirements for the maintenance of order."

40.    The Campus Expression policy restricts student expression protected by the First Amendment. While the CIRCLE values may represent laudable institutional goals, Haskell departs from its obligations under the First Amendment by mandating that student expression adheres to CIRCLE values.

41.    For example, under the Campus Expression policy, only student speech that conforms with the CIRCLE values, as determined by Haskell administrators, is permitted on campus. Students who engage in speech that an administrator deems "disrespectful," for example, are violating the Campus Expression policy.

42.    Thus, Haskell subordinates its students' rights to free expression to subjective CIRCLE values, like integrity and respect, providing administrators with unfettered discretion to police, burden, or punish expression that does not conform to the individual administrator's views on whether speech demonstrates "integrity" or is sufficiently respectful.

43.    While the Campus Expression policy restricts expression by all Haskell students, it has a pronounced chilling effect on journalists, like Plaintiffs, who have an obligation to vigilantly observe, question, and even criticize government officials, like Haskell administrators.

44. As detailed in the following allegations, Defendants used the Campus Expression policy and its incorporation of the CIRCLE values to punish Plaintiffs by imposing a prior restraint on Nally and interfering with the Indian Leader Association's operations when President Graham unilaterally determined that Plaintiffs' protected journalistic activities were disrespectful and did not conform to the Code of Student Conduct.

**Plaintiffs' Protected Journalistic Activities Draw Ire of President Graham.**

45. Haskell's tradition of retaliation and censorship against student journalists and *The Indian Leader* has continued under President Graham.

46. *The Indian Leader* has a long history of publishing content critical of the Haskell administration. For example, in just the month of December 2019, *The Indian Leader* published stories critical of multiple misspellings on official signs placed around campus, delays in students receiving letters awarding their financial aid, and subpar amenities in certain campus housing.

47. Over the last year, Nally engaged in various newsgathering, reporting, and advocacy activities that drew President Graham's ire. Four incidents are particularly relevant.

***First, Nally raises questions and complains about Haskell's reporting of student data for the 2020 Census.***

48. In March 2020, Nally began investigating Haskell's reporting of student data to the United States Census Bureau. This was a timely and newsworthy issue because the 2020 census was being completed while many students were displaced due to the COVID-19 pandemic. Nally thought it was vital that students be accurately counted in the communities in which they are attending college because federal funding for public services is tied to census data.

49.     On March 15, 2020, the U.S. Census Bureau issued a statement that college students—who would have been living in campus housing during the academic year but for the COVID-19 pandemic—will still be counted as living in the college community even if they were living at home on April 1.

50.     On April 13, 2020, Nally wrote and published an article in *The Indian Leader* advising students on Haskell's response to the census on behalf of students. As part of the Group Quarters Enumeration operation with the U.S. Census Bureau, Haskell completed the census on behalf of students living on campus, even if they were home due to the COVID-19 pandemic. To avoid potential double-counting, Nally's article informed readers that students who were living on campus should not complete a census form individually, and that parents of students living on campus, but who were temporarily home due to the pandemic, should not include their children when filling out their own census.

51.     In the course of his investigation, Nally became concerned that Haskell had reported all students to the Census Bureau as only Native American, including students who also identify as another race or ethnicity. This was also of personal concern to Nally who identifies as biracial and wanted to ensure that his identity was accurately reported to the U.S. Census Bureau.

52.     In late August 2020, Nally discovered that Haskell submitted student data to the U.S. Census Bureau but had not asked students to self-report racial or gender identities. In Nally's view, by refusing to provide an opportunity to self-report a racial identity other than Native American, Haskell was marginalizing biracial students.

53.     Concerned about Haskell's potential discrimination against biracial students by reporting all students as "Native American," regardless of their personal identities, Nally emailed several inquiries to Vice President of University Services Tonia Salvini.

54.     Vice President Salvini is also a member of the Community Police Review Board for the City of Lawrence. In that role, she is responsible for reviewing claims of racial bias in community policing.

55.     Vice President Salvini did not respond to Nally's inquiries.

56.     Failing to obtain any response through his inquiries at the university, Nally voiced his concerns about Haskell's response to the census—and specifically, the role of Vice President Salvini in reporting all students as "Native American"—at a public meeting of the Community Police Review Board. Given Vice President Salvini's role on the board, Nally thought it was appropriate to raise this issue of potential discrimination against biracial students at the public meeting of the board.

57.     On or about October 9, 2020, Nally also submitted a personal grievance to President Graham's office regarding his own individual concerns about Haskell's handling of the 2020 census and its future reporting of student racial identifies.

***Second, Nally legally records a Haskell administrator for an article criticizing Haskell's increase in student fees.***

58.     In the summer of 2020, Nally investigated another story involving Haskell's increase in student fees for the 2020–21 academic year.

59.     While Haskell offers tuition-free higher education to Native American students, it charges fees for each semester that, before the COVID-19 pandemic, covered food services, library services, campus housing, academic center services, internet, athletics events, the fitness center, student activities, and laundry services.

60.     Before the 2020–21 academic year, Haskell charged on-campus students $715 and off-campus students $240 in student fees for each semester. In June 2020, Haskell announced that student fees for all students would be $715 for the upcoming fall 2020 semester,

an almost 200% increase, despite the fact that most of the services traditionally covered by the fees, such as campus housing and food services, were unavailable. Only about 20 students remained on campus for the summer 2020 term, and starting in the fall of 2020, the university closed on-campus housing and meal plans were not available. Consequently, all students are now responsible for paying $715 in student fees as well as paying for their own housing and food, expenses that add up to thousands of dollars per year.

61.     As part of his investigation into Haskell's increase in student fees, Nally lawfully recorded a conversation he had with a Haskell financial aid officer.

62.     Under Kansas law, only one party's consent is required to record a conversation without informing the other party. Kan. Stat. Ann. § 21-6101(a)(1).

63.     Nally used the recording of his conversation with the financial aid officer in an editorial he authored and published on July 10, 2020, criticizing Haskell's decision to increase student fees for all students to $715 despite the decrease in services.

***Third, Nally and the Indian Leader Association object to the replacement of their faculty adviser with an adviser from the administration.***

64.     Around July 2020, Nally and the Indian Leader Association learned that Haskell's administration was requiring that faculty cease their roles as advisers to student organizations for the remainder of the summer 2020 term. Consequently, the administration removed the Indian Leader Association's faculty adviser, Rhonda LeValdo, and appointed Interim Dean of Humanities Joshua Falleaf to advise the newspaper.

65.     At the time that Haskell's administration changed the rule about who could serve as advisers to student organizations, the Indian Leader Association was the only organization at Haskell that was active.

