**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY-LEAVENWORTH DIVISION**

| | |
|---|---|
| JARED NALLY, ET AL., | |
| *Plaintiffs,* | CIVIL ACTION NO.: 21-2113 |
| v. | |
| RONALD GRAHAM, ET AL., | JURY TRIAL DEMANDED |
| *Defendants.* | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT RONALD GRAHAM'S MOTION TO DISMISS
PLAINTIFFS' THIRD CAUSE OF ACTION**

STEPHEN DOUGLAS BONNEY
KS. Bar No. 12322
5542 Crestwood Drive
Kansas City, MO 64110
(816) 363-3675
sdbonney@outlook.com

DARPANA M. SHETH
NY Bar No. 4287918
KATLYN A. PATTON
PA Bar No. 328353; OH Bar No. 097911
Admitted *Pro Hac Vice*
FOUNDATION FOR INDIVIDUAL
  RIGHTS IN EDUCATION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (215) 717-3440
darpana.sheth@thefire.org
katlyn.patton@thefire.org

*Counsel for Plaintiffs Jared Nally and the Indian Leader Association*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iv

STATEMENT OF NATURE OF THE MATTER .......................................... 1

INTRODUCTION ........................................................................................... 1

STATEMENT OF FACTS ............................................................................. 3

   I.   PLAINTIFFS' PROTECTED JOURNALISTIC ACTIVITIES DRAW THE IRE OF DEFENDANT GRAHAM. .................................................................. 4

       A.   Nally Investigates Haskell's Response to the 2020 U.S. Census. .......... 4

       B.   Nally Criticizes Haskell's Decision to Increase Student Fees. ............... 6

       C.   Nally and the Indian Leader Association Object to the Replacement of Their Faculty Adviser with an Administrator. ....................................... 6

       D.   Nally Reports on a Haskell Employee's Death. ...................................... 7

   II.   IN RETALIATION FOR THIS ACTIVITY PROTECTED BY THE FIRST AMENDMENT, GRAHAM ISSUED A "DIRECTIVE," IMPOSING A PRIOR RESTRAINT ON NALLY .......... 8

   III.   GRAHAM REFUSES TO RECOGNIZE THE INDIAN LEADER ASSOCIATION AFTER CRITICAL COVERAGE IN *THE INDIAN LEADER* ....................................... 11

   IV.   THE DIRECTIVE IS RESCINDED AND GRAHAM IS REMOVED AS PRESIDENT AMIDST ALLEGATIONS OF FIRST AMENDMENT VIOLATIONS ............................................... 14

STATEMENT OF THE QUESTIONS PRESENTED .................................. 15

ARGUMENT .................................................................................................. 16

   I.   STANDARD OF REVIEW. ......................................................................... 16

   II.   GRAHAM VIOLATED CLEARLY ESTABLISHED LAW PROHIBITING FIRST AMENDMENT RETALIATION AND THUS CANNOT CLAIM QUALIFIED IMMUNITY. .. 17

       A.   Under the Qualified-Immunity Standard, the Unlawfulness of Graham's Conduct Was "Apparent." ....................................................... 17

       B.   Plaintiffs State a Claim for First Amendment Retaliation. ................. 19

           1.   Nally and the Indian Leader Association engaged in constitutionally protected activity .............................................. 19

2. A reasonable person would have been chilled by Graham's retaliatory conduct. .................................................................... 23

3. Graham's retaliatory conduct was motivated by Plaintiffs' protected activity........................................................................... 24

C. Clearly Established First Amendment Law Bars Retaliatory Conduct Against Nally and the Indian Leader Association. .............................. 26

D. The Supreme Court's Pending Decision in *Mahanoy Area School District v. B.L.* Has No Relevance Here................................................. 28

III. PLAINTIFFS PROPERLY SEEK DAMAGES FOR FIRST AMENDMENT RETALIATION. . 29

A. As Four Other Courts Have Ruled, the Judiciary Is Well-Suited to Consider Damages Claims for First Amendment Retaliation By Federal Officers. ........................................................................................... 29

B. None of the Special Factors Asserted By Defendant Graham Warrant Leaving Plaintiffs Without Any Remedy for Their Past Harm. ........... 31

1. No alternative remedial structures address Plaintiffs' past harm. .............................................................................................. 32

2. Recognizing a *Bivens* remedy here poses no threat to the separation of powers. .............................................................. 36

a. *The Westfall Act endorses a* Bivens *remedy for constitutional violations.* ..................................................... 36

b. *Congressional silence concerning Plaintiffs' specific claim is not dispositive here.* ....................................................... 39

C. Practical Concerns Also Do Not Counsel Hesitation Before Recognizing Plaintiffs' *Bivens* Claim. ......................................................... 41

1. Defendant's concern about extending *Bivens* to the area of school administration is without merit. ................................................. 41

2. First Amendment retaliation claims are workable. ................... 43

CONCLUSION ......................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Avance*, 491 Fed. Appx. 1 (10th Cir. 2012) ..................................................... 26

*Antonelli v. Hammond*, 308 F. Supp. 1329 (D. Mass. 1970)...................................... 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................ 16, 33

*Barnes v. Zaccari*, 592 Fed. Appx. 859 (11th Cir. 2015)............................................ 27

*Bates v. Clark*, 95 U.S. 204 (1877) ............................................................................ 37

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................ 16

*Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853 (10th Cir. 2016) ........... 33

*Bistrian v. Levi*, 912 F.3d 79 (3rd Cir. 2018)............................................................... 34

*Bivens v. Six Unnamed Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)
.................................................................................................................... *passim*

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) ............................................... 22

*Boule v. Egbert*, 998 F.3d 370 (9th Cir. 2021) ..................................................... *passim*

*Branzburg v. Hayes*, 408 U.S. 665 (1972)................................................................... 22

*Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008) .................................... 26

*Butz v. Economou*, 438 U.S. 478 (1978)...................................................................... 42

*Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323 (10th Cir. 2007) ................ 26

*Clark v. Wilson*, 625 F.3d 686 (10th Cir. 2010).......................................................... 18

*Davis v. Passman*, 442 U.S. 228 (1979) ..................................................................... 35

*Dyer v. Smith*, No. 3:19-cv-921, 2021 WL 694811 (E.D. Va. Feb. 23, 2021) ........ 31, 45

*Edison v. Owens*, 515 F.3d 1139 (10th Cir. 2008)...................................................... 18

*Garcia v. City of Trenton*, 348 F.3d 726 (8th Cir. 2003) ............................................. 23

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ................................................................. 30

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ........................................... 21

*Healy v. James*, 408 U.S. 169 (1972) ........................................................ 2, 27, 28, 29

*Hernandez v. Mesa*, 140 S. Ct. 735 (2020) .................................................. 30

*Himmelreich v. Fed. Bureau of Prisons*, No. 4:10CV2404, 2019 WL 4694217 (N.D. Ohio Sept. 25, 2019) .................................................................... 31, 34, 45

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................... 18

*Hui v. Castaneda*, 559 U.S. 799 (2010)....................................................... 38

*Husain v. Springer*, 494 F.3d 108 (2d Cir. 2007) ..................................... 21, 28

*I.G. v. Jefferson Cnty. Sch. Dist.*, 452 F. Supp. 3d 989 (D. Colo. 2020)............... 23, 24

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 408 F.Supp.3d 960 (S.D. Iowa 2019) ................................................................................... 42

*Jerra v. United States*, No. 2:12-cv-01907, 2018 WL 1605563 (C.D. Cal. Mar. 29, 2018) ..................................................................................... 31, 34, 45

*Joyner v. Whiting*, 477 F.2d 456 (4th Cir. 1973) ....................................... 28

*Klen v. City of Loveland*, 661 F.3d 498 (10th Cir. 2011)............................... 17

*Koala v. Khosla*, 931 F.3d 887 (9th Cir. 2019) ....................................... 21, 28

*Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259 (3d Cir. 2007) ..................... 44

*Mahanoy Area School District v. B.L.*, No. 20-255 (U.S.) .................................... 17, 28

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) .......................................... 2

*Minneci v. Pollard*, 565 U.S. 118 (2012) ............................................... 32, 33

*Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009)........... 33

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)................................... 21

*Papish v. Bd. of Curators of the Univ. of Mo.*, 331 F. Supp. 1321 (W.D. Mo. 1971)..20

*Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973) .............. 20, 27, 29

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)................................ 22

*Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).........20, 28

*Schiff v. Williams*, 519 F.2d 247 (5th Cir. 1975)....................................... 28

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ................................ 23, 24

*Stanley v. Magrath*, 719 F.2d 279 (8th Cir. 1983) ..................................................... 28

*Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) ...................................................................... 38

*Thomas v. Collins*, 323 U.S. 516 (1945)....................................................................... 22

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .......................... 22

*Tiumalu v. Garden City Cmty. Coll.*, No. 20-2193-KHV, 2021 WL 1817844 (D. Kan. May 6, 2021) ....................................................................................................... 32, 42

*Trujillo v. Love*, 322 F.Supp. 1266 (D. Colo. 1971) .................................................... 28

*Ulrich v. City of San Francisco*, 308 F.3d 968 (9th Cir. 2002) ................................... 44

*Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154 (D. Kan. 2017) ........... 16, 25, 33

*Wenk v. O'Reilly*, 783 F.3d 585 (6th Cir. 2015) .......................................................... 44

*Wilkie v. Robbins*, 551 U.S. 537 (2007)....................................................................... 41

*Woods v. Moss*, 572 U.S. 744 (2014)..................................................................... 16, 30

*Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000) ..................................... 19, 25, 43, 44

*Youngblood v. Qualls*, 308 F. Supp. 3d 1184 (D. Kan. 2018) ............................... 17, 18

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).......................................................... *passim*

**Statutes**

25 U.S.C. § 13............................................................................................................ 40

