## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JARED NALLY and<br>THE INDIAN LEADER ASSOCIATION,<br><br>             Plaintiff,<br><br>v.<br><br>RONALD J. GRAHAM, in his individual and<br>official capacity as President of Haskell Indian<br>Nations University,<br><br>HASKELL INDIAN NATIONS UNIVERSITY,<br><br>TONY L. DEARMAN, in his official capacity as<br>Director of the Bureau of Indian Education, and<br><br>BUREAU OF INDIAN EDUCATION,<br><br>             Defendants. | No. 21-2113-JAR-TJJ |

### DEFENDANT RONALD J. GRAHAM'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS THE INDIVIDUAL CAPACITY CLAIM AGAINST HIM UNDER FED. R. CIV. P. 12(b)(6)

Although Plaintiffs' overlength[1] response to Dr. Graham's motion to dismiss presents a substantial effort to convince this Court to recognize a First Amendment *Bivens* claim in a new context, consistent with the vast majority of cases considering similar requests this Court should refuse to expand *Bivens* remedies to include First Amendment claims. *See, e.g., Roy Sargeant v. Aracelie Barfield*, No. 19 CV 50187, 2021 WL 2473805, at *1-2 (N.D. Ill. June 17, 2021) (court appointed attorney's "heroic attempts to make a silk purse out of a sow's ear were admirable and impressive, but ultimately unavailing.  The issue presented is straight-forward: Do federal inmates

---

[1]  Dr. Graham simply notes that Plaintiffs' reply is a total of 53 pages, most of which consists of legal analysis, violating this Court's 30-page limit. *See* D. Kan. Rule 7.1(e).

have a *Bivens* claim under the First Amendment for retaliation after *Abbasi*?  The unanimous and resounding answer is 'No!'").  But as demonstrated by Plaintiffs' own Complaint, the Plaintiffs already have the alternative remedy of asking this Court to enjoin the policy or directive.  *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017) ("[I]f there is an alternative remedial structure present in a certain case, that *alone* may limit the power of the Judiciary to infer a new *Bivens* cause of action." (emphasis added)).  Not to mention that, in the novel context of a Congressionally created and funded federal University there are many "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," *id.*, and thus special factors counsel against the judicial creation of a *Bivens* remedy here.

In this reply, Dr. Graham first demonstrates that this Court should not recognize a First Amendment *Bivens* claim and then turns to the issue of qualified immunity.  Although Plaintiffs' response places the qualified immunity issue first, the Supreme Court has clearly said that courts should first address the *Bivens* question before turning, if at all, to other questions presented.  *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) (explaining that the question of whether to imply a remedy is "'antecedent' to the other questions presented"); *see also Beddow v. Rhodes,* No. 2:18-CV-2442-JAR-TJJ, 2020 WL 1873565, at *8 (D. Kan. Apr. 15, 2020) ("The *Bivens* question, however, is "'antecedent' to the other questions presented.") (footnotes/citations omitted)) (Chief Judge Robinson), *appeal dismissed,* No. 20-3093, 2020 WL 9595173 (10th Cir. Sept. 24, 2020).  In that vein, Plaintiffs' interpretation of *Wood v. Moss*, 572 U.S. 744 (2014), is simply incorrect.  The existence of a *Bivens* remedy was not contested in that case, which is why the court assumed the existence of a remedy.  *Id.* at 757.  Per the Supreme Court's instructions in *Hernandez* and in *Abbasi*, what this court must do is first address the issue of whether a First Amendment *Bivens*

claim exists, and if it determines such a claim exists, then turn to the issue of qualified immunity. *See also Bistrian v. Levi*, 912 F.3d 79, 88 (3d Cir. 2018).

1.      **This Court Should Not Recognize a First Amendment *Bivens* Claim**

Before turning to the issue of whether this Court should recognize a First Amendment *Bivens* claim in this case, Dr. Graham notes that Plaintiffs offer no analysis—let alone any cases—suggesting that it is appropriate for this Court to recognize a First Amendment *Bivens* claim that may be asserted by an association such as *The Indian Leader Association.*  Based upon *The Indian Leader Association's* failure to address this argument, and because it is plainly unprecedented to recognize a valid *Bivens* claim on behalf of anything but a living person,[2] its First Amendment *Bivens* claims against Dr. Graham should be dismissed as uncontested for failure to state a claim.

a.      <u>Plaintiffs Concede that a First Amendment *Bivens* Claim Arises in a New Context</u>

Plaintiffs concede that their First Amendment *Bivens* claims arise in a new context.  *See* Opp. Pg. 30; *Abbasi*, 137 S. Ct. at 1859 (2017) ("If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new."); *Reichle v. Howards*, 566 U.S. 658, 663 n. 4 (2012); *Butler v. S. Porter*, 999 F.3d 287, 293 (5th Cir. 2021) (the Supreme Court has never held that *Bivens* extends to First Amendment claims); *Watkins v. Three Admin. Remedy Coordinators of Bureau of Prisons*, 998 F.3d 682, 686 (5th Cir. 2021) (noting that the "Supreme Court has not only never recognized a *Bivens* cause of action under the First Amendment, *Reichle v. Howards*, 566 U.S. 658, 663 n.4, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012), but also once rejected a First Amendment retaliation *Bivens* claim for federal employees" and

_____

[2] Dr. Graham explains that recognition of a First Amendment *Bivens* claim will open the floodgates of litigation against federal employees.  Permitting corporations, associations, or partnerships to assert First Amendment *Bivens* claims will only further spawn a deluge of claims against employees of the United States.

declining to extend *Bivens* to a prisoner's First Amendment claim that he was subjected to spoiled and contaminated food as a form of retaliation by prison officials); *see also Bush v. Lucas*, 462 U.S. 367, 390 (1983).