66.     Thus, as a practical matter, the Indian Leader Association was the only organization at Haskell affected by the administration's new rule regarding advisers to student organizations.

67.     Nally and the Indian Leader Association criticized Haskell for appointing an administrator as the association's faculty adviser and advocated for Falleaf's removal as adviser because they were concerned that oversight from an administrator would imperil the editorial independence of the paper and lead to renewed violations of their First Amendment rights and the 1989 Settlement Agreement.

68.     Nally and the Indian Leader Association attempted to remove Falleaf as adviser and to continue to operate without an adviser for the remainder of the summer 2020 term as per the paper's rights under the 1989 Settlement Agreement. *See* Ex. A, Settlement Agreement, at 4, ¶ 3(c).

69.     Accordingly, the Indian Leader Association altered its 2020–21 Plan of Operations, per its rights under the 1989 Settlement Agreement, and submitted it to Haskell's administration for approval on or about September 3, 2020.

70.     The 2020–21 Plan of Operations includes new procedures for Haskell's appointment of advisers, which allowed the Indian Leader Association to (i) nominate advisers for appointment by Haskell and (ii) remove an adviser by a majority vote of the Indian Leader Association's officers.

71.     The only adviser the Indian Leader Association nominated in its 2020–21 Plan of Operations was Rhonda LaValdo because she is the only available adviser with a journalism background.

72.     As of the date of this Complaint, Haskell has not approved the 2020–21 Plan of

Operations, and therefore not approved of the Indian Leader Association's adviser.

***Fourth, Nally requests information from local government to gather facts about the death of a beloved Haskell cafeteria worker.***

73.     On October 4, 2020, a Haskell food-service employee and alumnus, died just

short of her 30th birthday.

74.     As one of only a few students that remained on campus in the summer of 2020,

Nally became friends with this employee who was always cheerful and considerate. For

example, this employee always made sure Nally and the other students on campus in the summer

of 2020 would get fresh fruit like strawberries, which she grew outside Curtis Hall.

75.     Haskell did not send an email to inform students of the employee's passing, as it

had done with other deaths in the community.

76.     Nally learned of the death when he saw posts from others on the employee's

social media page.

77.     *The Indian Leader* typically covers deaths in the Haskell community. Nally began

gathering information about the death in order to report it in *The Indian Leader* and inform the

Haskell community how they could pay their respects.

78.     Without any information from Haskell, Nally emailed the local police on October

5, 2020, requesting information regarding the food-service employee's death. In his email to the

Lawrence Police Department, Nally accurately identified himself as a student journalist for *The*

*Indian Leader*.

79.     On October 9, 2020, Nally authored and published a story about the death of the

food-service employee in *The Indian Leader*.

80.     In response to these four instances, President Graham retaliated against Nally by forbidding him from engaging in routine journalistic activities.

**President Graham Issues Nally a Directive, Retaliating Against Nally for Protected Activity.**

81.     President Graham emailed Nally a formal, written memorandum on official university letterhead from the Office of the President addressed to Nally, dated October 16, 2020, with the subject heading "***Directive***." Director Dearman and "BIE Legal" were copied on this Directive.

82.     In the Directive, President Graham accuses Nally of "attacking" Haskell employees.

83.     Nally has never physically attacked anyone in the Haskell community.

84.     Throughout the Directive, President Graham uses the word "attack" to refer to criticism or unfavorable coverage of Haskell, its administration, or faculty.

85.     For example, in reference to Nally's criticism and complaints about Haskell's response to the 2020 Census in *The Indian Leader* and at the meeting of the Community Police Review Board, President Graham informed Nally that he "has been identified recently, and on more than one occasion, as someone who routinely attacks Haskell employees with letters; recently, you attacked a Haskell official during a community event."

86.     Regarding Nally's reporting of the food-service employee's death, President Graham advised Nally:

> Further, you have been identified as calling the police department and demanding information regarding a deceased Haskell employee while representing yourself as an editor for *The Indian Leader*. Under no circumstances do you have authority to contact the police department (or any other governmental agency) and demand anything on behalf of the University.

87.     Any citizen, including journalists, has the right to seek information from

government agencies under the Kansas Open Records Act or the federal Freedom of Information

Act.

88.     President Graham further chastised Nally, stating in the Directive:

Your behavior has discredited you and this university. You have compromised your
credibility within the community and, more importantly, you have brought
yourself, *The Indian Leader*, Haskell, and me unwarranted attention.

89.     Echoing the CIRCLE values, President Graham also suggests in his Directive that

Nally's protected journalistic activities violate the Code of Student Conduct:

I will remind you that you are a student first and foremost on this campus, and your
conduct falls under the umbrella of the Student Conduct Code. Your role on *The
Indian Leader* does not absolve you from your responsibilities as a Haskell
student—and as a representative of our community. Henceforth, you will conduct
yourself in accordance with the Haskell Student Code of Conduct—now and in the
future, and you will treat fellow students, University staff, and University officials
with appropriate respect. Failure to do so may result in disciplinary action.

90.     President Graham concludes the Directive by imposing a prior restraint upon

Nally, stating:

Let me make myself clear. You are being directed, as a Haskell student. To
[sic] comply with the following:

**You will NOT:**

- Attack any student, faculty, or staff member with letters or in public,
  or any public forum, thus bringing unjustified liability to this
  campus or anyone on this campus.
- Make demands on any governmental agency—or anyone else from
  Haskell—while claiming to represent *The Indian Leader*.
- Attempt countermanding decisions of Haskell personnel assigned
  by me or anyone else to positions in an effort to replace them.
- Record anyone at Haskell in your interviews unless you advise them
  first and they grant you permission.

**You WILL:**

- Treat all faculty members, staff, and students with the highest respect.
- Conduct yourself as a student under the umbrella of Code of Conduct.
- Understand that no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them.

91.     The Directive punished Nally by imposing a prior restraint both on his protected expression and his ability to engage in newsgathering and reporting under the explicit threat of discipline. President Graham issued the Directive without following required procedures.

92.     As required by 25 C.F.R. § 42.8, the Code of Student Conduct affords Haskell students with due-process protections.

93.     For example, the Code of Student Conduct requires an Incident Report to be filed with the Office of Student Rights within five days of any incident in which a Haskell student allegedly violated the Code.

94.     President Graham did not file an Incident Report with the Office of Student Rights about any of Nally's activities that he judged did not comply with the Code of Student Conduct.

95.     Additionally, Haskell students must be given notice of the charges against them "a reasonable time before" a fair and impartial hearing. Haskell students also have a right to administrative review and appeal of disciplinary decisions.

96.     President Graham imposed the Directive and its restrictions on Nally without providing any notice, any hearing, or any opportunity to appeal.