25 U.S.C. § 5342........................................................................................................ 40

28 U.S.C. § 1346........................................................................................................ 37

28 U.S.C. § 2671 *et seq.*......................................................................................... 37, 38

42 U.S.C. § 1983.............................................................................................. 3, 32, 41, 42

Johnson O'Malley Act, Pub. L. No. 73-167, 48 Stat. 596........................................... 40

Kan. Stat. Ann. § 21-6101(a)(1) ................................................................................. 22

Kan. Stat. Ann. § 45-215 *et seq.* ............................................................................... 22

Snyder Act, Pub. L. No. 67-85, 42 Stat. 208 ................................................................ 40

**Other Authorities**

James E. Pfander, Alexander A. Reinert & Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When* Bivens *Claims Succeed*, 72 Stan. L. Rev. 561 (2020) ............................................................................................................... 42, 43

Lauren Fox, *Haskell Faculty Senate unanimously declares no confidence in university's president, citing "disregard for academic freedom" and free speech, among other complaints*, Lawrence Journal-World (Apr. 2, 2021, 12:44 PM), https://www2.ljworld.com/ news/ general-news /2021/apr/02/haskell-faculty-senate-unanimously-declares-no-confidence-in-president/ .................................... 15

Poynter Staff, *The Haskell Indian Nations University president who muzzled free speech is out*, Poynter (May 13, 2021), https://www.poynter.org/newsletters/2021/the-haskell-indian-nations-university-president-who-muzzled-free-speech-is-out/ ............................................................ 15

*School Directory*, BUREAU OF INDIAN EDUC., https://www.bie.edu/schools/directory 40

Sina Kian, *The Path of the Constitution: The Original System of Remedies, How It Changed, and How the Court Responded*, 87 N.Y.U. L. Rev. 132 (2012) .............. 37

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 16, 45

## STATEMENT OF NATURE OF THE MATTER

Student journalists bring this First Amendment lawsuit against Haskell Indian Nations University (Haskell)—a federally operated tribal university—and its administrators. Plaintiff Jared Nally is a student and editor-in-chief of Haskell's editorially independent student newspaper, *The Indian Leader*. Pls.' Compl. ¶¶ 12–13, ECF No. 1. Plaintiff the Indian Leader Association is an unincorporated student association that manages and publishes *The Indian Leader*. *Id.* ¶ 14. Plaintiffs bring seven causes of action, primarily seeking declaratory and injunctive relief to remedy constitutional violations. Defendants filed their answer on June 1, 2021.

Plaintiffs' Third Cause of Action also seeks damages against former Haskell President Defendant Ronald J. Graham, personally, for retaliating against their journalistic activities protected by the First Amendment. *Id.* ¶¶ 204–17. After this lawsuit was filed, Graham was removed as President, at least in part due to his disregard for the free speech rights of Haskell students and faculty. Nevertheless, Defendant Graham now moves to dismiss Plaintiffs' damages claim arguing that: (1) Plaintiffs cannot state a First Amendment retaliation claim under *Bivens v. Six Unnamed Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971); and (2) he is entitled to qualified immunity.

## INTRODUCTION

Defendant Graham does not—and cannot—dispute that he was bound by the First Amendment while serving as Haskell's President. The Supreme Court established nearly a half-century ago that First Amendment protections apply with

1

full force on public university campuses, as in the community at large. *Healy v. James*, 408 U.S. 169, 180 (1972). Students at Haskell, a public institution operated and managed by the federal government, should be no exception to this rule.

Graham violated clearly established law prohibiting retaliation when he imposed a prior restraint on Nally in a so-called "Directive" and interfered with the operations and funding of the Indian Leader Association in response to critical coverage in the paper and protected newsgathering, reporting, and expression. The university, for its part, implicitly has acknowledged the blatant unlawfulness of Graham's conduct. It revoked the unconstitutional Directive that Graham issued to Nally, then removed Graham from his post as President of Haskell amidst allegations of First Amendment violations, including those detailed in this suit.

Despite these flagrant constitutional violations, Graham seeks to dismiss Plaintiffs' claim for damages on the grounds that he is essentially immune from any legal consequences for the harm he caused Plaintiffs to suffer under either the doctrine of qualified immunity or the Supreme Court's recent interpretation of *Bivens*. Granting Graham's motion to dismiss would upend the "general and indisputable rule" that "where there is a legal right, there is a legal remedy." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (quotations omitted).

This Court should accordingly reject Graham's attempt to escape liability for the constitutional harms he inflicted on Plaintiffs by flagrantly violating their First Amendment rights. Graham is not entitled to qualified immunity because the unlawfulness of his conduct was clear. And this Court should follow the decisions of

the four other lower courts that have found a *Bivens* remedy for First Amendment retaliation claims because special factors do not counsel hesitation in allowing the claims to proceed. Plaintiffs' claim here, like in those other prior cases, satisfies the two-part test for *Bivens* claims the Supreme Court outlined in *Abbasi*. Only damages—a remedy that would be available to virtually all other public college and university students through run-of-the-mill suits under 42 U.S.C. § 1983—can make Plaintiffs whole for Graham's past violation of their constitutional rights. Granting the motion to dismiss would mean that students at a federally operated university have fewer protections against First Amendment violations than those at state-operated colleges and universities nationwide. This runs counter to not only a general sense of fairness, but also the principle that where there is a legal right there is a legal remedy.

## STATEMENT OF FACTS

Between March and October of 2020, Plaintiff Nally engaged in various constitutionally protected newsgathering, reporting, and advocacy activities that were critical of Haskell's administration. In an October 16, 2020 "Directive," Defendant Graham imposed a prior restraint on Nally forbidding him from engaging in similar protected activities in the future. Moreover, during Graham's tenure as Haskell's President, he and his administration erected significant obstacles to the operation of the Indian Leader Association. After Plaintiffs' counsel advised Defendants of Graham's unconstitutional retaliation, the Directive was eventually rescinded. And after Plaintiffs sued, Graham was removed as President

of Haskell amidst allegations of First Amendment violations, including those detailed in this suit.

## I.   PLAINTIFFS' PROTECTED JOURNALISTIC ACTIVITIES DRAW THE IRE OF DEFENDANT GRAHAM.

Plaintiff Jared Nally, an enrolled member of the Miami Tribe of Oklahoma, is a student at Defendant Haskell and editor-in-chief of its editorially independent student newspaper, *The Indian Leader*, which is managed and published by Plaintiff Indian Leader Association, an unincorporated student association. Compl. ¶¶ 11–14. In the fall of 2019, during his first semester at Haskell, Nally started reporting for *The Indian Leader*—an award-winning publication and the oldest Native American student newspaper in the country. *Id.* ¶ 12–14. He became editor-in-chief in January 2020. *Id.* ¶ 13. At the time Plaintiffs filed this lawsuit, Nally had written over 60 articles for *The Indian Leader*. *Id.*

Between March and October of 2020, Nally and the Indian Leader Association engaged in a number of newsgathering, reporting, and advocacy activities that angered Graham. *Id.* ¶ 47. Each of these activities, protected by the First Amendment, occurred on campus, involved stories published in *The Indian Leader*, or involved Nally requesting information from local public officials. *Id.* ¶ 48–79. In his October 16 Directive, Graham specifically cited the following four protected activities to justify imposing a prior restraint on Nally.

### A.   Nally Investigates Haskell's Response to the 2020 U.S. Census.

In March 2020, Nally raised questions and complaints concerning Haskell's reporting of student data in response to the 2020 U.S. Census. *Id.* ¶ 48–57. Because

many students who typically resided on Haskell's campus during the academic year were displaced due to the COVID-19 pandemic, Nally was investigating the accuracy of census reporting of students, which would affect funding for public services. *Id.* ¶ 48. Nally wrote and published an article in *The Indian Leader* advising students that Haskell would be completing the census on behalf of students who would have been living on campus if it weren't for the pandemic, and that students and their parents should not report students on the census form individually to avoid double counting. *Id.* ¶ 50.

During this investigation, Nally also became concerned that Haskell had reported all students to the Census Bureau as only Native American, including those who also identify as another race or ethnicity, and had not asked students to self-report racial or gender identities. *Id.* ¶¶ 51–52. Concerned that this practice was discriminating against biracial students (Nally is also of Volga German descent), Nally emailed several inquiries to Haskell Vice President of University Services, Tonia Salvini. *Id.* ¶¶ 11, 53. Salvini also serves on the Community Police Review Board in Lawrence, Kansas, where Haskell's campus is located, in which capacity she is responsible for reviewing claims of racial bias in policing. *Id.* ¶ 54. After Salvini failed to respond to Nally's inquiries, he voiced his concerns at a public meeting of the Community Police Review Board. *Id.* ¶¶ 55–56. Given Salvini's role on the board, Nally thought it was appropriate to raise the issue of potential discrimination against biracial Haskell students at the public meeting of the board.

*Id.* ¶ 56. Nally also submitted a grievance to Graham regarding his personal concerns about Haskell's handling of the 2020 census. *Id.* ¶ 57.

**B.      Nally Criticizes Haskell's Decision to Increase Student Fees.**

On July 10, 2020, Nally published an editorial in *The Indian Leader* criticizing Haskell's decision to increase student fees for all students to $715 despite a decrease in services provided to students due to the COVID-19 pandemic.[1] *Id.* ¶ 63. As part of his investigation into the increase in student fees, Nally lawfully recorded a conversation with a Haskell financial-aid officer. *Id.* ¶ 61.