Therefore, under Supreme Court precedent, the only consideration for this Court is to determine whether there are *any* special factors counseling hesitation before implying a First Amendment *Bivens* remedy in the context of a federally run university. If so, their claim must be dismissed. *Abbasi*, 137 S. Ct. at 1858.

  b.  <u>The bar for determining whether there are "special factors counseling hesitation" is "remarkably low"</u>

It is well settled that the standard that courts apply in deciding whether to abstain from implying a remedy is not stringent: "The only relevant threshold—that a factor 'counsels hesitation'—is remarkably low . . . Hesitation is a pause, not a full stop, or an abstention; and to counsel is not to require. 'Hesitation' is 'counseled' whenever thoughtful discretion would pause even to consider." *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (footnote omitted); *Hernandez v. Mesa*, 885 F.3d 811, 823 (5th Cir. 2018) (en banc) ("Even before *Abbasi* clarified the 'special factors' inquiry, we agreed with our sister circuits that" the "threshold" for "counsel[ing] hesitation" is "remarkably low" (*quoting De La Paz v. Coy*, 786 F.3d 367, 378 (5th Cir. 2015))), *aff'd*, 140 S. Ct. 735 (2020). Congressional intent need not be "dispositive." Per *Abbasi*, if Congress might doubt the need to create a remedy, courts must decline to create a remedy. 137 S. Ct. at 1858 ("In sum, if there are sound reasons to think Congress *might* doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts *must* refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." (emphasis added)). Additionally, "Special factors" is a low bar which can be considered in the

aggregate even where a single factor might not suffice.  *See Chappell v. Wallace*, 462 U.S. 296, 304 (1983).

      c.     <u>The great weight of persuasive authority rejects the recognition of First Amendment *Bivens* claims</u>

In the face of a phalanx of federal cases rejecting the recognition of First Amendment *Bivens* claims, Plaintiffs cherry-pick what appear to be the only four post-*Abbasi* cases that have found a *Bivens* remedy for a First Amendment violation.  The great weight of authority—scores of cases— go the opposite way than those four cases:  "The courts uniformly find—correctly—that recognizing a First Amendment retaliation claim would be an extension of *Bivens* into a new context." *Sargeant,* 2021 WL 2473805, at *2.  In support of that statement, the Court in *Sargeant* collected several cases and noted that "every circuit court to address the issue has found that federal inmates have no First Amendment retaliation claim under *Bivens* after *Abbasi*.") (citing *Butler v. Porter*, ___ F.3d___, 2021 U.S. App. LEXIS 16462, at *6 (5th Cir. 2021); *Watkins v. Three Admin. Remedy Coordinators of the Bureau of Prisons*, ___ F.3d ___ 2012 U.S. App. LEXIS 15455, at *5-6 (5th Cir. 2021); *Earle v. Shreves*, 990 F.3d 774, 776 (4th Cir. 2021); *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 525 (6th Cir. 2020); *Bistrian v. Levi*, 912 F.3d 79, 96 (3d Cir. 2018); *see also, Johnson v. Burden*, 781 F. App'x 833, 836 (11th Cir. 2019) (holding that First Amendment retaliation claims are an extension of *Bivens*)).  The court in *Sargeant* also noted that "[e]ach district court in the Seventh Circuit to address the issue has found likewise." (*citing Decker v. Bradley*, No. 2:19-cv-00616, 2021 U.S. Dist. LEXIS 74296, at * 6 (S.D. Ind. Apr. 18, 2021); *Robinson v. Morris*, Case No. 18-cv-164, 2019 U.S. Dist. LEXIS 220234, at *13 (S.D. Ill. Sep. 23, 2019); *Silva v. Ward*, 16-cv-185, 2019 U.S. Dist. LEXIS 165211, at *25 (W.D. Wisc. Sept. 26, 2019); *Atkinson v. Broe*, 15-cv-386, 2019 U.S. Dist. LEXIS 7396, at *18 (W.D. Wisc. Jan. 16, 2019); *Early v. Shepherd*, No. 2:16-cv-00085, 2018 U.S. Dist. LEXIS 161664, at *41 (S.D. Ind.

Sept. 21, 2018) ("For these reasons, Mr. Early's First Amendment retaliation claims are foreclosed by *Ziglar v. Abbasi*, 137 S. Ct. 1843, 198 L. Ed. 2d 290 (2017).").

Finally, as noted by the court in *Sargeant,* district courts across the country agree that inmates cannot bring First Amendment *Bivens* claims. 2021 WL 2473805, at *2. *See Pinson v. United States DOJ*, No.: 12-1872, 2021 U.S. Dist. LEXIS 41262, at *21 (D.D.C. Jan. 8, 2021) ("The Court therefore agrees with nearly every other court to have addressed the issue and hold that prisoners cannot bring First Amendment retaliation cases under *Bivens*."); *Oneil v. Rodriguez*, 18-CV-3287, 2020 U.S. Dist. LEXIS 181275, at *11 (E.D.N.Y. Sept. 30, 2020); *Bistrian*, 912 F.3d at 96 (citing *Akande v. Philips*, No. 1:17-cv-01243 EAW, 2018 U.S. Dist. LEXIS 118212 (W.D.N.Y. July 11, 2018) (collecting cases)); *Decker*, 2021 U.S. Dist. LEXIS 74296, at * 6 n.2 (collecting cases)).

In addition to those cases, these very recent cases also reject the recognition of First Amendment *Bivens* claims across a broad spectrum of contexts (not just in the context of federal prisons): *Loumiet v. United States*, 948 F.3d 376 (D.C. Cir. 2020) (no First Amendment retaliatory prosecution claim for attorney against regulatory agents); *Jackson v. Barnes,* No. 4:20-CV-04474-JMC, 2021 WL 2767336 at *2 (D.S.C. July 2, 2021) (affirming the Magistrate Judge's Report and Recommendation recommending an inmate plaintiff's First Amendment *Bivens* claims that he was allegedly prohibited from contacting his family when he was diagnosed with COVID-19 be dismissed with prejudice for failure to state a claim because there has not yet been an extension of *Bivens*); *Morrison v. Wilson,* No. 4:20-CV-00222-O, 2021 WL 2716596 at *6-8 (N.D. Tex. June 30, 2021) (reasoning that special factors counseled against expansion of a *Bivens* remedy, the court dismissed a prisoner's claim that his transfer to a different cell was retaliatory and violated his rights under the First and Eighth Amendments); *Smith v. Ebbert,* No. 1:21-CV-00915, 2021 WL

2660872 at *5 (M.D. Pa. June 29, 2021) ("In sum, the Court finds that Plaintiff's First Amendment access to the courts claim presents a new context to which *Bivens* has not previously been extended.  Moreover, special factors counsel against extending *Bivens* to that new context.  The Court, therefore, declines to extend *Bivens* to Plaintiff's access to the courts claim, and his claim will be dismissed." (footnote omitted)); *Black Lives Matter D.C. v. Trump*, No. 20-CV-1469 (DLF), 2021 WL 2530722, at *8 (D.D.C. June 21, 2021) (granting the defendants' motions to dismiss the plaintiff protestors' First Amendment *Bivens* claims because special factors make it inappropriate to imply a claim).