97.     Nally reasonably understood the Directive to mean that engaging in protected journalistic activities, including newsgathering or reporting in *The Indian Leader*, would subject him to discipline.

98.     Nally refrained from reporting on campus news following the issuance of the Directive for fear of punishment. For example, when Haskell made meal plans available again at the end of the fall 2020 semester, students who were interested in the meal plan had to pay an additional fee on top of the $715 student fee, even though the student fees traditionally covered food services. Nally declined to report on this development as a follow-up to his July story on the fee increase because he was concerned about violating the Directive or being perceived to be violating the Directive—particularly because reporting on the story would have required him to contact Vice President Salvini for comment.

99.     In addition, due to fear of violating the Directive or even being perceived to be violating the Directive, Nally and all other reporters for *The Indian Leader* refrained from writing or publishing a story about the Directive itself, even though the story received considerable local and national media attention, including in the *Kansas City Star* and by the Associated Press.

100.     Nally has also chosen not to investigate and publish another developing story concerning President Graham's relationship with the Kansas City Chiefs of the National Football League. Nally remains concerned that President Graham could reinstate his Directive or another unconstitutional edict if he investigates and publishes this story.

101.     Other members of the Indian Leader Association and other reporters for *The Indian Leader* were also concerned about publishing stories that President Graham or Haskell

administrators might find disrespectful out of concern that they too would be subject to discipline, a similarly unconstitutional prior restraint, or other retaliatory measures.

102.    On October 17, 2020, Nally emailed Director Dearman to report President Graham for issuing the Directive.

103.    On October 21, 2020, Director Dearman told Nally he had referred the matter to BIE's human resources department.

104.    On December 28, investigator Sandra Wyllie—an independent contractor hired by the U.S. Department of the Interior to investigate allegations of harassment and Equal Employment Opportunity violations—contacted Nally in response to his complaint to Director Dearman.

105.    Wyllie informed Nally that she was investigating President Graham's allegedly harassing conduct, but that violations of Nally's constitutional rights were outside the scope of her investigation.

106.    Neither Director Dearman nor BIE sufficiently considered or addressed the constitutional violations presented by the Directive. Instead, Director Dearman and BIE directed Nally's complaint to a bureaucratic process designed to investigate and remedy allegations of workplace harassment, not violations of students' First Amendment rights.

**Haskell Imposes Financial and Administrative Hurdles That Impede the Indian Leader Association's Operations.**

107.    For Nally's entire tenure as editor-in-chief of *The Indian Leader*, the paper has faced difficulty accessing its Haskell Student Bank account or even ascertaining the balance, impeding the Indian Leader Association's ability to properly budget for its operations.

108.     Under the Haskell Indian Nations University Policies for the Student Bank that were provided to Nally, statements of Student Bank account balances must be sent via email to the account's managers each month.

109.     At no point during Nally's tenure as editor-in-chief of *The Indian Leader* has he received such a monthly accounting from the Haskell Student Bank.

110.     During the spring and summer 2020 terms, *The Indian Leader*'s Treasurer began contacting Haskell Student Bank administrator Jeri Sledd in an attempt to determine the balance in the paper's Student Bank account.

111.     While Sledd responded to the Treasurer's emails regarding *The Indian Leader*'s payroll, Sledd did not respond to the Treasurer's emails requesting an account statement.

112.     In the time leading up to President Graham issuing the Directive, the Indian Leader Association faced difficulty renewing its status as an officially recognized organization at Haskell.

113.     The Indian Leader Association was required to submit its 2020–21 Plan of Operations for approval because it had amended its previous plan.

114.     On September 3, 2020, Nally submitted the Indian Leader Association's 2020–21 Plan of Operations to Haskell Student Bank administrator Jeri Sledd to initiate the approval process.

115.     On September 10, 2020, Nally followed up with Sledd and submitted the minutes from the Indian Leader Association's first meeting, which included the results of their officer elections.

116.     When Sledd did not respond to these September emails, Nally followed up on his request in an email to Sledd on October 19, 2020.

117.    Sledd did not respond to Nally the rest of the calendar year.

118.    On January 8, 2021, Nally again followed up with Sledd about the Indian Leader Association's recognition and access to its Student Bank account.

119.    On January 11, 2021, Sledd finally confirmed receipt of the 2020–21 Plan of Operations, but told Nally that it had yet to be circulated for approval by the appropriate administrators.

120.    Nally, as editor-in-chief of *The Indian Leader*, then received an email with an accounting of the Indian Leader Association's Student Bank Account.

121.    When Haskell finally sent Nally an accounting of the Indian Leader Association's Student Bank account, it was short over $10,000.

122.    The accounting indicated that the last three deposits of Student Activity Fee funds into the Indian Leader Association's account were smaller than anticipated.

123.    *The Indian Leader* is allocated a certain portion of Haskell's Student Activity Fee.

124.    At all times relevant to this Complaint, Haskell's Student Activity Fee has consisted of $35.00 charged to each enrolled student every fall and spring semester, and $25.00 charged to each enrolled student every summer semester.

125.    The portion of the Student Activity Fee allocated to the Indian Leader Association is included in its yearly Plan of Operations per the 1989 Settlement Agreement. *See* Ex. A, Settlement Agreement, at 5, ¶ 6.

126.    At all times relevant to this Complaint, the Plan of Operations has allocated one-third of the amount of the total Haskell Student Activity Fees to the Indian Leader Association.

127.    As calculated in the table below, based on an estimation of Haskell's enrollment, deposits from the Student Activity Fees to the Indian Leader Association's Student Bank account are short over $10,000.

**Table 1**

*2020 Funding*

| Estimated Enrollment | | Funding Rate | Anticipated Funds | Actual | Difference |
|---|---|---|---|---|---|
| Spring | 740 | $11.67/student | $8,635.80 | $3,531.67 | -$5,104.13 |
| Summer | 220 | $8.33/student | $1,832.60 | $653.34 | -$1,179.26 |
| Fall | 730 | $11.67/student | $8,519.10 | $4,526.00 | -$3,993.10 |
| | **Total** | | **$18,987.50** | **$8,711.01** | **-$10,276.49** |

128.    As of the date of this Complaint, Haskell has not contacted the Indian Leader Association to notify it of any change to its allocation of Student Activity Fees.

129.    Because Nally and the Indian Leader Association were concerned about overdrawing their account when they could not ascertain the total available funds in its Student Bank Account, the Indian Leader Association has been forced to forego making expenditures, such as printing hard-copy issues, hosting virtual events, or investing in improvements in technology.