**C.      Nally and the Indian Leader Association Object to the Replacement of Their Faculty Adviser with an Administrator.**

Nally and the Indian Leader Association also objected to the replacement of their faculty adviser with an adviser from Haskell's administration. *Id.* ¶¶ 64–72. In the summer of 2020, during the COVID-19 pandemic, the Indian Leader Association was the only active student organization. *Id.* ¶ 65. Haskell changed its student organization policy to require that faculty cease serving as advisers to student organizations, and replaced them with members of the administration. *Id.* ¶¶ 64, 67. Accordingly, the Indian Leader Association's adviser, Rhonda LeValdo, was replaced as adviser by administrator Joshua Falleaf. *Id.* ¶ 64. At the time, LeValdo was a faculty member and the only Haskell employee with journalism experience. *Id.* ¶¶ 64, 71.

---

[1] Before the 2020–2021 academic year, Haskell charged on-campus students $715 and off-campus students $240 in student fees for each semester, because off-campus students were not provided some of the services traditionally covered by the fees, such as campus housing and food services. *Id.* ¶ 60.

Given a history of administrative interference with *The Indian Leader*'s editorial independence, Nally and the Indian Leader Association criticized Haskell's replacement of their adviser and change in policy. *Id.* ¶¶ 22–30, 67; Compl. Ex. A. The Indian Leader Association revised its Plan of Operations to include new procedures for the appointment and removal of the Association's faculty adviser. *Id.* ¶¶ 69–70. Plaintiffs also attempted to remove Falleaf as adviser and operate without an adviser for the remainder of the summer of 2020.[2] *Id.* ¶ 68.

### D.    Nally Reports on a Haskell Employee's Death.

On October 4, 2020, a Haskell food-service employee and alumnus died. *Id.* ¶ 73. As one of few students who remained on campus in the summer of 2020, Nally became friends with this employee. *Id.* ¶ 74. Haskell had not notified students of the employee's passing, which has been the university's previous practice with deaths in the community, and Nally learned of the employee's death only when he saw posts from others on the employee's social media page. *Id.* ¶¶ 75–76. As *The Indian Leader* typically covers deaths in the Haskell community, Nally began

---

[2] In 1989, the Indian Leader Association entered into a settlement agreement with Haskell (then known as Haskell Indian Junior College) that allows it to amend its Plan of Operations and operate without an adviser. *See* Compl. Ex. A, Settlement Agreement, at 4, ¶ 3(c). The Settlement Agreement provides that, among other things, the Indian Leader Association will retain editorial control of *The Indian Leader*, Haskell will not interfere with the publication of *The Indian Leader*, and Haskell will not refuse to approve the Indian Leader Association's Plan of Operations or neglect to disburse funds upon the request of the Indian Leader Association. *Id.* at 3–4, ¶ 3. While Plaintiffs' Seventh Cause of Action seeks to compel Defendants to comply with the Settlement Agreement, Plaintiffs' Third Cause of Action, the only one Graham seeks to dismiss, *see* Def.'s Mot. to Dismiss, ECF No. 19, does not involve the Settlement Agreement but rather only clearly established law prohibiting retaliation against the student press.

gathering information about the death and how the Haskell community could pay their respects. *Id.* ¶ 77. As part of his newsgathering, Nally emailed the Lawrence Police Department requesting information about the food-service employee's death and identifying himself as a student journalist from *The Indian Leader*. *Id.* ¶ 78. Nally then published a story about the employee's death in the October 9th issue of *The Indian Leader*. *Id.* ¶ 79.

## II. IN RETALIATION FOR THIS ACTIVITY PROTECTED BY THE FIRST AMENDMENT, GRAHAM ISSUED A "DIRECTIVE," IMPOSING A PRIOR RESTRAINT ON NALLY.

Citing the above four instances of protected newsgathering, reporting and expression, Graham emailed Nally a memorandum with the subject heading, "Directive." *Id.* ¶ 81. Defendant Tony Dearman, Director of the Bureau of Indian Education (BIE), and "BIE Legal" were copied on the Directive. *Id.* Throughout the Directive, Graham claimed that Nally's criticism or unfavorable coverage of Haskell, its administration, or faculty amounted to "attacks." *Id.* ¶¶ 82, 84–85.

Graham justified the Directive by informing Nally that he had "been identified recently, and on more than one occasion, as someone who routinely attacks Haskell employees with letters." *Id.* ¶ 85. Citing Nally's verbal complaint about Vice President Salvini at the open meeting of the Community Police Review Board, Graham's Directive claimed Nally "attacked a Haskell official during a community event." *Id.* Graham also claimed Nally had "been identified as calling the police department" and "demanding" information "regarding a deceased Haskell employee while representing yourself as an editor for *The Indian Leader*" (i.e., the Haskell food-service employee Nally had befriended). *Id.* ¶ 86.

Graham went on to forbid Nally from contacting the police department—or any other government agency—to demand anything "on behalf of the university." *Id.* Graham then suggested Nally's protected journalistic activities violated the Haskell Code of Student Conduct, and "remind[ed]" Nally that he is "a student first and foremost" whose "conduct falls under the umbrella of the Student Conduct Code," and that his role on *The Indian Leader* does not "absolve [him] of [his] responsibilities as a Haskell student." *Id.* ¶ 89. Graham concluded the Directive by directing Nally not to engage in a list of activities, tracking the same four protected activities that prompted the Directive. *Id.* ¶ 90. Specifically, Graham stated:

> Let me make myself clear. You are being directed, as a Haskell student [to] comply with the following:
>
> You will NOT:
>
> - Attack any student, faculty, or staff member with letters or in public, or in any public forum, thus bringing unjustified liability to this campus or anyone on this campus.
>
> - Make demands on any governmental agency—or anyone else from Haskell—while claiming to represent *The Indian Leader*.
>
> - Attempt countermanding decisions of Haskell personnel assigned by me or anyone else to positions in an effort to replace them.
>
> - Record anyone at Haskell in your interviews unless you advise them first and they grant you permission.
>
> You WILL:
>
> - Treat all faculty members, staff, and students with the highest respect.

*Id.*

Almost immediately, on October 17, Nally emailed Dearman, Graham's supervisor, to report Graham for issuing the Directive. *Id.* ¶ 102. On October 21, 2020, Dearman told Nally the matter had been referred to BIE's human resources department. *Id.* ¶ 103. Two months later, on December 28, Sandra Wyllie, an independent contractor hired by the Department of the Interior to investigate allegations of harassment and Equal Employment Opportunity violations, informed Nally that she was investigating Graham for potentially engaging in harassing conduct, but that any violation of Nally's constitutional rights were outside the scope of her investigation. *Id.* ¶¶ 104–05. Thus, the only result of Nally's email to Dearman was the initiation of a bureaucratic process designed to investigate workplace harassment, not violations of students' First Amendment rights. *Id.* ¶ 106. On October 26, 2020, the Foundation for Individual Rights in Education (FIRE), the Student Press Law Center (SPLC), and the Native American Journalists Association (NAJA) sent a letter to Graham detailing why the Directive constituted an unconstitutional prior restraint in retaliation for protected activity, and demanded that he rescind it. *Id.* ¶ 137.

To avoid violating the Directive (or being perceived to be violating it) and incurring further punishment, Nally refrained from reporting on newsworthy stories on campus. *Id.* ¶ 98. For example, he refrained from:

- publishing a follow-up to his July story on the student fee increase after Haskell again changed its fee structure to require an additional

payment for students who wanted a campus meal plan, on top of the $715 student fee,[3] *id.*;

- writing or publishing a story on the Directive itself for fear of violating the Directive, even though it received considerable local and national media attention, *id.* ¶ 99; and

- investigating a developing story concerning Graham's relationship with the Kansas City Chiefs of the National Football League for fear of violating the Directive, *id.* ¶ 100.

Other members of the Indian Leader Association were similarly chilled from reporting on certain stories out of fear that Graham would issue them a similar Directive. *Id.* ¶ 101. The Directive remained in place for 90 days. *Id.* ¶¶ 140–41; *see also infra* Section IV.

## III.   GRAHAM REFUSES TO RECOGNIZE THE INDIAN LEADER ASSOCIATION AFTER CRITICAL COVERAGE IN *THE INDIAN LEADER*.

*The Indian Leader* has a long history of publishing content critical of the Haskell administration, including in one month alone (December 2019), stories critical of multiple misspellings on official signs around campus, covering delays in students receiving financial aid award letters, and subpar amenities in certain dorm rooms. *Id.* ¶ 197. During Graham's tenure as President of Haskell, from May 2020 until May 2021, the Indian Leader Association also faced administrative and financial hurdles that impeded its operations. *Id.* ¶¶ 107–36.

---

[3] Nally chose not to report on this especially because it would have required him to contact Vice President Salvini for comment. Compl. ¶ 98.

One such hurdle was that the paper faced difficulty accessing its account with the Haskell Student Bank or ascertaining the balance therein. *Id.* ¶ 107. Under Haskell's policies for its Student Bank that were provided to Nally, statements of Student Bank account balances must be sent via email to the account's managers each month. *Id.* ¶ 108. But Nally, as editor-in-chief, has never received such a monthly accounting. *Id.* ¶ 109. During the spring and summer 2020 terms, the Indian Leader Association's treasurer began contacting Haskell Student Bank Administrator, Jeri Sledd, to try to determine the balance in the Student Bank account. *Id.* ¶ 110. Sledd responded to the Treasurer's emails concerning payroll, but not those requesting an account balance. *Id.* ¶ 111.

Additionally, as discussed above, during the summer of 2020 Haskell appointed an administrator to replace the Indian Leader Association's journalistically experienced faculty adviser, Rhonda LeValdo. *Id.* ¶ 64. The Indian Leader Association responded by revising its Plan of Operations to include new procedures for the appointment and removal of its faculty adviser. *Id.* ¶¶ 69–70. Because it amended its Plan of Operations, the Indian Leader Association needed to have it approved by Haskell. *Id.* ¶ 113. On September 3, 2020, Nally submitted the Indian Leader Association's Plan of Operations to Sledd to initiate the approval process. *Id.* ¶ 114. Despite following up twice and sending Sledd the minutes from the Indian Leader Association's first meeting, Nally did not hear back from Sledd for the rest of the calendar year. *Id.* ¶¶ 115–17. On January 8, 2021, Nally again followed up with Sledd concerning the Indian Leader Association's Plan of

12

Operations. *Id.* ¶¶ 118. On January 11, Sledd confirmed receipt of the Plan of Operations but told Nally it had not yet been circulated for approval by the appropriate administrators. *Id.* ¶¶ 119.