The four cases Plaintiffs cite—*Boule*, *Himmelreich*, *Dyer*, and *Jerra*—are not only outliers that were wrongly decided, but each is readily distinguishable from this case.  As an example, this case does not remotely involve law enforcement.  Consequently, this case in no way deals with the "common and recurrent sphere of law enforcement" which *Boule* (quoting *Abbasi*) referred to in implying a claim in that case.  *Boule v. Egbert*, 998 F.3d 370, 389 (9th Cir. 2021) (*quoting Abbasi*, 137 S. Ct. at 1857; *id.* at 1856).  Nor does the posture of this case come on the heels of having to overturn a jury verdict.  *Jerra v. United States*, 2018 WL 1605563, at *4 (C.D. Cal. Mar. 29, 2018).

The four cases cited by the Plaintiffs recognizing First Amendment *Bivens* claims are not binding on this Court—nor should their legal analysis be accepted in this case.  *Boule v. Egbert*, 998 F.3d 370 (9th Cir. 2021) has three separate dissents and is still vulnerable to review by the Supreme Court.  Plaintiffs fail to mention that *Himmelreich v. Fed. Bureau of Prisons*, No. 4:10-CV-2404, 2019 WL 4694217 (N.D. Ohio Sept. 25, 2019)[3] is on appeal before the Sixth Circuit.

---

[3] In *Himmelreich*, a federal inmate asserted a claim of First Amendment retaliation.  He claimed that the defendant, Captain Fitzgerald oversaw his placement in the SHU shortly after he had filed a grievance against prison staff alleging their failure to protect him from assault.  In analyzing whether special factors counseled hesitation the court stated that it could not "conclude

The other two cases cited by Plaintiffs, *Dyer v. Smith,* No. 3:19-cv-921, 2021 WL 694811 (E.D. Va. Feb. 23, 2021) and *Jerra v. United States*, No. 2:12-CV-01907-ODW (AGRX), 2018 WL 1605563 (C.D. Cal. Mar. 29, 2018), are cases that are also readily distinguishable unpublished district court cases.  What Plaintiffs fail to mention is that—other than *Boule*, which is an outlier— every single circuit to consider whether expressly to imply a remedy for a First Amendment violation post-*Abbasi* has refused to do so, citing special factors.  *See, e.g.*, *Butler*, 2021 WL 2221463 (no First Amendment retaliation claim for prisoner); *Earle*, 990 F.3d 774 (same); *Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020) (same); *Callahan*, 965 F.3d 520 (no First Amendment free speech claim for prisoner); *Loumiet*, 948 F.3d 376 (no First Amendment retaliatory prosecution claim for attorney against regulatory agents).

In any event, it is not enough for Plaintiffs to point the Court to these largely distinguishable out-of-circuit cases to imply a remedy.  Rather, the Court must affirmatively analyze the many special factors present in this case.  Notably, all four of the cases Plaintiffs cite still found the context was new for First Amendment *Bivens* claims, thus requiring a consideration of special factors. *See Abbasi*, 137 S. Ct. at 1860.  Plaintiffs' response relies heavily on the Ninth Circuit's decision in *Boule*—but that reliance is not warranted.  The *Boule* panel decision hardly reflects the unanimous opinion of the Ninth Circuit as twelve circuit judges opposed the denial of en banc rehearing through three separately filed dissents.  In regard to those dissents, Dr. Graham offers that Judge Bumatay's dissent is particularly thorough and persuasive in explaining why the Ninth Circuit panel erred in failing to dismiss the First Amendment claim, and essentially tracks Dr. Graham's analysis in this case.  Circuit Judge Bumatay, joined by six fellow circuit judges

---

that the existence of a prison grievance procedure counsels hesitation in inferring a *Bivens* cause of action." 2019 WL 4694217 at *11.

dissenting in *Boule*, posited that "[w]hile the panel could think of no reasons to hesitate, there are at least four: (1) congressional silence, (2) Supreme Court precedent, (3) the precedent of our fellow circuits, and (4) the various potential alternative remedies available to Boule." *Boule*, 998 F.3d at 378.  As to congressional silence, the dissent posited that "the panel should not have created a new First Amendment cause of action because that is the business of Congress, not the courts." *Id*.  "[I]nsofar as Congress, through the FTCA and § 1983, has not provided a remedy to Boule for his retaliation claim, the separation of powers commands that we must respect that silence.  *See Oliva v. Nivar*, 973 F.3d 438, 444 (5th Cir. 2020) (the "silence of Congress" is a special factor counseling hesitation) (quoting *Abbasi*, 137 S. Ct. at 1862)." *Id*. at 379.[4]

The dissenting circuit judges also pointed towards critical Supreme Court precedent.  "We also should have hesitated because the Supreme Court has expressly declined to extend *Bivens* to the First Amendment context.  Back in 1983, even during the heyday of *Bivens* expansions, the Court refused to allow a federal employee to sue his supervisor for retaliatory demotion under the First Amendment.  *See Bush v. Lucas*, 462 U.S. 367, 103 S. Ct. 2404, 76 L.Ed.2d 648 (1983)." *Id*.