130.    *The Indian Leader* traditionally publishes a print copy of its annual graduation issue. Due to the withheld funds and inability to access its account, *The Indian Leader* was forced to publish the graduation issue in an online-only PDF format.

131.    Additionally, the Indian Leader Association has been forced to forego holding virtual events. Investing in an organizational Zoom account would allow the organization to meet

26

and hold virtual events in the midst of the COVID-19 pandemic. A Zoom Pro account for small teams costs approximately $15.00 billed monthly or approximately $150.00 billed annually. A Zoom account with the capability to host video webinars costs $40.00 billed monthly or $400 billed annually. While Nally chose to pay for a Zoom pro account himself, which *The Indian Leader*'s staff uses to hold meetings, he was unable to pay for an account with the webinar function.

132.    The Indian Leader Association considered hosting a virtual event in November 2020 in celebration of Native American Heritage Month. Without a Zoom account with webinar functionality or the ability to properly budget for other necessary event-related expenses, the Indian Leader Association had to forego hosting this virtual event.

133.    The Indian Leader Association also considered hosting a virtual Homecoming event in the fall of 2020. Without a Zoom account with webinar functionality or the ability to properly budget for other necessary event-related expenses, the Indian Leader Association had to forego hosting a virtual Homecoming event.

134.    But for the withheld funds and inability to access its Student Bank Account and ascertain its balance, the Indian Leader Association would purchase an organizational Zoom account with webinar functionality and would host virtual events.

135.    The Indian Leader Association has also been prevented from buying podcasting equipment, which would have allowed it to produce a podcast for consideration in the Native American Journalists Association's National Native Media Awards, because Nally and the other reporters were concerned that they did not have the funds to spend on that technology.

136.    But for the withheld funds and inability to access its Student Bank account and ascertain its balance, the Indian Leader Association would purchase podcasting equipment and develop a podcast.

**President Graham and Haskell University Continue to Show a Reckless and Callous Disregard for its Students' Federally Protected Rights.**

137.    On October 26, 2020, the Foundation for Individual Rights in Education ("FIRE"), together with the Native American Journalists Association ("NAJA") and the Student Press Law Center ("SPLC") sent a letter, marked "URGENT" to President Graham detailing why the Directive was unlawful and requesting a response by November 2, 2020. The coalition letter demanded that President Graham immediately rescind the Directive, restore the Indian Leader Association's rights to university resources and access to its bank account, and clarify that Haskell will not interfere in the affairs of the student newspaper or impede the free expression rights of individual students in the future.

138.    The collation letter also warned President Graham that the Directive evidenced a "willful blindness to the basic concepts of constitutional rights." It advised President Graham that justifying a prior restraint on Nally by citing the 1989 Settlement Agreement—an order by this Court obligating Haskell to respect *The Indian Leader*'s First Amendment rights—starkly illustrated a reckless or callous indifference to the federally protected rights of others.

139.    President Graham failed to respond by the November 2 deadline.

140.    On January 13, 2021, 90 days after President Graham issued the Directive, counsel for BIE Jennifer Wiginton emailed FIRE Program Officer Lindsie Rank, attaching President Graham's undated rescission of the Directive. The body of Wiginton's email stated that President Graham's letter rescinding the Directive should have been sent on November 20, but was not sent due to an unexplained "administrative error."

141. Also on January 13, 2021, Nally received an email from President Graham attaching an undated letter rescinding the Directive, attributing the additional delay to an "administrative mishap."

142. On January 19, 2021, FIRE, NAJA, and the SPLC sent President Graham another letter calling for institutional policy changes to ensure that student reporters are protected from the whims of administrators like President Graham.

143. This January 19 coalition letter called on President Graham to revise the policy on Campus Expression to reflect that the university's CIRCLE values do not limit students' First Amendment rights to free expression, and to revise the CIRCLE values themselves to make clear that they are merely aspirational.

144. The January 19 coalition letter also called on President Graham to take steps to increase transparency at Haskell, including uploading a revised Code of Student Conduct to its website.

145. The January 19 coalition letter requested a response by January 26, 2021.

146. Wiginton replied to FIRE on January 19 indicating that the problematic portion of the Code of Student Conduct was under review.

147. As of the date of this Complaint, FIRE has not received a substantive response to this second letter.

148. To the contrary, at some point between January 26, 2021, and February 7, 2021, after receiving FIRE's January 19, 2021 letter, Haskell uploaded an updated copy of the Code of Student Conduct to its website. The Campus Expression policy in the updated Code of Student Conduct still explicitly makes student expressive rights contingent upon adherence to the

CIRCLE values, despite the fact the new Code was uploaded after Haskell received FIRE's letter advising that those provisions were constitutionally infirm.

149.    As of the date of this Complaint, the text of Haskell's Office of Student Rights website still contains only the placeholder "lorem ipsum" text, leaving Haskell students in the dark about their rights and responsibilities.

150.    As of the date of this Complaint, President Graham and other Haskell administrators have not approved the Indian Leader Association's 2020–21 Plan of Operations. Until President Graham and the Haskell administration officially approve the 2020–21 Plan and officially recognize the Indian Leader Association, it does not have an official adviser, it cannot receive additional funds to which it would be entitled, and while the Indian Leader Association has been able to access its Haskell Student Bank account a handful of times, it does not have regular, reliable access to its account or the funds therein.

## INJURY TO PLAINTIFFS

151.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

152.    Defendants' conduct has caused Plaintiffs injury by chilling their speech and other activity protected by the First Amendment. Plaintiffs have refrained from reporting on or publishing certain stories—including stories about the new Haskell meal plan fees, the Directive itself, and President Graham's dealings with the Kansas City Chiefs—as Nally reasonably feared disciplinary action under its terms for exercising their First Amendment rights.

153.    Defendants' conduct continues to cause Plaintiffs injury by chilling their speech and other activity protected by the First Amendment. Plaintiffs have continued to refrain from reporting on or publishing stories because they reasonably fear that Defendants could reinstate

the Directive, issue another prior restraint, or take substantially similar retaliatory action against them, particularly in light of Haskell's continued maintenance of a campus policy conditioning student speech rights on compliance with the CIRCLE values.

154.    As a direct and proximate cause of Defendants' actions, Plaintiffs have been chilled from publishing stories critical of the Haskell administration out of fear that such reporting will be considered "disrespectful" and thus subject to punishment.

155.    Defendants' conduct has also caused Plaintiffs difficulty in developing new content for *The Indian Leader*. Instead of pursuing potential stories, Plaintiffs have reasonably been concerned about whether Haskell's administration was going to take any further action against Nally or against the newspaper.