Then, for the first and only time during his tenure as editor-in-chief, Nally received an email with an accounting of the Indian Leader Association's Student Bank account balance.  *Id.* ¶ 120. It was at that point that he discovered the Indian Leader Association's bank account was short over $10,000, and the last three deposits into the account were smaller than anticipated based on the Indian Leader Association's allocation of Haskell's Student Activity Fee and an estimation of Haskell's enrollment numbers. *Id.* ¶¶ 121–22, 127–28.[4]

The portion of the Student Activity Fee allocated to the Indian Leader Association is included in its Plan of Operations per the 1989 Settlement Agreement. *Id.* ¶ 125; Ex. A, Settlement Agreement, at 5, ¶ 6. At all times relevant to this action, that portion has been one-third the total Student Activity Fee. *Id.* ¶ 126. At no point did Haskell contact the Indian Leader Association to notify it of any changes to its allocation of the Student Activity Fees. *Id.* ¶ 128.

Haskell still has not recognized the Indian Leader Association by approving its Plan of Operations, or given Nally regular access to the Indian Leader

---

[4] The Indian Leader Association is allocated a certain portion of Haskell's Student Activity Fee, which at all times relevant to this action consisted of $35.00 charged to each enrolled student every fall and spring semester, and $25.00 charged to each enrolled student every summer semester. Compl. ¶¶ 123–24.

Association's Student Bank Account.[5] *Id.* ¶ 194. Because of Graham's retaliatory conduct during the year he was in office as the President of Haskell, Nally and the Indian Leader Association were concerned about overdrawing their account with the Student Bank when they could not ascertain the total available funds in the account. *Id.* ¶ 129. This forced them to forego making expenditures, such as printing hard copy issues, hosting virtual events, and investing in improvements in technology. *Id.* ¶¶ 129–36. The group also operated for months without official recognition, by virtue of their Plan of Operations not being approved, and without an official adviser. *Id.* ¶¶ 68, 119, 194.

## IV. THE DIRECTIVE IS RESCINDED AND GRAHAM IS REMOVED AS PRESIDENT AMIDST ALLEGATIONS OF FIRST AMENDMENT VIOLATIONS.

On January 13, 2021, a full *90 days* after Graham issued the Directive and 80 days after FIRE, the SPLC, and NAJA notified him that the Directive was unconstitutional, he rescinded it. *Id.* ¶ 140–41. Graham and counsel for the BIE claimed the delay was caused by an administrative "error" or "mishap." *Id.* Ultimately, the BIE announced on May 7, 2021 that Graham had been replaced as President of Haskell, and in their Memorandum in Support of Defendant Ronald Graham's Motion to Dismiss Plaintiffs' Third Cause of Action, defense counsel indicates that he was "removed" from his post and is no longer an employee of the Bureau of Indian Education. Def.'s Mem. in Supp. of Mot. to Dismiss, 2, ECF No.

---

[5] Plaintiffs challenge this ongoing harm in other claims not subject to Defendant's Motion to Dismiss. Plaintiffs' Third Cause of Action is limited to Graham's retaliatory conduct against Nally and the Indian Leader Association when he was President of Haskell.

19-1. Publicly available information indicates that Graham was removed, at least in part, because of complaints about First Amendment violations, including his retaliation against Plaintiffs.[6]

## STATEMENT OF THE QUESTIONS PRESENTED

(1) Whether Graham violated clearly established law prohibiting First Amendment retaliation when he:

    a.  Imposed a prior restraint on Nally forbidding him, under explicit threat of discipline, from continuing to engage in newsgathering, reporting, and expression protected by the First Amendment; and

    b.  Refused to recognize the Indian Leader Association, approve its Plan of Operations, including its chosen adviser, and withheld funds to which the Association was due and denied regular access to its account at the Haskell Student Bank?

(2) Whether a *Bivens* remedy is available to Plaintiffs to compensate Nally for the unconstitutional prior restraint prohibiting him from protected

---

[6]  On April 1, after Plaintiffs filed their Complaint, the Haskell faculty unanimously passed a vote of no confidence in Graham for, amongst other concerns, disregarding the free speech rights of students and faculty. Lauren Fox, *Haskell Faculty Senate unanimously declares no confidence in university's president, citing "disregard for academic freedom" and free speech, among other complaints*, Lawrence Journal-World (Apr. 2, 2021, 12:44 PM), https://www2.ljworld.com/ news/ general-news /2021/apr/02/haskell-faculty-senate-unanimously-declares-no-confidence-in-president/; *see also* Poynter Staff, *The Haskell Indian Nations University president who muzzled free speech is out*, Poynter (May 13, 2021), https://www.poynter.org/newsletters/2021/the-haskell-indian-nations-university-president-who-muzzled-free-speech-is-out/ (reporting that Graham was fired after issuing the Directive).

expression, and the Indian Leader Association for Graham's refusal to recognize the organization and withholding of funding to which it is entitled?

## ARGUMENT

Plaintiffs' Third Cause of Action for First Amendment retaliation easily withstands Graham's cursory invocation of qualified immunity, and this Court should allow Plaintiffs to prove their entitlement to damages under *Bivens*. In cases where the Supreme Court has confronted a qualified immunity defense to a claim under *Bivens*, it has assumed a *Bivens* claim, while first evaluating qualified immunity. *See, e.g.*, *Woods v. Moss*, 572 U.S. 744, 757 (2014). Accordingly, after addressing the standard of review, Plaintiffs explain why Graham is not entitled to qualified immunity before addressing why a *Bivens* remedy is appropriate here.

## I.   STANDARD OF REVIEW.

To prevent dismissal under Fed. R. Civ. P. 12(b)(6), a complaint need only set out factual allegations sufficient to show that a claim for relief is plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard does not require a showing of probability that a defendant has acted unlawfully, but requires more than 'a sheer possibility.'" *Weckhorst v. Kan. State Univ.*, 241 F. Supp. 3d 1154, 1158 (D. Kan. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (denying university's motion to dismiss, in part, because plaintiff alleged facts plausible to satisfy each element of her Title IX discrimination claim). Rather, in evaluating a motion to dismiss, "the Court must accept the nonmoving party's factual allegations as true." *Id.* at 1158.

## II.   GRAHAM VIOLATED CLEARLY ESTABLISHED LAW PROHIBITING FIRST AMENDMENT RETALIATION AND THUS CANNOT CLAIM QUALIFIED IMMUNITY.

Plaintiffs' Third Cause of Action cannot be dismissed on qualified immunity grounds. Plaintiffs can show Graham violated their First Amendment rights. Additionally, well-established precedent of the Supreme Court, the Tenth Circuit, and other courts prohibit public university administrators, like Graham, from retaliating against students and student journalists for activity protected by the First Amendment. Instead of addressing this clearly established law, Graham argues that a pending case before the Supreme Court casts doubt upon the clearly established nature of nearly all student speech rights. Def.'s Mem. 23 n.8. That case, *Mahanoy Area School District v. B.L.*, is not on point here, and Graham's contention that Plaintiffs' rights are not clearly established is incorrect.

### A.   Under the Qualified-Immunity Standard, the Unlawfulness of Graham's Conduct Was "Apparent."

Qualified immunity is inappropriate where plaintiffs (1) establish a constitutional violation and (2) demonstrate that the law was clearly established such that "a reasonable person would have known" that what he or she was doing amounted to a constitutional violation. *Klen v. City of Loveland*, 661 F.3d 498, 510–11 (10th Cir. 2011) (denying government official's defense of qualified immunity against plaintiffs' First Amendment retaliation claim because plaintiffs' "less-than-polite" epithets were protected speech, not fighting words); *see also Youngblood v. Qualls*, 308 F. Supp. 3d 1184, 1198 (D. Kan. 2018) (denying qualified immunity on

17

plaintiff's First Amendment retaliation claim for being arrested after directing profanity at a mayor's house in the presence of a police officer).

As the Supreme Court has repeatedly held, Plaintiffs need not show that "the very action in question has been previously held to be unlawful," but "in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866–67 (2017). "That is, an officer might lose qualified immunity even if there is no reported case 'directly on point.'" *Abbasi*, 137 S. Ct. at 1867 (citation omitted); *see also Edison v. Owens*, 515 F.3d 1139, 1148 (10th Cir. 2008) (citation omitted) (holding that plaintiff need not point to a case with "identical" facts—the facts need only be "sufficiently analogous").

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope*, 536 U.S. at 739. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. For this Court to find that a right is clearly established, generally, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Youngblood*, 308 F. Supp. 3d at 1194 (quoting *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010)).

As set forth below, decisions of the Supreme Court, the Tenth Circuit, and the weight of authority from other courts demonstrate that a reasonable university

president would have known he could not lawfully retaliate against student journalists or student newspapers for protected newsgathering, reporting, or expressive activities.

## B.   Plaintiffs State a Claim for First Amendment Retaliation.

Plaintiffs state a claim for First Amendment retaliation because their Complaint demonstrates (1) they were engaged in constitutionally protected activity; (2) Graham's actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that protected activity; and (3) Graham's adverse action was substantially motivated by Plaintiffs' exercise of constitutionally protected activity. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (citation omitted). Graham only contests the third prong: substantial motivation. Def.'s Mem. 22–23. However, any contention that the Directive was not motivated by Nally's protected expression is contrary to what the Directive states on its face. Additionally, Plaintiffs plausibly allege that Graham's retaliatory conduct against the Indian Leader Association during his time as President was motivated by the content of *The Indian Leader*.