The dissent also noted that the "[t]he panel's *Bivens* extension puts us out of step with our sister courts, too.  Since the adoption of the 'counsels hesitation' test in 2007, circuit courts have nearly uniformly refused to extend *Bivens* to the First Amendment.  The Second, Fourth, Sixth, and D.C. Circuits have all refused to extend the doctrine to the First Amendment." *Id*. at 380.  Five

---

[4]  This analysis is consistent with Supreme Court precedent.  *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001) ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability.").  This inquiry focuses on "'who should decide' whether to provide for a damages remedy, Congress or the courts," and "[t]he answer most often will be Congress."  *Abbasi*, 137 S. Ct. at 1857.  This is because "[i]n most instances, the Court's precedents now instruct, the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability."  *Id.* (quotation marks omitted).

additional circuit judges dissented separately.  Finally, it is worth noting that the non-prevailing party in *Boule* may seek *certiorari*.

In sum, the great weight of persuasive authority counsels against the recognition of a First Amendment *Bivens* claim.[5]

    d.    <u>Alternative processes and other special factors counsel hesitation against recognizing a First Amendment *Bivens* claim</u>

        i.    *Alternative processes counsel hesitation against recognizing a First Amendment* Bivens *claim*

Alternative processes are available to the Plaintiffs that counsel against recognizing a First Amendment *Bivens* claim.  Plaintiffs' reading of *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853 (10th Cir. 2016) is simply incorrect.  Although the Court in *Big Cats* was unpersuaded that the APA was an alternative process, in that particular case involving a Fourth Amendment violation related to an unannounced USDA inspection—it nonetheless recognized that "judicial review under the APA may, in some circumstances, foreclose a *Bivens* claim."  *Id*. at 862 & n.4. When read properly and with other cases addressing the APA, it is plain that the APA can be an alternative process.[6]  In any event, *Big Cats* was pre-*Abbasi*, which made clear that injunctive

---

[5]  Almost all recent new *Bivens* context claims since *Abbasi* have been defeated.  *Bivens* claims are now seen as "highly" disfavored. *Tun-Cos v. Perrotte*, 922 F.3d 514, 518 (4th Cir. 2019), *cert. denied,* 140 S. Ct. 2565 (2020).

[6]  Plaintiffs would also have this Court ignore the case law holding that APA review forecloses *Bivens*.  *See, e.g.*, *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009); *Miller v. U.S. Dep't of Agr. Farm Servs. Agency*, 143 F.3d 1413, 1416 (11th Cir. 1998); *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011); *see also Wilkie v. Robbins*, 551 U.S. 537 at 553–54, 561 (2007) (relying in part on availability of "administrative and judicial review" in deciding not to imply *Bivens* remedy).  Plaintiffs cite no cases to the contrary and attempt to distinguish *Western Radio* by arguing that they are seeking money damages, whereas those plaintiffs sought injunctive relief.  But plaintiffs in *Western Radio* did seek money damages. 578 F.3d at 1122 ("At the outset, we note that *Wilkie* itself gave us a strong indication that the APA constitutes an 'alternative, existing process' for Western's damages claims based on agency actions and inactions.").  And, as discussed above, it is black letter law that plaintiffs need not receive money or "complete relief" through the APA or other processes.  *Id.* at 1120; *see also*

relief can be an alternative process, even though it does not provide past relief. *See Abbasi*, 137 S. Ct. at 1862-63 (including injunctive relief among alternative processes available to detainees in finding special factors counsel hesitation). It is obviously not "damages or nothing" in this case; Plaintiffs seek other relief. *See Bivens*, 403 U.S. at 410 (Harlan, J. concurring). An alternative process need not provide damages to counsel hesitation. Plaintiffs' argument about "damages or nothing" is simply inconsistent with the Supreme Court's current analysis. In every *Bivens* case in which a plaintiff complains about government action—which, by necessity, is all of them—the plaintiff alleges that they have already suffered some past harm at the hands of government actors. But the Supreme Court in *Abbasi* states that if there is injunctive relief, then that is enough, even though that relief may do nothing to address the plaintiff's past harm. *See Abbasi,* 137 S. Ct. at 1863;[7] *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018) ("'Alternative remedial structures' can take many forms, including administrative, statutory, equitable, and state law remedies."). In other words, in just about every *Bivens* case, it's "damages or nothing" on some level for some subset of past harm. Nonetheless, that has not stopped the great majority of courts from dismissing such claims outright.

---

*Vance v. Rumsfeld*, 701 F.3d 193, 205 (7th Cir. 2012) ("[T]he normal means to handle defective policies and regulations is a suit under the [APA] or an equivalent statute, not an award of damages against the policy's author . . . even if that regulation imposes billions of dollars in unjustified costs before being set aside."). Like Plaintiffs here, the plaintiffs in those cases had an opportunity to end allegedly ongoing violations. There, as here, the ability to challenge alleged unconstitutional conduct (or policy) through official-capacity relief – whatever the avenue – "provided a faster and more direct route to relief than a suit for money damages." *Abbasi*, 137 S. Ct. at 1863. That is enough to preclude a *Bivens* remedy.

[7] As the Supreme Court recognized in *Abbasi*, injunctive relief, rather than pursuing personal money damages against individual BOP officials, often provides a more "direct route" to remedy these actions. 137 S. Ct. at 1863. *See Malesko*, 534 U.S. at 74 (observing that injunctive relief has long been recognized as proper means for altering unconstitutional policy).