156.    Defendants' conduct has also injured Plaintiffs by frustrating their ability to recruit reporters because prospective reporters were (and are) concerned about unwarranted scrutiny or discipline from President Graham and other Haskell officials. Because the Directive made it difficult to recruit reporters, *The Indian Leader* was unable to fulfill its journalistic role because it did not have enough staff.

157.    As a direct and proximate cause of Defendants' actions, Nally has suffered harm to his ability to effectively serve as editor-in-chief and the Indian Leader Association has suffered harm to its ability to serve as a campus watchdog and report on the news.

158.    Defendants' conduct has also caused Nally financial injury. Nally received a $100 scholarship from Haskell, which he wanted to credit to his Student Bank account. Although Nally inquired about it twice, the $100 credit was never applied to his account. Defendants' conduct caused Nally not to pursue the issue because, as editor-in-chief of *The Indian Leader*, he was reasonably concerned that pursuing this personal issue would impact the paper's relationship

with the Student Bank, particularly given the Indian Leader Association's own issues with its Student Bank account.

159.    As a direct and proximate cause of Defendants' conduct, Nally has suffered emotional distress. For 90 days, Nally suffered as a student and student journalist operating under the threat of the Directive. Nally was reasonably worried about being disciplined because he did not know what journalistic activities or other expression President Graham would consider "disrespectful." The harsh tone and disciplinary threat contained in the Directive caused Nally anxiety and stress, resulting in the loss of sleep and difficulty in focusing on and completing course assignments. Nally continues to suffer this emotional distress because he reasonably fears that President Graham could reinstate the Directive, issue another prior restraint, or take other retaliatory action against him—particularly in light of Haskell's continued maintenance of a campus policy conditioning student speech rights on compliance with the CIRCLE values.

160.    Although President Graham rescinded the Directive, Nally remains a student subject to the Student Code of Conduct, and neither President Graham nor Haskell have repudiated the CIRCLE values invoked in the Directive or amended the Campus Expression policy which permits only that student expression that is consistent with the CIRCLE values.

161.    Defendants' conduct has also caused the Indian Leader Association to suffer quantifiable financial injury. As a direct and proximate cause of Defendants' actions, the Indian Leader Association has still not received the total amount of Haskell Student Activity Fees allocated to it by its 2020–21 Plan of Operations and the 1989 Settlement Agreement. Without any notice or explanation, Defendants have withheld more than $10,000 in funds to which the Indian Leader Association is entitled.

162.    Defendants' conduct also caused the Indian Leader Association other financial harm. As a direct and proximate cause of Defendants' actions, the Indian Leader Association has been unable to properly budget or assess its financials for over a year. As a direct and proximate cause of Defendants' actions, the Indian Leader Association did not incur costs because they did not have regular access to their Student Bank Account and did not know the available amount of their funds. For example, the Indian Leader Association did not print hard copy issues, host virtual events, develop a podcast, or invest in technology because Defendants' conduct impeded the Indian Leader Association's ability to ascertain whether it had enough funds for these expenditures.

163.    Defendants' conduct has also caused the Indian Leader Association other injuries. Until Haskell's administration, including President Graham, approves its 2020–21 Plan of Operations and officially recognizes it as a group, the Indian Leader Association does not have an official adviser, cannot receive additional funds, and is denied regular, reliable access to its Student Bank account and the funds therein.

164.    Defendants also caused Nally injury by violating his due process rights. In issuing the Directive, President Graham punished Nally without providing him with the due process protections provided for students in the Haskell Code of Student Conduct. Nally reasonably fears that President Graham could reinstate the Directive, issue another prior restraint, or take other retaliatory action against him again, without affording him due process protections.

165.    As a direct and proximate cause of Defendants' actions, Plaintiffs (and all Haskell students) are subject to unconstitutionally vague and overbroad policies regarding student expression. Reasonable students who read Haskell's Campus Expression policy would understand their protected expression to be subject to that provision.

166.    The chilling effect on Plaintiffs' expression posed by the imposition of the CIRCLE values on their campus expression is real.

167.    Haskell administrators, like President Graham, are willing to punish students for their expression, without due process, because it is "disrespectful."

168.    As demonstrated by Nally's experience, the threat that President Graham or another Haskell administrator could again punish Plaintiffs for their protected expression on campus under the Code of Student Conduct is not only real but likely without relief from this Court.

169.    The chilling effect on Plaintiffs' expression posed by the imposition of the CIRCLE values on their campus expression is substantial. Haskell's Campus Expression policy sweeps within its ambit a substantial amount of protected expression, including expression that is contrary to the CIRCLE values of "Respect" or "Integrity." A vast swath of protected expression is subject to this policy, and Plaintiffs have been chilled from engaging in such expression out of fear of discipline.

170.    Plaintiffs have a credible fear that expression that, for example, is critical of Haskell administrators, fails to show Haskell administrators sufficient "respect," or falls short of administrators' subjective definition of integrity, will subject them to punishment under the Code of Student Conduct on the basis that their expression violates the CIRCLE values.

171.    Because the Campus Expression policy, subject to the CIRCLE values, does not provide fair warning of exactly what expression it prohibits to a student of ordinary intelligence, the only way for Plaintiffs and all Haskell students to be sure to avoid punishment or discipline are to refrain from expressing their views, inhibiting the exercise of their expressive freedoms and causing a cognizable chilling effect on campus and in the classroom.

## FIRST CAUSE OF ACTION
### FIRST AMENDMENT RETALIATION AGAINST NALLY
**Unlawful Action Under 5 U.S.C. §§ 701–706 and the First Amendment**

172.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

173.    Plaintiffs bring this claim under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, for declaratory and injunctive relief against President Graham and Director Dearman (in their official capacities), Haskell Indian Nations University, and the Bureau of Indian Education.

174.    At all times relevant to this Complaint, Nally was engaged in constitutionally protected activity both as an individual and as a student journalist.

175.    Nally's routine journalistic activities, including requesting information from public officials, are protected by the First Amendment. A reporter's ability to gather news is an integral part of journalism without which "freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).

176.    Nally's criticism of Haskell officials and policies constitutes speech protected by the First Amendment. "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270 (1941) (footnote omitted); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) ("[D]ebate on public issues should be uninhibited, robust, and wide open and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.").

177.    The Directive, which is a prior restraint under which President Graham threatened to punish Nally if he continued to engage in protected activity, constitutes retaliatory action sufficient to chill Nally from continuing to exercise his First Amendment rights.

178.    The president of a public university threatening disciplinary action for failing to comply with strictures of a self-styled directive would chill any student of ordinary firmness from exercising their First Amendment rights.

179.    The Directive caused Nally to refrain from exercising his expressive rights when he chose not to report on and publish certain stories, such as a follow-up on his reporting on Haskell's changing student-fee structure.