### 1.   Nally and the Indian Leader Association engaged in constitutionally protected activity.

Graham does not contest that Plaintiffs sufficiently allege the first element of a First Amendment retaliation claim. As Plaintiffs allege, Nally's reporting, newsgathering, and advocacy activities—which Graham cited in the Directive to justify imposing a prior restraint—are protected by the First Amendment, as is the

Indian Leader Association's publication of hard news and editorial content that is critical of Haskell administrators. Compl. ¶¶ 81–91.

First, the articles and editorials that Nally and his fellow student journalists publish in *The Indian Leader*—an editorially independent student newspaper—fall squarely within the protections of press freedom. Take, for example, the Supreme Court's decision in *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667, 667 (1973). There, the plaintiff was expelled for distributing an independent publication on campus that contained forms of "indecent speech." *Id.* at 667. Papish was a staff member on the paper. *Papish v. Bd. of Curators of the Univ. of Mo.*, 331 F. Supp. 1321, 1325 (W.D. Mo. 1971). The university expelled her after she distributed an issue including a profane headline and offensive cartoon. *Papish*, 410 U.S. at 667–68. In holding that Papish's expulsion was unlawful, the Supreme Court said "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of conventions of decency." *Id.* at 670 (citations omitted).

The same principle that protected Papish also protects Nally and the Indian Leader Association. It is of no import that Graham found any of those stories to be "disrespectful," or that he objected to the newsgathering Nally engaged in to write some of them, because the "mere dissemination of ideas—no matter how offensive to [Graham's] taste" on a public university campus cannot be stifled based on a subjective determination that they are "disrespectful." *Id.* at 670; *see also Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)

(prohibiting viewpoint discrimination as an "egregious form of content discrimination"); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasis added) ("[D]ebate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp *attacks* on government and public officials.").

Nally's articles concerning Haskell's response to the U.S. Census, student fees, and the death of an employee, and other stories in *The Indian Leader* criticizing misspelled signs around campus, delays in students receiving financial aid award letters, and subpar amenities in dorm rooms are protected, even if the administration finds them critical or "attacking." Compl. ¶¶ 45–79, 82, 84, 197. And Plaintiffs are adult students attending a university. *Id.* ¶¶ 12–14. *The Indian Leader* is not published as part of a class, but is instead an editorially-independent student newspaper funded by Haskell's Student Activity Fee akin to the student newspapers in *Husain* and *Koala*, *id.* ¶¶ 13, 124, and Graham cannot reasonably, or lawfully, interfere with its publication. *Compare Husain v. Springer*, 494 F.3d 108 (2d Cir. 2007) *and Koala v. Khosla*, 931 F.3d 887 (9th Cir. 2019) *with Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988). *See infra* Section II.C.

Second, Nally's right to request information from Salvini and Graham regarding Haskell's response to the U.S. Census Bureau, request information from public entities like the Lawrence Police Department, and general right to ask questions of Haskell administrators is protected by the First Amendment. Compl. ¶¶ 53, 57, 61, 78.  The right to a free press carries with it a right to gather

information, because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). The press act as "surrogates for the public" in keeping a watchful eye on the operations of government. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980). Further, Kansas law protects Nally's right to record a conversation without first informing the other party. Kan. Stat. Ann. § 21-6101(a)(1).

Third, Nally and the students in the Indian Leader Association have a constitutional right to express themselves and to communicate with public officials. The right to criticize and engage with public officials carries with it a "cognate right" to petition the government. *Thomas v. Collins*, 323 U.S. 516, 530 (1945); *see also Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011) ("The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives."). And Kansas, like many states, permits individuals to request information from public entities via a public records request. Kan. Stat. Ann. § 45-215 *et seq.* Further, Plaintiffs have the right as students to advocate for or against developments on campus, such as the replacement of the Indian Leader Association's faculty adviser with an administrator. Compl. ¶¶ 67–68. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969) (holding that student speech remains protected unless it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others"). Plaintiffs have sufficiently alleged this prong of their First Amendment retaliation claim, and Graham does not dispute it.

### 2. A reasonable person would have been chilled by Graham's retaliatory conduct.

Similarly, Graham also does not dispute that Plaintiffs sufficiently allege the second element of a First Amendment retaliation claim. As the Complaint alleges, a reasonable person would have been chilled by the Directive and by Graham's retaliatory conduct against the Indian Leader Association. Compl. ¶¶ 177–78. The "objective" test asks "not whether the plaintiff herself was deterred" from speaking but whether a reasonable person may be so deterred. *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003).

To satisfy the second element of a First Amendment retaliation claim, a student need not have been suspended or expelled. For example, in *I.G. v. Jefferson County School District*, a student alleged First Amendment retaliation after she reported a classmate's anti-Semitic statements to the school principal and board. 452 F. Supp. 3d 989, 995–96 (D. Colo. 2020). After making these complaints, the student alleged that teachers were "uncooperative" with her, and that the school principal became "openly hostile" and interfered with her communications with the school counselor. *Id.* at 996. In denying the school district's motion to dismiss, the court found these allegations sufficient to demonstrate that a person of ordinary firmness would have been chilled by the school's response. *Id.* at 1005; *see also Speech First, Inc. v. Schlissel*, 939 F.3d 756, 764 (6th Cir. 2019) (emphasis in original) ("[T]he threat of punishment from a public official who *appears* to have punitive authority can be enough to produce an objective chill.").

The Directive is a much stronger response than the teachers' and principal's "uncooperative" and "hostile" response to the student's complaints in *Jefferson County School District*. And it both threatens punishment—as the *Schlissel* court explained can produce objective chill—and metes it out. It was an official memorandum that imposed a prior restraint and threatened Nally with further discipline under the Haskell Code of Student Conduct if he failed to comply with Graham's diktat. *Id.* ¶¶ 81–91. And although not required to satisfy this prong, Nally was, in fact, chilled by the Directive insofar as he declined to report on campus news for fear of violating or being perceived to have violated the Directive. *Id.* ¶¶ 97–100. Nally specifically alleges that he declined to report on stories such as a change to Haskell's meal plan, the Directive itself, and a developing story concerning Graham's relationship with the Kansas City Chiefs of the National Football League. *Id.* Fellow reporters at the Indian Leader Association were also chilled by the Directive, as they feared Graham or another Haskell administrator would issue a similar Directive against them in response to their reporting. *Id.* ¶ 101. Plaintiffs have sufficiently alleged the second element of a First Amendment retaliation claim, and Graham does not dispute it.

### 3. Graham's retaliatory conduct was motivated by Plaintiffs' protected activity.

Despite Graham's claim that "Plaintiffs cannot satisfy the third element . . . of retaliatory motive," Def.'s Mem. 22, the Directive speaks for itself. Graham expressly cited Nally's protected activities in the Directive and used them to justify ordering Nally not to engage in the same expressly described activities in the

24

future. Compl. ¶¶ 82–90. As alleged in Plaintiffs' Complaint, Graham's Directive laid out exactly why he was issuing it—because he identified Nally as someone who "attacks" Haskell employees "with letters" and in public, referring to Nally's newsgathering and advocacy activities concerning Haskell's response to the U.S. Census. *Id.* ¶ 85. Thus, Graham's own actions satisfy the requirement that a plaintiff must show the defendant's adverse action was substantially motivated by plaintiff's exercise of constitutionally protected activity. *Worrell*, 219 F.3d at 1212.

Plaintiffs also sufficiently allege that *The Indian Leader*'s negative coverage of Haskell's administration motivated Graham's other retaliatory conduct, such as interfering with the operations of the Indian Leader Association while he was President of Haskell. Plaintiffs' Complaint alleges that the Indian Leader Association published content critical of the university and complained about the removal of their adviser in the months before experiencing administrative hurdles in securing recognition and access to their funds. Compl. ¶¶ 64–72, 197. On a motion to dismiss, the Court must take these allegations and reasonable inferences arising from them as true. *Weckhorst*, 241 F. Supp. 3d at 1158.

Additionally, reasonable inferences arising from these allegations also support the fact that Graham engaged in retaliatory conduct against the Indian Leader Association. As the Tenth Circuit has held, "[o]ur cases allow an inference of whether defendant's response was substantially motivated by protected conduct where evidence showed (1) defendants were aware of protected activity; (2) the plaintiff directed his complaint to the defendant's actions; and (3) the alleged

25

retaliatory conduct was in close temporal proximity to the protected activity." *Allen v. Avance*, 491 Fed. Appx. 1, 5 (10th Cir. 2012) (citations omitted). Such an inference is supported here, as Graham was aware of *The Indian Leader*'s activity as a student newspaper and efforts to assert more control over its choice of adviser by amending the Plan of Operations, as he referenced "countermanding" his personnel decisions in the Directive. Compl. ¶ 90. Plaintiffs identify Graham's retaliatory conduct in the Complaint, and both Plaintiffs' protected activity and the retaliatory conduct against the Indian Leader Association occurred during Graham's tenure as President of Haskell. *Id.* ¶¶ 107–36, 209. As such, Plaintiffs have sufficiently alleged this prong of their First Amendment retaliation claim.

## C. Clearly Established First Amendment Law Bars Retaliatory Conduct Against Nally and the Indian Leader Association.

Plaintiffs' rights to be free from retaliation for activity protected by the First Amendment is clearly established, and a reasonable administrator in Graham's position should have known that his retaliatory conduct violated those rights.