On page 32 of their response, Plaintiffs take the quote from *Abbasi* out of context.  The availability to obtain injunctive relief at any point means that Plaintiffs had an alternative avenue to seek relief.  Plaintiffs implicitly ask this Court to ignore any process available to them prior to the filing of this suit and only look to currently available processes.  But that is not the law or the rationale underlying *Bivens*, *Carlson*, or *Davis*.  Webster Bivens never had an opportunity to file suit to cease the officers' conduct, *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971); there was no job for Shirley Davis to return to after she was fired and her boss retired from Congress, *Davis v. Passman*, 442 U.S. 228, 245 (1979); and Joseph Jones died as a result of the allegedly indifferent conduct, *Carlson v. Green*, 446 U.S. 14, 16 n.1. (1980).  For them, "equitable relief . . . would [have] be[en] unavailing" at any time.  *Davis*, 442 U.S. at 245.  That is not the case for Plaintiffs, who had the opportunity to seek injunctive relief and did so.  *See, e.g.*, *Ms. L. v. ICE*, No. 18-cv-428 (S.D. Cal.) (adopting the proposed Settlement Agreement submitted by the parties which provided for reunification of class members and resolution of their asylum claims).  Having an avenue to pursue injunctive relief is not "nothing." And courts, including the Supreme Court in *Abbasi* and elsewhere, have found that processes which provide injunctive relief are relevant, and indeed "of central importance" in deciding whether to imply a *Bivens* remedy.  *Abbasi*, 137 S. Ct. at 1862; *see also Malesko*, 534 U.S. at 74 (explaining plaintiff was not "in search of a remedy as in *Bivens* and *Davis*" and refusing to imply one in part because plaintiff could seek an injunction); *Hubbard v. U.S. E.P.A. Adm'r*, 809 F.2d 1, 14 (D.C. Cir. 1986), *on reh'g sub nom. Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) ("The availability of injunctive relief here counsels against allowing a *Bivens* action as well.").

It is not required that an alternative avenue redress past harm or deter future violations. Central to Plaintiffs' argument is the notion that the processes available to them are insufficient

because they do not "hold[] to account federal officers" or provide damages for past harms.  Opp. at 23.  But it is blackletter law, that alternative processes need not "punish" officers or offer monetary relief at all.  *See Abbasi*, 137 S. Ct. at 1865 ("alternative remedies available" could include "a writ of habeas corpus," an "injunction," or "some other form of equitable relief"); *De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015) ("The absence of monetary damages in the alternative remedial scheme is not ipso facto a basis for a *Bivens* claim."); *see also Schweiker v. Chilicky*, 487 U.S. 412, 428 (1988) ("agree[ing] that suffering months of delay in receiving the income . . . cannot be fully remedied by the 'belated restoration of back benefits,'" but declining to extend *Bivens* remedy where Congress did not).  Even in situations where a plaintiff has no possibility of relief, courts still refrain from implying a remedy if other special factors are present. *United States v. Stanley*, 483 U.S. 669, 683 (1987) ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford . . . an 'adequate' federal remedy.").  Indeed, the Supreme Court does not require that available processes provide similar compensation, or backwards looking relief, particularly where those processes are created at the federal level. *See, e.g.*, *Bush v. Lucas*, 462 U.S. 367, 388 (1983) (declining to create *Bivens* action even where existing federal processes "do not provide complete relief").

Although Plaintiffs suggest otherwise, the Federal Tort Claims Act (FTCA) could be an alternative remedy as they could have potentially asserted negligence claims against the United States for the actions they seek to challenge.  And while constitutional tort claims are barred by sovereign immunity, *see F.D.I.C. v. Meyer*, 510 U.S. 471 (1994) (Congress did not waive sovereign immunity for constitutional tort claims against the United States under the jurisdictional grant of FTCA), the FTCA is the exclusive route created by Congress to sue the United States for the alleged tortious acts of its employees.  That the route Congress created runs plaintiffs into a

dead end without a damages remedy reflects the separation of powers and does not counsel in favor

of recognizing a new *Bivens* action: "Although it is possible that no alternative remedy exists for

[the plaintiff], that does not conclude our analysis because, 'even in the absence of an alternative,

a *Bivens* remedy is a subject of judgment [.]'" *Vanderklok v. United States*, 868 F.3d 189, 205 (3d

Cir. 2017) (*quoting Wilkie*, 551 U.S. at 550 and citing *Meshal v. Higgenbotham*, 804 F.3d 417,

425 (D.C. Cir. 2015) (refusing to imply a *Bivens* remedy, even when the government admitted the

plaintiff had no alternative remedy); *De La Paz v. Coy*, 786 F.3d 367, 377 n. 8 (5th Cir. 2015),

("In fact, the government may not need to provide any remedy at all.") (*citing Chappell v. Wallace*,

462 U.S. 296, 304 (1983) (denying *Bivens* actions for enlisted military personnel against their

superior officers) and *United States v. Stanley*, 483 U.S. 669, 684 (1987) (denying a *Bivens* remedy

for injuries that arise out of or are in the course of activity incident to military service)).

> ii.    *Special Factors counsel against recognizing a new First Amendment Bivens action*

Many special factors unique to this case counsel against recognizing a new First

Amendment *Bivens* claim.  Based upon the history of the United States' relationship to HINU

outlined in Dr. Graham's motion to dismiss, it is clear that for a very long time there has been

frequent and repeated Congressional action in the context of Indian education and the BIE

specifically.  Simply put, Congress's long history and involvement in this area is undeniable.

HINU was founded in the late 1800s, creating a unique relationship between the United States and

the University.  Recognizing a First Amendment *Bivens* claim in this context invites the Judiciary

to become involved in the day-to-day operation and management of HINU administration and

education.

Plaintiffs urge this court to enact "fairness" by filling in where they admit Congress has

not provided a remedy they deem appropriate.  If there is any disparity between federal and state

university defendants, it is because Congress has chosen that system.  That Plaintiffs may assert First Amendment claims against state university officials is a product of Congress's enactment of 42 U.S.C. § 1983—which only applies to state actors—and its failure to enact a similar statute that applies to federal actors.  This was a clear choice by Congress which conscientiously created a right against state actors but did not choose to do so in regard to federal actors.  Simply put, Congress has designed it that way and it would be an intrusion on the separation of powers for the Court to expand the remedies to provide potential redress for the actions of federal actors when Congress has not.  Along those same lines, Plaintiffs' argument about state actor liability under § 1983 versus federal actors could be applied to many types of claims.  Plaintiffs essentially argue that if state actors are liable under § 1983, federal actors should be subject to similar civil liability.  But that is the crux of the matter:  Congress created § 1983 to address civil rights violations by *state* actors, *not* federal actors.  This Court should not supplant Congress's determination:

> When a party seeks to assert an implied cause of action under the Constitution . . . separation-of-powers principles are . . . central to the analysis," [and] "[w]hen an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them."  *Id.* (internal quotations and citation omitted). "In most instances, the Court's precedents now instruct, the Legislature is in the better position to consider if 'the public interest would be served' by imposing a 'new substantive legal liability.'" *Id.* (*quoting Schweiker*, 487 U.S. at 426-27).