180.    President Graham is clear in the Directive that it was substantially motivated by Nally's protected activity.

181.    President Graham cannot identify any non-retaliatory reason for the Directive.

182.    Director Dearman was copied on and tacitly approved the Directive. Director Dearman knew or should have known about the administrative error in failing to notify Nally, until January 13, 2021, that the Directive had been rescinded. Additionally, Director Dearman failed to take any meaningful corrective action, instead referring Nally's complaint to the Bureau of Indian Education Human Resources Department for an investigative process intended to address workplace harassment and discrimination.

183.    The Bureau of Indian Education was copied on and tacitly approved the Directive. The Bureau of Indian Education knew or should have known about the administrative error in failing to notify Nally, until January 13, 2021, that the Directive had been rescinded. Additionally, the Bureau of Indian Education failed to take any meaningful corrective action,

instead referring Nally's complaint to an internal investigative process intended to address workplace harassment and discrimination.

184.    As a direct and proximate result of Defendants' policies, Plaintiffs have suffered irreparable injury, including being deprived of their constitutional rights to free expression.

185.    The denial of constitutional rights is an irreparable injury *per se*. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

186.    Although the Directive was rescinded by President Graham, Nally reasonably fears similar retaliatory actions in the future and is continuing to refrain from exercising his right to engage in constitutionally protected expression and activity, particularly as the CIRCLE values President Graham invoked in the Directive remain in the Campus Expression policy. For example, Nally has not pursued, written, or published a story about President Graham's relationship with the Kansas City Chiefs.

187.    Plaintiff Nally has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to his First Amendment rights.

188.    Without declaratory and injunctive relief from this Court, Defendants' unconstitutional policies will continue and Plaintiffs will suffer irreparable harm indefinitely.

## SECOND CAUSE OF ACTION

### FIRST AMENDMENT RETALIATION AGAINST THE INDIAN LEADER ASSOCIATION— Unlawful Action Under 5 U.S.C. §§ 701–706 and the First Amendment

189.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

190.    The Indian Leader Association brings this claim under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, for declaratory and injunctive relief against President

Graham and Director Dearman (in their official capacities), Haskell Indian Nations University, and the Bureau of Indian Education.

191.    At all times relevant to this Complaint, members of the Indian Leader Association were engaged in constitutionally protected activity—like newsgathering and publishing—as student journalists.

192.    Courts have recognized that the press act as "surrogates for the public" in keeping a watchful eye on the operations of government. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573 (1980). This carries with it a right to gather information, *see Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."), and to publish content critical of government officials. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964) ("Criticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputations.").

193.    Reducing a student newspaper's funding or interfering with its editorial independence or ability to operate in response to constitutionally protected expression constitutes First Amendment retaliation. *See Koala v. Khosla*, 931 F.3d 887, 905 (9th Cir. 2019) (holding university violated First Amendment when it defunded student media in response to student newspaper's content); *Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir. 1983) ("A public university may not constitutionally take adverse action against a student newspaper, such as withdrawing or reducing the paper's funding, because it disapproves of the content of the paper.").

194.    By targeting the Indian Leader Association with a policy that removed its chosen adviser, withholding access to its funds, and imposing other financial and administrative hurdles,

Defendants unconstitutionally interfered with the Indian Leader Association's independence and caused them to refrain from incurring expenses to pursue journalistic and expressive activities, such as hosting virtual events and starting a podcast. *The Indian Leader* also struggled to recruit reporters, which continues to affect the paper's ability to publish as many stories. The Indian Leader Association remains without official recognition, and therefore without regular, reliable access to its funds, which makes it difficult to budget or plan future publications or events.

195.    Defendants cannot identify any non-retaliatory reasons for their actions, detailed above, against the Indian Leader Association.

196.    President Graham and the Haskell administration acted with the authority of Director Dearman and the BIE in failing to approve and sign the Indian Leader Association's 2020–21 Plan of Operations, and the Student Bank itself is subject to the authority of Director Dearman and the BIE.

197.    *The Indian Leader* has a long history of publishing content critical of the Haskell administration, such as stories critical of multiple misspellings on official signs placed around campus, covering delays in students receiving their financial aid award letters, and subpar amenities in certain dorm rooms—all in December of 2019.

198.    As a direct and proximate result of Defendants' actions and policies, the Indian Leader Association has suffered irreparable injury, including being deprived of their constitutional rights to free expression and freedom of the press under the First Amendment to the Constitution of the United States.

199.    The Indian Leader Association also struggled to retain reporters as a direct and proximate cause of President Graham's retaliatory action against the newspaper.

200.    The denial of constitutional rights is an irreparable injury *per se*. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

201.    The Indian Leader Association continues to operate without official university recognition, without an officially appointed adviser, and without regular, reliable access to its Student Bank account or the funds therein, which remain inexplicably short over $10,000.

202.    Plaintiff the Indian Leader Association has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to its First Amendment rights.

203.    Without declaratory and injunctive relief from this Court, Defendants' unconstitutional actions will continue and the Indian Leader Association will suffer irreparable harm indefinitely.

### THIRD CAUSE OF ACTION

**FIRST AMENDMENT RETALIATION AGAINST PLAINTIFFS**
**Claim for Damages Under *Bivens***
**Against President Graham in His Individual Capacity**

204.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

205.    Plaintiffs bring this claim under *Bivens* against President Graham in his individual capacity for retaliating against them for their constitutional rights.

206.    President Graham, as President of Haskell, is and was at all times relevant to this Complaint, a federal official.

207.    At all times relevant to this Complaint, Plaintiffs were engaged in constitutionally protected activity.

208.    President Graham has knowingly and purposely retaliated against Nally by subjecting him to a prior restraint on his protected expression, specifically by threatening disciplinary action if he continues to engage in protected activities specified in the Directive.

209.    President Graham has knowingly and purposely retaliated against the Indian Leader Association by refusing to complete the normal recognition process and thereby denying the Indian Leader Association access to its Student Bank account, withholding more than $10,000 in funds to which the Indian Leader Association is entitled, and also by targeting the group with policy that removed its chosen faculty adviser.

210.    President Graham cannot identify any non-retaliatory reasons for these actions. Indeed, President Graham is clear in the Directive that it was substantially motivated by Nally's protected activity.

211.    A reasonable official in President Graham's position would have known that the Directive violates the First Amendment. It is clearly established that enacting a prior restraint against a student by ordering them to refrain from constitutionally protected expression under threat of discipline is unconstitutional.

212.    A reasonable official in President Graham's position would have known that withholding funds and failing to approve the Indian Leader Association's 2020–21 Plan of Operations violates the First Amendment. It is clearly established that public institutions cannot constitutionally take adverse action against a student newspaper, such as reducing funding because it disapproves of its content, including the viewpoints expressed.