"[I]t has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008). In *Buck*, the Tenth Circuit considered plaintiffs' First Amendment retaliation claims against a police officer who authorized the use of force to break up an anti-war protest that started on the campus of the University of New Mexico and continued onto the streets of Albuquerque. *Id.* at 1274, 1292; *see also Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1332–34 (10th Cir. 2007) (finding that plaintiff stated First Amendment retaliation claim

26

based on demotion and nonrenewal in response to complaint to the state attorney general, and denying qualified immunity).

It is also well-established that Supreme Court "precedents . . . leave no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large." *See Healy*, 408 U.S. at 180. This includes, as that Court held nearly fifty years ago, the protection against retaliation for exercising free speech rights.  In *Papish*, the Court established not only that a public university could not expel a graduate student in retaliation for her First Amendment-protected activity, but more specifically that this includes a bar against retaliation for distributing a newspaper on campus. 410 U.S. at 667–71.

More recently, in *Barnes v. Zaccari*, a student at a public university filed suit for, amongst other claims, First Amendment retaliation after he was suspended for allegedly "threatening" behavior in the course of expressing his concerns about the environmental impact of construction on campus. 592 Fed. Appx. 859, 865, 867–68 (11th Cir. 2015). The Eleventh Circuit permitted Barnes' First Amendment retaliation claim to go forward, explaining that the factual allegations, including that "Zaccari told Barnes that Barnes' speech activities had embarrassed him," supported the claim. *Id.* at 868.

It is also well-established that the independent student press has the right to operate free from restrictions or retaliation based on content or viewpoint, so much so that the United States Court of Appeals for the Second Circuit noted in 2007 that "*all* the circuits that have considered the issue have determined that, at the very

27

least, when a public university creates or subsidizes a student newspaper," and allows that student newspaper editorial independence, "neither the school nor its officials may interfere with the viewpoints expressed in the publication without running afoul of the First Amendment." *Husain*, 494 F.3d at 124 (emphasis in original).[7] And, in *Husain*, the court noted that these decisions "appear to be rooted" in the Supreme Court's holdings in *Healy* and *Rosenberger*. *Id.* at 121 n.11.

### D. The Supreme Court's Pending Decision in *Mahanoy Area School District v. B.L.* Has No Relevance Here.

Graham cannot counter the above showing that he violated clearly established First Amendment law by citing a pending Supreme Court case about off-campus, grade-school student speech. Def.'s Mem. 23, n.8 (citing *Mahanoy Area School District v. B.L.*, No. 20-255 (U.S.)). *Mahanoy* involves the question of whether the Supreme Court's *Tinker* standard applies to off-campus, grade-school student speech, and it arose after a high school student was disciplined for a profane Snapchat post. *Id.* It is of no consequence to Plaintiffs' claim here, which

---

[7] *See, e.g.*, *Koala*, 931 F.3d at 904–06 (finding that university's defunding of all student media in response to content in satirical student publication *The Koala* was unlawful); *Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir. 1983) ("[a] public university may not constitutionally take adverse action against a student newspaper . . . because it disapproves of the content of the paper"); *Schiff v. Williams*, 519 F.2d 247, 260–61 (5th Cir. 1975) (finding that dismissing editors due to alleged inaccuracies in student newspaper violated the First Amendment); *Joyner v. Whiting*, 477 F.2d 456, 460 (4th Cir. 1973) ("[it] may well be that a college need not establish a campus newspaper . . . But if a college has a student newspaper, its publication cannot be suppressed because college officials dislike its editorial comment"); *Trujillo v. Love*, 322 F.Supp. 1266, 1271 (D. Colo. 1971) (same); *Antonelli v. Hammond*, 308 F. Supp. 1329, 1332, 1337 (D. Mass. 1970) (freezing a university newspaper's funding because administrators deemed its content "garbage" violated student journalists' First Amendment rights).

involves primarily expression that occurred on campus in the course of publishing a student newspaper or lawful petitions to certain local government entities. Further, the respondent in *Mahanoy* was a high school student, and Plaintiffs are adult university students. Nothing the Supreme Court decides in *Mahanoy* (whatever the outcome) can undermine its holdings in *Healy*, *Papish*, or the other post-secondary school cases cited above.

## III. PLAINTIFFS PROPERLY SEEK DAMAGES FOR FIRST AMENDMENT RETALIATION.

Plaintiffs properly seek damages against Defendant Graham for imposing a prior restraint on Nally and impeding the Indian Leader Association's operations in retaliation for activity protected by the First Amendment. While Plaintiffs' First Amendment retaliation claim here arises in a new context, contrary to Graham's contentions, there are no special factors that justify failing to allow a damages remedy against Graham for his violations of clearly established law.

### A. As Four Other Courts Have Ruled, the Judiciary Is Well-Suited to Consider Damages Claims for First Amendment Retaliation By Federal Officers.

The Supreme Court first recognized a claim for damages brought directly under the Constitution in 1971. *See Bivens*, 403 U.S. 396–97 (holding person could seek damages, directly under the Fourth Amendment, for an unlawful search and seizure); *see also Abbasi*, 137 S. Ct. at 1856–57 (reaffirming "the continued force, or even the necessity of *Bivens*" as a "fixed principle" in the "common and recurrent sphere of law enforcement"). In determining whether to extend the *Bivens* remedy, the Supreme Court has set forth a two-step inquiry: (1) whether the claim arises in

29

a new context; and, if so, (2) whether "there are any special factors that counsel hesitation" in recognizing a damages claim directly under the Constitution. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (quoting *Abbasi*, 137 S. Ct. at 1857). Central to this inquiry is "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.*

As an initial matter, the Supreme Court has been willing to assume, without deciding, that *Bivens* extends to First Amendment claims. *See Woods*, 572 U.S. at 757 (assuming a *Bivens* remedy was available for plaintiff's First Amendment retaliation claims in evaluating whether defendant was entitled to qualified immunity); *Harlow v. Fitzgerald*, 457 U.S. 800, 820 n.36 (1982) (deciding whether defendants were entitled to immunity without disputing whether plaintiffs properly alleged a damages claim under *Bivens*). Nevertheless, Plaintiffs concede that under the *Abbasi* framework, their *Bivens* claim arises in a new context, insofar as the Supreme Court has not recognized a *Bivens* cause of action for violation of the First Amendment. *See Abbasi*, 137 S. Ct. at 1859 ("If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new.").

Since the Supreme Court decided *Abbasi*, however, four courts have recognized a *Bivens* remedy for First Amendment retaliation by federal officers. The Ninth Circuit did so in *Boule v. Egbert*, where a Border Patrol agent retaliated against a local business-owner who filed a complaint with the agent's supervisor. 998 F.3d 370, 386, 392 (9th Cir. 2021).  The Eastern District of Virginia did so in

*Dyer v. Smith*, where a Transportation Security Administration agent ordered the plaintiff to delete a recording of the agent patting down plaintiff's husband. No. 3:19-cv-921, 2021 WL 694811, at *1–2 (E.D. Va. Feb. 23, 2021). The Northern District of Ohio did so in *Himmelreich v. Federal Bureau of Prisons*, where an inmate alleged that a corrections officer retaliated for filing a grievance against prison staff. No. 4:10CV2404, 2019 WL 4694217, at *2, *16 (N.D. Ohio Sept. 25, 2019). And the Central District of California did so in *Jerra v. United States*, where another inmate made similar First Amendment retaliation claims to Himmelreich's. No. 2:12-cv-01907, 2018 WL 1605563, at *5–6 (C.D. Cal. Mar. 29, 2018). While Graham acknowledges *Boule* in a footnote, Def.'s Mem. 10 n.5, he fails to cite, much less distinguish these other recent on-point decisions. This Court, too, should recognize Plaintiffs' damages claim for First Amendment retaliation.

## B. None of the Special Factors Asserted By Defendant Graham Warrant Leaving Plaintiffs Without Any Remedy for Their Past Harm.

Ignoring on-point case law from sister courts, Defendant Graham erroneously contends that a number of special factors counsel hesitation in recognizing a *Bivens* remedy for First Amendment retaliation. *See* Def.'s Mem. 11–20.

First, neither injunctive relief under the Administrative Procedure Act nor Haskell's Student Grievance Process provide any way to remedy the past harm Plaintiffs suffered during the months they were subject to Defendant Graham's retaliatory conduct. Second, allowing Plaintiffs' Third Cause of Action to move forward so they can be made whole for this past harm does not implicate separation of powers concerns. *Contra id.* 14–17.  And reading congressional silence to bar

31

Plaintiffs' claim, which would be available to their counterparts at public state colleges and universities as a remedy for constitutional violations, is illogical. Finally, practical concerns do not counsel hesitation in recognizing Plaintiffs' claim because holding college and university administrators who happen to be federal employees to account in just the same way as all other public college and university administrators may be will not negatively affect federal employees' job performance in the area of school administration. *Contra id.* at 19 (arguing that school administration is "sensitive"). Federal courts are also well suited to consider Plaintiffs' First Amendment retaliation claim because they frequently do so under 42 U.S.C. § 1983 and other federal civil rights statutes. *See, e.g.*, *Tiumalu v. Garden City Cmty. Coll.*, No. 20-2193-KHV, 2021 WL 1817844 (D. Kan. May 6, 2021).

### 1. No alternative remedial structures address Plaintiffs' past harm.

Contrary to Graham's assertions, *see* Def.'s Mem. 12–14, the mere existence of an alternative remedy does not preclude a *Bivens* action, and in any event, the particular "alternatives" offered by Graham cannot provide relief. The Supreme Court emphasized in *Abbasi* that when "equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations." 137 S. Ct. at 1858; *see also Minneci v. Pollard*, 565 U.S. 118, 130 (2012) (emphasizing that "the question is whether . . . state tort law remedies provide roughly similar incentives for potential defendants to comply with [the Constitution] while also providing roughly similar compensation to victims of violations"). That is precisely the situation here, where neither of the alternative

remedial schemes proposed by Graham—the APA and Haskell's Student Grievance Process[8]—would "redress past harm and deter future violations." *Abbasi*, 137 S. Ct. at 1858.