*Abbasi*, 137 S. Ct. at 1857.  That there is no counterpart that applies to federal officials is a reflection of Congress's evaluation of the interests of the United States, its immunity from suit, and how to best preserve and allocate the finite resources of the United States.

Plaintiffs essentially ask this Court to infer from Congress's decision to pass a law allowing claims only against state officers under § 1983 that there should also be claims allowed against

federal officials.[8]  This is exactly the opposite of what the courts have said.  There is a discrepancy: Congress has chosen to create a claim against state officers but not against federal officials.  But that is Congress's decision to make.  Indeed, Congress could choose to regulate state officials by means of a damages action, but may choose, and effectively has chosen, other mechanisms at its disposal to control federal officers, including, but not limited to: the power of the purse, federal oversight, internal government discipline, establishing OIGs, setting training requirements, setting hiring standards, and delineating responsibilities.

As explained by the Supreme Court, costs to the government can also warrant hesitation: "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide." *Abbasi*, 137 S. Ct. at 1858.  The systemwide costs include "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself . . . ." *Id.*  Among those consequences are the hesitation of federal officials to carry out their duties.  As the Supreme Court has made clear, *Bivens* liability is personal.  *See, e.g.*, *Carlson*, 446 U.S. at 21 (noting *Bivens* actions subject officials to "personal financial liability").

Also, government indemnification is irrelevant and discretionary.[9]  And in regard to the Plaintiffs' practical concerns argument, there is another substantial difference between § 1983 and

---

[8]  Plaintiffs contend that the courts' experience with Section 1983 suits demonstrates that there will be no "deluge" of cases if the Court extends *Bivens* here.  Opp. 34.  But the Court need not have epistemic certainty that there will be such a deluge of litigation in order to exercise "caution" before extending *Bivens*.  *Hernandez*, 140 S. Ct. at 742; *see also Ahmed v. Weyker*, No. 18-3461, 2020 WL 7637930, at *5 (8th Cir. Dec. 23, 2020) ("It may well be that the costs are worth it, but Congress is better equipped than we are to make the call.").  And Plaintiffs' argument rests on a false comparison.  There is no complete federal analog to Section 1983.  *See Abbasi*, 137 S. Ct. at 1854.

[9]  Plaintiffs argue that an individual-capacity action will not unduly burden federal officials because individual defendants may seek indemnification.  But indemnification is discretionary,

*Bivens* claims in that state governments typically provide automatic indemnification to state actors. Contrary to any suggestion otherwise, there is no automatic indemnification of federal officials sued under *Bivens*.

The idea of a special factor is not whether there are good policy arguments for a remedy or whether implying one is a good idea.  It is instead about respect for a coordinate branch of government and the separation of powers created by the Constitution.  And as the Supreme Court makes clear in *Abbasi* and *Hernandez,* that *is* the prime separation-of-powers concern with extending *Bivens* remedies. *Hernandez*, 140 S. Ct. at 741 ("In later years, we came to appreciate more fully the tension between [implying damages remedies] and the Constitution's separation of legislative and judicial power.").  If a court creates a new damages remedy against federal officials, it is in practical effect a court legislating new law.  Under our tripartite form of government, federal courts are not supposed to legislate, while Congress is.

Plaintiffs' argument about the history of state-law remedies against federal officers and the Westfall Act ignores the division of duties to the three branches of federal government.  If it were as Plaintiffs suggest, there would be no such thing as "special factors" counseling hesitation against recognizing new *Bivens* claims, and it certainly would not be as pervasive as it is.  There are other problems with Plaintiffs' understanding of the Westfall Act.  To begin, the cases cited by Plaintiffs are inapposite and, if anything, cut towards Dr. Graham.  *Hui v. Castaneda,* 559 U.S. 799 (2010)

---

*see* 28 C.F.R. § 50.15(a)(8)(iii), and would be decided by an administration perhaps years from now after liability (hypothetically) is established. More fundamentally, Plaintiffs cannot use *Bivens* as an end-run around sovereign immunity.  *See generally Meyer*, 510 U.S. at 484–86.  Plaintiffs focus exclusively on potential monetary costs to individual defendants, but do not dispute that creating a *Bivens* remedy here would place additional "burdens to the judiciary" and the United States defending the likely tidal wave of such new claims.  *See Mack v. Yost*, 968 F.3d 311, 324 (3d Cir. 2020) (noting practical concerns); *cf., De La Paz v. Coy*, 786 F.3d 367, 379 (5th Cir. 2015) ("[E]xtending *Bivens* suits to the immigration context could yield a tidal wave of litigation.), *cert. denied sub nom. Garcia de la Paz v. Coy*, 137 S. Ct. 2289 (2017).

was a statutory interpretation case asking whether 42 U.S.C. § 233(a) precluded *Bivens* actions against Public Health Service officials.  It's unclear what they think *Hui* says about whether to imply a *Bivens* remedy in this case, but it is wrong to infer from *Hui* that Congress "expressly sanctioned" the *Bivens* remedy.  Congress did not.  If anything, an act of Congress which addresses *Bivens* but neither allows nor bars a remedy should cut against implying a *Bivens* remedy, which is disfavored.  *See Abbasi,* 137 S. Ct. at 1858.  *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) is even more plainly distinguishable.  There, Congress had created a cause of action and the court said that damages were an appropriate form of relief under that cause of action.  *Id*. at 489.  Here, Congress has not created a cause of action.  If anything, *Tanzin* shows that when Congress wants, it knows how to create a damages remedy against federal officers, but it has not done so here.  *See Butler*, 2021 WL 2221463, at *4 n.3.