213.    There is an absence of any effective means, other than the judiciary, to enforce Plaintiffs' constitutional rights. There is no adequate alternative remedy for addressing Plaintiffs' past harms caused by President Graham's conduct in issuing the Directive.

214.     There are no factors in this case counseling hesitation in the absence of a damages remedy enacted by Congress.

215.     Money damages are appropriate to compensate Nally and the Indian Leader Association for their injuries.

216.     There are no statutory prohibitions against the relief sought.

217.     There is no exclusive statutory remedy.

## FOURTH CAUSE OF ACTION

### OVERBREADTH CHALLENGE TO THE CAMPUS EXPRESSION POLICY— Unlawful Action Under 5 U.S.C. §§ 701–706 and the First Amendment

218.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

219.     Plaintiffs bring this claim under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, for declaratory and injunctive relief against President Graham and Director Dearman (in their official capacities) and Haskell Indian Nations University and the Bureau of Indian Education.

220.     A regulation violates the First Amendment for overbreadth if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations and citations omitted).

221.     At least one policy contained in the Code of Student Conduct is unconstitutionally overbroad on their face because it allows Defendants to punish a broad range of protected speech.

222.     The Campus Expression policy circumscribes students' First Amendment rights by requiring adherence to subjective CIRCLE values.

223.    Defendants cannot restrict the right to free expression by making it contingent on compliance with subjective CIRCLE values, like integrity and respect.

224.    The First Amendment protects student expression even when it might be seen by university leadership as lacking integrity or being disrespectful. *See, e.g.*, *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (reversing graduate student's expulsion for distributing student newspaper on campus and finding that the "mere dissemination of ideas—no matter how offensive to good taste—on a [public] university campus may not shut off in the name alone of 'conventions of decency.'").

225.    "As a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011).

226.    A government entity cannot mandate that individuals be respectful or demonstrate integrity in their expression.

227.    Defendants—and the employees and agents of the agency defendants—are responsible for developing, adopting, implementing, disseminating, and enforcing the Campus Expression policy in the Code of Student Conduct, and they exercise federal authority in carrying out those responsibilities.

228.    Defendants knew or reasonably should have known that the challenged policy would lead to the deprivation of students' constitutional rights.

229.    Indeed, even after President Graham was advised that the Campus Expression policy was constitutionally infirm, Haskell uploaded a revised "Spring 2021–Fall 2021 Student Code of Conduct" that still included the challenged policy.

230.    Defendants' policies on students' expressive rights, specifically the Campus Expression policy, circumscribe rights guaranteed to students by the First Amendment and are thus contrary to a constitutional right.

231.    Defendants' policies on students' expressive rights, specifically the Campus Expression policy, are in excess of statutory jurisdiction and authority in part because they violate 25 C.F.R. § 42.1(a)(1), which requires schools funded by the Bureau of Indian Affairs, to "[r]espect the constitutional, statutory, civil and human rights of individual students."

232.    As a direct and proximate result of Defendants' policies, Plaintiffs have suffered irreparable injury, including being deprived of their constitutional rights to free expression.

233.    The denial of constitutional rights is an irreparable injury *per se. See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

234.    Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights.

235.    Without declaratory and injunctive relief from this Court, Defendants' unconstitutional policies will continue and Plaintiffs will suffer irreparable harm indefinitely.

## FIFTH CAUSE OF ACTION

### VAGUENESS CHALLENGE TO CODE OF CONDUCT
### Unlawful Action under 5 U.S.C. §§ 701–706 and the First and Fifth Amendments

236.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

237.    Plaintiffs bring this claim under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, for declaratory and injunctive relief against President Graham and Director Dearman (in their official capacities) and Haskell Indian Nations University and the Bureau of Indian Education.

238.     A regulation is unconstitutionally vague if a person of ordinary intelligence cannot distinguish between permissible and prohibited conduct. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

239.     The Campus Expression policy is unconstitutionally vague because it fails to give ordinary students fair notice of what expression complies with subjective CIRCLE values.

240.     The Campus Expression policy is also unconstitutionally vague because without standards for clear and consistent application as to what expression complies with subjective CIRCLE values, it encourages arbitrary and erratic enforcement.

241.     The Campus Expression policy also encourages viewpoint discrimination because it suppresses expression that Defendants deem to be lacking sufficient integrity or respect.

242.     President Graham explicitly threatened Nally with discipline for expression he deemed to lack appropriate respect, one of the CIRCLE values.

243.     Defendants—and the employees and agents of the institutional defendants—are responsible for developing, adopting, implementing, disseminating, and enforcing the challenged policy in the Code of Student Conduct, and exercise federal authority in carrying out those responsibilities.

244.     Defendants knew or reasonably should have known that the challenged policy would lead to the deprivation of students' constitutional rights.

245.     Indeed, even after President Graham was advised that the Campus Expression policy was constitutionally infirm, Haskell uploaded a revised "Spring 2021–Fall 2021 Student Code of Conduct" that still included the challenged policy.

246. Defendants' policies on students' expressive rights, specifically the Campus Expression policy, circumscribe rights guaranteed to students by the First and Fifth Amendments and are thus contrary to a constitutional right.

247. Defendants' policies on students' expressive rights, specifically the Campus Expression policy, are in excess of statutory jurisdiction and authority in part because they violate 25 C.F.R. § 42.1(a)(1), which requires schools funded by the Bureau of Indian Affairs, to "[r]espect the constitutional, statutory, civil and human rights of individual students."

248. As a direct and proximate result of Defendants' policies, Plaintiffs have suffered irreparable injury, including being deprived of their constitutional rights to free expression.

249. The denial of constitutional rights is an irreparable injury *per se. Elrod v. Burns*, 427 U.S. 347, 373 (1976).

250. Plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First and Fifth Amendment rights.

251. Without declaratory and injunctive relief from this Court, Defendants' unconstitutional policies will continue and Plaintiffs (and other Haskell students) will suffer irreparable harm indefinitely.

## SIXTH CAUSE OF ACTION

### VIOLATION OF DUE PROCESS
### Unlawful Agency Action Under 5 U.S.C. §§ 701–706 and the Fifth Amendment

252. Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

253. Plaintiffs bring this claim under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, for declaratory and injunctive relief against President Graham and Director

Dearman (in their official capacities) and Haskell Indian Nations University and the Bureau of Indian Education.

254.    Haskell's Code of Student Conduct sets forth necessary procedures that must be followed to guarantee students due process protections guaranteed by the Fifth Amendment and 25 C.F.R. § 42.8.