The Tenth Circuit has made clear the APA is not an adequate alternative remedy sufficient to foreclose a *Bivens* claim. In *Big Cats of Serenity Springs, Inc. v. Rhodes*, the court held that "we fail to see the APA as an 'alternative, existing process capable of protecting the constitutional interests at stake'" because it provides no relief for past harm. 843 F.3d 853, 862 (10th Cir. 2016) (quoting *Minneci*, 565 U.S. at 125); *see also Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 73 (D.D.C. 2009) (holding that APA did not preclude the plaintiff's *Bivens* claim for First Amendment retaliation because an injunction under the APA "would do nothing to address the harms allegedly caused by defendants' *past* unconstitutional action"). Plaintiffs seek redress for past harm suffered in the months their speech was chilled and suppressed by Graham's retaliatory conduct. Defendants' actions in rescinding the Directive after receiving a demand letter from

---

8   Plaintiffs allege that, as contemplated by Haskell's Student Grievance Process, Nally reported Graham's conduct to his direct supervisor, Defendant Dearman. Compl. ¶ 102. Plaintiffs further allege that the only result of that report was an investigation into alleged harassment, not constitutional violations. *Id.* ¶¶ 104–06. Graham's contention that the Student Grievance Process is an adequate alternate remedial structure, *see* Def.'s Mem. 12–14, impermissibly contradicts these well-plead factual allegations. On a motion to dismiss, the court must take the allegations in the Complaint and reasonable inferences arising from them as true, *Weckhorst*, 241 F. Supp. 3d at 1158 (citing *Iqbal*, 556 U.S. at 678). Moreover, as a legal matter, the Student Grievance Process is an inadequate alternative remedy because, as described in the text, like the injunctive and declaratory relief available under the APA, it does not redress past harm to Plaintiffs.

Plaintiffs' counsel and firing Graham after the lawsuit was filed implicitly recognize this violation of Plaintiffs' First Amendment rights. Yet equitable relief under the APA would do nothing to compensate Plaintiffs for their months-long past harm and would allow Graham to escape liability for his egregious conduct.

Moreover, courts have recently recognized *Bivens* actions for First Amendment retaliation claims in circumstances where the proposed alternative remedies would not have redressed the plaintiff's past harm. *See Boule*, 998 F.3d at 392 ("[I]njunctive relief is an inadequate remedy, for [the plaintiff] is seeking damages for [the federal agent]'s completed actions rather than protection against some future act."); *Jerra*, 2018 WL 1605563, at *5 ("Injunctive relief . . . does not compensate [the plaintiff] for the harm he suffered, and does not present an adequate alternative."); *Himmelreich*, 2019 WL 4694217, at *11 (holding that a petition for a writ of habeas corpus was not an adequate alternative remedy because "[e]ven if a writ of habeas corpus could have liberated Plaintiff from the tangible *consequences* of the alleged retaliation, it would not itself have cured the intangible First Amendment injury he endured the moment he was punished for engaging in protected activity"). In holding that a habeas writ was not an adequate alternative remedy, the United States District Court for the Northern District of Ohio in *Himmelreich* said the writ "cannot redress unlawful punishment for protected First Amendment activity 'because it…gives no *retrospective* relief.'" *Id.* (emphasis added) (quoting *Bistrian v. Levi*, 912 F.3d 79, 92 (3rd Cir. 2018)).

In one case, *Boule*, a Border Patrol Agent retaliated against a United States citizen after the citizen made a complaint to the agent's superiors. 998 F.3d at 386. After learning of the citizen's complaint, the agent contacted several government agencies to request that they initiate investigations into the citizen. *Id*. The citizen then filed a First Amendment retaliation claim under *Bivens. Id*. The Ninth Circuit held that the *Bivens* remedy was available to the citizen because no special factors counseled hesitation in recognizing a *Bivens* remedy. *Id*. at 390. The court rejected the agent's argument that the citizen had an adequate alternative remedy through injunctive relief because it did not compensate the citizen for the agent's "completed actions." *Id*. at 392. Like the citizen in *Boule*, Nally and the Indian Leader Association are seeking a remedy for the harm they suffered due to Graham's "completed actions" rather than "protection against some future act." *Id*. And just as equitable relief was an inadequate alternative remedy in *Boule*, equitable relief is inadequate to remedy the past harm to Plaintiffs here.

The Supreme Court found it to be "of central importance" that *Abbasi* was "not a case like *Bivens* or *Davis* in which 'it is damages or nothing.'" 137 S. Ct. at 1862 (quoting *Bivens*, 403 U.S. at 410) (Harlan, J., concurring in the judgment); *Davis v. Passman*, 442 U.S. 228, 245 (1979). But this case *is* like *Bivens* or *Davis* because the plaintiffs are "challeng[ing] individual instances of discrimination or law enforcement overreach, which due to their very nature are difficult to address *except by way of damages actions after the fact*." *Id*. (emphasis added). Therefore, Graham's invocation of the APA and Haskell's Student Grievance Process, Def.'s

Mem. 12–14, which do not provide for the recovery of monetary damages, actually *supports* Plaintiffs' *Bivens* claim, because damages are the *only* remedy available that can make Plaintiffs whole. For Plaintiffs' past harm, "it is damages or nothing." *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in the judgment).

      **2.**     **Recognizing a *Bivens* remedy here poses no threat to the separation of powers.**

Recognizing a *Bivens* First Amendment retaliation claim here does not implicate the primary concern of the Supreme Court of limiting such actions to avoid the perception of encroaching on separation of powers. *See Abbasi*, 137 S. Ct. at 1861. Considered in light of the common law history of damages claims against federal officials and the text and structure of the Westfall Act, separation-of-powers concerns do not counsel hesitation before recognizing Plaintiffs' *Bivens* claim. And it would be illogical to read congressional silence concerning Plaintiffs' specific claim to mean it considered that students at federally-run universities—like their counterparts at state-run universities—may need to vindicate their constitutional rights through damages, but denied them the opportunity to do so.

      ***a.***     ***The Westfall Act endorses a* Bivens *remedy for constitutional violations.***

For much of United States history, including when *Bivens* was decided in 1971, individuals could sue federal officers for damages in state court under common law tort liability. *See* Sina Kian, *The Path of the Constitution: The Original System of Remedies, How It Changed, and How the Court Responded*, 87 N.Y.U. L. Rev. 132, 144 (2012). Federal officials could still escape liability if they acted within their authority, and that authority was a valid exercise of government power as

enumerated in the Constitution. *Id.* at 144 n.39. For example, in *Bates v. Clark*, a whiskey merchant sued army officials after they confiscated his whiskey on the grounds that he planned to sell it in Indian Territory. 95 U.S. 204, 204–05 (1877). The officials defended themselves by explaining they seized the whiskey pursuant to an order from the U.S. Attorney. *Id.* at 205. The merchants nevertheless prevailed, because the statute at issue did not give the officials authority to seize the merchant's property. *Id.* at 209.

Cases like *Bates* were litigated in state court, and it is against that backdrop that the Supreme Court in *Bivens* considered supplementing common law remedies with a federal damages remedy, and ultimately decided to do so by recognizing an implied damages remedy for constitutional violations. *Bivens*, 403 U.S. at 392–97. The Court recognized an "independent" federal claim for damages against federal officers "regardless of whether the State in whose jurisdiction [the federal] power is exercised would prohibit or penalize the identical act if engaged in by a private citizen." *Id.* at 392. To foreclose all *Bivens* actions would be inconsistent with that endorsement, and would result in the absence of legal remedies in myriad cases involving constitutional violations by federal officers.

Additionally, Congress, in 1988, codified *Bivens* as a remedy in the Westfall Act. In the Westfall Act, Congress made the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671–2680, the exclusive remedy against federal officers acting within the scope of their employment, pre-empting state tort remedies. *See* 28 U.S.C. § 2679(b)(1) (providing that the FTCA is "exclusive of any other civil action . .

. for money damages . . . against the employee whose act or omission gave rise to the claim."). Notably, this broad pre-emption language included an exception for *Bivens* remedies by exempting cases where litigants bring claims "for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

The Supreme Court has acknowledged that Congress expressly sanctioned the *Bivens* remedy in 1988 by passing the Westfall Act. *Hui v. Castaneda*, 559 U.S. 799, 807 (2010) ("The Westfall Act's explicit exception for *Bivens* claims is powerful evidence that Congress did not understand the exclusivity provided by § 2679(b)(1)—or the substantially similar § 233(a)—to imply such an exception."); *see also Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (explaining that "damages against federal officials remain an appropriate form of relief today" because the Westfall Act left the door open to damages remedies for constitutional violations).

If the Westfall Act, through its broad pre-emption language, eliminates state common-law remedies as a source of relief for litigants' injuries, including constitutional injuries, and if the FTCA is also unavailable because constitutional violations are exempted from that statute, *see* 28 U.S.C. § 2680, the *only* option for vindicating constitutional rights is *Bivens*. Congress could not have, with one hand, permitted claims "for a violation of the Constitution" and, with the other, taken away the only available means for asserting those claims. The argument that concerns about separation of powers foreclose a *Bivens* remedy here is therefore inconsistent with the only reasonable interpretation of Congress' intent in carving out an exception for constitutional violations in the Westfall Act.