The Westfall Act simply makes clear that the United States is not waiving sovereign immunity for alleged constitutional violations.  It does not stand for the proposition that claims for such violations can be brought wholesale against federal officials personally.  Conversely, Congress, which is presumed to know and understand the law,[10] is well aware that federal courts have been denying the creation of new *Bivens* claims in a wide range of scenarios, yet Congress has not taken any action to correct the courts or to establish damages remedies.

Contrary to Plaintiffs' suggestion, this Court need not opine on whether state college systems are functioning well or cost effectively.  The point is not whether it is "worth it" as a

---

[10]   *See Lindsey v. Lessee of Miller*, 31 U.S. 666, 669 (1832) ("When in 1807 congress passed the law, they must be presumed to have legislated on the then existing state of things."); *White v. Mercury Marine*, 129 F.3d 1428, 1434 (11th Cir. 1997) (explaining that we ordinarily presume that Congress "act[s] with the knowledge of existing law and interpretations when it passes new legislation").

policy matter to allow these types of claims.  Indeed, that judgment is constitutionally entrusted to Congress. *Ahmed v. Weyker*, No. 18-3461, 2020 WL 7637930, at *5 (8th Cir. Dec. 23, 2020) ("It may well be that the costs are worth it, but Congress is better equipped than we are to make the call.").  The question is whether this Court should create a new damages remedy given the practical difficulties in doing so.  The courts make clear that retaliation claims are difficult to resolve and are burdensome on the courts and parties.  That counsels hesitation before creating the remedy Plaintiffs seek.[11]

### 2.    Plaintiffs fail to rebut Dr. Graham's qualified immunity showing as they cannot establish that Dr. Graham's conduct violated clearly established law

Even assuming, arguendo, that there is a *Bivens* remedy, qualified immunity "gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'" *Abbasi*, 137 S. Ct. at 1866 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)).  Its protection—particularly the "clearly established" prong—is "ample" and shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

---

[11]  Also, purported *Bivens* claims, like Plaintiffs', that require proof of a subjective state of mind are especially difficult to administer and increase the likelihood of frivolous, yet resource consuming, litigation. *See Crawford-El v. Britton*, 523 U.S. 574, 584-85 (1998) ("[B]ecause an official's state of mind is easy to allege and hard to disprove, insubstantial claims that turn on improper intent may be less amenable to summary disposition . . . .") (internal quotations omitted); *Mack v. Yost*, 968 F.3d 311, 324 (3rd Cir. 2020) ("First Amendment retaliation claims brought by inmates . . . are easy to allege and difficult to prove."); *cf. Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006) (quoting *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)) (noting "the danger of 'federal courts embroil[ing] themselves in every disciplinary act that occurs in state penal institutions'").  Because retaliation claims involve an inquiry into a defendant's state of mind, they may not be easily resolved at the summary judgment stage, leading to even higher litigation costs. *Mack*, 968 F.3d at 325 (noting that the "burdens and costs" include "the costs and resources needed to defend such suits").

For a right to be "'[c]learly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that *every* reasonable official would understand that what he is doing' is unlawful." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *al–Kidd*, 563 U.S. at 741) (emphasis added). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.* "The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Id.* at 589-90 (citation omitted). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* at 589. "It is not enough that the rule is suggested by then-existing precedent." *Id.* at 590. "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.*

As the above case law demonstrates, the right must be defined, not at a high level of generality, but in light of the specific facts and circumstances facing Dr. Graham such that a reasonable person in his position would know that his actions violated that right. *See al–Kidd,* 563 U.S. at 742; *DeSpain v. Uphoff*, 264 F.3d 965, 979 (10th Cir. 2001). In other words, there must have been a Supreme Court or Tenth Circuit case on point, or "the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Dodds v. Richardson,* 614 F.3d 1185, 1206 (10th Cir. 2010); *see Reavis estate of Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) ("[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.") (*quoting Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018)); *see also* MTD at 21-22 (citing above case law).

Plaintiffs have not met this high threshold. Here, the Complaint makes clear that the Directive that Dr. Graham issued was allegedly in response to Plaintiff Nally (1) raising complaints

to Vice President Salvini at an off-campus Community Police Review Board meeting (conduct that might be perceived as harassment or stalking), Compl., ¶¶ 53–57; (2) surreptitiously recording another faculty member, *id.* ¶¶ 58–63; (3) objecting to changes to the appointment of *The Indian Leader Association*'s faculty adviser in light of circumstances related to the COVID-19 pandemic, *id.* ¶¶ 64–72; and (4) emailing the local police to gather more information about the death of a HINU cafeteria worker, *id.* ¶¶ 73–79. Although Plaintiffs devote nearly ten pages arguing that they have alleged a First Amendment violation (an issue that Dr. Graham does not contest), *see* Opp. at 19 – 26, they devote only four pages to the salient inquiry—whether any such violation was clearly established. *See* Opp. Pgs. 17–19, & 26–28. Yet in none of those pages do Plaintiffs cite a Supreme Court or Tenth Circuit case where a university president, acting in response to the type of conduct that Plaintiff Nally engaged in, was held to have violated the First Amendment for issuing a directive even remotely akin to the one that Dr. Graham issued. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" (*quoting al–Kidd*, 563 U.S. at 742)).

None of the cases Plaintiffs cite are directly on point. All are distinguishable. *Buck v. City of Albuquerque*, 549 F.3d 1269, 1292 (10th Cir. 2008), and *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1332–34 (10th Cir. 2007), involved wholly separate sets of circumstances, both in terms of the actors and the alleged unconstitutional actions, than those involving Plaintiff Nally and Dr. Graham, and therefore would not have provided Dr. Graham with sufficient notice here. Needless to say, Dr. Graham is not a police officer, and nor was he engaged in using force to break up an anti-war protest. *See Buck*, 549 F.3d at 1292. Another case Plaintiffs cite relates to a student's expulsion from school for circulating a newspaper containing obscene language; again, this is quite different from a directive issued by a university president in response to a host

21

of different activities, none of which involved the use of obscene language.  *See Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973). *Barnes v. Zaccari*, 592 Fed. Appx. 859 (11th Cir. 2015), an unpublished, out-of-circuit case, also involved different facts and circumstances than those here, and in any event does not clearly establish a constitutional violation.  Nor does *Husain v. Springer*, 494 F.3d 108 (2d Cir. 2007), involving the nullification of a student election based on a school newspaper's endorsement of certain candidates, *id.* at 113-118. Each of these cases is plainly different on its face from the circumstances here such that they could not have provided Dr. Graham with the requisite notice.