255.    Without affording any process, President Graham unilaterally issued Nally the Directive, which limited his expressive rights under threat of further punishment.

256.    Without affording any process, Defendants subjected Nally to the requirements of the Directive for 90 days.

257.    The recission of the Directive constitutes voluntary cessation by Defendants.

258.    Nally reasonably fears Defendants may reissue the Directive or a substantially similar prior restraint on his expressive rights.

259.    Defendants knew or reasonably should have known that these actions would deprive Nally of his due process rights.

260.    Defendants' conduct in relation to the Directive violates Plaintiffs' due process rights guaranteed by the Fifth Amendment, and thus contrary to a constitutional right.

261.    Defendants' conduct in relation to the Directive is in excess of statutory jurisdiction and authority in part because they violate 25 C.F.R. § 42.1, which requires schools funded by the Bureau of Indian Affairs, to "[r]espect the constitutional, statutory, civil and human rights of individual students" and 25 C.F.R. § 42.8.

262.    As a direct and proximate result of Defendants' policies, Nally has suffered irreparable injury, including being deprived of his constitutional rights to due process.

263.    The denial of constitutional rights is an irreparable injury *per se*. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

264.    Nally has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to his Fifth Amendment right to due process.

265.    Without declaratory and injunctive relief from this Court, Defendants' unconstitutional actions will continue and Nally will suffer irreparable harm.

### SEVENTH CAUSE OF ACTION
### Violation of 1989 Settlement Agreement
### Unlawful Agency Action Under 5 U.S.C. §§ 701–706

266.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

267.    The 1989 Settlement Agreement restricts Haskell University's oversight and editorial control over *The Indian Leader* and protects the independence and expressive rights of its student journalists.

268.    Defendants are subject to the terms of the 1989 Settlement Agreement.

269.    Defendants have violated the terms of 1989 Settlement Agreement by imposing a prior restraint in the form of the Directive, inhibiting the free expression of members of the Indian Leader Association, refusing to approve the Indian Leader Association's 2020–21 Plan of Operations, and otherwise interfering with the Indian Leader Association's editorial control.

270.    Defendants have violated the terms of the 1989 Settlement Agreement by withholding funds to which the Indian Leader Association is entitled, denying the Indian Leader Association access to its Student Bank account, and failing to send monthly account statements.

271.    Additionally, application of the Campus Expression policy to Nally and members of the Indian Leader Association violates the 1989 Settlement Agreement by restricting their expressive rights.

272.    As a direct and proximate result of Defendants' failure to abide by the 1989 Settlement Agreement, Plaintiffs have suffered injuries, including but not limited to the more than $10,000 of withheld funds and the denial of their First Amendment rights.

273.    This Court has equitable powers to enforce the terms of the 1989 Settlement Agreement and issue a mandatory injunction requiring Defendants to comply with its terms and order restitution of withheld funds.

274.    Without declaratory and injunctive relief from this Court, Defendants' violation of its obligations under the 1989 Settlement Agreement will continue and Plaintiffs will suffer irreparable harm indefinitely.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Nally and the Indian Leader Association respectfully request that this Court enter judgment against Defendants and issue the following forms of relief:

A.    Declaratory relief against Defendants declaring that:

1.    the October 16, 2020 Directive constituted an unconstitutional prior restraint;

2.    Defendants unconstitutionally retaliated against Nally because of Nally's protected speech and activities under the First Amendment to the U.S. Constitution;

3.    Defendants unconstitutionally retaliated against the Indian Leader Association because of *The Indian Leader*'s protected journalistic activities under the First Amendment to the U.S. Constitution;

4.      Defendants' Campus Expression policy in Haskell's Code of Student Conduct is facially overbroad on its face under the First Amendment to the U.S. Constitution;

5.      Defendants' Campus Expression policy is void for vagueness under the First and Fifth Amendments to the U.S. Constitution;

6.      President Graham violated Nally's due-process rights in issuing the Directive;

7.      Defendants' retaliatory conduct and policies on students' expressive rights, including the Campus Expression policy in Haskell's Code of Student Conduct, are *ultra vires* and not in accordance with law because they violate the 1989 Settlement Agreement, insofar as they censor Plaintiffs and restrict student editorial control of *The Indian Leader*, and because they violate Part 42 of Title 25 of the Code of Federal Regulations.

B.      Injunctive relief against Defendants:

1.      permanently enjoining Defendants, including President Graham or his successors, from reinstating the October 16, 2020 Directive or any other prior restraint or promulgating any substantially similar directive that interferes with Plaintiffs' First Amendment rights;

2.      permanently enjoining Defendants from taking any other retaliatory action against Plaintiffs for protected activity;

3.      preliminarily and permanently enjoining enforcement of Defendants' Campus Expression policy contained in Haskell's Code of Student Conduct;

4.      permanently enjoining Defendants, including President Graham or his successors, from promulgating any directive or issuing any disciplinary action without

complying with the student disciplinary processes outlined in Title 25, Part 42 of the Code of Federal Regulations and the Haskell Code of Student Conduct;

       5.    mandating that Defendants comply with the 1989 Settlement Agreement including recognizing the Indian Leader Association, approving its 2020–21 Plan of Operations, restoring its access to its Student Bank account; restore any funds to which the Indian Leader Association is entitled; and allow their chosen adviser to continue to serve in that role.

    C.    An award of monetary damages against President Graham in his individual capacity in an amount to be determined by the Court to compensate Plaintiffs for President Graham's unconstitutional interference with Plaintiffs' rights under the U.S. Constitution;

    D.    An award of nominal damages against President Graham for violating Plaintiffs' rights under the U.S. Constitution;

    E.    An award of punitive damages against President Graham in his individual capacity for his reckless and callous disregard for Plaintiffs' First Amendment rights;

    F.    An award of attorneys' fees and costs under the Equal Access to Justice Act and other applicable law; and

    G.    All other further legal and equitable relief as the Court may deem just and proper.

## JURY DEMAND

    In compliance with Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

DATED:    March 2, 2021

Respectfully submitted,

/s/ *Stephen Douglas Bonney*
STEPHEN DOUGLAS BONNEY
KS. Bar No. 12322

5542 Crestwood Drive
Kansas City, MO 64110
(816) 363–3675
sdbonney@outlook.com

DARPANA M. SHETH*
NY Bar No. 4287918
KATLYN A. PATTON*
PA Bar No. 328353; OH Bar No. 097911
* Motions for Admission *Pro Hac Vice* forthcoming
FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (215) 717-3440
darpana.sheth@thefire.org
katlyn.patton@thefire.org

*Counsel for Plaintiffs Jared Nally and the Indian Leader Association*