> ### b. *Congressional silence concerning Plaintiffs' specific claim is not dispositive here.*

Graham's invocation of legislation governing Native American affairs, *see* Def.'s Mem. 16–17, also does not preclude Plaintiffs' *Bivens* claim. While Congress has legislated broadly in the area of Native American affairs, much of that legislation that touches on education is concerned with providing adequate K-12 education. In *Abbasi*, the Supreme Court found it telling that Congress was silent as to a remedy for plaintiffs, who challenged their detention under the United States' immigration and anti-terrorism policies in the post-9/11 era. *Abbasi*, 137 S. Ct. at 1851, 1862. There, plaintiffs challenged high-level policy decisions related to national security, which was "notable because it is likely that high-level policies will attract the attention of Congress." *Id.* at 1862. And the United States' policies concerning immigrant detention in the aftermath of the 9/11 terrorist attacks were the subject of "frequent and intense" debate in Congress. *Id.* In fact, the government had compiled a 300-page report on the conditions in the Brooklyn detention center—the exact subject of plaintiffs' claims. *Id.*

The same cannot be said of congressional silence on remedies for the constitutional rights of adult students at one of only two federally operated tribal universities, as is presented here. First, Plaintiffs do not challenge "high-level policies" in the sensitive area of national security. They challenge retaliatory conduct by a single federal employee, who managed a university of less than a thousand students and who has since been removed in the wake of the fallout from that retaliatory conduct. Second, while Congress legislates in the general area of

39

Native American Affairs, that legislation has primarily concerned funding, and the vast majority of schools operated by the Bureau of Indian Education pursuant to that legislation are K-12 institutions.[9] *See* Snyder Act, Pub. L. No. 67-85, 42 Stat. 208 (granting citizenship to Native Americans); Johnson O'Malley Act, Pub. L. No. 73-167, 48 Stat. 596 (authorizing the government to enter into contracts to provide educational support for Native students); 25 U.S.C. § 5342 (same); 25 U.S.C. § 13 (providing funding for Native American education, and stating that federally operated post-secondary schools are eligible for funding under the Higher Education Act). It is far more likely that Congress did not even consider that students at the two federally managed public universities may need to vindicate their constitutional rights through damages than it is that Congress' silence indicates that it considered the matter and decided these students should enjoy *fewer* protections of their constitutional rights compared to students at state colleges and universities.

Graham's argument in this vein is also self-defeating because, if congressional silence were generally a "special factor" counselling hesitation, then it would bar virtually every *Bivens* case insofar as Congress has yet to "provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government." *Abbasi*, 137 S. Ct. at 1854. Notably, if there were a statutory cause of action for damages available to individuals whose rights

---

[9]  Of the 52 Bureau-operated and 135 tribally controlled schools under the purview of the BIE, only two are post-secondary institutions—Haskell and Southwestern Indian Polytechnic Institute. *School Directory*, BUREAU OF INDIAN EDUC., https://www.bie.edu/schools/directory (last visited June 21, 2021).

were violated by federal officials, savvy plaintiffs and those represented by competent counsel would bring those claims, and the *Bivens* question would not come before the court. In no way does Congressional silence counsel hesitation here.

### C. Practical Concerns Also Do Not Counsel Hesitation Before Recognizing Plaintiffs' *Bivens* Claim.

This Court also should not disallow Plaintiffs' *Bivens* claim based on practical concerns that Graham claims counsel hesitation. Def's Mem. 18–20. Should this Court recognize a *Bivens* remedy here, federal school administrators will continue to be able to do their jobs, just as state college and university administrators do every day, as the First Amendment retaliation standard is neither unworkable nor will it "invite an onslaught" of *Bivens* actions. *Contra* Def's Mem. 18 (citing *Wilkie v. Robbins*, 551 U.S. 537, 562 (2007)).

### 1. Defendant's concern about extending *Bivens* to the area of school administration is without merit.

Graham claims that allowing Plaintiffs' *Bivens* claim would wade into the "sensitive" area of school administration and will cause administrators like Graham to fear that "every decision could subject them to a personal suit for damages" while performing their day-to-day duties. Def.'s Mem. 19. But this argument does not counsel hesitation, for two reasons.

First, virtually all other public college and university officials are subject to suit in their individual capacity for violating students' constitutional rights under 42 U.S.C. § 1983, and the higher education system continues to function. These administrators are not so paralyzed by the threat of personal liability that they cannot do their jobs. Students at these public colleges and universities have a path

41

to remedy past harm when administrators violate their clearly established constitutional rights. *See, e.g.*, *Tiumalu*, 2021 WL 1817844 (denying defendant's motion to dismiss in part); *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 408 F.Supp.3d 960 (S.D. Iowa 2019) (granting in part and denying in part cross-motions for summary judgment). "[T]here is no basis for according to federal officials a higher degree of immunity . . . than is accorded state officials when sued for the identical violation under § 1983." *Butz v. Economou*, 438 U.S. 478, 500 (1978) (finding federal officials exercising discretion are entitled to qualified, but not absolute, immunity). The reasoning in *Butz* is directly on-point here, where there is no reason why a damages remedy should be foreclosed against Graham, when it would not be foreclosed against a state university president when sued for an identical violation of First Amendment rights. This concern, therefore, does not counsel hesitation.

Second, because federal officers are almost never personally responsible for paying a settlement or judgment against them—and are often represented in court by the federal government—concerns about the cost of retaining counsel are misguided. *See* James E. Pfander, Alexander A. Reinert & Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When* Bivens *Claims Succeed*, 72 Stan. L. Rev. 561, 579–80 (2020) (examining successful *Bivens* actions against federal officials employed by the Bureau of Prisons over ten years and finding that, in all but eight of 171 cases, "officials named as defendants made no contribution to the payment of settlements and judgments"). This survey of cases against Bureau of Prisons agents

found that, frequently, neither individual federal-official defendants nor the agency itself paid settlements—rather, matters were resolved under the Judgment Fund, redirecting money from the U.S. Treasury. *Id.* at 594. And while representation of federal officials by the Department of Justice is discretionary, the examples provided in Graham's brief in support of his motion reflect that government attorneys represented some if not all of the defendants in eight out of the ten cases cited. Def.'s Mem. 9 n.4. Indeed, the Department of Justice is representing Graham here, despite the fact that he was removed from his post at Haskell, at least in part due to conduct upon which Plaintiffs' Complaint is based.

### 2. First Amendment retaliation claims are workable.

There is also no merit to Graham's contention that because retaliation claims are "easy to allege and difficult to prove," the Court should hesitate to extend *Bivens* to Plaintiffs' claims. Def.'s Mem. 18–20. Examination of the Tenth Circuit's First Amendment retaliation standard; the decisions of other courts; and lower court decisions that have chosen to recognize First Amendment *Bivens* claims all refute Graham's position.

As set forth above, the first two elements of a First Amendment retaliation claim are that (1) plaintiff engaged in constitutionally protected activity and (2) defendant's actions caused plaintiff to suffer an injury that would chill a "*person of ordinary firmness* from continuing to engage in that protected activity." *Worrell*, 219 F.3d at 1212 (emphasis added) (citations omitted). These are objective standards that can be measured against established bodies of law. Only the third element of a retaliation claim—whether the defendant's action alleged to violate the

43

First Amendment was substantially motivated by plaintiff's exercise of constitutionally protected activity, *id.*—requires probing an "official's state of mind." Def.'s Mem. 20.

Even as to that factor, however, proving substantial motivation does not require intrusive inquiry into the thoughts of a public official. Rather, the Courts of Appeal have recognized several forms of objective evidence from which subjective intent may be inferred. *See, e.g.*, *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) ("[A] plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." (citations omitted); *Wenk v. O'Reilly*, 783 F.3d 585, 595–600 (6th Cir. 2015) (affirming denial of qualified immunity where causation could be inferred from plaintiffs' evidence that defendant made child abuse report shortly after protected speech and that the report contained factual inaccuracies). Some cases are even easier, like here, where Graham explicitly identifies in the Directive itself his substantial motivation for issuing it, such that direct evidence of the public official's subjective intent may be found in the record without need for a deposition. *See, e.g.*, *Ulrich v. City of San Francisco*, 308 F.3d 968, 980 (9th Cir. 2002) (plaintiff's evidence for causation was strengthened by pre-litigation statement of supervisor).

That the elements of a retaliation claim should not cause the Court to hesitate here is reinforced by the above-referenced four courts that allowed a *Bivens* remedy for First Amendment retaliation claims in the years following the Supreme

44

Court's decision in *Abbasi*. *See supra* Section III.A–B. In all of those cases, the plaintiffs alleged First Amendment retaliation, *see Boule*, 998 F.3d 370; *Dyer*, 2021 WL 694811; *Himmelreich*, 2019 WL 4694217; *Jerra*, 2018 WL 1605563, and in none of them did the courts find proceeding to the First Amendment claims in any way overwhelming or dauting.  Graham's concern that First Amendment retaliation claims are "unworkable" for *Bivens* purposes does not counsel hesitation.

## CONCLUSION

For the foregoing reasons, Defendant Ronald Graham's Motion to Dismiss Plaintiffs' Third Cause of Action under Federal Rule of Civil Procedure 12(b)(6) should be denied in its entirety.


Dated: June 22, 2021

Respectfully submitted,

/s/ Stephen Douglas Bonney
STEPHEN DOUGLAS BONNEY
KS. Bar No. 12322
5542 Crestwood Drive
Kansas City, MO 64110
(816) 363-3675
sdbonney@outlook.com

DARPANA M. SHETH
NY Bar No. 4287918
KATLYN A. PATTON
PA Bar No. 328353; OH Bar No. 097911
Admitted *Pro Hac Vice*
FOUNDATION FOR INDIVIDUAL
  RIGHTS IN EDUCATION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (215) 717-3440
darpana.sheth@thefire.org
katlyn.patton@thefire.org

*Counsel for Plaintiffs Jared Nally and the Indian Leader Association*

**CERTIFICATE OF SERVICE**

I, Stephen D. Bonney, hereby certify that on June 22, 2021, a copy of the foregoing motion was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's electronic filing system.

/s/ Stephen Douglas Bonney
STEPHEN DOUGLAS BONNEY