Similarly, all the other circuit court cases Plaintiffs cite, *see* Opp. at 28 n.7, involved different circumstances and different actions undertaken by school officials.  In short, none of the cases Plaintiffs cite were on point, and none of them are sufficient to demonstrate that *every* reasonable person in Dr. Graham's shoes, when faced with a student who had surreptitiously recorded a school officer, spoken about faculty off campus at a community meeting, and engaged in other activities, would have known that issuing the Directive here violated Plaintiff's *clearly established* First Amendment rights.  *See Mullenix*, 136 S. Ct. at 308 ("This inquiry 'must be undertaken in light of the *specific context of the case*, not as a broad general proposition.'") (*quoting Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (emphasis added)).

Offering no case directly on point where a university president issued a directive even remotely similar to Dr. Graham's, let alone that the directive was in response to the same type of behavior that Plaintiff Nally allegedly exhibited, Plaintiff Nally instead resorts to broad-brush principles, such as the unremarkable and uncontroversial notion that First Amendment protections apply on college campuses, *Healy*, 408 U.S. at 180.  But, as explained above, such an observation is irrelevant to the clearly established inquiry.  The "Supreme Court has repeatedly reminded

[courts] 'not to define clearly established law at [such] a high level of generality.'" *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 864 F.3d 1154, 1179 (10th Cir. 2017) (quoting *Mullenix*, 136 S. Ct. at 308). Plaintiffs also cite *Hope v. Pelzer*, 536 U.S. 730, 734-35 (2002) (a case where prison officials tied an inmate to a hitching post, shirtless, for seven hours under the hot sun with minimal water and no bathroom breaks while taunting him), for the proposition that they "need not show that 'the very action in question has been previously held to be unlawful.'" But *Hope* is not the rule, it is an exception. A plaintiff "must either 'identify a case where an officer acting under similar circumstances as [Dr. Graham] was held to have violated the [constitutional right at issue],' or, absent an on-point precedent, show that the . . . conduct was so egregious that any officer would know it was unconstitutional." *Harte*, 864 F.3d at 1180 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)).

In any event, the conduct here was not so obviously egregious like tying an inmate to a hitching post, leaving him under the hot sun with no water, and then taunting him about his thirst. *See Hope*, 536 U.S. at 735. It is on this point that the Supreme Court's recent decision in *Mahanoy Area Sch. Dist. v. B.L. by and through Levy*, 141 S. Ct. 2038 (2021), is notable. The point of that case is not that its facts and circumstances apply here. Rather, the point is to demonstrate that the extent of First Amendment protections and applications are not always clear, especially in the unique context of school speech and the varied issues and circumstance that can arise when schools and university officials are faced with balancing the protections of the First Amendment with other important issues, like the safety of its faculty or disruptions to its campus environment. Indeed, one of the very issues that Dr. Graham was responding to with his Directive was Plaintiff Nally's off-campus activities at a police review board meeting, where he was raising concerns to the University's Vice President. Yet, *B.L.* was "the first case in which [the Supreme Court has]

considered the constitutionality of a public school's attempt to regulate true off-premises student speech[.]"  *Id.* at 2048–49 (2021) (Alito, J., concurring).   Thus, similar to the application of qualified immunity in the context of law enforcement and prisons, where the issues that police and prison officials face can vary under the circumstances, the issues that arise in the day-to-day administration of a public school or college campus are varied and complex, and the application of the First Amendment to a particular factual situation that a university official, like Dr. Graham, faces is not always clear.

In sum, Plaintiffs cannot meet their burden of pleading that Dr. Graham's conduct violated clearly established law at the time.  *See Reavis estate of Coale*, 967 F.3d at 992 (plaintiff has the burden of establishing a constitutional violation that was clearly established); *Olivier v. Baca*, 913 F.3d 852, 860 (9th Cir. 2019) ("The burden is on the party contesting qualified immunity to show that a law was clearly established at the time of an alleged violation.").   Plaintiffs have neither identified a directly on-point Supreme Court or Tenth Circuit case, nor have they supplied a robust "weight of authority from other courts show[ing] that the right must be as plaintiff maintains." *Dodds*, 614 F.3d at 1206.   Lastly, the facts of this case are certainly not in the realm of egregiousness for which such on-point case law is unnecessary.  *See, e.g., Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020) (reversing Fifth Circuit's grant of qualified immunity for lack of a case on point where prison officials put plaintiff in "shockingly unsanitary cells" for six days that were covered with mounds of human waste).   Plaintiffs have failed to demonstrate that Dr. Graham violated a clearly established right under the unique circumstances he faced.  Their claim against him should be dismissed.

## Conclusion

For the foregoing reasons, this Court should dismiss the individual-capacity claim asserted

against Dr. Graham pursuant to Rule 12(b)(6) for failure to state a claim.

Respectfully submitted,

DUSTON J. SLINKARD
Acting United States Attorney
District of Kansas

*s/ Terra D. Morehead*
Terra D. Morehead
Assistant United States Attorney
Ks. S. Ct. No. 12759
500 State Ave., Suite 360
Kansas City, KS 66101
Tele: (913) 551-6730
Fax: (913) 551-6541
Email: terra.morehead@usdoj.gov

*s/ Christopher Allman*
CHRISTOPHER ALLMAN
Assistant United States Attorney
Ks. S. Ct. No. 14225
500 State Avenue, Suite 360
Kansas City, Kansas 66101
Tele: (913) 551-6730
Fax: (913) 551-6541
Email: chris.allman@usdoj.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2021, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of filing to all CM/CMECF participants for this case.

s/ Christopher Allman
CHRISTOPHER ALLMAN
Assistant United States Attorney