IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

SEP 19  11 44 AM '89

RALPH       SON.

BY _____ DEPUTY
AT TOPEKA, KS.

THE INDIAN LEADER ASSOCIATION, ET AL.,

                    Plaintiffs,

vs.                                    Case No. 89-4063-R

UNITED STATES DEPARTMENT OF THE INTERIOR,
ET AL.,

                    Defendants.

## ORDER APPROVING SETTLEMENT AGREEMENT

NOW ON this 18th day of September 1989, the parties appear before the Court to announce a settlement of the claims of the Plaintiffs herein. The Plaintiffs appear through their attorney, Patrick R. Nichols; the Defendants appear through their attorney, David Cooper.

WHEREUPON, the parties announce to the Court that they have settled and resolved their differences, and entered into a settlement agreement in writing, which is appended hereto.

WHEREUPON, the Plaintiffs move orally to dismiss without prejudice all parties hereto, with the exception of Haskell Indian Junior College. The Court sustains said motion.

THEREUPON, the Court reviews the settlement agreement between the parties, guaranteeing the rights of free expression to the Indian Leader Association and the student journalist Plaintiffs, and find said agreement is valid, just and equitable. The Court approves the agreement.

Pursuant to paragraph 14 of the settlement agreement, the Plaintiffs move to dismiss the remaining party, Haskell Indian Junior College of the Bureau of Indian Affairs, subject to the provisions and terms of the settlement agreement. The Court sustains the motion and orders that the action be dismissed upon the terms of said motion.

The Court orders that hereafter the settlement agreement shall immediately bind the parties to all of its provisions and govern their conduct accordingly.

                    /s/ RICHARD D. ROGERS
                    Honorable Richard D. Rogers
                    United State District Judge

USA000001

APPROVED:

_____

Patrick R. Nichols
Attorney at Law
700 Jackson, Suite 703
Topeka, Kansas  66603
(913) 357-4050
Ks. S. Ct. No. 09396
Attorney for Plaintiffs

_____

David Cooper
Assistant United States Attorney
U.S. Department of Justice
444 S.E. Quincy
Topeka, Kansas  66603

-2-

USA000002

## SETTLEMENT AGREEMENT

This Settlement Agreement is made between the Indian Leader Association, Marcel Stevens, Laurey Chapman, Ardina Glenn, Cynthia Grant, Tina Melton, Harvey Ross, Cordell Whitetree and Catherine Williams and Haskell Indian Junior College of the Bureau of Indian Affairs of the United States Department of Interior to settle and compromise issues before the United States District Court for the District of Kansas in Indian Leader Association v. United States Department of the Interior, Case No. 89-4063-R (filed March 30, 1989).

1. Parties to Settlement Agreement. The parties to this Settlement Agreement are the plaintiff, Indian Leader Association, an unincorporated student association which publishes The Indian Leader (the "Association"), and plaintiffs Marcel Stevens, Laurey Chapman, Ardina Glenn, Cynthia Grant, Tina Melton, Harvey Ross, Cordell Whitetree and Catherine Williams, individually and in their capacities as editors, reporters and representatives of the Association ("Plaintiffs"), and defendant Haskell Indian Junior College of the Bureau of Indian Affairs of the United States Department of the Interior ("Haskell"), which enters into this Settlement Agreement through the agency of Jim Baker, Acting President of Haskell.

Nothing in this Settlement Agreement shall have any bearing on the academic standing of the named plaintiffs or any member of the Indian Leader Association. Nor shall this Settlement Agreement bear on the eligibility of a student to serve as an officer of the Indian Leader Association under the college's rules governing extracurricular activities.

2. Student Editorial Control. The parties agree that the members of the Association and the Editorial Board of The Indian Leader have the right to editorial control of the contents of The Indian Leader newspaper as described in the attached Plan of Operation of the Indian Leader Association ("Plan of Operation").

3. No Prior Restraint or Censorship. Haskell agrees that no officer, agent, instructor or employee of Haskell shall:

(a) censor, edit or modify the contents of The Indian Leader newspaper in violation of the First Amendment of the United States Constitution;

(b) restrain, obstruct or prohibit the publication of The Indian Leader newspaper or otherwise inhibit the free expression of members of the Association in violation of the First Amendment of the United States Constitution; however, nothing in this Settlement Agreement shall prevent Haskell, the BIA, the Department of the Interior, or Congress from withdrawing any federal funding for The Indian Leader, or from disposing of the printing press on

1

USA000003

the Haskell campus pursuant to the provisions of the Federal Property and Administrative Services Act or other applicable law;

(c) suspend the publication of The Indian Leader newspaper ~~on the ground that a vacancy has arisen in the position of faculty~~ adviser to the Indian Leader newspaper or the Association.

(d) refuse any written request for the disbursement of funds, reasonably related to the management or publication of The Indian Leader, from the Indian Leader Association Activity Fund, the Club Fund or any other Indian Leader Association account containing student monies in the Haskell Student Bank which is supported by a written resolution of the Editorial Board of The Indian Leader or the full membership of the Association finding "First Amendment Grounds for Funds Withdrawal by Students" as described in the attached Plan of Operation;

(e) refuse to approve a Plan of Operation for the Association substantially similar to the attached Plan of Operation, which is incorporated herein by reference and made an integral part hereof, and which shall be the Plan of Operation in effect for the 1989-1990 school year, or suspend the publication of The Indian Leader on the grounds that the Plan of Operation has not been approved; provided, that nothing in this Settlement Agreement shall prevent Haskell from establishing a journalism or communications department and incorporating The Indian Leader into the curriculum of such an academic program; that if such an academic program is established, Haskell and the members of The Indian Leader Association may revise the Plan of Operation of The Indian Leader Association to reflect incorporation of The Indian Leader under the curriculum of that program; provided further, that nothing in this Settlement Agreement is intended to prevent the members of The Indian Leader Association from adopting a Plan of Operation, or other organic operating charts or substantially dissimilar to the attached Plan of Operation; or

(f) have the right to excise any material from The Indian Leader on the grounds that it is either libelous or obscene.

4.   Role of Faculty Adviser.   The parties agree that the faculty adviser shall discharge his or her responsibilities consistent with the following guidelines:

(a) The faculty adviser to the Association may freely advise and instruct student editors and reporters in the subject of journalism and relevant professional standards, commend and critique the work product of student journalists, offer fiscal and technological guidance to the newspaper staff in business and production operations and provide whatever assistance to the newspaper and the student journalists the faculty adviser deems appropriate.

2

USA000004

(b) A faculty adviser may make nonbinding recommendations to the student editors which they may, in their sole discretion, take into consideration in the free exercise of their independent editorial judgment.

(c) Although a faculty adviser of the Association may freely offer advice and assistance to student members of the Association, neither the faculty adviser nor any other Haskell officer or employee has the right to censor, edit or modify in any way the content of The Indian Leader.

(d) The faculty adviser is under an affirmative duty to facilitate the disbursement of such funds allocated to the Association as directed by the Editorial Board and the Association by majority vote, supported by written resolution, which are reasonably related to the management and publication of The Indian Leader.

(e) The faculty adviser shall, to the best of his or her ability, adhere to the ethical standards set forth in the attached Code of Ethics of College Media Advisers.

5.    Responsibility of Student Journalists.    Sole legal responsibility for the contents of The Indian Leader shall rest with the individual members of the Indian Leader Association as recognized in 25 C.F.R. § 42.3 (1988). No legal responsibility for the contents of The Indian Leader shall be imputed to Haskell or the faculty adviser, the Bureau of Indian Affairs or the United States Department of the Interior. Plaintiffs understand that they may be held personally accountable for the contents of The Indian Leader in a court of law, if those contents are libelous or obscene, or infringe copyrights or trademarks, or otherwise give rise to civil liability.

6.    Newspaper Account in the Student Bank.    Those monies which may be received or collected by Haskell on behalf of the Association, such as the Association's allocation of student activity fees, if any, shall be maintained in the Haskell Student Bank in strict compliance with the applicable rules contained in the Bureau of Indian Affairs Manual ("BIAM"), this section of the Settlement Agreement and the Plan of Operations. Such monies shall be:

(a) the subject of a separate accounting in the Haskell Student Bank and assigned a separate account number;

(b) the subject of a monthly account statement prepared by the Haskell Student Bank which shall be presented to the President of the Indian Leader Association; and

(c) disbursed in accordance with this Settlement Agreement and the attached Plan of Operations.

3

USA000005

7. Off-Campus Bank Account. Those monies which are received, collected or raised off campus by the Association, without any intermediation by Haskell, may be deposited, at the election of the ~~Association, in either the Student Bank~~ account or in an off-campus account maintained at a local bank in Lawrence, Kansas. No disbursement from an off-campus bank account shall be made, however, without the signature of at least two officers of the Association on the draft drawn on such local bank. A copy of the monthly accounts of such off-campus bank account shall be published regularly in The Indian Leader. Nothing in this Settlement Agreement shall be read to prohibit Haskell from devising and implementing procedures for managing and accounting for on-campus revenue-raising activities of students.

8. Elections. As soon as possible following the execution of this Settlement Agreement, the President of the Association shall call a meeting of the membership of the Association for the purpose of electing the editors of The Indian Leader and the officers of the Association for the 1989-1990 academic year. This meeting shall be called within the first 30 days of the beginning of the fall 1989 semester at Haskell.

9. Control of Contributions for Subscriptions. Voluntary contributions made by individuals for subscriptions to The Indian Leader shall no longer be paid to the Haskell Indian Junior College Foundation and shall instead be paid directly to the Association Club Account in the Student Bank.

10. Waiver of Claims. This Settlement Agreement represents the final understanding between the parties concerning the resolution of the issues before the United States District Court for the District of Kansas in Indian Leader Association v. United States Department of Interior, Case No. 89-4063-R (filed March 30, 1989). All parties to this Settlement Agreement hereby release the others from any claims or causes of action, and the parties and their counsel agree not to initiate or cause to be initiated, any further proceedings between any of the parties or their counsel, or make any further requests regarding the facts of this case.

11. Covenant of Good Faith and Fair Dealing. The parties agree to interpret and implement this Settlement Agreement in good faith and with due regard for both the First Amendment rights of student journalists and the legitimate educational and administrative interests of Haskell. It is the central purpose of this Settlement Agreement to secure the regular publication of The Indian Leader free from any prior restraint or censorship. This Settlement Agreement is contingent upon the reciprocal performance of the specified obligations by all of the parties. In the event that any party acts in bad faith or breaches this Settlement Agreement, the aggrieved party shall be free to pursue appropriate legal remedies in a court of law. Nothing in this Settlement

4

PAGE.05

SEP 19 '89  8:55   U S A TOPEKA

USA000006

Agreement shall be construed to restrict or limit the right of any of the parties to commence litigation if any party fails to comply with all of the terms and conditions of this Settlement Agreement.

12. Use of Printing Press. The parties agree that the use of the federally authorized printing press at Haskell is subject to the Government Printing and Binding Regulations published by the Joint Committee on Printing of the U.S. Congress. See 44 U.S.C. §§ 103, 501, 502.

13. Recognition of Mutual Rights. Any and all rights and responsibilities under this Agreement are set forth in recognition of the mutual rights of the defendant Haskell, and the rights of the students to free speech, press and expression. The Agreement recognizes various rights of Haskell hereunder to alter the Plan of Operation in conjunction with the student journalists (3)(e), to reduce or eliminate funding (3)(b), and to dispose of or sell the printing presses under various provisions of this Agreement (12). These rights may not be exercised by Haskell in response to, or as a result of, articles, photographs or any other content of The Indian Leader. Further, such actions may not legitimately be performed under this Agreement as a form of prior restraint, or otherwise as intended to limit or restrict the free expression of ideas or rights to the students as recognized in this Agreement. Any exercise by Haskell of the rights noted in this paragraph shall be done following notice to The Indian Leader Association, stating the action to be taken and the reasons therefor. Such notice shall be delivered to the editor-in-chief and posted on the Student Activities bulletin board at least thirty (30) days prior to any such contemplated action.

14. Signature and Court Approval. This Agreement shall be signed by all the parties named in Section 1 of this Settlement Agreement or their duly authorized representatives. This Settlement Agreement shall be submitted to the Honorable Richard D. Rogers, Judge for the United States District Court for the District of Kansas, for final approval and shall not become effective until such final approval is obtained. After such final approval has been obtained, the Plaintiffs shall agree to the dismissal without prejudice of the action against all named defendants except Haskell. The Settlement Agreement shall then immediately bind the remaining parties to all of its provisions, and a judgment of dismissal of the action, subject to the terms of the Settlement Agreement, shall then be jointly submitted to the court by the remaining parties.

IN WITNESS WHEREOF, the parties have caused this Settlement Agreement to be executed by their duly authorized representatives on this _____ day of _____, 1989.

5

PAGE.06                    SEP 19 '89  8:55   U S A TOPEKA

USA000007

THE INDIAN LEADER ASSOCIATION

HASKELL INDIAN JUNIOR COLLEGE

MARCEL STEVENS
Managing Editor and President
The Indian Leader Association

JIM BAKER
Acting President
Haskell Indian Junior College

CYNTHIA GRANT
Student Journalist

DAVID M. COOPER
Assistant U.S. Attorney
Counsel for the Defendant

HARVEY ROSS
Student Journalist

CORDELL WHITETREE
Student Journalist

DARIO F. ROBERTSON
Counsel for Plaintiffs

PATRICK R. NICHOLS
Counsel for Plaintiffs

6

USA000008

THE INDIAN LEADER ASSOCIATION
Haskell Indian Junior College
Lawrence, Kansas 66046

PLAN OF OPERATION

I.   NAME

The name of this organization is The Indian Leader Association
and shall hereafter be referred to as the Association.

II.   PURPOSE

The purpose of the Association is to produce The Indian Leader
newspaper, an independent student publication, and the Haskell
Yearbook.   The Indian Leader newspaper will be produced and
published approximately six times each semester and the Haskell
Yearbook will be produced and published the spring semester of each
school year.  The Association will also maintain a separate account
to accept funds and donations on behalf of the newspaper and for
disbursing cash payments as incentives to students who contribute
articles, photographs and illustrations to The Indian Leader.

The Indian Leader is a nationally distributed Native American
newspaper edited and published by students at Haskell Indian Junior
College for the purpose of promoting the free and informed debate
and discussion of (1) topics of special interest to Haskell
students and alumni, (2) issues of special importance to Native
Americans generally and (3) all newsworthy topics and public issues
of general interest to American citizens.

The Indian Leader is published by the students at Haskell
Indian Junior College and the members of the Association in the
exercise of their individual rights to free speech and freedom of
the press guaranteed by the First Amendment of the United States
Constitution.   These fundamental First Amendment rights have been
expressly recognized as rights which individual students enjoy who
attend Bureau of Indian Affairs schools in Part 42 of Title 25 of
the Code of Federal Regulations.  Student Rights and Due Process
Procedures, 25 C.F.R. § 42.3(e)-(f) (1988).   These basic rights
have also been reaffirmed in Part III of the Code of Student Rights
and Responsibilities of Haskell Indian Junior College (1988).

The Indian Leader Association is committed to improving the
ability of Native Americans to determine their own destiny by
providing an open public forum in which all concerned citizens,
regardless of race, creed, color, sex, religion or national origin,
might freely discuss the important public issues of the day.  The
members of the Association believe that by providing such a public
forum, readers and contributors alike will improve their
understanding of the true meaning of leadership, citizenship and
democracy in contemporary American society through an open, honest

1

PAGE.08          SEP 13 '89  8:58   U S A TOPEKA

USA000009

and fair-minded exchange of views.

III. UNDERLINE{MEMBERSHIP AND OFFICERS OF THE ASSOCIATION}

A. General

To qualify as a member of the Association, an individual must:

(a) be an enrolled student at Haskell Indian Junior College;

(b) submit a news story, essay, proposed editorial, poem, short story, photograph or any other journalistic or literary work, not including advertisements, letters to the editor and notices, for publication in The Indian Leader, or participate in the production or circulation of The Indian Leader or the Haskell Yearbook.

(c) receive written notice that the submission has been accepted for publication in The Indian Leader; and

(d) inform the Association, orally or in writing, of an intention to become a member of the Association.

The Editor-in-Chief shall be responsible for keeping a current list of Association members and publishing said list at least once per semester in The Indian Leader.

In the event that any member fails to attend three consecutive meetings of the Association, without excuse, that person may be removed from the membership rolls of the Association by majority vote.

B. Officers

The officers of the Association shall include a President, Vice President, Treasurer and Secretary. The person elected President of the Association shall also serve as Editor-in-Chief of The Indian Leader and the person elected Vice-President shall also serve as Executive Editor of The Indian Leader.

Officers must maintain "academic good standing," as defined on page 35 of the Haskell Bulletin, 1988-1990, in order to receive a salary as specified in Appendix I containing the 1989-1990 Budget for The Indian Leader. Decisions made at duly convened meetings of the Association are binding on members.

All officers of the Association shall have taken or shall be currently enrolled in at least one course in English or Journalism at Haskell Indian Junior College at the time his or her term of office shall commence in order to be eligible to hold such office.

2

SEP 19 '88  8:59   U S A TOPEKA

USA000010

The President shall be the Editor-in-Chief and shall be responsible for the general operation of the paper and the Association.   The President shall pick up and distribute mail daily.

The Editor-in-Chief shall conduct regular and special meetings of student reporters, assign stories, edit manuscripts, oversee reporters and lay out The Indian Leader.

The Executive Editor shall assist the Editor-in-Chief in carrying out his or her assigned duties and shall succeed to the position of Editor-in-Chief in the event of a vacancy in that office prior to next regularly scheduled election.

The circulation manager shall (1) recommend to the printers the approximate number of issues of the newspaper to be published, (2) coordinate the distribution of issues on the day of publication, (3) maintain a current mailing list, (4) make additions, deletions, corrections and other appropriate changes in mailing list, (5) make labels or have labels made, (6) coordinate the process of labeling The Indian Leader for mailing, (7) keep a file of correspondence, and (8) make a weekly report, oral or written, to the Association.

Other positions in the Association shall be established upon the majority vote of the members of the Association.   The Association shall make the guidelines and prescribe the duties of all new positions.   Officers may be removed from office upon the vote of two-thirds of the members of the Association.

IV.   PARLIAMENTARY AUTHORITY

The rules contained in the current edition of Robert's Rules of Order Newly Revised shall govern the Association in all cases to which they are applicable and in which they are not inconsistent with this Plan of Operation and any special rules of order the Association may adopt.

V.   MEETINGS

Meetings of the Association shall be held weekly and will be open to all Haskell students and to the public.

At the beginning of each semester, the Association shall decide upon a day, time and place for such regular weekly meetings. Once the day, time and place has been decided by the Association and notice of such has been posted on the bulletin board at the Student Senate Building, no further notice shall be required for the Association to conduct business at such regular weekly meetings.

Any meeting of the Association not held on the day, time and

3

USA000011

place of the regular weekly meeting may be properly convened only upon three days' prior written notice.  Such notice shall be made to the Association by posting an announcement of the meeting on The Indian Leader Bulletin Board.  This notice requirement shall apply to any meeting of the Association, other than regular meetings, ~~referenced in this Plan of Operation, including but not limited to~~ meetings mentioned in Sections III(B), VI and VIII(B) of this Plan of Operation.

A majority of the members of the Association shall constitute a quorum.

VI.   EDITORIAL BOARD AND EDITORIAL CONTROL

The Editorial Board shall consist of the Association President and Editor-in-Chief, the Vice President and Executive Editor, Copy Editor, the Circulation Manager, and the Darkroom Manager.  Other positions and members of the Editorial Board may be added by majority vote of either the Editorial Board or the members of the Association.   A majority of the members of the Editorial Board shall constitute a quorum.

The Editorial Board shall have primary responsibility for and control of the editorial content of The Indian Leader.  Day-to-day editorial decisions shall be made by the Editor-in-Chief, but any question of editorial policy may be put to the vote of the Board of Editors at any regular or special meeting of the Board of Editors.

In the event that the faculty adviser, any member of the Editorial Board or any member of the Association requests, prior to publication, a special review of any portion of an issue of The Indian Leader to determine whether it is libelous or obscene, the entire Editorial Board shall:

(a) carefully read and evaluate the identified material to determine whether it is libelous or obscene;

(b) seek the advice of the faculty adviser and, if possible, experts in the field of student press rights and the law of libel and obscenity, such as legal counsel and journalists designated by the Student Press Law Center in Washington, D.C., the Journalism Education Association or College Media Advisers; and

(c) consult, when appropriate, authoritative treatises for more detailed guidance in determining whether the identified material is libelous or obscene, such as:

(1) Louis E. Ingelhart, Freedom for the College Student Press (Westport, Conn.: Greenwood Press, 1985): 125-151 (on libel), 159-168 (on obscenity); and

(2) Student Press Law Center, Law of the Student Press

4

USA000012

(Washington, D.C.:   Student Press Law Center, 1985):   31-38 (on libel), 38-41 (on obscenity);

(d) make a final, independent determination of whether to publish the identified material; and

(e) report its determination to the faculty adviser within 24 hours following such decision.

Any student who has submitted an article for publication may withdraw that article prior to publication upon reasonable written notice to the Editor-in-Chief, provided that such withdrawal can be accomplished without a substantial delay in publication.

## VII.  FACULTY ADVISER

One or more faculty advisers may be appointed by Haskell Indian Junior College to assist students in the publication of The Indian Leader.

The faculty adviser to the Association may freely advise and instruct student editors and reporters in the subject of journalism and relevant professional standards, commend and critique the work product of student journalists, offer fiscal and technological guidance to the newspaper staff in business and productions operations and provide whatever assistance to the newspaper and the student journalists the faculty adviser deems appropriate.

A faculty adviser may make nonbinding recommendations to the student editors which they may, in their sole discretion, take into consideration in the free exercise of their independent editorial judgment.

Although a faculty adviser of the Association may freely offer advice and assistance to student members of the Association, neither the faculty adviser nor any other Haskell officer or employee has the right to censor, edit or modify in any way the content of The Indian Leader.

The faculty adviser is under an affirmative duty to facilitate the disbursement of such funds belonging to the Association as directed by the Editorial Board and the Association by majority vote, supported by written resolution, which are reasonably related to the management and publication of The Indian Leader.

The faculty adviser shall, to the best of his or her ability, adhere to the ethical standards set forth in the attached Code of Ethics of College Media Advisers.

The right of the Association to publish The Indian Leader shall not be conditioned upon the prior appointment of a faculty adviser by Haskell Indian Junior College.   Consequently,

5

USA000013

publication of The Indian Leader. Receipt of any compensation as a result of the inability or unwillingness of Haskell Indian Junior College to appoint a faculty adviser to work with the Association in the event of a vacancy in that position.

The faculty adviser has no power to refuse to facilitate the disbursement of funds reasonably related to the management and publication of The Indian Leader as determined by the Editorial Board or the Association by majority vote.

## VIII. SALARIED POSITIONS OF THE INDIAN LEADER

### A.  Officers With Salaries

Salaried positions in the Association shall be those of President, Vice President, Copy Editor, Circulation Manager, Darkroom Manager.  The Typesetter shall also receive a salary.

### B.  Assistant Officers

Assistant officers shall be elected by majority vote of the members of the Association at the beginning of the last semester prior to the graduation of each salaried officer of the Association.  Such assistant officers shall serve as apprentices to the graduating officers for the purpose of receiving the necessary training and experience to assume the responsibilities of the graduating officer after commencement.  The assistant officers shall assume the office and responsibilities of the graduating officers on the date of the next commencement at Haskell Indian Junior College following their appointment as assistant officers.  Any office not so filled by an assistant officer shall be filled by majority vote of the members of the Association in a regular or special election.

## IX.  COMPENSATION AND AWARDS

Compensation and awards shall be as specified in this Section VIII.

Salaried positions shall be compensated according to the rates and amounts specified in Appendix I containing the 1989-90 Budget for The Indian Leader.  Students holding salaried positions shall not be paid any other compensation specified in this section.

Student reporters shall be paid $1.25 per column inch for articles published.  Student photographers shall be paid $5.00 for each photograph published.  Student artists shall be paid an amount to be determined by majority vote of the Association for each published illustration or cartoon.

The amount and disbursement of monies for any type of contest sponsored by The Indian Leader must be approved by majority vote

6

USA000014

of the Association.

X.   ACCOUNTS

    A.  Activity Fund

      Any funds allocated to The Indian Leader Association from the student activity fee, paid by each student of Haskell Indian Junior College each semester, shall be deposited in The Indian Leader Association Activity Fund in the Student Bank.   Other monies received or collected by Haskell on behalf of the Association shall also be deposited in that Activity Fund.

      Any officer, editor or any other member of the Association or any currently enrolled student or alumnus of Haskell Indian Junior College may, upon written request, examine the records of account of The Indian Leader Association Activity Fund in the Student Bank and may obtain a copy of any such records of account at his or her own expense.

      A summary of the records of account shall be published annually in The Indian Leader.

      In the absence of a finding by the Association of "First Amendment Grounds for Funds Withdrawal by Students" as described in the following paragraph, withdrawal from the Indian Leader Association Activity Fund shall be made by a faculty adviser, supported by signatures from a student member of the Editorial Board and the Association President.

      In the event that the Association or the Editorial Board passes by 2/3 (two-thirds) vote a resolution finding "First Amendment Grounds for Funds Withdrawal by Students," withdrawal from the Indian Leader Association Activity Fund shall be made by President of Haskell Indian Junior College, if the request is reasonably related to the management or publication of The Indian Leader, supported by the signatures of the Association President and another member of the Editorial Board.   "First Amendment Grounds for Funds Withdrawal by Students" exist whenever Haskell Indian Junior College has failed to appoint at least one faculty adviser to the Association or whenever the Association, by 2/3 (two-thirds) vote, reasonably determines that a faculty adviser (1) is in any way obstructing the publication of The Indian Leader, (2) refuses to comply with requests from the Association or the editorial board for disbursements reasonably related to the management or publication of The Indian Leader, or (3) attempts in any way to censor, edit or modify the content of The Indian Leader.

      Each withdrawal from The Indian Leader Association Activity Fund must be approved by a majority vote of the Editorial Board or the Association and supported by written resolution.   Each such resolution must explain the purpose of every withdrawal of funds.

7

PAGE.14

SEP 18 '89 9:03   U S A TOPEKA

USA000015

Receipts shall be collected within five (5) days following the disbursement of all funds. A full written accounting of any monies withdrawn pursuant to a resolution finding "First Amendment Grounds for Funds Withdrawal by Students" shall be given to a faculty adviser or, if there is no faculty adviser, to the President of Haskell Indian Junior College within five (5) days following the withdrawal transaction.

Nothing herein binds the federal government (or Haskell) to spend federal appropriated funds to publish The Indian Leader.

B.   Club Fund

Money raised by members may, at the election of the Association, be deposited into a Club Fund at the Student Bank or in an off-campus account at a local bank in Lawrence, Kansas. Such money may be withdrawn for (1) student entertainment, (2) contracting outside services and (3) such other uses benefiting the Association as the Editorial Board may, in its sole discretion, determine to be necessary or appropriate.

In the absence of a determination by the Association of "First Amendment Grounds for Funds Withdrawal by Students" as described in the following paragraph, withdrawal from a Club Fund maintained at the Student Bank shall be made by faculty adviser, supported by signatures from any two student officers of the Association.

In the event that the Association or the Editorial Board passes by majority vote a resolution finding "First Amendment Grounds for Funds Withdrawal by Students," withdrawal from the Club Fund shall be made by the President of Haskell Indian Junior College, supported by the signatures of the Association President and another officer of the Association. "First Amendment Grounds for Funds Withdrawal by Students" exist whenever Haskell Indian Junior College has failed to appoint at least one faculty adviser to the Association or whenever the Association, by majority vote, reasonably determines that a faculty adviser (1) is in any way obstructing the publication of The Indian Leader, (2) refuses to comply with requests from the Association or the editorial board for disbursements reasonably related to the management or publication of The Indian Leader, or (3) attempts in any way to censor, edit or modify the content of The Indian Leader.

Each withdrawal from the Club Fund must be approved by a majority vote of the Editorial Board or the Association and supported by written resolution. Each such resolution must explain the purpose of every withdrawal of funds. Receipts shall be collected following the disbursement of all funds. A full written accounting of any monies withdrawn pursuant to a resolution finding "First Amendment Grounds for Funds Withdrawal by Students" shall be given to a faculty adviser or, if there is no faculty adviser, to the President of Haskell Indian Junior College within five (5)

8

USA000016

days following the withdrawal transaction.

### C.   Contributions for Mailed Subscriptions

The Indian Leader shall be distributed free of charge to anyone interested in receiving a copy.   Any person wishing to receive a mailed subscription to The Indian Leader will be asked to make a $5.00 contribution directly to The Indian Leader Association Activity Fund by check or money order.   The next edition of the Haskell Bulletin shall be amended to provide for the payment of such $5.00 contributions directly into The Indian Leader Association Activity Fund, rather than the Haskell Foundation, a tax exempt organization which has not direct relationship with and provides no funding to The Indian Leader Association.

### D.   Off-Campus Bank Account

Those monies which are received, collected or raised off campus by the Association, without any intermediation by Haskell, may be deposited, at the election of the Association, in either the Student Bank account or in an off-campus account maintained at a local bank in Lawrence, Kansas.   No disbursement from an off-campus bank account shall be made, however, without the signature of at least two officers of the Association on the draft drawn on such local bank.   A copy of the monthly accounts of such off-campus bank account shall be published regularly in The Indian Leader.

9

USA000017

## APPENDIX I

### 1989-90 BUDGET FOR THE INDIAN LEADER

| Position | Salary | Times 12 Issues |
|----------|--------|-----------------|
| Editor-in-Chief | $33.50 | 402.00 |
| Executive Editor | 33.50 | 402.00 |
| Copy Editor | 33.50 | 402.00 |
| Circulation Manager | 33.50 | 402.00 |
| Darkroom Manager | 33.50 | 402.00 |
| Typesetter | 33.50 | 402.00 |
| Assistant Circulation | 33.50 | 402.00 |
| Assistant Darkroom | 33.50 | 402.00 |
| Assistant Typesetter | 33.50 | 402.00 |
| Freelance Compensation | 500.00 (per sem.) | $1,000.00 (x2 sem.) |
| Miscellaneous | 300.00 (per sem.) | 600.00 (x2 sem.) |
| Travel Expense | 750.00 (per sem.) | 1,500.00 (x2 sem.) |
| TOTAL | $3,158.00 (per sem.) | $6,716.00 (x2 sem.) |

10

USA000018

PLAN OF OPERATION APPROVAL

College Officials

PRESIDENT

Date Approved

DATE  9/14/89

DIRECTOR OF STUDENT ACTIVITIES

DATE

Kendall D. McHenry
STUDENT SENATE PRESIDENT

DATE  9 - 15 - 89

SPONSOR

DATE  9/15/89

Organization Officers

Marcel Stevens
PRESIDENT

Date Approved

DATE  9 - 14 - 89

(POSITION VACANT)
VICE PRESIDENT

DATE

Harvey E Ross J.
SECRETARY

DATE  15 Sept 89

Harvey E Ross J.
TREASURER

DATE  15 Sept 89

11

USA000019

# Haskell Indian Nations University
# Student Handbook
# Code of Student Conduct

Humankind has not woven the web of life.
We are but one thread within it.
Whatever we do to the web, we do to ourselves.
All things are bound together.
All things connect.
*~ Chief Seattle, 1854 ~*

USA000020

**I. Introduction**…………………………………….............………pg. 5
     A. Preamble……………………………………...........………pg. 6
     B. Mission of Haskell Indian Nations University……….. pg 6
     C.  Vision Statement …………………………………… pg 7
     D. Authority…………………………………………….pg 7
     E. Jurisdiction…………………………………......... ………pg. 7
     F. Violation of Law and University Discipline………..…pg. 8
     G. Student Rights…………………………………….pg. 8
     H. Student Responsibilities………………………….pg. 9
     I. Classroom Expression……………………........  ………pg. 10
     J. Campus Expression……………………………...……pg. 11
     K. Student and Campus Organizations………….........……pg. 11
     L. Publications…………………………………........ ………pg. 12
     M. Freedom of Protest…………………………….........……pg. 12
     N. Student FERPA Rights……………………………. pg. 13
     O.  Campus Safety and Security Survey…………………pg. 14

**II. Code of Student Conduct…………………………... ……. pg. 15**
     A. Code of Conduct and Definitions……………..………pg. 15

**III. Student Conduct Process…………………………...…….pg. 23**
     A. Due Process…………………………………………pg. 24
     B. Advocates…………………………………………… pg. 24
     C. Alternative Dispute Resolution……………..............…pg. 25
     D.  Restorative Justice Conference………………………pg. 25
     E. Adjudication Process…………………………………pg. 25
     F. Appeal Process………...……………………...………pg. 26
     G. Appeal Process following Expulsion……...…………. pg. 27
     H. Personal Safety during the SC Process……………. pg. 27
     I. Major/Minor Violations…………………………… pg. 28
          University Process Flow chart
     J. Sanctions…………………………………..…………pg. 30
     K. Emergency Suspension……………………………. pg. 32
     L. Trespassing Procedures…………………….............. pg. 32
     M. Diversion……………………………………………. pg. 33

**IV. Substance Abuse…………………………………….pg. 36**

**V. Violence Policy……………………………………pg. 42**

USA000021

**VI. Campus Sexual Assault/Harassment and Title IX..……... pg. 45**

**VII. Fire Safety………………………………………….... pg. 55**

**VIII. Residential Life Policies… ………………...........…. pg. 58**

**IX. Parking and Traffic Program Policies and
Procedures……………………………………….......……..pg. 67**

**X. Student Grievance Process……………………………..  pg. 74**

**XI. Definitions and Appendices…………………………....pg. 79**
        A. Policy and General Definitions…..……….......……..pg. 80
        B. Interpretation and Revision …….………….....……..pg. 83
        C. Sources ……………………………………….……..pg. 83
        D. Acknowledgements...………………………….……..pg. 84

**XII. Forms………………………………………...….…  pg. 85**

USA000022

## Statements of Accreditation, Mission, and Vision



National Accreditation

Haskell Indian Nations University is accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools to award associate and baccalaureate degrees



Professional Accreditation

The Haskell Indian Nation University, School of Education is accredited by National Council for Accreditation of Teacher Education (NCATE).



Haskell Indian Nations University Mission Statement

The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the leading institution of academic excellence, cultural and intellectual prominence, and holistic education that addresses the needs of Indigenous communities.

Haskell Indian Nations University Vision Statement

Haskell is a unique and diverse intertribal university committed to the advancement of sovereignty, self-determination, and the inherent rights of tribes.

USA000023

# I. Introduction

USA000024

## A.  Preamble

The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the leading institution of academic excellence, cultural and intellectual prominence and holistic education; in order to address the needs of Indigenous communities.

Haskell has established a Code of Student Conduct in order to promote healthy decision-making and to protect the rights of all students.  Each student is responsible for contributing to the values of Haskell through support and adherence to the Code of Student Conduct.  By forming this Code of Student Conduct, Haskell affirms students' rights to freedom, due process and impartiality in decision-making.  Haskell also prides itself on the focus of learning for students as they relate to self, friends, family, tribe, country, and world.

Sanctions are meant to help students reflect on their actions and learn to make better choices in the future to ensure they retain the opportunity to reach their academic potential. Students will be treated with fairness and respect throughout the processes of Student Conduct.  The Code of Student Conduct helps students understand the conduct expectations of the university and the consequences of your decision-making as a role in student learning.  We hope you will think about your choices and decisions and the impact they can have on your leadership potential and ability to complete your degree at Haskell before you engage in actions that violate our standards of conduct.

In October 2014, Haskell adopted new Institutional Values, commonly referred to in the document as "CIRCLE" values.

### Communication

> To successfully convey ideas, opinion, information, results, images and creative expression using multiple strategies for diverse groups and stakeholder.

### Integrity

> To conduct ourselves in ways that honor the sacrifices of our tribes on which treaty and trust responsibilities are based; and to carry out our responsibilities as students, staff, faculty, administrators, and regents by engaging in action based on the highest standard of conduct.

### Respect

> To honor and promote the diversity of beliefs, rights, responsibilities, cultures, accomplishments of self and others, including our non-human relations.

USA000025

### Collaboration

> The willingness and ability to work successfully with others to accomplish the goals of the university and to meet the needs of our students, the tribes we represent and serve as well as our mission.

### Leadership

> The willingness to acquire the knowledge and skills required to advocate for, and to advance the sovereignty and self-determination of tribes, Haskell and the students.

### Excellence

> To strive toward the strongest level of accomplishment in our respective roles on behalf of Haskell, as students, staff, faculty, administration, and the Board of Regents.

## B.  Vision Statement

Haskell is a unique and diverse intertribal university committed to the advancement of sovereignty, self-determination, and the inherent rights of tribes.

## C.  Authority

The President of Haskell Indian Nations University has delegated the responsibility and authority for resolving all issues of student conduct with the Student Conduct Administrator.  It will be presumed that Haskell employees will act in good faith when performing their duties and shall use a reasonable person standard to make discretionary decisions.

The Student Conduct Administrator shall determine the composition of Student Conduct Committees and Alternative Dispute Resolution Boards.

The Student Conduct Administrator shall develop internal policies and procedural rules for the Student Conduct Process and for Student Appeals Committees that are consistent with the provisions of the Code of Student Conduct.

Decisions made by a Student Appeals Committee, Alternative Dispute Resolution Board or the Student Conduct Administrator shall be final pending appeal, if any.

## D.  Jurisdiction

You are responsible for your conduct from the time of application to Haskell for admission through the actual awarding of a degree.  You are accountable for conduct that occurs before classes begin, after classes end, on or off campus, during the academic year or during periods between semesters of actual enrollment.  You are responsible for your

(7)

USA000026

conduct throughout your education at Haskell, even if your conduct is not discovered until after a degree is awarded or you have left the university.

While representing the university in off-campus events, you are held accountable for actions that may violate the Code of Conduct.  The Code of Student Conduct shall apply to your conduct even if you withdraw from school while a disciplinary matter is pending.

The Student Conduct Adminstrator shall decide whether the Code of Student Conduct shall be applied to conduct occurring off campus.

Anyone can file a written report against a student for violation of the Code of Student Conduct.  The report shall be submitted to the Office of Student Conduct within five (5) business days from the date the situation occurred.  The 5 business days rule does not apply to any complaints alleging sexual misconduct.  To learn more about processing sexual misconduct complaints and procedures, please go to page 45.

## E.   Violation of Law and University Discipline

You can be sanctioned for violation of the Code of Student Conduct, even if you receive a sanction for a violation of local, state or federal law arising from the same situation. Your Student Conduct Process can happen before, during, or after the on or off campus legal matter.  The sanctions you receive in the legal matter **will not** determine the sanctions given by the Office of Student Conduct or the Student Conduct Committee.

In order to be clear, if you get in trouble on or **off campus** and it is determined that you have violated the Code of Student Conduct, the outcome of the legal matter will have no effect on the Student Conduct process.  You can be found not guilty in criminal court and still be found responsible for violation of the Code of Student Conduct.

## F.   Student Rights

Part 42 of Title 25 of the Code of Federal Regulations applies to Haskell, which is funded by the Bureau of Indian Education.

Haskell recognizes that students have:
1. The right to understand the grading process at Haskell.
2. The right to an education that may take into consideration Native American or Alaska Native values and that incorporates applicable Federal and Tribal constitutional and statutory protections for individuals.
3. The right to be free from unreasonable search and seizure of their persons or property, to a reasonable degree of privacy, and to a safe and secure environment.
4. The right to make decisions for themselves where appropriate.
5.  The right to freedom of religion and culture.
6. The right to freedom of speech and expression so long as the expression does not unreasonably disrupt the educational process or endanger the health or safety of the students or others.
7. The right to freedom of the press, except where material in student publications is libelous, slanderous, or obscene.

USA000027

8. The right to peaceably assemble and to petition for the redress of grievances.
9. The right to freedom from harassment or discrimination based on sex, race, color, national origin, religion, ancestry, sexual orientation, disability, or, as specified by law, age, veteran status, marital or parental status, or degree of Indian blood.
10.  The right to due process.  Every student, student organization, and campus organization is entitled to due process and appeal in every instance of disciplinary action for alleged violation of Haskell expectations.  Please see Code of Conduct section on page 24.  A student or organization may waive the right to a hearing and use the alternative dispute resolution system or may choose to admit responsibility for misconduct and accept disciplinary sanctions from Haskell.
11. The right to reschedule examinations and tests, other than final examinations, which occur on mandated religious holidays or during traditional cultural ceremonies, provided that the students notify their instructors at the beginning of the semester.
12. The right to have respect for his/her property.
13.  The right to have student representation in the decision-making and policy forming groups.
14.  The right to be notified of proposed changes to student responsibility and academic policies.

The following rights are retained by students who live in the residential halls:
1. The right to read, study, and relax in one's room free from undue interference; unreasonable noise and other distractions that may inhibit the exercise of this right.
2. The right to sleep without undue disturbance from guests of roommate(s) and/or other residents.
3. The right to expect that a roommate will respect others' personal belongings.
4.  The right to a clean living environment.
5. The right to host guests with the expectation that guests are to respect the rights of the host's roommate(s) and other hall residents.

## G.   Student Responsibilities
Students shall have these responsibilities so as not to infringe upon the rights of others in the Haskell community.  Students assume an obligation to obey all rules and regulations made by properly constituted authorities to preserve all property provided for their education and to discharge their duties as students with diligence, fidelity and honor.

1.  Obtain an Education. Students shall regard the opportunity of obtaining an education as a duty to the community. Students have the responsibility to attend all their classes regularly.
2. Conform to Haskell rules. Students shall obey recognized rules and procedures developed by the school community, order and use of school property.
3. Exercise self-control. Students shall refrain from inflicting bodily harm on other students or other persons and respect the privacy of property and mail.
4. Understand the grievance process. Students shall inform themselves of the proper methods and channels for complaints and make use of them.
5.  Disclose any information regarding convictions of felonies.  Failure to disclose will result in immediate dismissal and loss of enrollment status.

(9)

USA000028

6.   Obtain and regularly check campus mailbox and e-mail.  This pertains to students living on-campus and off-campus.  This is the primary way that Haskell corresponds with the student body.

7.   Respect the rights of others and behave in accordance with expectations regulating student conduct and guidelines established by this Code of Student Conduct.

8.   Make decisions that do not infringe upon the rights of others.

9.   Express opinions and ideas in a respectful manner that does not slander, hurt or harm others.

10.  Respect the beliefs of others.

11.  Arrange a time and place for peaceable assembly that does not interfere with Haskell's normal operations.

12.  Recognize Haskell's authority to check student rooms for safety and health reasons.

13.  Respect the freedom of expression exercised by others.

14.  Maintain updated contact information at Haskell consistent with the application for admission in compliance with the Family Educational Rights and Privacy Act (FERPA).

**RESPONSIBILITIES CONCERNING CAMPUS E-MAIL**

1.  Haskell e-mail is a U.S. Government resource and, as such, all rules and regulations pertaining to use/misuse of Federal resources shall apply.

2.  Passwords are confidential and shall not be shared with any other individual.

3.  Haskell students shall not use the e-mail system for chain letters, junk mail, or any use of distribution lists such as campus-wide emails sent to the Haskell community.

4.  Haskell students shall not transmit through the e-mail system any unlawful, harassing, libelous, abusive, threatening, harmful, vulgar, obscene or otherwise objectionable material of any kind or nature.

5.  Haskell students shall not use the e-mail system for any illegal or commercial purposes, this includes compliance with Haskell's copyright policy.

6.  Haskell students shall provide true and accurate information on the e-mail application form.

7.  Failure to abide by the above terms will result in revocation of Haskell's e-mail privileges for the remainder of the semester in which the violation occurs.

## H.   Classroom Expression

Discussion and expression of all views relevant to the subject matter are permitted in the classroom subject to Haskell's CIRCLE values.  The responsibility of the instructor is to maintain order.

> a. Students are responsible for learning the content of any course for which they are enrolled.
> b. Requirements of participation in classroom discussion and submission of written exercises are consistent with this section.

Students are expected to conduct themselves with communication, respect, cooperation, leadership and excellence.  Disruptive, disrespectful behavior which poses a threat to the student or others, *or disrupts the learning environment of the classroom,* may result in

USA000029

sanctions and will be enforced through the Office of Vice President of Academics. Please refer to the Haskell Catalog for more information.

## I.  Campus Expression

Discussion and expression of all views is permitted, consistent with Haskell's CIRCLE values and subject only to requirements for the maintenance of order.  Support of any cause by orderly and peaceful means that does not disrupt Haskell's operations is permitted.

Students, groups, and organizations may invite and hear any persons of their choosing, subject only to the requirements for use of Haskell facilities.

## J.  Student and Campus Organizations

Organizations may be established for any legal purpose, including, but not limited to, religious, political, educational, economic, social, or recreational purposes.

> **a.** Affiliation or disaffiliation with an extramural organization shall not disqualify the Haskell-based branch or chapter from registering as a student or campus organization.
>
> **b**. Members in all Haskell-related organizations shall follow the guidelines established by the Constitution of the Student Senate.  The right of organizations to establish standards for membership is acknowledged, provided that all students are afforded equal opportunity to meet those standards.  Nothing in this section shall be interpreted as imposing a requirement that would violate the principle of selection on the basis of individual merit.
>
> **c.** A student may not be denied the rights of access to and participation in any Haskell-sponsored or Haskell-approved activity because of race, religion, sex, color, disability, national origin, ancestry, sexual orientation, political affiliation, marital or parental status, and to the extent specified by law, age or veteran status.

In order for an organization to apply for student activity funds, the organization shall register annually as an organization with the Student Senate and file a list of officers and plan of operation indicating that the organization shall abide by the rules and regulations of the Constitution of the Student Senate.

The Student Senate delegates to each organization, residential hall, fraternity, sorority or living group responsibility for establishing rules concerning social conduct.  Such rules shall be consistent with this Code of Student Conduct, rules of the Board of Regents, and local, state and federal law.

Residential rules of social conduct shall not be adopted that conflict with the Student Housing contract entered into as a condition of residency in facilities operated by the Department of Student Housing.

An organization or living group may discipline any member for violation of rules of social conduct, provided that any disciplinary action taken shall not affect a member's rights and privileges as a Haskell student.

USA000030

Haskell facilities shall be available to registered student and campus organizations for regular business meetings, social functions, recreational activities, and for programs open to the public. Reasonable conditions, as outlined in Haskell space utilization process, may be imposed to regulate the timeliness of requests, to determine the appropriateness of the space assigned, time of use, and to insure proper maintenance of the facilities. Haskell facilities may be made available to individuals or groups composed of members of the Haskell community, even though not formally registered. Preference may be given to programs designed for audiences consisting primarily of members of the Haskell community. The Space Utilization form can be attained at the Vice-President for University Services Office in Pushmataha Hall.

An organization alleged to have violated provisions of this code is entitled to alternative dispute resolution (ADR), restorative justice conference or a hearing in accordance with procedures established by the Office of Student Conduct. For more information about alternative dispute resolutions, please go to page 25.

## K.  Publications
A student, group, or organization may hand out written material on campus without prior approval.

The student press shall be free of censorship. Its editors, managers, and contributors shall be protected from arbitrary sanctions because of what is written. Similar freedom shall be assured for the oral statement of views on all Haskell-controlled radio or television stations. Slanderous speech or libelous writing is not protected. Slander is spoken words that are meant to defame another person or institution and that are untrue or unverified. Libel is a written, printed, or pictorial statement that defames one's character or reputation or exposes one to public ridicule.

## L.  Freedom of Protest
Students have the right of orderly and peaceful protest within the Haskell community. Haskell retains the right to assure the safety of individuals, the protection of property, and the continuity of the educational process including the maintenance of entrance to and from all Haskell buildings and offices, conduct of regular class meetings and other Haskell functions.

Orderly picketing and other forms of peaceful protest are protected activities on Haskell premises in the absence of interference with free passage through areas where members of the Haskell community have a right to be or the orderly conduct of Haskell business.

Peaceful picketing and other orderly demonstrations are permitted in public areas of Haskell buildings, including corridors, outside the auditorium and other places set aside for public meetings.

USA000031

Any student or group of students has the right to protest against the appearance on campus of any organization provided that the protest does not interfere with any other student's opportunity to communicate with the organization.

## M.   Student FERPA Rights

Haskell, in compliance with the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C.§1232g, ensures that students have the following rights relative to their education records.

1.   The right to inspect and review their education records within a reasonable period of time, and in no case longer than 45 days after a request has been made.  If any material or document in the education record of a student includes information on more than one student, each student shall have the right to inspect and review only such part of such material or document as relates to that student or to be informed of the specific information contained in such part of such material or document.  Copies are not to be distributed to students at any time.
2.   The right to request the amendment of their education records and to have the records amended within a reasonable period of time to ensure that the records are not inaccurate, misleading, or otherwise in violation of privacy or other rights.
3.   The right to confidentiality of personally identifiable information contained in their education records, except (a) to the extent that FERPA authorizes disclosure without consent; or (b) the information is disclosed to Haskell staff pursuant to Haskell policy; or (c) the information is disclosed to other persons, as provided by law, to comply with a judicial subpoena or a requirement of law or government regulation or to appropriate persons in a health or safety emergency.
4.   The right to have personally identifiable information withheld from Haskell directories, if the student informs Haskell within two weeks of public notice of the categories of information that will be included in the directories.
5.   The right to file a complaint with the US Department of Education concerning alleged failures by Haskell to comply with the requirements of FERPA.  For more information regarding the process for filing a complaint, you can find it on Haskell's website in the Office of Admissions.
6.   Except to the extent allowed by law or when acting on behalf of Haskell, those parties to whom personally identifiable information is given are not permitted to disclose that information to others without the written consent of the student.  A release of information form can be found on Haskell's website with the Office of the Registrar.
7.   Haskell must maintain a record of each disclosure of personally identifiable information about the student.
8.   Excluded from the category of education records, and to which the law does not guarantee the right of student access, are records that are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in his or her professional or paraprofessional capacity, or assisting in that capacity, and which are made, maintained, or used only in connection with the provision of treatment to the student, and are not available to persons other than those providing treatment, except that such records may be personally reviewed

(13)

USA000032

by a physician or other appropriate professional of the student's choice and with the student's written consent.

Any requests to view or obtain records should be made to the Office of the Registrar. For more information about students under the age of 21 in violation of the Substance Abuse Policy, please see page 37.

## N.  Campus Safety and Security Survey

Haskell Indian Nations University is required to comply with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (The Clery Act) as amended in 1998, which requires all post-secondary institutions to publish and distribute certain information regarding campus crimes, including reports of campus sexual assault, sexual assault policies and security programming to all current students, employees and to any applicant who so requests. A copy of the annual report can be requested at the Student Conduct Office or it can be found on our website at www.haskell.edu.

In compliance with the Jeanne Clery Act, Haskell has the Daily Crime Logs that are maintained in the Office of Student Conduct.  Please refer to the Haskell website at the Office of Student Conduct for more information.

USA000033

# II. Code of Student Conduct

USA000034

**Haskell Student Code of Conduct and definitions:**
**1-A. Being under the influence of Alcohol**
Reasonable grounds for a person to be considered under the influence of alcohol: odor of alcohol, slurred speech, bloodshot eyes, watery eyes, staggering, incoherence, inability to stay focused on conversation and maintains concentration due to consumption of alcohol. When a person exhibits 2 or more of the above-mentioned descriptions or their Blood Alcohol Content (BAC) is greater than 0.01%, a person may reasonably be considered to being under the influence of alcohol and in violation of this Article.
**1-B. Possessing Alcohol and/or Alcohol Containers**
Possession is when alcohol and/or alcohol containers such as cans, bottles, flasks, etc. are present, or in one's possession, whether full, empty, or partially filled. If these items are found on a student's person while anywhere on campus, in their dorm room, vehicle, or sites off campus as designated by the Haskell Administration, the student is in violation of this Article. All students who are in the immediate vicinity will be issued violation notices.
All alcohol and containers are subject to confiscation and will not be returned.
**1-C. Transporting and trafficking Alcohol**
To manufacture, supply, transport, or sell alcohol on campus as evidence by the alcohol itself, ingredients, packaging and distribution material, statements and/or witnessed by those items or transport alcoholic beverages onto campus. This also includes violation of laws or ordinances prohibiting the manufacture, sale, transporting, furnishing, maintaining unlawful drinking places; bootlegging; operating a still; furnishing liquor to a minor person; using a vehicle for illegal transportation of liquor; and all attempts to commit any of the aforementioned. All items associated with alcohol are subject to confiscation and will not be returned.
**2-A. Being Under the Influence of Drugs or Inhalants**
Reasonable grounds for a person to be considered under the influence of drugs or inhalants: odor of marijuana, slurred speech, bloodshot eyes, watery eyes, staggering, incoherence, inability to stay focused on conversation and maintain concentration due to use of drugs. When a person exhibits 2 or more of the above-mentioned descriptions, he/she may reasonably be considered to be in violation of this Article.
**2-B. Possession of Drugs and/or Paraphernalia**
Possession is having illegal drug(s) and/or prescription medication without a valid prescription, from a doctor or pharmacist, or drug paraphernalia or inhalants are present, or in one's possession. If these items are found on a student's person while anywhere on campus, dorm room, vehicle, or areas off campus as determined by the Haskell Administration and if in the vicinity where these items are present, the student is in violation of this Article. All who are in the immediate vicinity will be issued violation notices. All drugs, suspected drugs, and drug paraphernalia may be turned over to law enforcement agencies. Students in possession of drugs, suspected drugs, and/or drug paraphernalia, may be temporarily detained by Haskell Staff, pending an immediate criminal investigation by appropriate law enforcement agencies.
**2-C. Transporting and/or Trafficking of Drugs or Inhalants**
To manufacture, supply, transport, or sell illegal drugs, prescription medication or inhalants on the Haskell campus, or to bring on to campus, as evidence by the drug(s)

(16)

USA000035

and/or inhalant(s) itself, ingredients, packaging and/or distribution paraphernalia, statements and/or witnessed by those items or action. This also includes violation of laws or ordinances prohibiting the manufacture, sale, transporting, maintaining places to manufacture drugs; furnishing drugs or inhalants to a minor person; using a vehicle for illegal transportation of drugs; and all attempts to commit any of the aforementioned. Any drug packaging and/or distribution paraphernalia may be turned over to law enforcement agencies.  Haskell Staff may temporarily detain students that are found in possession of drug packaging and/or distribution paraphernalia, pending an immediate criminal investigation.

**2-D.  Contributing to the delinquency of a Minor**
Encouraging, abetting, permitting or assisting a person under the age of 21 to violate any of these articles or to otherwise commit any delinquent act. Persons over the age of 21 who allow such acts performed in their presence without objections are in violation of this article.

**3-A.  Violation of Haskell policy, federal, state or local laws.**
Any assisting, violating or having knowledge of a violation of Haskell policy, federal, state and local laws and not reporting it is prohibited at Haskell.

**3-B.  Violating any part of the Code of Student Conduct while on Haskell Probation.**

**4.  Violence**
Having knowledge of or facilitating violence without reporting the incident.

**4-A. Intimidation or Threat**
Any willful conduct, which creates a fear of bodily harm, or is verbally abusive, including gesturing, name-calling, threatening, by word or action of a perceived threat to inflict bodily harm.

**4-B. Simple Assault**
Assaults and attempted assaults where no weapon is used and which do not result in serious or aggravated injury to the victim.

**4-C. Aggravated Assault**
An unlawful attack by one person, upon another, that inflicts severe or aggravated bodily injury. This type of assault may be accompanied by the use of a weapon or by means likely to produce death or great bodily harm.

**4-D. Negligent Manslaughter**
The killing of another person through gross negligence.

**4-E. Murder/ Non-Negligent Manslaughter**
The willful (non-negligent) killing of one human being by another.

**4-F. Self-Destructive Behavior**
Inflicting harm on one's self by cuts, burns, or other harmful acts. These include ingesting harmful substances to cause self-injury. This includes statements of suicide, as evidenced by statements and/or witnessed by an individual. A student refusing medical attention could jeopardize his/her residence privileges due to the safety of himself/herself and others involved.

**5-A. Domestic violence** includes felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim.

**5-B. Dating violence** means violence committed by a person who is or has been in a romantic or intimate relationship with the affected party.

USA000036

**6-A. Bringing a Weapon on Campus**

All weapons are prohibited on the Haskell campus. Weapons are defined as any item whose primary use is to cause death or injury. Any use of, or having in one's possession or concealing, an instrument or substance, which by nature or use is an offensive or a combative object, even if otherwise legal, is prohibited. All weapons are subject to confiscation and will not be returned.

**6-B. Illegal Weapons Violation**

The violation of city, county, state, or federal laws or ordinances dealing with weapon offenses, regulatory in nature, such as: manufacture, sale, or possession of deadly weapons; carrying deadly weapons, concealed or openly; furnishing deadly weapons to minors; and all attempts to commit any of the aforementioned.

**7.  Haskell Property**

Attempting to damage or actually damaging property belonging to Haskell. Willfully marring, destroying, injuring or disturbing any real or personal property of Haskell.  This includes moving any property belonging to Haskell or others without permission.

**7-A. Robbery**

The taking or attempting to take anything of value from the care, custody, or control of a person or persons by force or threat of force or violence and/or by putting the affected person in fear.

**7-B. Burglary**

The unlawful entry of a structure, or room to commit a felony or a theft. Attempted forcible entry is included.

**7-C. Larceny/ Theft**

The unlawful taking, carrying, leading or riding away of property, from the possession of another. It includes crimes such as shoplifting, pocket picking, purse snatching, thefts from motor vehicles, thefts of motor vehicle parts and accessories, bicycle thefts, etc., in which no use of force, violence or fraud occurs.

**7-D. Motor Vehicle Theft**

The theft or attempted theft of a motor vehicle. A motor vehicle is self-propelled and runs on surface streets and roads. Construction equipment and farming equipment are excluded.

**7-E. Fraud**

Fraud consists of the intentional misappropriation or taking of anything of value, which belongs to another, by means of fraudulent conduct, practices or representations.

**7-F. Embezzlement**

Embezzlement consists of the embezzling or converting to his own use of anything of value, with which he has been entrusted, with fraudulent intent to deprive the owner thereof.

**7-G. Vandalism**

Any willful act that defaces, breaks, disables, or destroys any property not belonging to that person.

**7-H. Unauthorized Possession of School Property**

Students are not to be in possession of keys to any room or campus office, except for their assigned room in the residence lodge or mailbox key. Other prohibited items include cafeteria utensils, maintenance tools, equipment or other Haskell property.

USA000037

**8-A.  Harassment**

Harassment is prohibited at Haskell Indian Nations University. Harassment is defined as systematic and/or continued unwanted actions directed towards an individual or group of students by another student. Harassment may include, but is not limited to threats, demands, intimidation, coercion, suppression, and cruelty. Haskell Indian Nations University values the individual's right to live, work, and study without fear of intimidation, coercion, or exploitation regardless of race, gender, national origin, tribal affiliation, religion, disability, or sexual orientation. Indicators of harassment include but are not limited to:

- Any action or communication that would cause a reasonable person to fear for his/her safety.
- Any action or communication that causes any reasonable person harm or distress.
- Any repeated attempt to make contact with anyone over his or her objections.
- Intentionally, maliciously, and repeatedly following another person on campus.
- Haskell Indian Nations University prohibits bullying. Bullying behavior is any pattern of gestures or written, electronic or verbal communications, or any physical act or any threatening communication that:
  1. Places a student or school employee in actual and reasonable fear of harm to his or her person or damage to his or her property; or
  2. Creates or is certain to create a hostile environment by substantially interfering with or impairing a student's educational performance, opportunities or benefits.
- Cyber bullying, defined as sending threatening or aggressive texts, e-mails, or phone messages, posting insulting rumors, information, or pictures on a blog or social networking site, or using someone else's username to spread rumors or post insulting comments or pictures.

**9.  Sexual Harassment**

Sexual harassment can consist of the actions just described, but also creates an environment that is intolerable and incompatible with the mission and goals of the university; sexual harassment is a form of discrimination and is illegal.  Any unwelcomed sexual advances, requests for sexual favors, sexually motivated physical conduct, or gender-based verbal or physical threats that are explicit or implicit terms or conditions of employment (hire/fire, benefits) and/or substantially or unreasonably interferes with, limits or deprives an individual's ability to participate in or benefit from the university's educational program and/or activities creates a hostile environment and is prohibited at Haskell.

**10. Stalking**

To intentionally, maliciously, repeatedly follow or harass another person in person, by correspondence, or by electronic means.

**11. Lewd, Indecent, or Inappropriate Public Behavior**

Acts, words, or gestures which cause anger, shock, embarrassment or humiliation,

(19)

USA000038

including electronic communication is prohibited. Included is the excessive public display of affection.

## 12. Sexual Assault/Misconduct

Sexual assault can be any form of forced sexual contact. Force can be physical or emotional (threat, intimidation, pressure, coercion). Rape is a type of sexual assault usually involving sexual intercourse which is initiated by one or more persons against another person without that person's consent.

### 12-A. Forcible Rape

The carnal knowledge of a person, forcibly and/or against that person's will; or not forcibly or against the person's will where the victim is incapable of giving consent because of his/her temporary or permanent mental or physical incapacity.

### 12-B. Forcible Sodomy

Oral or anal sexual intercourse with another person, forcibly and/or against that person's will; or not forcibly against the person's will where the affected person is incapable of giving consent because of his/her youth or because of his/her temporary or permanent mental or physical incapacity.

### 12-C. Sexual Assault with an Object

The use of an object or instrument to unlawfully penetrate, however slightly, the genital or anal opening of the body of another person, forcibly and/or against that person's will; or not forcibly or against the person's will where the affected person is incapable of giving consent because of his/her youth or because of his/her temporary or permanent mental or physical incapacity.

### 12-D. Forcible Fondling

The touching of the private body parts of another person for the purpose of sexual gratification, forcibly and/or against that person's will; or, not forcibly or against the person's will where the affected person is incapable of giving consent because of his/her youth or because of his/her temporary or permanent mental incapacity.

## 13. Non-Forcible Sexual Misconduct

Unlawful, non-forcible sexual intercourse including Incest (non-forcible sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law) and Statutory Rape (non-forcible sexual intercourse with a person who is under the statutory age of consent.)

### 13-A. Incest

Non-forcible sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.

### 13-B. Statutory Rape

Non-forcible sexual intercourse with a person who is under the statutory age of consent. The statutory age of consent in Kansas is 16 years of age.

## 14. Fire Safety

### 14-A. Arson

Any willful or malicious burning or attempt to burn, with or without intent to defraud, a dwelling, building, motor vehicle, personal property of another, etc.

USA000039

**14-B. Activating and/or Tampering with a Safety Device**
Any willful attempt to block, hinder, or disable or activate a safety device, or use without just cause, such as fire alarms, smoke detectors, fire extinguisher, fire escape route, or any other safety device. Objects are not to be placed with-in 24-inches (2-feet) of a fire suppression device.

**14-C. Burning of Material, Use of Tobacco, and Fireworks**
Burning of any material in the residence lodge is strictly prohibited as it may endanger the health and the safety of occupants.
Burning of material means either open flame or smoldering material such as candles, medicinal plants and herbs, cigarettes or pipes containing tobacco or illegal substances, except when authorized by the Director of Housing, or designee, under Haskell's Smudging policy.  Please see the Residential Housing Student Handbook for more information.  Smoking of tobacco products on campus is allowed only outside of each building, except within 25-feet of entrances and ventilation air intake systems.
Fireworks, of any type, are prohibited from use and/or storage on Haskell campus at all times.

**14-D. Opening Exit Doors**
Opening an exit door to admit persons or keeping an exit door propped open for any reason, other than emergency, will be in violation of this policy.
At no time will any type of furniture or other item be placed within 24-inches (2-feet) of an automatic sprinkler head used for fire suppression. Students may be held financially liable for any damage caused by the movement of furniture or other object, with or without prior authorization.

**15.  Hazing**
Hazing constitutes doing, requiring or encouraging any act, whether or not the act is voluntarily agreed upon, in conjunction with initiation or continued membership or participation in any group, that causes or creates a substantial risk of causing mental or physical harm or humiliation. Such acts may include, but are not limited to, use of alcohol, creation of excessive fatigue, and paddling, punching or kicking in any form.

**16.  Residential Hall Policies**
This is not an all-inclusive list.  Please refer to the Residential Housing Student Handbook for more detailed information.

**16-A. Unauthorized Visitation**
Bringing or allowing into the residence lodge unauthorized person in a restricted areas of the residential hall, such as a member of the opposite sex in the living areas of the hall or allowing visitors to remain in the unauthorized areas past visiting hours.

**16-B. In the Private Living Area of the Opposite Sex**
Being anywhere in the private living areas of the opposite sex. This includes dorm rooms, showers, restrooms, windows, and dorm wing hallways.

**16-C. Failure to Maintain a Clean Room or Failure to Clean Assigned Area**
Students residing in the Haskell residential halls that fail to maintain a neat and clean room and/or are assigned to clean an area and fail to do so, or properly complete the assignment, will be in violation of this policy. Repeated violations will result in suspension of housing privileges.

**16-D. Gambling**
All gambling is prohibited on Haskell campus.

USA000040

**16-E. Littering**

Leaving trash or litter on campus except in appropriate receptacles. Residents who place their room trash in hall waste receptacles instead of the dumpster are in violation of this article.

**16-F. Excessive Noise**

Quiet hours are observed starting 10:00 p.m. to 8:00 a.m. All those making loud, excessive, obnoxious, repeated, or unnecessary noise, which interferes with the rights of those who want to sleep, study, or relax, even if outside the posted quiet hours are considered in violation of this article.

**16-G. Failure to Identify and/or Give False Identity**

At all times Haskell students are required to visibly display their Haskell Student Identification cards while on the Haskell Campus. Students are required to show identification upon demand, or when entering/exiting the campus.

Failure to visibly display their Haskell Student Identification Card; being in possession of another person's Haskell student Identification Card; allowing someone else to use your Haskell Student Identification Card and refusing to provide your name or providing a false name, are all violations of this policy.  Persons refusing or unable to provide suitable identification may be detained by Haskell employees until their identification can be satisfactorily verified by law enforcement authorities.

**17. Trespassing**

Entering on or loitering in unauthorized areas on campus is a violation of this policy. Students that have been suspended from the residential halls are not allowed in either residential areas including balconies, patios, windows, exit doors, and all other areas immediately adjacent to the dorm. Students that have been expelled from Haskell are in violation of a current Emergency Suspension (any levels), Notice to Vacate, or are on the  ineligible for housing master list.

**18. Cooperation with Haskell Employees**

Any attempt to misdirect, delay, misinform, hinder, or obstruct in any way Haskell staff in the performance of their duties will be in violation of this article.

**19.  Cooperation with Haskell Students**

Any attempt to misdirect, delay, misinform, hinder, or obstruct in any way Haskell students in the right to gaining an education will be in violation of this article.

**20. Harboring**

Harboring a person, such as a student who has been suspended from the dormitories or former student expelled from Haskell, or other person who has been evicted/ banned for disciplinary reasons from the campus.

**21. Misuse of Technology**

a. Violation of Haskell policy on proper use of E-mail or Internet while on the Haskell server.

b. Downloading or transferring of illegal downloaded media files, including illegal downloading of music and movies.

USA000041

# III. Student Conduct Process

USA000042

## A.  Due Process

Every Haskell student has the following rights to due process in a formal disciplinary proceeding pursuant to 25 C.F.R. 42.8:

1. **Notice.** Written notice of charges within a reasonable time before a hearing. Notice of charges shall include reference to the regulations allegedly violated, the facts alleged to constitute the violation, and notice of access to all statements related to the charge and to those parts of the student's school record which will be considered in rendering a disciplinary decision.
2. **Hearing.** A fair and impartial hearing.  In an emergency situation that seriously and immediately endangers the health and safety of the student or others, a Haskell official may temporarily suspend a student, but shall immediately report in writing the facts (not conclusions) giving rise to the emergency.  The official shall afford the student a hearing which fully comports with due process as soon as practicable thereafter.  Please see Student Conduct Office regarding 25 CFR mandate.
3. **Representation.** The right to have an Advocate at the hearing.  An attorney will be allowed to present the student's case, but only at the student's expense.
4. **Confrontation.** The right to confront and examine all witnesses and to produce and have produced witnesses on the student's behalf and to confront and examine all witnesses.
5. **Records.** The right to the minutes and record of all disciplinary proceedings (including appeal hearings) and to written findings of fact and conclusions in all cases.  All Information will follow Family Educational Rights and Privacy Act (FERPA) guidelines.
6. **Appeal.** The right to an administrative review and appeal.
7. **Non self-incrimination.** The student shall not be compelled to testify against himself/herself.
8. **Expunged.** The right to have the allegations of misconduct and information pertaining thereto expunged from the student's school record in the event the student is found not guilty of the charges.

## B. Advocates

1. Students who wish to have an "Advocate" must submit a "Release of Information" form to the Office of Student Conduct to allow the Advocate to have access to records and documentation associated with the case.
2. A Haskell employee must have permission from his or her immediate supervisor to act as an Advocate.  The Student Conduct Administrator will investigate potential "conflicts of interest" before a hearing.
3. A Haskell student must be in good academic and social standing to be and Advocate.  A student Advocate must notify the Office of Student Conduct and withdraw from being an Advocate if he/she is no longer in good academic and/or social standing OR if he/she has pending a disciplinary matter.
4. The Advocate is responsible for scheduling his/her own investigative interviews.
5. The student is responsible for providing the Advocate with all information that pertains to his/her case.

USA000043

6. The Presiding Officer will state on the record at each hearing that the student is represented by an Advocate and that a signed release form, allowing the Advocate access to records and documentation associated with the student's case, is in the student's case file.

## C.  Alternative Dispute Resolution

Haskell may address a student violation using an Alternative Dispute Resolution (ADR) process or the Adjudication process.

(1) When appropriate, Haskell will first attempt to use the ADR process.

(2) When the ADR process does not resolve matters or cannot be used, Haskell must address the alleged violation through the Adjudication process.

ADR process may:
(1) Include peer adjudication, mediation, and conciliation; and

(2) Involve appropriate customs and practices of the Indian Tribes or Alaska Native Villages to the extent that these practices are readily identifiable.

## D. Restorative Justice

Haskell may offer another alternative to addressing a student violation using the Restorative Justice model.  This model focuses on understanding and repairing the harms created by inappropriate conduct.  The Student Rights Specialist and the Dean of Students can determine if the Restorative Justice model will work in situations, and will be dealt with on a case by case basis.

Haskell may address an alleged violation through the ADR process or Restorative Justice Process unless one of the following conditions apply:

- the act requires immediate removal or emergency suspension.
- **OR**
- all parties do not agree to using an ADR process.

## E. Adjudication Process
1. An Incident Report shall be filed with the Student Conduct Administrator within five (5) business days of the incident.
2. The Student Conduct Administrator shall send a letter to the accused student through campus mail informing the student of the appointment date and time to meet with the Student Conduct Administrator or assigned housing staff.  Minor violations are handled by the Housing staff.  Major violations are handled by the Student Conduct Administrator with the exception of Fire Safety violations.  Fire Safety violations are handled by the Safety Officer.

(25)

USA000044

3.  At this meeting, the decision maker shall determine whether the student has committed a violation and shall impose sanctions based on preponderance of the the evidence.  If the student is found not responsible, then no sanctions will be given.
4.  Alternative Dispute Resolution (ADR) may be used when the accused student and the decision maker agree to it.  Situations may arise where the alternative dispute resolution process would resolve a problem in an informal manner.

## F. Appeal Process

1. A student may appeal based on the following:
    a)   Deprivation of Due Process.
    b)   Inadequate evidence to justify decision.
    c)   Sanction not in keeping with the gravity of the violation.
2. The student shall submit a written request for appeal that lays out the reason for appeal.  The written request shall be submitted to the Student Conduct Office, Minoka Hall, Room 106, no later than 5:00 p.m. and no later than 12:00pm noon five (5) business days after the Student Conduct Administrator's decision.
3. The student shall have the opportunity for an appeals hearing before a Student Appellate Board.  The Student Appellate Board is made up of at least three to five Haskell employees and/or students, selected by the Student Conduct Administrator.  The student shall be notified through campus mail of the time and date of the hearing.
4. The student is allowed a 15-minute waiting time from the time that the hearing is to begin.  Failure to report to the hearing before the waiting time ends will result in the Student Conduct Committee making a determination from the material before it.
5. At the hearing, the student may present a case, including witnesses and documents, and may ask questions of the accuser.
6. The Student Conduct Committee may interview the accuser, the accused student, and the witnesses.
7. The Office of Student Conduct shall record all hearings.  Minutes of the hearing shall be available upon written request to the accused student.  Students and witnesses are not allowed to record hearings.
8. Students are allowed to have an Attorney at Law present as an advocate at their appeal but at their own expense.
9. Parents have no standing in the appeal process.
10. After the Student Conduct Committee has deliberated in private, only the accused student and the student's authorized Advocate will be called before the Student Conduct Committee to be informed of the decision, a final decision will be made at this hearing.
11. The Student Conduct Committee has the authority to retract or alter any sanctions that were applied by the Student Conduct Administrator, the Housing Staff, an Alternative Dispute Resolution Board or a Restorative Justice Conference.
12. The decision of the Student Conduct Committee is final and there are no additional appeal rights to pursue.

USA000045

### G.   Appeal Process following Expulsion

Given the serious nature of expulsions, Haskell has established specific procedures for the appeal of an expulsion.

1.  If a student appeals an expulsion, the appeal will be referred to a Student Appellate Board. The student has five (5) business days from receiving notice of expulsion to file an appeal with the Student Conduct Administrator. The Student Conduct Administrator is responsible for convening the Student Conduct Committee and shall preside as the chair during the review hearing.

2.  The Student Conduct Administrator shall schedule a review hearing after receiving an appeal and the student will be notified through campus mail. Such notice shall contain:

   **a.** A specific statement of the violation(s) for which the student is being expelled.
   **b.** A statement of the time, date, and location of the Student Conduct Committee hearing to review the expulsion.
   **c.** A statement specifying the student's right to have an Advocate (or student paid attorney) to assist him/her.  A "Release of Information" form must be completed by the Advocate and filed by the student or the Advocate.
   **d.** A statement advising that the student may voluntarily waive the right to be present at the review hearing. Such statement shall advise that the student may not be forced to sign such waiver. Failure to report to a Student Conduct Committee review hearing shall constitute a waiver.

3.  The Student Conduct Committee shall have access to all materials used at the hearing that resulted in an expulsion order, including audiotapes of the proceeding. Additional material(s) provided by the student shall be allowed.

4.  The Student Conduct Committee shall issue a decision.  The Student Conduct Committee may uphold the expulsion; reverse the expulsion and order other appropriate sanctions; or, on a finding of serious procedural error below, reverse the expulsion and remand the case to the Student Conduct Administrator for further proceedings.

5.  The Student Conduct Administrator shall notify the student in writing of the Student Conduct Committee's decision.

6.  The Student Conduct Committee's decision is a final decision.

7.  Students expelled from Haskell forfeit their right to attend Haskell. They may not return to Haskell and are not permitted to be on campus grounds or in buildings without permission from Haskell's President.

### H.   Personal Safety during the Student Conduct Process (Affected Person's Rights)(25 C.F.R. 42.9)

In formal disciplinary proceedings, each school must consider affected person's rights when appropriate.

**(a)** The affected person's rights may include a right to:

   **(1)** Participate in disciplinary proceedings either in writing or in person;
   **(2)** Provide a statement concerning the impact of the incident on the affected person; and
   **(3)** Have the outcome explained to the affected person and to his or her parents or guardian by a school official, consistent with confidentiality.

USA000046

**(b)** For the purposes of this part, the affected person is the actual affected person, not his or her parents or guardians.

The decision maker may accommodate concerns for the personal safety, well-being, and/or fears of confrontation of the Complainant, Respondent, and/or other witness during the hearing by providing separate facilities, by using a visual screen, and/or by permitting participation by telephone, closed circuit television, video conferencing, videotape, audio tape, written statement, or other means, where and as determined in the sole judgment of the Director of the Office of Student Conduct.  Students should contact the Title IX Coordinator Tonia Salvini at Pushmataha Hall for a listing of affected person's rights.

## I.  Major/Minor Violations

**Major Violations -** Major violations will be adjudicated by the Student Conduct Administrator.
- Substance Abuse pg. 17
- Weapons pg. 18
- Haskell Property pg. 18
- Haskell Policy, State, and Local Laws pg. 17
- Intimidation pg. 17
- Violence pg. 17
- Harassment pg. 19-20
- Sexual Misconduct pg. 19
- Fire Safety pg. 20
- Haskell Property pg. 18
- Cooperation with Haskell employee pg. 21
- Cooperation with Students pg. 22


**Minor Violations -** Minor violations will be documented by the Housing staff.
- Residential Halls Violations (visitation and room checks) pg. 19-20

> **STUDENT NOTIFICATION PROCEDURE (Minor Violations):**  The following procedure will apply to students who are found in violation of the visitation and room check procedure.
> - First offense- written Student Notification warning is presented to the student.  A copy is forwarded on to the Student Life Director.
> - Second offense- $25.00 fine and 10 hours community service (In order for a violation to be considered at 2nd offense, the staff must include a copy of the first offense notification along with the incident report)
> - Third offense- eviction

USA000047

**Haskell University Conduct Flow Chart**



USA000048

## J. Sanctions
A decision maker has discretion to impose disciplinary, educational and/or restorative sanctions for a violation.

**Disciplinary Sanctions**
1. Warning and Probation- A notice in writing to the student that the student is found to have violated specific Haskell regulations and that more severe disciplinary sanctions may be imposed if the student is found to violate Haskell regulations during the designated probationary period.
2. Notice to Vacate:  A Notice to vacate means that a student must vacate their residential hall.  Typically a Notice to Vacate (NTV) is in place for one year of the issuance.
3. Loss of Privileges- Denial of specified privileges for a designated period of time.
4. Loss of Good Social Standing- Loss of Good Social Standing bars the student from being an officer in a student organization or representing Haskell.  It is regained once other sanctions are completed.
5. Fines- Previously established and published fines may be imposed.
6. Residential Hall Removal- This may be either temporary or permanent.  Temporary removal is separation of the student from the residential halls for a definite period of time, after which the student is eligible to return.  Conditions for return must be specified under a temporary removal.  Permanent removal is a permanent separation of the student from the residential halls with no eligibility for return.  Conditions for return will not be specified under a permanent removal since the student is ineligible to return.
7. University Removal- This may be either temporary or permanent.  Temporary University Removal is separation of the student from Haskell for a definite period of time, after which the student is eligible to return.  Conditions for return must be specified under a temporary removal.  Permanent removal is a permanent separation of the student from Haskell with no eligibility for return.  Conditions for return will not be specified under a permanent removal since the student is ineligible to return.  A student that has been removed will automatically receive a notice of trespassing if the student is found to enter or loiter on Haskell premises without prior authorization from Haskell's President.
8. Revocation of Admission and/or Degree- Admission to or a degree awarded from Haskell may be revoked for fraud, misrepresentation, or violation of Haskell standards for obtaining the degree or for other specified violations committed by a student before graduation.  Revocation of admission and/or degree may be coupled with temporary or permanent University banishment.
9. Withholding Degree- The University may withhold awarding a degree otherwise earned until the completion of the process set forth in this Code of Student Conduct, including the completion of all sanctions imposed.
10. Loss of Organizational Recognition: Student organizations that violate the Code of Student Conduct may lose their status as a student organization.

USA000049

`11. "No Contact Order" - A "no contact order" may be imposed to prohibit a student from being in contact with another student or Haskell employee.  This includes personal, electronic, postal, or any other types of contact.  The no-contact order may be temporary or permanent.

12. Guest Restriction: A student may be restricted from hosting guests in the residential halls if the student violates the guest policy.  The guest restriction may be temporary or permanent.

**Educational Sanctions**

1. Reflection Essay: A reflection essay may be assigned to help a student reflect on what choices he or she has made to get into a situation, what he or she could do instead to avoid situations like this in the future, and what he or she learned in this situation.  The essay cannot serve to blame others for the actions of the student.  Length will be assigned by the Student Conduct Administrator or Housing staff.

2. Policy Review: A policy review may be assigned in order to help students understand the motivation behind the Code of Student Conduct.  In this essay, the student must reflect on why the policies he or she violated exist in Code of Student Conduct and what would happen if the policy did not exist.  The review cannot be used to argue against the Code of Student Conduct.  It is meant to challenge the student to think from many perspectives.  Length will be assigned by the Student Conduct Administrator or Housing staff.

3. General Essay: A General Essay may be assigned about any topic the Student Conduct Administrator deems appropriate for the violation.  Length will be assigned by the Student Conduct Administrator or Housing staff.

4. Interview: An interview with a relevant campus resource may be assigned to help the student learn from this situation and relevant campus resources.  The length and number of questions will be assigned by the Student Conduct Administrator or Housing staff.

5. Flyer: An 8.5"x11" flyer about the violations committed may be assigned in order to help the student better explain a policy and to educate the Haskell or residential hall community about the violation.

**Restorative Sanctions**

1. Letter of Apology: A letter of apology will be assigned as a sanction when the student showed disrespect to other members of the Haskell community.  The letter must be sincere and will be reviewed by the Student Conduct Administrator before it is delivered.

2. Community Connection Activities: Community Connection hours will be assigned to help the student to repair harm done through his or her actions, but more importantly will help the student find better connections to help the student be successful at Haskell.  The Student Conduct Administrator will assign the specific location where hours are to be completed and specify a date by which the community connection hours must be completed.

3. Recommended Counseling: Counseling will be recommended in writing to students for assistance in resolving any potential mental or emotional issues.  The recommendation will be maintained in the student's file.

USA000050

4. Haskell Chemical Abuse Prevention Program (HCAPP): HCAPP or another licensed and/or certified Alcohol Assessment program will be required of students for severe alcohol violations.  This program assists students in understanding if they have problems with alcohol.
5. Conference: A conference between the person harmed and the person who violated the Code of Student Conduct will be assigned in cases where the person harmed agrees to have a conference with the student who violated the code.  The main objective of a conference is to have the student who violated the code understand how his or her choices have affected others.
6. Restitution- Compensation for loss, damage, or injury.  This may take the form of appropriate service and/or monetary or material replacement.
7.  Haskell Mental Health Assessment (HMHA) - HMCA or another licensed and/or certified mental health assessment program will be required of students for severe incidents involving violence and other threatening behavior. This program assists students in understanding if they have problems with anger management, and/or patterns of behaviors associated with violence.

## K.   Emergency Suspension

Any action to separate a student from the campus before a hearing is known as emergency suspension.  An emergency suspension can only come from the Student Conduct Administrator.  The forms for the Emergency suspension can be found on the website under the Student Conduct Office.   There are three levels of Emegency Suspension.  Please refer to page 94 for more information.

The emergency suspension may be imposed only: a) to ensure the safety and wellbeing of members of the Haskell community; b) to ensure the student's own physical or emotional safety and wellbeing; or c) if the student poses an ongoing threat of serious disruption of, or interference with, Haskell's normal operations.

During the emergency suspension, a student shall be denied access to the residential halls and/or to the campus (including classes), food service, community activities and all other Haskell activities or privileges for which the student might otherwise be eligible, as the Student Conduct Administrator determines to be appropriate.

## L.   Trespassing Procedures

A temporary, interim, or permanent "University Banishment" order will include a "no trespassing notice." The notice shall state that (a) the student will be charged with trespassing if he or she is found to enter or loiter on Haskell premises without prior authorization from Haskell's President and (b) Haskell will notify local, state or federal law enforcement units to enforce the law if the student violates a "no trespassing notice." The "no trespassing notice" will expire when the "University Banishment" order is lifted, expired or dismissed.

Similarly, a temporary, interim, or permanent "Residential Hall Banishment" order will include a "no trespassing notice." The notice shall state that (a) the student will be charged with trespassing if he or she is found to enter or loiter on the residential hall

USA000051

premises without prior authorization from Haskell's President and (b) Haskell will notify local, state or federal law enforcement units to enforce the law if the student violates a "no trespassing notice." The "no trespassing notice" will expire when the "Residential Hall Banishment" order is lifted, expired, or dismissed.

## M.  Diversion

The Office of Student Conduct for Haskell Indian Nations University has established the following guidelines for the Diversion Application process. This program is a service that is available only once during a student's enrollment at Haskell, and is designed to be a learning experience for students to help them be successful in their educational endeavor.

Diversion is a <u>privilege</u> and not a <u>right</u>. No presumption in favor of diversion exists in any case, and the burden of proof rests with the student to establish that a diversion agreement will best serve the student, the interests of the university, public safety and the rights of the victim(s).

In determining whether to grant a diversion, the Student Services Department will consider whether the student demonstrates a genuine sense of remorse and is prepared to acknowledge the offense(s) charged and accountability for consequences for his/her actions. Other factors to consider are the nature of the offense and the circumstances surrounding it, the probability that the student will cooperate and benefit from the program, the impact of diversion of the student on the university, the recommendations of the involved parties and that of the victim(s), the amount of restitution/damages which is owed, and any mitigating and aggravating circumstances surrounding the incident/offense.

It is not required that the student have a representative for the purpose of the diversion. However, each student has the right to secure counsel and have him/her represent them through the application process. If the student chooses to hire an attorney or seek legal advice, those costs are assessed to the student.

### <u>Eligibility</u>

The Office of Student Conduct will consider a number of factors in determining whether or not diversion is appropriate, which shall include but not be limited to the following:
1.  Prior offense(s) and nature of incident.
2.  Academic standing.
3.  Recommendations or letters of support.
4.  Letter of intent by student.
5.  Completed application and all materials related to application received in timely manner.

It is presumed by these guidelines that a diversion is **NOT appropriate** in the circumstances that follow:
1.  If the student has been found in violation of a substance abuse offense within the last five years.
2.  If the incident involved violence and/or weapons that resulted in arrest.

USA000052

3.  If the student was placed on emergency suspension as a result of the incident.
4.  If the student received any prior diversions or has pending incident reports not including matters covered by this application.
5.  If the student has been suspended from residential housing within the last five years.
6.  If the student had an incident report processed through Office of Student Conduct.

## Procedures

The student must attend all conferences set by the Office of Student Rights in regards to the application process.  During the initial conference regarding the incident report a determination will be made as to the disposition of the incident.  If the student meets the eligibility criteria an application may be obtained and the diversion process initiated.  The student will be need to complete the diversion application within 5 working days of formal adjudication, all necessary documents and materials must be submitted with the application.  Partial applications will not be accepted.

Assessments

- If the incident involves alcohol or drugs, the student may need to obtain an alcohol or drug evaluation from the Haskell Health Center prior to a final decision.

- If the incident involves violence, the student may be required to obtain an anger management assessment which may be done through the Haskell Health Center.

Notification of the application's approval or denial will be issued to the student during a conference to be set by the Student Services Department.  In the event the application is denied, due process will continue for the offense.

## Requirements

Once the student has been notified of the approval of the application, an appointment will be set for the student to review the requirements and conditions of the diversion.

- If an assessment was required, the recommendations of the assessment must be completed fully by the student as prescribed.
- Monitoring of academic progress by student and Office of Student Rights, or designee.
- Establish individualized plan for monitoring.
- Failure to adhere to conditions and requirements, or a second report involving substance abuse or similar offense will end diversion and loss of residential housing will be immediate with no appeal process.
- Failure to comply or any requests for extensions will result in the doubling of the fines and community service hours.

Diversion provides an opportunity for students to maintain Good Social Standing and remain eligible for housing.  Students may participate in a drug or alcohol treatment program while fulfilling the sanctions for violating the Substance Abuse Policy. For more information please turn to page 37.

(34)

**NOTE**: If a student is in an Honor Residential Hall and violates the Substance Abuse Policy and/or Violence Policy, he/she will have to vacate immediately and move to a regular residential hall.  The Haskell Chemical Abuse Prevention Program (HCAPP) and/or Haskell Mental Assessment (HMHA) may be utilized.  Students can choose to use other certified and/or licensed diversion programs at their own expense.  Failure to complete a diversion program will result in an immediate "Notice to Vacate" a residential hall and the student will no longer be considered in Good Social Standing.  All sanctions must be completed before the student is considered to be in Good Social Standing once again.

Student will need to apply for a diversion, and have that request granted in order to secure it as an option.  The Student Conduct Administrator will review all diversion applications and make a determination to approve, or deny.  Failure to complete application process, or having the diversion application denied can result in eviction from housing, a notice-to-vacate being issued, or other consequence deemed appropriate.

Application includes:
Completed Diversion Application
Personal Statement
Letter of Support from Instructor

A diversion application needs to be filed within 5 working days of formal adjudication.

USA000054

# IV. Substance Abuse

USA000055

## A. Standards of Conduct

Haskell's substance abuse policy prohibits the possession, use, or transporting/trafficking of alcohol, illegal drugs, non-prescribed prescription drugs, and other mind-altering substances by students. Haskell does not accept abuse of alcohol or drugs by students and behaviors that occur as a result of such abuse. The most serious consequences of this behavior are the loss of housing and suspension or expulsion from the University.

Haskell seeks to enrich the lives of students by employing programs and services to assist them, referring them to counseling, and having staff conferences with them.  See the Counseling Center for information about campus programs to prevent the possession, use or distribution of alcohol and drugs.

Haskell will contact the parents/guardians of students under the age of 21 in regards to violation of the "Substance Abuse Policy."

## B.  Medical Release for Substance Abuse

Abuse of alcohol and/or drugs is a serious threat to the wellbeing of students and the Haskell community. Accordingly, students who abuse alcohol or drugs to the extent that they become incapacitated and/or require monitoring shall be referred to the Counseling Center.  The Counseling Center shall determine if students should be medically released from Haskell.  Any student who is medically released must provide proof of treatment at a certified or licensed treatment facility and a written recommendation for return to Haskell from a licensed mental health professional before readmission to Haskell.  In some cases, violations of the code of conduct for medical reasons could be removed from the record.

## C.  Sanctions for Violation of the Substance Abuse Policy

**1. First Violation:**
- Student can participate in a Diversion Program in order to maintain housing.
- A student who does not participate in a Diversion Program will receive a "Notice to Vacate", or "Eviction" resulting in immediate loss of housing for one year from the date of issuance.
- Any time a student is found in violation of the Substance Abuse Policy, he/she will lose their housing privilege.  However, a student may appeal the loss of housing on their first violation only.  The student shall remain in housing pending the outcome of the appeal.  Should the student lose the appeal, the previous "Notice to Vacate" will go into effect immediately.

**2. Second Violation**:  This sanction is mandatory; however a student may appeal to the appellate board for review.  The Student will receive an order that includes the items below:
Notice to Vacate, resulting in immediate loss of housing for one year from the date of issuance, also includes:
- Loss of the privilege of visiting in the residential halls.

(37)

USA000056

- Loss of the privilege of being on campus after regular business hours, unless student is attending a class.
- Loss of the privilege to participate in any extracurricular activities, including athletic teams, intramural sports, etc. and loss of the use of Haskell facilities (i.e., Tecumseh Gym, Coffin Sports Complex, and Stidham Union). Student shall inform the Office of Student Conduct when the student has a class or class assignment or project in any of these facilities.
- Loss of privilege to Curtis Hall.
- Loss of Good Social Standing.
- Requirement to complete an Alcohol Assessment and Treatment Plan.
- Double the fine and community service hours from the diversion program.

**3. Third Violation:**

- Referral to Student Appellate Board with a recommendation of mandatory suspension for two academic years with a double fine and community service hours from the previous violation.
- Completion of an alcohol/drug treatment program or other appropriate treatment program before readmission to Haskell, or depending on the severity, expulsion from Haskell.

## D. Medical Amnesty

 The Medical Amnesty Program (MAP) represents the Haskell's commitment to increasing the likelihood that community members will call for medical assistance when faced with an alcohol or drug-related emergency. Every student, as a part of the Haskell community, has a responsibility for caring for self and others. In alcohol or drug related incidents, the primary concern of the University is the well-being, health, and safety of students.

Haskell has an obligation to make mandatory administrative referrals of students for incidents related to alcohol and other drug-related emergencies. The potential for student conduct action by the University against the student in need of medical attention and/or the student reporting the incident may act as a barrier to students getting the immediate medical attention they need. In order to alleviate the behavioral consequences associated with these alcohol and other drug-related emergencies, and increase the likelihood that students will get the medical attention they need, Haskell has developed a Medical Amnesty Program. This policy applies to all students who call on behalf of themselves or another student in need of immediate medical assistance including being transported by EMS.

In order to receive Medical Amnesty, students must use the policy proactively. This means that students must take the initiative to get assistance and that asking for medical amnesty after being confronted for possible alcohol or drug policy violations will not result in application of MAP.

If a student calls on behalf of another student, he or she is REQUIRED to remain with the student experiencing the medical emergency until medical personnel arrive.

Medical amnesty applies only to possession or consumption of alcohol and drugs.  In addition, the policy does not prevent action by police or other law enforcement personnel.

(38)

USA000057

## Frequently Asked Questions about the Medical Amnesty Program
**Why do we have a Medical Amnesty Program?**

At Haskell, the health and safety of every student is of primary importance and all students are strongly encouraged to be empowered bystanders who respond in a potentially dangerous situation without fear of reprisal from Haskell. Haskell supports students who act responsibly by reaching out for assistance in the case of a medical emergency, as well as supports the student who is helped.

A student or student organization seeking medical treatment for him/herself, or for any other student who is in immediate medical need, or any student who is the recipient of this emergency medical help, will not be subject to disciplinary sanctions related to the violation of using or possessing alcohol or other drugs, as defined in the Substance Abuse Policy. This rule applies to emergencies both on and off campus.

A student is eligible to use the Medical Amnesty Program on more than one occasion and students are always strongly encouraged to report a medical emergency. The positive impact of reporting a medical emergency will always hold the highest priority when determining the appropriate response for Haskell policy violations. In a situation where there are repeated violations, Haskell reserves the right to take disciplinary action on a case by case basis.

Because parents are vital partners in the educational process and because the student can be best supported from home, Haskell typically contacts parents of students under 21 years of age in instances where there is evidence of risk to health, welfare or safety. In addition, the University reserves the right to record names of those students involved to enable the University to follow up with the students as deemed necessary to ensure a student's well-being.

A student who receives medical assistance for alcohol use under the Medical Amnesty Program will be referred by the Student Conduct Office or their representative to a mandatory intervention program, such as the Red Road Program at the University Counseling Center. Additionally, a student who qualifies for the Medical Amnesty Program by calling for medical assistance for another student may be referred to this program at the discretion of the Student Conduct Office.

**Frequently Asked Questions**

*Q. What if I am underage and drunk when I call for help for a friend?*

A. In this situation, emergency personnel might want to ask you a few questions about how much the sick person had to drink or if they mixed the alcohol with any other drugs, for example. This

(39)

USA000058

information will be critical to helping your friend.  In such a case, Haskell will not refer you or the person you called for an alcohol violation.

**Q. *Will my name be recorded if I call for help for my friend?***
A. In most situations, if you are level-headed enough to call for help and you are not showing signs of alcohol or other drug overdose, emergency personnel will thank you for your assistance and simply help your friend.

**Q. *How will anyone know I was the one who called for help?***
A. In most cases, a professional staff members from Residential Halls will know that you called for help. If they do not know, you can simply inform them of your role in helping your friend or yourself.

**Q. *Does the Medical Amnesty Program apply if I call for help for myself?***
A. Yes

**Q. *Does Haskell contact my parents if I am transported to the hospital?***
A. Haskell does not automatically contact your parents when you are transported to the hospital. However, your parents would eventually be notified by mail if you are under 21 and had a hospital transport for alcohol or drug use.

**Q. *What happens if I am transported to the hospital for the second time – does the Medical Amnesty Program apply?***
A. While the main concern is the health and safety of every student, a pattern of behavior for hospital transports will require a staff member to review the situation and follow up using professional judgment for each individual situation.

**Q. *What should I do if a friend is showing signs of alcohol poisoning or overdose?***
A. Remember to **Check**, **Call** and **Care**. Alcohol overdose can be scary, but getting help is not.

**CHECK:** Watch out for your friends throughout the night. Encourage healthy choices. If someone you know has consumed too much alcohol, check for signs of overdose.

**CALL:** If you discover any one of the above problems, call for medical help immediately. Call 911. The above indicators of alcohol overdose are very serious and time is of the essence.  If you are unsure and are on campus, call Haskell Security at 785-760-6192.

(40)

USA000059

**CARE:** Continually talk to the person and monitor their skin color, temperature and breathing. Turn and keep the person on his/her left side as this will help to keep the person from choking should they vomit. Wait with your friend until help arrives; never leave a sick friend alone.

USA000060

# V. Campus Violence Policy

USA000061

## A. Purpose of the Policy
Haskell Indian Nations University and its respective entities are committed to maintaining a safe working and learning environment for all members of the Haskell community.   In this regard, HINU will take reasonable action to provide an environment free from violence, threats of violence, harassment, intimidation, and other disruptive behavior.

## B. Policy Statement
HINU will not tolerate violence, threats, harassment, intimidation and other disruptive behavior on its campus or in its programs, whether by students, faculty, staff or visitors. Such behavior may include oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm or intimidation.  Individuals who commit such acts may be subject to sanctions including, but not limited to, removal from the premises; exclusion from the premises; criminal prosecution; corrective and/or disciplinary action; and suspension or expulsion.

Haskell seeks to enrich the lives of students by employing programs and services to assist them, referring them to counseling, and having staff conferences with them.  See the Counseling Center for information about campus programs of harassment and violence.

## C. Sanctions for Violation of the Violence  Policy (That does NOT involve an arrest or emergency medical personnel)

### 1. First Violation:
• Student will have an opportunity to participate in a Level I Violence Diversion Program in order to maintain housing.
• A student who does not participate in a Level I Violence Diversion Program will receive a "Notice to Vacate", or "Eviction" resulting in immediate loss of housing for one year from the date of issuance.
• Any time a student is found in violation of the Violence Policy, he/she will lose their housing privilege.  However, a student may appeal the loss of housing.  The student shall remain in housing pending the outcome of the appeal.  Should the student lose the appeal, the previous "Notice to Vacate" will go into effect immediately.

### 2. Second Violation:  This sanction is mandatory; however a student may appeal to the appellate board for review.  The Student will receive an order that includes the items below:
Notice to Vacate, resulting in immediate loss of housing for one year from the date of issuance, also includes:
•        Loss of the privilege of visiting in the residential halls.
•        Loss of the privilege of being on campus after regular business hours, unless student is attending a class.
•        Loss of the privilege to participate in any extracurricular activities, including athletic teams, intramural sports, etc. and loss of the use of Haskell facilities (i.e., Tecumseh Gym, Coffin Sports Complex, and Stidham Union). Student shall

USA000062

inform the Office of Student Conduct when the student has a class or class assignment or project in any of these facilities.
- Loss of use of Curtis Hall.
- Loss of Good Social Standing.
- Requirement to complete a Mental Health Assessment and Treatment Plan.

**3. Third Violation:**
•Referral to Student Appellate Board with a recommendation of mandatory suspension for one academic year.
• Completion of an anger management treatment program or other appropriate treatment program before readmission to Haskell, or depending on the severity, expulsion from Haskell.

USA000063

# VI. Campus Sexual Assault and Sexual Harassment and Title IX

USA000064

## Jurisdiction

Haskell shall adjudicate cases involving alleged violators who are students or Haskell employees.  <u>There is no "statute of limitation" for violation of the sexual misconduct policy</u>.  This is in recognition of the severe psychological harm that sexual misconduct can have and to empower those against whom sexual misconduct is perpetrated to report when they have been harmed.

## Campus Sexual Assault

The following actions are violations of the sexual assault/harassment policy of Haskell.
1. Non-Consensual Sexual Touching
2. Non-Consensual Sexual Intercourse
3. Non-Consensual Sexual Contact (sexual contact without effective consent).
4. Sexual Exploitation.
5. Any attempt or aiding in attempt of any of the actions listed in this policy.

## Definitions

1. Intercourse: includes vaginal or anal penetration by penis, object, tongue, or finger; or contact between genitals and mouth).

2. Sexual Touching: any *intentional* contact with breasts, buttocks, groin, genitals, mouth, or other bodily orifice of another, or touching another with any of these body parts, or making another touch you or himself or herself with or on any of these body parts.

3. Consent: is informed agreement to do the same things, at the same time, in the same way, with each other, is freely given without coercion, uses mutually understood words or actions.  One cannot engage in sexual intercourse or sexual touching, without violating the sexual misconduct policy, if one knows the other cannot give consent.

4. Sexual Misconduct includes non-consensual sexual contact, non-consensual sexual intercourse, sexual exploitation, and sexual harassment.

5. Non-Consensual Sexual Intercourse is any sexual intercourse (vaginal, anal, or oral), however slight, between persons of whatever sex, without consent.

6. Non-Consensual Sexual Contact is any sexual touching, however slight, between persons of whatever sex, without consent.

7. Sexual Exploitation includes prostitution, posting images on social media without consent, video taping without consent, peeping tommery, intentional transmission of any sexually transmitted diseases, and inducing incapacitation for the purpose of having sex with a person.

8. Initiator: The person, of whatever sex, who initiates any sexual touching, contact, or intercourse.

USA000065

9. Respondent: The person, of whatever sex, who must consent before any sexual touching, contact, or intercourse may occur.

## What does consent mean?

1. In the absence of mutually understood actions or words, it is the responsibility of the initiator of any sexual contact to ensure consent is given by another person.
2. Consent to one form of sexual activity does NOT imply consent to other types of sexual activity.
3. Past consent to sexual activity does NOT imply consent to future sexual activity.
4. Consent must be given at each stage of sexual contact.
5. Consent given under the threat of physical force, any form of coercion, or intimidation is not effective consent.
6. Consent cannot be given by minors (persons under age 18), mentally disabled persons, or physically incapacitated persons.

## How do I know if someone cannot give consent?

Is the other person:
1. Unconscious?
2. Under the legal age of consent?
In these two cases, the other person cannot give consent.

Do you perceive in the other person:
1. Slurred speech
2. Bloodshot eyes
3. Smell of alcohol on breath
4. Inability to stand up straight
5. Vomiting
6. Outrageous or unusual behavior
Or, is the other person:
7. Physically impaired?
8. Physically incapacitated?
9. Mentally disabled?

This is not a comprehensive list.  None of these characteristics necessarily means that the person cannot give consent.  However, it is the responsibility of the initiator of sexual contact to ensure that the respondent can consent and that he or she gives consent. Sexual misconduct does NOT necessarily have to be intentional.  If the initiator does not ensure consent, the initiator can be found in violation of the sexual misconduct policy.

In other words, **__it is always the responsibility of the initiator of sexual contact to ensure that consent can be and is given__**.  It does not matter if the initiator is incapacitated or not; it is always the responsibility of the initiator to get consent from the partner.

(47)

USA000066

## Other Important Information to Consider

1. Any person is not required to resist sexual advances. Silence is NEVER implied consent.
2. Silence, previous sexual relationship, current relationship, style of dress, or money spent on the respondent does not imply consent to any sexual activity.
3. Intentional or unintentional use of alcohol or drugs does not imply consent on the part of the respondent.
4. Consent may be revoked at any time by any party involved.
5. Consent has an expiration date. Consent only lasts for a reasonable amount of time. Reasonable amount is defined by circumstances. If a person consents to sexual activity, but no sexual activity occurs, the initiator should reconfirm consent before again initiating sexual activity.

## Possible Sanctions for Sexual Assault

1. Any student found responsible for violating the Sexual Exploitation, the Non-Consensual Sexual Contact or the Non-Consensual Sexual Touching policy will face sanctions ranging from warning and probation to expulsion, depending on the severity of the incident and previous conduct records.
2. Any student found responsible for violating the Non-Consensual Sexual Intercourse policy will face sanctions ranging from suspension to expulsion, depending on the severity of the incident and previous conduct records. The recommended sanction will normally be expulsion.

### Definition of Sexual Harassment

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when either:

(1) submission is either explicitly or implicitly a condition affecting academic or employment decisions; (2) the behavior is sufficiently severe or pervasive as to create an intimidating, hostile or repugnant environment; or (3) the behavior persists despite objection by the person to whom the conduct is directed. The University considers such behavior, whether physical or verbal, to be a breach of its standards of conduct and will seek to prevent such incidents and take corrective action when sexual harassment occurs.

### Types of Sexual Harassment

Generally speaking, there are two types of sexual harassment, *"quid pro quo"* and *hostile environment*.

*Quid pro quo* (meaning "this for that") sexual harassment occurs when it is stated or implied that an academic or employment decision about a student or employee depends upon whether the student or employee submits to conduct of a sexual nature. Quid pro quo sexual harassment also occurs when it is stated or implied that an individual must submit to conduct of a sexual nature in order to participate in a University program or

(48)

USA000067

activity. So, for example, if an employee is made to believe that a promotion is likely if the employee goes on a date with the employee's supervisor, the employee is possibly being subjected to "quid pro quo" sexual harassment.

*Hostile environment* sexual harassment occurs when unwelcome conduct of a sexual nature creates an intimidating, threatening or abusive working or learning environment or is so severe, persistent or pervasive that it affects a person's ability to participate in or benefit from a University program or activity. While a person engaging in harassing behavior most often has some form of power or authority over the person being harassed, that is not always the case. The harasser can be a peer of the person being harassed. Sometimes the harasser is harassing a person who has power over them. For example, a supervisee can sexually harass a supervisor or a student can sexually harass a faculty member.

**Examples of Sexual Harassment**

The following descriptions, while not all-inclusive, will help you understand the types of behavior that are considered "conduct of a sexual nature" and that, if unwelcome, may constitute sexual harassment:

*Unwanted sexual statements:* Sexual or "dirty" jokes, comments on physical attributes, spreading rumors about or rating others as to sexual activity or performance, talking about one's sexual activity in front of others and displaying or distributing sexually explicit drawings, pictures and/or written material. Unwanted sexual statements can be made in person, in writing, electronically (email, instant messaging, blogs, web pages, etc.) and otherwise.

*Unwanted personal attention:* Letters, telephone calls, visits, pressure for sexual favors, pressure for unnecessary personal interaction and pressure for dates where a sexual/romantic intent appears evident but remains unwanted.

*Unwanted physical or sexual advances:* Touching, hugging, kissing, fondling, touching oneself sexually for others to view, sexual assault, intercourse or other sexual activity.

**Possible Sanctions for Sexual Harassment**

1. Any student found responsible for violating the Sexual Harassment policy will face sanctions ranging from warning and probation to expulsion, depending on the severity of the incident and previous conduct records.

# TITLE IX REQUIREMENTS:
# NON-DISCRIMINATION AND ANTI-HARASSMENT POLICY

**A. Title IX Statement**
It is the policy of the College to comply with Title IX of the Education Amendments of 1972 through E.O. 13160, which prohibit discrimination

USA000068

based on sex (which includes sexual harassment and sexual violence) in Haskell's educational programs and activities. Title IX and its implementing regulations also prohibit retaliation for asserting claims of sex discrimination. Haskell has designated the following Title IX Coordinator for the entire university system to coordinate its compliance with Title IX and to receive inquiries regarding Title IX.

Interim Title IX Coordinator/Student Rights Specialist
155 Indian Avenue
Lawrence, KS  66046
(785)749-8457

Students who wish to report sex discrimination or sexual harassment should file a complaint with the Title IX Coordinator Tonia Salvini at 785-749-8457.

**B. Policy Statement**

Haskell Indian Nations University is committed to providing a learning, working, and living environment that promotes personal integrity, civility, and mutual respect in an environment free of discrimination on the basis of sex. Haskell considers sex discrimination in all its forms to be a serious offense. Sex discrimination constitutes a violation of this policy, is unacceptable, and will not be tolerated.  Sexual harassment (as defined below), whether verbal/sexual, physical/rape unwanted touching, or visual, is inconsistent with the expectations of Haskell and may constitute a form of sex discrimination prohibited by this policy. Sexual harassment also includes sexual violence/assault (as defined below). Examples of specific conduct that constitutes sexual harassment and sexual violence/assault are set forth below.

**C. Content of the Complaint**

So that the Haskell has sufficient information to investigate a complaint, the complaint should include: (1) the date(s) and time(s) of the alleged conduct; (2) the names of all person(s) involved in the alleged conduct, including possible witnesses; (3) all details outlining what happened; and (4) contact information for the complainant so that the Haskell may follow up appropriately.

A complainant will be given a copy of the document titled "Explanation of Rights and Options After Filing a Complaint Under the Title IX: Non-Discrimination and Anti-Harassment Policy."

Conduct that Constitutes a Crime

Any person who wishes to make a complaint of sex discrimination or sexual harassment that also constitutes a crime—including sexual violence/assault, domestic violence, dating violence, or stalking—is encouraged to make a complaint to local law enforcement. If requested, Haskell will assist the complainant in notifying the appropriate law enforcement authorities. A victim may decline to notify such authorities.

(50)

USA000069

Special Guidance Concerning Complaints of Sexual Violence/Assault, Domestic Violence, Dating Violence, and Stalking

If you are the victim of sexual violence/assault, domestic violence, dating violence, or stalking, do not blame yourself. These crimes are never the victim's fault. Haskell recommends that you immediately go to the emergency room of a local hospital and contact local law enforcement, in addition to making a prompt complaint under this policy.

A victim may decline to notify such authorities. A victim is NOT required to report to law enforcement as a prerequisite for filing a Title IX complaint through Haskell. The Title IX complaint can proceed regardless of whether there is any simultaneous law enforcement reporting.

If you are the victim of sexual violence/assault, domestic violence, or dating violence, do everything possible to preserve evidence by making certain that the crime scene is not disturbed. Preservation of evidence may be necessary for proof of the crime or in obtaining a protection order. Victims of sexual violence/assault, domestic violence, or dating violence should not bathe, urinate, douche, brush teeth, or drink liquids until after they are examined and, if necessary, a rape examination is completed. Clothes should not be changed. When necessary, seek immediate medical attention at an area hospital and take a full change of clothing, including shoes, for use after a medical examination.

It is also important to take steps to preserve evidence in cases of stalking, to the extent such evidence exists. In cases of stalking, evidence is more likely to be in the form of letters, emails, text messages, etc. rather than evidence of physical contact and violence.

Once a complaint of sexual violence/assault, domestic violence, dating violence, or stalking is made, the complainant has several options such as, but not limited to:

- contacting parents or a relative
- seeking legal advice
- seeking personal counseling (always recommended)
- pursuing legal action against the perpetrator
- pursing disciplinary action
- requesting that no further action be taken

## 1.Protecting the Complainant

Pending final outcome of an investigation, Haskell will take steps to protect the complainant from any further harassment or retaliation regardless of whether the victim chooses to report the crime to campus police or local law enforcement. Steps may

USA000070

include assisting and allowing the complainant to change his or her academic, transportation, work, or living situation if options to do so are reasonably available.

If a complainant has obtained a temporary restraining order or other no contact order against the alleged perpetrator from a criminal, civil, or tribal court, the complainant should provide such information to the Title IX Coordinator or appropriate deputy Title IX Coordinator for their campus. Haskell will take all reasonable and legal action to implement the order.

## 2. Timing
Haskell encourages persons to make complaints of sex discrimination and sexual harassment as soon as possible because late reporting may limit Haskell's ability to investigate and respond to the conduct complained of.

## 3. Investigation and Confidentiality
All complaints of sex discrimination and sexual harassment will be promptly and thoroughly investigated in accordance with the Title IX Procedure. The interim Title IX Coordinator will investigate and any recommendations for adjudication will be referred to the Title IX Team.  For more information regarding the Title IX process, please see page 54.

Haskell will make reasonable and appropriate efforts to preserve an individual's privacy and protect the confidentiality of information when investigating and resolving a complaint. However, because of laws relating to reporting and other state and federal laws, Haskell cannot guarantee confidentiality to those who make complaints. In the event a complainant requests confidentiality or asks that a complaint not be investigated, Haskell will take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name not be disclosed to the alleged perpetrator, Haskell's ability to respond may be limited. Hskell reserves the right to initiate an investigation despite a complainant's request for confidentiality in limited circumstances involving serious or repeated conduct or where the alleged perpetrator may pose a continuing threat to the Haskell community.

## 4. Resolution
If a complaint of sex discrimination or sexual harassment is found to be substantiated, Haskell will take appropriate corrective action. Students, faculty, and staff found to be in violation of this policy will be subject to discipline up to and including termination, expulsion, or other appropriate institutional sanctions; affiliates and program participants may be removed from the university programs and/or prevented from returning to campus. Remedial steps may also include counseling for the complainant, academic, transportation, work, or living accommodations for the complainant, separation of the parties, and training for the respondent and other persons.

USA000071

**5. Bad Faith Complaints**

While Haskell encourages all good faith complaints of sex discrimination and sexual harassment, Haskell has the responsibility to balance the rights of all parties. Therefore, if the investigation at Haskell reveals that a complaint was knowingly false, the complaint will be dismissed and the person who filed the knowingly false complaint may be subject to discipline.

**D. Retaliation**

It is a violation of this policy to retaliate against any person for making a good faith complaint of sex discrimination or sexual harassment and/or cooperating in the investigation of (including testifying as a witness to) such complaint.

**E. Vendors, Contractors, and Third Parties**

This policy applies to the conduct of vendors, contractors, and third parties. If a member of the Haskell community believes that he or she has been subjected to sex discrimination or sexual harassment by a vendor, contractor, or third party, the person should make a complaint in the manner set forth in the above procedure. Haskell will respond to the complaint as appropriate, given the nature of its relationship to the vendor, contractor, or third party.

**F. Academic Freedom**

While Haskell is committed to the principles of free inquiry and free expression, sex discrimination and sexual harassment are neither legally protected expression nor the proper exercise of academic freedom.

**G. Education**

Because Haskell recognizes that the prevention of sex discrimination, sexual harassment, sexual violence/assault, domestic violence, dating violence, and stalking is important, it offers educational programming to a variety of groups such as: campus personnel; incoming students and new employees participating in orientation; and members of student organizations. Among other elements, such training will cover relevant definitions, procedures, and sanctions; will provide safe and positive options for bystander intervention and will provide risk reduction information, including recognizing warning signs of abusive behavior and how to avoid potential attacks. To learn more about education resources, please contact the Title IX Coordinator.  All forms can be found at the end of this book in the "Forms" Section.

(53)

USA000072

# HASKELL INDIAN NATIONS UNIVERSITY
## Title IX Coordinator's Office
## COMPLAINT PROCEDURE

**Complaint Filed with Tiltle IX Coordinators Office**

| | |
|---|---|
| Within **7 working days** Title IX office will acknowledge complaint reciept to Complainant. | **15 working days** to determine whether or not the complaint falls within the jurisdiction of the Title IX Office . The Title IX Office will contact the Complainant to clarify thier complaint allegations. |

**Notification of Investigation**

| | |
|---|---|
| The Title IX Office will make efforts, as appropriate and with written authorization from the complainant, to achieve an informal resolution to the complaint. If not authorized or not achievable, the Title IX Office will inform the complainant in writing whether or not an investigation is warranted. | The Title IX Office will open all complaints determined to fall within the Title IX Office jurisdiction for investigation within **30 days** of reciept. Advise parties that the Title IX Office is **nuetral fact** and retaliation prohibited |

**Investigation**

| | | | |
|---|---|---|---|
| Schedule meeting with respondent(s) to discuss allegations and investigation process. | Provide notice to appropriate unit heads. | Conduct investigation-interview witnesses, review documentation. | Prepare written report **within 60 working days** after complaint file with the Title IX Office. |

**STATUS Updates on Investigations**

| | |
|---|---|
| Review report with appropriate university officials | Maintain communication with the parties advising them of the status of the investigation. |

**Investigative Findings and Recommendations**

| |
|---|
| Provide written investigation summary and findings to complainant, respondent and director, chair, dean or vice president within **60 working days** after complaint filed. |

(54)

USA000073

# VII. Fire Safety

USA000074

# A. MAJOR VIOLATIONS

1. **Fire Protection Equipment** – Fire extinguisher's, pull stations, smoke detectors, automatic sprinkler systems, and fire alarms are located throughout the campus for the protection of human life and property. To use this equipment for non-emergency purposes is prohibited. Immediate action will be taken against anyone who falsely, whether intentionally or negligently, activates or tampers with fire safety equipment, exit signs, horns, strobes, notification devices, and fire exit doors. Tampering means to intentionally disable, alter, or change the fire alarm system, fire protective device, the station or signal box. Fire doors and any door with a closing mechanism must not be propped open or disabled.  In addition, initiating, causing or contributing to a false report, warning or threat of fire, explosion, or other emergency is grounds for disciplinary action.
Typical Sanctions: Emergency suspension, $100 fine plus all costs associated with the repair or replacement of misused or damaged equipment, cleaning of the facility, possible eviction from University housing and/or possible criminal charges.

2. **Fire Hazards** – All campus facilities, including student rooms and balconies, are smoke-free.  Smoking of tobacco products is permitted only in designated outdoor smoking areas (50 feet from buildings).  Cigarette butts and ashes shall be considered *prima facia* evidence of smoking. Open and smoldering flames, including lit candles, incense, plants/herbs, pipes, grills, e-cigarettes and hookahs are prohibited in all campus facilities, including student rooms and balconies. A student must receive prior approval from the Director of Housing to burn material for religious purposes.  No heat-producing appliances will be permitted in student rooms, unless authorized by the Haskell Safety Office.  This includes hot plates, coffee pots, popcorn poppers, electric skillets, heaters, air fresheners ("Sensies"), etc.  Any items confiscated WILL NOT be returned.
Typical Sanction: $50 fine.

3. **Endangerment (Emergency Evacuation)** – When a fire alarm is sounded, residents must assume that there is a fire in the building and are expected to evacuate the building. Residents may return to the building only when instructed to do so by Residential hall staff or Haskell Security/Safety personnel. Endangerment includes failure to follow these procedures for fire safety, as well as failure to take cover during severe weather upon notification by Residential Hall staff, Haskell officials, tornado siren, or television/radio severe weather instructions.
Typical Sanction: $50 fine.

4. **Fires (Intentional – Arson)** – Any willful or malicious burning or attempt to burn any building or government property on or around campus, any motor vehicle, and/or personal property of another is subject to expulsion from Haskell, as well as criminal charges.
Typical Sanction: Expulsion from Haskell as well as criminal charges.

USA000075

5. **Fires (Unintentional) –** All other fires will be handled on a case-by-case basis, based on fire department reports.  If it is determined that the fire was the result of violations listed above, sanctions will be at minimum: emergency suspension, $50 fine plus all costs associated with the repair or replacement of the damaged area, cleaning of the facility and other damaged property, possible eviction from Haskell housing, and possible criminal charges.
Typical Sanctions: Emergency suspension, $50 fine plus all costs associated with the repair and replacement of the damaged area and property, and cleaning of the facilities. Possible eviction from Haskell housing and possible criminal charges may apply.

(57)

USA000076

# VIII. Residential Life Policies

USA000077

## A. Authority to Enter Rooms

Residential hall staff or other non-law enforcement employees may enter rooms for several reasons as described below. **As a courtesy,** these officials will knock and will identify themselves and verbally request entry before entering the room. **Not hearing a knock or verbal request to enter is not a viable defense in disciplinary proceedings.**

1. For reasonable suspicion that a violation of the Code of Student Conduct or local, state, or federal law has occurred in the room or that evidence of the violation is in the room (see details below).
2. For emergencies such as fire drills.
3. For pre-announced health and safety checks.
4. For maintenance requested by the student or pre-announced requests by staff for maintenance work.
5. To conduct room inspections every two weeks.
6. To accompany a police officer who has a search or arrest warrant.
7. To ensure the safety of the student or others, if there is no response to the staff's knock or verbal request to enter.

## B. Search and Seizure in Student Rooms

**General Procedures:** These procedures apply when Residential Hall staff and other Haskell officials enter a room because of an emergency, or for a room check (every two weeks), or to determine the location of a repair job.

**1**. Residential Hall staff and other Haskell officials shall use prudent judgment to determine if Security should be present.
**2**. Illegal items in "plain view" shall be seized.
**3**. Violations of the Code of Student Conduct that are in "plain view" shall be written into an incident report.
**4**. Care shall be taken to ensure that the student's room is left in the same shape as it was found.

**Procedures Related to Search Based on Reasonable suspicion of Violation of the Code of Student Conduct:** Residential Hall staff and other Haskell officials have authority to search a room when there is **reasonable suspicion that** a violation of the Code of Student Conduct has occurred and there is reasonable suspicion that evidence of the violation will be found in the room. Reasonable suspicion: A school official must have specific and articulable facts or inference, obtained from either personal observation or a reliable informant, that leads him/her to conclude – based on his/her experience the totality of the circumstances – that the search will lead to a discover of a violation of the Student Code of Conduct.

**1**. Residential Hall staff and other Haskell officials shall use prudent judgment to determine if non-law enforcement staff should be present. Upon entering, if occupants are present, the occupants must be informed of the intent to search the room.
**2**. The article/item must be defined before a search begins. (i.e. alcohol, drugs, weapons, etc.)

(59)

USA000078

**3**. After beginning the search, an illegal item in "plain view," even if unrelated to the purpose of the search, shall be seized and included in the incident report.

**4**. The area to be searched is the area where the article could be found. For example: if the article was a jacket, only those spaces of the student's room where a jacket could be found can be searched; e.g., closet, under the bed, suitcases; however, the search cannot extend to a small purse or makeup cases.

**5**. Care shall be exercised to leave the room in the same shape as it was found.

**Procedures Related to reasonable suspicion Search for Lost or Stolen Property:**

If there is reasonable suspicion to believe that a room contains lost or stolen student or Haskell property, the following procedure is to be followed to locate the property and to return it to its owner.

**1**. The Vice President of University Services may authorize Haskell officials with Reasonable suspicion to search the room after a reasonable attempt is made to inform the student whose room is being searched and to have the student present for the search.

**2**. Residential Hall staff and other Haskell officials shall use prudent judgment to determine if non-law enforcement should be present. Upon entering, if occupants are present, the occupants must be informed of the intent to search the room.

**3**. The complaining party must clearly identify the property before the search begins.

**4**. The complaining party must request the particular room(s) to be searched or name(s) of residents whose rooms are to be searched. A BLANKET SEARCH OF A RESIDENTIAL HALL OR WING IS NOT ALLOWED.

**5**. The area searched is the area where the article likely could be found. If the article was a jacket, only those spaces of the student's room where a jacket could be found can be searched; e.g., closet, under the bed, suitcases; however, the search cannot extend to a small purse or makeup cases.

**6**. After beginning the search, illegal items in "plain view," even if unrelated to the purpose of the search, shall be seized and included in the incident report.

**7**. Care shall be taken to ensure the student's room is left in the same shape as it was found.

**8**. Violations of the Code of Student Conduct that are in "plain view" shall be written into an incident report.

**9**. In the event the searched-for contraband is found, it will be held in the Security Office until the matter is disposed of.

## C. Search of Belongings

**Scope of Policy**

This policy concerns search of a student's belongings by Haskell officials in the residential hall or anywhere on campus grounds. **This policy does not cover room searches or searches of vehicles.**

USA000079

**Procedure**

**1.** No Haskell employee shall search a student's personal belongings unless there is reasonable suspicion based on the five senses to believe that a student has items subject to confiscation in a closed container, belongings, etc.

**2.** Examples of where there is **not** reasonable suspicion:
    a. Sound of cans, bottles, visual shape of cans, bottles in back pack, purse, bag, etc.
    b. Prior substance abuse write-ups
    c. Walking to or from a known drinking area with a bag, backpack or purse
    d. Walking across campus late at night with a bag, backpack, etc.

**3.** Examples of reasonable suspicion:
    a. Odor of alcohol clearly emanating from the bag, purse, backpack
    b. Clear view of beer can or other alcohol container through clear or slightly opaque bags evidenced by a name brand, labels and/or color of can or bottles clearly identified to be that of a known brand
    c. Open container of liquid smelling of alcohol
    d. Combinations of the above

**4.** The Student Conduct Administrator will dismiss incident reports where there are violations of a student's right of privacy.

**5.** A request to search an item (back pack, purse, bag, luggage) may be done with phrases, "May I have your consent to search (item such as backpack, purse, etc.)?" If a student refuses and there is not reasonable suspicion, a search cannot be conducted.

## D. Visitation and Guests

Hosts and visitors who violate the Residential Halls visitation policy and other visitation conditions will be subject to Haskell disciplinary process. Non-student visitors may be subject to formal charges under local, state, or federal law.

**Visitation Hours will be:**
**Sunday through Thursday 12 p.m. – 12 a.m.**
**Friday and Saturday 12 p.m. – 2 a.m.**
**Holidays 12 p.m. – 2 a.m.**
**Spring Break 12 p.m. – 2 a.m.**

## E. Frequently Asked Questions about Visitation

**1. Who is a Visitor?**
A visitor is any individual who is not a resident of the residential hall visited or occupant of the room visited.

**2. What if I live in a Co-ed hall?**
Residents of co-ed residential halls also have to abide by "inter-visitation" rules.

**3. What is "inter-visitation" and are there specific rules?**

USA000080

This term is used to describe visitation between/among residents of that specific co-ed hall. Co-ed hall residents must not only adhere to the rules of visitation but also follow "inter-visitation" regulations. Students residing in co-ed housing may visit in their residential hall without signing the visitation logbook during the designated time for visitation.  Residents in co-ed halls are not allowed to be on wings/floors/rooms or study areas before and/or after visitation hours or in areas delegated to members of the opposite sex.

**4. What do I need to do to sign in the visitor?**
Present your Haskell Student Identification card to staff.  Staff will secure and return it after **you** have signed out your visitor.

**5. Where can I take my visitors once they are signed in?**
Visitors may visit in the floor lounges and, with the consent of roommate(s), in the private room of a student.

**6. Are minors allowed to visit?**
Under state law, minor children are those under the age of eighteen (18). Minor children are not permitted in residential halls without the supervision of parents, legal guardians or other appropriate adult supervision.

## F. Visitation Shall Be Governed by the Following Stipulations:

1. Student Services will poll students and determine those who prefer visitation and those who do not. From this data residential halls and residential hall wings will be identified for visitation or not. Student Services will assign students based upon their preference to the maximum extent practical.
2. All student-hosts and visitors shall be required to abide by the Code of Student Conduct and residential rules related to hours of visitation, areas in which visitation is allowed and procedures for visitation.
3. The student-**host** shall be responsible for his/her visitor's behavior. **The student-host must escort their visitors at all times.**
4. **Every visitor** must be **checked/signed in** at the residential hall's office before visitation and **checked/signed out** when leaving. Students currently enrolled at Haskell will leave their Haskell identification card when checking in to visit and may retrieve their Haskell identification card upon leaving. Non-student visitors will be required to be signed in by student-host. **Student-hosts** are responsible for checking/signing in visitor(s).
5. All visitors are required to enter through the main (front) entrance of the residential hall.
6. Residential hall staff have the authority to make reasonable decisions on who should/should not be in the residential hall subject to due process for currently enrolled students.
7. For purposes of this section, sleeping areas are defined as individual rooms and corridors/hallways adjacent to individual rooms. Common areas are defined as TV rooms and lounges.
8. Failure to adhere to or abide by this or other Residential Housing policies for visitation will result in disciplinary action, which could include an official warning and/or incident report.
9. Non-Students who continually violate residential rules and/or campus rules

USA000081

may be subject to criminal trespassing charges and/or banishment from the campus. (Also see Residential Housing Policies and Procedures Handbook).

## G. Prohibited Items in the Residential Halls

Due to fire hazard, safety, and energy use, the following items are prohibited while in the residential halls.

- More than one refrigerator per room.
- Any appliance with an open heating coil.
- Broiler ovens, toasters/toaster ovens
- Alcohol
- Candles, incense, candle warmers
- Air fresheners ("Sensies")
- Four-way or cheater plugs
- Any type of extension cord without breaker
- Sun or heat lamps
- Any appliance not clearly marked as U/L approved
- Tacks or nails in walls or ceilings
- Electronic items that cause electrical outages
- Contact paper on walls/furniture
- Any type of grill
- Electric blankets
- Electric sauce pans
- Laser pointers
- Halogen lamps
- Hot plates
- Space heaters
- Paint ball, BB-guns, or other weapons
- Oil popcorn poppers
- Flammable liquids and chemicals
- Cut Christmas trees or boughs
- Extension cords
- Firearms and fireworks
- Hookahs

## H. Other Policies

The following are general regulations common to all of the residential halls. **Students violating these regulations are subject to the disciplinary process.**

1. **Authority of Staff to Enter Rooms** – See Authority to Enter Rooms (Section II Authority to Enter Rooms p. 13).

2. **Baby-Sitting**: Baby-sitting is not allowed in the residential hall.

3. **Checkout Items**: Student identification cards shall be left with residential hall staff to ensure the return of items checked out from the office.

(63)

USA000082

**4. Door Opening Charge:** All requests to open doors will be $3.00. Student doors will be opened two (2) times before they are required to buy another key.

**5. House Meetings**: Attendance at the initial house meeting each semester is mandatory**.** Failure to obtain attendance by 75% of residents will result in no visitation privileges for all residents until after the first successful meeting is held. In addition, the Residential Housing Supervisors will host House Meetings to provide information related to changes in policy or other areas of concern for students and staff.

**6. Laundry:** Clothes may not be left unattended while doing laundry. The University is not responsible for lost or stolen articles. Doing laundry of non-residents is prohibited.  Any student unauthorized to use the laundry facilities will be automatically charged for the residential hall fee.

**7. Leave**: Residents shall sign out when leaving for holiday and/or long weekends or any extended leave of absences.

**8. Paging and Intercom**: Paging in the residential halls will be allowed only during the hours of: Monday through Friday- 8 a.m. to 10 p.m., Saturday & Sunday – 10 a.m. to 10 p.m.

**9. Pets**: No pets are permitted in the residential halls including, but not limited to, fish, reptiles, birds, gerbils, spiders, and insects. Students will be responsible for removal of pets from the residential hall and for any damages caused by pets.  Every individual with a disability has the right to be accompanied by a guide dog, signal dog, or service dog, trained and certified for the purpose. However, the individual shall be liable for any damage done to the premises or facilities by his/her dog. Guide Dog means any guide dog or Seeing Eye Dog that was trained and certified by a licensed person. Signal Dog means any dog trained or certified to alert a deaf person, or a person whose hearing is impaired, to intruders or sounds. Service Dog means any dog trained and certified to do work or perform tasks for the benefit of an individual with a disability, including but not limited to, minimal protection work, rescue work, pulling a wheelchair, or fetching dropped items.

**10. Proper Use Of Entrances**: The back and side entrance(s) will be locked at 10:00 P.M. The front entrance will be used to enter and exit the building after these hours. The front entrance will be locked on Monday-Friday at midnight and Saturday and Sunday at 2:00 A.M. Staff is available to open the front entrance after closing hours. The use of other entrances after those times is a code violation. Windows are not to be used to get in or out of a building except for life-

USA000083

threatening situations. Use of windows for entrance or exit in other situations is a code violation.  Identification may be requested by staff to assure residency within the hall.

11. **Public Displays**: Public displays of behavior such as fondling, passionate kissing and exposure are potentially embarrassing to other students. Visitors may lose visiting privileges if they do not properly respond to official warnings received.

12. **Quiet Hours**: The observance of quiet hours in all residential halls will begin at 11:00 P.M. and end at 11:00 A.M. Each residential hall will decide quiet hours during holidays and spring break sessions.

13. **Residential Room Keys:** Each student will be assigned a key to his/her residential hall room. If this key is lost or stolen, residents are responsible for reporting the loss immediately to the Residential Hall staff. Replacement keys will cost $25.00. Entry/room doors should be locked at all times to secure valuables and enhance individual safety. The University is not responsible for lost or stolen articles. Student must present a receipt from the Business Office to the Residential Hall staff before a key is given to the student. If a key is not available from the locksmith, the student will not be charged until the key is received. All funds collected will be transferred to the House Council account of each respective hall.

14. **Room Clearance**: Students are expected to check out of residential halls and follow procedures that include, but are not limited to, clean room/bathroom, return of key and payment for damages and repairs to room. Failure to do so may result in an assessment of charges to cover such costs.

15. **Study Room**: The study room is available 24 hours a day and is to be utilized for STUDYING ONLY (See inter-visitation in Code Violation). Eating or smoking is not allowed nor are radios or stereos permitted, unless using earphones and audio material is related to study material. Non-residents may study with a resident within the designated visitation hours and must sign in.

16. **Telephone Use**: The office phone is for official use only. Only emergency calls and official calls will be allowed from the office phone. No collect calls shall be accepted from any University telephone. All travel arrangements will be made on the public telephone.

USA000084

17. **Tobacco (Any products)**: Use of smokeless tobacco, snuff, and Cigarettes (including e-cigarettes and other vapor products) are prohibited in residential hall. Use of these product(s) is a Code violation (See Fire Hazard Code in Code Violation Section).

18. **Room Inspections**: Housing reserves the right to conduct room inspections every two weeks to ensure a level of cleanliness, order, and safety are maintained.

19. **Harboring**:  Harboring a person, such as a current student or a student who has been suspended from the dormitories or even a former student expelled from Haskell, or other person who has been evicted/barred for disciplinary reasons is prohibited.

## I.  Haskell Not Responsible for Student Property

Haskell will not be responsible for any damaged, lost, or stolen property.  All personal property must be removed from the residential hall on the last day of the student's occupancy.  Personal property remaining in residential halls, after the student is no longer residing there, may be discarded.  It is recommended that all personal property be appropriately labeled to prevent loss or theft.  It is also recommended that all students obtain renter's insurance for their personal property or be insured through their parent's homeowner's insurance.

USA000085

# IX. Parking and Traffic Program Policies and Procedures

USA000086

# GENERAL REGULATIONS

Haskell is authorized to establish campus parking and traffic regulations and to provide parking fines and penalties for infractions of these regulations.   Any motorized vehicle, including motorcycles, operated on Haskell property is subject to all campus parking and traffic regulations.

These regulations have been promulgated for the safety, welfare, and health of students, employees, and visitors and to govern traffic on campus.  The operation and/or parking of any vehicle on Haskell property is a privilege, not a right.

**Vehicle Registration:**
All privately owned motorized vehicles operated by Haskell students and employees on Haskell property must be registered at the time of enrollment, employment and/or acquisition. The following information is required to register a motorized vehicle: Name, address, vehicle year, vehicle make, vehicle color, license tag number, and state in which vehicle is registered.

A registration decal will be issued which must be affixed to the inside lower driver side windshield.  There is no cost for the initial decal; however, **replacement decals are $20.00** payable at the University Business Office.

Any students or employee's motorized vehicle not registered with the University Parking and Traffic Office will be subject to ticketing and towing.

**Responsibility for Vehicles**
Any person operating or parking a vehicle on campus shall be fully responsible for that vehicle and its contents. An individual shall be held responsible for violations by a vehicle registered to him/her either through Haskell registration or tracing through the state Motor Vehicle Department, regardless of the operator at the time of the violation. There will be a $20 fee if a trace through the Motor Vehicle Department is necessary.

Notify Parking and Traffic if a registered vehicle is sold.  If the vehicle remains on campus, any fines or fees incurred will be charged to the person on record and registered with Parking and Traffic.

**Regulations – Hours in Effect**
Regulations are in effect 24 hours a day and 365 days a year. All parking spaces are available for "open" parking between 5:00pm and 7:00am, except parking for the physically impaired, fire lanes, and where otherwise posted.


# PARKING

Subject to modification, the parking permit classifications and parking privileges are shown below. **All zones have color coded signs.**

USA000087

**GOLD/YELLOW** Student Parking Permit is valid in all **Green** areas, except for spaces designated for the physically impaired, visitors parking, loading zones, fire lanes, roadways, and other marked and designated "no parking" zones.

**PURPLE** Employees Parking Permit. Valid in all **Blue** and **Green** areas except for spaces designated for the physically impaired, visitors parking, loading zones, fire lanes, roadways, and other marked and designated "no parking" zones.

**Open Parking Lots**
There are two large open parking lots on campus.  The lots are located at Coffin Complex and the Cultural Center.

**Visitor Lot**
The visitor lot is located in the center of campus, between Tecumseh Hall and Hiawatha Hall.  Visitors may also park in any open parking lot.  A sign indicating either "visitors only" or "visiting staff" is <u>not</u> considered open parking.

**Parking for the Physically Impaired**
Certain parking spaces have been designated for the physically impaired. Parking in those spaces is reserved for individuals whose vehicle displays either:

A.  A specially issued license plate displaying the international symbol of access to the physically impaired.
B.  A specially issued state identification card with the international symbol of access to the physically impaired clearly displayed in the vehicle.

The permit is only valid for the individual to whom the tag is issued and that individual must be an occupant of the vehicle.

Persons desiring special parking consideration because of permanent disability are advised to obtain a Parking Permit for the Physically Impaired by making application at the State of Kansas, Department of Motor Vehicles.

**Prohibited Parking**
Parking violation notices may be issued to all vehicles, including GSA, and vehicles may be immobilized and/or removed from campus for:

A.  Double parking or in streets or roads
B.  Parking on sidewalks or grass
C.  Parking in service roads or restricted areas
D.  Parking across drive entrances or sidewalk crossings
E.  Parking outside of marked parking spaces and/or taking up two spaces
F.  Parking in fire lane/fire hydrant zones
G.  Parking over length/oversize vehicle without permit
H.  Parking in an area designated by signs and/or curb markings as a "no parking" zone
I.   Parking in a lot or space for which vehicle is not permitted

USA000088

J.  Unauthorized parking in physically impaired parking zone
K.  Blocking vehicles, roadway, or trash containers
L.  Parking in an area designated by signs as "visitors only" or "visiting staff only"

**Parking of Large Vehicles**
Over-length or oversized vehicles, such as buses, trucks, and campers cannot be parked in regular parking spaces.  Visiting groups and charter buses may arrange for a special parking assignment and permit with the Parking and Traffic Office.

**Overnight Camping or Sleeping**
Parking for camping or overnight sleeping in vehicles is prohibited. Designated personnel conduct periodic patrols of the campus in an effort to safeguard all vehicles from vandalism and to protect the health and welfare of any vehicle occupants. The personnel conducting the security patrols are authorized to remove any student, staff or faculty found loitering or sleeping in the parking areas.

**Vehicle Storage**
All student motorized vehicles on Haskell property must be removed from the campus 72 hours after the closure of residential halls at semester's end. Any individual violating these policy guidelines will have his/her vehicle removed from the campus by commercial vendor at the student's expense.

Permission for vehicle storage over the Christmas Holiday period must be obtained from the Parking and Traffic Office. All vehicles stored on campus must be parked in the Blalock Hall parking lot(s) during this period.

Employees' motorized vehicles may not be stored on campus with the exception of those employees on official travel, business, or by permission from the Parking and Traffic Office. Any individual violating these policy guidelines will have his/her vehicle removed from the campus by commercial vendor at the owner's expense.

**Abandoned Vehicles**
A vehicle will be considered abandoned if it appears to be un-drivable (i.e. flat tires, broken windows, damaged, etc.) and has not been moved for five or more days.  Vehicle owners will be notified by mail stating the date the vehicle must be moved.  If the vehicle is not moved or proven to be drivable, the vehicle will be removed from the campus by commercial vendor.

# FINES
**Payment of fines for Parking Violations**
A fine of **$50.00** shall be charged for parking without authorization in parking areas for the physically impaired, parking on the patio of the Coffin Sports Complex, and parking in fire lanes/fire hydrant zones. The traffic circles located at Roe Cloud, Osceola/Keokuk, and Winona-Pocahontas Hall are designated as fire lanes, as well as the area north of Coffin Complex. A fine of **$25.00** shall be charged for all other prohibited parking or for operation of a motor vehicle contrary to the provisions of these regulations.

USA000089

In the event that there is more than one violation on a parking violation notice, the secondary fine(s) will be **$10.00** each. Such fines are due and payable at the University Business Office within ten (10) school days following the date the citation is issued.

**Late Payment of Parking Violation Fines**
If the parking violation fine is not paid within ten (10) school days following the date the violation is issued, a late payment fee of $10.00 for a physically impaired parking zone violation and $5.00 for all other prohibited parking or traffic violations shall be assessed on the eleventh school day and thereafter.

**Student Parking Violation Fines – Failure to Pay**
Students with unpaid parking violation fines at of the end of any fall, spring, or summer semester shall not be permitted to re-enroll, graduate, or transfer, and a "hold" shall be placed on the student's transcript or transfer records until such fees are paid in full.

**Employee Parking Violation Fines – Failure to Pay**
Employees with unpaid parking violation fines shall be subject to administrative review. If, after administrative review, fines remain unpaid, the vehicle will either be immobilized or removed from the campus by a commercial vendor. An immobilized vehicle may be recovered by obtaining a release from the University Business Office, which will be issued only upon payment of a $25.00 fee for the removal of the wheel lock and payment of all outstanding fines.

**Excessive Unpaid Parking Violations**
Excessive unpaid parking violations exist whenever three or more parking violation notices have been posted to the record of the vehicle's registered driver.  Vehicles will be subject to immobilization or removal from campus.

**Towing and Impoundment of Vehicles**
Vehicles may be towed from the campus or immobilized by a wheel lock at any time if they interfere with the efficient operation of the traffic and parking on the Haskell campus or if they are parked in an area not specifically designated for or designed as a parking area. All charges for commercial towing and/or storage are the responsibility of the registered owner.  An immobilized vehicle may be recovered by obtaining from the University Business Office a release which will be issued only upon payment of a $25.00 fee for the removal of the wheel lock and all unpaid fines levied for parking violations posted to the registered owner.

# VEHICLE OPERATION
The provisions of the state highway traffic code, Chapter 8 of the Kansas Statutes Annotated (K.S.A. 8-2001) and the Standard Traffic Ordinance for Kansas Cities are applicable to the operation and condition of motor vehicles operated on the University campus except as may be otherwise provided for in these regulations.

USA000090

Haskell is within the city limits of the City of Lawrence. The Lawrence Police Department and Douglas County Sheriff's Office have the authority to enforce all traffic laws of the State of Kansas and any general ordinances of the City of Lawrence on the University campus.

**Vehicles, Pedestrians and Bicyclists**
Vehicles shall stop and/or yield to all pedestrians and bicyclists on all campus roadways and crosswalks.

**Vehicle Speed Limits**
All vehicles shall be driven prudently and not in excess of **20 MPH** on the streets and roads on the University campus. Except as may be otherwise posted, speed limits for vehicles operated in the University parking lots shall not exceed **10 MPH**.

**Vehicle Operation – Prohibited Acts**
The following is prohibited and may be subject to ticketing:
A.  Driving over the curbs or sidewalk
B.  Driving on grass or seeded areas
C.  Driving in excess of the speed limits
D.  Reckless Driving or speeding
E.  Failing to yield to a pedestrian in a crosswalk or at an intersection
F.  Failure to stop at a posted stop sign
G.  Driving in violation of the provisions of Chapter 8 of the Kansas Statutes Annotated

**Note:** Delivery and/or service vehicles must notify the Parking and Traffic office before driving or parking in non-designated parking areas for loading or unloading purposes.

**Reporting of Accidents**
Any accident involving a motor vehicle on the Haskell campus should be reported to the Lawrence Police Department which has jurisdiction over all accidents occurring within the City of Lawrence. A report of an accident should also be made to the Parking and Traffic Office.

**Appeals**
A parking citation may be appealed in writing within 10 calendar days of receipt of the ticket. Forms may be obtained in the Parking and Traffic Office or in the Outlook Public Folders under "Safety Information."

# IDENTIFICATION CARDS (ID'S)
All students and employees are required to obtain an official Haskell Identification Card (ID) at the time of enrollment or employment. IDs are required to be readily available upon request from any university official.

USA000091

**Obtaining an ID**
ID photos are taken in the Parking and Traffic Services office located in Winnemucca during posted hours.  Proper identification/credentials are needed to obtain a photo ID:
**A**.  Employees: Verification from supervisor or Human Resources of your appointment.
**B**.  Students: Current registration, class schedule, or paid receipt.

IDs are valid for:
**A.**  Employees:  Duration of employment.
**B**.  Students: A period of four years.  For example:  Fall 2015 IDs will be valid from Fall 2015-Spring 2019.

Initial IDs are free of charge.  There is a **$20** charge for replacement IDs.  Payment for a replacement ID is to be made at the Haskell Business Office.
**A**.  Replacement charges are waived when the information on the ID is incorrect or has been changed (documentation needed) or ID is broken or magnetic strip is damaged due to normal usage and wear and tear (must bring broken ID).
**B.**  Replacement charges will not be waived for lost or stolen IDs or if the ID is broken because of a hole punch.  It is recommended that holes not be punched into IDs.

## DEFINITIONS

**Employees -** individuals who are currently employed at Haskell. When an employee resigns or has been relieved of his/her position, without another assignment, his/her parking permit and ID become invalid.

**Parking and Traffic Office** is under the direction of the Facilities Management Department.  The office is located in Winnemucca, Building #118.  All questions or concerns and/or appeals should be directed to this office.

**Parking Space -** a space where an automobile or motorized vehicle can be parked and so indicated by two parallel white stripes on the ground.  Refer to the campus map.

**Students -** individuals who are currently enrolled at Haskell. For Parking and Traffic purposes, one can not be a student and employee at the same time.

**University Business Office** is located in Navarre Hall, Building #121.  All fine payments must be paid at this office.

**Visitors -** individuals who are not students or employees of Haskell.  Visitor parking passes may be obtained from the Parking and Traffic Office and the President's Office located in Navarre Hall, Building #121.

USA000092

# X. Student Grievance Process:

USA000093

In the interest of better serving students, Haskell has established and published a Student Grievance Process whereby students can be assured a prompt, impartial and fair hearing of their complaints. More specifically, a complaint is a written concern or formal charge of dissatisfaction with a person, service, or process that requires clarification, investigation, and resolution. If a student has attempted to work out an issue or problem by first discussing it with those most involved [individual(s) and/or office(s)] in a calm and honest way, but continues to feel that the issue or problem continues to exist, then the student may submit a written complaint to the supervisor of the various departments where the issue or concern took place.

The grievance can be submitted during normal operation hours (7:45am- 4:30pm M-F) within five (5) business days from the date of the occurrence or matter. The complaint shall be routed to the appropriate official for review and response within five (5) business days in receipt of the complaint. The official-within the department- to whom the complaint was forwarded to review and address, will submit a response to the person who wrote the complaint within five (5) business days in receipt of the complaint. A student may pick up a copy of the Student Complaint Policy and Procedures and a copy of the Student Complaint form on the Haskell website under University Services or in the Office of Student Rights. For questions or additional information contact the Student Conduct office at (785)749-8415. Haskell will not allow any form of retaliation against individuals who file a complaint to Haskell management, or who cooperate in the investigation of such reports. To the extent possible, the confidentiality of the reports will be maintained.

**SPECIAL NOTE:** Conversely, sometimes Haskell students find they are particularly pleased with how something has been handled for them, how they were assisted by a particular staff member, the positive experience they had in a specific class, or some other outstanding thing that happened to them at Haskell. As a student you should know that you are also encouraged to submit a written compliment or note of appreciation through the Vice President of University Services.

USA000094

# Contact Persons and Areas of Concern

**Instructors**
The instructors are located at:
College of Arts & Sciences- Sequoyah Hall
School of Business Blue- Eagle Hall
School of Education- Parker Hall
They receive concerns about classroom activity, for example: invasion of privacy, grades, not grading papers, excessive canceling of classes, and proselytizing (imposing one's religious belief).

**Academic Deans**
The Academic Deans are located at:
College of Arts & Sciences- Sequoyah Hall
School of Business Blue- Eagle Hall
School of Education- Parker Hall
They receive less severe concerns that are not initially resolved by Instructors.

**Vice President, Academic Affairs**
This office is located at Navarre Hall.  This office receives concerns not resolved by the Academic Deans.

**Director of Athletics**
This office is located at Coffin Sports Complex.  The Director of Athletics receives concerns about the athletic program.

**Office of the Chief Information Officer (OCIO)**
This office is located at Pontiac Hall.  The Chief Information Officer receives concerns about Computer Services.

**Admissions**
This office is located at Navarre Hall.  The Director of Admissions receives concerns about enrollment policies and discrimination in Admissions.

**Counseling Center**
This office is located at Stidham Union.  The Director of the Counseling Center receives concerns about the counseling programs, services or staff.

**Financial Aid Office**
This office is located at Navarre Hall.  The Director of the Financial Aid Office receives concerns about financial aid appeals and concerns about office staff.

**Food Service Department:**
This office is located at Curtis Hall.  The Director of the Food Service Department receives concerns about food service, kitchen employees, and student helpers.

USA000095

**Residential Hall Program:**
This office is located at Osceola-Keokuk Hall.  The Director of Housing receives concerns not resolved by the residential hall supervisors and security personnel concerns.

**Residential Hall Supervisor**
The residential hall supervisor receives concerns about pest control, Residential Aides, supplies, and physical operation of residential halls.

**Office of Student Conduct**
The Office of Student Conduct is located at Minoka Hall.  The Student Conduct Administrator receives concerns about the Student Conduct process in disciplinary matters; violation of the right of privacy; and the behavior of students, such as theft, sexual harassment, and substance abuse.

**Student Recruitment/Placement**
The Career Planning/Placement & Recruitment Office is located at Navarre Hall. The Office supervisors receive concerns about college work study.

**Finance Office**
The Finance Office is located in Navarre Hall. The main number is 749-8451.  The Finance Office receives concerns involving the following services: Business Office, Student Bank, Post Office, and Property & Supply.

**Director, Academic Support Center**
This office is located at Tommaney Hall.  The Director of the Academic Support Center receives concerns about library policies or hours, library staff, unpaid book fines, book orders, tutors, the Learning Center, peer tutors.

**Vice President of University Services**
The Office of the Vice President of University Services is located in Pushmataha Hall. The telephone number is 830-2753. This office receives concerns not resolved by: Admissions Office, Counseling Center, Financial Aid Office, Food Services, Registrar, Residential Housing Program, and the Office of Student Conduct.

**Office of the President**
This office is located in Navarre Hall-North. Office hours are Monday-Friday, 8 a.m. to 5 p.m. The telephone number is 749-8497. The President's Office receives concerns not resolved by the University Services, Division of Academic Affairs, Director of Athletics, Administrative Services, or Facilities Management.

**Title IX Office (Sexual Harassment and Sexual Violence)**
Interim Title IX Coordinator Ms. Tonia Salvini is located in Pushmataha hall, 785-749-8457.  Students can file a complaint and talk with the Title IX Coordinator about concerns involving sexual harassment, sexual assault, and domestic violence.

USA000096

Office of Civil Right, Public Civil Rights, Washington, DC

No individual, on the basis of race, sex, color, national origin, disability, religion, age, sexual orientation, or status as a parent, shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination in, a federally conducted education or training program or activity.  (Executive Order 13160)

If a student believes he or she has been discriminated against because of a violation of Executive Order 13160, he or she may, personally or through a representative, file a written complaint with the Public Civil Rights Office, U.S. Department of the Interior, 1849 C. Street, NW Washington, DC 20240.  All written complaints must cite EO 13160, include the complainant's name, address, and phone number, and must describe the alleged discriminatlry conduct in sufficient detail to inform the Civil Rights Office as to the nature and approximate date of the alleged violation.

Department of Interior, 1849 C. Street, NW Washington, DC, 20240 (Sloan Farrell, Director, Public Civil Rights 202-208-3455)

(78)

USA000097

# XI. Definitions and Appendices

USA000098

## A. Definitions

1. The term "**University**" means Haskell Indian Nations University
2. The term "**student**" means any person taking courses at Haskell either full-time or part-time, pursuing undergraduate, or professional studies. Persons who withdraw after allegedly violating the Code of Student Conduct, who are not officially enrolled for a particular term but who have a continuing relationship with Haskell or who have been notified of their acceptance for admission are considered "students." The term "student" includes any person with respect to whom Haskell maintains education records or personally identifiable information, but does not include a person who has not been in attendance at Haskell for the purpose of academic study.
3. The term "**faculty member**" means any person hired by Haskell to conduct classroom or teaching activities or who is otherwise considered by Haskell to be a member of its faculty.
4. The term "**Haskell official**" means any person employed by Haskell.
5. The term "**member of the Haskell community**" means any person who is a student, faculty member, or Haskell official, as well as any person employed by Haskell or any person living in Haskell residential halls, although not enrolled at Haskell. A person's status in a particular situation shall be determined by the Director of the Office of Student Conduct.
6. The term "**Haskell premises**" means all land, buildings, facilities, and other property in the possession of or owned, used, or controlled by Haskell (including adjacent streets and sidewalks).
7. The term "**organization**" means a group of persons that has been registered and approved by Haskell and that is either:
   a. A registered student organization, which is defined as a group of individuals of which at least 75% of the members are currently enrolled students. The officers of a student organization must be currently enrolled students; or
   b. A registered campus organization, which is defined as a group of individuals of which at least 75% of the members are from the Haskell community, including currently enrolled students, employees, or spouses of these persons. The officers of a campus organization must be members of the Haskell community as defined in this paragraph.
8. The term "**Student Appeals Committe for Hearings**" means a group of persons authorized by the Student Conduct Administrator to determine appeals after initial adjudication. The Student Appeals Committee can determine whether a student has violated the Code of Student Conduct and to recommend sanctions that may be imposed when a violation has been committed in situations where the Student Conduct Administrator is unable to do so. The Student Appeals Committee for Hearings is comprised of a cross-section of employees and students from the Haskell community.
9. The term "**Student Conduct Administrator**" means the Haskell official designated by the Haskell President to be responsible for the initial adjudication of violations of the Code of Student Conduct. The Student Conduct Administrator is authorized to resolve all issues of student conduct and to impose or monitor sanctions upon any student(s) found to have violated the Code of Student Conduct.
11. The term "**shall**" is used in the imperative sense.

USA000099

12. The term "**may**" is used in the permissive sense.

14. The term "**policy**" means written Haskell regulations as found in, but not limited to, the Code of Student Conduct, Residential Life Handbook, the Haskell web page and computer use policy, and Graduate/Undergraduate Catalogs.

15. The term "**Affected Person or Parties**" or "**Complainant**" means any person who submits a charge alleging that a student violated this Code of Student Conduct. When a student believes that s/he has been an affected person of another student's misconduct, the student who believes s/he has been an affected person will have the same rights under this Code of Student Conduct as are provided to the Complainant, even if another member of the Haskell community submitted the charge itself

16. The term "**Respondent**" means any student accused of violating this Code of Student Conduct.

17. The term "**Student Conduct Process**" means the procedures for conducting investigations, hearings, and appeals related to alleged violations of the Code of Student Conduct.

18. The term "**Alternative Dispute Resolution**" means a method to resolve disputes outside of the normal SC process.  Involves the use of neutral third parties to increase the effectiveness of settlement discussions.

19. The term "**Student Appeals Committee**" means any person or persons authorized to impose or monitor sanctions on any student(s) found to have violated the Code of Student Conduct.

21. The term "**education records**" means records, files, documents, and other materials that contain information directly related to a student and that are maintained by Haskell.  The term does not include: **(i)** records of instructional, supervisory, and administrative personnel and educational personnel ancillary thereto which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute; **(ii)** records maintained by a law enforcement unit of Haskell that were created by that law enforcement unit for the purpose of law enforcement; **(iii)** in the case of persons who are employed by Haskell but who are not in attendance at Haskell, records made and maintained in the normal course of business which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose; or **(iv)** records on a student that are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in his professional or paraprofessional capacity, or assisting in that capacity, and which are made, maintained, or used only in connection with the provision of treatment to the student, and are not available to anyone other than persons providing such treatment, except that such records can be personally reviewed by a physician or other appropriate professional of the student's choice.

22. The term "**directory information**" relating to a student includes the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational institution attended by the student.

23. The term "**disorderly conduct**" means petty offense chiefly against public order and decency that falls short of an indictable misdemeanor

(81)

USA000100

24. **ADJUDICATION** – The action of hearing and deciding a complaint of a violation of the Code of Student Conduct based on information in an incident report, evidence and /or testimony.

25. **ADVOCATE** – One who pleads for someone's cause, or in support of something. See Student Advocate Policy.

26. **APPEAL** – A request by a party to a disciplinary matter to have another designated Haskell official or officials review a disciplinary decision.

27. **BUSINESS DAYS** –Days that Haskell is in full operation.  Excludes weekends and holidays.

28. **CALENDAR DAYS** – All days of the week are considered calendar days including weekends and holidays.

29. **CODE VIOLATIONS** –Violations of the rules of the Code of Student Conduct, which subjects students to the Student Conduct Process and which may result in sanctions; see Sanctions on pg. 28-30.

30. **CRIMINAL TRESPASS NOTIFICATION** – A form issued by Haskell staff to an Individual(s) who trespasses on Haskell property or who has been issued a Notice to Vacate or Emergency Suspension. Once a Criminal Trespass Notification is in place, the person who violates the notice may be referred to local authorities and may incur arrest and charges for Criminal Trespass.

31. **DISPOSITION** – A written decision following adjudication.

32. **DISCIPLINARY (Social) PROBATION** –One or more of the following sanctions:
**A**. Restriction, for the duration of probation, from holding any student offices and from representing Haskell in any manner.
**B.** Monitoring of student's behavior, with a requirement that the student report to a counselor as directed. Any violations while a student is on social probation could result in a Notice to Vacate, removal from campus and Emergency Suspension or expulsion.

33. **DIVERSION PROGRAM** –An alcohol and/or drug program or campus violence program that allows a student to maintain "Good Social Standing," and/or maintain housing eligibility.  Usually applied as a sanction.

34. **EVICTION** – A sanction whereby the student is ineligible for housing for a specified period of time.

35. **EXPULSION** – A sanction that prevents a student from attending Haskell or being on its grounds or in its buildings without permission from the Haskell President. Violators may be referred to local authorities and may incur arrest and charges for Criminal Trespass.

36. **GOOD SOCIAL STANDING** – All students at Haskell have good social standing upon admission.  Good social standing can be lost by a violation of the Code of Student Conduct that results in removal, suspension or expulsion from Haskell; not to be confused with good academic standing. The student is restricted, for duration of loss of good social standing, from holding any student offices and from representing Haskell in any manner. Representation of Haskell includes all athletic programs and intramural activities.  Good social standing can be regained by completing the sanctions, fulfilling conditions of probation or by re-admission after suspension.

USA000101

37. **OFFICIAL WARNING** – A written warning on a disposition form notifying the student that he/she has not maintained acceptable standards of conduct by not complying with sanctions given.  Failure to comply will result in immediate "Notice to Vacate" from housing.

38. **PREPONDERANCE OF INFORMATION** – Evidence which is of greater weight or more convincing or more believable than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not.

39. **REASONABLE SUSPICION -** :  A school official must have specific and articulable facts or inference, obtained from either personal observation or a reliable informant, that leads him/her to conclude – based on his/her experience the totality of the circumstances – that the search will lead to a discover of a violation of the Student Code of Conduct.

40. **SOCIAL PROBATION-** A period of time when a student may be faced with more severe disciplinary sanctions if the student is found to violate the Haskell regulations while in the designated probationary period.

41. **SUSPENSION** – A sanction that prevents the student from attending Haskell for a specified time frame.  For substance abuse, if the student is found to have committed the violation, the suspension is for a minimum of one (1) full year but not more than two (2) full years.

42. **NOTICE TO VACATE (NTV) -** An immediate loss of housing for one year from the date of issuance and:
  • Loss of the privilege of visiting in the residential halls.
  • Loss of the privilege of being on campus after regular business hours, unless student is attending a class.
  • Loss of the privilege to participate in any extracurricular activities, including athletic teams, intramural sports, etc. and loss of the use of Haskell facilities (i.e., Tecumseh Gym, Coffin Sports Complex, and Stidham Union). Student shall inform the Office of Student Conduct when the student has a class or class assignment or project in any of these facilities.
  • Loss of Good Social Standing.
  • Requirement to complete an Alcohol Assessment and Treatment Plan if NTV was issued for a Substance Abuse Violation.

## B. Interpretation and Revision

Any question of interpretation or application of the Code of Student Conduct shall be referred to the Student Conduct Administrator or his or her designee for final determination.

The Code of Student Conduct shall be reviewed every 3 years under the direction of the Student Conduct Administrator.

## C. Sources

These sources may be found in the Student Service Policy and Procedures Manual at the Office of the Vice President of University Services. A brief description of each source is provided.

USA000102

**1. Drug Free School and Communities Acts Amendments of 1980 – P.L. 101-226**
A federal law that requires Haskell to notify students and employees about campus programs that prevent the unlawful possession, use, or distribution of illicit drugs and alcohol and the standard of conduct.

**2. E-Mail Regulations**
The Haskell Information Technology Department governs the use of e-mail for Haskell students. All U.S. government rules and regulations pertaining to use/misuse of Federal resources apply.

**3. Family Educational Rights and Privacy (FERPA)**
A federal law that protects the privacy of student education records.

**4. Health Insurance Portability and Accountability Act (HIPPA)**
A federal law that requires physicians to ensure they are protecting the privacy and security of patients' medical information and using a standard format when submitting electronic transactions, such as submitting claims to payers.

**5. Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act**
A federal law that requires all universities to report statistics on murder, sex offenses, robbery, aggravated assault, burglary, and motor vehicle theft, along with statistics on arrests for drug and alcohol violations and weapons violations.

**6.Violence Against Women Act**
A federal law that requires all universities to report statistics on any crimes committed concerning violence against women.  Although this mandate does state women, the jurisdiction covers any victims of violence.


## D. Acknowledgements

This Code of Student Conduct is based on the work done by Edward Stoner and John Lowery and their work, "A Twenty-First Century Model Student Conduct Code with a Model Hearing Script."  The Code of Student Conduct section was based on the code at the University of Denver, Haskell's core values, and the August 2007 Haskell Indian Nations University Code of Student Conduct.  The sexual misconduct policy was based on Brett Sokolow's work, "Creating a Proactive Campus Sexual Misconduct Policy." The "Classroom Expression," "Campus Expression," "Publications," "Freedom of Protest," and "Student and Campus Organizations" sections are based on Dr. Venida Chenault's document, "Haskell Indian Nations University Development of Comprehensive Code of Student Conduct." All other sections are based on the 2008/2009 Haskell Indian Nations University Student Code of Conduct and the August 2007 Haskell Indian Nations University Code of Student Conduct.
Revised 2-14-2015.

USA000103

# XII. Forms

USA000104

Haskell Indian Nations University
**INCIDENT REPORT**

**STUDENT INFORMATION**

_____         **A00000**
Student Full Name (LAST, First Middle Initial)                 Complete Haskell ID Number

_____         _____
Residential Hall or Local Address                                  Date of incident

**OFFENSE INFORMATION** – Check the appropriate boxes for the offense and then give a brief description of the account answering who, what when, where, how and why. **Attach narrative to this form.**

| Violations | |
|---|---|
| ☐ | 1.Alcohol Misuse |
| ☐ | 2.Drug Misuse |
| ☐ | 3.Haskell Policies and Fed., State, and Local Laws |
| ☐ | 4.Violence |
| ☐ | 5.Domestic/Dating Violence |
| ☐ | 6.Weapons |
| ☐ | 7.Haskell Property |
| ☐ | 8. Harassment |
| ☐ | 9.Sexual Harassment |
| ☐ | 10.Stalking |
| ☐ | 11.Lewd, Indecent, or Inappropriate Public Behavior |
| ☐ | 12.Sexual Assault/Misconduct |
| ☐ | 13.Non-Forcible Sexual Misconduct |
| ☐ | 14.Fire |
| ☐ | 15.Hazing |
| ☐ | 16.Residential Hall Policies |
| ☐ | 17.Trespassing |
| ☐ | 18.Cooperation with Haskell Employees |
| ☐ | 19.Cooperation with Students |
| ☐ | 20.Harboring |
| ☐ | 21.Misuse of Technology |

Facts-

Place-

Time-

Reporting Party-

Witness(es)-

Victim-

Others Involved-

| Substance Abuse Behavior Indicators | |
|---|---|
| ☐ | Odor |
| ☐ | Slurred Speech |
| ☐ | Impaired Coordination |
| ☐ | Bloodshot/Watery Eyes |
| ☐ | Incoherence |
| ☐ | Inability to Stay Focused/Concentrate |
| ☐ | Other |

List items confiscated:_____

_____

Was Lawrence Police contacted? ☐ Yes ☐ No Was student arrested? ☐ Yes ☐No
Comments:_____

Was Lawrence Emergency Medical Services contacted? ☐ Yes ☐ No

If yes, was student hospitalized? ☐ Yes    ☐ No

Was malicious destruction of property incurred? ☐ Yes    ☐ No (list of damages and fines attached)

**FOR OFFICIAL USE BELOW:**

Date reviewed by Department Supervisor:_____

_____
Supervisor's Signature

Comments/Recommendations:_____

_____

Referrals made or recommended: ☐ Counseling Center ☐ Safety Officer ☐ Other: (ie. Haskell Health, Bert Nash, etc.)

Date of Birth:_____/_____/_____   ☐ Over 21 yrs old   ☐ Under 21 yrs old

Date/Time rec'd in SCO:_____

Revised 02/19/2015

_____
SCO Signature

(86)

USA000105

**HASKELL INDIAN NATIONS UNIVERSITY**
**Student Disposition Summary Form**

_____     **ID# A00000**_____     _____
**Student Name**                                                                                      Date

_____     _____
Date of Incident Report          Offense

_____     _____
Date of Incident Report          Offense

**Adjudication/Disposition**
_____Student did not appear for conference on_____
_____Report is pending or under investigation until_____
_____Student follow-up appointment is scheduled for_____
_____Student Conduct Officer made finding of code violation_____
_____Student admitted to facts of incident report as being true
_____Evidence utilized by Student Conduct Officer _____
_____Allegations from incident report_____

**Sanction**
_____Informal Disposition initiated_____
_____Official Warning_____
_____Loss of _____
       _____
       _____
_____*Damages/Fines: Amount $_____type_____due by_____
       *To be determined by Department or Division incurring the damage, fine or loss.
_____Community Service Hours:  Number of hrs._____due by_____
       Report to:_____
       Follow-up appointment:_____

**Referrals (Failure to comply may result in further disciplinary action).**
_____Student Conduct Committee, reason:_____
_____Counseling Center/Student Assistance Program_____
_____Safety Office:  Report to:_____By date of:_____
       Follow-up appointment:_____
_____TRIO_____
_____Diversion Program/Alcohol and or Drug Assessment:_____

**Dismissal**
_____Due to insufficient evidence              _____Lack of probable cause
_____Procedural Error:_____     _____Other:_____

**Appeal**
_____**Appeal is due by 4:30 pm on:_____at the Office of Student Conduct,**
       **Minoka Hall, Room 106.  See Appeal Process in Codebook.**

I am aware that information will be released and/or obtained from referral service providers to verify my compliance with
disposition. I consent to this release and/or obtaining of particular information for my case incident report.

_____     _____
Student                                    Date        Student Conduct Administrator      Date

Revised 06/2014              Original-Student Conduct Office        Copy - Student

(87)

USA000106

**Haskell Indian Nations University**
**NOTICE TO VACATE FORM (sample)**

 TO:

 FROM:               NAME, Student Conduct Administrator

SUBJECT:             Notice to Vacate Residential Hall

 DATE:

You did/did not appear for your scheduled conference on _____.   You are hereby notified
that you must vacate your residential hall room effective when the Director of Housing determines you must leave.

## *You are no longer eligible for housing because of reason(s) listed below:*

**You must comply with the Notice to Vacate (NTV) terms and conditions as follows:**

1.  You are not allowed visitation in the residential halls.  You are not permitted to participate in extracurricular activities
    including athletic teams, intramural sports, etc. and loss of the use of Haskell facilities.   You are not allowed to eat at
    Curtis Hall.

2.  You are able to attend classes, check your campus mailbox, utilize the library and Academic Support Center, and conduct
    legitimate business on campus during regular office hours.

3.  If you are found on campus in areas where you are not supposed to be, the Lawrence Police may  be called and you
    could be arrested for criminal trespass under Kansas Law KSA 21-3721.

## *In order to regain Good Social Standing and Re-admission into Housing, you must meet the following conditions:*

1.  Present proof of completion to the Student Conduct Office of a substance abuse assessment and proof of completion of
    treatment recommendations.

2.  Loss of housing for one year from the date of incident.

    You may be able to continue attending classes if you have not been suspended or expelled from the university.
    You should check with the Registrar's Office for you academic standing.

3.  Petition for re-admission into the residential hall after completion of a substance abuse program ; a decision will
    be made after you have submitted the request.

4.  Pay a $_____ fine and complete ____hours of community connection before you can apply for re-entry into the residential
    hall.

_____                    _____
 Student Conduct Administrator                                              Date

cc: Director of Housing, Financial Aid, Food Service, Security, Student Activities, Residential Hall Staff, Athletic Director,
Business Office, Registrar, Admissions, Counseling, File

(88)

USA000107

**HASKELL INDIAN NATIONS UNIVERSITY**
**Office of Student Conduct**

**RELEASE OF INFORMATION**

I, _____ give permission
                      Print Name

To the Student Conduct Office to release and/or obtain information from referral resources or programs on my attendance and progress.

The sole purpose of this release/obtain information is for the Student Conduct Office to determine and verify whether I am complying with the sanctions and referrals ordered in the disposition hearing.

The person/department this information is released to or to be obtained from is:

_____

My permission is from today's date:

_____ to _____

Or until I consent otherwise in writing.

_____      _____
**Student Signature**                                  **Date**

_____      _____
**Witness Signature**                               **Date**

(89)

USA000108

**HASKELL INDIAN NATIONS UNIVERSITY**
*Release of Information Form for Student Advocate*

I, _____, student give

     Print Name

_____

Name of Advocate

Permission to act as my advocate/representative concerning my disciplinary matter of

_____ concerning_____

violation(s).

I understand that no information on my case will be given to anyone unless I have authorized it by signing a "Release of Information" form.

I understand that any investigative interviews conducted by my Advocate will be scheduled with the Student Conduct Administrator.  There will be no walk-in appointments.

I understand that by signing a "Release of Information," my advocate will be provided information from the Student Conduct Office.

I understand that Haskell Indian Nations University is not responsible for the acts of the Advocate in handling my case.

I understand that this release applies only to the Student Conduct hearings.

**Advocate Statement:**  I, _____, Advocate, state that I have no disciplinary matters pending against me at this time.  I understand that I may be charged with fraud under the Code of  Student Conduct policy in the event the university discovers that I have misrepresented my status.  I agree to notify the Student Conduct Administrator and withdraw from representing the above student in the event I have a pending disciplinary matter.


_____            _____

Student Signature                                              Date


_____            _____

Advocate Signature                                             Date


(90)

USA000109

***Application for Diversion Program***

Name_____Date of Birth_____

Home
Address_____City_____State_____

On campus mail box number_____Student Identification Number_____

Do you reside on campus? (circle answer) yes   no    If yes, which hall ?_____

If no, please list current
address_____

List the offense for which this application is being
submitted_____

How long have you attended Haskell?_____List your advisor_____

What is your major?_____When do you expect to graduate?_____

Do you know your GPA (Grade Point Average)?  Current:_____   Cumulative:_____
Are you involved in any organizations or clubs on campus?  _____yes  _____no
If yes, please list and include any offices you hold.
_____
_____
_____

Are you currently employed?  _____yes  _____no   If yes, please list employer_____

List all offenses for which you have been written up for during your enrollment at Haskell.  Include charges that
were dismissed:_____
_____
_____

If you are under 21 years of age, and the charge involved alcohol, answer the following questions in

detail (Note: any information will be used solely for this application).

       From where was the alcohol obtained:_____

       How did you receive the alcohol (i.e., did you or someone else purchase)_____

       Were you required to show I.D.? _____yes _____no   Did you use your real I.D.?_____

State any facts concerning the incident which in your opinion might excuse your
actions:_____
_____
_____

Explain why you feel you could successfully complete the Diversion Program:_____
_____
_____

USA000110

_____

_____

**The following items will be due within 5 days of formal adjudication to the Office of Student Conduct.**

_____Letter of intent regarding your academic goals.
_____Letter of support from Haskell staff or faculty.
_____Affected Parties Concept Map.
_____Completed diversion application.

I understand that if I fail to submit the above 4 items on the due date – appeal process will begin.

I solemnly swear that I have read the Diversion Program Guidelines and completed the application and all the information contained is true and correct to the best of my knowledge   I understand that if any of this information is not true and correct, this will be a basis for denial of diversion or revocation of diversion.

I understand that if the Diversion Application is denied, the disciplinary process will be continued.

I hereby authorize the Student Services Department to release any information to the agency which is performing the drug, alcohol and/or anger management assessment, or any other such agency or persons for use in determining whether I am a suitable candidate for the Diversion Program.


_____            _____
Signature of Student                                                    Date


_____

Date complete application rec'd:_____

Rec'd by: _____

Reviewed by:_____

Approved/Denied:_____

NOTES:_____
_____
_____
_____
_____

Revised 08/2015

USA000111

# Haskell Indian Nations University

## GRIEVANCE REPORT FORM

**Directions:** (1) Please complete the following information, use additional paper if necessary;
(2) Give this form to the Supervisor of the person/office related to the complaint.

PLEASE PRINT:

_____     _____
To                                                                                    Date

_____     _____
From                                                                                Complete Haskell ID Number

_____     _____
Residential Hall                                                             Haskell Mailbox

GRIEVANCE SUBJECT: (Use additional paper if necessary)
Who or What is the complaint about?
_____
What office or person is responsible for this problem?
_____
Have you gone directly to the person or office you are unhappy with and talk to them about the problem?
☐ Yes   ☐ No  If no, why?_____
_____
If yes, what did the person tell you to do? _____
_____
Have you done that yet?  ☐ Yes     ☐ No  If no, why? _____
_____

DESCRIPTION OF COMPLAINT: (Use additional paper if necessary)
What are you unhappy about?  _____
_____
_____
When did this happen?  _____
Where did this happen? _____
What would be a satisfactory resolution?  _____
_____
_____

_____     _____
Name (Please Print)                                                     Complete Haskell ID Number

_____     _____
Signature                                                                       Date

**For official use below:**_____

_____     _____
Supervisor's Signature                                                 Date Supervisor Received Form
Date Request for Status Form: _____
Date Rec'd:_____  Date Reply Sent:_____
Action Taken: _____

(93)

USA000112

# HASKELL INDIAN NATIONS UNIVERSITY
## EMERGENCY SUSPENSION NOTIFICATION

TO:  _____ Student

FROM:  _____ Student Conduct Administrator

RE:  **EMERGENCY SUSPENSION**

DATE:  _____

The following is to inform you that you are hereby placed on temporary emergency suspension as outlined in 25 CFR 42.7 Due Process and the Haskell Code of Conduct.  The facts that support your placement on Emergency Suspension, which we believe are creating an immediate danger of risk to the campus community or yourself are:

_____
_____
_____
_____

*The conditions of your Emergency Suspension are:*

_____   **Level 1** – Emergency Suspension (in-house) where student is confined to their residential hall but, may attend classes, use the library and go to the dining room.  Visitation privileges are suspended and student is not allowed to attend any activities on-campus until suspension status is withdrawn.  Must sign in as scheduled by residential hall staff. NOTE:  Student may or may not be moved to another room or even building in cases of violence.

_____   **Level 2** – Emergency suspension where student must be out of residential hall room, but still can attend classes, eat meals, use the library and be on the Haskell grounds for other school related purposes.

_____   **Level 3** – Emergency suspension where the student MUST BE OFF CAMPUS COMPLETELY; they cannot eat meals, attend classes, use the library or be on the Haskell grounds for any reason.

**Any violations of the above will automatically result in an off campus suspension.  If you come back on campus during your emergency suspension at times that you are not supposed to be here, you may be prosecuted for criminal trespassing under Kansas Law KSA 21-3721.**

You will remain on suspension until such time as you are offered a hearing.  This will require a conference with the Student Conduct Administrator.  A mutual agreement will be reached by the Housing Director and the Student Conduct Administrator for lifting of the Emergency Suspension or for placing conditions for on campus housing privileges.

Please check your campus mailbox daily for a notice from the Student Conduct Office regarding a disciplinary conference.  If you are on a Level 3 suspension, you may make contact with the Student Conduct Office by calling 785-749-8415 for an appointment.

_____   _____        _____   _____
Student Conduct Administrator           Date              Student Signature                            Date
Revised 08/2015

(94)

USA000113

## Haskell Indian Nations University
## CODE OF STUDENT CONDUCT FORM

The Haskell Indian Nations University Code of Student Conduct emphasizes each student's individual responsibility for maintaining behavior while attending and representing the university.  These are guidelines based on regulations and laws of the State of Kansas, ordinances of the City of Lawrence, and regulations found in the **Haskell Code of Student Conduct.  Knowledge of these regulations, laws, ordinances, and Haskell Code of Student Conduct are the responsibility of the individual student.**

Students found in violation of the Substance Abuse policy related to being intoxicated, possession and/or transportation and trafficking of alcohol or illegal drugs risk the loss of residential housing and/or suspension or expulsion. The university will inform parents/guardians of students under the age of 21 of incidents involving substance abuse.

Violent or disruptive actions such as fighting, intimidation, and unlawful assembly are not permitted on the Haskell campus and may result in Emergency Suspension and/or expulsion from the campus.  The use of possession of firearms or other lethal weapons are prohibited on campus and in the residential halls and could result in emergency suspension and/or expulsion.  Harassment based on gender, tribal affiliation, degree of Indian blood, sexual orientation, disability, martial or parental status or age is not tolerated.  All cases involving issues of gender and discrimination, dating and domestic violence, stalking, sexual harassment and sexual assault will fall under the Title IX and Violence Against Women Act.

Theft of personal, private and/or institutional property will not be tolerated and may lead to legal prosecution.

Show respect for property by not engaging in its defacement or destruction.  Student will be liable for all costs associated with damage.

Gambling is prohibited on the campus at Haskell activities.

Each student will receive the Code of Student Conduct handbook and follow regulations.

Trespassing on Haskell campus may result in issuance of Criminal Trespass Form, which could result in arrest and/or prosecution.

Abide by all residential housing rules.  Attend all scheduled classes.

Student must present university ID upon request by staff.

I have read and understand the above-mentioned regulations; I agree to abide by them.  **I further understand that failure to observe the regulations of the Haskell Code of Student Conduct could affect my status in the residential housing program and/or student at the university.**

_____          _____
Student Print Name                                                      Student Signature


_____
Date


Revised 07/2015

USA000114

# HASKELL INDIAN NATIONS UNIVERSITY
## Title IX Coordinator's Office
Complainant Rights and Responsibilities

This form documents the information shared with the Complainant regarding an investigation by the Title IX Coordinators Office, into a claim of discrimination, harassment, and/or retaliation.

Date:                          Topic Discussed:

_____    Discrimination Complaint Resolution Process (Copy Provided)

_____    Applicable University policies

_____    Timeframe for Investigation

_____    Correspondence regarding investigation

_____    Opportunity to provide information verbally and/or in writing

_____    Opportunity to submit supporting documentation, identify witnesses, and/or provide witness statements

_____    Policy prohibiting retaliation

_____    Opportunity to bring a representative to meetings

_____    Abuse of Discrimination Complaint Resolution Process

_____    Confidentiality

_____    Anonymity (limitation on investigation) – if applicable

_____    Right to file a criminal complaint – if applicable

_____    Campus and community resources – if applicable

 I acknowledge that the information identified above was communicated to me by the Title IX Coordinators Office and that I have had the opportunity to ask questions about the Discrimination Complaint Resolution Process and the information provided to me. I also acknowledge that I have received a copy of the Discrimination Complaint Resolution Process.

Name of Complainant: _____

Signature of Complainant: _____   Date: _____

This information was communicated and the signature witnessed by the undersigned Title IX representative:

_____

(96)

USA000115

# HASKELL INDIAN NATIONS UNIVERSITY
## Title IX Coordinator's Office
Respondent Rights and Responsibilities

This form documents the information shared with the Respondent regarding the Respondent's rights and responsibilities in an investigation by the Title IX Coordinators Office, into a claim of discrimination, harassment, and/or retaliation.

Date:                         Topic Discussed:

_____    Discrimination Complaint Resolution Process (Copy Provided)

_____    Applicable University policies

_____    Timeframe for Investigation

_____    Correspondence regarding investigation

_____    Opportunity to provide information verbally and/or in writing

_____    Opportunity to submit supporting documentation, identify witnesses, and/or provide witness statements

_____    Policy prohibiting retaliation

_____    Opportunity to bring a representative to meetings

_____    Confidentiality

_____    Campus and community resources – if applicable

 I acknowledge that the information identified above was communicated to me by the Title IX Coordinators Office and that I have had the opportunity to ask questions about the Discrimination Complaint Resolution Process and the information provided to me. I also acknowledge that I have received a copy of the Discrimination Complaint Resolution Process.

Name of Respondent:       _____

Signature of Respondent: _____ Date: _____

This information was communicated and the signature witnessed by the undersigned Title IX representative:

_____

(97)

USA000116

# HASKELL INDIAN NATIONS UNIVERSITY
## Title IX Coordinator's Office
Title IX No Contact Directive


Name: (enter name)

Address: (enter date)

Date: (enter date)

**NO CONTACT DIRECTIVE**

Hand Delivered and Electronic Mail to: (enter name)


Dear (enter name),

Haskell Indian Nations University Title IX Coordinators Office has received information about an allegation that you violated the University's Sexual Harassment Policy by engaging in sexual battery and/or sexual assault with (Name) . Specifically, it has been reported to the Title IX Coordinators Office that sometime during the early morning of (Date) you took Ms/Mr. (Name) to your room and sexually assaulted her/him. The purpose of this letter is to provide written notice that a "No Contact" Directive has been placed on you with respect to (Name). You are to refrain from any attempts to contact Ms. (Name), personally or through any person.

You are hereby informed that this "No Contact" Directive means that you are prohibited from initiating, or contributing through third-parties, by any physical, verbal, electronic, or written communication with (Name), her/his family, or her/his acquaintances. This prohibition includes messaging through Facebook, Twitter, Instagram, Tumblr or other social media. You are also to refrain from interfering with or damaging any of her/his personal possessions. The "No Contact" Directive will remain in effect until further notice from the Title IX Coordinators Office. Moreover, retaliation against persons who may pursue or participate in a University investigation, whether by you directly or by your associates, is a violation of the University policy. While I understand you have the right to communicate with your family and friends about this matter, please understand that those discussions should not be intended to reach (Name) in order to intimidate or further harass her/him.

Please further understand that any violation of this "No Contact" Directive with regard to (Name) will negatively reflect on any conduct case that may involve you relating to this matter, which may also put your student status in jeopardy. Retaliation is also against University policy and I want to make it clear that subjecting anyone you believe to be involved in an investigation could also be considered retaliation is against

University policy and could also lead to more serious disciplinary action taken against you, up to and including expulsion from the University.

The designated Title IX Investigator assigned to this case will be in touch with you in the near future to discuss this complaint. Please do not hesitate to contact me if you have any immediate questions. Also, if you are unclear about any of the directives in this letter please contact my office immediately at 785-749-8457.

Sincerely,

_____

Tonia Salvini, Title IX Coordinator

USA000117



**FIRE**
Foundation for Individual
Rights in Education

October 27, 2020

Office of the Inspector General
Department of the Interior
**Attention: Intake Management Unit**
1849 C Street NW – Mail Stop 4428
Washington, D.C. 20240

_Sent via Facsimile (703-487-5402)_

To Whom It May Concern:

Please find enclosed a complaint form concerning Haskell Indian Nations University and a violation of students' First Amendment rights.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Lindsie Rank
Program Officer, Individual Rights Defense Program
Foundation for Individual Rights in Education

USA000118



## GENERAL
## Hotline Complaint Form

If you suspect fraud, waste, abuse, misconduct, or mismanagement involving the U.S. Department of the Interior, please complete and submit this form by pressing the SUBMIT button below. If you are unable to submit this form directly online, you may select one of the alternative methods listed at the bottom of this form.

*By submitting this complaint, I understand I am **providing my name** and I agree that the **DOI OIG can disclose my name and other information I provide**, if necessary, to ensure my issues are addressed.*

Fields marked with * are required.

**Your Contact Information**

| | |
|---|---|
| First Name * | Lindsie |
| Last Name * | Rank |
| Select Your Current Status | Private Citizen |

If select 'Tribal Member', please include Tribal Affiliation:

Program Officer, Individual Rights Defense Program, Foundation for Individual R

| | |
|---|---|
| Title/Grade | Program Officer, Individual Rights Defense Program, Foundation for Individual Rights in |
| Address | 510 Walnut Street, Suite 1250 |
| City | Philadelphia |
| State | Pennsylvania(PA) |
| Zip Code | 19106 |
| Phone number (xxx-xxx-xxxx) * | 2157173473 |
| Email (xx@xx.xxx) | lindsie.rank@thefire.org |

**Complaint Information**

1. Subject Information: *(Who committed the alleged misconduct/wrongdoing? What is the title/position held by the alleged wrongdoer? Please include names, addresses, and telephone numbers of all subjects. If providing information concerning contractor or grantee fraud, please provide the name of the primary contractor and/or subcontractor, type of contract, contract or grant numbers, date of award, and the name of any agency officials.)*

   ```
   Dr. Ronald Graham
   President
   Haskell Indian Nations University
   Office of the President
   155 Indian Avenue
   Lawrence, Kansas 66046-4800
   (785) 749-8497
   ```

2. Victim Information: *(Please include names, addresses, and telephone numbers of all victims, to include Government entities. If the victim is a contractor or grantee, please provide the name of the primary contractor and/or subcontractor, type of contract, contract or grant numbers, date of the award, and the name of any agency officials.)*

USA000119

https://forms.doioig.gov/(S(zvco553ti03kg4h23r4f3ccu))/hotlinecomplaint_general_form.aspx

```
Jared Nally
155 Indian Avenue
████████
Lawrence, Kansas 66046-4800
██████████

Indian Leader Association
c/o Jared Nally
155 Indian Avenue
████████
Lawrence, Kansas 66046-4800
██████████
```

3. **Where did the wrongdoing occur?** *(Please provide the bureau, office, or other location, and the city, state, and phone number.)*

```
Haskell Indian Nations University
155 Indian Avenue
Lawrence, Kansas 66046-4800
(785) 749-8497
```

4. **When did the wrongdoing occur?** *(Please provide times and dates.)*

```
October 16, 2020.
```

5. **What exactly did the individual do wrong/how was the wrongdoing committed?** *(Please provide specific and relevant details concerning the alleged misconduct/wrongdoing, to include any policies, regulations, and laws violated.)*

```
On October 16, 2020, Dr. Ronald Graham, the president of Haskell Indian Nations University ("HINU"),
issued a written "Directive" to Jared Nally, an undergraduate student and Editor-in-Chief of the
student newspaper, The Indian Leader. A copy of the "Directive" is enclosed. The "Directive" violated
the First Amendment rights of Nally and the students who write, edit, and publish The Indian Leader
and threatens the rights of all students at HINU.

President Graham's "Directive" cited a number of instances of expression protected by the First
Amendment, including: (1) sending letters critical of HINU employees; (2) asking the Lawrence
Police Department, a local law enforcement agency, for information concerning the death of a HINU
employee in connection with a story for the newspaper; (3) recording a conversation with a HINU
employee in conformity with Kansas law, which authorizes recordings made by a party to the
conversation (State v. Roudybush, 686 P.2d 100, 107-108 (Kan. 1984)); and (5) Nally's raising
concerns about HINU's response to the 2020 Census. President Graham indicated that Nally's
expression has "brought yourself, The Indian Leader, [HINU], and me unwarranted attention,"
citing Graham's interaction with the local community, including the mayor and police department.

President Graham's "Directive" proceeded to assert that Nally's role as a student journalist
was subordinate to his role as a student and "representative of our community." Graham warned
Nally that he was to "treat fellow students, University staff, and University officials with
appropriate respect" and that failure to do so would "result in disciplinary action."
Graham's "Directive" then "directed" Nally to "comply" with an enumerated list of requirements.

President Graham's "Directive" violates the First Amendment rights of Nally and The Indian
Leader. It also violates the 1989 settlement agreement approved by the Federal District
Court for the District of Kansas in a lawsuit brought against the Department of the Interior
by the student newspaper. (Order Approving settlement Agreement, The Indian Leader Ass'n v.
United States Dep't of the Interior, No. 89-4063-R (D. Kan. Sept. 18, 1989)). That settlement
provides that "no officer or "agent" of the university will "restrain, obstruct or prohibit
the publication of The Indian Leader newspaper or otherwise inhibit the free expression of"
the students who publish it. Id. at p. 1, § 3(b). Graham is aware of the specific requirements
of the settlement, which he cites in his "Directive."

Graham's unlawful "Directive" has had and will continue to have an unlawful chilling effect
on Nally and other student journalists at HINU. In addition, because Graham's "Directive"
indicates that showing "appropriate respect" to university officials is a condition of the
university's Code of Student Conduct, the "Directive" threatens the First Amendment rights
of all students enrolled at HINU.

For further information, please see the October 26, 2020, letter from the Foundation for
Individual Rights in Education (FIRE), the Student Press Law Center (SPLC), and the Native
American Journalists Association (NAJA), attached.
```

6. What was the effect of the wrongdoing? *(Was there a loss to the government? Did anyone benefit/suffer from the wrongdoing?)*

> Graham's conduct violates well-established First Amendment law and the terms of the 1989 settlement agreement. This conduct exposes Haskell Indian Nations University, the Bureau of Indian Education, and the Department of the Interior to liability.
>
> Graham's conduct has had and will continue to have a chilling effect on the First Amendment rights of students, in particular Nally and other journalists affiliated with The Indian Leader.

7. Do you have firsthand knowledge of the wrongdoing? *(Please include when and how you gained this knowledge.)*

> No, except to the extent that I have sent or received correspondence relating to this matter.

8. Who else might be aware of this wrongdoing and how does the individual know? *(Please provide names, addresses, and telephone numbers.)*

> Jared Nally received the "directive" from Graham.
>
> Jared Nally
> 155 Indian Avenue
> ████████████
> Lawrence, Kansas 66046-4800
> ████████████
>
> Tony Dearman, Director of the Bureau of Indian Education (BIE), was copied on President Graham's letter to Nally. His address and telephone number:
>
> Tony Dearman
> Department of the Interior
> Bureau of Indian Education
> 1849 C Street NW, MS-3609-MIB
> Washington D.C. 20240
> Phone: 202-208-6123
> Email: ████████████████████

9. What do you believe would be an acceptable remedy to your concerns?

> We request that the Department of the Interior conduct an investigation into these actions and issue a report finding that Graham's action violated the First Amendment and the 1989 settlement agreement.
>
> We further request that the Department consider personnel action against Graham, including, at a minimum, a reprimand, in order to deter other university officials — whether at institutions operated by the federal or state governments — from violating the fundamental First Amendment rights of students.
>
> We further request that the Department direct HINU's leadership to publicly reaffirm that neither its Code of Student Conduct nor any other HINU policy will require or be interpreted to violate the First Amendment rights of its students or faculty. In conformity with that reaffirmation, we request that the Department direct HINU to review and revise its Code of Student Conduct such that it is compliant with the First Amendment.
>
> Finally, we request that the Department require HINU's senior leadership undertake training on the First Amendment as provided by the Student Press Law Center, FIRE, ACLU of Kansas, or another reputable organization with expertise in First Amendment requirements.

10. Has this allegation been previously reported to the OIG, or any other agency, to include, but not limited to, EEO, MSPB, OSC, or your bureau?
    ○ No  ● Yes

    If yes, please provide the dates, who did the review, and the current status of the complaint.

> Nally sent a letter to Tony Dearman, Director of the Bureau of Indian Education, on October 17, 2020. Dearman has assigned the matter to BIE's Human Resources department.
>
> Additionally, FIRE intends to file a separate complaint with the United States Department of Education.

USA000121

**Attachments**

If you have supporting documentation, please attach files here

Choose Files   No file chosen

---

\* ☑ *By checking this box, I confirm that the **DOI OIG can disclose my name and other** **information** I provide, if necessary, to ensure my issues are addressed.*

**Enter Captcha (with number):** 

25 + 46 =   71

Submit Online

---

*If you are unable to submit this form directly online, you may select one of the below alternative methods:*

- **Telephone:** OIG Hotline's Toll-Free Number: 1-800-424-5081
- **Fax:** Complete and fax this form and any supporting documents to: 703-487-5402 (Attention: Intake Management Unit)
- **US Mail:** Complete and mail this form and any supporting documents to:
  Office of Inspector General
  Department of the Interior
  1849 C Street NW - Mail Stop 4428
  Washington, D.C. 20240

View Your Form    Print

USA000122

  

October 26, 2020

Dr. Ronald Graham
Haskell Indian Nations University
Office of the President
Navarre Hall
155 Indian Ave
Lawrence, Kansas 66046-4800

## *URGENT*

*Sent via Electronic Mail (ronald.graham@bie.edu)*

Dear President Graham:

FIRE,[1] NAJA,[2] and the SPLC[3] are concerned about the state of freedom of expression, including freedom of the press, at Haskell Indian Nations University (HINU) in light of your recent directive sent to Jared Nally, editor-in-chief of *The Indian Leader*, HINU's student newspaper. Your directive forbids Nally from carrying on normal journalistic activities, such as requesting information from government agencies, recording interviews, and criticizing members of the HINU community.

Your directive violates the First Amendment and HINU's obligations under a September 1989 settlement agreement with *The Indian Leader*. HINU must immediately rescind the directive,

---

[1] The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.

[2] The Native American Journalists Association (NAJA) serves and empowers Native journalists through programs and actions designed to enrich journalism and promote Native cultures. NAJA recognizes Native Americans as distinct peoples based on tradition and culture. In this spirit, NAJA educates and unifies its membership through journalism programs that promote diversity and defends challenges to free press, speech, and expression. NAJA is committed to increasing the representation of Native journalists in mainstream media. NAJA encourages both mainstream and tribal media to attain the highest standards of professionalism, ethics and responsibility.

[3] Founded in 1974, the Student Press Law Center (SPLC) is the nation's only legal assistance agency devoted exclusively to supporting, defending, and educating high school and college journalists about the rights and responsibilities embodied in the First Amendment and supporting the student news media in covering important issues free from censorship. The SPLC is a nonpartisan, nonprofit organization.

510 Walnut Street, Suite 1250   Philadelphia, PA 19106
phone: 215-717-3473   fax: 215-717-3440
thefire.org

USA000123

restore the *Leader*'s rights to university resources and access to its bank account, and clarify that HINU will not interfere in the affairs of the student newspaper or impede the free expression rights of individual students in the future.

## I.   HINU Threatens Student Journalist with Disciplinary Sanctions

The following is our understanding of the pertinent facts. We appreciate that you may have additional information to offer and invite you to share it with us. Please find enclosed an executed waiver and request for FERPA records authorizing and requesting that you share Jared Nally's student file with FIRE.

### A.   *Nally raises questions about HINU's reporting of student data to the Census.*

In March, Nally began raising questions about how HINU reports student data to the U.S. Census Bureau.[4] Nally was initially concerned that HINU had not submitted census data on behalf of its students.[5] In addition to raising his personal concerns, Nally wrote an article for *The Leader* discussing HINU's institutional response to the Census on behalf of students.[6]

In late August, Nally discovered HINU had submitted student data to the Census but had not asked students to self-report racial or gender identities to be reported to the Census.[7] At this point, Nally became concerned that HINU had engaged in discrimination against biracial students by reporting all students as "Native American," regardless of their personal identities.[8]

As part of his concerns about whether and how HINU had reported student census data, Nally lodged concerns about Tonia Salvini, HINU's Vice President of University Services, with the Community Police Review Board (CPRB) of the City of Lawrence, on which Salvini sits.[9] Nally initially raised his concerns with the CPRB via public comments during CPRB meetings and lodged an official ethics complaint concerning Salvini on October 9.[10]

Also on October 9, Nally submitted a grievance to your office regarding his concerns about HINU's handling of the Census and reporting of student racial identities in the future.[11]

---

[4] Email from Nally to Ernie Wilson, Acting Supervisor: College Resident Assistant, HINU, and Tonia Salvini, Vice Pres. of Univ. Services, HINU (Mar. 24, 2020) (on file with author); *see also* letter from Nally to Salvini (Aug. 28, 2020) (on file with author).
[5] *Id.*
[6] Jared Nally, *2020 Census*, INDIAN LEADER, Apr. 13, 2020, http://www.theindianleader.com/2020/04/13/2020-census.
[7] Letter from Nally, *supra* note 1.
[8] *Id.*
[9] *Id.*
[10] Letter from Nally to CPRB (Oct. 9, 2020) (on file with author).
[11] Letter from Nally to Graham (Oct. 9, 2020) (on file with author).

### B.      *Nally legally records an HINU administrator without her knowledge.*

In July, when HINU announced its student fees would increase, Nally called financial aid coordinator Carlene Morris to inquire about his own financial aid situation and to gather more information about the change.[12] Nally recorded his conversation with Morris without seeking her permission, as is allowed under Kansas law.[13] Nally later used this recording in an opinions article regarding the fee change.[14]

### C.      *The* Leader *objects to an administratively-appointed faculty adviser.*

In July, the *Leader*'s faculty adviser, Rhonda LeValdo, informed the publication staff that because HINU's administration was requiring that faculty cease their roles as student organization advisers, she would no longer be able to serve as faculty adviser.[15] In LeValdo's stead, your predecessor appointed Interim Dean of Humanities Joshua Falleaf to advise the student newspaper.[16]

Concerned that the appointment of an administrator as an adviser would imperil their right to engage as members of a free, independent student press, the *Leader*'s officers unanimously voted to remove Falleaf as faculty adviser.[17] While it is not clear the *Leader*'s officers had the right to remove a faculty adviser at the time of the vote to remove Falleaf, the student officers were concerned that advisory oversight from an administrator would ultimately lead to violations of their First Amendment rights and the 1989 Agreement, which prohibits agents of the university from "inhibiting the free expression of members of" the *Leader*.[18]

On August 27, per its rights under the 1989 Agreement to alter its Plan of Operation,[19] the *Leader* altered its Plan of Operation for the 2020-21 school year (the 2020-21 Plan), implementing a new procedure for HINU's appointment of faculty advisers.[20] The 2020-21

---

[12] *See* Jared Nally, *It's Not Just $475*, INDIAN LEADER, July 10, 2020, http://www.theindianleader.com/2020/07/10/its-not-just-475.

[13] *See* KAN. STAT. ANN. § 21-6101(a)(1).

[14] Nally, *supra* note 12.

[15] Email from Nally to Joshua Falleaf, Interim Dean of Humanities, HINU, Jul. 29, 2020 (on file with author); email from Jim Rains to Rhonda LeValdo and Nally (July 31, 2020) (on file with author).

[16] *Id.*

[17] *Id.*

[18] *Id.*; Letter from Nally to Jim Rains, Acting Vice President of Academics, HINU (Aug. 3, 2020) (on file with author). *See* Settlement Agreement between HINU Indian Junior College of the Bureau of Indian Affairs and the Indian Leader Association (Sept. 19, 1989) (on file with author).

[19] Settlement Agreement, *supra* note 18 ("HINU agrees that no officer, agent, instructor, or employee shall . . . refuse to approve a Plan of Operation for [the *Leader*] substantially similar to the attached Plan. . . . [N]othing in this Settlement Agreement is intended to prevent members of *The Indian Leader Association* from adopting a Plan of Operation . . . substantially dissimilar to the attached Plan").

[20] The Indian Leader Association 2020-2021 Plan of Operations, THE INDIAN LEADER ASSOCIATION, *http://www.theindianleader.com/wp-content/uploads/2020/09/2020-2021-Plan-of-Operations.pdf* (last visited Oct. 20, 2020).

Plan provides that the *Leader* will nominate advisers, which will then be appointed by HINU.[21] Further, the 2020-21 Plan provides for removal of a faculty adviser by petition by a majority vote of the *Leader* officers.[22]

### D.   Nally pursues a story by requesting information from local government.

In October, when a food service employee of HINU died, Nally began gathering information about her death in order to report it in the *Leader*.[23] As part of this investigation, Nally reached out to the local police for any information they might have regarding the death.[24] In his email to the Lawrence Police Department, Nally accurately identified himself as "a student writer for *The Indian Leader*."[25] A copy of Nally's email is enclosed for reference.

### E.   You send an October 16 "directive" to Nally.

On October 16, you sent Nally a written memo, styled as a "directive," reciting a variety of grievances about his reporting and criticism of HINU administrators, and threatening him with "disciplinary action" for failing to show students, staff, and "officials" the "appropriate respect."[26] A copy of your October 16 "directive" is enclosed.

In particular, the "directive" accuses Nally of:

- "routinely attack[ing] HINU employees" by writing letters and speaking in public;
- "demanding information" while holding himself out as editor of the *Leader*;
- advocating for the removal of Falleaf as the *Leader* adviser; and
- recording his call with Morris, which would "[i]n many states . . . be considered a felony[.]"[27]

---

[21] *Id.*

[22] *Id.*

[23] *See* Jared Nally, *Curtis Worker Nia Schexnider Passes On*, THE INDIAN LEADER, Oct. 9, 2020, http://www.theindianleader.com/2020/10/09/curtis-worker-nia-schexnider-passes-on.

[24] Email from Nally to the Lawrence Police Department (Oct. 5, 2020) (on file with author).

[25] *Id.*

[26] Letter from Graham to Nally (Oct. 16, 2020) (on file with author).

[27] While this is an accurate statement regarding the law of *other states*, your directive failed to mention the fact that Kansas follows a one-party consent rule. That is, so long as a single party to a private conversation (here, Nally) consents to the recording thereof, the recording is absolutely legal and valid. KAN. STAT. ANN. § 21-6101(a)(1).

After warning Nally that disciplinary consequences could follow his non-compliance, your "directive" specifically instructs Nally that he "WILL" treat "all faculty members, staff, and students with the highest respect," and:

> **You will NOT:**
>
> - Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus,
> - Make demands on any *governmental agency* – or anyone else from HINU – while claiming to represent *The Indian Leader*.
> - Attempt countermanding decisions of HINU personnel assigned by me or anyone else to positions in an effort to replace them,
> - Record anyone at HINU in your interview unless you advise them first and they grant you permission.

Around the same time as your "directive" to Nally, the *Leader* faced significant difficulty renewing its status as an officially recognized[28] organization for the 2020-21 school year. In years past, the *Leader* has completed an annual recognition process by submitting its annual Plan of Operations and minutes from its first meeting to the Student Bank. Following this submission, the Student Bank has typically provided a signature card to be completed by elected officers and students' chosen faculty adviser.

Following its implementation of the 2020-21 Plan, on September 10, the *Leader* submitted this and its first meeting minutes to the Student Bank, which controls the disbursement of student funds to recognized student organizations.[29] Unlike in previous years, the *Leader* has not heard back from the Student Bank, despite multiple attempts to get in contact.[30] During this time, the *Leader* has also been unable to ascertain the balance of its account with the Student Bank[31] and has yet to be formally assigned an adviser for the 2020-21 school year, despite its nomination of its previous adviser, LeValdo.

## II.    Your "Directive" Violates the First Amendment Rights of Nally and the *Leader*

It has long been settled law that the First Amendment is binding on public colleges like HINU. *Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should

---

[28] We understand that HINU refers to its official student organization recognition process as "sanctioning." We refer to it as "recognition" throughout this correspondence, as most institutions of higher education do, for the sake of distinguishing between recognizing the *Leader* and HINU's unlawful threats to impose disciplinary sanctions on its editor.

[29] Email from Nally to Jeri Sledd, Student Bank Manager, HINU (Sept. 10, 2020) (on file with author).

[30] *See id.*; email from Nally to Sledd (Oct. 19, 2020) (on file with author).

[31] Oct. 19 email, *supra* note 30.

apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'") (internal citation omitted). Indeed, the 1989 settlement agreement—which you concede is a binding agreement[32]—obligates Haskell Indian Nations University in particular to protect the First Amendment rights of the student publishers of the *Leader*.

### A.     *The actions identified in your "directive" are protected speech.*

Your directive to Nally threatens to punish him for engaging in normal journalistic activity, violating the expressive rights of both Nally and the publication that he leads.

### i.     Criticism of university officials is constitutionally-protected speech.

Your first demand is that Nally abstain from "[a]ttack[ing] any student, faculty, or staff member . . . [in] any public forum." Based on your description earlier in the "directive" of what constitutes an "attack"—namely, criticizing the actions of campus officials by lodging written and oral complaints—it is clear that your "directive" contemplates disciplinary action for a broad range of journalistic and expressive activity protected by the First Amendment.

Not only is criticism often a part of journalism, criticism of government officials—and, to be clear, as administrators of a public institution, HINU administrators are such officials—is at the core of the First Amendment's protection. "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270 (1941). So central is this ability to criticize officials that the Supreme Court, affirming that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp **attacks** on government and public officials," determined that a higher standard of fault applies to speech-related torts where a public official is the plaintiff. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasis added).

This right to criticize applies both to the press and to individuals. In other words, Nally retains a right to "attack"—as both you and the Supreme Court put it—HINU administrators both as a journalist, such as by writing a story for the *Leader*, and as an individual, such as by writing a letter to your superior or offering public comment at a government meeting. Because Nally's right to criticize is protected by the First Amendment, you may not punish him for doing so. Your "directive" expressly threatens to do so.

The First Amendment right to criticize and engage with government officials, such as administrators at a public university or officials at the local police department, also protects Nally's ability to "[m]ake demands on any governmental agency" and "[a]ttempt countermanding decisions of HINU personnel," activities to which you expressed displeasure in your directive. These activities, in addition to being protected by the First Amendment

---

[32] Letter from Graham, *supra* note 26.

rights of free speech and free press, are also protected by the "cognate right" to petition the government. *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

This right includes actions that you refer to as "[a]ttempt[ing to] countermand[] decisions of HINU personnel"—that is, expressing displeasure in HINU's choice of faculty adviser for the *Leader* and attempting to take action to secure a different adviser. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives[.]" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). This includes Nally and the *Leader*'s right to express concerns with their appointed adviser, and, in fact, to demand a different faculty adviser be appointed. Nothing in this right requires individuals to *only* express their ideas to government officials when their ideas align with those of the officials whom they contact.

This right also encompasses "request[ing] action by the government," *id.* at 388–89, protecting Nally's right to "[m]ake demands of" government agents. This shields Nally's right to request information and records from HINU, the local police department, or any other government agency. Further, Nally and the *Leader*'s right to request records from government agencies is not only protected by the First Amendment but also by Kansas law. In Kansas, "[a]ll public records shall be open for inspection by any person," with some exceptions. Kan. Stat. Ann. § 45-218(a). It necessarily follows that coupled with this right to inspect records is a corollary right to *request* their inspection.

> ii.   **Kansas law allows recording of private conversations with the consent of only one party.**

The First Amendment not only protects the spoken and written word, but encompasses the "act of making an audio or audiovisual recording" as a necessary "corollary of the right to disseminate the resulting recording." *Am Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012). "The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of making the recording is wholly unprotected." *Id.* This includes the act of "nonconsensual audio recording." *Id.* at 596–97. Accordingly, federal courts of appeal have long recognized a right to receive and record information, including a right to record matters of public interest. *See, e.g., Forcyde v. City of Seattle*, 55 F.3d 436. 439 (9th Cir. 1995) (discussing a "First Amendment right to film matters of public interest"); *Gilk v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011) (although "not unqualified, a citizen's right to film government officials . . . in the discharge of their duties in a public duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment").

The right to record government actors is perhaps at its highest importance when connected to the right of the press to gather information. *See Branzburg v. Hayes*, 408 U.S. 655, 681 (1972). The press, including the student press, serves as an important conduit in preserving the public's right to know. Courts recognize that the press act as "surrogates for the public" in keeping a watchful eye on their communities, and especially on the actions of government

USA000129

agents, such as those acting on behalf of public colleges and universities. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573 (1980).

While the right to record is qualified in some states by privacy statutes requiring the consent to record from all parties to a conversation,[33] the right is not so qualified in Kansas—a fact your "directive" implicitly recognizes by invoking the laws of *other* states as rendering such recordings potential felonies. Under the law of Kansas—the state in which HINU sits—it is a crime to record a telephone call "without the consent of the sender or receiver." Kan. Stat. Ann. § 21-6101(a)(1).[34] In the situation with Morris, Nally initiated the telephone call and had the right to record it without Morris' consent. Because his actions in recording HINU officials are protected by the First Amendment and Kansas law, you may not punish him for participating in legal newsgathering techniques.[35]

> ### B. Threatening retaliation against Nally or the Leader *for their free expression violates the First Amendment.*

It is well-established that public institutions of higher education "may not constitutionally take adverse action against a student newspaper, such as withdrawing or reducing the paper's funding, because it disapproves of the content of the paper." *Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir. 1983); *see also Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829–30 (1995). The United States Court of Appeals for the Second Circuit has expanded on this concept to explain:

> [A]t a minimum, when a public university establishes a student media outlet and requires no initial restrictions on content, it may not censor, retaliate, or otherwise chill that outlet's speech, or the speech of the student journalists who produce it, on the basis of content or viewpoints expressed through that outlet.

*Husain v. Springer*, 494 F.3d 108, 124 (2d Cir. 2007).

It is equally true that retaliation against *any actor*—whether an individual student or the campus paper—for participating in First Amendment-protected activity is unconstitutional. Where a government actor responds to protected speech with an "adverse action" that would "chill a person of ordinary firmness from continuing in the activity," it has engaged in impermissible retaliation. *Revels v. Vincenz*, 382 F.3d 876 (8th Cir. 2004). This "well established" test does not require a "great" deal of discipline in order to be "actionable," and the "objective" test asks "not whether the plaintiff herself was deterred" from speaking but

---

[33] For a state-by-state discussion of recording statutes, *see Reporters' Recording Guide*, Reporters Committee for Freedom of the Press, https://www.rcfp.org/reporters-recording-guide (last visited Oct. 21, 2020).

[34] The Kansas Supreme Court has interpreted the state's recording statute as enjoining "only interceptions without the consent of *either* the sender *or* the receiver." *State v. Roudybush*, 235 Kan. 834, 842 (1984).

[35] Even assuming that HINU, a federally-operated institution, could impose a more restrictive standard, it has not done so and may not do so retroactively. Further, federal law permits a party to a call to record that call. 18 U.S.C. § 2511(2)(d).

whether a reasonable person may be so deterred. *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003).

Here, HINU has taken two adverse actions: First, it has threatened disciplinary action against Nally if he continues to engage in your enumerated list of First Amendment-protected activities. Second, it has retaliated against the *Leader* by refusing to complete the normal recognition process, thereby denying the *Leader*'s access to its bank account and other resources. Each of these actions, individually, is enough to "chill a person of ordinary firmness" from continuing to engage in protected speech that HINU administrators find objectionable.

While Nally appears to be an exceptionally resilient individual and has continued to self-advocate despite HINU's actions and threats, the chilling effect is nonetheless borne out here in the reasonable apprehension Nally feels about engaging in normal activities on behalf of the *Leader* in his role as its editor-in-chief. For example, after receiving your directive, Nally was nervous to once again prod the Student Bank to ask about the *Leader*'s account balance, worried that doing so might result in discipline. This result is untenable and cannot be squared with HINU's obligations as a public institution bound to uphold the First Amendment.

> ### C. Threatening to punish a student journalist for engaging in journalistic activities violates the 1989 Agreement.

In the 1989 Agreement, HINU, then Haskell Indian Junior College of the Bureau of Indian Affairs, agreed to allow students to retain full editorial control over the *Leader*. This includes the right of the *Leader* to access its monies in its Student Bank account, as well as its right to engage in journalistic pursuits free from censorship.

While the 1989 Agreement does not explicitly forbid HINU from punishing students for their protected journalistic activities, it does forbid HINU from "otherwise inhibit[ing] the free expression of members of [the *Leader*] in violation of the First Amendment[.]"[36] As outlined here, your directive and HINU's refusal to follow the usual sanctioning processes for the *Leader* violate the First Amendment, and thereby also violate the 1989 agreement.

## III.   HINU Must Rescind the "Directive" and Immediately Recognize the *Leader*

Your "directive" to Nally is an appalling and unequivocal departure from the First Amendment, betraying willful blindness to the basic concepts of constitutional rights. A public college administrator who violates clearly established law will not retain qualified immunity and can be held personally responsible for monetary damages for violating First Amendment rights under 42 U.S.C. § 1983. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Citing—in the course of violating students' expressive rights—a settlement agreement

---

[36] Settlement Agreement, *supra* note 18.

obligating you to respect the First Amendment is a stark illustration of a "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Given the urgent nature of this matter, we request receipt of a response to this letter no later than the close of business on November 2, 2020.

Sincerely,

Lindsie Rank
Program Officer
Individual Rights Defense Program, Foundation for Individual Rights in Education

Francine Compton
President
Native American Journalists Association

Sommer Ingram Dean
Staff Attorney
Student Press Law Center

Encl.

DocuSign Envelope ID: B3FA967E-5913-4FDC-94C5-578A0AB2475E

# Authorization and Waiver for Release of Personal Information and Request for FERPA Records

This is an authorization for the release of records and information, as well as a request for records, under the Family Educational Rights and Privacy Act (20 U.S.C. § 1232g) and its applicable regulations (particularly 34 CFR § 99.30).

I, Jared Eugene Nally _____, born on ▓▓▓▓▓▓▓▓▓, do hereby authorize Haskell Indian Nations University _____ (the "Institution") to release to the Foundation for Individual Rights in Education ("FIRE") any and all information concerning my current status, disciplinary records, or other student records maintained by the Institution, including records which are otherwise protected from disclosure under the Family Educational Rights and Privacy Act of 1974. I further authorize the Institution to engage FIRE's staff members in a full discussion of all matters pertaining to my status as a student, disciplinary records, records maintained by the Institution, or my relationship with the Institution, and, in so doing, to fully disclose all relevant information. The purpose of this waiver is to provide information concerning a dispute in which I am involved.

I have reached or passed 18 years of age or I am attending an institution of postsecondary education.

In waiving such protections, I am complying with the instructions to specify the records that may be disclosed, state the purpose of the disclosure, and identify the party or class of parties to whom disclosure may be made, as provided by 34 CFR 99.30(b)(3) under the authority of 20 U.S.C. § 1232g(b)(2)(A).

**Records requested under FERPA:** I request access to and a copy of all documents defined as my "education records" under 34 CFR § 99.3, including without limitation:
- A complete copy of any files kept in my name in any and all university offices;
- any emails, notes, memoranda, video, audio, or other material maintained by any school employee in which I am personally identifiable;
- any and all phone, medical or other records in which I am personally identifiable; and
- the log of requests for and disclosures of my education records, as required by 34 CFR § 99.32(a).

USA000133

DocuSign Envelope ID: B3FA967E-5913-4FDC-94C5-578A0AB2475E

**Records requested under state public records law:** To the extent the applicable public records law would require a faster response, a more comprehensive response, or production of copies of records:

- I request, pursuant to the applicable state public records law, copies of all records that would be available for my inspection under FERPA;
- To the extent the public records law allows disclosure of responsive records, I request that such records be produced in an electronic format, preferably by email.

**Fees:** I agree to pay any reasonable copying and postage fees of not more than $20. If the cost would be greater than this amount, please notify me. Bear in mind, however, that FERPA prohibits the imposition of a fee to search or retrieve records (34 CFR § 99.11).

**Request for Privilege Log:** If any otherwise responsive documents are withheld on the basis that they are privileged or fall within a statutory exemption, please provide a privilege log setting forth (1) the subject matter of the document; (2) the person(s) who sent and received the document; (3) the date the document was created or sent; and (4) the basis on which it is the document is withheld.

**Request for Redaction Log:** If any portion of responsive documents must be redacted, please provide a written explanation for the redaction including a reference to the statutory exemption permitting such redaction. Additionally, please provide all segregable parts of redacted materials.

Per 34 CFR § 99.10(b), these records must be made available within **45 days**.

I request that the records be sent to me via email at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and to FOIA@thefire.org.

This authorization and waiver does not extend to or authorize the release of any information or records to any entity or person other than the Foundation for Individual Rights in Education, and I understand that I may withdraw this authorization in writing at any time. I further understand that my execution of this waiver and release does not, on its own or in connection with any other communications or activity, serve to establish an attorney-client relationship with FIRE.

DocuSign Envelope ID: B3FA967E-5913-4FDC-94C5-578A0AB2475E

I also hereby consent that FIRE may disclose information obtained as a result of this authorization and waiver, but only the information that I authorize.

DocuSigned by:

*Jared Nally*

81C2B4531DAF45F...

10/23/2020

Student's Signature                    Date

USA000135



# HASKELL INDIAN NATIONS UNIVERSITY

**Office of the President**
155 Indian Avenue
Lawrence, Kansas  66046-4800
**www.haskell.edu**

# Memorandum

Date:   October 16, 2020

To:          Jared Nally

From:      Dr. Ronald Graham, President

Subject:    *Directive*

Jared, I work directly with the Lawrence community at several different levels (i.e., the Mayor and City Manager's Office, Lawrence Police Department, the Chamber of Commerce, and the Rotary). My intention is to build relationships, identify training and internships, work with the community on their projects as a representative from Haskell, and create opportunities for Haskell students. Your name has been identified recently, and on more than one occasion, as someone who routinely attacks Haskell employees with letters; recently, you attacked a Haskell official during a community event.  Further, you have been identified as calling the police department and demanding information regarding a deceased Haskell employee while representing yourself as an editor for *The Indian Leader*. Under no circumstances do you have the authority to contact the police department (or any other governmental agency) and demand anything on behalf of the University.  Your behavior has discredited you and this university. You have compromised your credibility within the community and, more importantly, you have brought yourself, *The Indian Leader*, Haskell, and me unwarranted attention.

Earlier this summer, Josh Falleaf was assigned as the Faculty Advisor by Dr. Rains, the University's Acting Vice President of Academic Affairs, to advise *The Indian Leader* staff pursuant to University guidelines.  You took it upon yourself to attempt to remove him from this position per your letter dated August 3, 2020.  Mr. Falleaf was placed in an Acting Dean's position by me; however, he is first and foremost a Haskell Instructor.  In that, he is appropriately qualified to serve as the University's appointed Faculty Advisor to *The Indian Leader*.  Neither you nor any member of *The Indian Leader* staff has the authority to "vote out" the University-appointed Faculty Advisor; appointing the Faculty Advisor is the exclusive right of the University and it is in accordance with the 1989 court settlement.  You are a student at this University; you are not entitled to reverse Executive-level decisions. Furthermore, you essentially called Dr. Rains a liar in your email (referring to Mr. Falleaf's assignment), which violates Student Conduct.

You also chose to talk to yet another university official, Ms. Carlene Morris, and to record her conversation with you surreptitiously – and without her permission.  This action resulted in yet another complaint against you.  In many states, this would be considered a felony.  You invoked Kansas law to justify disrespectful behavior toward a university official. In the future, I strongly advise that you – out of respect, honesty, and journalistic codes of ethical conduct -- obtain permission from anyone from whom you seek to solicit information for your paper – especially information that is freely available to Haskell students.

USA000136

I will remind you that you are a student first and foremost on this campus, and your conduct falls under the umbrella of the Student Conduct Code. Your role on *The Indian Leader* does not absolve you from your responsibilities as a Haskell student – and as a representative of our community.  Henceforth, you will conduct yourself in accordance with the Haskell Student Code of Conduct -- now and in the future; and you will treat fellow students, University staff, and University officials with appropriate respect. Failure to do so, may result in disciplinary action.

Let me make myself clear. You are being directed, as a Haskell student. To comply with the following:

**You will NOT:**

- Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus,
- Make demands on any governmental agency -- or anyone else from Haskell -- while claiming to represent *The Indian Leader*.
- Attempt countermanding decisions of Haskell personnel assigned by me or anyone else to positions in an effort to replace them,
- Record anyone at Haskell in your interviews unless you advise them first and they grant you permission.

**You WILL:**

- Treat all faculty members, staff, and students with the highest respect.
- Conduct yourself as a student under the umbrella of Code of Conduct.
- Understand that no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them.

Lastly, Haskell is not obligated to report any census.  If you wish to be counted differently, I strongly suggest that you do what many of us do: contact the US. Census Bureau and file an individual report.


Cc:     BIE Legal

        Tony Dearman
        Director of BIE

USA000137

 **Gmail**                                   **Jared Nally** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## Media Inquiry - The Indian Leader
2 messages

**Jared Nally** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓                          Mon, Oct 5, 9:13 AM
To: <lpdmedia@lkpd.org>

I'm reaching out the the Lawrence Police Department as a student writer for The Indian
Leader, Haskell Indian Nations University's student newspaper. I'm wanting to get
confirmation and information on the death of Neeoni Chex to provide our community with
a proper death notice. She was a community pilar and I would appreciate any information
you could provide.

She would have died sometime yesterday, October 4, before 4:00 PM CST. Please let me
know if LPD can confirm her death, cause of death, and provide a funeral home if
possible.

Thank You,
-Jared Nally, Editor-In-Chief

**Patrick S. Compton** <pscompton@lkpd.org>                    Mon, Oct 5, 3:24 PM
To: Jared Nally ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Jared,

Jared,

Thank you for inquiry.

My apologies, but we do not generally do police records searches by name. Do you have
any other information on the location (Was it in Lawrence?), or circumstances of her
death?

Best,

Patrick

Patrick Compton
Public Affairs
Lawrence, Kansas Police Department
4820 Bob Billings Parkway
Lawrence, KS 66049
(785) 830-7409
pscompton@lkpd.org
https://www.facebook.com/LawrencePolice
https://twitter.com/lawrenceks_pd
[Quoted text hidden]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

SEP 19  11 44 AM '89

RALPH ___ _____
BY _____ DEPUTY
AT TOPEKA, KS.

THE INDIAN LEADER ASSOCIATION, ET AL.,

Plaintiffs,

vs.                                    Case No. 89-4063-R

UNITED STATES DEPARTMENT OF THE INTERIOR,
ET AL.,

Defendants.

## ORDER APPROVING SETTLEMENT AGREEMENT

NOW ON this 18th day of September 1989, the parties appear before the Court to announce a settlement of the claims of the Plaintiffs herein. The Plaintiffs appear through their attorney, Patrick R. Nichols; the Defendants appear through their attorney, David Cooper.

WHEREUPON, the parties announce to the Court that they have settled and resolved their differences, and entered into a settlement agreement in writing, which is appended hereto.

WHEREUPON, the Plaintiffs move orally to dismiss without prejudice all parties hereto, with the exception of Haskell Indian Junior College. The Court sustains said motion.

THEREUPON, the Court reviews the settlement agreement between the parties, guaranteeing the rights of free expression to the Indian Leader Association and the student journalist Plaintiffs, and find said agreement is valid, just and equitable. The Court approves the agreement.

Pursuant to paragraph 14 of the settlement agreement, the Plaintiffs move to dismiss the remaining party, Haskell Indian Junior College of the Bureau of Indian Affairs, subject to the provisions and terms of the settlement agreement. The Court sustains the motion and orders that the action be dismissed upon the terms of said motion.

The Court orders that hereafter the settlement agreement shall immediately bind the parties to all of its provisions and govern their conduct accordingly.

/s/ RICHARD D. ROGERS
_____
Honorable Richard D. Rogers
United State District Judge

USA000140

APPROVED:

_Patrick Nichols_ (signature)

Patrick R. Nichols
Attorney at Law
700 Jackson, Suite 703
Topeka, Kansas  66603
(913) 357-4050
Ks. S. Ct. No. 09396
Attorney for Plaintiffs

_David M. Cooper_ (signature)

David Cooper
Assistant United States Attorney
U.S. Department of Justice
444 S.E. Quincy
Topeka, Kansas  66603

-2-

## SETTLEMENT AGREEMENT

This Settlement Agreement is made between the Indian Leader Association, Marcel Stevens, Laurey Chapman, Ardina Glenn, Cynthia Grant, Tina Melton, Harvey Ross, Cordell Whitetree and Catherine Williams and Haskell Indian Junior College of the Bureau of Indian Affairs of the United States Department of Interior to settle and compromise issues before the United States District Court for the District of Kansas in Indian Leader Association v. United States Department of the Interior, Case No. 89-4063-R (filed March 30, 1989).

1.    Parties to Settlement Agreement.    The parties to this Settlement Agreement are the plaintiff, Indian Leader Association, an unincorporated student association which publishes The Indian Leader (the "Association"), and plaintiffs Marcel Stevens, Laurey Chapman, Ardina Glenn, Cynthia Grant, Tina Melton, Harvey Ross, Cordell Whitetree and Catherine Williams, individually and in their capacities as editors, reporters and representatives of the Association ("Plaintiffs"), and defendant Haskell Indian Junior College of the Bureau of Indian Affairs of the United States Department of the Interior ("Haskell"), which enters into this Settlement Agreement through the agency of Jim Baker, Acting President of Haskell.

Nothing in this Settlement Agreement shall have any bearing on the academic standing of the named plaintiffs or any member of the Indian Leader Association. Nor shall this Settlement Agreement bear on the eligibility of a student to serve as an officer of the Indian Leader Association under the college's rules governing extracurricular activities.

2.    Student Editorial Control.    The parties agree that the members of the Association and the Editorial Board of The Indian Leader have the right to editorial control of the contents of The Indian Leader newspaper as described in the attached Plan of Operation of the Indian Leader Association ("Plan of Operation").

3.    No Prior Restraint or Censorship.  Haskell agrees that no officer, agent, instructor or employee of Haskell shall:

(a)  censor, edit or modify the contents of The Indian Leader newspaper in violation of the First Amendment of the United States Constitution;

(b)  restrain, obstruct or prohibit the publication of The Indian Leader newspaper or otherwise inhibit the free expression of members of the Association in violation of the First Amendment of the United States Constitution; however, nothing in this Settlement Agreement shall prevent Haskell, the BIA, the Department of the Interior, or Congress from withdrawing any federal funding for The Indian Leader, or from disposing of the printing press on

1

USA000142

the Haskell campus pursuant to the provisions of the Federal Property and Administrative Services Act or other applicable law;

(c) suspend the publication of The Indian Leader newspaper on the ground that a vacancy has arisen in the position of faculty adviser to the Indian Leader newspaper or the Association.

(d) refuse any written request for the disbursement of funds, reasonably related to the management or publication of The Indian Leader, from the Indian Leader Association Activity Fund, the Club Fund or any other Indian Leader Association account containing student monies in the Haskell Student Bank which is supported by a written resolution of the Editorial Board of The Indian Leader or the full membership of the Association finding "First Amendment Grounds for Funds Withdrawal by Students" as described in the attached Plan of Operation;

(e) refuse to approve a Plan of Operation for the Association substantially similar to the attached Plan of Operation, which is incorporated herein by reference and made an integral part hereof, and which shall be the Plan of Operation in effect for the 1989-1990 school year, or suspend the publication of The Indian Leader on the grounds that the Plan of Operation has not been approved; provided, that nothing in this Settlement Agreement shall prevent Haskell from establishing a journalism or communications department and incorporating The Indian Leader into the curriculum of such an academic program; that if such an academic program is established, Haskell and the members of The Indian Leader Association may revise the Plan of Operation of The Indian Leader Association to reflect incorporation of The Indian Leader under the curriculum of that program; provided further, that nothing in this Settlement Agreement is intended to prevent the members of The Indian Leader Association from adopting a Plan of Operation, or other organic operating charts or substantially dissimilar to the attached Plan of Operation; or

(f) have the right to excise any material from The Indian Leader on the grounds that it is either libelous or obscene.

4. Role of Faculty Adviser. The parties agree that the faculty adviser shall discharge his or her responsibilities consistent with the following guidelines:

(a) The faculty adviser to the Association may freely advise and instruct student editors and reporters in the subject of journalism and relevant professional standards, commend and critique the work product of student journalists, offer fiscal and technological guidance to the newspaper staff in business and production operations and provide whatever assistance to the newspaper and the student journalists the faculty adviser deems appropriate.

2

USA000143

(b) A faculty adviser may make nonbinding recommendations to the student editors which they may, in their sole discretion, take into consideration in the free exercise of their independent editorial judgment.

(c) Although a faculty adviser of the Association may freely offer advice and assistance to student members of the Association, neither the faculty adviser nor any other Haskell officer or employee has the right to censor, edit or modify in any way the content of The Indian Leader.

(d) The faculty adviser is under an affirmative duty to facilitate the disbursement of such funds allocated to the Association as directed by the Editorial Board and the Association by majority vote, supported by written resolution, which are reasonably related to the management and publication of The Indian Leader.

(e) The faculty adviser shall, to the best of his or her ability, adhere to the ethical standards set forth in the attached Code of Ethics of College Media Advisers.

5.   Responsibility of Student Journalists.   Sole legal responsibility for the contents of The Indian Leader shall rest with the individual members of the Indian Leader Association as recognized in 25 C.F.R. § 42.3 (1988). No legal responsibility for the contents of The Indian Leader shall be imputed to Haskell or the faculty adviser, the Bureau of Indian Affairs or the United States Department of the Interior. Plaintiffs understand that they may be held personally accountable for the contents of The Indian Leader in a court of law, if those contents are libelous or obscene, or infringe copyrights or trademarks, or otherwise give rise to civil liability.

6.   Newspaper Account in the Student Bank. Those monies which may be received or collected by Haskell on behalf of the Association, such as the Association's allocation of student activity fees, if any, shall be maintained in the Haskell Student Bank in strict compliance with the applicable rules contained in the Bureau of Indian Affairs Manual ("BIAM"), this section of the Settlement Agreement and the Plan of Operations. Such monies shall be:

(a) the subject of a separate accounting in the Haskell Student Bank and assigned a separate account number;

(b) the subject of a monthly account statement prepared by the Haskell Student Bank which shall be presented to the President of the Indian Leader Association; and

(c) disbursed in accordance with this Settlement Agreement and the attached Plan of Operations.

3

USA000144

7.  **Off-Campus Bank Account.**  Those monies which are received, collected or raised off campus by the Association, without any intermediation by Haskell, may be deposited, at the election of the Association, in either the Student Bank account or in an off-campus account maintained at a local bank in Lawrence, Kansas.  No disbursement from an off-campus bank account shall be made, however, without the signature of at least two officers of the Association on the draft drawn on such local bank.  A copy of the monthly accounts of such off-campus bank account shall be published regularly in The Indian Leader.  Nothing in this Settlement Agreement shall be read to prohibit Haskell from devising and implementing procedures for managing and accounting for on-campus revenue-raising activities of students.

8.  **Elections.**  As soon as possible following the execution of this Settlement Agreement, the President of the Association shall call a meeting of the membership of the Association for the purpose of electing the editors of The Indian Leader and the officers of the Association for the 1989-1990 academic year.  This meeting shall be called within the first 30 days of the beginning of the fall 1989 semester at Haskell.

9.  **Control of Contributions for Subscriptions.**  Voluntary contributions made by individuals for subscriptions to The Indian Leader shall no longer be paid to the Haskell Indian Junior College Foundation and shall instead be paid directly to the Association Club Account in the Student Bank.

10.  **Waiver of Claims.**  This Settlement Agreement represents the final understanding between the parties concerning the resolution of the issues before the United States District Court for the District of Kansas in Indian Leader Association v. United States Department of Interior, Case No. 89-4063-R (filed March 30, 1989).  All parties to this Settlement Agreement hereby release the others from any claims or causes of action, and the parties and their counsel agree not to initiate or cause to be initiated, any further proceedings between any of the parties or their counsel, or make any further requests regarding the facts of this case.

11.  **Covenant of Good Faith and Fair Dealing.**  The parties agree to interpret and implement this Settlement Agreement in good faith and with due regard for both the First Amendment rights of student journalists and the legitimate educational and administrative interests of Haskell.  It is the central purpose of this Settlement Agreement to secure the regular publication of The Indian Leader free from any prior restraint or censorship.  This Settlement Agreement is contingent upon the reciprocal performance of the specified obligations by all of the parties.  In the event that any party acts in bad faith or breaches this Settlement Agreement, the aggrieved party shall be free to pursue appropriate legal remedies in a court of law.  Nothing in this Settlement

4

USA000145

Agreement shall be construed to restrict or limit the right of any of the parties to commence litigation if any party fails to comply with all of the terms and conditions of this Settlement Agreement.

~~12.   Use of Printing Press.   The parties agree that the use~~ of the federally authorized printing press at Haskell is subject to the Government Printing and Binding Regulations published by the Joint Committee on Printing of the U.S. Congress.   See 44 U.S.C. §§ 103, 501, 502.

13.   Recognition of Mutual Rights.   Any and all rights and responsibilities under this Agreement are set forth in recognition of the mutual rights of the defendant Haskell, and the rights of the students to free speech, press and expression.   The Agreement recognizes various rights of Haskell hereunder to alter the Plan of Operation in conjunction with the student journalists (3)(e), to reduce or eliminate funding (3)(b), and to dispose of or sell the printing presses under various provisions of this Agreement (12).   These rights may not be exercised by Haskell in response to, or as a result of, articles, photographs or any other content of The Indian Leader.   Further, such actions may not legitimately be performed under this Agreement as a form of prior restraint, or otherwise as intended to limit or restrict the free expression of ideas or rights to the students as recognized in this Agreement. Any exercise by Haskell of the rights noted in this paragraph shall be done following notice to The Indian Leader Association, stating the action to be taken and the reasons therefor.   Such notice shall be delivered to the editor-in-chief and posted on the Student Activities bulletin board at least thirty (30) days prior to any such contemplated action.

14.   Signature and Court Approval.   This Agreement shall be signed by all the parties named in Section 1 of this Settlement Agreement or their duly authorized representatives.   This Settlement Agreement shall be submitted to the Honorable Richard D. Rogers, Judge for the United States District Court for the District of Kansas, for final approval and shall not become effective until such final approval is obtained.   After such final approval has been obtained, the Plaintiffs shall agree to the dismissal without prejudice of the action against all named defendants except Haskell.   The Settlement Agreement shall then immediately bind the remaining parties to all of its provisions, and a judgment of dismissal of the action, subject to the terms of the Settlement Agreement, shall then be jointly submitted to the court by the remaining parties.

IN WITNESS WHEREOF, the parties have caused this Settlement Agreement to be executed by their duly authorized representatives on this _____ day of _____, 1989.

5

PAGE.06          SEP 19 '89 8:56   U S A TOPEKA

USA000146

THE INDIAN LEADER ASSOCIATION             HASKELL INDIAN JUNIOR COLLEGE

_signature_                               _signature_

MARCEL STEVENS                            JIM BAKER
Managing Editor and President             Acting President
The Indian Leader Association             Haskell Indian Junior College

_signature_                               _signature_

CYNTHIA GRANT                             DAVID M. COOPER
Student Journalist                        Assistant U.S. Attorney
                                          Counsel for the Defendant

_signature_

HARVEY ROSS
Student Journalist

_signature_

CORDELL WHITETREE
Student Journalist

_signature_

DARIO F. ROBERTSON
Counsel for Plaintiffs

_signature_

PATRICK R. NICHOLS
Counsel for Plaintiffs

6

USA000147

THE INDIAN LEADER ASSOCIATION
Haskell Indian Junior College
Lawrence, Kansas 66046

PLAN OF OPERATION

I.   NAME

The name of this organization is The Indian Leader Association and shall hereafter be referred to as the Association.

II.   PURPOSE

The purpose of the Association is to produce The Indian Leader newspaper, an independent student publication, and the Haskell Yearbook.   The Indian Leader newspaper will be produced and published approximately six times each semester and the Haskell Yearbook will be produced and published the spring semester of each school year.   The Association will also maintain a separate account to accept funds and donations on behalf of the newspaper and for disbursing cash payments as incentives to students who contribute articles, photographs and illustrations to The Indian Leader.

The Indian Leader is a nationally distributed Native American newspaper edited and published by students at Haskell Indian Junior College for the purpose of promoting the free and informed debate and discussion of (1) topics of special interest to Haskell students and alumni, (2) issues of special importance to Native Americans generally and (3) all newsworthy topics and public issues of general interest to American citizens.

The Indian Leader is published by the students at Haskell Indian Junior College and the members of the Association in the exercise of their individual rights to free speech and freedom of the press guaranteed by the First Amendment of the United States Constitution.   These fundamental First Amendment rights have been expressly recognized as rights which individual students enjoy who attend Bureau of Indian Affairs schools in Part 42 of Title 25 of the Code of Federal Regulations.   Student Rights and Due Process Procedures, 25 C.F.R. § 42.3(e)-(f) (1988).   These basic rights have also been reaffirmed in Part III of the Code of Student Rights and Responsibilities of Haskell Indian Junior College (1988).

The Indian Leader Association is committed to improving the ability of Native Americans to determine their own destiny by providing an open public forum in which all concerned citizens, regardless of race, creed, color, sex, religion or national origin, might freely discuss the important public issues of the day.   The members of the Association believe that by providing such a public forum, readers and contributors alike will improve their understanding of the true meaning of leadership, citizenship and democracy in contemporary American society through an open, honest

1

PAGE.08                  SEP 19 '89  8:58   U S A TOPEKA

USA000148

and fair-minded exchange of views.

III. <u>MEMBERSHIP AND OFFICERS OF THE ASSOCIATION</u>

A. <u>General</u>

To qualify as a member of the Association, an individual must:

(a) be an enrolled student at Haskell Indian Junior College;

(b) submit a news story, essay, proposed editorial, poem, short story, photograph or any other journalistic or literary work, not including advertisements, letters to the editor and notices, for publication in <u>The Indian Leader</u>, or participate in the production or circulation of <u>The Indian Leader</u> or the <u>Haskell Yearbook</u>.

(c) receive written notice that the submission has been accepted for publication in <u>The Indian Leader</u>; and

(d) inform the Association, orally or in writing, of an intention to become a member of the Association.

The Editor-in-Chief shall be responsible for keeping a current list of Association members and publishing said list at least once per semester in <u>The Indian Leader</u>.

In the event that any member fails to attend three consecutive meetings of the Association, without excuse, that person may be removed from the membership rolls of the Association by majority vote.

B. <u>Officers</u>

The officers of the Association shall include a President, Vice President, Treasurer and Secretary. The person elected President of the Association shall also serve as Editor-in-Chief of <u>The Indian Leader</u> and the person elected Vice-President shall also serve as Executive Editor of <u>The Indian Leader</u>.

Officers must maintain "academic good standing," as defined on page 35 of the <u>Haskell Bulletin</u>, 1988-1990, in order to receive a salary as specified in Appendix I containing the 1989-1990 Budget for <u>The Indian Leader</u>. Decisions made at duly convened meetings of the Association are binding on members.

' All officers of the Association shall have taken or shall be currently enrolled in at least one course in English or Journalism at Haskell Indian Junior College at the time his or her term of office shall commence in order to be eligible to hold such office.

2

USA000149

The President shall be the Editor-in-Chief and shall be responsible for the general operation of the paper and the Association. The President shall pick up and distribute mail daily.

The Editor-in-Chief shall conduct regular and special meetings of student reporters, assign stories, edit manuscripts, oversee reporters and lay out The Indian Leader.

The Executive Editor shall assist the Editor-in-Chief in carrying out his or her assigned duties and shall succeed to the position of Editor-in-Chief in the event of a vacancy in that office prior to next regularly scheduled election.

The circulation manager shall (1) recommend to the printers the approximate number of issues of the newspaper to be published, (2) coordinate the distribution of issues on the day of publication, (3) maintain a current mailing list, (4) make additions, deletions, corrections and other appropriate changes in mailing list, (5) make labels or have labels made, (6) coordinate the process of labeling The Indian Leader for mailing, (7) keep a file of correspondence, and (8) make a weekly report, oral or written, to the Association.

Other positions in the Association shall be established upon the majority vote of the members of the Association. The Association shall make the guidelines and prescribe the duties of all new positions. Officers may be removed from office upon the vote of two-thirds of the members of the Association.

IV. PARLIAMENTARY AUTHORITY

The rules contained in the current edition of Robert's Rules of Order Newly Revised shall govern the Association in all cases to which they are applicable and in which they are not inconsistent with this Plan of Operation and any special rules of order the Association may adopt.

V. MEETINGS

Meetings of the Association shall be held weekly and will be open to all Haskell students and to the public.

At the beginning of each semester, the Association shall decide upon a day, time and place for such regular weekly meetings. Once the day, time and place has been decided by the Association and notice of such has been posted on the bulletin board at the Student Senate Building, no further notice shall be required for the Association to conduct business at such regular weekly meetings.

Any meeting of the Association not held on the day, time and

3

USA000150

place of the regular weekly meeting may be properly convened only upon three days' prior written notice.  Such notice shall be made to the Association by posting an announcement of the meeting on The Indian Leader Bulletin Board.  This notice requirement shall apply to any meeting of the Association, other than regular meetings, referenced in this Plan of Operation, including but not limited to meetings mentioned in Sections III(B), VI and VIII(B) of this Plan of Operation.

A majority of the members of the Association shall constitute a quorum.

## VI.  EDITORIAL BOARD AND EDITORIAL CONTROL

The Editorial Board shall consist of the Association President and Editor-in-Chief, the Vice President and Executive Editor, Copy Editor, the Circulation Manager, and the Darkroom Manager.  Other positions and members of the Editorial Board may be added by majority vote of either the Editorial Board or the members of the Association.  A majority of the members of the Editorial Board shall constitute a quorum.

The Editorial Board shall have primary responsibility for and control of the editorial content of The Indian Leader.  Day-to-day editorial decisions shall be made by the Editor-in-Chief, but any question of editorial policy may be put to the vote of the Board of Editors at any regular or special meeting of the Board of Editors.

In the event that the faculty adviser, any member of the Editorial Board or any member of the Association requests, prior to publication, a special review of any portion of an issue of The Indian Leader to determine whether it is libelous or obscene, the entire Editorial Board shall:

(a) carefully read and evaluate the identified material to determine whether it is libelous or obscene;

(b) seek the advice of the faculty adviser and, if possible, experts in the field of student press rights and the law of libel and obscenity, such as legal counsel and journalists designated by the Student Press Law Center in Washington, D.C., the Journalism Education Association or College Media Advisers; and

(c) consult, when appropriate, authoritative treatises for more detailed guidance in determining whether the identified material is libelous or obscene, such as:

(1) Louis E. Ingelhart, Freedom for the College Student Press (Westport, Conn.: Greenwood Press, 1985): 125-151 (on libel), 159-168 (on obscenity); and

(2) Student Press Law Center, Law of the Student Press

4

USA000151

(Washington, D.C.:   Student Press Law Center, 1985):   31-38 (on libel), 38-41 (on obscenity);

     (d) make a final, independent determination of whether to publish the identified material; and

     (e) report its determination to the faculty adviser within 24 hours following such decision.

     Any student who has submitted an article for publication may withdraw that article prior to publication upon reasonable written notice to the Editor-in-Chief, provided that such withdrawal can be accomplished without a substantial delay in publication.

## VII.  FACULTY ADVISER

     One or more faculty advisers may be appointed by Haskell Indian Junior College to assist students in the publication of The Indian Leader.

     The faculty adviser to the Association may freely advise and instruct student editors and reporters in the subject of journalism and relevant professional standards, commend and critique the work product of student journalists, offer fiscal and technological guidance to the newspaper staff in business and productions operations and provide whatever assistance to the newspaper and the student journalists the faculty adviser deems appropriate.

     A faculty adviser may make nonbinding recommendations to the student editors which they may, in their sole discretion, take into consideration in the free exercise of their independent editorial judgment.

     Although a faculty adviser of the Association may freely offer advice and assistance to student members of the Association, neither the faculty adviser nor any other Haskell officer or employee has the right to censor, edit or modify in any way the content of The Indian Leader.

     The faculty adviser is under an affirmative duty to facilitate the disbursement of such funds belonging to the Association as directed by the Editorial Board and the Association by majority vote, supported by written resolution, which are reasonably related to the management and publication of The Indian Leader.

     The faculty adviser shall, to the best of his or her ability, adhere to the ethical standards set forth in the attached Code of Ethics of College Media Advisers.

     The right of the Association to publish The Indian Leader shall not be conditioned upon the prior appointment of a faculty adviser by Haskell Indian Junior College.   Consequently,

5

USA000152

publication or distribution of The Indian Leader as a result of the inability or unwillingness of Haskell Indian Junior College to appoint a faculty adviser to work with the Association in the event of a vacancy in that position.

The faculty adviser has no power to refuse to facilitate the disbursement of funds reasonably related to the management and publication of The Indian Leader as determined by the Editorial Board or the Association by majority vote.

## VIII. SALARIED POSITIONS OF THE INDIAN LEADER

### A.  Officers With Salaries

Salaried positions in the Association shall be those of President, Vice President, Copy Editor, Circulation Manager, Darkroom Manager.  The Typesetter shall also receive a salary.

### B.  Assistant Officers

Assistant officers shall be elected by majority vote of the members of the Association at the beginning of the last semester prior to the graduation of each salaried officer of the Association.  Such assistant officers shall serve as apprentices to the graduating officers for the purpose of receiving the necessary training and experience to assume the responsibilities of the graduating officer after commencement.  The assistant officers shall assume the office and responsibilities of the graduating officers on the date of the next commencement at Haskell Indian Junior College following their appointment as assistant officers.  Any office not so filled by an assistant officer shall be filled by majority vote of the members of the Association in a regular or special election.

## IX.  COMPENSATION AND AWARDS

Compensation and awards shall be as specified in this Section VIII.

Salaried positions shall be compensated according to the rates and amounts specified in Appendix I containing the 1989-90 Budget for The Indian Leader.  Students holding salaried positions shall not be paid any other compensation specified in this section.

Student reporters shall be paid $1.25 per column inch for articles published.  Student photographers shall be paid $5.00 for each photograph published.  Student artists shall be paid an amount to be determined by majority vote of the Association for each published illustration or cartoon.

The amount and disbursement of monies for any type of contest sponsored by The Indian Leader must be approved by majority vote

6

USA000153

of the Association.

X.   ACCOUNTS

   A.   Activity Fund

     Any funds allocated to The Indian Leader Association from the student activity fee, paid by each student of Haskell Indian Junior College each semester, shall be deposited in The Indian Leader Association Activity Fund in the Student Bank.   Other monies received or collected by Haskell on behalf of the Association shall also be deposited in that Activity Fund.

     Any officer, editor or any other member of the Association or any currently enrolled student or alumnus of Haskell Indian Junior College may, upon written request, examine the records of account of The Indian Leader Association Activity Fund in the Student Bank and may obtain a copy of any such records of account at his or her own expense.

     A summary of the records of account shall be published annually in The Indian Leader.

     In the absence of a finding by the Association of "First Amendment Grounds for Funds Withdrawal by Students" as described in the following paragraph, withdrawal from the Indian Leader Association Activity Fund shall be made by a faculty adviser, supported by signatures from a student member of the Editorial Board and the Association President.

     In the event that the Association or the Editorial Board passes by 2/3 (two-thirds) vote a resolution finding "First Amendment Grounds for Funds Withdrawal by Students," withdrawal from the Indian Leader Association Activity Fund shall be made by President of Haskell Indian Junior College, if the request is reasonably related to the management or publication of The Indian Leader, supported by the signatures of the Association President and another member of the Editorial Board.   "First Amendment Grounds for Funds Withdrawal by Students" exist whenever Haskell Indian Junior College has failed to appoint at least one faculty adviser to the Association or whenever the Association, by 2/3 (two-thirds) vote, reasonably determines that a faculty adviser (1) is in any way obstructing the publication of The Indian Leader, (2) refuses to comply with requests from the Association or the editorial board for disbursements reasonably related to the management or publication of The Indian Leader, or (3) attempts in any way to censor, edit or modify the content of The Indian Leader.

     Each withdrawal from The Indian Leader Association Activity Fund must be approved by a majority vote of the Editorial Board or the Association and supported by written resolution.   Each such resolution must explain the purpose of every withdrawal of funds.

USA000154

Receipts shall be collected within five (5) days following the disbursement of all funds. A full written accounting of any monies withdrawn pursuant to a resolution finding "First Amendment Grounds for Funds Withdrawal by Students" shall be given to a faculty adviser or, if there is no faculty adviser, to the President of Haskell Indian Junior College within five (5) days following the withdrawal transaction.

Nothing herein binds the federal government (or Haskell) to spend federal appropriated funds to publish The Indian Leader.

B.  Club Fund

Money raised by members may, at the election of the Association, be deposited into a Club Fund at the Student Bank or in an off-campus account at a local bank in Lawrence, Kansas. Such money may be withdrawn for (1) student entertainment, (2) contracting outside services and (3) such other uses benefiting the Association as the Editorial Board may, in its sole discretion, determine to be necessary or appropriate.

In the absence of a determination by the Association of "First Amendment Grounds for Funds Withdrawal by Students" as described in the following paragraph, withdrawal from a Club Fund maintained at the Student Bank shall be made by faculty adviser, supported by signatures from any two student officers of the Association.

In the event that the Association or the Editorial Board passes by majority vote a resolution finding "First Amendment Grounds for Funds Withdrawal by Students," withdrawal from the Club Fund shall be made by the President of Haskell Indian Junior College, supported by the signatures of the Association President and another officer of the Association. "First Amendment Grounds for Funds Withdrawal by Students" exist whenever Haskell Indian Junior College has failed to appoint at least one faculty adviser to the Association or whenever the Association, by majority vote, reasonably determines that a faculty adviser (1) is in any way obstructing the publication of The Indian Leader, (2) refuses to comply with requests from the Association or the editorial board for disbursements reasonably related to the management or publication of The Indian Leader, or (3) attempts in any way to censor, edit or modify the content of The Indian Leader.

Each withdrawal from the Club Fund must be approved by a majority vote of the Editorial Board or the Association and supported by written resolution. Each such resolution must explain the purpose of every withdrawal of funds. Receipts shall be collected following the disbursement of all funds. A full written accounting of any monies withdrawn pursuant to a resolution finding "First Amendment Grounds for Funds Withdrawal by Students" shall be given to a faculty adviser or, if there is no faculty adviser, to the President of Haskell Indian Junior College within five (5)

8

USA000155

days following the withdrawal transaction.

### C. Contributions for Mailed Subscriptions

The Indian Leader shall be distributed free of charge to
anyone interested in receiving a copy. Any person wishing to
receive a mailed subscription to The Indian Leader will be asked
to make a $5.00 contribution directly to The Indian Leader
Association Activity Fund by check or money order. The next
edition of the Haskell Bulletin shall be amended to provide for the
payment of such $5.00 contributions directly into The Indian Leader
Association Activity Fund, rather than the Haskell Foundation, a
tax exempt organization which has not direct relationship with and
provides no funding to The Indian Leader Association.

### D. Off-Campus Bank Account

Those monies which are received, collected or raised off
campus by the Association, without any intermediation by Haskell,
may be deposited, at the election of the Association, in either the
Student Bank account or in an off-campus account maintained at a
local bank in Lawrence, Kansas. No disbursement from an off-campus
bank account shall be made, however, without the signature of at
least two officers of the Association on the draft drawn on such
local bank. A copy of the monthly accounts of such off-campus bank
account shall be published regularly in The Indian Leader.

PAGE.16

SEP 19 '89 9:05   U S A TOPEKA

USA000156

## APPENDIX I

### 1989-90 BUDGET FOR THE INDIAN LEADER

| Position | Salary | Times 12 Issues |
|---|---|---|
| Editor-in-Chief | $33.50 | 402.00 |
| Executive Editor | 33.50 | 402.00 |
| Copy Editor | 33.50 | 402.00 |
| Circulation Manager | 33.50 | 402.00 |
| Darkroom Manager | 33.50 | 402.00 |
| Typesetter | 33.50 | 402.00 |
| Assistant Circulation | 33.50 | 402.00 |
| Assistant Darkroom | 33.50 | 402.00 |
| Assistant Typesetter | 33.50 | 402.00 |
| Freelance Compensation | 500.00 (per sem.) | $1,000.00 (x2 sem.) |
| Miscellaneous | 300.00 (per sem.) | 600.00 (x2 sem.) |
| Travel Expense | 750.00 (per sem.) | 1,500.00 (x2 sem.) |
| **TOTAL** | $3,158.00 (per sem.) | $6,718.00 (x2 sem.) |

10

SEP 19 '89  9:06   U S A TOPEKA                    PAGE.17

USA000157

PLAN OF OPERATION APPROVAL

College Officials                                   Date Approved

_Jimmy W Sohn_                                      _9/14/89_
PRESIDENT                                           DATE

_____                            _____
DIRECTOR OF STUDENT ACTIVITIES                      DATE

_Kindall D. McHenry_                                _9 - 15 - 89_
STUDENT SENATE PRESIDENT                            DATE

_hannex combert_                                    _9/15/89_
SPONSOR                                             DATE

Organization Officers                               Date Approved

_Marcel Stevens_                                    _9 - 14 - 89_
PRESIDENT                                           DATE

(POSITION VACANT)                                   _____
VICE PRESIDENT                                      DATE

_Harvey E Ross J._                                  _15 Sept 89_
SECRETARY                                           DATE

_Harvey E Ross J._                                  _15 Sept 89_
TREASURER                                           DATE

11

USA000158

October 17, 2020

Tony Dearman
Director of BIE
Bureau of Indian Education
1849 C Street NW
Washington, DC 20240

**Reporting Behavior of Subordinate**

Tony Dearman:

  As you may be aware, Haskell Indian Nations University (HINU) President Ronald Graham issued a directive to me on Friday, October 16 which you were included as a copied recipient. I would like to report Ronald Graham for issuing this directive as a threat and intimidation with the intent to withdraw my student rights. The directive includes misleading narratives and baseless information for which I've been given sanctions that don't follow the Code of Student Conduct, violate my student rights, and appear to be a misuse of President Graham's authority.

  I would first like to say this directive follows a grievance I submitted to President Graham on October 9th regarding how HINU has falsely collected and represented my racial identity, and an attempt to rectify my racial identity record and offer the same considerations for my peers. This grievance was not addressed in Graham's directive which appears to be a retaliatory email. Before I address Graham's directive, I would like to call attention to the current issue I'm engaged in with the HINU administration and say that I have attempted to resolve this issue with Graham, but will continue to fight for my right to my racial identity and will be following up with Sloan Farrell on this matter.

  Graham's directive does not follow the Code of Student Conduct. I've received no letters from the Office of Student Rights for any violations or complaints referenced in Graham's directive. The president cannot operate outside of my rights as a student outlined in the Code of Student Conduct and cannot ignore the Code of Student Conduct processes needed to issue sanctions, nor may the sanctions violate my legal rights.

  I feel the following sanctions infringe upon my constitutional rights afforded by the first amendment for freedom of speech and infringe upon lawful rights provided by state and federal laws.

  **You will NOT "Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone of this campus**.

  This directive directly correlates to me exercising my freedom of speech to ask that the Lawrence Community Police Review Board to remove Tonia Salvini as a board member because she violates the ethics of the board by contributing to my racial discrimination. While HINU may see this as an "Attack" on Salvini's public persona, I have every right to critique her and hold her accountable as a public figure even if HINU does not like the things I have to say. I should not be receiving criticism based on HINU's distaste for how I self advocate. This is not an issue of defamation, libel, or slander—I've provided sufficient evidence to support my claims. This is an attack on my right to voice a dissenting opinion of a HINU administrator.

  **You will NOT: "Make demands on any governmental agency — or anyone else from Haskell — while claiming to represent The Indian Leader".**

  This directive comes from a false claim that I contacted the police department and "demand[ed] [information] on behalf of the University". The interaction described claims that I identified

USA000159

myself on behalf on Haskell Indian Nations University which goes against my standard press greeting of,"My name is Jared Nally. I'm a student writer (or Editor-In-Chief for) the *The Indian Leader*, Haskell Indian Nations University's student newspaper." This is not a false introduction, but I welcome an open dialogue to how Indian Leader writers can identify themselves to avoid confusion. However, I do not want this sanction to impede on my ability to ask for information, and for the administration to color any request for information as a "demand".

I did not "demand" information when I reached out to the police department about Nia Schexnider's death, and it's a disservice to myself and to her to color it as such when I wrote a tribute piece honoring her life and even provided funeral information to HINU who did not send any messaging out to students about her death nor funeral information. I fear, HINU's ability to discolor any attempt to get information as "demanding" puts me at risk that asking any questions could be found as "demanding" and place me in violation of this sanction, and subject to disciplinary action.

I have a right to ask questions. I won't do so pretending to represent HINU—I always represent *The Indian Leader*. This sanctions endangers my freedom of speech to ask questions.

**You will NOT: "Attempt countermanding decisions of Haskell personnel assigned by me or anyone else in to positions in an effort to replace them.**

This directive is related to my actions as Editor-In-Chief of The Indian Leader Association to refuse to allow Joshua Falleaf whose expressed negative views of *The Indian Leader* publication calling it a "gossip rag" on April 17th, 2020, to be assigned as faculty advisor. HINU administration cites their authority is provided to them by a legal settlement agreement, but the clause cited, "One or more faculty advisers may be appointed by Haskell Indian Junior College to assist students in the publication of *The Indian Leader*," is not part of the settlement agreement, but is part of the Plan of Operations included as an appendix example referenced in the settlement agreement. The Plan of Operations is under The Indian Leader Association's authority — It was voted on by the association to remove Falleaf from the position and later the Plan of Operations was completely amended to allow an explicit statement for the removal and reappointment of Faculty Advisors. This sanction restricts the Indian Leader Association's rights to challenge the misuse of authority, and ability act in our own interest under our own Plan of Operations. This is a violation of freedom of speech where I am being criticized for asking for clarification, expressing the association's needs, the association's sovereignty, and the association's own policy. This sanction is a broad attempt at complacency and exploitation which threatens all of those free speech rights.

**You will NOT: "Record anyone at Haskell in your interviews unless you advise them first and they grant you permission."**

This is not how Single-Party Consent States work. I have every right to record my conversations without the explicit need to have permission granted. This is afforded to me through Kan. Stat. Ann. § 21-6101(4). It is blatant disrespect by the university to equate me to a felon for exercising a legal right in this state provides, and subsequently remove this right by assigning a sanction allowing disciplinary action if I exercise my right to record conversations in the future.

Related to this situation using the university's own language, HINU has "attacked" me in emails and letters, saying I'm deceitful and disrespectful and infer that I am not honest, not credible, and don't have journalistic integrity. This is a great example of freedom of speech, but showcases a double standard that a student isn't allowed to exercise free speech and is subject to sanctions, but faculty and administration may do so without repercussions.

**You WILL: "Understand no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them."**

I completely understand that sentiment and agree. Timelines have been "imposed" to provide HINU with an understanding that their is (a) a limited amount of time to provide a statement before a story goes live to allow opportunity for HINU to provide a statement, or (b) has legal obligations like the recent October 25th which is a legal deadline for HINU to provide requested FERPA information and is done out of respect to allow HINU to avoid a FERPA violation which I will file if that timeline is failed to be met. I will continue to provides dates for the benefit of HINU, but understand it is entirely for their benefit, and not required.

My main take away from this directive is that HINU doesn't want unflattering information released and this directive is meant to accomplish that through intimidation and bullying myself with unjustified sanctions that violate my rights. Mr. Dearman, I ask that you please review the directive and consider these violations. I'm more then willing to provide documentation and additional explanation to the brief backgrounds provided above. Please provide communication as to how the process moves forward with this complaint.


Sincerely,

Jared Nally

Cc:      Monica Cooper, Human Resources Specialist

 Gmail                                                    **Jared Nally**

## Follow up to "Reporting Subordinate Ronald Graham"

**Jared Nally**                                                    Sat, Oct 17, 8:22 PM
To:                        @bie.edu>
Cc:                        @bia.gov>

Tony Dearman:

I apologize I did not include this in my email " Reporting Subordinate Ronald Graham", I
have finally been able to find the email attached to provide to you as an example of the
inaccuracies and unfavorable coloring that President Graham has done to impose these
sanctions.

In Graham's directive I am portrayed as demanding and incentive to the death of a
respected HINU employee, and falsely accused of acting on behalf of the university. I
hope I can offer this as a starting point to unravel the false narrative being told about me
from the administration  and work toward rectifying my rights being withheld because of
this  directive.

In the attachment you will find that I did not call the police department, I had sent an
email that outlines our communication which was respectful, non-demanding, and not
impersonating or representing HINU. It was upsetting to see myself portrayed as such
and to see the rhetoric continue to unsavory and misrepresentative throughout Graham's
directive. I am appalled that Graham used Nia Schexnider's death as a means to debase
me, and create false allegations. I had a lot of respect for Nia, and believe I provided that
in my tribute, and HINU has ruined all of that to use her death against me.  HINU paid
 little respects to her death, they did not provide any death notice to students. A short
notice was provided to faculty which promised to update them with funeral information. I
provided funeral information to to HINU the day before the funeral, but this information
was not distributed. Weaponizing an employee's recent death is unsettling.

It is also unsettling that HINU demonstrates the ability to create false narratives to
support their agenda, and silence my voice. I hope this provides incite as to why I'm
adamant on retaining my rights that the vague and objective sanctions restrict, and
concern with how HINU could misconstrue any situation where I exercise protected rights
as a violation of these sanctions and afford them opportunities to exercise unjust

disciplinary action.

Thank you for your help again,

–Jared Nally

Note: Neeoni Chex's legal name is Nia Schexnider which I did not know at the time of writing the email
Media Inquiry – The Indian Leader.pdf

11/13/2020                                                                                                 Mail - Jim Rains - Outlook

## Deans, please forward this message to your faculty

Jim Rains <jrains@HASKELL.edu>

Fri 7/10/2020 11:32 AM

**To:** Carrie Cornelius <ccornelius@HASKELL.edu>; Joshua Falleaf <jfalleaf@HASKELL.edu>; Julia GoodFox
<jgoodfox@HASKELL.edu>; cheryl.chuckluck@bie.edu <cheryl.chuckluck@bie.edu>; tracy.pargeets@bie.edu
<tracy.pargeets@bie.edu>
**Cc:** tracy.pargeets@bie.edu <tracy.pargeets@bie.edu>

Deans and Faculty,

The remainder of the summer weeks will be an especially busy time for Haskell's faculty. We are again preparing
for a fully online semester, and we want to ensure a high-quality learning experience for our students. Appearing
below is a list of activities that many of you will be asked to participate in:

- Department program reviews
- Course migration to the new Blackboard platform
- Training and certification on the new Blackboard platform
- Library textbook alternative training
- Presidential Strategic planning committees
- Various DOI Talent training
- Various department activities—new program development, program improvements, etc.

All of these activities are designed to contribute to the improvement of the student experience at Haskell –
especially during the COVID-19 pandemic and the University's transition to online course delivery. In the days
ahead, you will be receiving more scheduling information about these activities.


Due to the urgency of these activities and the need to focus on the successful completion of these tasks, Haskell's
administration is directing all faculty to temporarily step down from faculty sponsorship roles in student clubs and
other non-teaching activities; grant activities are exempt from this directive. Faculty sponsorship roles with student
clubs may be resumed when in-person classes resume. The University will be implementing a new policy that
establishes a rotating sponsorship process for student clubs, which is intended to allow equal opportunity for all
faculty to participate in university service such as club sponsorship.


**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

USA000164

| | |
|---|---|
| **From:** | Jim Rains |
| **To:** | Rhonda Levaldo; Jared Nally |
| **Cc:** | Joshua Falleaf; Mona Franklin |
| **Subject:** | Teaching, summer work, and the Indian leader |
| **Date:** | Friday, July 31, 2020 4:15:48 PM |

Rhonda and Jared,

By directive, all Haskell faculty have been asked to focus exclusively on preparation for teaching online this fall, program reviews, Blackboard training, and other University business; no faculty is excluded from this directive. Teaching is the University's core mission. In a related matter, per the The Settlement Agreement between the University and *The Indian Leader* (United States District Court For the District of Kansas. Entered September 11, 1989), the University holds the exclusive right to appoint a Faculty Adviser to "assist students in the publication of the Indian Leader" (p. 5). The Settlement Agreement and the Plan of Operation contain no language granting students the right to select the Faculty Adviser. As in the recent past, Haskell's current administration is indifferent to how *The Indian Leader* chooses its own student leadership and it remains generally disinterested in its editorial content -- and it has at no point demonstrated any attempt to "censor, edit or modify the contents of the Indian Leader" (p. 1). I hope this email clarifies any ambiguity on your summer duties, Rhonda, with respect to this matter. If you have any questions regarding these two points, either I or Josh Falleaf, your current supervisor, would be more than happy to respond.

**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

# The Indian Leader

The oldest Native American Student Newspaper

August 3, 2020

Jim Rains, PhD
Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Ave
Lawrence, KS 66046

Advisor Response

Jim Rains:

The Indian Leader Association recognizes Haskell Indian Nations University's (HINU) right to remove HINU Faculty from their roles as Faculty Advisors. However, the email you sent to my personal email address on Friday July, 31st seems to assert an authority that goes beyond rights provided by the settlement agreement you cited.[1] Furthermore, your goal of reducing ambiguity was not achieved based on the contradictions presented in your email. Thus, The Indian Leader Association's affirms that:

**HINU does not have the authority to assign Interim Dean of Humanities Joshua Falleaf as the Faculty Advisor for the Indian Leader.**

WHEREAS a vacancy for Faculty Advisor for the Indian Leader has arisen as a result of an administrative directive to all faculty.[2,3]

WHEREAS no faculty is excused from the directive resulting in an undefined timeframe where there are no candidates to fill the vacant role of Faculty Advisor.[4]

WHEREAS  Interim Dean of Humanities Joshua Falleaf, an administrator, is disqualified as a candidate to serve as a Faculty Advisor on account that he is not a faculty member.

WHEREAS the Indian Leader is allowed to continue operations while there is a vacancy for Faculty Advisor.[5]

At this time, the Indian Leader Association requests a response by the end of business on Monday, the 17th of August 17th, that either acknowledges the overstep in assigning administrator Joshua Falleaf as Faculty Adviser or can provide a proper source to support a non-faculty member being assigned as a Faculty Adviser.

---

[1] Email from Jim Rains to Jared Nally (July 31, 2020) (on file with recipient)

[2] Email from Jim Rains to Faculty (July 21, 2020) (on file with author)

[3] *supra* Note 1

[4] *supra* Note 1

[5] Settlement Agreement dated September 19, 1989, Case No. 89-4063-R

USA000166

# The Indian Leader

The oldest Native American Student Newspaper

Sincerely,

*[signature: Jared Nally]*

Jared Nally
Editor, The Indian Leader

Cc:    Ronald Graham, President
        Joshua Falleaf, Acting Dean of Humanities

USA000167

| | |
|---|---|
| **From:** | Jim Rains |
| **To:** | The Indian Leader |
| **Cc:** | ronald.graham@bie.edu; Ronald Graham; rgraham@bie.edu; Joshua Falleaf |
| **Subject:** | RE: Adviser |
| **Date:** | Friday, August 14, 2020 1:31:48 PM |

Indian Leader,

Josh Falleaf is permanent faculty; he will remain the appointed Faculty Advisor to *The Indian Leader* while all other faculty members are fulfilling their teaching responsibilities to the University, precluding their involvement with student club sponsorships at this time. All actions involving Haskell employees are conducted in compliance with HR's federal guidelines and policies. A new Faculty Advisor to *The Indian Leader* will be appointed on or before August 24, the start of Fall 2020 classes.

**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

**From:** The Indian Leader [ PII ]
**Sent:** Friday, August 14, 2020 12:19 PM
**To:** Jim Rains
**Cc:** ronald.graham@bie.edu; Ronald Graham; rgraham@bie.edu; Joshua Falleaf
**Subject:** Adviser

Jim Rains,

Please see the attached email from the Indian Leader Assocation.

Sincerely,
-Jared Nally, Editor-In-Cheif

USA000168

# Adviser

## The Indian Leader [⬚ PII ⬚]

| | |
|---|---|
| **Sent:** | Friday, August 14, 2020 12:19 PM |
| **To:** | Jim Rains |
| **Cc:** | ronald.graham@bie.edu; Ronald Graham; rgraham@bie.edu; Joshua Falleaf |
| **Attachments:** | Adviser.pdf (79 KB) |

Jim Rains,

Please see the attached email from the Indian Leader Assocation.

Sincerely,
-Jared Nally, Editor-In-Cheif

USA000169

# The Indian Leader

The oldest Native American Student Newspaper

August 3, 2020

Jim Rains, PhD
Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Ave
Lawrence, KS 66046

Advisor Response

Jim Rains:

The Indian Leader Association recognizes Haskell Indian Nations University's (HINU) right to remove HINU Faculty from their roles as Faculty Advisors. However, the email you sent to my personal email address on Friday July, 31st seems to assert an authority that goes beyond rights provided by the settlement agreement you cited.[1] Furthermore, your goal of reducing ambiguity was not achieved based on the contradictions presented in your email. Thus, The Indian Leader Association's affirms that:

**HINU does not have the authority to assign Interim Dean of Humanities Joshua Falleaf as the Faculty Advisor for the Indian Leader.**

WHEREAS a vacancy for Faculty Advisor for the Indian Leader has arisen as a result of an administrative directive to all faculty.[2,3]

WHEREAS no faculty is excused from the directive resulting in an undefined timeframe where there are no candidates to fill the vacant role of Faculty Advisor.[4]

WHEREAS  Interim Dean of Humanities Joshua Falleaf, an administrator, is disqualified as a candidate to serve as a Faculty Advisor on account that he is not a faculty member.

WHEREAS the Indian Leader is allowed to continue operations while there is a vacancy for Faculty Advisor.[5]

At this time, the Indian Leader Association requests a response by the end of business on Monday, the 17th of August 17th, that either acknowledges the overstep in assigning administrator Joshua Falleaf as Faculty Adviser or can provide a proper source to support a non-faculty member being assigned as a Faculty Adviser.

---

[1] Email from Jim Rains to Jared Nally (July 31, 2020) (on file with recipient)

[2] Email from Jim Rains to Faculty (July 21, 2020) (on file with author)

[3] *supra* Note 1

[4] *supra* Note 1

[5] Settlement Agreement dated September 19, 1989, Case No. 89-4063-R

USA000170

# The Indian Leader

### The oldest Native American Student Newspaper

Sincerely,

*Jared Nally*

Jared Nally
Editor, The Indian Leader

Cc:    Ronald Graham, President
       Joshua Falleaf, Acting Dean of Humanities

USA000171

## Distribution of Indian Leader Link

The Indian Leader [_____ PII _____]

**Sent:** Monday, April 27, 2020 8:00 AM
**To:** Prue, Stephen [stephen.prue@bie.edu]; Jim Rains

aya Dr. Rains & Mr. Prue,

I'm writing to see if there was a problem with sending out a PDF document of the newspaper, and instead of you would send out a link to http://www.theindianleader.com/ . Please let me know if you can distribute this link.

neewe,
-Jared Nally

USA000172

## Indian Leader

### Joshua Falleaf

**Sent:** Tuesday, July 28, 2020 9:37 AM
**To:**   Jim Rains

Jim,

Have a look at this.

Joshua

---

**From:** The Indian Leader [⸤⸻⸻⸻ PII ⸻⸻⸻⸻⸥]
**Sent:** Tuesday, July 28, 2020 9:13 AM
**To:** Joshua Falleaf
**Subject:** Advising and Negotiable Removal from the Club

Good Morning Dean Falleaf,

Last week we had an Indian Leader meeting in which we found out that Rhonda LeValdo, faculty advisor to the Indian Leader, could not attend in her role as our advisor because she had been asked to step down as part of a university-wide notice to HINU faculty removing their roles as club advisors. We were also informed that you've been self appointed as our replacement advisor in the meantime.

In part this message is to inform you, that you have been removed of your burden as our advisor. While I've waited for you to reach out to us, you have yet to engage with our club in over a week since the VPAA sent Rhonda the notice. Timeliness is an important trait for news, and you're lack of timeliness is an undesirable trait for our next advisor. A unanimous vote was conducted on our last meeting removing you from your temporary role.

Furthermore, Indian Leader has been structured to prevent oversight from HINU administration, which would negate your ability to assume that role since you are part of the administration and cannot opperate as a faculty advisor. As we currently don't have an advisor, I would like to remind the administration of the following legal rights HINU agreed to in 1989.

> "Haskell agrees that no officer, agent, instructor or employee of Haskell shall:
>
> ...
>
> (c) suspend the publication of The Indian Leader newspaper on the ground that a vacancy has arisen in the position of the faculty adviser to the Indian Leader newspaper of the Association.
>
> (d) refuse any written request for the disbursement of funds, reasonably related to the management or publication of the Indian Leader...."

As such, Indian Leader will continue to operate without an advisor and with access to our funds. We will once again appoint an advisor when HINU allows faculty to assume roles as club advisors again.

The Last part of this message, I would like to address that I feel HINU is not setting the Indian Leader up for success during the pandemic to continue one of HINU's longest legacies which began in 1897. HINU has

USA000173

removed our faculty advisor, has eliminated student activity fees which fund our organization, and refused to distribute a pdf of our publication to the student email list.

You once reached out to me to tell me you thought I was turning Indian Leader into a "Gossip Rag". If this is the reason Indian Leader is not being supported by the university, I would like to see if it is negotiable to reinstate funding to the newspaper and Rhonda as the advisor if I agree to step down as the editor and cease to write for the student paper. Please let me know if this is something we can discuss to ensure the continued legacy of the paper.

Sincerely,
-Jared Nally, Editor

USA000174

8/17/2020
Case 2:21-cv-02113-JAR-TJJ   Document 29-2   Filed 07/19/21   Page 175 of 528
Press Questions Deadline of 11:00 am

Reply    Reply All    Forward

Press Questions Deadline of 11:00 am

The Indian Leader [ <span>**PII**</span> h]

| | |
|---|---|
| **To:** | tonia.salvini@bie.edu; Danelle McKinney; Jim Rains |
| **Cc:** | Rhonda Levaldo |

Tuesday, April 14, 2020 11:14 PM

You forwarded this message on 4/15/2020 7:13 AM.

aya ceeki,

The Indian Leader is covering a story on Russell Parker's disciplinary decisions in which he received an Action Notice that states his allegations of intimidation and harassment are not currently appealable. The article will go live tomorrow at 12:00 pm if you would like to make a statement to the Indian Leader on any of the following, please do so through email by 11:00 am.

Was Parkers safety taken into consideration when he was temporarily asked to vacate under stay-at-home orders?

How was Parker given due process granted by the Code of Student Conduct if he is not able to appeal his allegations?

How did an overview of "Student failed to comply with verbal directives from Facilities Staff" result in allegations of intimidation and harassment?

How does the administration address concerns from students that facilities staff is targeting students because they don't want students to remain on campus and are treating students as bio-hazards not people?

neewe,
-Jared Nally

USA000175

## Re: Adviser

The Indian Leader [_____ PII _____]

**Sent:** Friday, August 14, 2020 2:15 PM
**To:**   Jim Rains

Thank you for the prompt response.

For clarity, Joshua Falleaf who is acting as an administrator is not an administrator but is in fact permanent faculty? Additionally, despite you specifically telling me "no faculty is excluded from this directive", that was a lie and does not apply to permanent faculty member Joshua Falleaf? These contradictions in you're emails have introduced ambiguity on my end.

If Falleaf is administration he cannot be a faculty advisor, and If Falleaf is faculty how is he excluded from your directive which says "no faculty is excluded from this directive?"

We would be happy to operate the next two weeks without an adviser to allow your directives and statements to hold true without exception.

Additionally, this would show that you value the input of students and their operations when we explicitly have shown disinterest in Falleaf as our advisor. Not only would there be a conflict of interest with Falleaf operating as an administrator, but Falleaf has demonstrated many personal acts that demonstrate a lack of understanding or interest in the Indian Leader. For example, Falleaf referred to the Indian Leader as a "gossip rag" on April 17th, has asked our previous advisor multiple times how to get content removed from our site and social media, and has not reached out to contact the Indian Leader during any of these weeks you've "appointed" him as adviser. The Indian Leader has unanimously voted to not accept him as our adviser and we hope HINU would show consideration for the interests in the party's affected by your decisions.

-Jared Nally

> On Aug 14, 2020, at 1:28 PM, Jim Rains <jrains@haskell.edu> wrote:
>
> Indian Leader,
> Josh Falleaf is permanent faculty; he will remain the appointed Faculty Advisor to *The Indian Leader* while all other faculty members are fulfilling their teaching responsibilities to the University, precluding their involvement with student club sponsorships at this time. All actions involving Haskell employees are conducted in compliance with HR's federal guidelines and policies. A new Faculty Advisor to *The Indian Leader* will be appointed on or before August 24, the start of Fall 2020 classes.
>
>
> **Jim Rains, Ph.D.**
>
> Acting Vice President of Academics
> Haskell Indian Nations University
> 155 Indian Avenue
> Lawrence, KS 66046
>
> Phone: (785) 749-8494
>
> ---
> **From:** The Indian Leader [_____ PII _____]
> **Sent:** Friday, August 14, 2020 12:19 PM

USA000176

Case 2:21-cv-02113-JAR-TJJ   Document 29-2   Filed 07/19/21   Page 177 of 528

**To:** Jim Rains
**Cc:** ronald.graham@bie.edu; Ronald Graham; rgraham@bie.edu; Joshua Falleaf
**Subject:** Adviser

Jim Rains,

Please see the attached email from the Indian Leader Assocation.

Sincerely,
-Jared Nally, Editor-In-Cheif

USA000177

Case 2:21-cv-02113-JAR-TJJ   Document 29-2   Filed 07/19/21   Page 178 of 528

# RE: Adviser

**Jim Rains**

**Sent:** Friday, August 14, 2020 1:31 PM
**To:**  The Indian Leader [ PII ]
**Cc:**  ronald.graham@bie.edu; Ronald Graham; rgraham@bie.edu; Joshua Falleaf

Indian Leader,

Josh Falleaf is permanent faculty; he will remain the appointed Faculty Advisor to *The Indian Leader* while all other faculty members are fulfilling their teaching responsibilities to the University, precluding their involvement with student club sponsorships at this time. All actions involving Haskell employees are conducted in compliance with HR's federal guidelines and policies. A new Faculty Advisor to *The Indian Leader* will be appointed on or before August 24, the start of Fall 2020 classes.

**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

---

**From:** The Indian Leader [ PII ]
**Sent:** Friday, August 14, 2020 12:19 PM
**To:** Jim Rains
**Cc:** [ PII ] Ronald Graham; rgraham@bie.edu; Joshua Falleaf
**Subject:** Adviser

Jim Rains,

Please see the attached email from the Indian Leader Assocation.

Sincerely,
-Jared Nally, Editor-In-Cheif

USA000178

## RE: Distribution of Indian Leader Link

Jim Rains

**Sent:** Monday, April 27, 2020 10:45 AM
**To:**   The Indian Leader [_____PII_____]; Prue, Stephen [stephen.prue@bie.edu]

Jared,
I'll definitely consider ways in which we can assist you.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

---

**From:** The Indian Leader [_____PII_____]
**Sent:** Monday, April 27, 2020 8:00 AM
**To:** Prue, Stephen; Jim Rains
**Subject:** Distribution of Indian Leader Link

aya Dr. Rains & Mr. Prue,

I'm writing to see if there was a problem with sending out a PDF document of the newspaper, and instead of you would send out a link to http://www.theindianleader.com/ . Please let me know if you can distribute this link.

neewe,
-Jared Nally

USA000179

## Re: Indian Leader Volume 123 Issue 3

The Indian Leader [⌐ ⁻ ⁻ ⁻ ⁻ ⁻ ⁻ PII ⁻ ⁻ ⁻ ⁻ ⁻ ⁻ ⌐]
**Sent:**Wednesday, April 15, 2020 2:28 PM
**To:**   Jim Rains


aya Dr. Rains,

Thank you for your response. Could you please clarify a few of your points.

1. If we are not an official publication of Haskell Indian Nations University then why was our PDF sent to the BIE's
 Central Office for review when that is only necessary for HINU statements? Is this done for other releases from other organizations, for example when Prue distributes pdf's from other campus clubs or non-haskell affiliated organizations — unsanctioned clubs
 like the language revitalization club and Fort Scott National Historic Site, if these organizations can have accesses to students sending unofficial publications through Prue, is it a censorship problem that ours is being singled out to not be forwarded?

2. If Haskell has not played a role in sending the Indian Leader out, how is that Prue sent an email out for Volume
 123 Issue 2, our previous issue?

3. "Haskell's administration
 has no role in the writing, editing, supervision, or publication of any outside publication it's been forwarding from other organizations, why is this the concern for our publication? I'm not asking the University to assume responsibility for the content just
 like it does not assume the responsibility of events it forwards that are not campus sponsored events. I'm also aware of the legal history of the University with regards to censorship of the Indian Leader.

I would like the clarification on the above, but also would recommend that if it would assist in get to students getting a copy of the Indian Leader,
 the oldest Native American student newspaper and a pride to HINU, could there not be a disclaimer in the email forwarded to students that states this the following document has not been prepared by the University and is not an official statement? An additional
 request is to receive a student directory with names and emails since directory information is not protected by FERPA and would allow the Indian Leader to send out it's publication through our own email server.

I hope the additional clarity will help us work with and feel supported by our university

neewe,
.-Jared Nally, Editor


On Wed, Apr 15, 2020 at 12:31 PM Jim Rains <jrains@haskell.edu> wrote:
> Jared,
> We forwarded your request to distribute the Indian Leader in PDF form to the BIE's Central Office. We have been advised against complying with your request for the following reasons:
>
> - Although the Indian Leader is a student activity, it is not an official publication of Haskell Indian Nations University. All official University messaging must be submitted to BIE's Central Office for review prior to release.
> - Historically, Haskell University does not play a role in distributing the Indian Leader; therefore, it is not advisable to do so at this time.

USA000180

- Haskell's administration has no role in the writing, editing, supervision, or publication of the Indian Leader; therefore, it is not in a position to verify the accuracy of the information contained within it--and we cannot, as a University, assume responsibility for its content. Please refer to Ms. LeValdo's knowledgeable account of the history and legal standing of the Indian Leader as a student newspaper.

We regret that we cannot assist you with distribution, and we continue to wish you and your fellow students the very best in the continued success of your newspaper.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

**From:** The Indian Leader [_____PII_____]
**Sent:** Wednesday, April 15, 2020 11:13 AM
**To:** Stephen Prue; Jim Rains
**Cc:** Rhonda Levaldo
**Subject:** Indian Leader Volume 123 Issue 3

aya Mr. Prue,

This is my third request for you to please send out a student email with the latest issue of the Indian Leader to students. The document is attached and I hope you'll give the Indian Leader the same consideration for distributing our information as you have with done with student government and healing week who you've distributed information since my first request.

-Jared Nally, Editor

USA000181

Reply    Reply All    Forward

## RE: Indian Leader Volume 123 Issue 3

### Jim Rains

| To: | The Indian Leader [ PII ] |
|---|---|
| Cc: | Stephen Prue; Rhonda Levaldo; Joshua Falleaf |

Wednesday, April 15, 2020 3:05 PM

Jared,

Rhonda LeValdo, faculty advisor to the Indian Leader, can provide you with the long, complicated history of Haskell's student publication. It's an important history, and it will explain the autonomy that the Indian Leader fought hard to retain at a time when an administration sought to suppress it. Since that time, Haskell's administration has respected the autonomy of the publication and has never attempted, rightfully so, to exercise supervisory control or censorship over the writing, editing, production, and management of the newspaper. Ms. LeValdo and I have had several conversations about this on a variety of occasions and she can clarify many of your questions. Please know that we sympathize with your challenges during this difficult time, and we continue to support your journalistic efforts -- and your independence. All official messaging from the University originates within the President's Office, and all official messaging is subject to approval from BIE's Central Office. We are compelled to abide by that directive. We believe that distributing the Indian Leader, inasmuch as we cannot verify the accuracy of the reporting and the facts that you report (which we would never attempt to do at any time), would be in violation of the guidance we have received for disseminating University information. We in no way oppose the distribution of the Indian Leader -- and we encourage you to continue to provide information to Haskell students and that you find alternative means for its circulation -- however, we cannot accommodate your request. I ask for your understanding in this matter.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

---

**From:** The Indian Leader [ PII ]
**Sent:** Wednesday, April 15, 2020 2:28 PM
**To:** Jim Rains
**Subject:** Re: Indian Leader Volume 123 Issue 3

aya Dr. Rains,

Thank you for your response. Could you please clarify a few of your points.

1. If we are not an official publication of Haskell Indian Nations University then why was our PDF sent to the BIE's
Central Office for review when that is only necessary for HINU statements? Is this done for other releases from other organizations, for example when Prue distributes pdf's from other campus clubs or non-haskell affiliated organizations — unsanctioned clubs
like the language revitalization club and Fort Scott National Historic Site, if these organizations can have accesses to students sending unofficial publications through Prue, is it a censorship problem that ours is being singled out to not be forwarded?

2. If Haskell has not played a role in sending the Indian Leader out, how is that Prue sent an email out for Volume
123 Issue 2, our previous issue?

USA000182

Reply    Reply All    Forward

## RE: Indian Leader Volume 123 Issue 3

### Jim Rains

**To:**       The Indian Leader [ PII ]; Stephen Prue [stephen.prue@bie.edu]

**Cc:**       Rhonda Levaldo

Wednesday, April 15, 2020 12:32 PM

Jared,
We forwarded your request to distribute the Indian Leader in PDF form to the BIE's Central Office. We have been advised against complying with your request for the following reasons:

- Although the Indian Leader is a student activity, it is not an official publication of Haskell Indian Nations University. All official University messaging must be submitted to BIE's Central Office for review prior to release.
- Historically, Haskell University does not play a role in distributing the Indian Leader; therefore, it is not advisable to do so at this time.
- Haskell's administration has no role in the writing, editing, supervision, or publication of the Indian Leader; therefore, it is not in a position to verify the accuracy of the information contained within it--and we cannot, as a University, assume responsibility for its content. Please refer to Ms. LeValdo's knowledgeable account of the history and legal standing of the Indian Leader as a student newspaper.

We regret that we cannot assist you with distribution, and we continue to wish you and your fellow students the very best in the continued success of your newspaper.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

---

**From:** The Indian Leader [ PII ]
**Sent:** Wednesday, April 15, 2020 11:13 AM
**To:** Stephen Prue; Jim Rains
**Cc:** Rhonda Levaldo
**Subject:** Indian Leader Volume 123 Issue 3

aya Mr. Prue,

This is my third request for you to please send out a student email with the latest issue of the Indian Leader to students. The document is attached and I hope you'll give the Indian Leader the same consideration for distributing our information as you have with done with student government and healing week who you've distributed information since my first request.

-Jared Nally, Editor

USA000183

8/17/2020                                                                Re: Recorded conversation

## Re: Recorded conversation

Jared Nally

**Sent:** Tuesday, July 14, 2020 6:23 AM
**To:**  Carlene Morris
**Cc:** [ PII ] Salvini, Tonia [tonia.salvini@bie.edu]; Prue, Stephen C [stephen.prue@bie.edu]; Jim Rains; Rhonda Levaldo

Dear Carlene:

Thank you for reaching out to me with your concerns regarding actions I took to record my conversation with Financial Aid on June 10th. While I do acknowledge that your message reflects contempt for my actions, I want to be firm in asserting my right to record my conversations which does not require your permission.

Kan. Stat. Ann. § 21-6101(4) provides guidelines for my personal right in a  single-party consent state which allows me, a participant in the conversation, to provide my own consent to surreptitiously record my conversation with Financial Aid.

As for your allegations of deceit, I ensure you I was candid when I mentioned I had personal interest in students loans for pursuing grad school in another country. My number one school choice was the University of Tromsø, in Tromsø, Norway; I emphasize "was" here because my grad school application for this December would require "Proof of Financial Ability" which is a sum of NOK 123,519 or $13,044 which I was hoping to establish through a student loan. This is a conversation I intended to have with you closer towards the fall semester, but it has been expedited after hearing rumors from students responding to fall semester fees that HINU didn't allow student loans.

Did I also use my personal conversation to also write an article for the student newspaper? Yes. It was a commentary piece which built on the relevant information you gave me that was timely and relevant to the context of what I was writing. It was also spurred by the additional realization that I could not expect help paying for rent with student loans for the apartment I just signed a lease for because HINU is no longer offering student housing — an extra $8, 622 for my yearly cost of living according to Financial Aid's online financial calculator.

I hope you do not take any of this personally, as this is now my response to working with HINU. I have taken this approach after receiving many comments from HINU employees aimed to discredit my reporting for the Indian Leader — Joshua Falleaf on April 17th, said I'm turning Indian Leader into a "Gossip Rag", President Ronald Graham May 24th, said I published incorrect information but won't say what, etc — following those, I've had multiple employees provide wrong information such as mandatory pickup of student belongings. It is for these reasons I've gone back to all the articles I've written to add links documenting emails, statements, and dialogues that provide the information I wrote the article with. At this time, I feel like I have to protect myself by collecting source information.

Thank you for reaching out which has allowed me to respond to some of your points, and hopefully bring understanding to your concerns.

neewe,
-Jared Nally

On Jul 13, 2020, at 1:51 PM, Carlene Morris <CMorris@haskell.edu> wrote:

Jared,

USA000184

I am of the understanding you recorded our phone conversation the other day without my permission.  I also understand you posted it on Facebook, also without my permission.  I do not believe I said anything that was not true or accurate. However, I believe it is appropriate to ask the person you are speaking to if is it ok to record our conversation, which you did not.

I am sorry you felt you had to be deceitful to get the information.

Carlene Morris
Financial Aid Officer
Haskell Indian Nations University
785-830-2702
785-832-6617 (FAX)
cmorris@haskell.edu
Carlene.Morris@BIE.edu

Haskell  Mission
The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the leading institution of academic excellence, culture and intellectual prominence, and holistic education to address the needs of Indigenous communities.
<Picture (Device Independent Bitmap) 1.jpg>

NOTICE TO RECIPIENT: The information contained in this electronic mail message and all attachments are confidential, privileged and/or proprietary and are intended for the exclusive use of the addressee(s). If you are not an intended addressee of this message, your interception, copying, distribution, disclosure or other use of this message, any attachment or the information contained therein is strictly prohibited. If you received this message and were not an addressee, immediately notify the sender by e-mail. Destroy every electronic, paper and other copy of this message and all attachments and every digest or other summary of the information contained herein or any attachments.  All e-mail sent to this address will be received by the Haskell Indian Nations University e-mail system and is subject to archiving and review by someone other than the recipient.

USA000185

# Recorded conversation

## Carlene Morris

**Sent:**      Monday, July 13, 2020 1:51 PM
**To:**        Jared Nally
**Cc:**        [                PII                ] Salvini, Tonia [tonia.salvini@bie.edu]; Prue, Stephen C [stephen.prue@BIE.EDU]; Jim Rains; Rhonda
               Levaldo
**Importance:** High

Jared,
I am of the understanding you recorded our phone conversation the other day without my permission.  I also understand
you posted it on Facebook, also without my permission.  I do not believe I said anything that was not true or accurate.
However, I believe it is appropriate to ask the person you are speaking to if is it ok to record our conversation, which you
did not.

I am sorry you felt you had to be deceitful to get the information.

Carlene Morris
Financial Aid Officer
Haskell Indian Nations University
785-830-2702
785-832-6617 (FAX)
cmorris@haskell.edu
Carlene.Morris@BIE.edu

Haskell  Mission

The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the
leading institution of academic excellence, culture and intellectual prominence, and holistic education to address the needs
of Indigenous communities.

NOTICE TO RECIPIENT: The information contained in this electronic mail message and all attachments are confidential, privileged and/or proprietary
and are intended for the exclusive use of the addressee(s). If you are not an intended addressee of this message, your interception, copying,
distribution, disclosure or other use of this message, any attachment or the information contained therein is strictly prohibited. If you received this
message and were not an addressee, immediately notify the sender by e-mail. Destroy every electronic, paper and other copy of this message and
all attachments and every digest or other summary of the information contained herein or any attachments.  All e-mail sent to this address will be
received by the Haskell Indian Nations University e-mail system and is subject to archiving and review by someone other than the recipient.

USA000186

# Request for Student Directory

## Jared Nally

**Sent:** Monday, March 16, 2020 9:53 AM
**To:**   Stephen Prue; Lou Hara; Jim Rains; Rhonda Levaldo

aya ceeki,

For upcoming articles in the Indian Leader, I'm requesting a student directory of all students who were/are enrolled at Haskell Indian Nations University for the spring 2020 semester. I am not asking for protected information.

> FERPA defines "directory information" as information contained in the education records of a student that would not generally be considered harmful or an invasion of privacy if disclosed. Typically, "directory information" includes information such as name, address, telephone listing, date and place of birth, participation in officially recognized activities and sports, and dates of attendance. A school may disclose "directory information" to third parties without consent if it has given public notice of the types of information which it has designated as "directory information," the parent's or eligible student's right to restrict the disclosure of such information, and the period of time within which a parent or eligible student has to notify the school in writing that he or she does not want any or all of those types of information designated as "directory information." The means of notification could include publication in various sources, including a newsletter, in a local newspaper, or in the student handbook. The school could also include the "directory information" notification as part of the general notification of rights under FERPA. The school does not have to notify a parent or eligible student individually. (34 CFR § 99.37.)

The Information I'm looking at would be student first and last names. These have previously been provided to the Indian Leader and I'm looking forward to working with our university who supports it's school paper. Thank you for all your assistance.

neewe,
-Jared Nally, Editor

USA000187

# Teaching, summer work, and the Indian leader

Jim Rains

**Sent:** Friday, July 31, 2020 4:15 PM
**To:**   Rhonda Levaldo; Jared Nally
**Cc:**   Joshua Falleaf; Mona Franklin

Rhonda and Jared,
By directive, all Haskell faculty have been asked to focus exclusively on preparation for teaching online this fall, program reviews, Blackboard training, and other University business; no faculty is excluded from this directive. Teaching is the University's core mission. In a related matter, per the The Settlement Agreement between the University and *The Indian Leader* (United States District Court For the District of Kansas. Entered September 11, 1989), the University holds the exclusive right to appoint a Faculty Adviser to "assist students in the publication of the Indian Leader" (p. 5). The Settlement Agreement and the Plan of Operation contain no language granting students the right to select the Faculty Adviser. As in the recent past, Haskell's current administration is indifferent to how *The Indian Leader* chooses its own student leadership and it remains generally disinterested in its editorial content -- and it has at no point demonstrated any attempt to "censor, edit or modify the contents of the Indian Leader" (p. 1). I hope this email clarifies any ambiguity on your summer duties, Rhonda, with respect to this matter. If you have any questions regarding these two points, either I or Josh Falleaf, your current supervisor, would be more than happy to respond.

**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

USA000188



April 24, 2020

Acting President Jim Rains
Haskell Indian Nations University
Office of the President
Navarre Hall
155 Indian Ave
Lawrence, Kansas 66046-4800

### *URGENT*

*Sent via Electronic Mail (jrains@haskell.edu)*

Dear President Rains:

The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.

FIRE is concerned about the ongoing threat to student due process rights at Haskell Indian Nations University (HINU) posed by its suspension of HINU student Russell Parker without a hearing. HINU's continued refusal to schedule a hearing for Parker after removing him from university housing contravenes the university's obligation to afford students due process. FIRE urges HINU to provide Parker with a full and fair opportunity to contest the allegations against him immediately.

I.   **HINU Suspends Parker Without Providing a Hearing**

The following is our understanding of the pertinent facts, based on public accounts by Parker and HINU officials.[1] We appreciate that you may have additional information to offer and invite you to share it with us. Please find enclosed an executed waiver authorizing you to share

---

[1] FIRE's understanding of the facts is drawn from HINU's incident report and Parker's description of events. Haskell Indian Nations Univ., *Incident Report* (Apr. 10, 2020), http://www.theindianleader.com/wp-content/uploads/2020/04/Parkers-Docuemnts-from-HINU.pdf (containing HINU employees' account of events); Email from Parker to Tonia Salvini, HINU Vice President of University Services (Apr. 11, 2020), http://www.theindianleader.com/wp-content/uploads/2020/04/Parker%E2%80%99s-Email-to-Salvini.pdf (containing Parker's account of events).

USA000189

information with FIRE. However, if the facts here are substantially accurate, HINU must afford Parker due process by scheduling a hearing for him as soon as practicable.

On April 8, 2020, HINU student and golf team member Russell Parker was golfing on the southwest side of Blalock Hall around 30 feet from the building. Parker regularly hits golf balls toward the driving range at this location, where he can practice by himself without disruption.

At approximately 4 p.m., HINU Acting Facilities Foreman Steven LaCour approached Parker in a forklift to inform him that HINU's campus is closed to the public. Parker replied that he was a student and lived in Winona Hall. LaCour questioned whether Parker was a student, stating that he did not see a student parking sticker on Parker's nearby vehicle. Parker assured LaCour that this sticker was on his car and that he was a HINU student.

LaCour then asked Parker to relocate because of nearby construction. Parker told LaCour that he was aware of the construction workers, that he regularly golfs at this location, and that he was not bothering or disrupting anyone. LaCour clarified that he was ordering Parker to relocate, to which Parker replied: "Ok, that's all you had to say initially. I hope you're happy now." Parker collected his golf equipment and walked to his car.

LaCour, still in his forklift, followed Parker to his car. Upon seeing his student parking sticker on his car, LaCour asked to see Parker's student identification. Parker explained that he left it in his dorm room.

LaCour then ordered Parker to move his car, claiming that this parking lot was off-limits to him. Parker asked why he wasn't allowed to park there, explaining that he did not see any signs prohibiting parking and that he has parked there without issue for the last three weeks. LaCour repeated his order, to which Parker responded: "Are you on some kind of power trip?" LaCour drove off while saying, "I'm going to take a picture and have your car ticketed or towed." Parker said, "You're being an asshole." LaCour said, "Did you just call me an asshole?" Parker replied: "No! I said you're being one!" LaCour, noticing that Parker was becoming agitated and had a golf club in his hand, drove off to get a security guard. Once LaCour drove off, Parker resumed golfing on the southwest side of Blalock Hall.

A few minutes later, HINU Lead Security Officer James Yarnall approached Parker to ask about his encounter with LaCour. Parker recounted the events to Yarnall, who asked for Parker's student identification. Parker told him that he left it in his dorm room. Yarnall then informed Parker that he could continue golfing at this location, but that he had to move his car because the lot was closed. Parker packed up his golf equipment and left.

On April 10, HINU Student Rights Specialist Danelle McKinney notified Parker that he would be placed on "Emergency Suspension Level II" due to "an incident report for violence indicating threats to one or more federal employees" on April 8.[2] The notice stated that this

---

[2] Action Notice Letter from Danelle McKinney, HINU Student Rights Administrator, to Parker (Apr. 10, 2020), http://www.theindianleader.com/wp-content/uploads/2020/04/Parkers-Docuemnts-from-HINU.pdf.

suspension came "with a recommendation for PERMANENT LOSS OF HOUSING" with a deadline for Parker to request an appeal for the loss of housing of April 17.[3] In an accompanying "Emergency Suspension Notification" sent to Parker, McKinney claimed: "The facts that support your placement on Emergency Suspension, which we believe are creating an immediate danger of risk to the campus community or yourself are: An incident for substance misuse which resulted in threats to federal employees puts the Haskell Community in an immediate danger of risk for health and safety."[4] Under the conditions of his suspension, Parker must immediately vacate his "residential hall room, but still can attend classes, eat lunch meal,  use the library and be on the Haskell grounds for other school related purposes."[5]

Parker replied to McKinney the same day, asking that McKinney schedule the appeal of his suspension as soon as possible because the sudden loss of housing would leave him homeless during the COVID-19 pandemic.[6] On April 11, Parker emailed his version of events to HINU Vice President of University Services Tonia Salvini, asking for her consideration of his situation.[7]

On April 16, Parker formally asked for an appeal and requested a week's notice since his lack of housing and internet access rendered him unable to promptly respond to any scheduled hearing on short notice.[8] McKinney confirmed receipt of Parker's request on April 17, but did not schedule an appeal hearing.[9]

Upon being removed from university housing on April 10, Parker has slept sporadically at his friends' houses, in his car, and at hotels. He is currently without housing as his efforts to find temporary housing are hindered by the COVID-19 crisis.

Parker has not heard back from HINU about a hearing date.

II.   **HINU's Refusal to Provide a Timely Hearing to Parker After Suspending Him Violates His Due Process Rights**

By removing Parker from university housing without promptly providing a hearing, HINU failed to provide Parker with due process and betrayed its legal and moral obligation to uphold students' rights.

A.   ***HINU is legally and morally obligated to afford students due process.***

As an educational institution subject to the regulations of the United States Department of the

---

[3] *Id.* (capitalization in original).
[4] Emergency Suspension Notification from McKinney to Parker (Apr. 10, 2020),
http://www.theindianleader.com/wp-content/uploads/2020/04/Parkers-Docuemnts-from-HINU.pdf.
[5] *Id.*
[6] Email from Parker to McKinney (Apr. 10, 2020) (on file with author).
[7] Email from Parker to Salvini, *supra* note 1.
[8] Email from Parker to McKinney (Apr. 16, 2020) (on file with author).
[9] Email from McKinney to Parker (Apr. 17, 2020) (on file with author).

4

Interior's Bureau of Indian Affairs, HINU is required to "[r]espect the constitutional, statutory, civil and human rights of individual students"[10] and to uphold "[t]he right to due process in instances of disciplinary actions."[11]

None of the allegations of Parker's behavior cited by HINU constituted an emergency. But even assuming for the sake of argument that it had, HINU is still bound to respect his right to due process by affording him a prompt hearing. Per federal regulation, when dealing with "an emergency situation that seriously and immediately endangers the health or safety of the student or others," requiring the university to "temporarily remove the student" from university grounds, HINU "[m]ust afford the student a hearing that follows due process . . . within ten days" of the removal."[12]

Indeed, HINU appears to hold itself to a stricter standard when dealing with emergency suspensions. As stated in its Student Handbook, "[i]n an emergency situation that seriously and immediately endangers the health and safety of the student or others," HINU may "temporarily suspend a student, but  . . .  shall afford the student a hearing which fully comports with due process **as soon as practicable thereafter**."[13]

Per both federal regulation and university policy, HINU must provide Parker a prompt and fair hearing.[14] It has failed to do so.

### B.    *HINU must provide Parker with a prompt and meaningful chance to contest allegations against him.*

At least 14 days have passed since HINU evicted Parker from his campus residence, forcing him to find new housing during a global pandemic in which public health officials have urged individuals to stay in their homes.[15] At least 14 days have passed since Parker expressed his desire to HINU for a hearing as soon as practicable, and at least 8 days have passed since he formally requested a hearing. This is unacceptable. HINU's failure to provide Parker a prompt hearing moves its restrictions beyond the temporary and limited measures allowed in emergency circumstances, and cannot be justified under HINU policy and applicable law.

The importance of providing a prompt hearing is heightened when circumstances cast doubt on whether the alleged misconduct constitutes an emergency situation. Parker stands accused

---

[10] 25 C.F.R. § 42.1 (2020).

[11] 25 C.F.R. § 42.2 (2020).

[12] 25 C.F.R. § 42.7 (2020).

[13] Haskell Indian Nations Univ., *Student Handbook* (last updated 2014), https://www.haskell.edu/downloads/student-rights/Haskell%20CSC_Table%20of%20Contents%207-10-14.pdf. (emphasis added).

[14] *See* Goss v. Lopez, 419 U.S. 565, 581-83 (1975) (discussing how due process requires public schools to provide a suspended student with "an opportunity to present his side of the story . . . as soon as practicable.").

[15] HINU's punishment of Parker renders him essentially incapable of complying with Kansas Governor Laura Kelly's "stay-home" executive order. Kansas Executive Order No. 20-24 (Apr. 16, 2020) https://governor.kansas.gov/wp-content/uploads/2020/04/EO-20-24-Executed.pdf (extending statewide "stay-home" executive order until May 3, 2020).

of making a threat and presenting an "an immediate danger of risk to the campus community"[16]—a determination he has vigorously denied by providing an account of the April 8 incident contradicting the university's account.[17] These conflicting accounts present the possibility that HINU has punished Parker without a hearing for expression protected under the First Amendment—an untenable result at a university obligated to uphold the constitutional rights of its students.[18]

According to LaCour, Parker appeared "agitated" and "irritated," and engaged in name-calling with a golf club in his hand.[19] Yarnall claimed that Parker "became belligerent and cussed at Steve [LaCour] and called him rude names," but "did not say much to me."[20] Parker admits to feeling annoyed, but denies saying anything threatening to these individuals. He also denies any menacing behavior related to his handling of his golf clubs, and argues that he was simply complying with LaCour's order to pack up his golf equipment and leave. Nor does anything in LaCour's report indicate that Parker took any physical action in response to their argument, only that he was—as he was before the argument—holding a golf club.

Further, if the alleged danger posed by Parker to the HINU community is "immediate," it is unclear why the terms of Parker's emergency suspension require his immediate removal from his residential dorm room, yet allow him to "attend classes, eat lunch meals, use the library and be on the Haskell grounds for other school related purposes."[21] This disparity strongly indicates that the "emergency" removal from housing is punitive, not an interim measure designed to address a compelling need.

Because the context of a statement is vital to determining whether an individual's statements constitute a "true threat" and thus do not enjoy First Amendment protection, HINU's failure to provide Parker with an opportunity to provide this basic information not only violated his right to due process, but likely violated his free speech rights as well.[22] The conflicting

---

[16] Emergency Suspension Notification, *supra* note 4.

[17] Email from Parker to Salvini, *supra* note 1.

[18] *See supra* notes 10–12 and accompanying discussion. Certain well-defined categories of speech are not protected expression under the First Amendment, including a "true threat," which is a statement through which "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Virginia v. Black, 538 U.S. 343, 359 (2003). The context of a statement is essential to determine whether the statement was a "serious threat," or something else: a joke, hyperbole, sarcasm, or other non-serious expression of an intent to commit violence. *See, e.g.*, Watts v. United States, 394 U.S. 705, 707 (1969) (Vietnam War draftee's statement that "the first man I want to get in my sights is" the president, followed by laughter, was not a threat, but political hyperbole), Rankin v. McPherson, 483 U.S. 378, 381–87 (1987) (statement expressing hope that someone might assassinate the president did not amount to a threat).

[19] *Incident Report, supra* note 1 (containing LaCour's account of his interaction with Parker).

[20] James Yarnall, *Activity Log and Door Report* (Apr. 8, 2020) (containing Yarnall's account of his interaction with Parker), http://www.theindianleader.com/wp-content/uploads/2020/04/Parkers-Docuemnts-from-HINU.pdf.

[21] Emergency Suspension Notification, *supra* note 4. None of the reports underlying the Emergency Suspension Notification reference any "substance" use or "misuse" by Parker. *Id.*

[22] While impolite, referring to someone as an "asshole" is not reasonably likely to provoke a violent response from a university employee, and remains protected by the First Amendment. *See, e.g.*, Green v. Barber, 310 F.3d

accounts of Parker's conduct, as well as HINU's obligation to afford due process, Parker's current perilous living situation, and the distinct possibility that Parker remains punished for protected expression—or, at the very least, conduct posing no imminent threat to the HINU community—necessitates a prompt and full hearing for Parker.

III.    **HINU Must Provide a Hearing to Parker Immediately**

HINU's inexcusable delay in scheduling a hearing has already caused great harm to Parker, who eagerly awaits an opportunity to clear his name and resume his education at HINU. This abdication of responsibility to its students must not proceed any further. FIRE calls on HINU to fulfill its obligations by providing Parker with a fair hearing immediately.

Given the urgent nature of this matter, we request receipt of a response to this letter no later than the close of business on Tuesday, April 28, 2020, confirming that HINU has vacated the interim suspension and will afford Parker his right to a fair hearing on the underlying accusations.

Sincerely,

Zachary Greenberg
Program Officer, Individual Rights Defense Program

Cc:     Danelle McKinney, Student Rights Administrator
        Tonia Salvini, Vice President of University Services


Encl.
FERPA Waiver

---

889, 896–97 (6th Cir. 2002) (plaintiff's remark, "you're being [an] asshole," was "not egregious enough to trigger application" of the fighting words doctrine).

USA000194

  

October 26, 2020

Dr. Ronald Graham
Haskell Indian Nations University
Office of the President
Navarre Hall
155 Indian Ave
Lawrence, Kansas 66046-4800

## *URGENT*

*Sent via Electronic Mail (ronald.graham@bie.edu)*

Dear President Graham:

FIRE,[1] NAJA,[2] and the SPLC[3] are concerned about the state of freedom of expression, including freedom of the press, at Haskell Indian Nations University (HINU) in light of your recent directive sent to Jared Nally, editor-in-chief of *The Indian Leader*, HINU's student newspaper. Your directive forbids Nally from carrying on normal journalistic activities, such as requesting information from government agencies, recording interviews, and criticizing members of the HINU community.

Your directive violates the First Amendment and HINU's obligations under a September 1989 settlement agreement with *The Indian Leader*. HINU must immediately rescind the directive,

---

[1] The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.

[2] The Native American Journalists Association (NAJA) serves and empowers Native journalists through programs and actions designed to enrich journalism and promote Native cultures. NAJA recognizes Native Americans as distinct peoples based on tradition and culture. In this spirit, NAJA educates and unifies its membership through journalism programs that promote diversity and defends challenges to free press, speech, and expression. NAJA is committed to increasing the representation of Native journalists in mainstream media. NAJA encourages both mainstream and tribal media to attain the highest standards of professionalism, ethics and responsibility.

[3] Founded in 1974, the Student Press Law Center (SPLC) is the nation's only legal assistance agency devoted exclusively to supporting, defending, and educating high school and college journalists about the rights and responsibilities embodied in the First Amendment and supporting the student news media in covering important issues free from censorship. The SPLC is a nonpartisan, nonprofit organization.

USA000195

restore the *Leader*'s rights to university resources and access to its bank account, and clarify that HINU will not interfere in the affairs of the student newspaper or impede the free expression rights of individual students in the future.

## I.   HINU Threatens Student Journalist with Disciplinary Sanctions

The following is our understanding of the pertinent facts. We appreciate that you may have additional information to offer and invite you to share it with us. Please find enclosed an executed waiver and request for FERPA records authorizing and requesting that you share Jared Nally's student file with FIRE.

### A.   *Nally raises questions about HINU's reporting of student data to the Census.*

In March, Nally began raising questions about how HINU reports student data to the U.S. Census Bureau.[4] Nally was initially concerned that HINU had not submitted census data on behalf of its students.[5] In addition to raising his personal concerns, Nally wrote an article for *The Leader* discussing HINU's institutional response to the Census on behalf of students.[6]

In late August, Nally discovered HINU had submitted student data to the Census but had not asked students to self-report racial or gender identities to be reported to the Census.[7] At this point, Nally became concerned that HINU had engaged in discrimination against biracial students by reporting all students as "Native American," regardless of their personal identities.[8]

As part of his concerns about whether and how HINU had reported student census data, Nally lodged concerns about Tonia Salvini, HINU's Vice President of University Services, with the Community Police Review Board (CPRB) of the City of Lawrence, on which Salvini sits.[9] Nally initially raised his concerns with the CPRB via public comments during CPRB meetings and lodged an official ethics complaint concerning Salvini on October 9.[10]

Also on October 9, Nally submitted a grievance to your office regarding his concerns about HINU's handling of the Census and reporting of student racial identities in the future.[11]

---

[4] Email from Nally to Ernie Wilson, Acting Supervisor: College Resident Assistant, HINU, and Tonia Salvini, Vice Pres. of Univ. Services, HINU (Mar. 24, 2020) (on file with author); *see also* letter from Nally to Salvini (Aug. 28, 2020) (on file with author).
[5] *Id.*
[6] Jared Nally, *2020 Census*, INDIAN LEADER, Apr. 13, 2020, http://www.theindianleader.com/2020/04/13/2020-census.
[7] Letter from Nally, *supra* note 1.
[8] *Id.*
[9] *Id.*
[10] Letter from Nally to CPRB (Oct. 9, 2020) (on file with author).
[11] Letter from Nally to Graham (Oct. 9, 2020) (on file with author).

### B.     *Nally legally records an HINU administrator without her knowledge.*

In July, when HINU announced its student fees would increase, Nally called financial aid coordinator Carlene Morris to inquire about his own financial aid situation and to gather more information about the change.[12] Nally recorded his conversation with Morris without seeking her permission, as is allowed under Kansas law.[13] Nally later used this recording in an opinions article regarding the fee change.[14]

### C.     *The* Leader *objects to an administratively-appointed faculty adviser.*

In July, the *Leader*'s faculty adviser, Rhonda LeValdo, informed the publication staff that because HINU's administration was requiring that faculty cease their roles as student organization advisers, she would no longer be able to serve as faculty adviser.[15] In LeValdo's stead, your predecessor appointed Interim Dean of Humanities Joshua Falleaf to advise the student newspaper.[16]

Concerned that the appointment of an administrator as an adviser would imperil their right to engage as members of a free, independent student press, the *Leader*'s officers unanimously voted to remove Falleaf as faculty adviser.[17] While it is not clear the *Leader*'s officers had the right to remove a faculty adviser at the time of the vote to remove Falleaf, the student officers were concerned that advisory oversight from an administrator would ultimately lead to violations of their First Amendment rights and the 1989 Agreement, which prohibits agents of the university from "inhibiting the free expression of members of" the *Leader*.[18]

On August 27, per its rights under the 1989 Agreement to alter its Plan of Operation,[19] the *Leader* altered its Plan of Operation for the 2020-21 school year (the 2020-21 Plan), implementing a new procedure for HINU's appointment of faculty advisers.[20] The 2020-21

---

[12] *See* Jared Nally, *It's Not Just $475*, INDIAN LEADER, July 10, 2020, http://www.theindianleader.com/2020/07/10/its-not-just-475.
[13] *See* KAN. STAT. ANN. § 21-6101(a)(1).
[14] Nally, *supra* note 12.
[15] Email from Nally to Joshua Falleaf, Interim Dean of Humanities, HINU, Jul. 29, 2020 (on file with author); email from Jim Rains to Rhonda LeValdo and Nally (July 31, 2020) (on file with author).
[16] *Id.*
[17] *Id.*
[18] *Id.*; Letter from Nally to Jim Rains, Acting Vice President of Academics, HINU (Aug. 3, 2020) (on file with author). *See* Settlement Agreement between HINU Indian Junior College of the Bureau of Indian Affairs and the Indian Leader Association (Sept. 19, 1989) (on file with author).
[19] Settlement Agreement, *supra* note 18 ("HINU agrees that no officer, agent, instructor, or employee shall . . . refuse to approve a Plan of Operation for [the *Leader*] substantially similar to the attached Plan. . . . [N]othing in this Settlement Agreement is intended to prevent members of *The Indian Leader Association* from adopting a Plan of Operation . . . substantially dissimilar to the attached Plan").
[20] The Indian Leader Association 2020-2021 Plan of Operations, THE INDIAN LEADER ASSOCIATION, *http://www.theindianleader.com/wp-content/uploads/2020/09/2020-2021-Plan-of-Operations.pdf* (last visited Oct. 20, 2020).

4

Plan provides that the *Leader* will nominate advisers, which will then be appointed by HINU.[21] Further, the 2020-21 Plan provides for removal of a faculty adviser by petition by a majority vote of the *Leader* officers.[22]

### D.   *Nally pursues a story by requesting information from local government.*

In October, when a food service employee of HINU died, Nally began gathering information about her death in order to report it in the *Leader*.[23] As part of this investigation, Nally reached out to the local police for any information they might have regarding the death.[24] In his email to the Lawrence Police Department, Nally accurately identified himself as "a student writer for *The Indian Leader*."[25] A copy of Nally's email is enclosed for reference.

### E.   *You send an October 16 "directive" to Nally.*

On October 16, you sent Nally a written memo, styled as a "directive," reciting a variety of grievances about his reporting and criticism of HINU administrators, and threatening him with "disciplinary action" for failing to show students, staff, and "officials" the "appropriate respect."[26] A copy of your October 16 "directive" is enclosed.

In particular, the "directive" accuses Nally of:

- "routinely attack[ing] HINU employees" by writing letters and speaking in public;
- "demanding information" while holding himself out as editor of the *Leader*;
- advocating for the removal of Falleaf as the *Leader* adviser; and
- recording his call with Morris, which would "[i]n many states . . . be considered a felony[.]"[27]

---

[21] *Id.*

[22] *Id.*

[23] *See* Jared Nally, *Curtis Worker Nia Schexnider Passes On*, THE INDIAN LEADER, Oct. 9, 2020, http://www.theindianleader.com/2020/10/09/curtis-worker-nia-schexnider-passes-on.

[24] Email from Nally to the Lawrence Police Department (Oct. 5, 2020) (on file with author).

[25] *Id.*

[26] Letter from Graham to Nally (Oct. 16, 2020) (on file with author).

[27] While this is an accurate statement regarding the law of *other states*, your directive failed to mention the fact that Kansas follows a one-party consent rule. That is, so long as a single party to a private conversation (here, Nally) consents to the recording thereof, the recording is absolutely legal and valid. KAN. STAT. ANN. § 21-6101(a)(1).

After warning Nally that disciplinary consequences could follow his non-compliance, your "directive" specifically instructs Nally that he "WILL" treat "all faculty members, staff, and students with the highest respect," and:

**You will NOT:**

- Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus,
- Make demands on any governmental agency – or anyone else from HINU – while claiming to represent *The Indian Leader*.
- Attempt countermanding decisions of HINU personnel assigned by me or anyone else to positions in an effort to replace them,
- Record anyone at HINU in your interview unless you advise them first and they grant you permission.

Around the same time as your "directive" to Nally, the *Leader* faced significant difficulty renewing its status as an officially recognized[28] organization for the 2020-21 school year. In years past, the *Leader* has completed an annual recognition process by submitting its annual Plan of Operations and minutes from its first meeting to the Student Bank. Following this submission, the Student Bank has typically provided a signature card to be completed by elected officers and students' chosen faculty adviser.

Following its implementation of the 2020-21 Plan, on September 10, the *Leader* submitted this and its first meeting minutes to the Student Bank, which controls the disbursement of student funds to recognized student organizations.[29] Unlike in previous years, the *Leader* has not heard back from the Student Bank, despite multiple attempts to get in contact.[30] During this time, the *Leader* has also been unable to ascertain the balance of its account with the Student Bank[31] and has yet to be formally assigned an adviser for the 2020-21 school year, despite its nomination of its previous adviser, LeValdo.

## II.   Your "Directive" Violates the First Amendment Rights of Nally and the *Leader*

It has long been settled law that the First Amendment is binding on public colleges like HINU. *Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should

---

[28] We understand that HINU refers to its official student organization recognition process as "sanctioning." We refer to it as "recognition" throughout this correspondence, as most institutions of higher education do, for the sake of distinguishing between recognizing the *Leader* and HINU's unlawful threats to impose disciplinary sanctions on its editor.

[29] Email from Nally to Jeri Sledd, Student Bank Manager, HINU (Sept. 10, 2020) (on file with author).

[30] *See id.*; email from Nally to Sledd (Oct. 19, 2020) (on file with author).

[31] Oct. 19 email, *supra* note 30.

apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'") (internal citation omitted). Indeed, the 1989 settlement agreement—which you concede is a binding agreement[32]—obligates Haskell Indian Nations University in particular to protect the First Amendment rights of the student publishers of the *Leader*.

### A.     *The actions identified in your "directive" are protected speech.*

Your directive to Nally threatens to punish him for engaging in normal journalistic activity, violating the expressive rights of both Nally and the publication that he leads.

### i.     **Criticism of university officials is constitutionally-protected speech.**

Your first demand is that Nally abstain from "[a]ttack[ing] any student, faculty, or staff member . . . [in] any public forum." Based on your description earlier in the "directive" of what constitutes an "attack"—namely, criticizing the actions of campus officials by lodging written and oral complaints—it is clear that your "directive" contemplates disciplinary action for a broad range of journalistic and expressive activity protected by the First Amendment.

Not only is criticism often a part of journalism, criticism of government officials—and, to be clear, as administrators of a public institution, HINU administrators are such officials—is at the core of the First Amendment's protection. "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270 (1941). So central is this ability to criticize officials that the Supreme Court, affirming that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp **attacks** on government and public officials," determined that a higher standard of fault applies to speech-related torts where a public official is the plaintiff. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasis added).

This right to criticize applies both to the press and to individuals. In other words, Nally retains a right to "attack"—as both you and the Supreme Court put it—HINU administrators both as a journalist, such as by writing a story for the *Leader*, and as an individual, such as by writing a letter to your superior or offering public comment at a government meeting. Because Nally's right to criticize is protected by the First Amendment, you may not punish him for doing so. Your "directive" expressly threatens to do so.

The First Amendment right to criticize and engage with government officials, such as administrators at a public university or officials at the local police department, also protects Nally's ability to "[m]ake demands on any governmental agency" and "[a]ttempt countermanding decisions of HINU personnel," activities to which you expressed displeasure in your directive. These activities, in addition to being protected by the First Amendment

---

[32] Letter from Graham, *supra* note 26.

rights of free speech and free press, are also protected by the "cognate right" to petition the government. *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

This right includes actions that you refer to as "[a]ttempt[ing to] countermand[] decisions of HINU personnel"—that is, expressing displeasure in HINU's choice of faculty adviser for the *Leader* and attempting to take action to secure a different adviser. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives[.]" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). This includes Nally and the *Leader*'s right to express concerns with their appointed adviser, and, in fact, to demand a different faculty adviser be appointed. Nothing in this right requires individuals to *only* express their ideas to government officials when their ideas align with those of the officials whom they contact.

This right also encompasses "request[ing] action by the government," *id.* at 388–89, protecting Nally's right to "[m]ake demands of" government agents. This shields Nally's right to request information and records from HINU, the local police department, or any other government agency. Further, Nally and the *Leader*'s right to request records from government agencies is not only protected by the First Amendment but also by Kansas law. In Kansas, "[a]ll public records shall be open for inspection by any person," with some exceptions. Kan. Stat. Ann. § 45-218(a). It necessarily follows that coupled with this right to inspect records is a corollary right to *request* their inspection.

> ii.   **Kansas law allows recording of private conversations with the consent of only one party.**

The First Amendment not only protects the spoken and written word, but encompasses the "act of making an audio or audiovisual recording" as a necessary "corollary of the right to disseminate the resulting recording." *Am Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012). "The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of making the recording is wholly unprotected." *Id.* This includes the act of "nonconsensual audio recording." *Id.* at 596–97. Accordingly, federal courts of appeal have long recognized a right to receive and record information, including a right to record matters of public interest. *See, e.g.*, *Forcyde v. City of Seattle*, 55 F.3d 436. 439 (9th Cir. 1995) (discussing a "First Amendment right to film matters of public interest"); *Gilk v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011) (although "not unqualified, a citizen's right to film government officials . . . in the discharge of their duties in a public duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment").

The right to record government actors is perhaps at its highest importance when connected to the right of the press to gather information. *See Branzburg v. Hayes*, 408 U.S. 655, 681 (1972). The press, including the student press, serves as an important conduit in preserving the public's right to know. Courts recognize that the press act as "surrogates for the public" in keeping a watchful eye on their communities, and especially on the actions of government

USA000201

agents, such as those acting on behalf of public colleges and universities. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573 (1980).

While the right to record is qualified in some states by privacy statutes requiring the consent to record from all parties to a conversation,[33] the right is not so qualified in Kansas—a fact your "directive" implicitly recognizes by invoking the laws of *other* states as rendering such recordings potential felonies. Under the law of Kansas—the state in which HINU sits—it is a crime to record a telephone call "without the consent of the sender or receiver." Kan. Stat. Ann. § 21-6101(a)(1).[34] In the situation with Morris, Nally initiated the telephone call and had the right to record it without Morris' consent. Because his actions in recording HINU officials are protected by the First Amendment and Kansas law, you may not punish him for participating in legal newsgathering techniques.[35]

> **B.   Threatening retaliation against Nally or the Leader for their free expression violates the First Amendment.**

It is well-established that public institutions of higher education "may not constitutionally take adverse action against a student newspaper, such as withdrawing or reducing the paper's funding, because it disapproves of the content of the paper." *Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir. 1983); *see also Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829–30 (1995). The United States Court of Appeals for the Second Circuit has expanded on this concept to explain:

> [A]t a minimum, when a public university establishes a student media outlet and requires no initial restrictions on content, it may not censor, retaliate, or otherwise chill that outlet's speech, or the speech of the student journalists who produce it, on the basis of content or viewpoints expressed through that outlet.

*Husain v. Springer*, 494 F.3d 108, 124 (2d Cir. 2007).

It is equally true that retaliation against *any actor*—whether an individual student or the campus paper—for participating in First Amendment-protected activity is unconstitutional. Where a government actor responds to protected speech with an "adverse action" that would "chill a person of ordinary firmness from continuing in the activity," it has engaged in impermissible retaliation. *Revels v. Vincenz*, 382 F.3d 876 (8th Cir. 2004). This "well established" test does not require a "great" deal of discipline in order to be "actionable," and the "objective" test asks "not whether the plaintiff herself was deterred" from speaking but

---

[33] For a state-by-state discussion of recording statutes, *see Reporters' Recording Guide*, Reporters Committee for Freedom of the Press, https://www.rcfp.org/reporters-recording-guide (last visited Oct. 21, 2020).

[34] The Kansas Supreme Court has interpreted the state's recording statute as enjoining "only interceptions without the consent of *either* the sender *or* the receiver." *State v. Roudybush*, 235 Kan. 834, 842 (1984).

[35] Even assuming that HINU, a federally-operated institution, could impose a more restrictive standard, it has not done so and may not do so retroactively. Further, federal law permits a party to a call to record that call. 18 U.S.C. § 2511(2)(d).

whether a reasonable person may be so deterred. *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003).

Here, HINU has taken two adverse actions: First, it has threatened disciplinary action against Nally if he continues to engage in your enumerated list of First Amendment-protected activities. Second, it has retaliated against the *Leader* by refusing to complete the normal recognition process, thereby denying the *Leader*'s access to its bank account and other resources. Each of these actions, individually, is enough to "chill a person of ordinary firmness" from continuing to engage in protected speech that HINU administrators find objectionable.

While Nally appears to be an exceptionally resilient individual and has continued to self-advocate despite HINU's actions and threats, the chilling effect is nonetheless borne out here in the reasonable apprehension Nally feels about engaging in normal activities on behalf of the *Leader* in his role as its editor-in-chief. For example, after receiving your directive, Nally was nervous to once again prod the Student Bank to ask about the *Leader*'s account balance, worried that doing so might result in discipline. This result is untenable and cannot be squared with HINU's obligations as a public institution bound to uphold the First Amendment.

> ### C. Threatening to punish a student journalist for engaging in journalistic activities violates the 1989 Agreement.

In the 1989 Agreement, HINU, then Haskell Indian Junior College of the Bureau of Indian Affairs, agreed to allow students to retain full editorial control over the *Leader*. This includes the right of the *Leader* to access its monies in its Student Bank account, as well as its right to engage in journalistic pursuits free from censorship.

While the 1989 Agreement does not explicitly forbid HINU from punishing students for their protected journalistic activities, it does forbid HINU from "otherwise inhibit[ing] the free expression of members of [the *Leader*] in violation of the First Amendment[.]"[36] As outlined here, your directive and HINU's refusal to follow the usual sanctioning processes for the *Leader* violate the First Amendment, and thereby also violate the 1989 agreement.

### III.   HINU Must Rescind the "Directive" and Immediately Recognize the *Leader*

Your "directive" to Nally is an appalling and unequivocal departure from the First Amendment, betraying willful blindness to the basic concepts of constitutional rights. A public college administrator who violates clearly established law will not retain qualified immunity and can be held personally responsible for monetary damages for violating First Amendment rights under 42 U.S.C. § 1983. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Citing—in the course of violating students' expressive rights—a settlement agreement

---

[36] Settlement Agreement, *supra* note 18.

USA000203

obligating you to respect the First Amendment is a stark illustration of a "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Given the urgent nature of this matter, we request receipt of a response to this letter no later than the close of business on November 2, 2020.

Sincerely,

Lindsie Rank
Program Officer
Individual Rights Defense Program, Foundation for Individual Rights in Education

Francine Compton
President
Native American Journalists Association

Sommer Ingram Dean
Staff Attorney
Student Press Law Center

Encl.

USA000204

DocuSign Envelope ID: B3FA967E-5913-4FDC-94C5-578A0AB2475E

# Authorization and Waiver for Release of Personal Information and Request for FERPA Records

This is an authorization for the release of records and information, as well as a request for records, under the Family Educational Rights and Privacy Act (20 U.S.C. § 1232g) and its applicable regulations (particularly 34 CFR § 99.30).

I, Jared Eugene Nally , born on 05/05/1993 , do hereby authorize Haskell Indian Nations University (the "Institution") to release to the Foundation for Individual Rights in Education ("FIRE") any and all information concerning my current status, disciplinary records, or other student records maintained by the Institution, including records which are otherwise protected from disclosure under the Family Educational Rights and Privacy Act of 1974. I further authorize the Institution to engage FIRE's staff members in a full discussion of all matters pertaining to my status as a student, disciplinary records, records maintained by the Institution, or my relationship with the Institution, and, in so doing, to fully disclose all relevant information. The purpose of this waiver is to provide information concerning a dispute in which I am involved.

I have reached or passed 18 years of age or I am attending an institution of postsecondary education.

In waiving such protections, I am complying with the instructions to specify the records that may be disclosed, state the purpose of the disclosure, and identify the party or class of parties to whom disclosure may be made, as provided by 34 CFR 99.30(b)(3) under the authority of 20 U.S.C. § 1232g(b)(2)(A).

**Records requested under FERPA:** I request access to and a copy of all documents defined as my "education records" under 34 CFR § 99.3, including without limitation:
- A complete copy of any files kept in my name in any and all university offices;
- any emails, notes, memoranda, video, audio, or other material maintained by any school employee in which I am personally identifiable;
- any and all phone, medical or other records in which I am personally identifiable; and
- the log of requests for and disclosures of my education records, as required by 34 CFR § 99.32(a).

USA000205

DocuSign Envelope ID: B3FA967E-5913-4FDC-94C5-578A0AB2475E

**Records requested under state public records law:** To the extent the applicable public records law would require a faster response, a more comprehensive response, or production of copies of records:
- I request, pursuant to the applicable state public records law, copies of all records that would be available for my inspection under FERPA;
- To the extent the public records law allows disclosure of responsive records, I request that such records be produced in an electronic format, preferably by email.

**Fees:** I agree to pay any reasonable copying and postage fees of not more than $20. If the cost would be greater than this amount, please notify me. Bear in mind, however, that FERPA prohibits the imposition of a fee to search or retrieve records (34 CFR § 99.11).

**Request for Privilege Log:** If any otherwise responsive documents are withheld on the basis that they are privileged or fall within a statutory exemption, please provide a privilege log setting forth (1) the subject matter of the document; (2) the person(s) who sent and received the document; (3) the date the document was created or sent; and (4) the basis on which it is the document is withheld.

**Request for Redaction Log:** If any portion of responsive documents must be redacted, please provide a written explanation for the redaction including a reference to the statutory exemption permitting such redaction. Additionally, please provide all segregable parts of redacted materials.

Per 34 CFR § 99.10(b), these records must be made available within **45 days**.

I request that the records be sent to me via email at [PII] and to FOIA@thefire.org.

This authorization and waiver does not extend to or authorize the release of any information or records to any entity or person other than the Foundation for Individual Rights in Education, and I understand that I may withdraw this authorization in writing at any time. I further understand that my execution of this waiver and release does not, on its own or in connection with any other communications or activity, serve to establish an attorney-client relationship with FIRE.

USA000206

DocuSign Envelope ID: B3FA967E-5913-4FDC-94C5-578A0AB2475E

I also hereby consent that FIRE may disclose information obtained as a result of this authorization and waiver, but only the information that I authorize.

DocuSigned by:

Jared Nally

81C2B4531DAF45F...

10/23/2020

Student's Signature                                    Date

USA000207



# HASKELL INDIAN NATIONS UNIVERSITY

**Office of the President**
155 Indian Avenue
Lawrence, Kansas  66046-4800
**www.haskell.edu**

# Memorandum

Date:   October 16, 2020

To:        Jared Nally

From:     Dr. Ronald Graham, President

Subject:   ***Directive***

Jared, I work directly with the Lawrence community at several different levels (i.e., the Mayor and City Manager's Office, Lawrence Police Department, the Chamber of Commerce, and the Rotary). My intention is to build relationships, identify training and internships, work with the community on their projects as a representative from Haskell, and create opportunities for Haskell students. Your name has been identified recently, and on more than one occasion, as someone who routinely attacks Haskell employees with letters; recently, you attacked a Haskell official during a community event.  Further, you have been identified as calling the police department and demanding information regarding a deceased Haskell employee while representing yourself as an editor for *The Indian Leader*. Under no circumstances do you have the authority to contact the police department (or any other governmental agency) and demand anything on behalf of the University.  Your behavior has discredited you and this university. You have compromised your credibility within the community and, more importantly, you have brought yourself, *The Indian Leader*, Haskell, and me unwarranted attention.

Earlier this summer, Josh Falleaf was assigned as the Faculty Advisor by Dr. Rains, the University's Acting Vice President of Academic Affairs, to advise *The Indian Leader* staff pursuant to University guidelines.  You took it upon yourself to attempt to remove him from this position per your letter dated August 3, 2020.  Mr. Falleaf was placed in an Acting Dean's position by me; however, he is first and foremost a Haskell Instructor.  In that, he is appropriately qualified to serve as the University's appointed Faculty Advisor to *The Indian Leader*.  Neither you nor any member of *The Indian Leader* staff has the authority to "vote out" the University-appointed Faculty Advisor; appointing the Faculty Advisor is the exclusive right of the University and it is in accordance with the 1989 court settlement.  You are a student at this University; you are not entitled to reverse Executive-level decisions. Furthermore, you essentially called Dr. Rains a liar in your email (referring to Mr. Falleaf's assignment), which violates Student Conduct.

You also chose to talk to yet another university official, Ms. Carlene Morris, and to record her conversation with you surreptitiously – and without her permission.  This action resulted in yet another complaint against you.  In many states, this would be considered a felony.  You invoked Kansas law to justify disrespectful behavior toward a university official. In the future, I strongly advise that you – out of respect, honesty, and journalistic codes of ethical conduct -- obtain permission from anyone from whom you seek to solicit information for your paper – especially information that is freely available to Haskell students.

USA000208

I will remind you that you are a student first and foremost on this campus, and your conduct falls under the umbrella of the Student Conduct Code. Your role on *The Indian Leader* does not absolve you from your responsibilities as a Haskell student – and as a representative of our community. Henceforth, you will conduct yourself in accordance with the Haskell Student Code of Conduct -- now and in the future; and you will treat fellow students, University staff, and University officials with appropriate respect. Failure to do so, may result in disciplinary action.

Let me make myself clear. You are being directed, as a Haskell student. To comply with the following:

**You will NOT:**

- Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus,
- Make demands on any governmental agency -- or anyone else from Haskell -- while claiming to represent *The Indian Leader*.
- Attempt countermanding decisions of Haskell personnel assigned by me or anyone else to positions in an effort to replace them,
- Record anyone at Haskell in your interviews unless you advise them first and they grant you permission.

**You WILL:**

- Treat all faculty members, staff, and students with the highest respect.
- Conduct yourself as a student under the umbrella of Code of Conduct.
- Understand that no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them.

Lastly, Haskell is not obligated to report any census. If you wish to be counted differently, I strongly suggest that you do what many of us do: contact the US. Census Bureau and file an individual report.


Cc:     BIE Legal

        Tony Dearman
        Director of BIE

 **Jared Nally** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## Media Inquiry - The Indian Leader

2 messages

**Jared Nally** ▓▓▓▓▓▓▓▓▓▓▓▓▓                                    Mon, Oct 5, 9:13 AM
To: <lpdmedia@lkpd.org>

I'm reaching out the the Lawrence Police Department as a student writer for The Indian
Leader, Haskell Indian Nations University's student newspaper. I'm wanting to get
confirmation and information on the death of Neeoni Chex to provide our community with
a proper death notice. She was a community pilar and I would appreciate any information
you could provide.

She would have died sometime yesterday, October 4, before 4:00 PM CST. Please let me
know if LPD can confirm her death, cause of death, and provide a funeral home if
possible.

Thank You,
-Jared Nally, Editor-In-Chief

**Patrick S. Compton** <pscompton@lkpd.org>                      Mon, Oct 5, 3:24 PM
To: Jared Nally ▓▓▓▓▓▓▓▓▓▓▓▓▓

Jared,

Jared,

Thank you for inquiry.

My apologies, but we do not generally do police records searches by name. Do you have
any other information on the location (Was it in Lawrence?), or circumstances of her
death?

Best,

Patrick

Patrick Compton
Public Affairs
Lawrence, Kansas Police Department
4820 Bob Billings Parkway
Lawrence, KS 66049
(785) 830-7409
pscompton@lkpd.org
https://www.facebook.com/LawrencePolice
https://twitter.com/lawrenceks_pd
[Quoted text hidden]

USA000211



**HASKELL INDIAN NATIONS UNIVERSITY**

**Office of the President**
155 Indian Avenue
Lawrence, Kansas  66046-4800
www.haskell.edu

Dear Mr. Nally,

I am writing in response to a letter from FIRE, dated October 26, 2020, requesting I rescind the memorandum I directed to you on October 16, 2020.  I hereby rescind the October 16 memorandum, including the directives contained therein.

The October 16 letter originated because of Haskell staff members' concerns and complaints regarding certain methods employed to obtain information.  They perceived these methods to be needlessly aggressive and, at times, deceitful. However, I acknowledge that we took an incorrect approach to address those concerns through the issuance of the October 16 memorandum.   Accordingly, I commit that Haskell will not interfere in the affairs of the Indian Leader or impede the free expression rights of individual students at Haskell.
I instructed my staff to review the status of the Leader's annual recognition process to ensure continued access by the Leader to its Student Bank account and Haskell resources.

Sincerely,

Dr. Ronald Graham, President

Cc:  Lindsie Rank, FIRE
        Francine Compton, Native American Journalists Association
        Sommer Ingram Dean, Student Press Law Center
        Tony Dearman, BIE Director

*The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the leading institution of academic excellence, cultural and intellectual prominence, and holistic education that addresses the needs of Indigenous communities.*

  

January 19, 2021

Dr. Ronald Graham
Haskell Indian Nations University
Office of the President
Navarre Hall
155 Indian Ave
Lawrence, Kansas 66046-4800

*Sent via Electronic Mail (ronald.graham@bie.edu)*

Dear President Graham:

On January 14, FIRE,[1] NAJA,[2] and the SPLC[3] received an email from Jennifer Wiginton of the Bureau of Indian Education (BIE) notifying us that your directive of October 16, 2020, was rescinded and attaching a letter from you, addressed to Jared Nally, to that effect. While Wiginton asserted that you had intended to send this letter on November 20, the letter was itself undated, and the letter's metadata reveals that it was last edited after that date. It would appear that this letter was only belatedly sent to us and to Nally last week as a result of the BIE's investigation into your directive.

Rescission of your unconstitutional directive of October 16, 2020—which barred Jared Nally, editor-in-chief of *The Indian Leader*, from engaging in basic newsgathering and expressive activities protected by the First Amendment—was appropriate. While it is important that *The Indian Leader* may now do its work without the chill of censorship hanging over it, your

---

[1] The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.

[2] The Native American Journalists Association (NAJA) serves and empowers Native journalists through programs and actions designed to enrich journalism and promote Native cultures. NAJA recognizes Native Americans as distinct peoples based on tradition and culture. In this spirit, NAJA educates and unifies its membership through journalism programs that promote diversity and defends challenges to free press, speech, and expression. NAJA is committed to increasing the representation of Native journalists in mainstream media. NAJA encourages both mainstream and tribal media to attain the highest standards of professionalism, ethics and responsibility.

[3] Founded in 1974, the Student Press Law Center (SPLC) is the nation's only legal assistance agency devoted exclusively to supporting, defending, and educating high school and college journalists about the rights and responsibilities embodied in the First Amendment and supporting the student news media in covering important issues free from censorship. The SPLC is a nonpartisan, nonprofit organization.

USA000213

administration's inexcusable and unexplained delay evidences continuing negligence in protecting your students' First Amendment rights. As a result, serious concerns remain about the state of freedom of speech and of the press at Haskell Indian Nations University (HINU). To that end, we request that HINU take further actions to revise its student code of conduct to comport with the First Amendment and notify students of these changes.

Three organizations concerned with students' rights wrote a letter to you on October 26, 2020, seeking your urgent attention and calling for an "immediate" rescission of a patently unconstitutional directive to a student journalist. At best, your intended response—accepting as true the BIE's representations that your undated letter was intended to be sent on November 20—would have come some thirty-five days after your October 16 order that Nally cease exercising his First Amendment rights. As it stands, that rescission was not communicated to Nally until eighty-nine days after the October 16 order.

It is absolutely inappropriate and inexcusable that it took HINU three months to rescind a directive that was unconstitutional from day one, regardless of the reason for the delay. For three months, your directive caused Nally and *The Leader* uncertainty as to their fundamental First Amendment rights, causing serious injury to their constitutional rights. This violated both the First Amendment and *The Leader*'s 1989 settlement agreement with the university.[4] While we appreciate that you and your leadership team have taken some belated steps to countermand your directive, further action must be taken to make these students—and all students at HINU—whole.

This is especially true given that, in addition to being a flagrant violation of the First Amendment, your directive also represented a departure from HINU's usual student conduct process.[5] Despite the process for adjudicating student conduct violations laid out in HINU's student handbook,[6] Nally did not receive fair notice that he was being accused of violating university policy, nor did he receive a hearing or other opportunity to be heard. Instead, Nally was subject to only a unilateral—and unconstitutional—diktat, imposing penalties on Nally and *The Leader* for three months without any due process.

Unfortunately, this complete disregard for Nally's rights appears consistent with HINU's worrying lack of concern for student rights in general. This is further evidenced by HINU's Student Rights Office web page, which continues to read, "Lorem ipsum dolor sit amet, consectetuer adipiscing elit, sed diam nonummy nibh euismod tincidunt ut laoreet dolore magna aliquam erat volutpat"—three months after FIRE, NAJA, and SPLC first alerted you of this oversight in our letter of October 26, 2020. Additionally, HINU does not make any

---

[4] Settlement Agreement between HINU Indian Junior College of the Bureau of Indian Affairs and the Indian Leader Association (Sept. 19, 1989) (on file with author).

[5] *See* Haskell Indian Nations University Student Handbook Code of Conduct at 23–35, *available at* https://haskell.edu/wp-content/uploads/2017/01/Haskell-CSC-Table-of-Contents-7-22-16.pdf (last visited Jan. 15, 2021).

[6] *Id.*

student handbook available on its website, leaving students in the dark as to their rights and responsibilities.[7]

Of particular concern are HINU's "CIRCLE" values, which restrict student expression rights at HINU.[8] CIRCLE, an acronym ("Communication, Integrity, Respect, Collaboration, Leadership, and Excellence"),[9] presents laudable goals, but HINU cannot mandate these goals without departing from its obligations under the First Amendment.

For example, a government entity cannot mandate that individuals be respectful or demonstrate integrity in their expression. This is because the First Amendment, distilled to its most fundamental concepts, is intended to protect expression when it is controversial or upsetting to others, might be seen as disrespectful, or even might be seen to fully lack integrity. The Supreme Court has repeatedly, consistently, and clearly held that expression may not be restricted merely because some, many, or even most find it to be offensive or rude. This core First Amendment principle is why the authorities cannot ban the burning of the American flag,[10] prohibit the wearing of a jacket emblazoned with the words "Fuck the Draft,"[11] penalize satirical advertisements describing a pastor losing his virginity to his mother in an outhouse,[12] or disperse civil rights marchers out of fear that "muttering" and "grumbling" white onlookers might lead to violence.[13] In ruling that the First Amendment protects protesters holding signs outside of soldiers' funerals (including signs that read "Thank God for Dead Soldiers," "Thank God for IEDs," and "Fags Doom Nations"), the Court reiterated this fundamental principle, remarking that "[a]s a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate."[14]

This principle does not lose its salience in the context of the public university. To the contrary, a commitment to expressive rights must be robust and uncompromising if students and faculty are to be free to engage in debate and discussion about the issues of the day in pursuit of advanced knowledge and understanding. This dialogue may encompass speech that shows disrespect or offends. For example, the Supreme Court upheld as protected speech a student newspaper's use of a vulgar headline ("Motherfucker Acquitted") and a front-page "political cartoon . . . depicting policemen raping the Statue of Liberty and the Goddess of Justice."[15]

---

[7] Only by using Google to search for "Haskell Indian Nations Handbook" can one find outdated codes of conduct from 2012, 2015, and 2016. Because it is the most recent student handbook either FIRE or Nally could locate, this letter will reference HINU's 2016 Student Handbook and Code of Conduct.

[8] "Discussion and expression of all views is permitted, consistent with Haskell's CIRCLE values . . . " Handbook, *supra* note 5, at 11.

[9] *Id.* at 6-7.

[10] *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (burning the American flag was protected by the First Amendment, the "bedrock principle underlying" the holding being that government actors "may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

[11] *Cohen v. California*, 403 U.S. 15, 25 (1971).

[12] *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988).

[13] *Cox v. Louisiana*, 379 U.S. 536, 557 (1965).

[14] *Snyder v. Phelps*, 562 U.S. 443, 448, 461 (2011).

[15] *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 667–68 (1973).

USA000215

There is no doubt that many found these images deeply disrespectful at a time of political polarization and civil unrest, yet "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"[16]

Further, your directive indicated that you believe criticism of government officials—such as HINU administrators—to be disrespectful, and thus in contravention of HINU's CIRCLE policy. However, again, the Supreme Court has specifically held that constitutionally-protected public debate "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."[17]

In an effort to remedy its callous disregard for the rights of its students, including Nally and *The Leader*, HINU must take substantial steps to ensure that its policies and practices protect the rights of its students. To this end, we ask HINU to do the following:

1. Revise its CIRCLE values to make clear that these are aspirational, not mandatory.
2. Amend its Classroom Expression[18] and Campus Expression[19] policies to make clear that the right to free expression is not contingent upon compliance with the CIRCLE values. Further, the policy should be amended to clarify that student press and speech may be regulated by the university only if the expression falls into a category unprotected by the First Amendment, such as true threats, harassment, or incitement.
3. Distribute a revised student handbook to all HINU students, and ensure that the updated handbook is easily found and publicly available on HINU's website.
4. Ensure that all outdated versions of HINU's policies are removed from the website or marked clearly to indicate they are no longer in effect.

Making these revisions to the student handbook and ensuring that students are aware of these changes will begin to make amends for the hostile free expression climate HINU has created.

We also understand that *The Leader*'s new Plan of Operations—including the newspaper's right to nominate and have confirmed a faculty adviser of its own choice, and its right to request that its faculty adviser be removed—will be approved.[20]

As we ensure that HINU does, in fact, intend to repair its relationship with Nally and *The Leader*, please also see the attached request for records pursuant to the Freedom of Information Act (5 U.S.C. § 552), which was also filed using the online portal on FOIA.gov.

In addition, HINU must preserve all documents and electronically stored information as defined by Rule 34 of the Federal Rules of Civil Procedure, that are relevant to this dispute.

---

[16] *Id.*
[17] *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).
[18] Handbook, *supra* note 5, at 10.
[19] *Id.* at 11.
[20] Please see our letter of October 26, 2020 for a discussion of the constitutional pitfalls of preventing student journalists from being able to direct the leadership of their own publications.

This includes any electronically stored information located on the "haskell.edu" email server. This includes without limitation electronic data within HINU's custody and control that is relevant to this dispute, including without limitation emails, instant messages, and other information contained on HINU's computer systems and any electronic storage systems. This also includes electronic data contained in computers, cellular phones, and other devices used by HINU administrators. As such, HINU must ensure that all HINU administrators involved in this dispute have preserved all electronic data relating to Nally and *The Leader* on their personal devices.

No procedures should be implemented to alter any active, deleted, or fragmented data. Moreover, no electronic data should have been disposed of or destroyed. We trust that HINU will continue to preserve such documents and electronically stored information.

Your directive to Nally represented a brazen departure from your First Amendment obligations, and it came as part of a pattern of unconstitutional actions at HINU.[21] In order to move forward, HINU must take clear actions to demonstrate that it will now take its First Amendment obligations seriously. We request receipt of a response to this letter no later than the close of business on January 26, 2021.

Sincerely,

Lindsie Rank
Program Officer, Individual Rights Defense Program
Foundation for Individual Rights in Education

Francine Compton
President
Native American Journalists Association

Sommer Ingram Dean
Staff Attorney
Student Press Law Center

Cc:     Jennifer Segal Wiginton, Bureau of Indian Education Team Lead
        Division of Indian Affairs, Office of the Solicitor

Encl.

---

[21] *See, e.g.*, Haskell Indian Nations University: Denial of Hearing After Student Kicked Out of Campus Housing, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., (Apr. 29, 2020), https://www.thefire.org/kansas-student-forced-to-sleep-in-car-after-university-kicks-him-out-of-housing-during-stay-at-home-order.

# Preview Request

The Freedom of Information Act (FOIA) is a federal law that gives the public the right to make requests for federal agency records. Agencies may withhold information according to nine exemptions contained in the statute. The FOIA applies only to federal agencies. It does not apply to records held by Congress, the courts, or by state or local government agencies. Each state has its own public access laws that should be consulted for access to state and local records.

**\*** indicates a required field.

## Agency Selection

| | |
|---|---|
| **Agency** | U.S. Department of the Interior |
| **Sub Agency** | Bureau of Indian Education |
| **Sub Agency** | Bureau of Indian Education (General) |

Please note that the complexity of your request will affect the order in which your request is processed. For more information on multitrack processing and how it affects your request, please see section 2.15 of our regulations

Fields marked with an asterisk (*) are required. In addition, you should indicate in the Description field your fee category (that is, whether you are a commercial-use requester, news media, educational or noncommercial scientific institution, or other requester as described in sections 2.38 and 2.39 of our regulations).

The FOIA offices in the bureaus/offices of the Department of the Interior are continuing to process FOIA requests to the best of their ability during the COVID-19 pandemic. To keep employees healthy and safe, the Department is maximizing telework flexibility and employing social distancing protocols. As a result of these precautions, most employees are working remotely and unable to collect hard copy records located in government facilities at this time. If your request is for hard copy records, the response to your request will very likely be delayed. In addition, employees may not receive FOIA requests that are sent by U.S. mail, overnight mail services, or facsimile in a timely manner.

You will receive an email shortly after this form has been submitted. This email confirms that your request was submitted successfully and that the selected FOIA office can begin review of your request. If you do not receive a confirmation email and would like to confirm your submission, please contact the bureau FOIA office through the information located on our Contact page.

The Office of Inspector General is not accepting FOIA requests through FOIAonline. You may file a request with the Office of Inspector General at: https://www.doioig.gov/complaints/FOIA/how-to-submit-a-foia-request.

The Department's expedited processing requirements correspond with 43 C.F.R. § 2.10 and § 2.20. A request for expedited processing must set forth the reasons why the request should be expedited. You must certify that the reasons given for seeking expedited processing of this request are true and correct to the best of your knowledge and belief.

The Department's fee waiver requirements correspond with 43 C.F.R. Part 2, Subpart G. Please be advised that by making a FOIA request, it shall be considered an agreement by you to pay all fees unless you have been granted a fee waiver or specify your willingness to pay fees up to a particular amount. Please note that a default amount of *$200 will be prepopulated* to your request, but can be modified by you to be less or more. Additionally, the amount of fees you will be charged (or not charged) will be affected by your fee category. We will confirm this agreement in our acknowledgement letter.

USA000218

If the bureau processing your request finds that the actual cost will exceed the amount you specify, the bureau will stop processing the request and consult with you (see 43 C.F.R. 2.49(d)). If you are seeking a fee waiver, it is your responsibility to provide detailed information to support your request by addressing all the criteria outlined in 43 C.F.R. 2.48. If you do not submit sufficient justification, your fee waiver request will be denied (see 43 C.F.R. 2.45). Please note the fact you may have received a fee waiver in the past is not determinative of whether you will receive one for this request--you still must submit sufficient justification.

## Request Type

| | |
|---|---|
| **Request Type** | FOIA |

## Contact Information

| | |
|---|---|
| **Salutation** | Miss |
| **First Name** | Katlyn |
| **Middle Initial** | |
| **Last Name** | Patton |
| **Email Address** | katlyn.patton@thefire.org |
| **Organization** | Foundation for Individual Rights in Education |
| **Phone Number** | 2157173473 |
| **Fax Number** | |
| **Mailing Address Location** | United States/US Territories |
| **Address Line 1** | 510 Walnut Street |
| **Address Line 2** | Suite 1250 |
| **City** | Philadelphia |
| **State/Province** | Pennsylvania |
| **Zip Code/Postal Code** | 19106 |

## Processing Fees

| | |
|---|---|
| **Will Pay Up To** | $10.00 |

USA000219

# Description

| | |
|---|---|
| **Description** | (1) Any emails (including attachments), memoranda, text messages, or social media messages sent or received by Dr. Ronald Graham to or from any employee or agent of Haskell Indian Nations University, from October 26, 2020 through the present date, which contain the terms "Indian Leader," "newspaper," "free expression," "free speech," "free press," "Jared," or "Nally." (2) Any emails (including attachments), memoranda, text messages, or social media messages sent or received by Dr. Ronald Graham to or from any employee or agent of Haskell Indian Nations University, from October 26, 2020 through the present date, which reference the letter from Lindsie Rank, Foundation for Individual Rights in Education, to Dr. Ronald Graham, dated October 26, 2020. (3) Any document (including emails, attachments to emails, memoranda, text messages, or social media messages) which reflect, pertain to, or substantiate Dr. Graham's statement in an undated letter to Jared Nally that Dr. Graham had "instructed my staff to review the status of the Leader's annual recognition process to ensure continued access by the Leader to its Student Bank account and Haskell resources." Privacy waiver: Please find enclosed with this request a privacy waiver executed by Jared Nally. Request for Privilege Log: If any otherwise responsive documents are withheld on the basis that they are privileged or fall within a statutory exemption, please provide a privilege log setting forth (1) the subject matter of the document; (2) the person(s) who sent and received the document; (3) the date the document was created or sent; and (4) the basis on which the Bureau of Indian Education contends it is entitled to withhold the document from production. |

# Request Expedited Processing

| | |
|---|---|
| **Make Request?** | Yes |
| **Justification** | Request for expedited processing: Pursuant to 5 U.S.C. § 552(a)(6)(E) and 43 C.F.R. § 2.20, I request expedited processing of this request because there is a compelling need for the records and an "urgency to inform the public about an actual or alleged Federal Government activity." The Foundation for Individual Rights in Education is primarily engaged in disseminating information to inform the public about government affairs, and regularly publishes on its website news and information concerning matters relating to civil liberties in higher education. Each of the substantive requests included herein involve an actual or alleged Federal Government activity, namely the actions of an institution under the authority of the Bureau of Indian Education which violated students' First Amendment rights, and that institution's current purported efforts to correct that violation. (See the enclosed letters of October 26, 2020 and of today's date from Lindsie Rank, Foundation for Individual Rights in Education.) I request a response to this request for expedited processing within 10 calendar days under 43 C.F.R. § 2.20(e). I certify that the statements contained in this letter regarding the alleged activity and public concern are true and correct to the best of my knowledge. |

USA000220

## Request a Fee Waiver

| | |
|---|---|
| **Make Request?** | Yes |
| **Justification** | Fee waiver request: Pursuant to 5 U.S.C. § 552(a)(6)(E) and 43 C.F.R. § 2.45(a). The Foundation for Individual Rights in Education, Inc. (FIRE) is a 501(c)(3) non-profit, non-partisan organization dedicated to defending, preserving, and extending civil liberties on campus. The records sought herein are not sought for a commercial purpose and are, instead, requested by a non-profit organization to facilitate the public's understanding of government activities. The subject of the request specifically concerns identifiable operations or activities of the government, and the disclosable portions of the requested information will be meaningfully informative in relation to the subject matter of the request. The public interest would be well-served by granting a fee waiver. The disclosure will contribute to the public understanding `of government operations, and the public's understanding will be significantly enhanced by the disclosure, as FIRE has expertise in the subject matter of the request and the intention and demonstrated ability to disseminate the information to the public. FIRE regularly shares information with other media outlets and maintains a blog regularly publishing information concerning similar matters. See, for example, https://www.thefire.org/santa-clara-university-protects-student-free-speech-with-one-hand-censors-with-the-other. Because the subject of this request pertains to an ongoing controversy, it is important that records be produced in an expedited manner in order to facilitate the public's interest in understanding, and being able to respond to, decisions by government officials. If a fee waiver is not granted, please apprise me if the estimated costs will exceed $10. |

## Additional Information

| | |
|---|---|
| **Relevant park or refuge or site or other location** | N/A |

## Attach Supporting Files

| Attached File Name | Size (MB) | File Type |
|---|---|---|
| Jared Nally FERPA waiver & request.pdf | 0.1932 | Adobe PDF document |

✔ **I Agree.**
   **I have read the Privacy and Security Notice and agree to the terms set forth.**

USA000221

 **I Agree.**

**Affirmation. Pursuant to 28 USC § 1746, I declare and affirm that under penalty of perjury under the laws of the United States of America that all of the foregoing information, statements, and signatures submitted in connection with this request and in any supporting documents are true and correct to the best of my knowledge.**

USA000222

# Request Confirmation

## Request Information

| | |
|---|---|
| **Tracking Number** | DOI-BIE-2021-001931 |
| **Requester Name** | Under Agency Review |
| **Submitted Date** | 01/19/2021 |
| **Request Phase** | Submitted |
| **Description** | Under Agency Review |

USA000223



**FIRE**
Foundation for Individual
Rights in Education

March 25, 2021

Jennifer Wiginton, Esq.
Division of Indian Affairs
Office of the Solicitor
1849 C Street Northwest
Washington, District of Columbia 20240

***URGENT***

*Sent via Electronic Mail (jennifer.wiginton@sol.doi.gov)*

Dear Ms. Wiginton:

FIRE[1] is disappointed to alert you that the state of freedom of expression continues to deteriorate at Haskell Indian Nations University (Haskell).[2] President Ronald Graham and his administration has mounted a second front in his battle against expressive rights, this time targeting the speech and academic freedom rights of faculty and other employees.

A recent directive sent by Graham forbids all faculty and other Haskell employees—whom Graham refers to as "detractors"—from discussing "issues publicly through . . . any [] means of mass communication[.]"[3] Subsequently on March 21, Vice President of Academics Melanie Daniel sent Haskell faculty an email forbidding them from using their professional titles in conversations with the news media.[4] Both of these mandates plainly violate the First Amendment and must be immediately rescinded. Haskell must also clarify that it will not continue to interfere with the expressive rights of its faculty and staff.

---

[1] As you will recall, the Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.
[2] Due to ongoing litigation, this letter is addressed to counsel.
[3] Letter from Ronald Graham, President, Haskell, to All Haskell Employees (Mar. 11, 2021) (on file with author) ("Employee Directive").
[4] Email from Daniel to Faculty (Mar. 21, 2021, 4:35 PM) (on file with author) ("Press Policy Email").

USA000224

2

## I.   Haskell Forbids Faculty and Employee "Detractors" from Expressing Opinions

The following is our understanding of the pertinent facts. We appreciate that you may have additional information to offer and invite you to share it with us.

On March 11, 2021, Graham issued a directive aimed at restricting the speech of "All Haskell Indian Nations University Employees."[5] The Employee Directive purports to restrain Haskell employees, including faculty, from "engaging in any misconduct or behavior that is considered to be defaming, slanderous, damaging, and inflammatory towards others."[6] This includes "[d]erogatory opinions regarding coworkers, colleagues, and supervisors or administration[,]" which the Employee Directive claims "[are] not protected under 'academic freedom[.]'"[7]

The Employee Directive goes on to require that employees report any complaints through Haskell's prescribed chain of command, and that employees not air their concerns publicly.[8] The Employee Directive applies to Haskell employees "both on and off duty, and within our community[.]"[9] All of Graham's orders, the Employee Directive states, "are effective immediately and are also non-negotiable."[10]

Soon after Graham issued the Employee Directive, Daniel sent another instruction to Haskell faculty: Haskell employees may not speak to the news media if their statements are in any way "associated" with their "professional relationship with Haskell."[11] This Press Policy Email purported to invoke—but overstated—the Department of Interior's policy on employee's public communications.[12]

The Employee Directive and Press Policy Email are all the more troubling in that they came just days after FIRE filed a First Amendment lawsuit against Graham and Haskell related to a similar directive, which Graham issued in October of last year to student journalist Jared Nally.[13]

In the Nally Directive, Graham denounced newsgathering methods used by Nally in reporting for Haskell's student newspaper, *The Indian Leader*.[14] The Nally Directive threatened Nally with "disciplinary action" if he failed to show "appropriate respect" to Haskell "officials."[15]

---

[5] Employee Directive, *supra* note 3.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] Press Policy Email, *supra* note 4.
[12] *Id. See* DEPARTMENTAL MANUAL, 470 DM 1, DEP'T OF THE INTERIOR, Mar. 7, 2012 (on file with author).
[13] Proof of Service of Ronald Graham, Case No. 2:21-cv-02113, executed by Geoffrey Poston on March 4, 2021.
[14] Letter from Graham to Nally (Oct. 16, 2021) (on file with author) ("Nally Directive").
[15] *Id.*

On October 26, 2020, FIRE, the Native American Journalists Association (NAJA), and the Student Press Law Center (SPLC) wrote to Haskell, asking for Graham to rescind the Nally Directive, ensure free press rights for *The Leader*, and refrain from further censorship of students.[16] Graham's subsequent rescission of the directive against Nally was only effectuated on January 13, 2021, via an email from you to FIRE.[17] On January 19, FIRE, NAJA, and SPLC wrote to Haskell once again to explain that the prolonged denial of basic First Amendment freedoms to Nally was unacceptable and to again ask that Haskell ensure these basic rights would be protected in the future by amending its student handbook.[18] Haskell did not substantively respond to this correspondence.

Due to Haskell's non-response, on March 2, 2021, Nally, represented by FIRE, sued Haskell, Graham, the Bureau of Indian Education, and Tony Dearman, Director of the Bureau of Indian Education, alleging First Amendment retaliation, violation of due process, violation of a 1989 settlement agreement between Haskell and *The Leader*, and that Haskell's Campus Expression policy in its Code of Student Conduct is both overbroad and vague.[19] Graham was personally served with this lawsuit on March 4.

## II.   Haskell Violates the First Amendment—Again—Through the Employee Directive and Press Policy Email

As FIRE has cautioned Haskell before, there can be no question that the First Amendment is binding upon Haskell as a public university. *Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'") (internal citation omitted). Indeed, Haskell has recognized this fact in previous litigation.[20]

### A.   *Faculty maintain a First Amendment right to speak as private citizens on matters of public concern.*

The law is also well established that employees of government institutions like Haskell retain a First Amendment right to speak as private citizens on matters of public concern, and may not be disciplined or retaliated against for their constitutionally protected expression. *Connick v. Myers*, 461 U.S. 138, 150 (1983). This protection applies unless the government employer demonstrates that its interests "as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs the interest of the employee, "as

---

[16] Letter from Lindsie Rank, Program Officer, Found. for Individual Rights in Educ., et al., to Graham (Oct. 26, 2020) (on file with author).

[17] Email from Wiginton to Rank (Jan. 13, 2021, 3:34 PM) (on file with author).

[18] Letter from Rank, et al., to Graham (Jan. 19, 2021) (on file with author).

[19] Compl., *Nally v. Graham et al.*, No. 2:21-cv-02113 (D. Kan.).

[20] *Id.*, Ex. A. (acknowledging that inhibiting the free expression of Haskell's student newspaper would be "in violation of the First Amendment of the United States Constitution").

USA000226

a citizen, in commenting upon matters of public concern[.]" *Id.*[21] This constitutional obligation prevents Haskell officials, including Graham and Daniel, from issuing overbroad directives that infringe upon faculty and employee rights.

The "critical question" in determining whether speech is that of an employee or private citizen is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks,* 573 U.S. 228, 240 (2014). Further, "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community[.]" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (picketers' signs outside of a fallen soldier's funeral, including "Thank God for dead soldiers," related to matters of public concern). Many issues on public university campuses are issues of public concern because, as the category implies, these universities are funded by *public* monies, overseen by *public* officials, and sit on *public* land. In other words, issues such as the leadership of public universities and workplace conditions at public universities are certainly within the public's concern.

Because the Employee Directive and Press Policy Email both reach the speech of faculty and employees speaking as private citizens on matters of public concern, the Directive and Press Policy Email are unconstitutional. Both regulate employee speech that is not within most employee's job duties and that are on matters of public concern.

This is most apparent with respect to the Employee Directive, which purports to prohibit faculty and employee disclosure of "issues," an amorphous range of speech in no way cabined to the employees' individual roles as Haskell employees. A substantial amount of speech as private citizens may address "issues" which may have no bearing on their employment. Yet even if those "issues" happen to *concern* Haskell, that speech may remain protected. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 571–73 (1968). This is especially true when these "issues" involve "derogatory opinions" about Haskell officials—speech that is highly unlikely to be pursuant to an employee's job duties. Further, these "derogatory opinions" and the "policing" of administrators' actions—types of public speech proscribed in the Employee Directive—will often be on matters of public concern, as they reflect the leadership and workplace conditions of an institution supported by funds from taxpayers across the country.

Similarly, the Press Policy Email materially misapplies Department of the Interior policy and the First Amendment, contorting what is a well-drafted policy that affirms the expressive rights of faculty to authorize broad censorship of faculty members who disclose their employment when they speak out on matters of public concern.

---

[21] These protections extend to all employees, including untenured faculty members. *Perry v. Sindermann*, 408 U.S. 593, 598 (1972) ("[T]his Court has specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights . . . . We reaffirm those holdings here.") (internal citations omitted).

Most Haskell faculty are likely not called upon to speak to media on Haskell's behalf, and it cannot be said that such statements are within their normal employment duties, especially when their speech is critical of Haskell. In the Press Policy Email, Daniel uses herself as an example, noting that while she can "make a statement to a local paper, as Melanie Daniel," she cannot "add Vice President of Academics, Haskell Indian Nations University."[22] While this interpretation of DOI policy may have some truth for an *administrator* like Daniel, who is likely indeed required by her ordinary job duties to make official statements to the media, the same proposition does not apply to faculty and other employees.

For purposes of First Amendment protection, it is of no significance that a faculty member discloses to a reporter that he teaches at Haskell. In fact, that a faculty member is employed by Haskell surely would surely be relevant to his remarks about university policies or actions as they relate to public importance. Despite Haskell's concerns that faculty might speak on behalf of the university, a speaker's mere mention of his employment does not automatically mean he is speaking in his capacity as an employee. "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. . . ." *Lane*, 573 U.S. at 240.

> **B.      Criticism of university officials is still constitutionally-protected speech, even when the speaker is a federal employee.**

As FIRE has explained to Haskell before, the First Amendment protects vehement criticism of government officials. In fact, it is at the core of our Constitution's guarantee of expressive rights.[23] So central is this ability to criticize officials that the Supreme Court of the United States, affirming that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," determined that a higher standard of fault applies to speech-related torts where a public official is the plaintiff. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

This right also protects faculty's right to publicly criticize their employer—including to the news media. Faculty are not required to share their concerns only with administrators and otherwise remain silent about the policies and practices of their own universities. In the seminal case addressing the protection of employee speech under the First Amendment—in which a public-school teacher criticized his administration in a public letter identifying himself as an employee—the Supreme Court explained:

> Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is

---

[22] Press Policy Email, *supra* note 4.
[23] *See, e.g., Bridges v. California*, 314 U.S. 252, 270 (1941) ("[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.").

essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.[24]

### C.   Employee speech cannot be proscribed because some may find it "damaging," "inflammatory," or "derogatory."

The "inappropriate or controversial character" of the speech "is irrelevant to the question of whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (expression of hope that President Ronald Reagan might be assassinated was protected against retaliation). This is because the First Amendment, distilled to its most fundamental concepts, is intended to protect expression when it is controversial or upsetting to others.

The Supreme Court has repeatedly, consistently, and clearly held that expression may not be restricted merely because some, many, or even most find it to be offensive or disrespectful. This core First Amendment principle is why the authorities cannot ban the burning of the American flag,[25] prohibit the wearing of a jacket emblazoned with the words "Fuck the Draft,"[26] penalize satirical advertisements depicting a pastor losing his virginity to his mother in an outhouse,[27] or disperse civil rights marchers out of fear that "muttering" and "grumbling" white onlookers might resort to violence.[28] In ruling that the First Amendment protects protesters holding signs outside of soldiers' funerals (including signs that read "Thank God for Dead Soldiers," "Thank God for IEDs," and "Fags Doom Nations"), the Court reiterated this fundamental principle, remarking that "[a]s a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder*, 562 U.S. at 448.

This principle does not lose its salience in the context of the public college. To the contrary, a commitment to expressive rights must be robust and uncompromising if students and faculty are to be free to engage in debate and discussion about the issues of the day in pursuit of advanced knowledge and understanding. This dialogue may encompass speech that offends. For example, the Supreme Court unanimously upheld as protected speech a student newspaper's use of a vulgar headline ("Motherfucker Acquitted") and a front-page "political cartoon . . . depicting policemen raping the Statue of Liberty and the Goddess of Justice." *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 667–68 (1973). These images were no doubt deeply offensive to many at a time of political polarization and civil unrest, yet "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.*

---

[24] *Pickering*, 391 U.S. at 571–73.
[25] *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (burning the American flag was protected by the First Amendment, the "bedrock principle underlying" the holding being that government actors "may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").
[26] *Cohen v. California*, 403 U.S. 15, 25 (1971).
[27] *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988).
[28] *Cox v. Louisiana*, 379 U.S. 536, 557 (1965).

USA000229

> **D.** **Threatening retaliation against employees who exercise their constitutionally-protected rights itself violates the First Amendment.**

Retaliation for participating in First Amendment-protected activity is clearly unconstitutional. Where a government actor responds to protected speech with an "adverse action" that would "chill a person of ordinary firmness from continuing in the activity," it has engaged in impermissible retaliation. *Revels v. Vincenz*, 382 F.3d 876 (8th Cir. 2004). This "well established" test does not require a "great" deal of action in order to be "actionable," and the "objective" test asks "not whether the plaintiff herself was deterred" from speaking but whether a reasonable person may be so deterred. *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003).

The United States Court of Appeals for the Tenth Circuit, the decisions of which are binding upon Haskell, "has repeatedly stated, '*any form* of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." *Collopy v. City of Hobbes*, 27 Fed. Appx. 980, 985 (10th Cir. 2001).  Here, Haskell again threatens adverse actions against its constituents for engaging in expression protected by the First Amendment.

This is untenable at a publicly funded university led by officials who once took an oath to support and defend our Constitution.

> **III.** **Haskell Must Immediately Rescind the Employee Directive and Clarify the Press Policy Email**

Graham's Employee Directive and the Press Policy Email are just as appalling as Graham's earlier Nally Directive, and they show a continued pattern of animosity toward First Amendment rights. A public college administrator who violates clearly established law will not retain qualified immunity and can be held personally responsible for monetary damages for violating First Amendment rights. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

In addition, Haskell must preserve all documents and electronically stored information as defined by Rule 34 of the Federal Rules of Civil Procedure, that are relevant to this dispute. This includes any electronically stored information located on the "haskell.edu" and "bie.gov" email servers. This includes without limitation electronic data within Haskell's custody and control that is relevant to this dispute, including without limitation emails, instant messages, and other information contained on Haskell's computer systems and any electronic storage systems. This also includes electronic data contained in computers, cellular phones, and other devices used by Haskell administrators. As such, Haskell must ensure that all Haskell administrators involved in this dispute have preserved all electronic data relating to this dispute on their personal devices.

8

No procedures should be implemented to alter any active, deleted, or fragmented data. Moreover, no electronic data should have been disposed of or destroyed. We trust that Haskell will continue to preserve such documents and electronically stored information.

We request receipt of a response to this letter no later than the close of business on April 6, 2021.

Sincerely,


Lindsie Rank
Program Officer, Individual Rights Defense Program

USA000231



# HASKELL INDIAN NATIONS UNIVERSITY

**Office of the President**
155 Indian Avenue
Lawrence, Kansas  66046-4800
**www.haskell.edu**

## Memorandum

Date:   October 16, 2020

To:          Jared Nally

From:      Dr. Ronald Graham, President

Subject:   ***Directive***

Jared, I work directly with the Lawrence community at several different levels (i.e., the Mayor and City Manager's Office, Lawrence Police Department, the Chamber of Commerce, and the Rotary). My intention is to build relationships, identify training and internships, work with the community on their projects as a representative from Haskell, and create opportunities for Haskell students. Your name has been identified recently, and on more than one occasion, as someone who routinely attacks Haskell employees with letters; recently, you attacked a Haskell official during a community event.  Further, you have been identified as calling the police department and demanding information regarding a deceased Haskell employee while representing yourself as an editor for *The Indian Leader*. Under no circumstances do you have the authority to contact the police department (or any other governmental agency) and demand anything on behalf of the University.  Your behavior has discredited you and this university. You have compromised your credibility within the community and, more importantly, you have brought yourself, *The Indian Leader*, Haskell, and me unwarranted attention.

Earlier this summer, Josh Falleaf was assigned as the Faculty Advisor by Dr. Rains, the University's Acting Vice President of Academic Affairs, to advise *The Indian Leader* staff pursuant to University guidelines.  You took it upon yourself to attempt to remove him from this position per your letter dated August 3, 2020.  Mr. Falleaf was placed in an Acting Dean's position by me; however, he is first and foremost a Haskell Instructor.  In that, he is appropriately qualified to serve as the University's appointed Faculty Advisor to *The Indian Leader*.  Neither you nor any member of *The Indian Leader* staff has the authority to "vote out" the University-appointed Faculty Advisor; appointing the Faculty Advisor is the exclusive right of the University and it is in accordance with the 1989 court settlement.  You are a student at this University; you are not entitled to reverse Executive-level decisions. Furthermore, you essentially called Dr. Rains a liar in your email (referring to Mr. Falleaf's assignment), which violates Student Conduct.

You also chose to talk to yet another university official, Ms. Carlene Morris, and to record her conversation with you surreptitiously – and without her permission.  This action resulted in yet another complaint against you.  In many states, this would be considered a felony.  You invoked Kansas law to justify disrespectful behavior toward a university official. In the future, I strongly advise that you – out of respect, honesty, and journalistic codes of ethical conduct -- obtain permission from anyone from whom you seek to solicit information for your paper – especially information that is freely available to Haskell students.

I will remind you that you are a student first and foremost on this campus, and your conduct falls under the umbrella of the Student Conduct Code. Your role on *The Indian Leader* does not absolve you from your responsibilities as a Haskell student – and as a representative of our community.  Henceforth, you will conduct yourself in accordance with the Haskell Student Code of Conduct -- now and in the future; and you will treat fellow students, University staff, and University officials with appropriate respect. Failure to do so, may result in disciplinary action.

Let me make myself clear. You are being directed, as a Haskell student. To comply with the following:

**You will NOT:**

- Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus,
- Make demands on any governmental agency -- or anyone else from Haskell -- while claiming to represent *The Indian Leader*.
- Attempt countermanding decisions of Haskell personnel assigned by me or anyone else to positions in an effort to replace them,
- Record anyone at Haskell in your interviews unless you advise them first and they grant you permission.

**You WILL:**

- Treat all faculty members, staff, and students with the highest respect.
- Conduct yourself as a student under the umbrella of Code of Conduct.
- Understand that no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them.

Lastly, Haskell is not obligated to report any census.  If you wish to be counted differently, I strongly suggest that you do what many of us do: contact the US. Census Bureau and file an individual report.

Cc:     BIE Legal

        Tony Dearman
        Director of BIE

USA000233

October 17, 2020

Tony Dearman
Director of BIE
Bureau of Indian Education
1849 C Street NW
Washington, DC 20240

## Reporting Behavior of Subordinate

Tony Dearman:

      As you may be aware, Haskell Indian Nations University (HINU) President Ronald Graham issued a directive to me on Friday, October 16 which you were included as a copied recipient. I would like to report Ronald Graham for issuing this directive as a threat and intimidation with the intent to withdraw my student rights. The directive includes misleading narratives and baseless information for which I've been given sanctions that don't follow the Code of Student Conduct, violate my student rights, and appear to be a misuse of President Graham's authority.

      I would first like to say this directive follows a grievance I submitted to President Graham on October 9th regarding how HINU has falsely collected and represented my racial identity, and an attempt to rectify my racial identity record and offer the same considerations for my peers. This grievance was not addressed in Graham's directive which appears to be a retaliatory email. Before I address Graham's directive, I would like to call attention to the current issue I'm engaged in with the HINU administration and say that I have attempted to resolve this issue with Graham, but will continue to fight for my right to my racial identity and will be following up with Sloan Farrell on this matter.

      Graham's directive does not follow the Code of Student Conduct. I've received no letters from the Office of Student Rights for any violations or complaints referenced in Graham's directive. The president cannot operate outside of my rights as a student outlined in the Code of Student Conduct and cannot ignore the Code of Student Conduct processes needed to issue sanctions, nor may the sanctions violate my legal rights.

      I feel the following sanctions infringe upon my constitutional rights afforded by the first amendment for freedom of speech and infringe upon lawful rights provided by state and federal laws.

      **You will NOT "Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone of this campus**.

      This directive directly correlates to me exercising my freedom of speech to ask that the Lawrence Community Police Review Board to remove Tonia Salvini as a board member because she violates the ethics of the board by contributing to my racial discrimination. While HINU may see this as an "Attack" on Salvini's public persona, I have every right to critique her and hold her accountable as a public figure even if HINU does not like the things I have to say. I should not be receiving criticism based on HINU's distaste for how I self advocate. This is not an issue of defamation, libel, or slander—I've provided sufficient evidence to support my claims. This is an attack on my right to voice a dissenting opinion of a HINU administrator.

      **You will NOT: "Make demands on any governmental agency — or anyone else from Haskell — while claiming to represent The Indian Leader".**

      This directive comes from a false claim that I contacted the police department and "demand[ed] [information] on behalf of the University". The interaction described claims that I identified

USA000234

myself on behalf on Haskell Indian Nations University which goes against my standard press greeting of,"My name is Jared Nally. I'm a student writer (or Editor-In-Chief for) the *The Indian Leader*, Haskell Indian Nations University's student newspaper." This is not a false introduction, but I welcome an open dialogue to how Indian Leader writers can identify themselves to avoid confusion. However, I do not want this sanction to impede on my ability to ask for information, and for the administration to color any request for information as a "demand".

I did not "demand" information when I reached out to the police department about Nia Schexnider's death, and it's a disservice to myself and to her to color it as such when I wrote a tribute piece honoring her life and even provided funeral information to HINU who did not send any messaging out to students about her death nor funeral information. I fear, HINU's ability to discolor any attempt to get information as "demanding" puts me at risk that asking any questions could be found as "demanding" and place me in violation of this sanction, and subject to disciplinary action.

I have a right to ask questions. I won't do so pretending to represent HINU—I always represent *The Indian Leader*. This sanctions endangers my freedom of speech to ask questions.

**You will NOT: "Attempt countermanding decisions of Haskell personnel assigned by me or anyone else in to positions in an effort to replace them.**

This directive is related to my actions as Editor-In-Chief of The Indian Leader Association to refuse to allow Joshua Falleaf whose expressed negative views of *The Indian Leader* publication calling it a "gossip rag" on April 17th, 2020, to be assigned as faculty advisor. HINU administration cites their authority is provided to them by a legal settlement agreement, but the clause cited, "One or more faculty advisers may be appointed by Haskell Indian Junior College to assist students in the publication of *The Indian Leader*," is not part of the settlement agreement, but is part of the Plan of Operations included as an appendix example referenced in the settlement agreement. The Plan of Operations is under The Indian Leader Association's authority — It was voted on by the association to remove Falleaf from the position and later the Plan of Operations was completely amended to allow an explicit statement for the removal and reappointment of Faculty Advisors. This sanction restricts the Indian Leader Association's rights to challenge the misuse of authority, and ability act in our own interest under our own Plan of Operations. This is a violation of freedom of speech where I am being criticized for asking for clarification, expressing the association's needs, the association's sovereignty, and the association's own policy. This sanction is a broad attempt at complacency and exploitation which threatens all of those free speech rights.

**You will NOT: "Record anyone at Haskell in your interviews unless you advise them first and they grant you permission."**

This is not how Single-Party Consent States work. I have every right to record my conversations without the explicit need to have permission granted. This is afforded to me through Kan. Stat. Ann. § 21-6101(4). It is blatant disrespect by the university to equate me to a felon for exercising a legal right in this state provides, and subsequently remove this right by assigning a sanction allowing disciplinary action if I exercise my right to record conversations in the future.

Related to this situation using the university's own language, HINU has "attacked" me in emails and letters, saying I'm deceitful and disrespectful and infer that I am not honest, not credible, and don't have journalistic integrity. This is a great example of freedom of speech, but showcases a double standard that a student isn't allowed to exercise free speech and is subject to sanctions, but faculty and administration may do so without repercussions.

**You WILL: "Understand no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them."**

I completely understand that sentiment and agree. Timelines have been "imposed" to provide HINU with an understanding that their is (a) a limited amount of time to provide a statement before a story goes live to allow opportunity for HINU to provide a statement, or (b) has legal obligations like the recent October 25th which is a legal deadline for HINU to provide requested FERPA information and is done out of respect to allow HINU to avoid a FERPA violation which I will file if that timeline is failed to be met. I will continue to provides dates for the benefit of HINU, but understand it is entirely for their benefit, and not required.

My main take away from this directive is that HINU doesn't want unflattering information released and this directive is meant to accomplish that through intimidation and bullying myself with unjustified sanctions that violate my rights. Mr. Dearman, I ask that you please review the directive and consider these violations. I'm more then willing to provide documentation and additional explanation to the brief backgrounds provided above. Please provide communication as to how the process moves forward with this complaint.


Sincerely,

Jared Nally

Cc:      Monica Cooper, Human Resources Specialist

 Gmail

**Jared Nally** ▨▨▨▨▨▨▨▨▨▨▨▨▨▨

## Follow up to "Reporting Subordinate Ronald Graham"

**Jared Nally** ▨▨▨▨▨▨▨▨▨▨▨▨▨▨                    Sat, Oct 17, 8:22 PM

To: ▨▨▨▨▨▨▨▨▨@bie.edu>
Cc: ▨▨▨▨▨▨▨▨▨@bia.gov>

Tony Dearman:

I apologize I did not include this in my email " Reporting Subordinate Ronald Graham", I have finally been able to find the email attached to provide to you as an example of the inaccuracies and unfavorable coloring that President Graham has done to impose these sanctions.

In Graham's directive I am portrayed as demanding and incentive to the death of a respected HINU employee, and falsely accused of acting on behalf of the university. I hope I can offer this as a starting point to unravel the false narrative being told about me from the administration  and work toward rectifying my rights being withheld because of this  directive.

In the attachment you will find that I did not call the police department, I had sent an email that outlines our communication which was respectful, non-demanding, and not impersonating or representing HINU. It was upsetting to see myself portrayed as such and to see the rhetoric continue to unsavory and misrepresentative throughout Graham's directive. I am appalled that Graham used Nia Schexnider's death as a means to debase me, and create false allegations. I had a lot of respect for Nia, and believe I provided that in my tribute, and HINU has ruined all of that to use her death against me.  HINU paid  little respects to her death, they did not provide any death notice to students. A short notice was provided to faculty which promised to update them with funeral information. I provided funeral information to to HINU the day before the funeral, but this information was not distributed. Weaponizing an employee's recent death is unsettling.

It is also unsettling that HINU demonstrates the ability to create false narratives to support their agenda, and silence my voice. I hope this provides incite as to why I'm adamant on retaining my rights that the vague and objective sanctions restrict, and concern with how HINU could misconstrue any situation where I exercise protected rights as a violation of these sanctions and afford them opportunities to exercise unjust

USA000237

disciplinary action.

Thank you for your help again,

–Jared Nally

Note: Neeoni Chex's legal name is Nia Schexnider which I did not know at the time of writing the email

Media Inquiry – The Indian Leader.pdf

 **Gmail**                                    **Jared Nally** < [ PII ] >

---

## Reporting Subordinate Ronald Graham

---

**Dearman, Tony L** <Tony.Dearman@bie.edu>                    Wed, Oct 21, 2020, 8:31 AM
To: Jared Nally [ PII ], Cooper, Monica M <Monica.Cooper@bia.gov>
Cc: Shamblin, Jackie R <Jackie.Shamblin@bia.gov>

Hello Jared,

I have assigned our HR department to look into this situation. I have included
Jackie Shamblin and he can address questions you may have on next steps.

Tony L. Dearman
Director Bureau of Indian Education
Office: 202-208-6123
Cell: 202-570-5458
Fax: 202-208-3311

---

**From:** Jared Nally < [ PII ] >
**Sent:** Saturday, October 17, 2020 5:14 PM
**To:** Cooper, Monica M <Monica.Cooper@bia.gov>; Dearman, Tony L
<Tony.Dearman@bie.edu>
[Quoted text hidden]
Reporting Behavior of Subordinate 2.pdf

# M Gmail

**Jared Nally** ⟨ PII ⟩

---

## HR Complaint Followup

---

**Jared Nally** ⟨ PII ⟩                                    Wed, Oct 28, 2020, 8:53 AM
To: Jackie.Shamblin@bia.gov <Jackie.Shamblin@bia.gov>

Good Morning Mr. Shamblin,

I'm reaching out to follow up on an HR Complaint against Haskell Indian Nations
University's President Ronald Graham forwarded to you by Tony Dearman on October
21st. I first wanted to touch base on the status of the complaint and see if your office can
let me know what the process looks like for investigating my complaint.

I would also like to add that the Foundation for Individual Rights in Education (FIRE) has
gotten involved to help advocate on my behalf. I'm adding a link to their letter to Graham
in this email which more clearly defines the violations of my student rights and the
retaliation I received in Graham's directive for participating in normal journalistic practices.
FIRE has also filed a complaint with the Office of the Inspector General of the Department
of the Interior which I am also adding a link to.

Directive from Graham:
https://www.thefire.org/directive-october-16-2020/

Letter to Graham:
https://www.thefire.org/fire-naja-and-splc-letter-to-haskell-indian-nations-university-
october-26-2020/

Complaint to OIG
https://www.thefire.org/fire-complaint-to-the-department-of-the-interior-office-of-the-
inspector-general/
[Quoted text hidden]

USA000240

# M Gmail

**Jared Nally** [ PII ]

---

## HR Complaint Followup

---

**Shamblin, Jackie R** <Jackie.Shamblin@bia.gov>   Wed, Oct 28, 2020, 3:16 PM
To: Jared Nally < [ PII ] >

Mr. Nally,

For clarification you did not file an HR complaint.  Director Dearman referred your complaint/allegations over to Human Resources because we handle the majority of the administrative complaints and/or investigations for BIE.  I have assigned your complaint to a contract investigator who will be reaching out to you for any additional information that may be needed from you in regards to your complaint.  BIE and Haskell University are a Federal organization and our employees are Federal employee, so the rules and processes are different than they are in a State or public organization.  Once the investigation is completed, you will receive a letter notifying you that the investigation has been completed and that the case is closed.

Jackie R. Shamblin

Human Resources Officer

Bureau of Indian Education

1011 Indian School Road NW Suite 150

Albuquerque, NM  87104

Phone: (505) 563-5300

Fax: (505) 563-5305

USA000241

Please take a moment to complete our HR Customer Satisfaction Survey.  Your feedback is very important to us.  Thank you.

- BIE survey - BIE HR Customer Satisfaction Survey

CONFIDENTIALITY NOTICE: This e-mail and any attachments may contain information that is privileged, confidential, or otherwise protected from disclosure. Interception, dissemination, distribution, or copying of this e-mail or the information herein is prohibited, and the information should only be viewed by the intended recipient. Any misuse or unauthorized disclosure may result in both civil and criminal penalties. If you have received this e-mail in error, please notify the sender by reply e-mail and destroy the original message and all copies.

**\*\*REMINDER: THE FEDERAL BENEFITS OPEN SEASON IS NOVEMBER 9 – DECEMBER 14, 2020\*\***

**If you have Open Season questions please reach out to your Benefits Specialist servicing your location:**

**Natalie Buckley** - natalie.buckley@bia.gov

Services BIE headquarters and schools/offices located in NM, AZ and UT including SIPI

**Stephanie Blanken** - stephanie.blanken@bie.edu

Services schools/offices located elsewhere (KS, CA, OK, SD, ND, OR, MT) including HINU and Bureau of Trust Funds Administration (BTFA) employees (formerly OST)

Declaration A
Page 21 of 34

**From:** Jared Nally < PII >
**Sent:** Wednesday, October 28, 2020 7:54 AM
**To:** Shamblin, Jackie R <Jackie.Shamblin@bia.gov>
**Subject:** [EXTERNAL] HR Complaint Followup

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

[Quoted text hidden]

# M Gmail

Jared Nally < PII >

---

## HR Complaint Followup

---

**Jared Nally** < PII >                                    Wed, Oct 28, 2020, 3:20 PM
To: Shamblin, Jackie R <Jackie.Shamblin@bia.gov>

Thank you, that was very helpful!
[Quoted text hidden]

HARASSING CONDUCT FACT-FINDING INVESTIGATION

Department of the Interior

1849 C Street, NW

Washington, DC  20240-0001

Case Number:  DOI-21-HCI-011-BIA

INVESTIGATIVE REPORT

This Investigative Report was prepared by the undersigned Investigator and submitted to the Agency on this, the 9th day of February 2021.

*Sandra Wyllie*

SANDRA WYLLIE
CONTRACT INVESTIGATOR
5006 Allen Cay Dr.
Texas City, TX  77590-1406

**NOTICE OF RESTRICTED USAGE**

Access to, and usage of, this report is **RESTRICTED** by both the Freedom of Information Act and the Privacy Act to Government officials who must have access to the report to discharge their OFFICIAL duties.  This file and its contents must be safeguarded.  Willful violations of these requirements are subject to criminal penalties (5 U.S.C. 552a (i)).

USA000245

# WORKPLACE HARASSMENT FACT-FINDING REPORT

## TABLE OF CONTENTS

**ITEM**                                                     **PAGE #**

Table of Contents                                                2

List of Declarations                                            2-5

List of Exhibits and Policies                                    6

Investigative Summary                                            7

Declarations                                                   7-17

Record Evidence and Policies                                  18-22

## LIST OF DECLARATIONS

A.   Jared Nally                     Student, Editor-in-Chief of the Indian Leader
     Complainant                     Department of the Interior (DOI)
                                     Bureau of Indian Education (BIE)
                                     Haskell Indian Nations University
                                     155 Indian Ave.
                                     Lawrence, KS  66046-4817

B.   Ronald Joseph Graham            President
     Witness                         DOI/BIE
                                     Haskell Indian Nations University
                                     155 Indian Ave., Box 4999
                                     Lawrence, KS  66046-4817

C.   James W. Rains, Jr.             Dean, College of Humanities and Arts
     Witness                         Acting Director, Special Projects (Detail)
                                     DOI/BIE
                                     Haskell Indian Nations University
                                     155 Indian Ave.
                                     Lawrence, KS  66046-4817

USA000246

D.  Joshua Levi Falleaf                 Instructor of English
    Witness                             Acting Dean, College of Humanities and Arts
                                        DOI/BIE
                                        Haskell Indian Nations University
                                        155 Indian Ave.
                                        Lawrence, KS  66046-4817

E.  Carlene Morris                      Financial Aid Officer
    Witness                             DOI/BIE
                                        Haskell Indian Nations University
                                        155 Indian Ave.
                                        Lawrence, KS  66046-4817

F.  Tonia Salvini                       Vice President of University Services
    Witness                             DOI/BIE
                                        Haskell Indian Nations University
                                        155 Indian Ave.
                                        Lawrence, KS  66046-4817

G.  Rhonda LeValdo                      Faculty, Media Communications
    Witness                             Humanities Department
                                        DOI/BIE
                                        Haskell Indian Nations University
                                        155 Indian Ave.
                                        Lawrence, KS  66046-4817

| ATTACHMENTS TO DECLARATION A: | PAGE NUMBER: |
|---|---|
| Email dated October 16, 2020, sent to Complainant by Dr. Graham, attaching a Directive | 7-9 |
| Email dated October 17, 2020, sent to Tony Dearman, BIE Director, by Complainant, attaching a complaint against Dr. Graham | 10-13 |
| Email communication dated October 17-28, 2020, among Complainant, Mr. Dearman, and Jackie Shamblin, Human Resources, regarding Complainant's complaint against Dr. Graham | 14-23 |

USA000247

**ATTACHMENTS TO DECLARATION A:**   **PAGE NUMBER:**

Letter dated January 19, 2021, sent to Dr. Graham by   24-28
Lindsie Rank, Program Officer, Foundation for
Individual Rights in Education (FIRE); Francine
Compton, President, Native American Journalists
Association (NAJA); and Sommer Ingram Dean, Staff
Attorney, Student Press Law Center (SPLC),
regarding the Directive

A FOIA request dated January 19, 2021, sent to BIE   29-34
by Katlyn Patton, FIRE

**ATTACHMENTS TO DECLARATION C:**   **PAGE NUMBER:**

Email dated March 16, 2020, sent to Dr. Rains;   8
Rhonda LeValdo; Stephen Prue, Executive Assistant;
and Lou Hara, Registrar, by Complainant, regarding
requesting a student directory

Email communication dated April 15-27, 2020, among   9-14
Complainant, Dr. Rains, Ms. LeValdo, and Mr. Prue,
regarding the distribution of the Indian Leader

Email dated April 15, 2020, sent to Dr. Rains, Tonia   15
Salvini, and Danielle McKinney, Guidance Counselor,
regarding Russell Parker's disciplinary action

Email communication dated July 13-14, 2020, between   16-18
Complainant and Carlene Morris, regarding
Complainant recording their discussion

Email communication and memorandum dated from   19-27
July 28 to August 14, 2020, between Complainant and
Dr. Rains, regarding Joshua Falleaf replacing Ms.
LeValdo as Student Advisor for the Indian Leader

**ATTACHMENTS TO DECLARATION D:**   **PAGE NUMBER:**

Email dated July 31, 2020, sent to Complainant and   6
Ms. LeValdo regarding replacing her as the Faculty
Advisor for the Indian Leader

USA000248

| **ATTACHMENTS TO DECLARATION F:** | **PAGE NUMBER:** |
|---|---|
| Email dated October 9, 2020, sent to Craig Owens, Lawrence City Manager, by Complainant, attaching an Ethics Complaints against Ms. Salvini | 6-9 |
| Letter dated December 17, 2020, sent to Complainant by Mr. Owens, responding to the Ethics Complaint | 10-11 |

| **ATTACHMENTS TO DECLARATION G:** | **PAGE NUMBER:** |
|---|---|
| Email communication dated April 15, 2020, between Complainant and Dr. Rains, regarding the distribution of the Indian Leader | 6-8 |
| Email communication dated July 20, 2020, among Dr. Rains, Mr. Falleaf, and Ms. LeValdo, regarding her role as Indian Leader Advisor | 9-10 |

USA000249

## LIST OF EXHIBITS AND POLICIES

| DOCUMENT | # OF PAGES |
|---|---|
| 1. Letter dated October 26, 2020, sent to Dr. Graham by Lindsie Rank, Program Officer, Foundation for Individual Rights in Education (FIRE); Francine Compton, President, Native American Journalists Association (NAJA); and Sommer Ingram Dean, Staff Attorney, Student Press Law Center (SPLC), regarding the Directive sent to Complainant by Dr. Graham | 10 |
| 2. Letter (undated) sent to Complainant by Dr. Graham, rescinding the Directive | 1 |
| 3. Article dated October 26, 2020, published by FIRE, regarding the Directive | 4 |
| 4. Article dated November 5, 2020, published by LJWorld.Com, regarding the Directive | 5 |
| 5. Settlement Agreement dated September 19, 1989, between the Indian Leader and the Agency | 19 |
| 6. Haskell Indian Nations University Student Handbook Code of Student Conduct (undated) | 98 |
| 7. Haskell Institutional Values 2020 and Code (undated) | 4 |

USA000250

## HARASSMENT FACT-FINDING INVESTIGATIVE REPORT

## INVESTIGATIVE SUMMARY

**Background**:

Jared Nally (Complainant) is a Student and the Editor-in-Chief of the Indian Leader, a student newspaper.  It was believed that due to Tonia Salvini's involvement in the census, Complainant stalked her related to her role on the Community Police Review Board, attended a board meeting, and during the meeting called her a racist.  It was believed Complainant contacted the Lawrence Police Department requesting information regarding a deceased individual on behalf of the University. It was further believed he recorded a discussion with Carlene Morris without her knowledge or approval.  A Directive dated October 16, 2020, was sent to Complainant by Dr. Graham, including a list of activities/behavior he would not engage in, as well as a list of activities/behavior he would engage in.

**Investigation Chronology**:

Bennett Tuchawena commissioned an investigation into Complainant's allegations of harassment. The investigation was assigned to the Investigator on December 7, 2020. Declarations were obtained telephonically from Complainant and witnesses January 12-18, 2021.

## GENERAL ALLEGATIONS

Complainant claimed he was subjected to harassment by Dr. Graham when he received a Directive dated October 16, 2020.

## DECLARATIONS

**[Investigator's Note:  The Investigator began each witness interview by explaining her role; the purpose of the interview; and the need for the witness to cooperate, and not discuss their interview with others.]**

**Alleged Harasser's Testimony:**

**Jared Nally** stated he is a student at the Haskell Indian Nations University in Lawrence, Kansas and the Editor-in-Chief of the school newspaper, the Indian Leader.  He further stated his first semester at the University was fall of 2019, and he joined the Indian Leader shortly after that.  He related he became Editor-in-Chief in January 2020.

Complainant asserted the Indian Leader newspaper was founded in 1897, and they report on ongoing student activities, issues affecting students in Indian country, and occurrences within the administration.  He further asserted he manages staff and guest writers, and proofreads public prints, manages assignments, and facilitates staff writers.

USA000251

Complainant avowed their news sources are the same as other news organizations, and they interview students, faculty, administration, and other individuals inside and outside the community.

Complainant asserted he does not believe he was subjected to harassment based upon any protected purview.

Complainant declared that on October 16, 2020, Dr. Graham sent him an email and attached a Directive.  He further declared the Directive stated, "Your name has been identified recently, and on more than one occasion, as someone who routinely attacks Haskell employees with letters; recently, you attacked a Haskell official during a community event." Complainant stated that what Dr. Graham referred to as a community event was his making an ethics complaint with the City of Lawrence.  He further stated the Directive condemned his actions and threatened disciplinary action if he continued to make his complaint.  Complainant contended he felt the Directive threatened the likelihood that the City would take his complaint seriously because Dr. Graham brandished his relationship with the Mayor and City Manager.  He further contended he believes Dr. Graham harassed him, and he felt he could not make complaints to the City like other members of the community.

Complainant stated the Directive falsely portrayed his news-gathering efforts.  He further stated he did not ask for information regarding Neeoni Chex on behalf of the University, and he did not discredit himself on behalf of the University.  Complainant avowed his email to the police was to obtain information as a student writer for the Indian Leader.  He further avowed he wanted to confirm the death and obtain information to give the community a proper death notice.  He asserted he stated Ms. Chex was a community pillar and appreciated any information they could provide.  He further asserted he did not demand anything on behalf of the University.  Complainant related the Directive made it appear his journalism caused fear.

Complainant averred Dr. Graham's Directive stated, "You will not: Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus; make demands on any government agency – or anyone else from Haskell – while claiming to represent the Indian Leader; attempt  countermanding decisions of Haskell personnel assigned by me or anyone else to positions in an effort to replace them; and record anyone at Haskell in your interviews unless you advise them first and they grant you permission." He contended that these activities are protected under the First Amendment, but the Directive prevented him from participating in them.  Complainant attested Dr. Graham referenced criticism of administrators, but this is an element of reporting as a student journalist.  He further attested the Directive came directly from Dr. Graham and not the Students Rights Office, and this means Dr. Graham was directly harassing him, and this violates the Code of Conduct.  He contended the Directive impaired his ability to perform as a student journalist and infringed upon his constitutional rights.  He further contended it seemed to be an abuse of power to prevent the newspaper from writing unflattering articles that the community needed to know about.

USA000252

Complainant avowed he did not tell Dr. Graham that he found his behavior unwelcome, offensive, inappropriate, etc.; however, he sent an email to Dr. Graham's manager, Tony Dearman, BIE Director.  He further avowed Mr. Dearman gave the letter to Jackie Shamblin, Human Resources, and he believes she initiated the investigation. Complainant stated FIRE, NAJA, and SPLC sent a letter to Dr. Graham wherein they explained that the Directive violated his First Amendment rights and why it should be rescinded.  He further stated the University did not respond to the letter.

Complainant asserted the alleged harassment affected his ability to participate as a student in the fall semester because he was worried about what had taken place.  He further asserted it affected the stories he wanted to write because he worried he might be disciplined.  He related it made it more difficult to retain staff writers because of the scrutiny and retaliation Dr. Graham demonstrated towards the newspaper.  He further related he has experienced much anxiety, and this made it difficult to complete assignments timely and focus on schoolwork as he was normally able to do. Complainant averred it was difficult to engage academically and stressful to manage their staff writer meetings.  He further averred that instead of focusing on stories they wanted to write, they discussed how the situation affected the news organization. Complainant stated their newsroom was not very productive during that semester.

Complainant attested he has not attended anti-harassment training because he was a transfer student and did not participate in the freshman seminar.  He further attested that if that seminar included anti-harassment training, to the best of his knowledge, it was not available to him.  Complainant avowed he is aware of a Code of Student Conduct, but he believes that addresses student-to-student harassment.  He further avowed he is not certain whether that applies to faculty and administrators. Complainant stated he has not seen the anti-harassment policy posted anywhere.

Complainant requested that the Directive be rescinded; the Code of Student Conduct be updated regarding free speech; to have no restrictions from the CIRCLE values of the University; compliance with the First Amendment; and to have no qualifiers that restrict the First Amendment.  **[Declaration A]**

**Alleged Harasser's Testimony:**

**Ronald Joseph Graham** stated he is President, Haskell Indian Nations University in Lawrence, Kansas, and he has held this position for eight months.  He further stated he has been with the Department of the Interior (Agency) for eight months.

Dr. Graham avowed he has no role or responsibilities associated with the Indian Leader Newspaper; however, one of his faculty members has oversight for the newspaper.  He related he recently learned he was responsible for the newspaper's bank account.  Dr. Graham asserted he has no professional relationship with Complainant in his capacity as Editor-in-Chief of the Indian Leader.

USA000253

Dr. Graham declared he does not know the purpose of the Indian Leader, but it apparently reports news the same as any other newspaper. He further declared the newspaper staff has a journalist instructor who guides and directs them. Dr. Graham attested the Indian Leader creates much drama, and instead of reporting news, they engage in irritating things. He further attested Complainant made the Indian Leader his personal newspaper. He stated he does not read the Indian Leader or have any contact with it. He further stated the Indian Leader previously received many awards and had a large journalist department, but it currently is not that way. Dr. Graham averred he does not know to whom the Indian Leader is circulated, but he guesses it is to the University, and it is also online.

Dr. Graham asserted he probably sent Complainant the Directive dated October 16, 2020, and no one else was involved. He further asserted he believes the Directive was triggered when Complainant stalked Tonia Salvini, his Vice President. Dr. Graham avowed Complainant harassed Ms. Salvini and followed her to her meetings downtown where she was the chair of a committee. He further avowed Complainant stood up during a meeting and called Ms. Salvini a racist. Dr. Graham stated Ms. Salvini contacted an attorney and was going to have a cease-and-desist order served on Complainant. He further stated his Dean did the same thing. He avowed that females were afraid of Complainant because he went after anyone with authority and wrote horrible things about them.

Dr. Graham asserted Complainant recorded a discussion with a University employee. He further asserted Complainant did not understand that if you record a person without their knowledge on Federal property, it is a felony. He related that Complainant and his representatives claimed you could record someone without their knowledge under Kansas law, but they failed to understand it was on Federal property.

Dr. Graham asserted that an individual died on campus. He further asserted Complainant contacted the police, stated he was a journalist, and demanded to be given the name of the deceased. Dr. Graham averred the police basically ignored Complainant because they do not provide that type of information. He further averred he believes Complainant represented himself as the Indian Leader from Haskell Indian Nations University. He attested they have an individual who contacts newspapers and provides information with the permission of the family, and that individual already had the information for the deceased individual.

Dr. Graham avowed they were restructuring, and Jim Rains, Acting Vice President of Academics, reassigned Joshua Falleaf as Advisor to the Indian Leader. He further avowed Complainant did not like this, and he and his colleagues voted Mr. Falleaf out. Dr. Graham contended they did not have the authority to do this because it was a University position. He further contended he basically told Complainant he could not do this.

Dr. Graham stated Complainant is a student, and he referred to Student Conduct. He further stated he wrote a long response regarding why he sent the Directive and sent it to the BIE Solicitors. He averred he identified several student violations Complainant

USA000254

committed, and stated he wanted it to stop.  Dr. Graham stated Complainant claimed he violated his First Amendment rights, and he sent a notice to Complainant rescinding the Directive.  He further stated that since Complainant is a journalist and serves as a leader, he believed he could go to these meetings and do what he did because of his position with the Indian Leader.  Dr. Graham attested that a Student Conduct Committee had enough information to remove Complainant from the Indian Leader, and they were going to remove him.  He further attested he stopped them and asked to handle the matter.  He related this did not violate Complainant's First Amendment rights, but he was basically telling Complainant to "knock it off" and do his job as a student.

Dr. Graham stated Complainant contacted FIRE, NAJA, and SPLC, organizations for student rights.  He further stated they accused him of violating Complainant's First Amendment rights.  He declared he sent their letter to the Solicitors, and working with them, he subsequently sent a letter to FIRE, NAJA, and SPLC, rescinding the Directive.

Dr. Graham contended the Directive was not intended as a reprimand to Complainant but was an attempt to have him stop the abuse and his behavior towards the Vice President and Dean.  He further contended Complainant had no right to do this.

Dr. Graham avowed Complainant only informed him that he found his behavior unwelcome, offensive, inappropriate, etc. via the newspaper.  He further avowed Complainant wrote a large newspaper article that was outlandish, and he did not respond to it.

Dr. Graham affirmed taking anti-harassment training online.  He stated he is familiar with the policy, and it covers the harassment of students by faculty and administration.  He further stated he has seen the policy on the intranet, and he mentions it in his cabinet meetings.  **[Declaration B]**

**Witnesses' Testimony:**

**James W. Rains, Jr.** stated he is Dean, College of Humanities and Arts, but he is currently detailed as Acting Director, Special Projects.  He further stated he has been Dean since May 2018, but he acted in this position since November 2017.  He related he was detailed as Acting Vice President and Acting President intermittently since November 2018.  He further related he has been with the Agency since August 2014.

Dr. Rains asserted the only role or responsibility he had associated with the Indian Leader newspaper was identifying a Faculty Advisor in the summer of 2020.  He further asserted he has no professional relationship with Complainant, and he has never had him as a student.  He related he does not provide oversight for the newspaper, which is independent from the University.

Dr. Rains avowed the Indian Leader is regarded as a student club, and an independent student organization that reports news for the benefit of students.  He further avowed the newspaper is written and edited by students.

USA000255

Dr. Rains attested he is aware of a Directive dated October 16, 2020, that was given to Complainant by Dr. Graham.  He further attested he has a PhD in English, and he assisted Dr. Graham with editing for grammar, but he did not change the content of the Directive.

Dr. Rains averred that in February 2020, their Acting President had a medical condition, and he assumed the role as President until Dr. Graham came to the campus in May 2020.  He further averred that on March 23, 2020, the campus was evacuated due to Covid-19, but less than 100 students remained on campus, including Complainant.  Dr. Rains stated Complainant constantly sought stories and information; however, they were in an information lock-down and anything referred to the media or other inquiries were referred to BIE Director Tony Dearman's office in Washington DC.  He further stated they were not allowed to respond to Complainant's requests for information because he was regarded as a separate media enterprise.  Dr. Rains declared that Complainant's inquiries were referred to Mr. Dearman.  He further declared he believes Complainant became frustrated with this, and he became somewhat harassing and antagonistic towards administration.  Dr. Rains asserted he began to receive FOIA requests for things unrelated to current events, and many pertained to Complainant and their failure to respond to his requests for information.  He further asserted he responded to the FOIA requests, but they felt Complainant was antagonizing them.

Dr. Rains averred that later in the summer of 2020, Complainant demonstrated some animosity towards Tonia Salvini.  He further averred Ms. Salvini served on the Community Police Review Board.  Dr. Rains stated Complainant attended some of the city meetings and basically antagonized and attempted to embarrass Ms. Salvini. He further stated it was his understanding that Complainant was displeased with Ms. Salvini because during the census, he was not allowed to represent himself as white and Native American.  Dr. Rains asserted he believes Dr. Graham somewhat felt Complainant was exploiting his position as Editor of the Indian Leader to represent himself in that capacity to antagonize Ms. Salvini at the board meetings.

Dr. Rains asserted that Russell Parker, a student, was expelled because he became belligerent with a University employee during the pandemic.  He further asserted Complainant represented Mr. Parker, and he used the Indian Leader to take exception to Mr. Parker's disciplinary action.  Dr. Rains attested Mr. Parker was given an opportunity to appeal his disciplinary action.  He further attested the Indian Leader became Mr. Parker's advocate, and this may have added to the animosity towards the administration.

Dr. Rains stated Rhonda LeValdo, an Instructor, was the sponsor for the Indian Leader. He further stated their faculty had to prepare for fall online classes.  He averred that fall was going to be a full 15-weeks online, and they invested much time into moving online and improving the quality of the courses.  He further averred that with the advice and permission of Human Resources, they asked all faculty to discontinue their sponsorship with all student organizations and prepare to improve their online classes.  He related

USA000256

the Indian Leader is a student organization, and Ms. LeValdo was asked to leave the sponsorship role to prepare for online teaching.  He further related that at the time, he was Acting Vice President, and Josh Falleaf replaced him as Dean of Humanities.  Dr. Rains asserted that when he was in the President's office he asked Mr. Falleaf to serve as Acting Director of Special Projects and Faculty Advisor for the Indian Leader.  He further asserted Mr. Falleaf was in an administrative role and did not have teaching duties.  Dr. Rains contended Complainant took exception to having Mr. Falleaf in this role because he wanted Ms. LeValdo to retain the role, and he rejected their explanation that Ms. LeValdo had to prepare for online courses.  He further contended Complainant sent him an email wherein he called him a liar and said Mr. Falleaf was not faculty.  He related Mr. Falleaf's position of record is faculty.  Dr. Rains stated that a court settlement in 1989 pertained to a President attempting to interfere with the content of the Indian Leader, and the ACLU filing a court case.  He further stated the case was settled that administration could exert no influence over the Indian Leader.  Dr. Rain asserted they have administrative influence over who is named the Advisor, but the settlement stated the Indian Leader does not have to follow the advice of the Advisor. He further asserted the Indian Leader rejected Mr. Falleaf as Advisor only because Complainant wanted Ms. LeValdo to be the Advisor.  He related he believes this caused Complainant to become antagonistic towards the administration.  He further related he believes by giving Complainant the Directive, Dr. Graham was attempting to have Complainant stop attacking the administration.

Dr. Rains averred there was an incident when Complainant recorded Carlene Morris and posted the discussion on social media without her authorization.  He further averred Ms. Morris felt violated and there was an inquiry into whether Complainant broke any laws.  Dr. Rains stated there was apparently no legal issue; however, journalistically, it was not proper.  He further stated he saw an email wherein Ms. Morris informed Complainant she did not appreciate what he did, but Complainant did not apologize

Dr. Rains asserted he believes the only action was the Directive Dr. Graham gave Complainant, and not a series of events that would constitute harassment.

Dr. Rains affirmed attending training regarding anti-harassment, and noted it was at least three years ago.  He stated he is familiar with the policy, but he has no specific experiential knowledge of it.  He further stated he thinks the policy is posted on campus, but he is not certain.  **[Declaration C]**

**Joshua Levi Falleaf** stated he is Instructor of English, but currently Acting Dean, College of Humanities and Arts, for the Haskell Indian Nations University in Lawrence, Kansas.  He further stated he has been an Instructor since spring of 2012, and he became an Acting Dean in 2014.  He related that he provided parttime teaching/adjunct work on a contract basis for two semesters prior to spring of 2012.

Mr. Falleaf asserted he is Ms. LeValdo's supervisor.  He further asserted that for a short period in the summer of 2020, Dr. Rains issued a Directive for the faculty to focus on their teaching.  He avowed this was the first semester when classes would be

USA000257

completely online after the emergency transition in spring, and this required much training and preparation.  He further avowed it was his understanding the Directive was for one or two months, and during this time, he replaced Ms. LeValdo as Faculty Advisor for the Indian Leader.

Mr. Falleaf attested he is aware Dr. Graham sent Complainant the Directive, but he was not involved in that action.  He further attested he believes Dr. Graham felt Complainant had overstepped or presented the University in an unfairly bad light, and he wanted this corrected.   Mr. Falleaf stated there was concern regarding Complainant's ongoing harassment of Ms. Salvini associated with her public roles within the community.  He further stated Dr. Graham attempted to clarify that the Indian Leader was not entitled to certain information, but it could be provided to anyone who used and represented it accurately.   Mr. Falleaf averred he believes the Directive was intended to have Complainant understand he was a student and was required to uphold a certain code of conduct and journalistic ethics.  He further averred he does not believe the Directive expressed this very well.  Mr. Falleaf related the foregoing is just his interpretation of the situation.

Mr. Falleaf contended that replacing Ms. LeValdo as Advisor to the Indian Leader had nothing to do with the Directive Dr. Graham sent Complainant.  He further contended that all University Advisors were replaced.  Mr. Falleaf asserted he does not have the initial communication regarding this matter, but there was follow-up clarification with Complainant and Ms. LeValdo including dates from July 31, 2020.  He further asserted Dr. Graham's Directive was dated October 16, 2020.   He declared the Directive regarding Advisors was intended to streamline faculty focus on the delivery of their online classes.

Mr. Falleaf avowed he has completed annual BIE or DOI Talent training, and he is familiar with the anti-harassment policy.  He further avowed he believes the policy is posted on their website.  **[Declaration D]**

**Carlene Morris** stated she is Financial Aid Officer for the Haskell Indian Nations University in Lawrence, Kansas.  She further stated she was hired as a contractor in 2013, and she was hired full-time in February 2015.

Ms. Morris attested she has no role or responsibilities associated with the Indian Leader newspaper.  She further attested she has no professional relationship with Complainant, but she processes his financial aid.  Ms. Morris averred the Indian Leader is like any newspaper.  She further averred the newspaper shares and disseminates information to their students, and it is also distributed to the alumni and community.

Ms. Morris declared she heard about the Directive Dr. Graham sent to Complainant, but she was not involved in it.  She further declared she informed Dr. Graham of an incident when Complainant called her to inquire about his financial aid, and she answered his questions to the best of her ability.   Ms. Morris asserted a co-worker subsequently informed her Complainant recorded the telephone discussion and posted it on

USA000258

Facebook.  She further asserted she was a little upset that Complainant had not informed her prior to recording their discussion.  She related that when she previously worked with the Indian Leader, the students asked if they could record their discussions, and she usually said they could.  She further related she sent Complainant an email asking why he had not informed her that he was recording their discussion.  Ms. Morris stated she did not say anything inappropriate during their discussion, but it was a trust issue.  She further stated she asked Complainant to ask her prior to recording her again, and she would probably agree.  Ms. Morris attested Complainant stated he did not have to because of the law.  She further attested she was raised to believe just because you can do something, does not mean you should.  She averred Complainant was a nice young man, but now she has an issue with trust.

Ms. Morris asserted a young man sent her an email and asked her to make a comment about the situation, but she did not respond to him.  She further asserted she believes people should be treated fairly.  She related that Native Americans are taught to respect their elders, and Complainant could have asked to record their discussion.  She further related that in the future, she may ask the students if they are recording.

Ms. Morris affirmed attending anti-harassment training recently.  She stated she is familiar with the school's anti-harassment policy, and she believes it is in Policy Stats. **[Declaration E]**

**Tonia Salvini** stated she is Vice President of University Services for the Haskell Indian Nations University in Lawrence, Kansas, and she has had this position for five years and approximately eight months.

Ms. Salvini attested she has no role or responsibilities associated with the Indian Leader newspaper, and she has no professional relationship with Complainant.  She further attested the newspaper is run by the students, and they should probably be reporting on issues pertaining to the University; providing some assistance to students to keep them informed as they achieve academic success; and presenting issues that affect Native populations.  Ms. Salvini declared she is not sure the newspaper should advocate; however, they could perhaps provide advocacy-centered information.  She further declared the University does not have a journalism program, and she does not know how the newspaper fits into an academic program in terms of honor and respecting journalistic ethics.

Ms. Salvini asserted she is aware of the Directive Dr. Graham sent Complainant, but she was not involved in it.  She further asserted she does not know why Complainant was given the Directive, but Dr. Graham is her supervisor, and she reported concerns she had regarding Complainant to him.  Ms. Salvini declared she volunteers on a Community Police Review Board, and she notified Dr. Graham of her concerns regarding Complainant encroaching upon her private life.  She further declared her role on the board is as a citizen, and it is unrelated to her role with the University.  Ms. Salvini avowed her work with the board is public, but it is not public knowledge with the University.  She further avowed her concern is that Complainant sought her out

USA000259

because it is difficult to find her involvement with the board on the website.  Ms. Salvini contended Complainant inserted himself into the board's work which he did not understand.  She further contended Complainant had himself placed on the agenda for the board because they take public comments and inform the public of the work they do online.  Ms. Salvini averred the board was working on an ordinance, and Complainant inserted himself into this situation as a means to stalk and harass her.  She further averred he had the right to do this as a citizen, but he represented himself as part of the Indian Leader newspaper.  She further averred this caused some board members to be confused.  Ms. Salvini stated the board listens to the public's concerns about the work they do, but they do not act on it.  She further stated Complainant sent a document on Indian Leader letterhead suggesting she was unfit to be on the board.  She related the complaint was relevant to the University, but not the board.  She further related she believes Complainant was possibly expressing his concern that he was not represented for all his ethnicity on campus but was counted as a tribe member.  She contended that matter was between the Census Bureau and the registrar, and she does not know what was asked about ethnicity.  She further contended they wanted their students counted, and they worked with the Census Bureau to do this.  Ms. Salvini attested Census representatives were on campus all the time, and Complainant had an opportunity to meet with them.  She further attested Complainant suggested it was her fault his ethnicity was not fully represented, and because of that, she was not capable of serving on the board that dealt with racial profiling.

Ms. Salvini stated she sought private counsel to obtain another perspective, and she hired a local attorney to guide her regarding what constitutes harassment and stalking.  She further stated she prepared a protective order in case Complainant's behavior escalated.

Ms. Salvini avowed that in November 2020, Complainant filed a formal complaint against her with the City, but this situation had been going on since probably August 2020.   She further avowed the City Attorney staff invited her to respond to Complainant's complaint, and she did.  She related she informed them that if they did not believe she was fit to be a board member, she would respectfully leave.  She further related the City found no cause to pursue the complaint, and it was completely dismissed.

Ms. Salvini attested that a couple of years ago, she attended civility training which included anti-harassment.  She further attested she is aware of the anti-harassment policy, but she does not know whether it is for students, faculty, and/or administration.  She declared the policy was posted in her former office, but she has moved. **[Declaration F]**

**Rhonda LeValdo** stated she is Faculty, Media Communications, Humanities Department, for Haskell Indian Nations University in Lawrence, Kansas.  She further stated she began the position as adjunct in 2008, and she became permanent in 2011.  She related she has been with the Agency since probably 2001.

USA000260

Ms. LeValdo asserted she is Advisor for the Indian Leader Newspaper.  She further asserted that during the beginning of summer 2020, Mr. Falleaf informed her they were working on projects that required her time, and she would not have time to serve as Advisor for the Indian Leader.  She avowed Mr. Falleaf stated he would be assuming that role temporarily through the summer.  She further avowed they were switching to online classes, and they had to attend training courses.  Ms. LeValdo attested more of her time would be focused on training.  She further attested she asked for clarification because she did not understand.  She declared she previously had summer projects that did not take much time from her, and her work on the newspaper was minimal.  She further declared she asked Dr. Rains for clarification because prior to this happening, Complainant had a discussion with Mr. Falleaf that did not go well.  She related that due to this, she would not have selected Mr. Falleaf to be the Advisor.  She further related Dr. Rains stated there was a Directive, but she had not seen it, and she was sent emails indicating Mr. Falleaf was to be the temporary Advisor until fall.  Ms. LeValdo stated she notified the newspaper of the change in Advisor, and they decided to attempt to change the plan of operation because they knew they did not engage in good discussions with Mr. Falleaf.  She further stated there was a lawsuit which indicated no one in an administrative position would have oversight of the newspaper, and Mr. Falleaf is a Dean and part of administration.  Ms. LeValdo asserted it is her understanding that Complainant contacted Mr. Falleaf to invite him to their weekly meeting, but he did not attend.  She further asserted Complainant had a meeting to prepare a plan of operation to not have Mr. Falleaf voted in as their Advisor, but Mr. Falleaf did not respond.  She attested that Mr. Falleaf was never really their Advisor.  She further attested the Advisor signs to have the students paid for working on the newspaper, and their banker was not processing checks for them.  Ms. LeValdo averred the only checks that were paid were those for an outstanding debt, and the students were not paid until last week.  She further averred Geri Sledd, the banker for the student bank, finally acknowledged that she was still the Advisor, but Ms. Sledd had not responded to any requests from Complainant since March 2020.

Ms. LeValdo asserted she is aware of the Directive Dr. Graham sent Complainant, but she was not involved in it.  She further asserted she learned about the Directive when Complainant informed her.  She attested Complainant was very upset, and she could not imagine an administrator stating that to a student.  She further attested she believes Complainant feared being expelled from school.  Ms. LeValdo stated Dr. Graham was dissatisfied with some stories that were circulated.  She further stated one story gained national news attention and pertained to a student being expelled during the Covid pandemic.  She averred the student was given no hearing, but he was expelled based on hearsay.  She further averred it portrayed the University in a bad light, and Dr. Graham and Mr. Falleaf did not like the exposure.

Ms. LeValdo stated she believes she has completed online anti-harassment training, but she is not really aware of the policy.  She further stated that because of the situation among her, Dr. Rains, and Mr. Falleaf, she began the process of filing a complaint, but she stopped because she did not want to be retaliated against.  **[Declaration G]**

USA000261

**RECORD EVIDENCE:**

An email dated October 16, 2020, was sent to Complainant by Dr. Graham, attaching a Directive.  In the Directive, Dr. Graham stated Complainant had been mentioned recently on more than one occasion as someone who routinely attacked Haskell employees with letters.  He stated Complainant had attacked a Haskell official during a community event, and he contacted the police department representing himself as Editor of the Indian Leader and demanding information regarding a deceased Haskell employee.  He related that Complainant had no authority to contact the police department or any other government agency and demand information on behalf of the University.  He further related Complainant attempted to remove Mr. Falleaf as Student Advisor for the Indian Leader, and recorded Ms. Morris without her permission.  Dr. Graham identified four actions Complainant would not engage in, and three actions he would engage in.  Dr. Graham stated Haskell University was not obligated to report any census, and if Complainant wished to be counted differently, he should contact the U.S. Census Bureau and file an individual report.  **[Attachment to Declaration A, pages 7-9]**

A letter dated October 26, 2020, was sent to Dr. Graham by Lindsie Rank, Program Officer, FIRE; Francine Compton, President, NAJA; and Sommer Ingram Dean, Staff Attorney, SPLC.  They stated the Directive he sent Complainant forbade him from carrying on normal journalistic activities, and it violated the First Amendment and the University's obligation under the September 1989 Settlement Agreement.  **[Exhibit 1]**

An email dated October 17, 2020, was sent to Mr. Dearman by Complainant, attaching a complaint against Dr. Graham.  Complainant reported Dr. Graham for issuing the Directive as a threat and intimidation, with the intent to withdraw his student rights.  He stated the Directive followed a grievance he submitted to Dr. Graham on October 9, 2020, regarding the University falsely collecting and representing his racial identity.  He further stated the Directive did not follow the Code of Student Conduct, and he received no letters from the Office of Student Rights regarding any violations or complaints referenced in the Directive.  Complainant provided his challenge to the individual directives included in Dr. Graham's Directive.  **[Attachment to Declaration A, pages 10-13]**

A letter (undated) was sent to Complainant by Dr. Graham, rescinding the October 16, 2020 Directive.  **[Exhibit 2]**

An email dated October 17, 2020, was sent to Mr. Dearman by Complainant, attaching an email he sent to the Lawrence Police Department.  He stated Dr. Graham portrayed him as demanding regarding the death of a respected University employee, and falsely accused him of acting on behalf of the University.  The attached email dated October 5, 2020, was sent to Patrick Compton, Public Affairs, Lawrence Police Department, by Complainant as a student writer for the Indian Leader.  Complainant requested confirmation and information on the death of Neeoni Chex.  Mr. Compton replied on October 5, 2020, stating they did not do police record searches by name, and asking if

USA000262

he had other information or the circumstances of her death.  An email dated October 21, 2020, was sent to Complainant by Mr. Dearman, stating he assigned his complaint to the Human Resources Department.  An email dated October 28, 2020, was sent to Ms. Shamblin by Complainant, requesting the status of his complaint.  Ms. Shamblin replied on October 28, 2020, stating Complainant did not file a Human Resources complaint. She stated she had assigned his complaint to a contract investigator.  **[Attachment to Declaration A, pages 14-23]**

An email dated October 9, 2020, was sent to Craig Owens, Lawrence City Manager, by Complainant, attaching an ethics complaint letter for the Community Police Review Board.  The attached complaint was made against Ms. Salvini, a member of the Community Police Review Board.  Complainant claimed Ms. Salvini failed to engage with him and act as an agent protecting the systems and furthering the disenfranchisement of his racial identity and abusing her position of authority.  He stated the University violated his rights by reporting racial and gender information to the U.S. Census Bureau without his consent and creating a system that did not offer identification of racial biases and protections for multi-racial students.  He further stated they ignored his requests to provide his own racial identity to the school.  **[Attachment to Declaration F, pages 6-9]**

A letter dated December 17, 2020, was sent to Complainant by Toni Wheeler, City Attorney, stating that after consideration of his Ethics Complaint, they found no violation of the City's Ethics Policy or bylaws of the Community Police Review Board. **[Attachment to Declaration F, pages 10-11]**

A letter dated January 19, 2021, was sent to Dr. Graham by Lindsie Rank, Program Officer, FIRE; Francine Compton, President, NAJA; and Sommer Ingram Dean, Staff Attorney, SPLC.  They stated that on January 14, 2020, Jennifer Wiginton with BIE notified them that his Directive dated October 16, 2020, was rescinded, and she attached a letter addressed to Complainant documenting that.  They further stated Ms. Wiginton indicated it had been intended to send the letter on November 20, 2020.  They related that the letter was undated, and it appeared it was belatedly sent to them the prior week as a result of the BIE investigation regarding the Directive.  They further related that a letter was sent to him on October 26, 2020, requesting his urgent attention and calling for an immediate rescission of the unconstitutional Directive.  They stated it was inappropriate and inexcusable that it took the University three months to rescind a Directive that was unconstitutional.  As a remedy they requested:  Revision of CIRCLE values to make clear that these are aspirational, not mandatory; amendment of Classroom Expression and Campus Expression policies to make clear that the right to free expression is not contingent upon compliance with the CIRCLE, and the policy should be amended to clarify that student press and speech may be regulated by the University only if the expression falls into a category unprotected by the First Amendment, such as true threats, harassment, or incitement; distribution of a revised

USA000263

student handbook to all Haskell students, and ensure that the updated handbook is easily found and publicly available on the University's website; and assurance that all outdated versions of the University's policies are removed from the website or marked clearly to indicate they are no longer in effect. **[Attachment to Declaration A, pages 24-28]**

A FOIA request dated January 19, 2021, was submitted to BIE by Katlyn Patton, FIRE, requesting all documentation regarding the Indian Leader and Complainant. **[Attachment to Declaration A, pages 29-34]**

An email dated March 16, 2020, was sent to Dr. Rains, Ms. LeValdo, Stephen Prue, and Lou Hara, by Complainant, requesting a student directory for students enrolled for the spring 2020 semester. **[Attachment to Declaration C, page 8]**

An email dated April 15, 2020, was sent to Dr. Rains and Mr. Prue by Complainant, stating it was his third request for them to send out a student email with the latest issue of the Indian Leader. Dr. Rains replied, stating they forwarded his request to the Central Office and they advised them to not comply. Dr. Rains provided Complainant the reasons for their advice. Complainant responded, requesting clarification. Dr. Rains replied, stating that Ms. LeValdo could provide him the "long, complicated" history of the newspaper. He stated they did not oppose the distribution of the newspaper and encouraged him to continue to provide information to students, but they could not accommodate his request. An email dated April 27, 2020, was sent to Dr. Rains and Mr. Prue, asking if they could email a link to the newspaper. Dr. Rains replied, stating he would consider ways they could assist him. **[Attachment to Declaration C, pages 9-14]**

An email dated April 15, 2020, was sent to Dr. Rains by Complainant, asking why their PDF was sent to the BIE Central Office for review if the Indian Leader was not an official publication of the University; if the University had not played a role in sending the Indian Leader out, why did Mr. Prue send an email with Volume 123, Issue 2 out; and if administration had no role in writing, editing, supervising, and publishing the newspaper, why were they concerned about the publication. **[Attachment to Declaration G, pages 6-8]**

An email dated April 14, 2020, was sent to Dr. Rains, Ms. Salvini, and Ms. McKinney by Complainant, stating the Indian Leader was covering a story regarding Russell Parker's disciplinary action. He asked if Mr. Parker's safety was considered when he was temporarily asked to vacate under stay-at-home orders; how Mr. Parker was given due process; how did an overview of "Student failed to comply with verbal directives from Facilities Staff" result in allegations of intimidation and harassment; and how did the administration address concerns from students that Facilities staff targeted students because they did not want them to remain on campus. **[Attachment to Declaration C, page 15]**

USA000264

An email dated July 13, 2020, was sent to Complainant by Ms. Morris, stating it was her understanding that he recorded the telephone discussion without her permission and posted it on Facebook without her permission.  She stated she did not believe she said anything inaccurate, but she believed it was appropriate to ask someone prior to recording their conversation.  She further stated she was sorry Complainant had to be deceitful to get information.  Complainant replied on July 14, 2020, stating he acknowledged her message reflected contempt for his actions, but he wanted to assert his right to record his conversations which did not require her permission.  **[Attachment to Declaration C, pages 16-18]**

An email dated July 10, 2020, was sent to deans and faculty by Mr. Falleaf, forwarding an email from Dr. Rains, stating they were preparing for a fully online semester, and ensuring a high-quality learning experience for the students.  He stated that due to the urgency of the required activities, all faculty was directed to temporarily step down from faculty sponsorship roles in student clubs and other non-teaching activities. An email dated July 10, 2020, was sent to Ms. LeValdo by Mr. Falleaf, reminding her of Dr. Rains' Directive.  **[Attachment to Declaration G, pages 9-10]**

An email dated July 28, 2020, was sent to Mr. Falleaf by Complainant, stating they were informed he was replacing Ms. LeValdo as part of a University-wide notice to faculty removing their roles as club Advisors.  Complainant stated he invited Mr. Falleaf to reach out to them, but he had not engaged with their club in more than a week since the notice.  He further stated the Indian Leader was structured to prevent oversight from administration, which would negate his ability to assume the Advisor role since he was part of administration.  Complainant related he would continue to operate without an Advisor and with access to their funds.  A memorandum dated August 3, 2020, was sent to Dr. Rains by Complainant, stating they recognized their right to remove Faculty Advisors, but his email seemed to assert an authority that went beyond the rights provided in the Settlement Agreement.  Complainant contended the University did not have the authority to assign Mr. Falleaf as the Faculty Advisor.  An email dated August 14, 2020, was sent to Dr. Rains by Complainant, stating Mr. Falleaf was not an administrator, but faculty.  He stated despite Dr. Rains telling him "no faculty is excluded from this directive," that was a lie and did not apply to Mr. Falleaf because he was a permanent faculty member.  Dr. Rains replied stating that Mr. Falleaf was permanent faculty, and he would continue to be appointed the Faculty Advisor for the Indian Leader while other faculty members were fulfilling their teaching responsibilities.  **[Attachment to Declaration C, pages 19-27]**

An email dated July 31, 2020, was sent to Complainant and Ms. LeValdo by Dr. Rains, stating all faculty had been asked to focus exclusively on preparation for teaching online that fall, program reviews, Blackboard training, and other University business.  Dr. Rains stated no faculty was excluded from the directive.   Dr. Rains related that per the Settlement Agreement between the University and the Indian Leader, the University had the exclusive right to appoint a Faculty Advisor to assist students in the publication of the Indian Leader.  He further related the agreement contained no language granting students the right to select the Faculty Advisor.  **[Attachment to Affidavit D, page 6]**

USA000265

An article dated October 26, 2020, was published by FIRE, and pertained to the Directive sent to Complainant by Dr. Graham. **[Exhibit 3]**

An article dated November 5, 2020, was published by LFWorld.Com, and pertained to the Directive sent to Complainant by Dr. Graham. **[Exhibit 4]**

A Settlement Agreement dated September 19, 1989, was between the Indian Leader Association and the Agency. It was resolved that: No employee of Haskell could censor, edit, or modify the content of the newspaper in violation of the First Amendment; or restrain, obstruct, or prohibit the publication of the paper. Regarding the role of the Faculty Advisor: Advisor shall discharge his or her responsibilities consistent with the following guidelines: The Faculty Advisor to the Association may freely advise and instruct student editors and reporters in the subject of journalism and relevant professional standards, recommend and critique the work product of student journalists, offer fiscal and technological guidance to the newspaper staff in business and production operations, and provide whatever assistance to the newspaper and the student journalists the Faculty Advisor deems appropriate; Faculty Advisor may make nonbinding recommendations to the student editors which they may, in their sole discretion, take into consideration; and although a Faculty Advisor of the Association may freely offer advice and assistance to student members of the Association, neither the Faculty Advisor nor any other Haskell officer or employee has the right to censor, edit or modify in any way the content of The Indian Leader. **[Exhibit 5]**

**POLICIES:**

Haskell Indian Nations University Student Handbook Code of Student Conduct (undated), Chapter II Code of Student Conduct. **[Exhibit 6]**

Haskell Institutional Values 2020 and Code (undated), Institutional Values - CIRCLE. **[Exhibit 7]**

USA000266

HARASSING CONDUCT FACT-FINDING INVESTIGATION

Department of the Interior

1849 C Street, NW

Washington, DC  20240-0001

Case Number:  DOI-21-HCI-011-BIA

INVESTIGATIVE REPORT

This Investigative Report was prepared by the undersigned Investigator and submitted to the Agency on this, the 9th day of February 2021.


SANDRA WYLLIE
CONTRACT INVESTIGATOR
5006 Allen Cay Dr.
Texas City, TX  77590-1406


**NOTICE OF RESTRICTED USAGE**

Access to, and usage of, this report is **RESTRICTED** by both the Freedom of Information Act and the Privacy Act to Government officials who must have access to the report to discharge their OFFICIAL duties.  This file and its contents must be safeguarded.  Willful violations of these requirements are subject to criminal penalties (5 U.S.C. 552a (i)).

USA000267

**WORKPLACE HARASSMENT FACT-FINDING REPORT**

**TABLE OF CONTENTS**

| ITEM | PAGE # |
|------|--------|
| Table of Contents | 2 |
| List of Declarations | 2-5 |
| List of Exhibits and Policies | 6 |
| Investigative Summary | 7 |
| Declarations | 7-17 |
| Record Evidence and Policies | 18-22 |

## LIST OF DECLARATIONS

A.   Jared Nally                           Student, Editor-in-Chief of the Indian Leader
     Complainant                           Department of the Interior (DOI)
                                           Bureau of Indian Education (BIE)
                                           Haskell Indian Nations University
                                           155 Indian Ave.
                                           Lawrence, KS  66046-4817

B.   Ronald Joseph Graham                  President
     Witness                               DOI/BIE
                                           Haskell Indian Nations University
                                           155 Indian Ave., Box 4999
                                           Lawrence, KS  66046-4817

C.   James W. Rains, Jr.                   Dean, College of Humanities and Arts
     Witness                               Acting Director, Special Projects (Detail)
                                           DOI/BIE
                                           Haskell Indian Nations University
                                           155 Indian Ave.
                                           Lawrence, KS  66046-4817

USA000268

D.  Joshua Levi Falleaf                           Instructor of English
    Witness                                       Acting Dean, College of Humanities and Arts
                                                  DOI/BIE
                                                  Haskell Indian Nations University
                                                  155 Indian Ave.
                                                  Lawrence, KS  66046-4817

E.  Carlene Morris                                Financial Aid Officer
    Witness                                       DOI/BIE
                                                  Haskell Indian Nations University
                                                  155 Indian Ave.
                                                  Lawrence, KS  66046-4817

F.  Tonia Salvini                                 Vice President of University Services
    Witness                                       DOI/BIE
                                                  Haskell Indian Nations University
                                                  155 Indian Ave.
                                                  Lawrence, KS  66046-4817

G.  Rhonda LeValdo                                Faculty, Media Communications
    Witness                                       Humanities Department
                                                  DOI/BIE
                                                  Haskell Indian Nations University
                                                  155 Indian Ave.
                                                  Lawrence, KS  66046-4817


**ATTACHMENTS TO DECLARATION A:**                 **PAGE NUMBER:**

Email dated October 16, 2020, sent to Complainant          7-9
by Dr. Graham, attaching a Directive

Email dated October 17, 2020, sent to Tony                10-13
Dearman, BIE Director, by Complainant, attaching a
complaint against Dr. Graham

Email communication dated October 17-28, 2020,            14-23
among Complainant, Mr. Dearman, and Jackie
Shamblin, Human Resources, regarding
Complainant's complaint against Dr. Graham

USA000269

| ATTACHMENTS TO DECLARATION A: | PAGE NUMBER: |
|---|---|
| Letter dated January 19, 2021, sent to Dr. Graham by Lindsie Rank, Program Officer, Foundation for Individual Rights in Education (FIRE); Francine Compton, President, Native American Journalists Association (NAJA); and Sommer Ingram Dean, Staff Attorney, Student Press Law Center (SPLC), regarding the Directive | 24-28 |
| A FOIA request dated January 19, 2021, sent to BIE by Katlyn Patton, FIRE | 29-34 |

| ATTACHMENTS TO DECLARATION C: | PAGE NUMBER: |
|---|---|
| Email dated March 16, 2020, sent to Dr. Rains; Rhonda LeValdo; Stephen Prue, Executive Assistant; and Lou Hara, Registrar, by Complainant, regarding requesting a student directory | 8 |
| Email communication dated April 15-27, 2020, among Complainant, Dr. Rains, Ms. LeValdo, and Mr. Prue, regarding the distribution of the Indian Leader | 9-14 |
| Email dated April 15, 2020, sent to Dr. Rains, Tonia Salvini, and Danielle McKinney, Guidance Counselor, regarding Russell Parker's disciplinary action | 15 |
| Email communication dated July 13-14, 2020, between Complainant and Carlene Morris, regarding Complainant recording their discussion | 16-18 |
| Email communication and memorandum dated from July 28 to August 14, 2020, between Complainant and Dr. Rains, regarding Joshua Falleaf replacing Ms. LeValdo as Student Advisor for the Indian Leader | 19-27 |

| ATTACHMENTS TO DECLARATION D: | PAGE NUMBER: |
|---|---|
| Email dated July 31, 2020, sent to Complainant and Ms. LeValdo regarding replacing her as the Faculty Advisor for the Indian Leader | 6 |

USA000270

| **ATTACHMENTS TO DECLARATION F:** | **PAGE NUMBER:** |
|---|---|
| Email dated October 9, 2020, sent to Craig Owens, Lawrence City Manager, by Complainant, attaching an Ethics Complaints against Ms. Salvini | 6-9 |
| Letter dated December 17, 2020, sent to Complainant by Mr. Owens, responding to the Ethics Complaint | 10-11 |

| **ATTACHMENTS TO DECLARATION G:** | **PAGE NUMBER:** |
|---|---|
| Email communication dated April 15, 2020, between Complainant and Dr. Rains, regarding the distribution of the Indian Leader | 6-8 |
| Email communication dated July 20, 2020, among Dr. Rains, Mr. Falleaf, and Ms. LeValdo, regarding her role as Indian Leader Advisor | 9-10 |

**Page 5 of 22**

USA000271

## LIST OF EXHIBITS AND POLICIES

**DOCUMENT**

**# OF PAGES**

| | | |
|---|---|---|
| 1. | Letter dated October 26, 2020, sent to Dr. Graham by Lindsie Rank, Program Officer, Foundation for Individual Rights in Education (FIRE); Francine Compton, President, Native American Journalists Association (NAJA); and Sommer Ingram Dean, Staff Attorney, Student Press Law Center (SPLC), regarding the Directive sent to Complainant by Dr. Graham | 10 |
| 2. | Letter (undated) sent to Complainant by Dr. Graham, rescinding the Directive | 1 |
| 3. | Article dated October 26, 2020, published by FIRE, regarding the Directive | 4 |
| 4. | Article dated November 5, 2020, published by LJWorld.Com, regarding the Directive | 5 |
| 5. | Settlement Agreement dated September 19, 1989, between the Indian Leader and the Agency | 19 |
| 6. | <u>Haskell Indian Nations University Student Handbook Code of Student Conduct</u> (undated) | 98 |
| 7. | <u>Haskell Institutional Values 2020 and Code</u> (undated) | 4 |

USA000272

## HARASSMENT FACT-FINDING INVESTIGATIVE REPORT

## INVESTIGATIVE SUMMARY

**Background**:

Jared Nally (Complainant) is a Student and the Editor-in-Chief of the Indian Leader, a student newspaper.  It was believed that due to Tonia Salvini's involvement in the census, Complainant stalked her related to her role on the Community Police Review Board, attended a board meeting, and during the meeting called her a racist.  It was believed Complainant contacted the Lawrence Police Department requesting information regarding a deceased individual on behalf of the University. It was further believed he recorded a discussion with Carlene Morris without her knowledge or approval.  A Directive dated October 16, 2020, was sent to Complainant by Dr. Graham, including a list of activities/behavior he would not engage in, as well as a list of activities/behavior he would engage in.

**Investigation Chronology**:

Bennett Tuchawena commissioned an investigation into Complainant's allegations of harassment. The investigation was assigned to the Investigator on December 7, 2020. Declarations were obtained telephonically from Complainant and witnesses January 12-18, 2021.

## GENERAL ALLEGATIONS

Complainant claimed he was subjected to harassment by Dr. Graham when he received a Directive dated October 16, 2020.

## DECLARATIONS

**[Investigator's Note:  The Investigator began each witness interview by explaining her role; the purpose of the interview; and the need for the witness to cooperate, and not discuss their interview with others.]**

**Alleged Harasser's Testimony:**

**Jared Nally** stated he is a student at the Haskell Indian Nations University in Lawrence, Kansas and the Editor-in-Chief of the school newspaper, the Indian Leader.  He further stated his first semester at the University was fall of 2019, and he joined the Indian Leader shortly after that.  He related he became Editor-in-Chief in January 2020.

Complainant asserted the Indian Leader newspaper was founded in 1897, and they report on ongoing student activities, issues affecting students in Indian country, and occurrences within the administration.  He further asserted he manages staff and guest writers, and proofreads public prints, manages assignments, and facilitates staff writers.

USA000273

Complainant avowed their news sources are the same as other news organizations, and they interview students, faculty, administration, and other individuals inside and outside the community.

Complainant asserted he does not believe he was subjected to harassment based upon any protected purview.

Complainant declared that on October 16, 2020, Dr. Graham sent him an email and attached a Directive.  He further declared the Directive stated, "Your name has been identified recently, and on more than one occasion, as someone who routinely attacks Haskell employees with letters; recently, you attacked a Haskell official during a community event." Complainant stated that what Dr. Graham referred to as a community event was his making an ethics complaint with the City of Lawrence.  He further stated the Directive condemned his actions and threatened disciplinary action if he continued to make his complaint.  Complainant contended he felt the Directive threatened the likelihood that the City would take his complaint seriously because Dr. Graham brandished his relationship with the Mayor and City Manager.  He further contended he believes Dr. Graham harassed him, and he felt he could not make complaints to the City like other members of the community.

Complainant stated the Directive falsely portrayed his news-gathering efforts.  He further stated he did not ask for information regarding Neeoni Chex on behalf of the University, and he did not discredit himself on behalf of the University.  Complainant avowed his email to the police was to obtain information as a student writer for the Indian Leader.  He further avowed he wanted to confirm the death and obtain information to give the community a proper death notice.  He asserted he stated Ms. Chex was a community pillar and appreciated any information they could provide.  He further asserted he did not demand anything on behalf of the University.  Complainant related the Directive made it appear his journalism caused fear.

Complainant averred Dr. Graham's Directive stated, "You will not: Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus; make demands on any government agency – or anyone else from Haskell – while claiming to represent the Indian Leader; attempt  countermanding decisions of Haskell personnel assigned by me or anyone else to positions in an effort to replace them; and record anyone at Haskell in your interviews unless you advise them first and they grant you permission." He contended that these activities are protected under the First Amendment, but the Directive prevented him from participating in them.  Complainant attested Dr. Graham referenced criticism of administrators, but this is an element of reporting as a student journalist.  He further attested the Directive came directly from Dr. Graham and not the Students Rights Office, and this means Dr. Graham was directly harassing him, and this violates the Code of Conduct.  He contended the Directive impaired his ability to perform as a student journalist and infringed upon his constitutional rights.  He further contended it seemed to be an abuse of power to prevent the newspaper from writing unflattering articles that the community needed to know about.

USA000274

Complainant avowed he did not tell Dr. Graham that he found his behavior unwelcome, offensive, inappropriate, etc.; however, he sent an email to Dr. Graham's manager, Tony Dearman, BIE Director.  He further avowed Mr. Dearman gave the letter to Jackie Shamblin, Human Resources, and he believes she initiated the investigation. Complainant stated FIRE, NAJA, and SPLC sent a letter to Dr. Graham wherein they explained that the Directive violated his First Amendment rights and why it should be rescinded.  He further stated the University did not respond to the letter.

Complainant asserted the alleged harassment affected his ability to participate as a student in the fall semester because he was worried about what had taken place.  He further asserted it affected the stories he wanted to write because he worried he might be disciplined.  He related it made it more difficult to retain staff writers because of the scrutiny and retaliation Dr. Graham demonstrated towards the newspaper.  He further related he has experienced much anxiety, and this made it difficult to complete assignments timely and focus on schoolwork as he was normally able to do. Complainant averred it was difficult to engage academically and stressful to manage their staff writer meetings.  He further averred that instead of focusing on stories they wanted to write, they discussed how the situation affected the news organization. Complainant stated their newsroom was not very productive during that semester.

Complainant attested he has not attended anti-harassment training because he was a transfer student and did not participate in the freshman seminar.  He further attested that if that seminar included anti-harassment training, to the best of his knowledge, it was not available to him. Complainant avowed he is aware of a Code of Student Conduct, but he believes that addresses student-to-student harassment.  He further avowed he is not certain whether that applies to faculty and administrators. Complainant stated he has not seen the anti-harassment policy posted anywhere.

Complainant requested that the Directive be rescinded; the Code of Student Conduct be updated regarding free speech; to have no restrictions from the CIRCLE values of the University; compliance with the First Amendment; and to have no qualifiers that restrict the First Amendment.  **[Declaration A]**

**Alleged Harasser's Testimony:**

**Ronald Joseph Graham** stated he is President, Haskell Indian Nations University in Lawrence, Kansas, and he has held this position for eight months.  He further stated he has been with the Department of the Interior (Agency) for eight months.

Dr. Graham avowed he has no role or responsibilities associated with the Indian Leader Newspaper; however, one of his faculty members has oversight for the newspaper.  He related he recently learned he was responsible for the newspaper's bank account.  Dr. Graham asserted he has no professional relationship with Complainant in his capacity as Editor-in-Chief of the Indian Leader.

USA000275

Dr. Graham declared he does not know the purpose of the Indian Leader, but it apparently reports news the same as any other newspaper.  He further declared the newspaper staff has a journalist instructor who guides and directs them.  Dr. Graham attested the Indian Leader creates much drama, and instead of reporting news, they engage in irritating things.  He further attested Complainant made the Indian Leader his personal newspaper.  He stated he does not read the Indian Leader or have any contact with it.  He further stated the Indian Leader previously received many awards and had a large journalist department, but it currently is not that way.   Dr. Graham averred he does not know to whom the Indian Leader is circulated, but he guesses it is to the University, and it is also online.

Dr. Graham asserted he probably sent Complainant the Directive dated October 16, 2020, and no one else was involved.  He further asserted he believes the Directive was triggered when Complainant stalked Tonia Salvini, his Vice President.  Dr. Graham avowed Complainant harassed Ms. Salvini and followed her to her meetings downtown where she was the chair of a committee.  He further avowed Complainant stood up during a meeting and called Ms. Salvini a racist.  Dr. Graham stated Ms. Salvini contacted an attorney and was going to have a cease-and-desist order served on Complainant.  He further stated his Dean did the same thing.  He avowed that females were afraid of Complainant because he went after anyone with authority and wrote horrible things about them.

Dr. Graham asserted Complainant recorded a discussion with a University employee.  He further asserted Complainant did not understand that if you record a person without their knowledge on Federal property, it is a felony.  He related that Complainant and his representatives claimed you could record someone without their knowledge under Kansas law, but they failed to understand it was on Federal property.

Dr. Graham asserted that an individual died on campus.   He further asserted Complainant contacted the police, stated he was a journalist, and demanded to be given the name of the deceased.   Dr. Graham averred the police basically ignored Complainant because they do not provide that type of information.  He further averred he believes Complainant represented himself as the Indian Leader from Haskell Indian Nations University.  He attested they have an individual who contacts newspapers and provides information with the permission of the family, and that individual already had the information for the deceased individual.

Dr. Graham avowed they were restructuring, and Jim Rains, Acting Vice President of Academics, reassigned Joshua Falleaf as Advisor to the Indian Leader.  He further avowed Complainant did not like this, and he and his colleagues voted Mr. Falleaf out.  Dr. Graham contended they did not have the authority to do this because it was a University position.  He further contended he basically told Complainant he could not do this.

Dr. Graham stated Complainant is a student, and he referred to Student Conduct.  He further stated he wrote a long response regarding why he sent the Directive and sent it to the BIE Solicitors.  He averred he identified several student violations Complainant

USA000276

committed, and stated he wanted it to stop.  Dr. Graham stated Complainant claimed he violated his First Amendment rights, and he sent a notice to Complainant rescinding the Directive.  He further stated that since Complainant is a journalist and serves as a leader, he believed he could go to these meetings and do what he did because of his position with the Indian Leader.  Dr. Graham attested that a Student Conduct Committee had enough information to remove Complainant from the Indian Leader, and they were going to remove him.  He further attested he stopped them and asked to handle the matter.  He related this did not violate Complainant's First Amendment rights, but he was basically telling Complainant to "knock it off" and do his job as a student.

Dr. Graham stated Complainant contacted FIRE, NAJA, and SPLC, organizations for student rights.  He further stated they accused him of violating Complainant's First Amendment rights.  He declared he sent their letter to the Solicitors, and working with them, he subsequently sent a letter to FIRE, NAJA, and SPLC, rescinding the Directive.

Dr. Graham contended the Directive was not intended as a reprimand to Complainant but was an attempt to have him stop the abuse and his behavior towards the Vice President and Dean.  He further contended Complainant had no right to do this.

Dr. Graham avowed Complainant only informed him that he found his behavior unwelcome, offensive, inappropriate, etc. via the newspaper.  He further avowed Complainant wrote a large newspaper article that was outlandish, and he did not respond to it.

Dr. Graham affirmed taking anti-harassment training online.  He stated he is familiar with the policy, and it covers the harassment of students by faculty and administration.  He further stated he has seen the policy on the intranet, and he mentions it in his cabinet meetings.  **[Declaration B]**

**Witnesses' Testimony:**

**James W. Rains, Jr.** stated he is Dean, College of Humanities and Arts, but he is currently detailed as Acting Director, Special Projects.  He further stated he has been Dean since May 2018, but he acted in this position since November 2017.  He related he was detailed as Acting Vice President and Acting President intermittently since November 2018.  He further related he has been with the Agency since August 2014.

Dr. Rains asserted the only role or responsibility he had associated with the Indian Leader newspaper was identifying a Faculty Advisor in the summer of 2020.  He further asserted he has no professional relationship with Complainant, and he has never had him as a student.  He related he does not provide oversight for the newspaper, which is independent from the University.

Dr. Rains avowed the Indian Leader is regarded as a student club, and an independent student organization that reports news for the benefit of students.  He further avowed the newspaper is written and edited by students.

USA000277

Dr. Rains attested he is aware of a Directive dated October 16, 2020, that was given to Complainant by Dr. Graham.  He further attested he has a PhD in English, and he assisted Dr. Graham with editing for grammar, but he did not change the content of the Directive.

Dr. Rains averred that in February 2020, their Acting President had a medical condition, and he assumed the role as President until Dr. Graham came to the campus in May 2020.  He further averred that on March 23, 2020, the campus was evacuated due to Covid-19, but less than 100 students remained on campus, including Complainant.  Dr. Rains stated Complainant constantly sought stories and information; however, they were in an information lock-down and anything referred to the media or other inquiries were referred to BIE Director Tony Dearman's office in Washington DC.  He further stated they were not allowed to respond to Complainant's requests for information because he was regarded as a separate media enterprise.  Dr. Rains declared that Complainant's inquiries were referred to Mr. Dearman.  He further declared he believes Complainant became frustrated with this, and he became somewhat harassing and antagonistic towards administration.  Dr. Rains asserted he began to receive FOIA requests for things unrelated to current events, and many pertained to Complainant and their failure to respond to his requests for information.  He further asserted he responded to the FOIA requests, but they felt Complainant was antagonizing them.

Dr. Rains averred that later in the summer of 2020, Complainant demonstrated some animosity towards Tonia Salvini.  He further averred Ms. Salvini served on the Community Police Review Board.  Dr. Rains stated Complainant attended some of the city meetings and basically antagonized and attempted to embarrass Ms. Salvini. He further stated it was his understanding that Complainant was displeased with Ms. Salvini because during the census, he was not allowed to represent himself as white and Native American.  Dr. Rains asserted he believes Dr. Graham somewhat felt Complainant was exploiting his position as Editor of the Indian Leader to represent himself in that capacity to antagonize Ms. Salvini at the board meetings.

Dr. Rains asserted that Russell Parker, a student, was expelled because he became belligerent with a University employee during the pandemic.  He further asserted Complainant represented Mr. Parker, and he used the Indian Leader to take exception to Mr. Parker's disciplinary action.  Dr. Rains attested Mr. Parker was given an opportunity to appeal his disciplinary action.  He further attested the Indian Leader became Mr. Parker's advocate, and this may have added to the animosity towards the administration.

Dr. Rains stated Rhonda LeValdo, an Instructor, was the sponsor for the Indian Leader. He further stated their faculty had to prepare for fall online classes.  He averred that fall was going to be a full 15-weeks online, and they invested much time into moving online and improving the quality of the courses.  He further averred that with the advice and permission of Human Resources, they asked all faculty to discontinue their sponsorship with all student organizations and prepare to improve their online classes.  He related

USA000278

the Indian Leader is a student organization, and Ms. LeValdo was asked to leave the sponsorship role to prepare for online teaching.  He further related that at the time, he was Acting Vice President, and Josh Falleaf replaced him as Dean of Humanities.  Dr. Rains asserted that when he was in the President's office he asked Mr. Falleaf to serve as Acting Director of Special Projects and Faculty Advisor for the Indian Leader.  He further asserted Mr. Falleaf was in an administrative role and did not have teaching duties.  Dr. Rains contended Complainant took exception to having Mr. Falleaf in this role because he wanted Ms. LeValdo to retain the role, and he rejected their explanation that Ms. LeValdo had to prepare for online courses.  He further contended Complainant sent him an email wherein he called him a liar and said Mr. Falleaf was not faculty.  He related Mr. Falleaf's position of record is faculty.  Dr. Rains stated that a court settlement in 1989 pertained to a President attempting to interfere with the content of the Indian Leader, and the ACLU filing a court case.  He further stated the case was settled that administration could exert no influence over the Indian Leader.  Dr. Rain asserted they have administrative influence over who is named the Advisor, but the settlement stated the Indian Leader does not have to follow the advice of the Advisor. He further asserted the Indian Leader rejected Mr. Falleaf as Advisor only because Complainant wanted Ms. LeValdo to be the Advisor.  He related he believes this caused Complainant to become antagonistic towards the administration.  He further related he believes by giving Complainant the Directive, Dr. Graham was attempting to have Complainant stop attacking the administration.

Dr. Rains averred there was an incident when Complainant recorded Carlene Morris and posted the discussion on social media without her authorization.  He further averred Ms. Morris felt violated and there was an inquiry into whether Complainant broke any laws.  Dr. Rains stated there was apparently no legal issue; however, journalistically, it was not proper.  He further stated he saw an email wherein Ms. Morris informed Complainant she did not appreciate what he did, but Complainant did not apologize

Dr. Rains asserted he believes the only action was the Directive Dr. Graham gave Complainant, and not a series of events that would constitute harassment.

Dr. Rains affirmed attending training regarding anti-harassment, and noted it was at least three years ago.  He stated he is familiar with the policy, but he has no specific experiential knowledge of it.  He further stated he thinks the policy is posted on campus, but he is not certain.  **[Declaration C]**

**Joshua Levi Falleaf** stated he is Instructor of English, but currently Acting Dean, College of Humanities and Arts, for the Haskell Indian Nations University in Lawrence, Kansas.  He further stated he has been an Instructor since spring of 2012, and he became an Acting Dean in 2014.  He related that he provided parttime teaching/adjunct work on a contract basis for two semesters prior to spring of 2012.

Mr. Falleaf asserted he is Ms. LeValdo's supervisor.  He further asserted that for a short period in the summer of 2020, Dr. Rains issued a Directive for the faculty to focus on their teaching.   He avowed this was the first semester when classes would be

USA000279

completely online after the emergency transition in spring, and this required much training and preparation. He further avowed it was his understanding the Directive was for one or two months, and during this time, he replaced Ms. LeValdo as Faculty Advisor for the Indian Leader.

Mr. Falleaf attested he is aware Dr. Graham sent Complainant the Directive, but he was not involved in that action. He further attested he believes Dr. Graham felt Complainant had overstepped or presented the University in an unfairly bad light, and he wanted this corrected. Mr. Falleaf stated there was concern regarding Complainant's ongoing harassment of Ms. Salvini associated with her public roles within the community. He further stated Dr. Graham attempted to clarify that the Indian Leader was not entitled to certain information, but it could be provided to anyone who used and represented it accurately. Mr. Falleaf averred he believes the Directive was intended to have Complainant understand he was a student and was required to uphold a certain code of conduct and journalistic ethics. He further averred he does not believe the Directive expressed this very well. Mr. Falleaf related the foregoing is just his interpretation of the situation.

Mr. Falleaf contended that replacing Ms. LeValdo as Advisor to the Indian Leader had nothing to do with the Directive Dr. Graham sent Complainant. He further contended that all University Advisors were replaced. Mr. Falleaf asserted he does not have the initial communication regarding this matter, but there was follow-up clarification with Complainant and Ms. LeValdo including dates from July 31, 2020. He further asserted Dr. Graham's Directive was dated October 16, 2020. He declared the Directive regarding Advisors was intended to streamline faculty focus on the delivery of their online classes.

Mr. Falleaf avowed he has completed annual BIE or DOI Talent training, and he is familiar with the anti-harassment policy. He further avowed he believes the policy is posted on their website. **[Declaration D]**

**Carlene Morris** stated she is Financial Aid Officer for the Haskell Indian Nations University in Lawrence, Kansas. She further stated she was hired as a contractor in 2013, and she was hired full-time in February 2015.

Ms. Morris attested she has no role or responsibilities associated with the Indian Leader newspaper. She further attested she has no professional relationship with Complainant, but she processes his financial aid. Ms. Morris averred the Indian Leader is like any newspaper. She further averred the newspaper shares and disseminates information to their students, and it is also distributed to the alumni and community.

Ms. Morris declared she heard about the Directive Dr. Graham sent to Complainant, but she was not involved in it. She further declared she informed Dr. Graham of an incident when Complainant called her to inquire about his financial aid, and she answered his questions to the best of her ability. Ms. Morris asserted a co-worker subsequently informed her Complainant recorded the telephone discussion and posted it on

USA000280

Facebook.   She further asserted she was a little upset that Complainant had not informed her prior to recording their discussion.   She related that when she previously worked with the Indian Leader, the students asked if they could record their discussions, and she usually said they could.   She further related she sent Complainant an email asking why he had not informed her that he was recording their discussion.   Ms. Morris stated she did not say anything inappropriate during their discussion, but it was a trust issue.   She further stated she asked Complainant to ask her prior to recording her again, and she would probably agree.   Ms. Morris attested Complainant stated he did not have to because of the law.   She further attested she was raised to believe just because you can do something, does not mean you should.   She averred Complainant was a nice young man, but now she has an issue with trust.

Ms. Morris asserted a young man sent her an email and asked her to make a comment about the situation, but she did not respond to him.   She further asserted she believes people should be treated fairly.   She related that Native Americans are taught to respect their elders, and Complainant could have asked to record their discussion.   She further related that in the future, she may ask the students if they are recording.

Ms. Morris affirmed attending anti-harassment training recently.   She stated she is familiar with the school's anti-harassment policy, and she believes it is in Policy Stats. **[Declaration E]**

**Tonia Salvini** stated she is Vice President of University Services for the Haskell Indian Nations University in Lawrence, Kansas, and she has had this position for five years and approximately eight months.

Ms. Salvini attested she has no role or responsibilities associated with the Indian Leader newspaper, and she has no professional relationship with Complainant.   She further attested the newspaper is run by the students, and they should probably be reporting on issues pertaining to the University; providing some assistance to students to keep them informed as they achieve academic success; and presenting issues that affect Native populations.   Ms. Salvini declared she is not sure the newspaper should advocate; however, they could perhaps provide advocacy-centered information.   She further declared the University does not have a journalism program, and she does not know how the newspaper fits into an academic program in terms of honor and respecting journalistic ethics.

Ms. Salvini asserted she is aware of the Directive Dr. Graham sent Complainant, but she was not involved in it.   She further asserted she does not know why Complainant was given the Directive, but Dr. Graham is her supervisor, and she reported concerns she had regarding Complainant to him.   Ms. Salvini declared she volunteers on a Community Police Review Board, and she notified Dr. Graham of her concerns regarding Complainant encroaching upon her private life.   She further declared her role on the board is as a citizen, and it is unrelated to her role with the University.   Ms. Salvini avowed her work with the board is public, but it is not public knowledge with the University.   She further avowed her concern is that Complainant sought her out

USA000281

because it is difficult to find her involvement with the board on the website.  Ms. Salvini contended Complainant inserted himself into the board's work which he did not understand.  She further contended Complainant had himself placed on the agenda for the board because they take public comments and inform the public of the work they do online.  Ms. Salvini averred the board was working on an ordinance, and Complainant inserted himself into this situation as a means to stalk and harass her.  She further averred he had the right to do this as a citizen, but he represented himself as part of the Indian Leader newspaper.  She further averred this caused some board members to be confused.  Ms. Salvini stated the board listens to the public's concerns about the work they do, but they do not act on it.  She further stated Complainant sent a document on Indian Leader letterhead suggesting she was unfit to be on the board.  She related the complaint was relevant to the University, but not the board.  She further related she believes Complainant was possibly expressing his concern that he was not represented for all his ethnicity on campus but was counted as a tribe member.  She contended that matter was between the Census Bureau and the registrar, and she does not know what was asked about ethnicity.  She further contended they wanted their students counted, and they worked with the Census Bureau to do this.  Ms. Salvini attested Census representatives were on campus all the time, and Complainant had an opportunity to meet with them.  She further attested Complainant suggested it was her fault his ethnicity was not fully represented, and because of that, she was not capable of serving on the board that dealt with racial profiling.

Ms. Salvini stated she sought private counsel to obtain another perspective, and she hired a local attorney to guide her regarding what constitutes harassment and stalking.  She further stated she prepared a protective order in case Complainant's behavior escalated.

Ms. Salvini avowed that in November 2020, Complainant filed a formal complaint against her with the City, but this situation had been going on since probably August 2020.  She further avowed the City Attorney staff invited her to respond to Complainant's complaint, and she did.  She related she informed them that if they did not believe she was fit to be a board member, she would respectfully leave.  She further related the City found no cause to pursue the complaint, and it was completely dismissed.

Ms. Salvini attested that a couple of years ago, she attended civility training which included anti-harassment.  She further attested she is aware of the anti-harassment policy, but she does not know whether it is for students, faculty, and/or administration.  She declared the policy was posted in her former office, but she has moved. **[Declaration F]**

**Rhonda LeValdo** stated she is Faculty, Media Communications, Humanities Department, for Haskell Indian Nations University in Lawrence, Kansas.  She further stated she began the position as adjunct in 2008, and she became permanent in 2011.  She related she has been with the Agency since probably 2001.

USA000282

Ms. LeValdo asserted she is Advisor for the Indian Leader Newspaper.  She further asserted that during the beginning of summer 2020, Mr. Falleaf informed her they were working on projects that required her time, and she would not have time to serve as Advisor for the Indian Leader.  She avowed Mr. Falleaf stated he would be assuming that role temporarily through the summer.  She further avowed they were switching to online classes, and they had to attend training courses.  Ms. LeValdo attested more of her time would be focused on training.  She further attested she asked for clarification because she did not understand.  She declared she previously had summer projects that did not take much time from her, and her work on the newspaper was minimal.  She further declared she asked Dr. Rains for clarification because prior to this happening, Complainant had a discussion with Mr. Falleaf that did not go well.  She related that due to this, she would not have selected Mr. Falleaf to be the Advisor.  She further related Dr. Rains stated there was a Directive, but she had not seen it, and she was sent emails indicating Mr. Falleaf was to be the temporary Advisor until fall.  Ms. LeValdo stated she notified the newspaper of the change in Advisor, and they decided to attempt to change the plan of operation because they knew they did not engage in good discussions with Mr. Falleaf.  She further stated there was a lawsuit which indicated no one in an administrative position would have oversight of the newspaper, and Mr. Falleaf is a Dean and part of administration.  Ms. LeValdo asserted it is her understanding that Complainant contacted Mr. Falleaf to invite him to their weekly meeting, but he did not attend.  She further asserted Complainant had a meeting to prepare a plan of operation to not have Mr. Falleaf voted in as their Advisor, but Mr. Falleaf did not respond.  She attested that Mr. Falleaf was never really their Advisor.  She further attested the Advisor signs to have the students paid for working on the newspaper, and their banker was not processing checks for them.  Ms. LeValdo averred the only checks that were paid were those for an outstanding debt, and the students were not paid until last week.  She further averred Geri Sledd, the banker for the student bank, finally acknowledged that she was still the Advisor, but Ms. Sledd had not responded to any requests from Complainant since March 2020.

Ms. LeValdo asserted she is aware of the Directive Dr. Graham sent Complainant, but she was not involved in it.  She further asserted she learned about the Directive when Complainant informed her.  She attested Complainant was very upset, and she could not imagine an administrator stating that to a student.  She further attested she believes Complainant feared being expelled from school.  Ms. LeValdo stated Dr. Graham was dissatisfied with some stories that were circulated.  She further stated one story gained national news attention and pertained to a student being expelled during the Covid pandemic.  She averred the student was given no hearing, but he was expelled based on hearsay.  She further averred it portrayed the University in a bad light, and Dr. Graham and Mr. Falleaf did not like the exposure.

Ms. LeValdo stated she believes she has completed online anti-harassment training, but she is not really aware of the policy.  She further stated that because of the situation among her, Dr. Rains, and Mr. Falleaf, she began the process of filing a complaint, but she stopped because she did not want to be retaliated against.  **[Declaration G]**

USA000283

**RECORD EVIDENCE:**

An email dated October 16, 2020, was sent to Complainant by Dr. Graham, attaching a Directive.  In the Directive, Dr. Graham stated Complainant had been mentioned recently on more than one occasion as someone who routinely attacked Haskell employees with letters.   He stated Complainant had attacked a Haskell official during a community event, and he contacted the police department representing himself as Editor of the Indian Leader and demanding information regarding a deceased Haskell employee.   He related that Complainant had no authority to contact the police department or any other government agency and demand information on behalf of the University.  He further related Complainant attempted to remove Mr. Falleaf as Student Advisor for the Indian Leader, and recorded Ms. Morris without her permission.   Dr. Graham identified four actions Complainant would not engage in, and three actions he would engage in.  Dr. Graham stated Haskell University was not obligated to report any census, and if Complainant wished to be counted differently, he should contact the U.S. Census Bureau and file an individual report.  **[Attachment to Declaration A, pages 7-9]**

A letter dated October 26, 2020, was sent to Dr. Graham by Lindsie Rank, Program Officer, FIRE; Francine Compton, President, NAJA; and Sommer Ingram Dean, Staff Attorney, SPLC.   They stated the Directive he sent Complainant forbade him from carrying on normal journalistic activities, and it violated the First Amendment and the University's obligation under the September 1989 Settlement Agreement.  **[Exhibit 1]**

An email dated October 17, 2020, was sent to Mr. Dearman by Complainant, attaching a complaint against Dr. Graham.  Complainant reported Dr. Graham for issuing the Directive as a threat and intimidation, with the intent to withdraw his student rights.  He stated the Directive followed a grievance he submitted to Dr. Graham on October 9, 2020, regarding the University falsely collecting and representing his racial identity.  He further stated the Directive did not follow the Code of Student Conduct, and he received no letters from the Office of Student Rights regarding any violations or complaints referenced in the Directive.   Complainant provided his challenge to the individual directives included in Dr. Graham's Directive.  **[Attachment to Declaration A, pages 10-13]**

A letter (undated) was sent to Complainant by Dr. Graham, rescinding the October 16, 2020 Directive.  **[Exhibit 2]**

An email dated October 17, 2020, was sent to Mr. Dearman by Complainant, attaching an email he sent to the Lawrence Police Department.  He stated Dr. Graham portrayed him as demanding regarding the death of a respected University employee, and falsely accused him of acting on behalf of the University.  The attached email dated October 5, 2020, was sent to Patrick Compton, Public Affairs, Lawrence Police Department, by Complainant as a student writer for the Indian Leader.  Complainant requested confirmation and information on the death of Neeoni Chex.  Mr. Compton replied on October 5, 2020, stating they did not do police record searches by name, and asking if

USA000284

he had other information or the circumstances of her death. An email dated October 21, 2020, was sent to Complainant by Mr. Dearman, stating he assigned his complaint to the Human Resources Department. An email dated October 28, 2020, was sent to Ms. Shamblin by Complainant, requesting the status of his complaint. Ms. Shamblin replied on October 28, 2020, stating Complainant did not file a Human Resources complaint. She stated she had assigned his complaint to a contract investigator. **[Attachment to Declaration A, pages 14-23]**

An email dated October 9, 2020, was sent to Craig Owens, Lawrence City Manager, by Complainant, attaching an ethics complaint letter for the Community Police Review Board. The attached complaint was made against Ms. Salvini, a member of the Community Police Review Board. Complainant claimed Ms. Salvini failed to engage with him and act as an agent protecting the systems and furthering the disenfranchisement of his racial identity and abusing her position of authority. He stated the University violated his rights by reporting racial and gender information to the U.S. Census Bureau without his consent and creating a system that did not offer identification of racial biases and protections for multi-racial students. He further stated they ignored his requests to provide his own racial identity to the school. **[Attachment to Declaration F, pages 6-9]**

A letter dated December 17, 2020, was sent to Complainant by Toni Wheeler, City Attorney, stating that after consideration of his Ethics Complaint, they found no violation of the City's Ethics Policy or bylaws of the Community Police Review Board. **[Attachment to Declaration F, pages 10-11]**

A letter dated January 19, 2021, was sent to Dr. Graham by Lindsie Rank, Program Officer, FIRE; Francine Compton, President, NAJA; and Sommer Ingram Dean, Staff Attorney, SPLC. They stated that on January 14, 2020, Jennifer Wiginton with BIE notified them that his Directive dated October 16, 2020, was rescinded, and she attached a letter addressed to Complainant documenting that. They further stated Ms. Wiginton indicated it had been intended to send the letter on November 20, 2020. They related that the letter was undated, and it appeared it was belatedly sent to them the prior week as a result of the BIE investigation regarding the Directive. They further related that a letter was sent to him on October 26, 2020, requesting his urgent attention and calling for an immediate rescission of the unconstitutional Directive. They stated it was inappropriate and inexcusable that it took the University three months to rescind a Directive that was unconstitutional. As a remedy they requested: Revision of CIRCLE values to make clear that these are aspirational, not mandatory; amendment of Classroom Expression and Campus Expression policies to make clear that the right to free expression is not contingent upon compliance with the CIRCLE, and the policy should be amended to clarify that student press and speech may be regulated by the University only if the expression falls into a category unprotected by the First Amendment, such as true threats, harassment, or incitement; distribution of a revised

USA000285

student handbook to all Haskell students, and ensure that the updated handbook is easily found and publicly available on the University's website; and assurance that all outdated versions of the University's policies are removed from the website or marked clearly to indicate they are no longer in effect. **[Attachment to Declaration A, pages 24-28]**

A FOIA request dated January 19, 2021, was submitted to BIE by Katlyn Patton, FIRE, requesting all documentation regarding the Indian Leader and Complainant. **[Attachment to Declaration A, pages 29-34]**

An email dated March 16, 2020, was sent to Dr. Rains, Ms. LeValdo, Stephen Prue, and Lou Hara, by Complainant, requesting a student directory for students enrolled for the spring 2020 semester. **[Attachment to Declaration C, page 8]**

An email dated April 15, 2020, was sent to Dr. Rains and Mr. Prue by Complainant, stating it was his third request for them to send out a student email with the latest issue of the Indian Leader.  Dr. Rains replied, stating they forwarded his request to the Central Office and they advised them to not comply.  Dr. Rains provided Complainant the reasons for their advice.  Complainant responded, requesting clarification.  Dr. Rains replied, stating that Ms. LeValdo could provide him the "long, complicated" history of the newspaper.  He stated they did not oppose the distribution of the newspaper and encouraged him to continue to provide information to students, but they could not accommodate his request.  An email dated April 27, 2020, was sent to Dr. Rains and Mr. Prue, asking if they could email a link to the newspaper.  Dr. Rains replied, stating he would consider ways they could assist him. **[Attachment to Declaration C, pages 9-14]**

An email dated April 15, 2020, was sent to Dr. Rains by Complainant, asking why their PDF was sent to the BIE Central Office for review if the Indian Leader was not an official publication of the University; if the University had not played a role in sending the Indian Leader out, why did Mr. Prue send an email with Volume 123, Issue 2 out; and if administration had no role in writing, editing, supervising, and publishing the newspaper, why were they concerned about the publication. **[Attachment to Declaration G, pages 6-8]**

An email dated April 14, 2020, was sent to Dr. Rains, Ms. Salvini, and Ms. McKinney by Complainant, stating the Indian Leader was covering a story regarding Russell Parker's disciplinary action.  He asked if Mr. Parker's safety was considered when he was temporarily asked to vacate under stay-at-home orders; how Mr. Parker was given due process; how did an overview of "Student failed to comply with verbal directives from Facilities Staff" result in allegations of intimidation and harassment; and how did the administration address concerns from students that Facilities staff targeted students because they did not want them to remain on campus. **[Attachment to Declaration C, page 15]**

USA000286

An email dated July 13, 2020, was sent to Complainant by Ms. Morris, stating it was her understanding that he recorded the telephone discussion without her permission and posted it on Facebook without her permission.  She stated she did not believe she said anything inaccurate, but she believed it was appropriate to ask someone prior to recording their conversation.  She further stated she was sorry Complainant had to be deceitful to get information.  Complainant replied on July 14, 2020, stating he acknowledged her message reflected contempt for his actions, but he wanted to assert his right to record his conversations which did not require her permission.  **[Attachment to Declaration C, pages 16-18]**

An email dated July 10, 2020, was sent to deans and faculty by Mr. Falleaf, forwarding an email from Dr. Rains, stating they were preparing for a fully online semester, and ensuring a high-quality learning experience for the students.  He stated that due to the urgency of the required activities, all faculty was directed to temporarily step down from faculty sponsorship roles in student clubs and other non-teaching activities. An email dated July 10, 2020, was sent to Ms. LeValdo by Mr. Falleaf, reminding her of Dr. Rains' Directive.  **[Attachment to Declaration G, pages 9-10]**

An email dated July 28, 2020, was sent to Mr. Falleaf by Complainant, stating they were informed he was replacing Ms. LeValdo as part of a University-wide notice to faculty removing their roles as club Advisors.  Complainant stated he invited Mr. Falleaf to reach out to them, but he had not engaged with their club in more than a week since the notice.  He further stated the Indian Leader was structured to prevent oversight from administration, which would negate his ability to assume the Advisor role since he was part of administration.  Complainant related he would continue to operate without an Advisor and with access to their funds.  A memorandum dated August 3, 2020, was sent to Dr. Rains by Complainant, stating they recognized their right to remove Faculty Advisors, but his email seemed to assert an authority that went beyond the rights provided in the Settlement Agreement.  Complainant contended the University did not have the authority to assign Mr. Falleaf as the Faculty Advisor.  An email dated August 14, 2020, was sent to Dr. Rains by Complainant, stating Mr. Falleaf was not an administrator, but faculty.  He stated despite Dr. Rains telling him "no faculty is excluded from this directive," that was a lie and did not apply to Mr. Falleaf because he was a permanent faculty member.  Dr. Rains replied stating that Mr. Falleaf was permanent faculty, and he would continue to be appointed the Faculty Advisor for the Indian Leader while other faculty members were fulfilling their teaching responsibilities.  **[Attachment to Declaration C, pages 19-27]**

An email dated July 31, 2020, was sent to Complainant and Ms. LeValdo by Dr. Rains, stating all faculty had been asked to focus exclusively on preparation for teaching online that fall, program reviews, Blackboard training, and other University business.  Dr. Rains stated no faculty was excluded from the directive.   Dr. Rains related that per the Settlement Agreement between the University and the Indian Leader, the University had the exclusive right to appoint a Faculty Advisor to assist students in the publication of the Indian Leader.  He further related the agreement contained no language granting students the right to select the Faculty Advisor.  **[Attachment to Affidavit D, page 6]**

USA000287

An article dated October 26, 2020, was published by FIRE, and pertained to the Directive sent to Complainant by Dr. Graham.  **[Exhibit 3]**

An article dated November 5, 2020, was published by LFWorld.Com, and pertained to the Directive sent to Complainant by Dr. Graham.  **[Exhibit 4]**

A Settlement Agreement dated September 19, 1989, was between the Indian Leader Association and the Agency.  It was resolved that:  No employee of Haskell could censor, edit, or modify the content of the newspaper in violation of the First Amendment; or restrain, obstruct, or prohibit the publication of the paper.  Regarding the role of the Faculty Advisor:  Advisor shall discharge his or her responsibilities consistent with the following guidelines:  The Faculty Advisor to the Association may freely advise and instruct student editors and reporters in the subject of journalism and relevant professional standards, recommend and critique the work product of student journalists, offer fiscal and technological guidance to the newspaper staff in business and production operations, and provide whatever assistance to the newspaper and the student journalists the Faculty Advisor deems appropriate; Faculty Advisor may make nonbinding recommendations to the student editors which they may, in their sole discretion, take into consideration; and although a Faculty Advisor of the Association may freely offer advice and assistance to student members of the Association, neither the Faculty Advisor nor any other Haskell officer or employee has the right to censor, edit or modify in any way the content of The Indian Leader.  **[Exhibit 5]**

**POLICIES:**

Haskell Indian Nations University Student Handbook Code of Student Conduct (undated), Chapter II Code of Student Conduct.  **[Exhibit 6]**

Haskell Institutional Values 2020 and Code (undated), Institutional Values - CIRCLE. **[Exhibit 7]**

USA000288

**DECLARATION OF _____JARED NALLY_____**

**Title:  Student and Editor-in-Chief of The Indian Leader**
**Location:    Haskell Indian Nations University, Lawrence, Kansas**
**Date of Interview: January 12, 2021**
**Case Number:  DOI-21-HCI-011-BIA**

I, **Jared Nally**, hereby make this Declaration.

I understand that I am making this statement under penalty of perjury; that it is the equivalent of a

sworn statement made under oath; and that it may be filed in proceedings in accordance with or

before the Merit Systems Protection Board (MSPB) or the Equal Employment Opportunity

Commission (EEOC), in the grievance process or before an Arbitrator, in court, or in any other

similar proceeding. This statement is voluntary and no promises of any kind have been made to me

and I have not been subjected to any threatening or coercive behavior for the purpose of obtaining

this declaration. I understand that this declaration is part of an official management investigation

and that this investigation is not part of the Equal Employment Opportunity (EEO) process.

1.    This interview and the subject matter discussed, including the identity of the individuals
      mentioned are confidential in nature.  You should not discuss any information divulged during
      this interview with any other person.  Do you understand?

      **Response:**

      **Yes.**

2.    For the record, please state your full name.

      **Response:**

      **Jared Nally**

3.    Please state your:

      Address:

      ┌─────────────────────────┐
      │      **PII**            │
      └─────────────────────────┘

      Telephone Number:

      ┌──────────────┐
      │    **PII**   │
      └──────────────┘

Page __1___ of __6___

Declaration A
Page 1 of 34   Initials _____

USA000289

DOI-21-HCI-011-BIA
**Declaration - Jared Nally**
**Page 2**

4.   Are you a student at Haskell Indian Nations University?  If so, how long have you been a
     student at the University?

     **Response:**

     **Yes.  My first semester was fall of 2019.**

5.   What is your role with the student newspaper, the Indian Leader?

     **Response:**

     **Editor-in-Chief**

6.   How long have you worked on the student newspaper?

     **Response:**

     **I started shortly after starting school at Haskell, probably a couple of weeks or a
     month after.  I didn't become Editor until January 2020.**

7.   Briefly describe the duties and responsibilities of your position with the newspaper.

     **Response:**

     **The Indian Leader newspaper was founded in 1897.  We are a student paper that
     reports on the ongoing student activities, things that affect students in Indian country,
     and things that happen within the administration.  I manage both our staff writers and
     our guest writers with putting together our print and our online articles.  I proof read
     public prints, and I manage assignments so we don't have two people working on the
     same lead.  I facilitate staff writers, make sure they have the resources they need, and
     that we stay on budget.  Our news sources are like those from any other news
     organization.  We interview students, faculty, administration, and other sources both
     inside and outside the community.  We have had interviews with Representatives and
     other government organizations. We engage in the full gambit of news collection.**

8.   Are you alleging you were subjected to harassment based upon any protected purview(s)?  If
     so, what is it or are they?

     **Response:**

     **No.**

DOI-21-HCI-011-BIA
Declaration - Jared Nally
Page 3

9.   Identify by first/last name and position the individual(s) whom you allege has/have subjected you to harassment.

**Response:**

**Dr. Ronald Graham, President, Haskell Indian Nations University**

10.   State the date(s) when you allege you were subjected to harassing behavior.  For each date, identify the individuals by first/last name and position who were involved in each incident, and describe in detail what happened during each incident.

**Response:**

**October 16, 2020 – Dr. Graham sent me an email, attaching a memorandum/directive. The email did not have any context to it, but only included the attachment.**

**In the directive Graham stated, "Your name has been identified recently, and on more than one occasion, as someone who routinely attacks Haskell employees with letters; recently, you attacked a Haskell official during a community event."  The action he referenced as the "community event" was me making an ethics complaint with the City of Lawrence, Kansas. This directive condemns my actions and threatens to take disciplinary action if I continue to make my complaint, and I felt the directive threatened the likelihood that the City would take my complaint seriously because Graham brandished his relationship with "the Mayor and City Manager." I felt harassed by Graham under the threat of discipline at Haskell that I could not make complaints to the City like other members of the Lawrence community.**

**The directive also falsely portrays my newsgathering efforts specifically about obtaining information about Naomi Chex (legal name Nia Shexnider). I did not ask for information on behalf of the University and I did not discredit myself on behalf of the University as suggested by the directive.  I participated in regular journalism practices for this and my other articles.  My email to the police was me reaching out to the Lawrence Police Department as a student writer for the Leader.  I wanted to get confirmation and information on the death of Neeomi Chex to provide our community with a proper death notice.  I stated she was a community pillar, and I would appreciate any information they could provide.  Nowhere in that did I attempt to demand anything on behalf of the University. The directive portrays my act of everyday journalism falsely causing fear that continued ethical journalistic practices could also be portrayed through similarly false narratives and result in the discipline threatened in the directive.**

**Graham's directive demanded "You will not: Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus; make demands on any government agency – or anyone else from Haskell – while claiming to represent the Indian Leader; attempt**

Page 3 | 6

Declaration A
Page 3 of 34

Initial _J/N_

DOI-21-HCI-011-BIA
Declaration - Jared Nally
Page 4

countermanding decisions of Haskell personnel assigned by me or anyone else to positions in an effort to replace them; and record anyone at Haskell in your interviews unless you advise them first and they grant you permission."  These were protected activities under the First Amendment that I had been participating in, and I was told I was not allowed to do so anymore with this directive.  Graham characterized criticism of administrators, which is an element of reporting as a student journalist, as countermanding decisions of those administrators. I received a directive directly from the President and not the Students Right Office which means Graham was directly harassing me, and this did not come directly from the Student Rights Office finding me in violation of the Code of Conduct, which would be the typical procedure.

The directive impairs my ability to work as a student journalist and infringes upon my constitutional rights.  I am not sure how my actions continuing as the Editor are going to affect my ability to continue as a student and journalist at Haskell without receiving any of the discipline referred to in the directive.  It seems like an abuse of power to keep the newspaper from writing unflattering articles that the community needs to know about.

This is a letter directly from President Graham.   It has very critical language about my behavior and this behavior is the same as doing journalistic activities.

11.   Did you tell the individual(s) who you claim subjected you to harassment that you found their behavior unwelcome, offensive, inappropriate, etc.?  If so, state the date, describe in detail what you told them, describe in detail their response, if any.

Response:

No.  I sent an email to Tony Dearman, Director of BIE, attaching the directive.  He is Dr. Graham's manager. Tony gave it to Jackie Shamblin, Human Resources.  I believe Mr. Shamblin began the investigation.  Refer to the October 26, 2020 letter directly to Dr. Graham from FIRE, NAJA, and SPLC, explaining how the directive violated my 1st amendment rights and why it should be rescinded.  The University has not responded to this letter.

12.   What, if any, effect did the alleged harassment have on your physical and emotional wellbeing?

Response:

Emotionally, it affected my ability to participate as a student in the fall semester because I was worried about everything going on.  It affected the types of stories that I wanted to write because I worried about how I may receive discipline referenced in Dr. Graham's directive.  It made it harder to retain staff writers because of the scrutiny and retaliation the president has shown towards the newspaper.

13.   What, if any, effect did the alleged harassment have on your work or school performance.

Declaration A
Page 4 of 34
Initial

DOI-21-HCI-011-BIA
Declaration - Jared Nally
Page 5

**Response:**

**I had a lot of anxiety surrounding this. It made it hard to complete assignments on time and focus on schoolwork like I'm normally able to do.  It made it hard to engage academically, and it made it stressful to manage during our staff writer meetings. Instead of focusing on stories we wanted to write, we had to talk about how it affected the news organization and shifted the focus of the conversation of the meetings.  We were not a very productive newsroom during that semester.**

14.   Have you attended training regarding anti-harassment?  If so, state the date(s).

**Response:**

**I have not, but I am a transfer student and did not have to take the seminar course for Freshmen.  If that program includes anti-harassment training, it was not made available to me as a transfer student to the best of my knowledge.**

15.   Are you aware of the school having an anti-harassment policy?

**Response:**

**I'm aware of a Code of Student Conduct, but I think that refers to student-to-student level harassment.  I'm not sure it applies to faculty and administrators.**

16.   Is the policy posted anywhere on the school property?  If so, state where it is posted.

**Response:**

**I have not seen anything.  I think I looked at some forms at the back of the Student Conduct and it didn't look like it was set up to report faculty or provide an understanding of who you would report it to.**

17.   Are you aware of anyone else who may have information relevant to your claim of harassment? If so, identify them by first/last name and position, and describe in detail what relevant information you believe they have.

**Response:**

**Rhonda LeValdo, who is the adviser for *The Indian Leader*.**

18.   What do you suggest as a remedy to this matter?

**Response:**

P a g e   5 | 6

Declaration A
Page 5 of 34
Initial

USA000293

# M Gmail

Jared Nally <jarednally@gmail.com>

## Directive

**Graham, Ronald J** <RONALD.GRAHAM@bie.edu>

Fri, Oct 16, 2020 at 4:10 PM

To: 
PII

📄 **doc00813120201016155650.pdf**
117K

USA000295



# HASKELL INDIAN NATIONS UNIVERSITY

**Office of the President**
155 Indian Avenue
Lawrence, Kansas  66046-4800
**www.haskell.edu**

## Memorandum

Date:   October 16, 2020

To:         Jared Nally

From:      Dr. Ronald Graham, President

Subject:    ***Directive***

Jared, I work directly with the Lawrence community at several different levels (i.e., the Mayor and City Manager's Office, Lawrence Police Department, the Chamber of Commerce, and the Rotary). My intention is to build relationships, identify training and internships, work with the community on their projects as a representative from Haskell, and create opportunities for Haskell students. Your name has been identified recently, and on more than one occasion, as someone who routinely attacks Haskell employees with letters; recently, you attacked a Haskell official during a community event.  Further, you have been identified as calling the police department and demanding information regarding a deceased Haskell employee while representing yourself as an editor for *The Indian Leader*. Under no circumstances do you have the authority to contact the police department (or any other governmental agency) and demand anything on behalf of the University.  Your behavior has discredited you and this university. You have compromised your credibility within the community and, more importantly, you have brought yourself, *The Indian Leader*, Haskell, and me unwarranted attention.

Earlier this summer, Josh Falleaf was assigned as the Faculty Advisor by Dr. Rains, the University's Acting Vice President of Academic Affairs, to advise *The Indian Leader* staff pursuant to University guidelines.  You took it upon yourself to attempt to remove him from this position per your letter dated August 3, 2020.  Mr. Falleaf was placed in an Acting Dean's position by me; however, he is first and foremost a Haskell Instructor.  In that, he is appropriately qualified to serve as the University's appointed Faculty Advisor to *The Indian Leader*.  Neither you nor any member of *The Indian Leader* staff has the authority to "vote out" the University-appointed Faculty Advisor; appointing the Faculty Advisor is the exclusive right of the University and it is in accordance with the 1989 court settlement.  You are a student at this University; you are not entitled to reverse Executive-level decisions. Furthermore, you essentially called Dr. Rains a liar in your email (referring to Mr. Falleaf's assignment), which violates Student Conduct.

You also chose to talk to yet another university official, Ms. Carlene Morris, and to record her conversation with you surreptitiously – and without her permission.  This action resulted in yet another complaint against you.  In many states, this would be considered a felony.  You invoked Kansas law to justify disrespectful behavior toward a university official. In the future, I strongly advise that you – out of respect, honesty, and journalistic codes of ethical conduct -- obtain permission from anyone from whom you seek to solicit information for your paper – especially information that is freely available to Haskell students.

Declaration A
Page 8 of 34

I will remind you that you are a student first and foremost on this campus, and your conduct falls under the umbrella of the Student Conduct Code. Your role on *The Indian Leader* does not absolve you from your responsibilities as a Haskell student – and as a representative of our community.  Henceforth, you will conduct yourself in accordance with the Haskell Student Code of Conduct -- now and in the future; and you will treat fellow students, University staff, and University officials with appropriate respect. Failure to do so, may result in disciplinary action.

Let me make myself clear. You are being directed, as a Haskell student. To comply with the following:

**You will NOT**:

- Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus,
- Make demands on any governmental agency -- or anyone else from Haskell -- while claiming to represent *The Indian Leader*.
- Attempt countermanding decisions of Haskell personnel assigned by me or anyone else to positions in an effort to replace them,
- Record anyone at Haskell in your interviews unless you advise them first and they grant you permission.

**You WILL**:

- Treat all faculty members, staff, and students with the highest respect.
- Conduct yourself as a student under the umbrella of Code of Conduct.
- Understand that no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them.

Lastly, Haskell is not obligated to report any census.  If you wish to be counted differently, I strongly suggest that you do what many of us do: contact the US. Census Bureau and file an individual report.

Cc:     BIE Legal

        Tony Dearman
        Director of BIE

# M Gmail

**Jared Nally <** ............PII............ **>**

---

## Reporting Subordinate Ronald Graham

---

⟨ ............PII............ ⟩                         Sat, Oct 17, 2020, 4:12 PM
To: <tony.dearman@bie.gov>, <monica.cooper@bia.gov>

Mr. Dearman:

Attached is a complaint report I would like to file against your subordinate Ronald
Graham, President of Haskell Indian Nations University. Please advise how this complaint
will move forward.

Thank you,
–Jared Nally
Reporting Behavior of Subordinate 2.pdf

USA000298

October 17, 2020

Tony Dearman
Director of BIE
Bureau of Indian Education
1849 C Street NW
Washington, DC 20240

## Reporting Behavior of Subordinate

Tony Dearman:

As you may be aware, Haskell Indian Nations University (HINU) President Ronald Graham issued a directive to me on Friday, October 16 which you were included as a copied recipient. I would like to report Ronald Graham for issuing this directive as a threat and intimidation with the intent to withdraw my student rights. The directive includes misleading narratives and baseless information for which I've been given sanctions that don't follow the Code of Student Conduct, violate my student rights, and appear to be a misuse of President Graham's authority.

I would first like to say this directive follows a grievance I submitted to President Graham on October 9th regarding how HINU has falsely collected and represented my racial identity, and an attempt to rectify my racial identity record and offer the same considerations for my peers. This grievance was not addressed in Graham's directive which appears to be a retaliatory email. Before I address Graham's directive, I would like to call attention to the current issue I'm engaged in with the HINU administration and say that I have attempted to resolve this issue with Graham, but will continue to fight for my right to my racial identity and will be following up with Sloan Farrell on this matter.

Graham's directive does not follow the Code of Student Conduct. I've received no letters from the Office of Student Rights for any violations or complaints referenced in Graham's directive. The president cannot operate outside of my rights as a student outlined in the Code of Student Conduct and cannot ignore the Code of Student Conduct processes needed to issue sanctions, nor may the sanctions violate my legal rights.

I feel the following sanctions infringe upon my constitutional rights afforded by the first amendment for freedom of speech and infringe upon lawful rights provided by state and federal laws.

**You will NOT "Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone of this campus**.

This directive directly correlates to me exercising my freedom of speech to ask that the Lawrence Community Police Review Board to remove Tonia Salvini as a board member because she violates the ethics of the board by contributing to my racial discrimination. While HINU may see this as an "Attack" on Salvini's public persona, I have every right to critique her and hold her accountable as a public figure even if HINU does not like the things I have to say. I should not be receiving criticism based on HINU's distaste for how I self advocate. This is not an issue of defamation, libel, or slander—I've provided sufficient evidence to support my claims. This is an attack on my right to voice a dissenting opinion of a HINU administrator.

**You will NOT: "Make demands on any governmental agency — or anyone else from Haskell — while claiming to represent The Indian Leader".**

This directive comes from a false claim that I contacted the police department and "demand[ed] [information] on behalf of the University". The interaction described claims that I identified

USA000299

myself on behalf on Haskell Indian Nations University which goes against my standard press greeting of,"My name is Jared Nally. I'm a student writer (or Editor-In-Chief for) the *The Indian Leader*, Haskell Indian Nations University's student newspaper." This is not a false introduction, but I welcome an open dialogue to how Indian Leader writers can identify themselves to avoid confusion. However, I do not want this sanction to impede on my ability to ask for information, and for the administration to color any request for information as a "demand".

I did not "demand" information when I reached out to the police department about Nia Schexnider's death, and it's a disservice to myself and to her to color it as such when I wrote a tribute piece honoring her life and even provided funeral information to HINU who did not send any messaging out to students about her death nor funeral information. I fear, HINU's ability to discolor any attempt to get information as "demanding" puts me at risk that asking any questions could be found as "demanding" and place me in violation of this sanction, and subject to disciplinary action.

I have a right to ask questions. I won't do so pretending to represent HINU—I always represent *The Indian Leader*. This sanctions endangers my freedom of speech to ask questions.

**You will NOT: "Attempt countermanding decisions of Haskell personnel assigned by me or anyone else in to positions in an effort to replace them.**

This directive is related to my actions as Editor-In-Chief of The Indian Leader Association to refuse to allow Joshua Falleaf whose expressed negative views of *The Indian Leader* publication calling it a "gossip rag" on April 17th, 2020, to be assigned as faculty advisor. HINU administration cites their authority is provided to them by a legal settlement agreement, but the clause cited, "One or more faculty advisers may be appointed by Haskell Indian Junior College to assist students in the publication of *The Indian Leader*," is not part of the settlement agreement, but is part of the Plan of Operations included as an appendix example referenced in the settlement agreement. The Plan of Operations is under The Indian Leader Association's authority — It was voted on by the association to remove Falleaf from the position and later the Plan of Operations was completely amended to allow an explicit statement for the removal and reappointment of Faculty Advisors. This sanction restricts the Indian Leader Association's rights to challenge the misuse of authority, and ability act in our own interest under our own Plan of Operations. This is a violation of freedom of speech where I am being criticized for asking for clarification, expressing the association's needs, the association's sovereignty, and the association's own policy. This sanction is a broad attempt at complacency and exploitation which threatens all of those free speech rights.

**You will NOT: "Record anyone at Haskell in your interviews unless you advise them first and they grant you permission."**

This is not how Single-Party Consent States work. I have every right to record my conversations without the explicit need to have permission granted. This is afforded to me through Kan. Stat. Ann. § 21-6101(4). It is blatant disrespect by the university to equate me to a felon for exercising a legal right in this state provides, and subsequently remove this right by assigning a sanction allowing disciplinary action if I exercise my right to record conversations in the future.

Related to this situation using the university's own language, HINU has "attacked" me in emails and letters, saying I'm deceitful and disrespectful and infer that I am not honest, not credible, and don't have journalistic integrity. This is a great example of freedom of speech, but showcases a double standard that a student isn't allowed to exercise free speech and is subject to sanctions, but faculty and administration may do so without repercussions.

USA000300

**You WILL: "Understand no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them."**

I completely understand that sentiment and agree. Timelines have been "imposed" to provide HINU with an understanding that their is (a) a limited amount of time to provide a statement before a story goes live to allow opportunity for HINU to provide a statement, or (b) has legal obligations like the recent October 25th which is a legal deadline for HINU to provide requested FERPA information and is done out of respect to allow HINU to avoid a FERPA violation which I will file if that timeline is failed to be met. I will continue to provides dates for the benefit of HINU, but understand it is entirely for their benefit, and not required.

My main take away from this directive is that HINU doesn't want unflattering information released and this directive is meant to accomplish that through intimidation and bullying myself with unjustified sanctions that violate my rights. Mr. Dearman, I ask that you please review the directive and consider these violations. I'm more then willing to provide documentation and additional explanation to the brief backgrounds provided above. Please provide communication as to how the process moves forward with this complaint.


Sincerely,

Jared Nally

Cc:      Monica Cooper, Human Resources Specialist

USA000301

M Gmail                                    **Jared Nally** < ⌐ ‾ ‾ ‾ PII ‾ ‾ ‾ ⌐ ¬

---

## Follow up to "Reporting Subordinate Ronald Graham"

---

**Jared Nally** < ⌐ ‾ ‾ PII ‾ ‾ ⌐ ¬              Sat, Oct 17, 2020, 8:22 PM
To: <tony.dearman@bie.edu>
Cc: <monica.cooper@bia.gov>

Tony Dearman:

I apologize I did not include this in my email " Reporting Subordinate Ronald Graham", I
have finally been able to find the email attached to provide to you as an example of the
inaccuracies and unfavorable coloring that President Graham has done to impose these
sanctions.

In Graham's directive I am portrayed as demanding and incentive to the death of a
respected HINU employee, and falsely accused of acting on behalf of the university. I
hope I can offer this as a starting point to unravel the false narrative being told about me
from the administration  and work toward rectifying my rights being withheld because of
this  directive.

In the attachment you will find that I did not call the police department, I had sent an
email that outlines our communication which was respectful, non-demanding, and not
impersonating or representing HINU. It was upsetting to see myself portrayed as such
and to see the rhetoric continue to unsavory and misrepresentative throughout Graham's
directive. I am appalled that Graham used Nia Schexnider's death as a means to debase
me, and create false allegations. I had a lot of respect for Nia, and believe I provided that
in my tribute, and HINU has ruined all of that to use her death against me.  HINU paid
 little respects to her death, they did not provide any death notice to students. A short
notice was provided to faculty which promised to update them with funeral information. I
provided funeral information to to HINU the day before the funeral, but this information
was not distributed. Weaponizing an employee's recent death is unsettling.

It is also unsettling that HINU demonstrates the ability to create false narratives to
support their agenda, and silence my voice. I hope this provides incite as to why I'm
adamant on retaining my rights that the vague and objective sanctions restrict, and
concern with how HINU could misconstrue any situation where I exercise protected rights
as a violation of these sanctions and afford them opportunities to exercise unjust

disciplinary action.

Thank you for your help again,

-Jared Nally

Note: Neeoni Chex's legal name is Nia Schexnider which I did not know at the time of writing the email
Media Inquiry - The Indian Leader.pdf

USA000303

**M** Gmail                                      **Jared Nally** < ⸻ PII ⸻ >

---

## Media Inquiry - The Indian Leader
2 messages

---

**Jared Nally** < ⸻ PII ⸻ >                          Mon, Oct 5, 9:13 AM
To: <lpdmedia@lkpd.org>

I'm reaching out the the Lawrence Police Department as a student writer for The Indian
Leader, Haskell Indian Nations University's student newspaper. I'm wanting to get
confirmation and information on the death of Neeoni Chex to provide our community with
a proper death notice. She was a community pilar and I would appreciate any information
you could provide.

She would have died sometime yesterday, October 4, before 4:00 PM CST. Please let me
know if LPD can confirm her death, cause of death, and provide a funeral home if
possible.

Thank You,
-Jared Nally, Editor-In-Chief

---

**Patrick S. Compton** <pscompton@lkpd.org>          Mon, Oct 5, 3:24 PM
To: Jared Nally < ⸻ PII ⸻ >

Jared,

Jared,

Thank you for inquiry.

My apologies, but we do not generally do police records searches by name. Do you have
any other information on the location (Was it in Lawrence?), or circumstances of her
death?

Best,

Patrick

Declaration A
Page 16 of 34

Patrick Compton
Public Affairs
Lawrence, Kansas Police Department
4820 Bob Billings Parkway
Lawrence, KS 66049
(785) 830-7409
pscompton@lkpd.org
https://www.facebook.com/LawrencePolice
https://twitter.com/lawrenceks_pd
[Quoted text hidden]

USA000305

 Gmail

**Jared Nally <** PII **>**

---

## Reporting Subordinate Ronald Graham

---

**Dearman, Tony L** <Tony.Dearman@bie.edu>                    Wed, Oct 21, 2020, 8:31 AM
To: Jared Nally < PII >, Cooper, Monica M <Monica.Cooper@bia.gov>
Cc: Shamblin, Jackie R <Jackie.Shamblin@bia.gov>

Hello Jared,

I have assigned our HR department to look into this situation. I have included
Jackie Shamblin and he can address questions you may have on next steps.

Tony L. Dearman
Director Bureau of Indian Education
Office: 202-208-6123
Cell: 202-570-5458
Fax: 202-208-3311

---

**From:** Jared Nally <           PII           >
**Sent:** Saturday, October 17, 2020 5:14 PM
**To:** Cooper, Monica M <Monica.Cooper@bia.gov>; Dearman, Tony L
<Tony.Dearman@bie.edu>
[Quoted text hidden]
Reporting Behavior of Subordinate 2.pdf

USA000306

M Gmail                                          **Jared Nally** <⌐ PII ¬>

---

## HR Complaint Followup

---

**Jared Nally** <⌐ PII ¬>                        Wed, Oct 28, 2020, 8:53 AM
To: Jackie.Shamblin@bia.gov <Jackie.Shamblin@bia.gov>

Good Morning Mr. Shamblin,

I'm reaching out to follow up on an HR Complaint against Haskell Indian Nations
University's President Ronald Graham forwarded to you by Tony Dearman on October
21st. I first wanted to touch base on the status of the complaint and see if your office can
let me know what the process looks like for investigating my complaint.

I would also like to add that the Foundation for Individual Rights in Education (FIRE) has
gotten involved to help advocate on my behalf. I'm adding a link to their letter to Graham
in this email which more clearly defines the violations of my student rights and the
retaliation I received in Graham's directive for participating in normal journalistic practices.
FIRE has also filed a complaint with the Office of the Inspector General of the Department
of the Interior which I am also adding a link to.

Directive from Graham:
https://www.thefire.org/directive-october-16-2020/

Letter to Graham:
https://www.thefire.org/fire-naja-and-splc-letter-to-haskell-indian-nations-university-
october-26-2020/

Complaint to OIG
https://www.thefire.org/fire-complaint-to-the-department-of-the-interior-office-of-the-
inspector-general/
[Quoted text hidden]

USA000307



## HR Complaint Followup

**Shamblin, Jackie R** <Jackie.Shamblin@bia.gov>          Wed, Oct 28, 2020, 3:16 PM
To: Jared Nally <PII>

Mr. Nally,

For clarification you did not file an HR complaint.  Director Dearman referred your complaint/allegations over to Human Resources because we handle the majority of the administrative complaints and/or investigations for BIE.  I have assigned your complaint to a contract investigator who will be reaching out to you for any additional information that may be needed from you in regards to your complaint.  BIE and Haskell University are a Federal organization and our employees are Federal employee, so the rules and processes are different than they are in a State or public organization.  Once the investigation is completed, you will receive a letter notifying you that the investigation has been completed and that the case is closed.

Jackie R. Shamblin

Human Resources Officer

Bureau of Indian Education

1011 Indian School Road NW Suite 150

Albuquerque, NM  87104

Phone: (505) 563-5300

Fax: (505) 563-5305

Declaration A
Page 20 of 34

Please take a moment to complete our HR Customer Satisfaction Survey.  Your feedback is very important to us.  Thank you.

- BIE survey - BIE HR Customer Satisfaction Survey

CONFIDENTIALITY NOTICE: This e-mail and any attachments may contain information that is privileged, confidential, or otherwise protected from disclosure. Interception, dissemination, distribution, or copying of this e-mail or the information herein is prohibited, and the information should only be viewed by the intended recipient. Any misuse or unauthorized disclosure may result in both civil and criminal penalties. If you have received this e-mail in error, please notify the sender by reply e-mail and destroy the original message and all copies.

**\*\*REMINDER: THE FEDERAL BENEFITS OPEN SEASON IS NOVEMBER 9 – DECEMBER 14, 2020\*\***

**If you have Open Season questions please reach out to your Benefits Specialist servicing your location:**

**Natalie Buckley** - natalie.buckley@bia.gov

Services BIE headquarters and schools/offices located in NM, AZ and UT including SIPI

**Stephanie Blanken** - stephanie.blanken@bie.edu

Services schools/offices located elsewhere (KS, CA, OK, SD, ND, OR, MT) including HINU and Bureau of Trust Funds Administration (BTFA) employees (formerly OST)

Declaration A
Page 21 of 34

USA000309

**From:** Jared Nally < [ PII ] >
**Sent:** Wednesday, October 28, 2020 7:54 AM
**To:** Shamblin, Jackie R <Jackie.Shamblin@bia.gov>
**Subject:** [EXTERNAL] HR Complaint Followup

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

[Quoted text hidden]

USA000310

M Gmail                                                    **Jared Nally** < PII >

---

## HR Complaint Followup

---

**Jared Nally** < PII >                    Wed, Oct 28, 2020, 3:20 PM
To: Shamblin, Jackie R <Jackie.Shamblin@bia.gov>

Thank you, that was very helpful!
[Quoted text hidden]

USA000311

  

January 19, 2021

Dr. Ronald Graham
Haskell Indian Nations University
Office of the President
Navarre Hall
155 Indian Ave
Lawrence, Kansas 66046-4800

*Sent via Electronic Mail (ronald.graham@bie.edu)*

Dear President Graham:

On January 14, FIRE,[1] NAJA,[2] and the SPLC[3] received an email from Jennifer Wiginton of the Bureau of Indian Education (BIE) notifying us that your directive of October 16, 2020, was rescinded and attaching a letter from you, addressed to Jared Nally, to that effect. While Wiginton asserted that you had intended to send this letter on November 20, the letter was itself undated, and the letter's metadata reveals that it was last edited after that date. It would appear that this letter was only belatedly sent to us and to Nally last week as a result of the BIE's investigation into your directive.

Rescission of your unconstitutional directive of October 16, 2020—which barred Jared Nally, editor-in-chief of *The Indian Leader*, from engaging in basic newsgathering and expressive activities protected by the First Amendment—was appropriate. While it is important that *The Indian Leader* may now do its work without the chill of censorship hanging over it, your

---

[1] The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.

[2] The Native American Journalists Association (NAJA) serves and empowers Native journalists through programs and actions designed to enrich journalism and promote Native cultures. NAJA recognizes Native Americans as distinct peoples based on tradition and culture. In this spirit, NAJA educates and unifies its membership through journalism programs that promote diversity and defends challenges to free press, speech, and expression. NAJA is committed to increasing the representation of Native journalists in mainstream media. NAJA encourages both mainstream and tribal media to attain the highest standards of professionalism, ethics and responsibility.

[3] Founded in 1974, the Student Press Law Center (SPLC) is the nation's only legal assistance agency devoted exclusively to supporting, defending, and educating high school and college journalists about the rights and responsibilities embodied in the First Amendment and supporting the student news media in covering important issues free from censorship. The SPLC is a nonpartisan, nonprofit organization.

510 Walnut Street, Suite 1250   Philadelphia, PA 19106
phone: 215-717-3473   fax: 215-717-3440
thefire.org

USA000312

administration's inexcusable and unexplained delay evidences continuing negligence in protecting your students' First Amendment rights. As a result, serious concerns remain about the state of freedom of speech and of the press at Haskell Indian Nations University (HINU). To that end, we request that HINU take further actions to revise its student code of conduct to comport with the First Amendment and notify students of these changes.

Three organizations concerned with students' rights wrote a letter to you on October 26, 2020, seeking your urgent attention and calling for an "immediate" rescission of a patently unconstitutional directive to a student journalist. At best, your intended response—accepting as true the BIE's representations that your undated letter was intended to be sent on November 20—would have come some thirty-five days after your October 16 order that Nally cease exercising his First Amendment rights. As it stands, that rescission was not communicated to Nally until eighty-nine days after the October 16 order.

It is absolutely inappropriate and inexcusable that it took HINU three months to rescind a directive that was unconstitutional from day one, regardless of the reason for the delay. For three months, your directive caused Nally and *The Leader* uncertainty as to their fundamental First Amendment rights, causing serious injury to their constitutional rights. This violated both the First Amendment and *The Leader*'s 1989 settlement agreement with the university.[4] While we appreciate that you and your leadership team have taken some belated steps to countermand your directive, further action must be taken to make these students—and all students at HINU—whole.

This is especially true given that, in addition to being a flagrant violation of the First Amendment, your directive also represented a departure from HINU's usual student conduct process.[5] Despite the process for adjudicating student conduct violations laid out in HINU's student handbook,[6] Nally did not receive fair notice that he was being accused of violating university policy, nor did he receive a hearing or other opportunity to be heard. Instead, Nally was subject to only a unilateral—and unconstitutional—diktat, imposing penalties on Nally and *The Leader* for three months without any due process.

Unfortunately, this complete disregard for Nally's rights appears consistent with HINU's worrying lack of concern for student rights in general. This is further evidenced by HINU's Student Rights Office web page, which continues to read, "Lorem ipsum dolor sit amet, consectetuer adipiscing elit, sed diam nonummy nibh euismod tincidunt ut laoreet dolore magna aliquam erat volutpat"—three months after FIRE, NAJA, and SPLC first alerted you of this oversight in our letter of October 26, 2020. Additionally, HINU does not make any

---

[4] Settlement Agreement between HINU Indian Junior College of the Bureau of Indian Affairs and the Indian Leader Association (Sept. 19, 1989) (on file with author).

[5] *See* Haskell Indian Nations University Student Handbook Code of Conduct at 23–35, *available at* https://haskell.edu/wp-content/uploads/2017/01/Haskell-CSC-Table-of-Contents-7-22-16.pdf (last visited Jan. 15, 2021).

[6] *Id.*

USA000313

student handbook available on its website, leaving students in the dark as to their rights and responsibilities.[7]

Of particular concern are HINU's "CIRCLE" values, which restrict student expression rights at HINU.[8] CIRCLE, an acronym ("Communication, Integrity, Respect, Collaboration, Leadership, and Excellence"),[9] presents laudable goals, but HINU cannot mandate these goals without departing from its obligations under the First Amendment.

For example, a government entity cannot mandate that individuals be respectful or demonstrate integrity in their expression. This is because the First Amendment, distilled to its most fundamental concepts, is intended to protect expression when it is controversial or upsetting to others, might be seen as disrespectful, or even might be seen to fully lack integrity. The Supreme Court has repeatedly, consistently, and clearly held that expression may not be restricted merely because some, many, or even most find it to be offensive or rude. This core First Amendment principle is why the authorities cannot ban the burning of the American flag,[10] prohibit the wearing of a jacket emblazoned with the words "Fuck the Draft,"[11] penalize satirical advertisements describing a pastor losing his virginity to his mother in an outhouse,[12] or disperse civil rights marchers out of fear that "muttering" and "grumbling" white onlookers might lead to violence.[13] In ruling that the First Amendment protects protesters holding signs outside of soldiers' funerals (including signs that read "Thank God for Dead Soldiers," "Thank God for IEDs," and "Fags Doom Nations"), the Court reiterated this fundamental principle, remarking that "[a]s a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate."[14]

This principle does not lose its salience in the context of the public university. To the contrary, a commitment to expressive rights must be robust and uncompromising if students and faculty are to be free to engage in debate and discussion about the issues of the day in pursuit of advanced knowledge and understanding. This dialogue may encompass speech that shows disrespect or offends. For example, the Supreme Court upheld as protected speech a student newspaper's use of a vulgar headline ("Motherfucker Acquitted") and a front-page "political cartoon . . . depicting policemen raping the Statue of Liberty and the Goddess of Justice."[15]

---

[7] Only by using Google to search for "Haskell Indian Nations Handbook" can one find outdated codes of conduct from 2012, 2015, and 2016. Because it is the most recent student handbook either FIRE or Nally could locate, this letter will reference HINU's 2016 Student Handbook and Code of Conduct.

[8] "Discussion and expression of all views is permitted, consistent with Haskell's CIRCLE values . . . " Handbook, *supra* note 5, at 11.

[9] *Id.* at 6-7.

[10] *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (burning the American flag was protected by the First Amendment, the "bedrock principle underlying" the holding being that government actors "may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

[11] *Cohen v. California*, 403 U.S. 15, 25 (1971).

[12] *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988).

[13] *Cox v. Louisiana*, 379 U.S. 536, 557 (1965).

[14] *Snyder v. Phelps*, 562 U.S. 443, 448, 461 (2011).

[15] *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 667–68 (1973).

USA000314

There is no doubt that many found these images deeply disrespectful at a time of political polarization and civil unrest, yet "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'"[16]

Further, your directive indicated that you believe criticism of government officials—such as HINU administrators—to be disrespectful, and thus in contravention of HINU's CIRCLE policy. However, again, the Supreme Court has specifically held that constitutionally-protected public debate "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."[17]

In an effort to remedy its callous disregard for the rights of its students, including Nally and *The Leader*, HINU must take substantial steps to ensure that its policies and practices protect the rights of its students. To this end, we ask HINU to do the following:

1. Revise its CIRCLE values to make clear that these are aspirational, not mandatory.
2. Amend its Classroom Expression[18] and Campus Expression[19] policies to make clear that the right to free expression is not contingent upon compliance with the CIRCLE values. Further, the policy should be amended to clarify that student press and speech may be regulated by the university only if the expression falls into a category unprotected by the First Amendment, such as true threats, harassment, or incitement.
3. Distribute a revised student handbook to all HINU students, and ensure that the updated handbook is easily found and publicly available on HINU's website.
4. Ensure that all outdated versions of HINU's policies are removed from the website or marked clearly to indicate they are no longer in effect.

Making these revisions to the student handbook and ensuring that students are aware of these changes will begin to make amends for the hostile free expression climate HINU has created.

We also understand that *The Leader*'s new Plan of Operations—including the newspaper's right to nominate and have confirmed a faculty adviser of its own choice, and its right to request that its faculty adviser be removed—will be approved.[20]

As we ensure that HINU does, in fact, intend to repair its relationship with Nally and *The Leader*, please also see the attached request for records pursuant to the Freedom of Information Act (5 U.S.C. § 552), which was also filed using the online portal on FOIA.gov.

In addition, HINU must preserve all documents and electronically stored information as defined by Rule 34 of the Federal Rules of Civil Procedure, that are relevant to this dispute.

---

[16] *Id.*
[17] *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).
[18] Handbook, *supra* note 5, at 10.
[19] *Id.* at 11.
[20] Please see our letter of October 26, 2020 for a discussion of the constitutional pitfalls of preventing student journalists from being able to direct the leadership of their own publications.

Declaration A
Page 27 of 34

USA000315

5

This includes any electronically stored information located on the "haskell.edu" email server. This includes without limitation electronic data within HINU's custody and control that is relevant to this dispute, including without limitation emails, instant messages, and other information contained on HINU's computer systems and any electronic storage systems. This also includes electronic data contained in computers, cellular phones, and other devices used by HINU administrators. As such, HINU must ensure that all HINU administrators involved in this dispute have preserved all electronic data relating to Nally and *The Leader* on their personal devices.

No procedures should be implemented to alter any active, deleted, or fragmented data. Moreover, no electronic data should have been disposed of or destroyed. We trust that HINU will continue to preserve such documents and electronically stored information.

Your directive to Nally represented a brazen departure from your First Amendment obligations, and it came as part of a pattern of unconstitutional actions at HINU.[21] In order to move forward, HINU must take clear actions to demonstrate that it will now take its First Amendment obligations seriously. We request receipt of a response to this letter no later than the close of business on January 26, 2021.

Sincerely,

Lindsie Rank
Program Officer, Individual Rights Defense Program
Foundation for Individual Rights in Education

Francine Compton
President
Native American Journalists Association

Sommer Ingram Dean
Staff Attorney
Student Press Law Center

Cc:     Jennifer Segal Wiginton, Bureau of Indian Education Team Lead
        Division of Indian Affairs, Office of the Solicitor

Encl.

---

[21] *See, e.g.*, Haskell Indian Nations University: Denial of Hearing After Student Kicked Out of Campus Housing, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., (Apr. 29, 2020), https://www.thefire.org/kansas-student-forced-to-sleep-in-car-after-university-kicks-him-out-of-housing-during-stay-at-home-order.

# Preview Request

The Freedom of Information Act (FOIA) is a federal law that gives the public the right to make requests for federal agency records. Agencies may withhold information according to nine exemptions contained in the statute. The FOIA applies only to federal agencies. It does not apply to records held by Congress, the courts, or by state or local government agencies. Each state has its own public access laws that should be consulted for access to state and local records.

**\*** indicates a required field.

## Agency Selection

| | |
|---|---|
| **Agency** | U.S. Department of the Interior |
| **Sub Agency** | Bureau of Indian Education |
| **Sub Agency** | Bureau of Indian Education (General) |

Please note that the complexity of your request will affect the order in which your request is processed. For more information on multitrack processing and how it affects your request, please see section 2.15 of our regulations

Fields marked with an asterisk (\*) are required. In addition, you should indicate in the Description field your fee category (that is, whether you are a commercial-use requester, news media, educational or noncommercial scientific institution, or other requester as described in sections 2.38 and 2.39 of our regulations).

The FOIA offices in the bureaus/offices of the Department of the Interior are continuing to process FOIA requests to the best of their ability during the COVID-19 pandemic. To keep employees healthy and safe, the Department is maximizing telework flexibility and employing social distancing protocols. As a result of these precautions, most employees are working remotely and unable to collect hard copy records located in government facilities at this time. If your request is for hard copy records, the response to your request will very likely be delayed. In addition, employees may not receive FOIA requests that are sent by U.S. mail, overnight mail services, or facsimile in a timely manner.

You will receive an email shortly after this form has been submitted. This email confirms that your request was submitted successfully and that the selected FOIA office can begin review of your request. If you do not receive a confirmation email and would like to confirm your submission, please contact the bureau FOIA office through the information located on our Contact page.

The Office of Inspector General is not accepting FOIA requests through FOIAonline. You may file a request with the Office of Inspector General at: https://www.doioig.gov/complaints/FOIA/how-to-submit-a-foia-request.

The Department's expedited processing requirements correspond with 43 C.F.R. § 2.10 and § 2.20. A request for expedited processing must set forth the reasons why the request should be expedited. You must certify that the reasons given for seeking expedited processing of this request are true and correct to the best of your knowledge and belief.

The Department's fee waiver requirements correspond with 43 C.F.R. Part 2, Subpart G. Please be advised that by making a FOIA request, it shall be considered an agreement by you to pay all fees unless you have been granted a fee waiver or specify your willingness to pay fees up to a particular amount. Please note that a default amount of *$200 will be prepopulated* to your request, but can be modified by you to be less or more. Additionally, the amount of fees you will be charged (or not charged) will be affected by your fee category. We will confirm this agreement in our acknowledgement letter.

Declaration A
Page 29 of 34

USA000317

If the bureau processing your request finds that the actual cost will exceed the amount you specify, the bureau will stop processing the request and consult with you (see 43 C.F.R. 2.49(d)). If you are seeking a fee waiver, it is your responsibility to provide detailed information to support your request by addressing all the criteria outlined in 43 C.F.R. 2.48. If you do not submit sufficient justification, your fee waiver request will be denied (see 43 C.F.R. 2.45). Please note the fact you may have received a fee waiver in the past is not determinative of whether you will receive one for this request--you still must submit sufficient justification.

## Request Type

| | |
|---|---|
| **Request Type** | FOIA |

## Contact Information

| | |
|---|---|
| **Salutation** | Miss |
| **First Name** | Katlyn |
| **Middle Initial** | |
| **Last Name** | Patton |
| **Email Address** | katlyn.patton@thefire.org |
| **Organization** | Foundation for Individual Rights in Education |
| **Phone Number** | 2157173473 |
| **Fax Number** | |
| **Mailing Address Location** | United States/US Territories |
| **Address Line 1** | 510 Walnut Street |
| **Address Line 2** | Suite 1250 |
| **City** | Philadelphia |
| **State/Province** | Pennsylvania |
| **Zip Code/Postal Code** | 19106 |

## Processing Fees

| | |
|---|---|
| **Will Pay Up To** | $10.00 |

Declaration A
Page 30 of 34

USA000318

# Description

| Description | (1) Any emails (including attachments), memoranda, text messages, or social media messages sent or received by Dr. Ronald Graham to or from any employee or agent of Haskell Indian Nations University, from October 26, 2020 through the present date, which contain the terms "Indian Leader," "newspaper," "free expression," "free speech," "free press," "Jared," or "Nally." (2) Any emails (including attachments), memoranda, text messages, or social media messages sent or received by Dr. Ronald Graham to or from any employee or agent of Haskell Indian Nations University, from October 26, 2020 through the present date, which reference the letter from Lindsie Rank, Foundation for Individual Rights in Education, to Dr. Ronald Graham, dated October 26, 2020. (3) Any document (including emails, attachments to emails, memoranda, text messages, or social media messages) which reflect, pertain to, or substantiate Dr. Graham's statement in an undated letter to Jared Nally that Dr. Graham had "instructed my staff to review the status of the Leader's annual recognition process to ensure continued access by the Leader to its Student Bank account and Haskell resources." Privacy waiver: Please find enclosed with this request a privacy waiver executed by Jared Nally. Request for Privilege Log: If any otherwise responsive documents are withheld on the basis that they are privileged or fall within a statutory exemption, please provide a privilege log setting forth (1) the subject matter of the document; (2) the person(s) who sent and received the document; (3) the date the document was created or sent; and (4) the basis on which the Bureau of Indian Education contends it is entitled to withhold the document from production. |
|---|---|

# Request Expedited Processing

| Make Request? | Yes |
|---|---|
| Justification | Request for expedited processing: Pursuant to 5 U.S.C. § 552(a)(6)(E) and 43 C.F.R. § 2.20, I request expedited processing of this request because there is a compelling need for the records and an "urgency to inform the public about an actual or alleged Federal Government activity." The Foundation for Individual Rights in Education is primarily engaged in disseminating information to inform the public about government affairs, and regularly publishes on its website news and information concerning matters relating to civil liberties in higher education. Each of the substantive requests included herein involve an actual or alleged Federal Government activity, namely the actions of an institution under the authority of the Bureau of Indian Education which violated students' First Amendment rights, and that institution's current purported efforts to correct that violation. (See the enclosed letters of October 26, 2020 and of today's date from Lindsie Rank, Foundation for Individual Rights in Education.) I request a response to this request for expedited processing within 10 calendar days under 43 C.F.R. § 2.20(e). I certify that the statements contained in this letter regarding the alleged activity and public concern are true and correct to the best of my knowledge. |

## Request a Fee Waiver

| | |
|---|---|
| **Make Request?** | Yes |
| **Justification** | Fee waiver request: Pursuant to 5 U.S.C. § 552(a)(6)(E) and 43 C.F.R. § 2.45(a). The Foundation for Individual Rights in Education, Inc. (FIRE) is a 501(c)(3) non-profit, non-partisan organization dedicated to defending, preserving, and extending civil liberties on campus. The records sought herein are not sought for a commercial purpose and are, instead, requested by a non-profit organization to facilitate the public's understanding of government activities. The subject of the request specifically concerns identifiable operations or activities of the government, and the disclosable portions of the requested information will be meaningfully informative in relation to the subject matter of the request. The public interest would be well-served by granting a fee waiver. The disclosure will contribute to the public understanding ` of government operations, and the public's understanding will be significantly enhanced by the disclosure, as FIRE has expertise in the subject matter of the request and the intention and demonstrated ability to disseminate the information to the public. FIRE regularly shares information with other media outlets and maintains a blog regularly publishing information concerning similar matters. See, for example, https://www.thefire.org/santa-clara-university-protects-student-free-speech-with-one-hand-censors-with-the-other. Because the subject of this request pertains to an ongoing controversy, it is important that records be produced in an expedited manner in order to facilitate the public's interest in understanding, and being able to respond to, decisions by government officials. If a fee waiver is not granted, please apprise me if the estimated costs will exceed $10. |

## Additional Information

| | |
|---|---|
| **Relevant park or refuge or site or other location** | N/A |

## Attach Supporting Files

| Attached File Name | Size (MB) | File Type |
|---|---|---|
| Jared Nally FERPA waiver & request.pdf | 0.1932 | Adobe PDF document |

✔ **I Agree.**

**I have read the Privacy and Security Notice and agree to the terms set forth.**

Declaration A
Page 32 of 34

USA000320

 **I Agree.**

**Affirmation. Pursuant to 28 USC § 1746, I declare and affirm that under penalty of perjury under the laws of the United States of America that all of the foregoing information, statements, and signatures submitted in connection with this request and in any supporting documents are true and correct to the best of my knowledge.**

Declaration A
Page 33 of 34

USA000321

# Request Confirmation

## Request Information

| | |
|---|---|
| **Tracking Number** | DOI-BIE-2021-001931 |
| **Requester Name** | Under Agency Review |
| **Submitted Date** | 01/19/2021 |
| **Request Phase** | Submitted |
| **Description** | Under Agency Review |

Declaration A
Page 34 of 34

USA000322

DECLARATION OF _____ **RONALD JOSEPH GRAHAM** _____

**Title:  President**
**Location:   Haskell Indian Nations University, Lawrence, Kansas**
**Date of Interview: January 13, 2021**
**Case Number:  DOI-21-HCI-011-BIA**

I, **Ronald Joseph Graham**, hereby make this Declaration.

I understand that I am making this statement under penalty of perjury; that it is the equivalent of a

sworn statement made under oath; and that it may be filed in proceedings in accordance with or

before the Merit Systems Protection Board (MSPB) or the Equal Employment Opportunity

Commission (EEOC), in the grievance process or before an Arbitrator, in court, or in any other

similar proceeding. This statement is voluntary and no promises of any kind have been made to me

and I have not been subjected to any threatening or coercive behavior for the purpose of obtaining

this declaration. I understand that this declaration is part of an official management investigation

and that this investigation is not part of the Equal Employment Opportunity (EEO) process.

1.     This interview and the subject matter discussed, including the identity of the individuals
       mentioned are confidential in nature.  You should not discuss any information divulged during
       this interview with any other person.  Do you understand?

       **Response:**

       **Yes.**

2.     For the record, please state your full name.

       **Response:**

       **Ronald Joseph Graham**

3.     Please state your:

       Address:

       **PII**

       Telephone Number:

       **PII**

Initials _____

Declaration B
Page 1 of 7

DOI-21-HCI-011-BIA
Declaration – Ronald Graham
Page 2

Email Address:

**Ronald.Graham@bie.edu**

4.    Please identify your position with Haskell Indian Nations University.

**Response:**

**President**

5.    How long have you held this position?

**Response:**

**Eight months.**

6.    How long have you been with the Agency?

**Response:**

**Eight months.**

7.    Please identify your role and responsibilities associated with the Indian Leader newspaper.

**Response:**

**Absolutely nothing.  I have a faculty member who does the oversight.  I don't get personally involved in it.  I just learned I am in charge of their bank account.**

8.    Describe your professional relationship with Jared Nally pertaining to his role as Editor-in-Chief of the Indian Leader newspaper.

**Response:**

**Absolutely nothing.**

9.    Describe in detail the purpose of the Indian Leader newspaper.

**Response:**

**I really don't know.  Apparently, it is a paper that reports the news like any other paper.  It's for the BIA and Native American kids here.  They have a journalist instructor that guides and directs them.  They just report the news.  The University of Kansas has the same thing, and the faculty and students work together.  They want to**

P a g e  2 | 7

USA000324

DOI-21-HCI-011-BIA
Declaration – Ronald Graham
Page 3

partner with us and work with our journalist department, but I'm going to hold off and see how things are going. I don't know what is going on with the paper, how it's being handled, or the relationship. The paper itself starts a lot of drama. It has a lot of irritating stuff instead of reporting. Jared made it his own personal paper. I don't read it or have any contact with it. The Indian Leader has in the past received a lot of awards and had a large journalist department. It is not that way now. I don't really know anyone who works on that paper.

10.   If not previously addressed, identify the individuals/entities to whom the Indian Leader is circulated.

**Response:**

**I honestly don't know. I'm guessing just the University. It might go outside. It's also online.**

11.   Did you send the Directive dated October 16, 2020, to Mr. Nally?

**Response:**

**I probably did.**

12.   Was anyone else involved in the decision to send the Directive to Complainant? If so, identify them by first/last name and position. Describe their involvement in detail.

**Response:**

**No.**

13.   Explain in detail why you sent the Directive to Mr. Nally.

**Response:**

**I think what really triggered it was when Jared stalked my female Vice President, Tonia Salvini. He was basically harassing her and following her to meetings downtown at Lawrence where she is a chair on a committee. He stood up during a meeting and called her a racist. He is a student, and I referred to the Student Conduct. I wrote a long response and sent it to the BIA Solicitors regarding why I sent the Directive. I laid out several student violations Jared was doing, and I wanted it stop. I also think Jared was recording one of my Deans, and he did a few other things too. I am a retired homicide cop and my background in Law has been criminal. Jared said I violated his First Amendment. I sent a retraction notice to Jared. I guess because he is a journalist or serves as a leader, he felt he could go to all these meetings and do what he does due to his position with the Indian Leader. I had a Student Conduct Committee that was going to remove him from the Indian Leader, and they had enough**

Page 3 | 7

USA000325

DOI-21-HCI-011-BIA
Declaration – Ronald Graham
Page 4

information to remove him from campus, and I stopped it. I asked to handle it from my end. This is not against the First Amendment. I was only going by Student Conduct. I was basically telling him to knock it off, do your job as student, and quit what you're doing.

He contacted FIRE, NAJA, and SPLC. They accused me of violating his First Amendment right. I sent the letter to our solicitors. I worked with them, and subsequently I sent a letter to FIRE, NAJA, and SPLC, retracting the Directive.

14. Was the Directive intended as a reprimand to Mr. Nally?

Response:

No. It was a Directive to stop what he was doing. Stop the abuse and the things he was doing to the Vice President and the Deans. He didn't have that right.

15. In the Directive you stated Mr. Nally routinely attacked Haskell employees/officials with letters and attacked a Haskell official during a community event. Please describe in detail your basis for these comments (specifically, dates when this occurred, who he attacked, how he attacked them, etc.).

Response:

He was attacking the Vice President almost constantly. She actually went to an attorney and was going to have him served with a cease and desist order. She was so scared of him, that she had it stopped. My Dean did the same thing. I have women scared to death of him on campus. He goes after anybody with authority. He will go after an Indian leader and write horrible things about them. That's why I sent the Directive.

16. In the Directive you referenced Mr. Nally contacting the police department on behalf of the University. Please describe this incident in detail.

Response:

We had a person die on campus. I was actually there. Jared contacted the police department and said he was a journalist, and he was not asking, but demanding the name of the deceased. They basically blew him off and hung up on him. They were nice about it, but they don't give out that kind of information. I think he was representing himself as the Indian Leader from Haskell Indian University. We have a person who contacts newspapers and gives out information with the permission of the family. I had already given this person that information.

Page 4|7
Declaration B Initial
Page 4 of 7

USA000326

DOI-21-HCI-011-BIA
Declaration – Ronald Graham
Page 5

17. In the Directive, you directed Mr. Nally to not attempt to countermand decisions of Haskell personnel assigned by you or anyone else to positions in an effort to replace them.  Explain in detail why directed Mr. Nally to not do this.

    **Response:**

    **The Acting Vice President of Academics, Jim Rains, reassigned Josh Falleaf as Advisor to the Indian Leader, and he was doing it because we are doing a lot of restructuring.  Falleaf went in as the new Advisor.   Jared did not like that, and he and his colleagues got together and voted him out.  They don't have that authority because it's a university position.  It is not for Jared or any other student to vote anyone out.  I basically told him he could not do that.**

18. In the Directive, you directed Mr. Nally to not record anyone at Haskell in his interviews unless he advised them first and they granted him permission.  Explain in detail why you directed Mr. Nally not to do this.

    **Response:**

    **He was recording the conversation of one of the employees on campus.  You can't do that.  Under Kansas law if one side knows they are recording the other side you can do that.  What he failed to understand was that if you record a person unbeknownst to the other person on Federal property, you have committed a felony act.  His side was claiming Kansas law, but they failed to understand he did it on Federal property.  This is Federal property.**

19. Do you recall receiving a letter dated October 26, 2020, from Lindsie Rank, Program Officer, FIRE; Francine Compton, President NAJA; and Sommer Ingram Dean, Staff Attorney, SPLC?  If so, did you respond to the letter?  If so, state when.

    **Response:**

    **Yes.  I forwarded it to my Solicitors for advice.  I said I was not going under First Amendment, but I was going under Student Conduct.  After the Solicitors said the Directive was a First Amendment violation, I wrote a letter of retraction.  I don't recall the date.  I signed the letter and sent it to the Solicitors to send to them.**

20. Did Complainant ever tell you that he found your behavior unwelcome, offensive, inappropriate, etc.?  If so, state the date, describe in detail what he told you, describe in detail your response, if any.

    **Response:**

    **Only via the newspapers.  He wrote a big newspaper article that was outlandish.  I didn't respond to anything.**

USA000327

**DOI-21-HCI-011-BIA**
**Declaration – Ronald Graham**
**Page 6**

21.   Have you attended training regarding anti-harassment?  If so, state the date(s).

      **Response:**

      **Yes.  I took an online course through DOI.  I also did it several times when I was in the military.**

22.   Are you aware of the school having an anti-harassment policy?

      **Response:**

      **Yes.  The policy covers the harassment of students by faculty and administration.**

23.   Is the policy posted anywhere on the school property?  If so, state where it is posted.

      **Response:**

      **I've seen it on the intranet.  Especially in between semesters when we work with Faculty and staff.  I mention it in my cabinet meetings.**

24.   Are you aware of anyone else who may have information relevant to the issues we have discussed?  If so, identify them by first/last name and position, and describe in detail what relevant information you believe they have.

      **Response:**

      **Tonya Salvini**
      **Carlene Morris**

25.   Do you any additional information or documents that might be relevant to the issues referenced in this matter or that may be helpful in this investigation?  If so, please provide the information and/or copies of the documents with an explanation of each.

      **Response:**

      **No.**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  This declaration, including this page, consists of____ pages.

_____
Declarant's Signature

Page 6|7

USA000328

**DOI-21-HCI-011-BIA**
**Declaration – Ronald Graham**
**Page 7**

**President**
Position

_____ 1/13/2021 _____
Date

**DECLARATION OF** _____ **James W. Rains, Jr.** _____

**Title:** **Dean of the College of Humanities and Arts, Currently detailed as Acting Director of Special Projects**
**Location:** **Haskell Indian Nations University, Lawrence, Kansas**
**Date of Interview: January 14, 2021**
**Case Number:** **DOI-21-HCI-011-BIA**

I, __**James W. Rains, Jr.**__, hereby make this Declaration.

I understand that I am making this statement under penalty of perjury; that it is the equivalent of a sworn statement made under oath; and that it may be filed in proceedings in accordance with or before the Merit Systems Protection Board (MSPB) or the Equal Employment Opportunity Commission (EEOC), in the grievance process or before an Arbitrator, in court, or in any other similar proceeding. This statement is voluntary and no promises of any kind have been made to me and I have not been subjected to any threatening or coercive behavior for the purpose of obtaining this declaration. I understand that this declaration is part of an official management investigation and that this investigation is not part of the Equal Employment Opportunity (EEO) process.

1.  This interview and the subject matter discussed, including the identity of the individuals mentioned are confidential in nature.  You should not discuss any information divulged during this interview with any other person.  Do you understand?

    **Response:**

    **Yes.**

2.  For the record, please state your full name.

    **Response:**

    **James W. Rains, Jr.**

3.  Please state your:

    Address:

    ```
    PII
    ```



Declaration C
Page 2 of 27

Telephone Number:

PII

Email Address:

**James.Rains@bie.edu**

4.   Please identify your position with Haskell Indian Nations University.

**Response:**

**Dean of the College of Humanities and Arts, Currently detailed as Acting Director of Special Projects**

5.   How long have you held this position?

**Response:**

**I have been Dean of the College of Humanities and Arts since May 2018. I had been acting in this position in November 2017. I was detailed as Acting VPA and Acting President off and on since November 2018.**

6.   How long have you been with the Agency?

**Response:**

**I started in August 2014.**

7.   Please identify your role and responsibilities associated with the Indian Leader newspaper.

**Response:**

**The only role I played was that of Acting Vice President; in that role I was responsible for identifying a faculty advisor. This was in the summer of 2020, in perhaps July.**

8.   Describe your professional relationship with Jared Nally pertaining to his role as Editor-in-Chief of the Indian Leader newspaper.

**Response:**

Declaration C
Page 3 of 27



**None.  He is a Haskell student, but I've never had him as a student.  I don't provide oversight for the newspaper, which independent from the University, except to identify the faculty advisor.**

9.   Describe in detail the purpose of the Indian Leader newspaper.

**Response:**

**We regard it as a student club.  It is an independent student organization that reports news for the benefit of students.  It is written by students and edited by students.**

10.   Are you aware of a Directive dated October 16, 2020, that Dr. Graham sent to Mr. Nally?

**Response:**

**Yes.**

11.   Did you have any involvement or input into the decision to send the Directive to Mr. Nally?  If so, describe your involvement or input in detail.

**Response:**

**I assisted the President with the editing.  My PhD is in English.  I helped with grammar, etc., but I didn't change the content of it.**

12.   Do you know why Dr. Graham sent the Directive to Mr. Nally?   If so, explain in detail why.

**Response:**

**Yes.  In February 2020, our Acting President was Dr. Daniel Wildcat, and he suffered a medical condition.  I assumed the President's role until Dr. Graham arrived sometime in May 2020.  During that time, on March 23, 2020, we evacuated the campus because of Covid-19 so our students would not be infected.  A few students remained on campus, less than 100.  Jared Nally remained on campus. Jared was always looking for stories and information.  We were in an information lock-down, everything we reported to the media or inquiries had to be referred to Tony Deerman's office (BIE Director) in DC.  When Jared solicited information from us, we were not allowed to reply because he was regarded as a separate media enterprise.   We forwarded his inquiries to Mr. Deerman.   I think Jared grew frustrated with this and in my opinion, he became kind of harassing towards the administration and antagonized us about not being able to respond directly to his requests for information.  I began to get FOIA requests for things not related in any way to the events at time.  We responded to the requests.  Many of them were about Jared, and our not responding directly to his inquiries and releasing information to**

him.  We felt we were being antagonized by him.  Later in the summer, Jared had some animosity towards the Vice President, University Services, Tonia Salvini. She is on the Police Review Board.  Jared would show up at those city meetings and basically antagonize her and try to embarrass her on behalf of the Indian Leader. I understand he was unhappy with Ms. Salvini because during the census he was not allowed to represent himself as white as well as Native American. I think that was the basis of his complaint against Ms. Salvini.  Russell Parker, a student, had been expelled because he became belligerent with a Haskell employee during the pandemic.  Jared, representing himself as the editor of the Indian Leader, took exception to that disciplinary action and used the Indian Leader to complain about and pursue that.  Mr. Parker was given plenty of opportunity to appeal his disciplinary action.  The Indian Leader became an advocate for Mr. Parker, and this may have created some of the animosity. I think Dr. Graham felt Jared was sort of exploiting his position as the Editor of the Indian Leader to represent himself at the Police Board meetings to antagonize Ms. Salvini.

All the student clubs have sponsors. We had a sponsor for the Indian Leader, Rhonda LeValdo, an instructor, who had been in place for quite some time.  All our faculty had to begin to prepare for fall classes online.  During that time, as the Acting Vice President and with the advice and permission of Human Resources, we asked all faculty to discontinue their sponsorship with the student organizations and prepare to improve their classes online.  The Indian Leader was one of those organizations.  The fall was going to be a full 15 weeks online.  We invested a lot into getting online and improving the quality of our courses.  The sponsor at that time, Rhonda LeValdo, was asked to step away from the Indian Leadership sponsorship role to prepare for online teaching.  I was Acting Vice President and Josh Falleaf replaced me as the Dean of Humanities. While I was in the President's office, I asked Josh Fallef to serve as the Acting Director of Special Projects; I also asked Josh to serve as the faculty advisor for the Indian Leader. He did not have teaching duties because he was in an administrative role.  Jared took exception because he wanted Ms. LeValdo to stay in place.  He rejected our explanation that Ms. LeValdo had to prepare for courses.  In an email to me, he called me a "liar" because he said Josh Falleaf was not a faculty person. That is Josh's position of record, however.

There was a court settlement in 1989 where the President at the time had tried to interfere with the content of the Indian Leader.  The ACLU brought a court case. The settlement was that administration could exert no influence over the Indian Leader.  We do have administrative influence over who the advisor is, but the settlement indicates the Indian Leader does not have to follow the advice of the advisor.  Indian Leader rejected our naming Josh Falleaf for no particular reason except Jared wanted the former advisor.  For that reason, I think Jared adopted an attitude of antagonism towards the administration.  I think what Dr. Graham was trying to do with the Directive was to get Jared to not attack the administration.

USA000334

There was an incident with Carlene Morris. Jared recorded a conversation with her and posted it on social media without her authorization. She felt violated and there was an inquiry to see if he broke any laws. There was apparently no legal issue, but journalistically it was not proper. I saw an email where Ms. Morris told Jared she did not appreciate it, but he was unapologetic. I think the President felt Jared was exploiting his position as Editor of the Indian Leader to harass the administration. I think it was just the one letter that Jared received and not a series of events that would constitute harassment.

13.   Have you attended training regarding anti-harassment?  If so, state the date(s).

**Response:**

**Yes. I'm not sure of the date, but it was at least three years ago.**

14.   Are you aware of the school having an anti-harassment policy?

**Response:**

**Yes, I am aware. I don't have any specific experiential knowledge of it based on direct experience of it in my duties.**

15.   Is the policy posted anywhere on the school property?  If so, state where it is posted.

**Response:**

**It seems there was some signage around the campus, but I can't say with certainty.**

16.   Are you aware of anyone else who may have information relevant to the issues we have discussed?  If so, identify them by first/last name and position, and describe in detail what relevant information you believe they have.

**Response:**

**Josh Falleaf, Acting Dean of Humanities. He is probably one of the best writers on the campus and would have been great in the advisor position. I think the most beneficial thing about being on the Indian Leader staff is to get writing experience.**

17.   Do you any additional information or documents that might be relevant to the issues referenced in this matter or that may be helpful in this investigation?  If so, please provide the information and/or copies of the documents with an explanation of each.

**Response:**

**Email from Jared.**

Declaration C
Page 6 of 27

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  This declaration, including this page, consists of _____ pages.

*James Rains*

Declarant's Signature

**<u>Dean of the College of Humanities and Arts</u>**
Position

1/15/2021

Date

Declaration C
Page 7 of 27

USA000336

Request for Student Directory

# Request for Student Directory

## Jared Nally

**Sent:** Monday, March 16, 2020 9:53 AM
**To:** Stephen Prue; Lou Hara; Jim Rains; Rhonda Levaldo

aya ceeki,

For upcoming articles in the Indian Leader, I'm requesting a student directory of all students who were/are enrolled at Haskell Indian Nations University for the spring 2020 semester. I am not asking for protected information.

> FERPA defines "directory information" as information contained in the education records of a student that would not generally be considered harmful or an invasion of privacy if disclosed. Typically, "directory information" includes information such as name, address, telephone listing, date and place of birth, participation in officially recognized activities and sports, and dates of attendance. A school may disclose "directory information" to third parties without consent if it has given public notice of the types of information which it has designated as "directory information," the parent's or eligible student's right to restrict the disclosure of such information, and the period of time within which a parent or eligible student has to notify the school in writing that he or she does not want any or all of those types of information designated as "directory information." The means of notification could include publication in various sources, including a newsletter, in a local newspaper, or in the student handbook. The school could also include the "directory information" notification as part of the general notification of rights under FERPA. The school does not have to notify a parent or eligible student individually. (34 CFR § 99.37.)

The Information I'm looking at would be student first and last names. These have previously been provided to the Indian Leader and I'm looking forward to working with our university who supports it's school paper. Thank you for all your assistance.

neewe,
-Jared Nally, Editor

USA000337

## Re: Indian Leader Volume 123 Issue 3

The Indian Leader [                    PII                    ]
**Sent:** Wednesday, April 15,
**To:**   Jim Rains

aya Dr. Rains,

Thank you for your response. Could you please clarify a few of your points.

1. If we are not an official publication of Haskell Indian Nations University then why was our PDF sent to the BIE's
 Central Office for review when that is only necessary for HINU statements? Is this done for other releases from other organizations, for example when Prue distributes pdf's from other campus clubs or non-haskell affiliated organizations — unsanctioned clubs
 like the language revitalization club and Fort Scott National Historic Site, if these organizations can have accesses to students sending unofficial publications through Prue, is it a censorship problem that ours is being singled out to not be forwarded?

2. If Haskell has not played a role in sending the Indian Leader out, how is that Prue sent an email out for Volume
 123 Issue 2, our previous issue?

3. "Haskell's administration
 has no role in the writing, editing, supervision, or publication of any outside publication it's been forwarding from other organizations, why is this the concern for our publication? I'm not asking the University to assume responsibility for the content just
 like it does not assume the responsibility of events it forwards that are not campus sponsored events. I'm also aware of the legal history of the University with regards to censorship of the Indian Leader.

I would like the clarification on the above, but also would recommend that if it would assist in get to students getting a copy of the Indian Leader,
 the oldest Native American student newspaper and a pride to HINU, could there not be a disclaimer in the email forwarded to students that states this the following document has not been prepared by the University and is not an official statement? An additional
 request is to receive a student directory with names and emails since directory information is not protected by FERPA and would allow the Indian Leader to send out it's publication through our own email server.

I hope the additional clarity will help us work with and feel supported by our university

neewe,
.-Jared Nally, Editor

On Wed, Apr 15, 2020 at 12:31 PM Jim Rains <jrains@haskell.edu> wrote:
   Jared,
   We forwarded your request to distribute the Indian Leader in PDF form to the BIE's Central Office. We have been
   advised against complying with your request for the following reasons:

   • Although the Indian Leader is a student activity, it is not an official publication of Haskell Indian Nations
      University. All official University messaging must be submitted to BIE's Central Office for review prior to release.
   • Historically, Haskell University does not play a role in distributing the Indian Leader; therefore, it is not advisable
      to do so at this time.

Declaration C
Page 5 of 23

USA000338

- Haskell's administration has no role in the writing, editing, supervision, or publication of the Indian Leader; therefore, it is not in a position to verify the accuracy of the information contained within it--and we cannot, as a University, assume responsibility for its content. Please refer to Ms. LeValdo's knowledgeable account of the history and legal standing of the Indian Leader as a student newspaper.

We regret that we cannot assist you with distribution, and we continue to wish you and your fellow students the very best in the continued success of your newspaper.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

---

**From:** The Indian Leader [ PII ]
**Sent:** Wednesday, April 15, 2020 11:13 AM
**To:** Stephen Prue; Jim Rains
**Cc:** Rhonda Levaldo
**Subject:** Indian Leader Volume 123 Issue 3


aya Mr. Prue,

This is my third request for you to please send out a student email with the latest issue of the Indian Leader to students. The document is attached and I hope you'll give the Indian Leader the same consideration for distributing our information as you have with done with student government and healing week who you've distributed information since my first request.

-Jared Nally, Editor

USA000339

Reply    Reply All    Forward

## RE: Indian Leader Volume 123 Issue 3

## Jim Rains

**To:**  The Indian Leader [_____PII_____]; Stephen Prue [stephen.prue@bie.edu]

**Cc:**  Rhonda Levaldo

Wednesday, April 15, 2020 12:32 PM

Jared,
We forwarded your request to distribute the Indian Leader in PDF form to the BIE's Central Office. We have been advised against complying with your request for the following reasons:

- Although the Indian Leader is a student activity, it is not an official publication of Haskell Indian Nations University. All official University messaging must be submitted to BIE's Central Office for review prior to release.
- Historically, Haskell University does not play a role in distributing the Indian Leader; therefore, it is not advisable to do so at this time.
- Haskell's administration has no role in the writing, editing, supervision, or publication of the Indian Leader; therefore, it is not in a position to verify the accuracy of the information contained within it--and we cannot, as a University, assume responsibility for its content. Please refer to Ms. LeValdo's knowledgeable account of the history and legal standing of the Indian Leader as a student newspaper.

We regret that we cannot assist you with distribution, and we continue to wish you and your fellow students the very best in the continued success of your newspaper.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

**From:** The Indian Leader [**PII**]
**Sent:** Wednesday, April 15, 2020 11:13 AM
**To:** Stephen Prue; Jim Rains
**Cc:** Rhonda Levaldo
**Subject:** Indian Leader Volume 123 Issue 3

aya Mr. Prue,

This is my third request for you to please send out a student email with the latest issue of the Indian Leader to students. The document is attached and I hope you'll give the Indian Leader the same consideration for distributing our information as you have with done with student government and healing week who you've distributed information since my first request.

-Jared Nally, Editor

USA000340

8/17/2020                                                 RE: Indian Leader Volume 123 Issue 3

Reply    Reply All    Forward

## RE: Indian Leader Volume 123 Issue 3

### Jim Rains

| | |
|---|---|
| **To:** | The Indian Leader [ ___PII___ ] |
| **Cc:** | Stephen Prue; Rhonda Levaldo; Joshua Falleaf |

Wednesday, April 15, 2020 3:05 PM

Jared,
Rhonda LeValdo, faculty advisor to the Indian Leader, can provide you with the long, complicated history of Haskell's student publication. It's an important history, and it will explain the autonomy that the Indian Leader fought hard to retain at a time when an administration sought to suppress it. Since that time, Haskell's administration has respected the autonomy of the publication and has never attempted, rightfully so, to exercise supervisory control or censorship over the writing, editing, production, and management of the newspaper. Ms. LeValdo and I have had several conversations about this on a variety of occasions and she can clarify many of your questions. Please know that we sympathize with your challenges during this difficult time, and we continue to support your journalistic efforts -- and your independence. All official messaging from the University originates within the President's Office, and all official messaging is subject to approval from BIE's Central Office. We are compelled to abide by that directive. We believe that distributing the Indian Leader, inasmuch as we cannot verify the accuracy of the reporting and the facts that you report (which we would never attempt to do at any time), would be in violation of the guidance we have received for disseminating University information. We in no way oppose the distribution of the Indian Leader -- and we encourage you to continue to provide information to Haskell students and that you find alternative means for its circulation -- however, we cannot accommodate your request. I ask for your understanding in this matter.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

**From:** The Indian Leader [indianleader10@gmail.com]
**Sent:** Wednesday, April 15, 2020 2:28 PM
**To:** Jim Rains
**Subject:** Re: Indian Leader Volume 123 Issue 3

aya Dr. Rains,

Thank you for your response. Could you please clarify a few of your points.

1. If we are not an official publication of Haskell Indian Nations University then why was our PDF sent to the BIE's
 Central Office for review when that is only necessary for HINU statements? Is this done for other releases from other organizations, for example when Prue distributes pdf's from other campus clubs or non-haskell affiliated organizations — unsanctioned clubs
 like the language revitalization club and Fort Scott National Historic Site, if these organizations can have accesses to students sending unofficial publications through Prue, is it a censorship problem that ours is being singled out to not be forwarded?

2. If Haskell has not played a role in sending the Indian Leader out, how is that Prue sent an email out for Volume
 123 Issue 2, our previous issue?

https://webmail.haskell.edu/owa/?ae=Item&a=Open&t=IPM.Note&id=RgAAAADCcArUsuwvRL6FDpl1E2vXBwCptvztRXfJSIX71oRvral2AAAAaMwPA...    1/1

USA000341

## Distribution of Indian Leader Link
### The Indian Leader [indianleader10@gmail.com]
**Sent:** Monday, April 27, 2020 8:00 AM
**To:**   Prue, Stephen [stephen.prue@bie.edu]; Jim Rains

aya Dr. Rains & Mr. Prue,

I'm writing to see if there was a problem with sending out a PDF document of the newspaper, and instead of you would send out a link to http://www.theindianleader.com/ . Please let me know if you can distribute this link.

neewe,
-Jared Nally

USA000342

## RE: Distribution of Indian Leader Link

Jim Rains

**Sent:** Monday, April 27, 2020 10:45 AM
**To:**   The Indian Leader [indianleader10@gmail.com]; Prue, Stephen [stephen.prue@bie.edu]

Jared,
I'll definitely consider ways in which we can assist you.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

**From:** The Indian Leader [indianleader10@gmail.com]
**Sent:** Monday, April 27, 2020 8:00 AM
**To:** Prue, Stephen; Jim Rains
**Subject:** Distribution of Indian Leader Link

aya Dr. Rains & Mr. Prue,

I'm writing to see if there was a problem with sending out a PDF document of the newspaper, and instead of you would send out a link to http://www.theindianleader.com/ . Please let me know if you can distribute this link.

neewe,
-Jared Nally

Declaration C
Page 14 of 27

USA000343

Reply    Reply All    Forward

# Press Questions Deadline of 11:00 am

The Indian Leader [          **PII**          ]

| | |
|---|---|
| **To:** | tonia.salvini@bie.edu; Danelle McKinney; Jim Rains |
| **Cc:** | Rhonda Levaldo |

Tuesday, April 14, 2020 11:14 PM

You forwarded this message on 4/15/2020 7:13 AM.

aya ceeki,

The Indian Leader is covering a story on Russell Parker's disciplinary decisions in which he received an Action Notice that states his allegations of intimidation and harassment are not currently appealable. The article will go live tomorrow at 12:00 pm if you would like to make a statement to the Indian Leader on any of the following, please do so through email by 11:00 am.

Was Parkers safety taken into consideration when he was temporarily asked to vacate under stay-at-home orders?

How was Parker given due process granted by the Code of Student Conduct if he is not able to appeal his allegations?

How did an overview of "Student failed to comply with verbal directives from Facilities Staff" result in allegations of intimidation and harassment?

How does the administration address concerns from students that facilities staff is targeting students because they don't want students to remain on campus and are treating students as bio-hazards not people?

neewe,
-Jared Nally

Declaration C
Page 15 of 27

USA000344

# Recorded conversation
## Carlene Morris

**Sent:**        Monday, July 13, 2020 1:51 PM
**To:**          Jared Nally
**Cc:**          tonia.salvini.bie@gmail.com; Salvini, Tonia [tonia.salvini@bie.edu]; Prue, Stephen C [stephen.prue@BIE.EDU]; Jim Rains; Rhonda
               Levaldo
**Importance:** High

Jared,

I am of the understanding you recorded our phone conversation the other day without my permission.  I also understand you posted it on Facebook, also without my permission.  I do not believe I said anything that was not true or accurate.  However, I believe it is appropriate to ask the person you are speaking to if is it ok to record our conversation, which you did not.

I am sorry you felt you had to be deceitful to get the information.

Carlene Morris
Financial Aid Officer
Haskell Indian Nations University
785-830-2702
785-832-6617 (FAX)
cmorris@haskell.edu
Carlene.Morris@BIE.edu

Haskell  Mission

The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the leading institution of academic excellence, culture and intellectual prominence, and holistic education to address the needs of Indigenous communities.



NOTICE TO RECIPIENT: The information contained in this electronic mail message and all attachments are confidential, privileged and/or proprietary and are intended for the exclusive use of the addressee(s). If you are not an intended addressee of this message, your interception, copying, distribution, disclosure or other use of this message, any attachment or the information contained therein is strictly prohibited. If you received this message and were not an addressee, immediately notify the sender by e-mail. Destroy every electronic, paper and other copy of this message and all attachments and every digest or other summary of the information contained herein or any attachments.  All e-mail sent to this address will be received by the Haskell Indian Nations University e-mail system and is subject to archiving and review by someone other than the recipient.

Declaration C
Page 16 of 27

Re: Recorded conversation

## Re: Recorded conversation

**Jared Nally**
**Sent:** Tuesday, July 14, 2020 6:23 AM
**To:**   Carlene Morris
**Cc:**   tonia.salvini.bie@gmail.com; Salvini, Tonia [tonia.salvini@bie.edu]; Prue, Stephen C [stephen.prue@bie.edu]; Jim Rains; Rhonda Levaldo

Dear Carlene:

Thank you for reaching out to me with your concerns regarding actions I took to record my conversation with Financial Aid on June 10th. While I do acknowledge that your message reflects contempt for my actions, I want to be firm in asserting my right to record my conversations which does not require your permission.

Kan. Stat. Ann. § 21-6101(4) provides guidelines for my personal right in a  single-party consent state which allows me, a participant in the conversation, to provide my own consent to surreptitiously record my conversation with Financial Aid.

As for your allegations of deceit, I ensure you I was candid when I mentioned I had personal interest in students loans for pursuing grad school in another country. My number one school choice was the University of Tromsø, in Tromsø, Norway; I emphasize "was" here because my grad school application for this December would require "Proof of Financial Ability" which is a sum of NOK 123,519 or $13,044 which I was hoping to establish through a student loan. This is a conversation I intended to have with you closer towards the fall semester, but it has been expedited after hearing rumors from students responding to fall semester fees that HINU didn't allow student loans.

Did I also use my personal conversation to also write an article for the student newspaper? Yes. It was a commentary piece which built on the relevant information you gave me that was timely and relevant to the context of what I was writing. It was also spurred by the additional realization that I could not expect help paying for rent with student loans for the apartment I just signed a lease for because HINU is no longer offering student housing — an extra $8,622 for my yearly cost of living according to Financial Aid's online financial calculator.

I hope you do not take any of this personally, as this is now my response to working with HINU. I have taken this approach after receiving many comments from HINU employees aimed to discredit my reporting for the Indian Leader — Joshua Falleaf on April 17th, said I'm turning Indian Leader into a "Gossip Rag", President Ronald Graham May 24th, said I published incorrect information but won't say what, etc — following those, I've had multiple employees provide wrong information such as mandatory pickup of student belongings. It is for these reasons I've gone back to all the articles I've written to add links documenting emails, statements, and dialogues that provide the information I wrote the article with. At this time, I feel like I have to protect myself by collecting source information.

Thank you for reaching out which has allowed me to respond to some of your points, and hopefully bring understanding to your concerns.

neewe,
-Jared Nally

On Jul 13, 2020, at 1:51 PM, Carlene Morris <CMorris@haskell.edu> wrote:

Jared,

Declaration C
Page 17 of 27

USA000346

I am of the understanding you recorded our phone conversation the other day without my permission.  I also understand you posted it on Facebook, also without my permission.  I do not believe I said anything that was not true or accurate. However, I believe it is appropriate to ask the person you are speaking to if is it ok to record our conversation, which you did not.

I am sorry you felt you had to be deceitful to get the information.

Carlene Morris
Financial Aid Officer
Haskell Indian Nations University
785-830-2702
785-832-6617 (FAX)
cmorris@haskell.edu
Carlene.Morris@BIE.edu

Haskell  Mission
The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the leading institution of academic excellence, culture and intellectual prominence, and holistic education to address the needs of Indigenous communities.
<Picture (Device Independent Bitmap) 1.jpg>

NOTICE TO RECIPIENT: The information contained in this electronic mail message and all attachments are confidential, privileged and/or proprietary and are intended for the exclusive use of the addressee(s). If you are not an intended addressee of this message, your interception, copying, distribution, disclosure or other use of this message, any attachment or the information contained therein is strictly prohibited. If you received this message and were not an addressee, immediately notify the sender by e-mail. Destroy every electronic, paper and other copy of this message and all attachments and every digest or other summary of the information contained herein or any attachments.  All e-mail sent to this address will be received by the Haskell Indian Nations University e-mail system and is subject to archiving and review by someone other than the recipient.

Declaration C
Page 18 of 27

USA000347

# Indian Leader

## Joshua Falleaf

**Sent:** Tuesday, July 28, 2020 9:37 AM
**To:** Jim Rains

Jim,

Have a look at this.

Joshua

---

**From:** The Indian Leader [ PII ]
**Sent:** Tuesday, July 28, 2020 9:13 AM
**To:** Joshua Falleaf
**Subject:** Advising and Negotiable Removal from the Club

Good Morning Dean Falleaf,

Last week we had an Indian Leader meeting in which we found out that Rhonda LeValdo, faculty advisor to the Indian Leader, could not attend in her role as our advisor because she had been asked to step down as part of a university-wide notice to HINU faculty removing their roles as club advisors. We were also informed that you've been self appointed as our replacement advisor in the meantime.

In part this message is to inform you, that you have been removed of your burden as our advisor. While I've waited for you to reach out to us, you have yet to engage with our club in over a week since the VPAA sent Rhonda the notice. Timeliness is an important trait for news, and you're lack of timeliness is an undesirable trait for our next advisor. A unanimous vote was conducted on our last meeting removing you from your temporary role.

Furthermore, Indian Leader has been structured to prevent oversight from HINU administration, which would negate your ability to assume that role since you are part of the administration and cannot opperate as a faculty advisor. As we currently don't have an advisor, I would like to remind the administration of the following legal rights HINU agreed to in 1989.

> "Haskell agrees that no officer, agent, instructor or employee of Haskell shall:
>
> ...
>
> (c) suspend the publication of The Indian Leader newspaper on the ground that a vacancy has arisen in the position of the faculty adviser to the Indian Leader newspaper of the Association.
>
> (d) refuse any written request for the disbursement of funds, reasonably related to the management or publication of the Indian Leader...."

As such, Indian Leader will continue to operate without an advisor and with access to our funds. We will once again appoint an advisor when HINU allows faculty to assume roles as club advisors again.

The Last part of this message, I would like to address that I feel HINU is not setting the Indian Leader up for success during the pandemic to continue one of HINU's longest legacies which began in 1897. HINU has

USA000348

removed our faculty advisor, has eliminated student activity fees which fund our organization, and refused to distribute a pdf of our publication to the student email list.

You once reached out to me to tell me you thought I was turning Indian Leader into a "Gossip Rag". If this is the reason Indian Leader is not being supported by the university, I would like to see if it is negotiable to reinstate funding to the newspaper and Rhonda as the advisor if I agree to step down as the editor and cease to write for the student paper. Please let me know if this is something we can discuss to ensure the continued legacy of the paper.

Sincerely,
-Jared Nally, Editor

Declaration C
Page 20 of 27

USA000349

# Teaching, summer work, and the Indian leader

Jim Rains

**Sent:** Friday, July 31, 2020 4:15 PM
**To:**   Rhonda Levaldo; Jared Nally
**Cc:**   Joshua Falleaf; Mona Franklin

Rhonda and Jared,
By directive, all Haskell faculty have been asked to focus exclusively on preparation for teaching online this fall, program reviews, Blackboard training, and other University business; no faculty is excluded from this directive. Teaching is the University's core mission. In a related matter, per the The Settlement Agreement between the University and *The Indian Leader* (United States District Court For the District of Kansas. Entered September 11, 1989), the University holds the exclusive right to appoint a Faculty Adviser to "assist students in the publication of the Indian Leader" (p. 5). The Settlement Agreement and the Plan of Operation contain no language granting students the right to select the Faculty Adviser. As in the recent past, Haskell's current administration is indifferent to how *The Indian Leader* chooses its own student leadership and it remains generally disinterested in its editorial content -- and it has at no point demonstrated any attempt to "censor, edit or modify the contents of the Indian Leader" (p. 1). I hope this email clarifies any ambiguity on your summer duties, Rhonda, with respect to this matter. If you have any questions regarding these two points, either I or Josh Falleaf, your current supervisor, would be more than happy to respond.

**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

Declaration C
Page 21 of 27

USA000350

# The Indian Leader

The oldest Native American Student Newspaper

August 3, 2020

Jim Rains, PhD
Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Ave
Lawrence, KS 66046

Advisor Response

Jim Rains:

The Indian Leader Association recognizes Haskell Indian Nations University's (HINU) right to remove HINU Faculty from their roles as Faculty Advisors. However, the email you sent to my personal email address on Friday July, 31st seems to assert an authority that goes beyond rights provided by the settlement agreement you cited.[1] Furthermore, your goal of reducing ambiguity was not achieved based on the contradictions presented in your email. Thus, The Indian Leader Association's affirms that:

**HINU does not have the authority to assign Interim Dean of Humanities Joshua Falleaf as the Faculty Advisor for the Indian Leader.**

WHEREAS a vacancy for Faculty Advisor for the Indian Leader has arisen as a result of an administrative directive to all faculty.[2,3]

WHEREAS no faculty is excused from the directive resulting in an undefined timeframe where there are no candidates to fill the vacant role of Faculty Advisor.[4]

WHEREAS Interim Dean of Humanities Joshua Falleaf, an administrator, is disqualified as a candidate to serve as a Faculty Advisor on account that he is not a faculty member.

WHEREAS the Indian Leader is allowed to continue operations while there is a vacancy for Faculty Advisor.[5]

At this time, the Indian Leader Association requests a response by the end of business on Monday, the 17th of August 17th, that either acknowledges the overstep in assigning administrator Joshua Falleaf as Faculty Adviser or can provide a proper source to support a non-faculty member being assigned as a Faculty Adviser.

---

[1] Email from Jim Rains to Jared Nally (July 31, 2020) (on file with recipient)

[2] Email from Jim Rains to Faculty (July 21, 2020) (on file with author)

[3] *supra* Note 1

[4] *supra* Note 1

[5] Settlement Agreement dated September 19, 1989, Case No. 89-4063-R

theindianleader.com | 155 Indian Ave Box 4999, Lawrence, KS 66046 | indianleader@gmail.com

USA000351

# The Indian Leader

The oldest Native American Student Newspaper

Sincerely,

Jared Nally
Editor, The Indian Leader

Cc:     Ronald Graham, President
        Joshua Falleaf, Acting Dean of Humanities

USA000352

8/17/2020                                                     Re: Adviser

## Re: Adviser
The Indian Leader [ PII ]
**Sent:** Friday, August 14, 2020 2:15 PM
**To:**   Jim Rains

Thank you for the prompt response.

For clarity, Joshua Falleaf who is acting as an administrator is not an administrator but is in fact permanent faculty? Additionally, despite you specifically telling me "no faculty is excluded from this directive", that was a lie and does not apply to permanent faculty member Joshua Falleaf? These contradictions in you're emails have introduced ambiguity on my end.

If Falleaf is administration he cannot be a faculty advisor, and If Falleaf is faculty how is he excluded from your directive which says "no faculty is excluded from this directive?"

We would be happy to operate the next two weeks without an adviser to allow your directives and statements to hold true without exception.

Additionally, this would show that you value the input of students and their operations when we explicitly have shown disinterest in Falleaf as our advisor. Not only would there be a conflict of interest with Falleaf operating as an administrator, but Falleaf has demonstrated many personal acts that demonstrate a lack of understanding or interest in the Indian Leader. For example, Falleaf referred to the Indian Leader as a "gossip rag" on April 17th, has asked our previous advisor multiple times how to get content removed from our site and social media, and has not reached out to contact the Indian Leader during any of these weeks you've "appointed" him as adviser. The Indian Leader has unanimously voted to not accept him as our adviser and we hope HINU would show consideration for the interests in the party's affected by your decisions.

-Jared Nally

On Aug 14, 2020, at 1:28 PM, Jim Rains <jrains@haskell.edu> wrote:

Indian Leader,
Josh Falleaf is permanent faculty; he will remain the appointed Faculty Advisor to *The Indian Leader* while all other faculty members are fulfilling their teaching responsibilities to the University, precluding their involvement with student club sponsorships at this time. All actions involving Haskell employees are conducted in compliance with HR's federal guidelines and policies. A new Faculty Advisor to *The Indian Leader* will be appointed on or before August 24, the start of Fall 2020 classes.

**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

**From:** The Indian Leader [ PII ]                          Declaration C
**Sent:** Friday, August 14, 2020 12:19 PM                   Page 24 of 27

USA000353

Case 2:21-cv-02113-JAR-TJJ   Document 29-2   Filed 07/19/21   Page 354 of 528

Re: Adviser

**To:** Jim Rains
**Cc:** ronald.graham@bie.edu; Ronald Graham; rgraham@bie.edu; Joshua Falleaf
**Subject:** Adviser

Jim Rains,

Please see the attached email from the Indian Leader Assocation.

Sincerely,
-Jared Nally, Editor-In-Cheif

Declaration C
Page 25 of 27

USA000354

# RE: Adviser

**Jim Rains**
**Sent:** Friday, August 14, 2020 1:31 PM
**To:**   The Indian Leader [                    PII            ]
**Cc:**   ronald.graham@bie.edu; Ronald Graham; rgraham@bie.edu; Joshua Falleaf

Indian Leader,
Josh Falleaf is permanent faculty; he will remain the appointed Faculty Advisor to *The Indian Leader* while all other faculty members are fulfilling their teaching responsibilities to the University, precluding their involvement with student club sponsorships at this time. All actions involving Haskell employees are conducted in compliance with HR's federal guidelines and policies. A new Faculty Advisor to *The Indian Leader* will be appointed on or before August 24, the start of Fall 2020 classes.

**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

---

**From:** The Indian Leader [              PII            ]
**Sent:** Friday, August 14, 2020 12:19 PM
**To:** Jim Rains
**Cc:** ronald.graham@bie.edu; Ronald Graham; rgraham@bie.edu; Joshua Falleaf
**Subject:** Adviser

Jim Rains,

Please see the attached email from the Indian Leader Assocation.

Sincerely,
-Jared Nally, Editor-In-Cheif

8/17/2020                                                    Adviser

# Adviser

The Indian Leader [      **PII**      ]

**Sent:**        Friday, August 14, 2020 12:19 PM
**To:**          Jim Rains
**Cc:**          ronald.graham@bie.edu; Ronald Graham; rgraham@bie.edu; Joshua Falleaf
**Attachments:** Adviser.pdf (79 KB)


Jim Rains,

Please see the attached email from the Indian Leader Assocation.

Sincerely,
-Jared Nally, Editor-In-Cheif

USA000356

**DECLARATION OF <u>JOSHUA LEVI FALLEAF</u>**

**Title:     Acting Dean, College of Humanities and Arts, Instructor of English (position of record)**
**Location:   Haskell Indian Nations University, Lawrence, Kansas**
**Date of Interview: January 19, 2021**
**Case Number:  DOI-21-HCI-011-BIA**

I, **<u>Joshua Levi Falleaf</u>**, hereby make this Declaration.

I understand that I am making this statement under penalty of perjury; that it is the equivalent of a sworn statement made under oath; and that it may be filed in proceedings in accordance with or before the Merit Systems Protection Board (MSPB) or the Equal Employment Opportunity Commission (EEOC), in the grievance process or before an Arbitrator, in court, or in any other similar proceeding. This statement is voluntary, and no promises of any kind have been made to me and I have not been subjected to any threatening or coercive behavior for the purpose of obtaining this declaration. I understand that this declaration is part of an official management investigation and that this investigation is not part of the Equal Employment Opportunity (EEO) process.

1.   This interview and the subject matter discussed, including the identity of the individuals mentioned are confidential in nature.  You should not discuss any information divulged during this interview with any other person.  Do you understand?

     **Response:**

     **Yes.**

2.   For the record, please state your full name.

     **Response:**

     **Joshua Levi Falleaf**

3.   Please state your:

     Address:

     **155 Indian Ave.**
     **Lawrence, KS  66046**

Initials_____

USA000357

DOI-21-HCI-011-BIA
Declaration – Joshua Falleaf
Page 2

Telephone Number:

**785-813-5915**

Email Address:

jfalleaf@haskell.edu

4.   Please identify your position with Haskell Indian Nations University.

**Response:**

**Currently Acting Dean, College of Humanities and Arts. My position of record is Instructor of English.**

5.   How long have you held this position?

**Response:**

**I became an Instructor in the spring of 2012. I became Acting Dean in about 2014. I returned to being an instructor for a couple of years, but I returned to Acting Dean.**

6.   How long have you been with the Agency?

**Response:**

**Since spring of 2012. I was a contractor for one or two semesters when I provided parttime teaching, adjunct work.**

7.   Please identify your role and responsibilities associated with the Indian Leader newspaper.

**Response:**

**I supervise the faculty Advisor, Rhonda LeValdo.**

8.   Did you replace Rhonda LeValdo as Advisor for the Indian Leader?

**Response:**

**There was a short time in the summer 2020, when there was a Directive for faculty to focus on their teaching. This was our first fully online semester following the emergency transition we made in the Spring. There was a lot of**

USA000358

DOI-21-HCI-011-BIA
Declaration – Joshua Falleaf
Page 3

training and preparation. **Dr. Rains issued a Directive that all faculty, and their advisor roles to any student clubs – as well as other duties, needed to be nullified for the time being to prepare for classes. I believe the directive was temporary for a month or two.  This was my reading of it.  I replaced Ms. LeValdo during this time.**

9.   Are you aware of a Directive dated October 16, 2020, that Dr. Graham sent to Mr. Nally?

**Response:**

**I am.**

10.   Did you have any involvement or input into the decision to send the Directive to Mr. Nally?  If so, describe your involvement or input in detail.

**Response:**

**I did not.**

11.   Do you know why Dr. Graham sent the Directive to Mr. Nally?   If so, explain in detail why.

**Response:**

**I believe the President felt Mr. Nally was overstepping or presenting Haskell in an unfairly bad light and wanted to correct that, but that's only my perception from the outside.  That was my reading of the directive.  There was concern about Mr. Nally's ongoing harassment of Vice President Tonia Salvini in some of her public roles within the community.  He tried to clarify that the Indian Leader is not entitled to certain information, but it can be provided to any who use and represent it accurately.  I think it was to make Nally understand he was a student, and he had to uphold certain code of conduct and journalistic ethics. That was my interpretation.  However, I don't think it was expressed particularly well.**

12.   Did replacing Ms. LeValdo as Advisor to the Indian Leader have anything to do with the Directive Dr. Graham sent Mr. Nally or the incidents that occurred that resulted in the Directive being issued?

**Response:**

**No. The replacing of Advisers was campus-wide. I don't have readily available the initial communiqué, but the follow-up clarification with Mr. Nally and Ms. LeValdo – included – dates from July 31, 2020. President Graham's**

DOI-21-HCI-011-BIA
Declaration – Joshua Falleaf
Page 4

memo/directive to Mr. Nally dates Oct. 16, 2020, which was written and issued on his own timeline, in conjunction with whoever he was seeking guidance from at the time. The July 31st (really earlier) directive was made to streamline faculty focus on the delivery of their online classes. The President made his October 16th, 2020 directive without my knowledge or input. So I can't speak to his motivation or purpose. The intersection of these matters are not matters to which I am aware.

13.  Have you attended training regarding anti-harassment?  If so, state the date(s).

**Response:**

**Yes. The typical BIE or DOI Talent training that we do annually.**

14.  Are you aware of the school having an anti-harassment policy?

**Response:**

**Yes.**

15.  Is the policy posted anywhere on the school property?  If so, state where it is posted.

**Response:**

**I believe it is on the website.**

16.  Are you aware of anyone else who may have information relevant to the issues we have discussed?  If so, identify them by first/last name and position, and describe in detail what relevant information you believe they have.

**Response:**

**Dr. Graham, Dr. Rains, Ms. Salvini, Mr. Nally.**

17.  Do you any additional information or documents that might be relevant to the issues referenced in this matter or that may be helpful in this investigation?  If so, please provide the information and/or copies of the documents with an explanation of each.

**Response:**

**The Directive regarding faculty temporarily not having Advisor roles with school student organizations/clubs.**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  This declaration, including this page, consists of __**5**__ pages.

Page 4|5

Declaration D
Page 4 of 6      Initial _____

USA000360

DOI-21-HCI-011-BIA
Declaration – Joshua Falleaf
Page 5

_____
Declarant's Signature

Acting Dean, College of Humanities and Arts
_____
Position

January 19, 2021
_____
Date

Page 5|5

Declaration D
Page 5 of 6   Initial _____

**Joshua Falleaf**

| | |
|---|---|
| **From:** | Jim Rains |
| **Sent:** | Friday, July 31, 2020 4:16 PM |
| **To:** | Rhonda Levaldo; Jared Nally |
| **Cc:** | Joshua Falleaf; Mona Franklin |
| **Subject:** | Teaching, summer work, and the Indian leader |

Rhonda and Jared,
By directive, all Haskell faculty have been asked to focus exclusively on preparation for teaching online this fall, program reviews, Blackboard training, and other University business; no faculty is excluded from this directive. Teaching is the University's core mission. In a related matter, per the The Settlement Agreement between the University and *The Indian Leader* (United States District Court For the District of Kansas. Entered September 11, 1989), the University holds the exclusive right to appoint a Faculty Adviser to "assist students in the publication of the Indian Leader" (p. 5). The Settlement Agreement and the Plan of Operation contain no language granting students the right to select the Faculty Adviser. As in the recent past, Haskell's current administration is indifferent to how *The Indian Leader* chooses its own student leadership and it remains generally disinterested in its editorial content -- and it has at no point demonstrated any attempt to "censor, edit or modify the contents of the Indian Leader" (p. 1). I hope this email clarifies any ambiguity on your summer duties, Rhonda, with respect to this matter. If you have any questions regarding these two points, either I or Josh Falleaf, your current supervisor, would be more than happy to respond.

**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046



Phone: (785) 749-8494

USA000362

## DECLARATION OF CARLENE MORRIS

**Title:   Financial Aid Officer**
**Location:   Haskell Indian Nations University, Lawrence, Kansas**
**Date of Interview: January 15, 2021**
**Case Number: DOI-21-HCI-011-BIA**

I, **Carlene Morris**, hereby make this Declaration.

I understand that I am making this statement under penalty of perjury; that it is the equivalent

of a sworn statement made under oath; and that it may be filed in proceedings in accordance

with or before the Merit Systems Protection Board (MSPB) or the Equal Employment

Opportunity Commission (EEOC), in the grievance process or before an Arbitrator, in court, or

in any other similar proceeding. This statement is voluntary, and no promises of any kind have

been made to me and I have not been subjected to any threatening or coercive behavior for the

purpose of obtaining this declaration. I understand that this declaration is part of an official

management investigation and that this investigation is not part of the Equal Employment

Opportunity (EEO) process.

1.    This interview and the subject matter discussed, including the identity of the individuals
      mentioned are confidential in nature.  You should not discuss any information divulged
      during this interview with any other person.  Do you understand?

      **Response:**

      **Yes.**

2.    For the record, please state your full name.

      **Response:**

      **Carlene Morris**

      Please state your:

      Address:

      **155 Indian Ave.**
      **Lawrence, KS  66046**

Declaration E
Page 1 of 4

Initials [signature]

DOI-21-HCI-011-BIA
**Declaration – Carlene Morris**
**Page 2**

Telephone Number:

**785-830-2702**

Email Address:

**Carlene.Morris@bie.edu**

3.   Please identify your position with Haskell Indian Nations University.

**Response:**

**Financial Aid Officer**

4.   How long have you held this position?

**Response:**

**I was hired as a contractor in 2013.  I was hired full-time February 2015.**

5.   How long have you been with the Agency?

**Response:**

**February 2015.**

6.   Please identify your role and responsibilities associated with the Indian Leader newspaper.

**Response:**

**None.**

7.   Describe your professional relationship with Jared Nally pertaining to his role as Editor-in-Chief of the Indian Leader newspaper.

**Response:**

**None.  I process his financial aid, but that's about it.**

8.   Describe in detail the purpose of the Indian Leader newspaper.

**Response:**

USA000364

**Just like any other newspaper. To share and disseminate info to our students. It goes to the alumni and community as well.**

9.   Are you aware of a Directive dated October 16, 2020, that Dr. Graham sent to Mr. Nally?

**Response:**

**I did hear about.**

10.   Did you have any involvement or input into the decision to send the Directive to Mr. Nally? If so, describe your involvement or input in detail.

**Response:**

**No. I don't really tell the President what to do. Dr. Graham talked to me about an incident that happened. Someone (I don't know who) told him about an issue I had, and I guess it all started with me when Jared chose to record our phone call. He called me to ask about his financial aid. I answered him to the best of my ability, but I did not know he recorded the phone discussion until one of my co-workers contacted me and said he recorded the call and posted it on Facebook. Once my co-worker informed me and said it was on Facebook, I looked, but couldn't find it. The co-worker then gave me the link and I saw it. I was a little upset that Jared did not inform me prior that he was recording it. I had worked with the Indian Leader before, and students have asked me if they could record our conversations, and I usually told them yes. Jared didn't ask me, and I was a little bit upset. I emailed him after I found out and asked him why. I didn't say anything inappropriate during the discussion he recorded, but for me, it was an issue of trust. I asked him if he would ask me the next time, and I would probably say yes. I wanted to understand why he didn't ask me if he could record it and post in on Facebook. He responded and said he didn't really have to because of the law. I was brought up that just because you can, doesn't mean you should. I don't know Jared very well except that he's with the Indian Leader. He was a very nice young man, but right now, my issue would be trust.**

11.   Have you attended training regarding anti-harassment? If so, state the date(s).

**Response:**

**Yes. Not too long ago.**

12.   Are you aware of the school having an anti-harassment policy?

**Response:**

**Yes. I think it is in our Policy Stats. We do training through BIE and DOI Talent.**

DOI-21-HCI-011-BIA
Declaration – Carlene Morris
Page 4

13.   Is the policy posted anywhere on the school property?  If so, state where it is posted.

**Response:**

**I assume it is on the intranet.**

14.   Are you aware of anyone else who may have information relevant to the issues we have discussed?  If so, identify them by first/last name and position, and describe in detail what relevant information you believe they have.

**Response:**

**No.  I had a young man who emailed me and asked if I would make a comment about the situation that was going on.  I did not respond to him.  I'm not going to add more fuel to the fire.  I believe people should be treated fairly, but just because you can doesn't mean you should.  As Native people we are taught to respect our elders, and he could have asked.  I told Jared this.  I wanted him to learn something positive out of this situation.  I'm good with Jared right now.  Because of the situation, I may ask if they are recording in the future.  I may be leery.  I'm old fashioned and it's the way I was brought up.  I think trust is important, especially in journalism.**

15.   Do you any additional information or documents that might be relevant to the issues referenced in this matter or that may be helpful in this investigation?  If so, please provide the information and/or copies of the documents with an explanation of each.

**Response:**

**Email with Jared.**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  This declaration, including this page, consists of 5 pages.

_Carlene Morris_
Declarant's Signature

_Financial Aid Officer_
Position

_1 – 21 – 2021_
Date

Page 4 | 4

Declaration E
Page 4 of 4

Initial _(initials)_

USA000366

**DECLARATION OF <u>TONIA SALVINI</u>**

**Title:   Vice President of University Services**
**Location:    Haskell Indian Nations University, Lawrence, Kansas**
**Date of Interview: January 15, 2021**
**Case Number:  DOI-21-HCI-011-BIA**

I,  <u>Tonia Salvini</u> , hereby make this Declaration.

I understand that I am making this statement under penalty of perjury; that it is the equivalent of a sworn statement made under oath; and that it may be filed in proceedings in accordance with or before the Merit Systems Protection Board (MSPB) or the Equal Employment Opportunity Commission (EEOC), in the grievance process or before an Arbitrator, in court, or in any other similar proceeding. This statement is voluntary, and no promises of any kind have been made to me and I have not been subjected to any threatening or coercive behavior for the purpose of obtaining this declaration. I understand that this declaration is part of an official management investigation and that this investigation is not part of the Equal Employment Opportunity (EEO) process.

1.   This interview and the subject matter discussed, including the identity of the individuals mentioned are confidential in nature.   You should not discuss any information divulged during this interview with any other person.  Do you understand?

   **Response:**

   **Yes.**

2.   For the record, please state your full name.

   **Response:**

   **Tonia Salvini**

3.   Please state your:

   Address:

   **155 Indian Ave.**
   **Lawrence, KS  66046**

   Telephone Number:

**DOI-21-HCI-011-BIA**
**Declaration – Tonia Salvini**
**Page 2**

**785-749-8457**

Email Address:

**Tonia.Salvini@bie.edu**

4.   Please identify your position with Haskell Indian Nations University.

**Response:**

**Vice President of University Services**

5.   How long have you held this position?

**Response:**

**Five years and around eight months.**

6.   How long have you been with the Agency?

**Response:**

**Five years and around eight months.**

7.   Please identify your role and responsibilities associated with the Indian Leader newspaper.

**Response:**

**None.**

8.   Describe your professional relationship with Jared Nally pertaining to his role as Editor-in-Chief of the Indian Leader newspaper.

**Response:**

**None.**

9.   Describe in detail the purpose of the Indian Leader newspaper.

**Response:**

**It's a school newspaper, and a student-run newspaper.  It probably should be reporting on issues of the University and providing some assistance to**

P a g e   2 | 5

DOI-21-HCI-011-BIA
Declaration – Tonia Salvini
Page 3

**students to inform them as they achieve their academic success, such as resource support services and reporting on activities and events that contribute to the student academic life on campus. They should present issues that affect Native populations. There could perhaps be advocacy centered information. I'm not sure their role is to do advocacy, but this is an observation I have. We don't have a journalism program, so I don't know how it fits into an academic program in terms of honoring and respecting journalist ethics. That is my observation.**

10.  Are you aware of a Directive dated October 16, 2020, that Dr. Graham sent to Mr. Nally?

**Response:**

**Yes.**

11.  Did you have any involvement or input into the decision to send the Directive to Mr. Nally?  If so, describe your involvement or input in detail.

**Response:**

**No.**

12.  Do you know why Dr. Graham sent the Directive to Mr. Nally?   If so, explain in detail why.

**Response:**

**I don't know.  The President is my supervisor, and I reported to him some of my concerns that I have had with Mr. Nally that are not based in the University, but with the city.  I volunteer on a Police Review Board.  I reported to Dr. Graham my concerns about my privacy as a citizen because Mr. Nally was encroaching on my private life.  My role on the board was as a citizen, and it had nothing to do with my role with the University.  My work with the board is public and on record.  My concern was that Mr. Nally sought me out.  It is not public knowledge with the University what my private life is off campus with my family and with the community.  I don't know how he found me, and although my board involvement is definitely public, it is hard to find on the website.  He inserted himself into the work that we're doing which he clearly didn't understand.  He got on the agenda with the Police Board.  We take public comments and invite the public in on the work we're doing, which is online.  We are working on an ordinance.  He inserted himself into the situation just to harass and stalk me.  He had the right to do that as a citizen, but he represented himself as part of the newspaper at Haskell.  It caused confusion with some of the board members.  Our protocol is to allow community members to voice**

Page 3 | 5

Declaration F
Page 3 of 11  Initial _____

USA000369

DOI-21-HCI-011-BIA
Declaration – Tonia Salvini
Page 4

concerns about the work we're doing, but we don't act on it. We just hear it and if we can fold it into our work, we do. It is a specific separate exercise. He signed up to do this and he had a document on letterhead for the Indian Leader suggesting I wasn't fit to be on the board. I have read it several times and I still don't understand what his complaint is. The complaint was relevant to the University and not the board. I think he tried to maybe conflate what his concern was here on campus concerning not feeling he was truly represented of all his ethnicity, but counted in the census as a tribe member. That is between the census bureau and the registrar. I don't really know what they asked about ethnicity. I just know we wanted our students counted and there was a way to do that. We worked with the census bureau and had census people on campus all the time. He had a chance to meet with them. He was upset that his full ethnicity was not represented on the census bureau. Because I didn't allow for that, he suggested it was my fault and I was not capable of being on a Police Board that dealt with racial profiling. I sought private counsel to get another person's perspective. I hired a local attorney to guide me through what constitutes harassment and what constitutes stalking. I was prepared to get a protective order if the behavior escalated. Mr. Nally filed a formal complaint against me to the city in November 2020, and I had to respond to it in December 2020. This has been going on since probably August 2020. I was invited by the City Attorney staff to respond to the complaint, and I did. I told them if they didn't think I was fit to be on the board, I would respectfully leave. I still wasn't sure what the concern was, but it was completely dismissed and found there was no cause for pursuing it.

13.   Have you attended training regarding anti-harassment? If so, state the date(s).

      **Response:**

      **Yes. It was civility training which identified harassment. It was a couple of years ago.**

14.   Are you aware of the school having an anti-harassment policy?

      **Response:**

      **Yes. I don't know whether it is for students, faculty, and/or administration.**

15.   Is the policy posted anywhere on the school property? If so, state where it is posted.

      **Response:**

      **It was at my former office, but I just moved.**

P a g e  4 | 5

Declaration F
Page 4 of 11 Initial ___

DOI-21-HCI-011-BIA
Declaration – Tonia Salvini
Page 5

16.   Are you aware of anyone else who may have information relevant to the issues we have discussed?  If so, identify them by first/last name and position, and describe in detail what relevant information you believe they have.

**Response:**

**No.**

17.   Do you any additional information or documents that might be relevant to the issues referenced in this matter or that may be helpful in this investigation?  If so, please provide the information and/or copies of the documents with an explanation of each.

**Response:**

**I'll provide relevant document.**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  This declaration, including this page, consists of____ pages.

TONIA SALVINI Digitally signed by TONIA SALVINI
Date: 2021.01.15 16:36:58 -06'00'
_____
Declarant's Signature

Vice-President/University Services
_____
Position

January 15, 2021
_____
Date

P a g e   5 | 5

USA000371

| From: | Jared Nally |
|---|---|
| To: | craigowens@lawrenceks.org |
| Cc: | ctoomay@lawrenceks.org; bmcguire@lawrenceks.org; [ PII ] [ PII ] dubuiq@yahoo.com; stephanielittleton@yahoo.com; [ PII ] dstoddard@lawrenceks.org; smishra@ku.edu; [ PII ] |
| Subject: | Ethics Complaint Against Community Police Review Board |
| Date: | Friday, October 9, 2020 3:30:38 PM |
| Attachments: | Letter to City Manager.pdf |
| | Untitled attachment 00116.txt |

City Manager Craig Owens,

Please see the attached ethics complaint letter for the Community Police Review Board. I was told to deliver complaints against the Community Police Review Board to you and would like instruction if I am to submit this complaint otherwise. Please keep in contact with how you will process the complaint.

Thank You,
-Jared Nally

October 9, 2020

Craig Owens
City Manager
City Hall
6 E 6th St
PO Box 708
Lawrence, KS 66044

Ethics Complaint

To The City Manager:

Introduction

I'm writing the City Manager regarding a complaint against Community Police Review Board (CPRB) member Tonia Salvini. The complaint alleges Salvini has violated the board's set of ethics while acting as a public figure in the Lawrence community. A subsidiary complaint is also being lodged related to the response of the board when the complaint was presented directly to the CPRB.

**Complaint Against Tonia Salvini**

While Tonia Salvini operates as a Lawrence public figure serving as a board member on the Community Police Review Board, she is also a Lawrence public figure as the Vice President of Student Services at Haskell Indian Nations University (HINU). While I do not credit Salvini with the creation of the systems in place that oppress my identity as a mixed-race student at HINU, she has made the conscious decision to not engage with me and act as an agent protecting these systems and furthering the disenfranchisement of my racial identity and abusing her position of authority.

I understand that these allegations take place outside the institution of the City of Lawrence, but hold firm that any public action has consequences that can either erode or build public trust, and with any other role or job, you are a sum of all your parts—actions outside the workplace affect individuals all the time. It is for this reason I hold Salvini's actions accountable the City Manager's Office, to the Ethics Policy (Resolution No. 7269), and to CPRB bylaws and affirm that she (a) has eroded public trust, (b) she has treated me differently on the basis of race, (c) that upholding a system of racial prejudice poses a conflict with the goals of her position on the CPRB for "reviewing completed racial or other bias-based policing investigations", and (d) is antithetical to the ideals of the board to have members demonstrate understanding of racial bias which is in discussion for city ordinance no. 9324.

Complaint Background

Haskell Indian Nations University (HINU) has violated my right to self identify my race, has violated my FERPA rights by reporting racial and gender information to the US. Census Bureau without my consent, and has created a system that doesn't offer identification of racial biases and racial protections for multi-racial students. Board member Tonia Salvini acts as the Vice President of University Services for HINU and supervises all departments involved with the complaint and whom I continue to reach out to.

For six months, Tonia Salvini and other HINU faculty have ignored my requests to provide my own racial identity to the school. The intent was to have this information used for the 2020 Census, but the neglect and disregard by Tonia Salvini, Vice President of University Services; Ronald Graham, President; Stephen Prue, Office of the President; and Ernest Wilson, Acting Supervisor of Student Housing, has shown a systemic problem with how HINU handles racial identities and has resulted in me being marginalized and disenfranchised as a student who identifies as multi-racial.

USA000373

Despite multiple attempts to engage with Salvini and HINU before and during the 2020 Census, I found out on August 28, 2020 that HINU filed on behalf of students without engaging me or capturing my "self reported racial identity" which is a question on the census. The completion of this census also indicates a violation of my rights under The Family Educational Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99) since I gave no prior permission to release information with my race/ethnicity or gender.

Currently and historically, Haskell Indian Nations University (HINU) violates federal guidance for reporting racial and ethnic data to the U.S. Department of Education, 72 FR 59266. This standard was implemented in 2007, but goes back to standards set in 1997 that HINU would still be in violation of today, twenty-three years later. This guidance stipulates that HINU (a) "will be required to collect racial and ethnic data using a two-part question on the educational institution's or other recipient's survey instrument" and (b) "should allow students, parents, and staff to "self-identify" race and ethnicity unless self-identification is not practicable or feasible."

HINU currently does not have a survey instrument for students to self identify their racial identity—there is no two part questionnaire on admissions applications or housing applications (Both overseen by Salvini). HINU instead uses students' Certificate of Degree of Indian Blood (Which is not a racial identity) to provide "observer  identification" and reports all students as Native American with no secondary racial identities. It should also be noted that the practice of "observer identification" of race has historic problems in Native American populations, and is an inappropriate policy. **The Integrated Postsecondary Education Data System (IPEDS) shows HINU has never reported a student as two or more races since it's oldest report from 2001.**

I do not identify as only Native American, and yet the school reported me as only Native American in previous semesters according to IPEDS. The malignant neglect not collecting student's self identified racial identities not only affects US Census data, but also university reports along racial lines. If every student is considered the same on paper, it is impossible to identify patterns of systemic racism along the lines of students marginalized racial identities. For example, many students including myself feel that Student Rights (supervised by Salvini) has racially biased disciplinary practices for multi-racial Black students on campus, however, their Black identities are not recorded by HINU and thus there is no traceable bias or accountability.

I have engaged Tonia Salvini multiple times to have my racial identity represented, and it is her decision to not engage with me that furthers these systems already in place to marginalize multi-racial identities. I've already been misrepresented on the 2020 census and I am set up to be misidentified again when Salvini's subordinate reports racial data for the university to the IPEDS system for fall enrollment. **Her passive actions to ignore me are an active hurdle for me in being recognized as multi racial and why I don't feel she is fit for additional community duties to hold the Lawrence Police Department accountable since she cannot engage with a student on their personal racial concerns.**

### Subsidiary Complaint Against Community Police Review Board

I would also like to lodge a complaint with the City Manager's Office on the behavior of the Community Police Review Board (CPRB) with how they handled the the presentation of my complaints directly to the board. I admit to my lack of knowledge to the operation of city committee meetings, and suggest to add a section to the bylaws to instruct those of us with grievances where they can be filed. I understand now that I inappropriately aired my grievance in the public comments not knowing this was supposed to go to the City Manager. That being said, I'm upset that Chair Member Tonia Salvini did not provide a statement of where my grievance could be filed or that the board did not assign staff to provide information for how to file a grievance—both of which I've now discovered are common practice with handling public comments that need additional information. To me this is just another

USA000374

hurdle that Salvini has used to protect her from being held accountable for her actions by not providing an option to file a complaint and further embarrassed me with my continued use of public comments to incorrectly try and find justice for her actions.

Not only was there a lack of direction for my complaint, but in the initial meeting on August 27th where I presented my first grievance in public comments, board members William Graybill and Jane Gibson broke what I understand is decorum to discuss my complaint and choose to do so with language that was dismissive of the nature of my complaint and gaslit my complaint saying it didn't concern the board in an effort to silence my grievance. See the summary of meetings and actions below.

### Summary of Complaints Already Presented to the CPRB

Complaints against Salvini were presented directly to the board during the August 27th and September 30th meetings (Documents on file with CPRB Agendas) as public comments. I present the following summary of those meetings related to my complaint.

During the August 27th Meeting, the agenda included my initial complaint letter. My letter was not acknowledged during public comment section of the agenda. Before adjournment, board member William Graybill asked the board to acknowledge my letter, "I don't really want to wake up tomorrow and read the newspaper accusing this board or myself of white-washing material..." Board member Jane Gibson responded, "I don't see how it is even marginally relevant to the board. So I don't see any reason to respond to it because it's not about what we do."

For the September 30th meeting, I rewrote my complaint which held criticism for Graybill and Gibson's responses to my letter at the previous meeting. Graybill presented dialogue that relegated my complaint to a public image issue rather then acknowledging the nature of my complaint. I also brought attention to the White privilege present in Gibson's response where she (a) refused to view my complaint from my perspective as a racially marginalized member and (b) invalidated and gaslit my complaint dismissing it as something that doesn't concern the board. Additional information was provided in my letter expanding on my original complaint against Tonia Salvini. After presenting my complaint to the board, board member Marie Taylor posed questions to City Attorney Toni Wheeler which resulted in the advisement to present my ethics complaint to the City Manager.

Thank you for handling my complaint,

Jared Nally

Cc: Diane Stoddard, Casey Toomay, Brandon McGuire, Tonia Salvini, Jennifer Robinson, William Graybill, Stephanie Littleton, Sanjay Mishra, Jane Gibson, Marie Taylor, LJ World

USA000375



**City of Lawrence**

CITY ATTORNEY'S OFFICE

CITY COMMISSION

MAYOR
BRADLEY R. FINKELDEI

COMMISSIONERS
COURTNEY SHIPLEY
STUART BOLEY
LISA LARSEN
JENNIFER ANANDA, JD, MSW

CRAIG S. OWENS
CITY MANAGER

City Offices
PO Box 708 66044-0708
www.lawrenceks.org

6 East 6th St
785-832-3000
FAX  785-832-3405

December 17, 2020

Mr. Jared Nally
Delivered Via Electronic Communication to
   Address:  [         PII          ]

Re: Correspondence to City Manager Craig Owens Concerning Tonia Salvini

Dear Jared:

I am writing to follow up on your correspondence to City Manager Craig Owens referenced above. At the outset, we wish to express our appreciation to you for your patience as we have carefully considered the concerns you raised in your letter.

Your letter concerns a member of the Community Police Review Board (CPRB), Ms. Tonia Salvini. In your letter you complain that Ms. Salvini in her role as an administrator at Haskell Indian Nations University (HINU), along with other HINU faculty, ignored your requests to provide your own racial identity to the school in certain reports made by HINU. You also complain that Ms. Salvini did not engage with you when you made multiple attempts to engage with her and other HINU officials regarding your concerns.

After careful consideration, I find that the allegations stated in your complaint, even if everything in the letter is true, are not violations of the City's Ethics Policy or the bylaws of the CPRB. The actions of which you complain largely concern policies, practices, or actions of HINU. The allegation that Ms. Salvini, in her role as a HINU administrator, did not engage with you regarding your concerns is not a violation of the Ethics Policy or the CPRB bylaws. The conclusion I have reached should not be interpreted to mean that the concerns you raised regarding HINU's reporting and communication protocols are not valid. The City of Lawrence, however, is not the proper forum to address those concerns.

In your letter you also expressed dissatisfaction with the manner in which the Community Police Review Board handled the presentation of your complaint. Jared, we appreciate your honest feedback on this matter. The board is not tasked with or responsible for addressing or investigating complaints made against its members. City staff will endeavor to assist in directing persons making complaints in the future to the appropriate City office.

Declaration F
Page 10 of 11

Mr. Nally
Dec. 17, 2020
Page 2

Thank you again for contacting the City.   We wish you the very best as you continue your
studies.

Sincerely,

Toni R. Wheeler
City Attorney

C: Craig Owens, City Manager

USA000377

## DECLARATION OF RHONDA LEVALDO

**Title:   Faculty, Media Communication, Humanities Department**
**Location:   Haskell Indian Nations University, Lawrence, Kansas**
**Date of Interview: January 18, 2021**
**Case Number: DOI-21-HCI-011-BIA**

I, **Rhonda LeValdo** , hereby make this Declaration.

I understand that I am making this statement under penalty of perjury; that it is the equivalent of a sworn statement made under oath; and that it may be filed in proceedings in accordance with or before the Merit Systems Protection Board (MSPB) or the Equal Employment Opportunity Commission (EEOC), in the grievance process or before an Arbitrator, in court, or in any other similar proceeding. This statement is voluntary, and no promises of any kind have been made to me and I have not been subjected to any threatening or coercive behavior for the purpose of obtaining this declaration. I understand that this declaration is part of an official management investigation and that this investigation is not part of the Equal Employment Opportunity (EEO) process.

1.   This interview and the subject matter discussed, including the identity of the individuals mentioned are confidential in nature.   You should not discuss any information divulged during this interview with any other person.  Do you understand?

**Response:**

**Yes.**

2.   For the record, please state your full name.

**Response:**

**Rhonda LeValdo**

3.   Please state your:

Address:

**155 Indian Ave.**
**Lawrence, KS  66046**

Initials

Declaration G
Page 1 of 10

USA000378

DOI-21-HCI-011-BIA
Declaration – Rhonda LeValdo
Page 2

Telephone Number:

785-749-8442

Email Address:

**Rhonda.Levaldo@bie.edu**

4.   Please identify your position with Haskell Indian Nations University.

**Response:**

**Faculty, Media Communication, Humanities Department**

5.   How long have you held this position?

**Response:**

**I started as adjunct in 2008. I believe I became permanent in 2011.**

6.   How long have you been with the Agency?

**Response:**

**I have been working there since probably 2001.**

7.   Please identify your role and responsibilities associated with the Indian Leader newspaper.

**Response:**

**I am Advisor to the students.**

8.   Were you replaced in your role?

**Response:**

At the beginning of the summer Joshua Falleaf told me that because we were working on projects that would require my time, I would not have time to advise the newspaper, and that he would be taking the Advisor role temporarily through the summer until fall. We were switching to online school, and they had put us in a training course. More of my time would be focused on training. Apparently, that would require more of my time than usual. I asked for clarification because I didn't understand. I had done summer projects before that did not take that much time from me. My work on the newspaper it is basically like I don't do anything unless they need clarification

P a g e   2 | 5

Initial _____

USA000379

DOI-21-HCI-011-BIA
Declaration – Rhonda LeValdo
Page 3

about a story, editing help, or something about writing. For the most part, I'm just there. I sign any requests to be paid and that's just about it.

I asked Jim Rains about this. I asked for clarification on the situation because Mr. Falleaf had a discussion with Mr. Nally prior to this happening, and it wasn't very good. I felt like because of their relationship I would not have chosen him to be the Advisor. I thought there was some situation going on and I advised with Jim. He said there was a Directive. I said I hadn't seen it, and they sent me some emails that Mr. Falleaf was to be the temporary Advisor until the fall. I was kind of confused. At that time, I let the newspaper know what was going on, and they decided to try and change their plan of operation because they knew they did not have good discussions with Mr. Falleaf. Also, our prior lawsuit said no administration would have oversight over the newspaper. Mr. Falleaf is a Dean and part of administration. From my understanding Mr. Nally reached out to Mr. Falleaf to invite him to their weekly meeting, but Mr. Falleaf never attended. When he didn't attend, Jared decided they would have a meeting for a plan of operation and not have Mr. Falleaf voted in as their Advisor. Mr. Falleaf never responded. He was never really their Advisor. An Advisor must sign to get the students paid for being on the newspaper. The banker was not cutting the checks for them. The only time any checks were paid was to pay an outstanding debt. The students didn't get paid until last week. Jeri Sledd, the banker for the student bank, finally acknowledged that I was still the Advisor. She had not been acknowledging any requests from Jared since June 2020. I guess I am currently the Advisor, but no one has said anything about it.

9. Are you aware of a Directive dated October 16, 2020, that Dr. Graham sent to Mr. Nally?

**Response:**

Yes.

10. Did you have any involvement or input into the decision to send the Directive to Mr. Nally? If so, describe your involvement or input in detail.

**Response:**

**Nothing. I didn't know about it until Jared got it and called me. He was really upset. I can only imagine being a student and having an administrator tell you that. I felt terrible for him and told him to take a breather, go for a walk, and calm down. I think he was afraid he was going to get kicked out of school.**

11. Do you know why Dr. Graham sent the Directive to Mr. Nally? If so, explain in detail why.

**Response:**

Page 3 | 5

Initial _RL_

Declaration G
Page 3 of 10

USA000380

DOI-21-HCI-011-BIA
Declaration – Rhonda LeValdo
Page 4

I know Dr. Graham was not happy about some stories that were posted. One which gained national news attention was about a student who was kicked off campus during the Covid pandemic. There was no hearing or anything like that, he was just kicked off based on hearsay. It was picked up by a national organization that helps students, FIRE. The story went national and was picked up by more media sites. It made Haskell look bad. You shouldn't kick a student off campus based on hearsay. It was a bad situation.

12. Have you attended training regarding anti-harassment? If so, state the date(s).

Response:

I think we've done online training.

13. Are you aware of the school having an anti-harassment policy?

Response:

Not really.

14. Is the policy posted anywhere on the school property? If so, state where it is posted.

Response:

I know they talk about it. Because of the situation in spring and other things going on with myself, Mr. Rains, and Mr. Falleaf, I began the process of writing a complaint, but I stopped because I didn't want them to retaliate against me. This was right before the pandemic and I didn't want to rock the boat, so I stopped the process. After the pandemic, we sent all the students home, and these other things started happening.

15. Are you aware of anyone else who may have information relevant to the issues we have discussed? If so, identify them by first/last name and position, and describe in detail what relevant information you believe they have.

Response:

Mr. Falleaf and Mr. Rains.

16. Do you any additional information or documents that might be relevant to the issues referenced in this matter or that may be helpful in this investigation? If so, please provide the information and/or copies of the documents with an explanation of each.

Response:

Page 4|5

Initial _____

Declaration G
Page 4 of 10

USA000381

DOI-21-HCI-011-BIA
Declaration – Rhonda LeVaido
Page 5

The email regarding the Directive. I am sending 4 e-mails. The 1. AIHEC story, I think this was the beginning of the bad relationship between the administration and the Indian Leader. In short, AIHEC (American Indian Higher Education Consortium) is a spring conference that students compete against other tribal colleges in academic, cultural and athletic events. I have traveled with the students for four years. In 2020, there was some confusion over who was allowed to go on the trip and at the time the students brought up the issue to then interim Vice President Rains. Jared Nally wrote a story about it, and it was not well received. 2. Distribution of Indian Leader PDF email- Because of the pandemic, we were not printing the paper and were wanting the school to send the students via e-mail, which the had done previously and Mr. Prue, administrative assistant is one of the few people who could send out a mass e-mail. If you look at the very start of the thread of e-mails, Jared had asked numerous times to send out and no response until Dr. Rains stated they could no longer do this, therefore stopping the Indian Leader from reaching all students. 3. Initial Directive sent out by Dr. Rains about faculty no longer sponsoring clubs 4. I had asked some questions about the Directive and this was the response from Mr. Falleaf.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  This declaration, including this page, consists of ____ pages.

_____
Declarant's Signature

_____
Position

_____
Date

USA000382

**Subject:** RE: Indian Leader Volume 123 Issue 3

**Date:**   Wednesday, April 15, 2020 at 3:05:46 PM Central Daylight Time

**From:**   Jim Rains

**To:**     The Indian Leader

**CC:**     Stephen Prue, Rhonda Levaldo, Joshua Falleaf

Jared,

Rhonda LeValdo, faculty advisor to the Indian Leader, can provide you with the long, complicated history of Haskell's student publication. It's an important history, and it will explain the autonomy that the Indian Leader fought hard to retain at a time when an administration sought to suppress it. Since that time, Haskell's administration has respected the autonomy of the publication and has never attempted, rightfully so, to exercise supervisory control or censorship over the writing, editing, production, and management of the newspaper. Ms. LeValdo and I have had several conversations about this on a variety of occasions and she can clarify many of your questions. Please know that we sympathize with your challenges during this difficult time, and we continue to support your journalistic efforts -- and your independence. All official messaging from the University originates within the President's Office, and all official messaging is subject to approval from BIE's Central Office. We are compelled to abide by that directive. We believe that distributing the Indian Leader, inasmuch as we cannot verify the accuracy of the reporting and the facts that you report (which we would never attempt to do at any time), would be in violation of the guidance we have received for disseminating University information. We in no way oppose the distribution of the Indian Leader -- and we encourage you to continue to provide information to Haskell students and that you find alternative means for its circulation -- however, we cannot accommodate your request. I ask for your understanding in this matter.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

**From:** The Indian Leader [       PII       ]
**Sent:** Wednesday, April 15, 2020 2:28 PM
**To:** Jim Rains
**Subject:** Re: Indian Leader Volume 123 Issue 3

aya Dr. Rains,

Thank you for your response. Could you please clarify a few of your points.

1. If we are not an official publication of Haskell Indian Nations University then why was our PDF sent to the BIE's Central Office for review when that is only necessary for HINU statements? Is this done for other releases from other organizations, for example when Prue distributes pdf's from other campus clubs or non-haskell affiliated organizations — unsanctioned clubs like the language revitalization club and Fort Scott National Historic Site, if these organizations can have accesses to students sending unofficial publications through Prue, is it a censorship problem that ours is being singled out to not be forwarded?

2. If Haskell has not played a role in sending the Indian Leader out, how is that Prue sent an email out for Volume 123 Issue 2, our previous issue?

3. "Haskell's administration has no role in the writing, editing, supervision, or publication of any

outside publication it's been forwarding from other organizations, why is this the concern for our publication? I'm not asking the University to assume responsibility for the content just like it does not assume the responsibility of events it forwards that are not campus sponsored events. I'm also aware of the legal history of the University with regards to censorship of the Indian Leader.

I would like the clarification on the above, but also would recommend that if it would assist in get to students getting a copy of the Indian Leader, the oldest Native American student newspaper and a pride to HINU, could there not be a disclaimer in the email forwarded to students that states this the following document has not been prepared by the University and is not an official statement? An additional request is to receive a student directory with names and emails since directory information is not protected by FERPA and would allow the Indian Leader to send out it's publication through our own email server.

I hope the additional clarity will help us work with and feel supported by our university

neewe,
-Jared Nally, Editor

On Wed, Apr 15, 2020 at 12:31 PM Jim Rains <jrains@haskell.edu> wrote:
Jared,
We forwarded your request to distribute the Indian Leader in PDF form to the BIE's Central Office. We have been advised against complying with your request for the following reasons:

- Although the Indian Leader is a student activity, it is not an official publication of Haskell Indian Nations University. All official University messaging must be submitted to BIE's Central Office for review prior to release.
- Historically, Haskell University does not play a role in distributing the Indian Leader; therefore, it is not advisable to do so at this time.
- Haskell's administration has no role in the writing, editing, supervision, or publication of the Indian Leader; therefore, it is not in a position to verify the accuracy of the information contained within it--and we cannot, as a University, assume responsibility for its content. Please refer to Ms. LeValdo's knowledgeable account of the history and legal standing of the Indian Leader as a student newspaper.

We regret that we cannot assist you with distribution, and we continue to wish you and your fellow students the very best in the continued success of your newspaper.

**Jim Rains, Ph.D.**

Acting President
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

**From:** The Indian Leader [ PII ]
**Sent:** Wednesday, April 15, 2020 11:13 AM
**To:** Stephen Prue; Jim Rains
**Cc:** Rhonda Levaldo
**Subject:** Indian Leader Volume 123 Issue 3

aya Mr. Prue,

This is my third request for you to please send out a student email with the latest issue of the Indian Leader to students. The document is attached and I hope you'll give the Indian Leader the same consideration for distributing our information as you have with done with student government and healing week who you've distributed information since my first request.

- Jared Nally, Editor

USA000385

**Subject:** Summer 2020 Business and Activities

**Date:** Friday, July 10, 2020 at 11:46:29 AM Central Daylight Time

**From:** Joshua Falleaf

**To:** Christie Cooke, Jim Rains, Joseph Rodriguez, Michelle Brown, Rhonda Levaldo, Robin Shield, Sarah Libel, Smokey McKinney, Tyler Kimbrell, Bond Love

From the Office of the VPA

Deans and Faculty,

The remainder of the summer weeks will be an especially busy time for Haskell's faculty. We are again preparing for a fully online semester, and we want to ensure a high-quality learning experience for our students. Appearing below is a list of activities that many of you will be asked to participate in:

- Department program reviews
- Course migration to the new Blackboard platform
- Training and certification on the new Blackboard platform
- Library textbook alternative training
- Presidential Strategic planning committees
- Various DOI Talent training
- Various department activities—new program development, program improvements, etc.

All of these activities are designed to contribute to the improvement of the student experience at Haskell – especially during the COVID-19 pandemic and the University's transition to online course delivery. In the days ahead, you will be receiving more scheduling information about these activities.

Due to the urgency of these activities and the need to focus on the successful completion of these tasks, Haskell's administration is directing all faculty to temporarily step down from faculty sponsorship roles in student clubs and other non-teaching activities; grant activities are exempt from this directive. Faculty sponsorship roles with student clubs may be resumed when in-person classes resume. The University will be implementing a new policy that establishes a rotating sponsorship process for student clubs, which is intended to allow equal opportunity for all faculty to participate in university service such as club sponsorship.

**Jim Rains, Ph.D.**

Acting Vice President of Academics
Haskell Indian Nations University
155 Indian Avenue
Lawrence, KS 66046

Phone: (785) 749-8494

USA000386

## Assessment and Program Review

Joshua Falleaf
**Sent:** Monday, July 20, 2020 9:01 PM
**To:** Rhonda Levaldo
**Cc:** Jim Rains

Rhonda,

I am checking in with our various teams to see how progress is going with the assessment plans and assessment reports for our various degree programs. In this case, I'm hoping you can let me know where we're at with the Media Communication degree assessment plan and report, and if I can answer any questions you may have, I'm happy to help.

As faculty, Humanities especially, is very busy at this time, I remind you of the Memorandum from the VPA, which states, "Haskell's administration is directing all faculty to temporarily step down from faculty sponsorship roles in student clubs and other non-teaching activities; grant activities are exempt from this directive."

Therefore, I will be assuming those duties for faculty in the interim. In addition to the Band Club and Indian Leader, are there any other related activities you're involved in that I should be aware of? In addition, please provide me contact information for the Band Club, Indian Leader staff, and any other club/organizations for which I will be responsible, for now, so that I can notify them of this change. You do not have to do that. Please refer any and all inquiries from students involved to me at jfalleaf@haskell.edu.

Upon the completion of these assessment and Fall 2020 preparation activities, faculty can reengage with club/organization sponsorship/advising roles on a rotating basis and prepare for the program reviews we're scheduled to do during this cycle.

Thank you for all your hard work, and please don't hesitate to contact me for assistance with your assessment work. I'm happy to help.

Joshua Falleaf
Acting Dean
College of Humanities and Arts

USA000387

  

October 26, 2020

Dr. Ronald Graham
Haskell Indian Nations University
Office of the President
Navarre Hall
155 Indian Ave
Lawrence, Kansas 66046-4800

### ***URGENT***

*Sent via Electronic Mail (ronald.graham@bie.edu)*

Dear President Graham:

FIRE,[1] NAJA,[2] and the SPLC[3] are concerned about the state of freedom of expression, including freedom of the press, at Haskell Indian Nations University (HINU) in light of your recent directive sent to Jared Nally, editor-in-chief of *The Indian Leader*, HINU's student newspaper. Your directive forbids Nally from carrying on normal journalistic activities, such as requesting information from government agencies, recording interviews, and criticizing members of the HINU community.

Your directive violates the First Amendment and HINU's obligations under a September 1989 settlement agreement with *The Indian Leader*. HINU must immediately rescind the directive,

---

[1] The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.

[2] The Native American Journalists Association (NAJA) serves and empowers Native journalists through programs and actions designed to enrich journalism and promote Native cultures. NAJA recognizes Native Americans as distinct peoples based on tradition and culture. In this spirit, NAJA educates and unifies its membership through journalism programs that promote diversity and defends challenges to free press, speech, and expression. NAJA is committed to increasing the representation of Native journalists in mainstream media. NAJA encourages both mainstream and tribal media to attain the highest standards of professionalism, ethics and responsibility.

[3] Founded in 1974, the Student Press Law Center (SPLC) is the nation's only legal assistance agency devoted exclusively to supporting, defending, and educating high school and college journalists about the rights and responsibilities embodied in the First Amendment and supporting the student news media in covering important issues free from censorship. The SPLC is a nonpartisan, nonprofit organization.

Exhibit 1
Page 1 of 10

510 Walnut Street, Suite 1250   Philade.phia, PA 19106
phone: 215-717-3473   fax: 215-717-3440
thefire.org

USA000388

restore the *Leader*'s rights to university resources and access to its bank account, and clarify that HINU will not interfere in the affairs of the student newspaper or impede the free expression rights of individual students in the future.

## I.     HINU Threatens Student Journalist with Disciplinary Sanctions

The following is our understanding of the pertinent facts. We appreciate that you may have additional information to offer and invite you to share it with us. Please find enclosed an executed waiver and request for FERPA records authorizing and requesting that you share Jared Nally's student file with FIRE.

### A.     *Nally raises questions about HINU's reporting of student data to the Census.*

In March, Nally began raising questions about how HINU reports student data to the U.S. Census Bureau.[4] Nally was initially concerned that HINU had not submitted census data on behalf of its students.[5] In addition to raising his personal concerns, Nally wrote an article for *The Leader* discussing HINU's institutional response to the Census on behalf of students.[6]

In late August, Nally discovered HINU had submitted student data to the Census but had not asked students to self-report racial or gender identities to be reported to the Census.[7] At this point, Nally became concerned that HINU had engaged in discrimination against biracial students by reporting all students as "Native American," regardless of their personal identities.[8]

As part of his concerns about whether and how HINU had reported student census data, Nally lodged concerns about Tonia Salvini, HINU's Vice President of University Services, with the Community Police Review Board (CPRB) of the City of Lawrence, on which Salvini sits.[9] Nally initially raised his concerns with the CPRB via public comments during CPRB meetings and lodged an official ethics complaint concerning Salvini on October 9.[10]

Also on October 9, Nally submitted a grievance to your office regarding his concerns about HINU's handling of the Census and reporting of student racial identities in the future.[11]

---

[4] Email from Nally to Ernie Wilson, Acting Supervisor: College Resident Assistant, HINU, and Tonia Salvini, Vice Pres. of Univ. Services, HINU (Mar. 24, 2020) (on file with author); *see also* letter from Nally to Salvini (Aug. 28, 2020) (on file with author).
[5] *Id.*
[6] Jared Nally, *2020 Census*, Indian Leader, Apr. 13, 2020, http://www.theindianleader.com/2020/04/13/2020-census.
[7] Letter from Nally, *supra* note 1.
[8] *Id.*
[9] *Id.*
[10] Letter from Nally to CPRB (Oct. 9, 2020) (on file with author).
[11] Letter from Nally to Graham (Oct. 9, 2020) (on file with author).

Exhibit 1
Page 2 of 10

USA000389

### B.      *Nally legally records an HINU administrator without her knowledge.*

In July, when HINU announced its student fees would increase, Nally called financial aid coordinator Carlene Morris to inquire about his own financial aid situation and to gather more information about the change.[12] Nally recorded his conversation with Morris without seeking her permission, as is allowed under Kansas law.[13] Nally later used this recording in an opinions article regarding the fee change.[14]

### C.      *The* Leader *objects to an administratively-appointed faculty adviser.*

In July, the *Leader*'s faculty adviser, Rhonda LeValdo, informed the publication staff that because HINU's administration was requiring that faculty cease their roles as student organization advisers, she would no longer be able to serve as faculty adviser.[15] In LeValdo's stead, your predecessor appointed Interim Dean of Humanities Joshua Falleaf to advise the student newspaper.[16]

Concerned that the appointment of an administrator as an adviser would imperil their right to engage as members of a free, independent student press, the *Leader*'s officers unanimously voted to remove Falleaf as faculty adviser.[17] While it is not clear the *Leader*'s officers had the right to remove a faculty adviser at the time of the vote to remove Falleaf, the student officers were concerned that advisory oversight from an administrator would ultimately lead to violations of their First Amendment rights and the 1989 Agreement, which prohibits agents of the university from "inhibiting the free expression of members of" the *Leader*.[18]

On August 27, per its rights under the 1989 Agreement to alter its Plan of Operation,[19] the *Leader* altered its Plan of Operation for the 2020-21 school year (the 2020-21 Plan), implementing a new procedure for HINU's appointment of faculty advisers.[20] The 2020-21

---

[12] *See* Jared Nally, *It's Not Just $475*, INDIAN LEADER, July 10, 2020, http://www.theindianleader.com/2020/07/10/its-not-just-475.

[13] *See* KAN. STAT. ANN. § 21-6101(a)(1).

[14] Nally, *supra* note 12.

[15] Email from Nally to Joshua Falleaf, Interim Dean of Humanities, HINU, Jul. 29, 2020 (on file with author); email from Jim Rains to Rhonda LeValdo and Nally (July 31, 2020) (on file with author).

[16] *Id.*

[17] *Id.*

[18] *Id.*; Letter from Nally to Jim Rains, Acting Vice President of Academics, HINU (Aug. 3, 2020) (on file with author). *See* Settlement Agreement between HINU Indian Junior College of the Bureau of Indian Affairs and the Indian Leader Association (Sept. 19, 1989) (on file with author).

[19] Settlement Agreement, *supra* note 18 ("HINU agrees that no officer, agent, instructor, or employee shall . . . refuse to approve a Plan of Operation for [the *Leader*] substantially similar to the attached Plan. . . . [N]othing in this Settlement Agreement is intended to prevent members of *The Indian Leader Association* from adopting a Plan of Operation . . . substantially dissimilar to the attached Plan").

[20] The Indian Leader Association 2020-2021 Plan of Operations, THE INDIAN LEADER ASSOCIATION, *http://www.theindianleader.com/wp-content/uploads/2020/09/2020-2021-Plan-of-Operations.pdf* (last visited Oct. 20, 2020).

Exhibit 1
Page 3 of 10

USA000390

4

Plan provides that the *Leader* will nominate advisers, which will then be appointed by HINU.[21] Further, the 2020-21 Plan provides for removal of a faculty adviser by petition by a majority vote of the *Leader* officers.[22]

### D.    *Nally pursues a story by requesting information from local government.*

In October, when a food service employee of HINU died, Nally began gathering information about her death in order to report it in the *Leader*.[23] As part of this investigation, Nally reached out to the local police for any information they might have regarding the death.[24] In his email to the Lawrence Police Department, Nally accurately identified himself as "a student writer for *The Indian Leader*."[25] A copy of Nally's email is enclosed for reference.

### E.    *You send an October 16 "directive" to Nally.*

On October 16, you sent Nally a written memo, styled as a "directive," reciting a variety of grievances about his reporting and criticism of HINU administrators, and threatening him with "disciplinary action" for failing to show students, staff, and "officials" the "appropriate respect."[26] A copy of your October 16 "directive" is enclosed.

In particular, the "directive" accuses Nally of:

- "routinely attack[ing] HINU employees" by writing letters and speaking in public;
- "demanding information" while holding himself out as editor of the *Leader*;
- advocating for the removal of Falleaf as the *Leader* adviser; and
- recording his call with Morris, which would "[i]n many states . . . be considered a felony[.]"[27]

---

[21] *Id.*

[22] *Id.*

[23] *See* Jared Nally, *Curtis Worker Nia Schexnider Passes On*, THE INDIAN LEADER, Oct. 9, 2020, http://www.theindianleader.com/2020/10/09/curtis-worker-nia-schexnider-passes-on.

[24] Email from Nally to the Lawrence Police Department (Oct. 5, 2020) (on file with author).

[25] *Id.*

[26] Letter from Graham to Nally (Oct. 16, 2020) (on file with author).

[27] While this is an accurate statement regarding the law of *other states*, your directive failed to mention the fact that Kansas follows a one-party consent rule. That is, so long as a single party to a private conversation (here, Nally) consents to the recording thereof, the recording is absolutely legal and valid. KAN. STAT. ANN. § 21-6101(a)(1).

Exhibit 1
Page 4 of 10

USA000391

After warning Nally that disciplinary consequences could follow his non-compliance, your "directive" specifically instructs Nally that he "WILL" treat "all faculty members, staff, and students with the highest respect," and:

### You will NOT:

- Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus,
- Make demands on any *governmental agency* – or anyone else from HINU – while claiming to represent *The Indian Leader*.
- Attempt countermanding decisions of HINU personnel assigned by me or anyone else to positions in an effort to replace them,
- Record anyone at HINU in your interview unless you advise them first and they grant you permission.

Around the same time as your "directive" to Nally, the *Leader* faced significant difficulty renewing its status as an officially recognized[28] organization for the 2020-21 school year. In years past, the *Leader* has completed an annual recognition process by submitting its annual Plan of Operations and minutes from its first meeting to the Student Bank. Following this submission, the Student Bank has typically provided a signature card to be completed by elected officers and students' chosen faculty adviser.

Following its implementation of the 2020-21 Plan, on September 10, the *Leader* submitted this and its first meeting minutes to the Student Bank, which controls the disbursement of student funds to recognized student organizations.[29] Unlike in previous years, the *Leader* has not heard back from the Student Bank, despite multiple attempts to get in contact.[30] During this time, the *Leader* has also been unable to ascertain the balance of its account with the Student Bank[31] and has yet to be formally assigned an adviser for the 2020-21 school year, despite its nomination of its previous adviser, LeValdo.

## II.   <u>Your "Directive" Violates the First Amendment Rights of Nally and the *Leader*</u>

It has long been settled law that the First Amendment is binding on public colleges like HINU. *Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should

---

[28] We understand that HINU refers to its official student organization recognition process as "sanctioning." We refer to it as "recognition" throughout this correspondence, as most institutions of higher education do, for the sake of distinguishing between recognizing the *Leader* and HINU's unlawful threats to impose disciplinary sanctions on its editor.

[29] Email from Nally to Jeri Sledd, Student Bank Manager, HINU (Sept. 10, 2020) (on file with author).

[30] *See id.*; email from Nally to Sledd (Oct. 19, 2020) (on file with author).

[31] Oct. 19 email, *supra* note 30.

Exhibit 1
Page 5 of 10

USA000392

apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'") (internal citation omitted). Indeed, the 1989 settlement agreement—which you concede is a binding agreement[32]—obligates Haskell Indian Nations University in particular to protect the First Amendment rights of the student publishers of the *Leader*.

### A.   The actions identified in your "directive" are protected speech.

Your directive to Nally threatens to punish him for engaging in normal journalistic activity, violating the expressive rights of both Nally and the publication that he leads.

### i.   Criticism of university officials is constitutionally-protected speech.

Your first demand is that Nally abstain from "[a]ttack[ing] any student, faculty, or staff member . . . [in] any public forum." Based on your description earlier in the "directive" of what constitutes an "attack"—namely, criticizing the actions of campus officials by lodging written and oral complaints—it is clear that your "directive" contemplates disciplinary action for a broad range of journalistic and expressive activity protected by the First Amendment.

Not only is criticism often a part of journalism, criticism of government officials—and, to be clear, as administrators of a public institution, HINU administrators are such officials—is at the core of the First Amendment's protection. "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270 (1941). So central is this ability to criticize officials that the Supreme Court, affirming that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp **attacks** on government and public officials," determined that a higher standard of fault applies to speech-related torts where a public official is the plaintiff. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasis added).

This right to criticize applies both to the press and to individuals. In other words, Nally retains a right to "attack"—as both you and the Supreme Court put it—HINU administrators both as a journalist, such as by writing a story for the *Leader*, and as an individual, such as by writing a letter to your superior or offering public comment at a government meeting. Because Nally's right to criticize is protected by the First Amendment, you may not punish him for doing so. Your "directive" expressly threatens to do so.

The First Amendment right to criticize and engage with government officials, such as administrators at a public university or officials at the local police department, also protects Nally's ability to "[m]ake demands on any governmental agency" and "[a]ttempt countermanding decisions of HINU personnel," activities to which you expressed displeasure in your directive. These activities, in addition to being protected by the First Amendment

---

[32] Letter from Graham, *supra* note 26.

Exhibit 1
Page 6 of 10

USA000393

rights of free speech and free press, are also protected by the "cognate right" to petition the government. *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

This right includes actions that you refer to as "[a]ttempt[ing to] countermand[] decisions of HINU personnel"—that is, expressing displeasure in HINU's choice of faculty adviser for the *Leader* and attempting to take action to secure a different adviser. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives[.]" *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). This includes Nally and the *Leader*'s right to express concerns with their appointed adviser, and, in fact, to demand a different faculty adviser be appointed. Nothing in this right requires individuals to *only* express their ideas to government officials when their ideas align with those of the officials whom they contact.

This right also encompasses "request[ing] action by the government," *id.* at 388–89, protecting Nally's right to "[m]ake demands of" government agents. This shields Nally's right to request information and records from HINU, the local police department, or any other government agency. Further, Nally and the *Leader*'s right to request records from government agencies is not only protected by the First Amendment but also by Kansas law. In Kansas, "[a]ll public records shall be open for inspection by any person," with some exceptions. Kan. Stat. Ann. § 45-218(a). It necessarily follows that coupled with this right to inspect records is a corollary right to *request* their inspection.

      **ii.**    **Kansas law allows recording of private conversations with the consent of only one party.**

The First Amendment not only protects the spoken and written word, but encompasses the "act of making an audio or audiovisual recording" as a necessary "corollary of the right to disseminate the resulting recording." *Am Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012). "The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of making the recording is wholly unprotected." *Id*. This includes the act of "nonconsensual audio recording." *Id.* at 596–97. Accordingly, federal courts of appeal have long recognized a right to receive and record information, including a right to record matters of public interest. *See, e.g., Forcyde v. City of Seattle*, 55 F.3d 436. 439 (9th Cir. 1995) (discussing a "First Amendment right to film matters of public interest"); *Gilk v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011) (although "not unqualified, a citizen's right to film government officials . . . in the discharge of their duties in a public duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment").

The right to record government actors is perhaps at its highest importance when connected to the right of the press to gather information. *See Branzburg v. Hayes*, 408 U.S. 655, 681 (1972). The press, including the student press, serves as an important conduit in preserving the public's right to know. Courts recognize that the press act as "surrogates for the public" in keeping a watchful eye on their communities, and especially on the actions of government

Exhibit 1
Page 7 of 10

USA000394

agents, such as those acting on behalf of public colleges and universities. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573 (1980).

While the right to record is qualified in some states by privacy statutes requiring the consent to record from all parties to a conversation,[33] the right is not so qualified in Kansas—a fact your "directive" implicitly recognizes by invoking the laws of *other* states as rendering such recordings potential felonies. Under the law of Kansas—the state in which HINU sits—it is a crime to record a telephone call "without the consent of the sender or receiver." Kan. Stat. Ann. § 21-6101(a)(1).[34] In the situation with Morris, Nally initiated the telephone call and had the right to record it without Morris' consent. Because his actions in recording HINU officials are protected by the First Amendment and Kansas law, you may not punish him for participating in legal newsgathering techniques.[35]

### B. Threatening retaliation against Nally or the Leader for their free expression violates the First Amendment.

It is well-established that public institutions of higher education "may not constitutionally take adverse action against a student newspaper, such as withdrawing or reducing the paper's funding, because it disapproves of the content of the paper." *Stanley v. Magrath*, 719 F.2d 279, 282 (8th Cir. 1983); *see also Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829–30 (1995). The United States Court of Appeals for the Second Circuit has expanded on this concept to explain:

> [A]t a minimum, when a public university establishes a student media outlet and requires no initial restrictions on content, it may not censor, retaliate, or otherwise chill that outlet's speech, or the speech of the student journalists who produce it, on the basis of content or viewpoints expressed through that outlet.

*Husain v. Springer*, 494 F.3d 108, 124 (2d Cir. 2007).

It is equally true that retaliation against *any actor*—whether an individual student or the campus paper—for participating in First Amendment-protected activity is unconstitutional. Where a government actor responds to protected speech with an "adverse action" that would "chill a person of ordinary firmness from continuing in the activity," it has engaged in impermissible retaliation. *Revels v. Vincenz*, 382 F.3d 876 (8th Cir. 2004). This "well established" test does not require a "great" deal of discipline in order to be "actionable," and the "objective" test asks "not whether the plaintiff herself was deterred" from speaking but

---

[33] For a state-by-state discussion of recording statutes, *see Reporters' Recording Guide*, Reporters Committee for Freedom of the Press, https://www.rcfp.org/reporters-recording-guide (last visited Oct. 21, 2020).

[34] The Kansas Supreme Court has interpreted the state's recording statute as enjoining "only interceptions without the consent of *either* the sender *or* the receiver." *State v. Roudybush*, 235 Kan. 834, 842 (1984).

[35] Even assuming that HINU, a federally-operated institution, could impose a more restrictive standard, it has not done so and may not do so retroactively. Further, federal law permits a party to a call to record that call. 18 U.S.C. § 2511(2)(d).

Exhibit 1
Page 8 of 10

USA000395

whether a reasonable person may be so deterred. *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003).

Here, HINU has taken two adverse actions: First, it has threatened disciplinary action against Nally if he continues to engage in your enumerated list of First Amendment-protected activities. Second, it has retaliated against the *Leader* by refusing to complete the normal recognition process, thereby denying the *Leader*'s access to its bank account and other resources. Each of these actions, individually, is enough to "chill a person of ordinary firmness" from continuing to engage in protected speech that HINU administrators find objectionable.

While Nally appears to be an exceptionally resilient individual and has continued to self-advocate despite HINU's actions and threats, the chilling effect is nonetheless borne out here in the reasonable apprehension Nally feels about engaging in normal activities on behalf of the *Leader* in his role as its editor-in-chief. For example, after receiving your directive, Nally was nervous to once again prod the Student Bank to ask about the *Leader*'s account balance, worried that doing so might result in discipline. This result is untenable and cannot be squared with HINU's obligations as a public institution bound to uphold the First Amendment.

### C. Threatening to punish a student journalist for engaging in journalistic activities violates the 1989 Agreement.

In the 1989 Agreement, HINU, then Haskell Indian Junior College of the Bureau of Indian Affairs, agreed to allow students to retain full editorial control over the *Leader*. This includes the right of the *Leader* to access its monies in its Student Bank account, as well as its right to engage in journalistic pursuits free from censorship.

While the 1989 Agreement does not explicitly forbid HINU from punishing students for their protected journalistic activities, it does forbid HINU from "otherwise inhibit[ing] the free expression of members of [the *Leader*] in violation of the First Amendment[.]"[36] As outlined here, your directive and HINU's refusal to follow the usual sanctioning processes for the *Leader* violate the First Amendment, and thereby also violate the 1989 agreement.

### III. HINU Must Rescind the "Directive" and Immediately Recognize the *Leader*

Your "directive" to Nally is an appalling and unequivocal departure from the First Amendment, betraying willful blindness to the basic concepts of constitutional rights. A public college administrator who violates clearly established law will not retain qualified immunity and can be held personally responsible for monetary damages for violating First Amendment rights under 42 U.S.C. § 1983. *See Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Citing—in the course of violating students' expressive rights—a settlement agreement

---

[36] Settlement Agreement, *supra* note 18.

Exhibit 1
Page 9 of 10

USA000396

obligating you to respect the First Amendment is a stark illustration of a "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

Given the urgent nature of this matter, we request receipt of a response to this letter no later than the close of business on November 2, 2020.

Sincerely,

Lindsie Rank
Program Officer
Individual Rights Defense Program, Foundation for Individual Rights in Education

Francine Compton
President
Native American Journalists Association

Sommer Ingram Dean
Staff Attorney
Student Press Law Center

Encl.

Exhibit 1
Page 10 of 10

USA000397



# HASKELL INDIAN NATIONS UNIVERSITY

**Office of the President**
155 Indian Avenue
Lawrence, Kansas  66046-4800
www.haskell.edu

Dear Mr. Nally,

I am writing in response to a letter from FIRE, dated October 26, 2020, requesting I rescind the memorandum I directed to you on October 16, 2020.  I hereby rescind the October 16 memorandum, including the directives contained therein.

The October 16 letter originated because of Haskell staff members' concerns and complaints regarding certain methods employed to obtain information.  They perceived these methods to be needlessly aggressive and, at times, deceitful. However, I acknowledge that we took an incorrect approach to address those concerns through the issuance of the October 16 memorandum.   Accordingly, I commit that Haskell will not interfere in the affairs of the Indian Leader or impede the free expression rights of individual students at Haskell.
I instructed my staff to review the status of the Leader's annual recognition process to ensure continued access by the Leader to its Student Bank account and Haskell resources.

Sincerely,

Dr. Ronald Graham, President

Cc:  Lindsie Rank, FIRE
         Francine Compton, Native American Journalists Association
         Sommer Ingram Dean, Student Press Law Center
         Tony Dearman, BIE Director

Exhibit 2
Page 1 of 1

*The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the leading institution of academic excellence, cultural and intellectual prominence, and holistic education that addresses the needs of Indigenous communities.*

USA000398

11/5/2020

Case 2:21-cv-02113-JAR-TJJ   Document 29-2   Filed 07/19/21   Page 399 of 528

University president threatens student newspaper editor for asking questions, not treating administration with 'highest respect'

**Last month, 182 people came to FIRE when their rights were in jeopardy. Hear their stories — and how we're fighting back — by subscribing today.**

Hear their stories — and how we're fighting back — by subscribing today.

☐ Student

☐ Faculty

☐ K-12 Teacher

☐ Alumni/Other

Enter email address

**SUBMIT**

# University president threatens student newspaper editor for asking questions, not treating administration with 'highest respect'

by FIRE

October 26, 2020

- Haskell Indian Nations University president issues student-editor a "directive" entirely incompatible with practice of actual journalism.

- Student-editor: "When our university challenges the free speech of students, they are silencing a whole generation of Native voices."

- Saga is a warning to student journalists across the country.

LAWRENCE, Kan., Oct. 26, 2020 — In a meandering, scolding screed that demonstrates shockingly little knowledge of how journalism or the First Amendment work, a public university president formally forbade a student from interviewing government agencies for the student newspaper. He also directed the student editor to start showing university administrators the "highest respect" — or else!

Today, the Foundation for Individual Rights in Education, the Native American Journalists Association and the Student Press Law Center **wrote to Haskell Indian Nations University**. The coalition demands that the federally-operated university immediately and explicitly rescind its threats against the award-winning student newspaper and reminds the university's leadership that they can be held personally and monetarily responsible for threatening freedom of speech and freedom of the press.

HINU President Ronald Graham issued a personally-signed **"directive"** on Oct. 16 to student journalist Jared Nally, threatening him with disciplinary action if he continued basic acts of journalism. Graham specifically prohibited Nally from recording interviews, interviewing government officials, and failing to treat members of the HINU community with the "highest respect."

Exhibit 3
Page 1 of 4

USA000399

11/5/2020

Case 2:21-cv-02113-JAR-TJJ   Document 29-2   Filed 07/19/21   Page 400 of 528

University president threatens student newspaper editor for asking questions, not treating administration with 'highest respect'

On Oct. 5, Nally, editor-in-chief of **The Indian Leader** student newspaper, emailed the Lawrence Police Department with a **routine request for information** about the death of an HINU employee. As is standard journalistic practice, Nally identified himself as a student reporter of The Indian Leader. For that, Graham wrote that Nally "discredited" himself and the university, and brought "unwanted attention" to the Kansas university.

"Under no circumstances," wrote Graham, "do you have the authority to contact the police department (or any other governmental agency) and demand anything on behalf of the university." (Read Nally's "**demand**" for yourself.)

"Native student journalists are our communities' next generation of storytellers," said Nally. "Journalism is about being community watchdogs, sharing information with our communities, and providing spaces for voices to be heard. When our university challenges the free speech of students, they are silencing a whole generation of Native voices."

In July, the administration unilaterally removed the newspaper's faculty adviser and installed its own pick — who happened to also be an administrator — which student editors feared would violate their editorial independence. Concerned that the appointment would imperil their right to engage as a free, independent student press, the Leader's officers unanimously voted to remove the administration's choice as faculty adviser.

Further complicating matters, the university ignored the Leader's repeated attempts to renew its position as a sanctioned organization, ascertain the balance of its account with the student bank, and gain recognition for its former adviser.

The contentious backstory also led Graham to accuse Nally of "attack[ing] Haskell employees with letters" — a colorful, if not overly-dramatic, description of Nally criticizing the actions of campus officials by lodging written and oral complaints.

"The only 'attack' here is Ronald Graham's egregious and unconstitutional attack on the free press," said Lindsie Rank, author of **FIRE's letter** to HINU. "President Graham must immediately disavow his threats against Jared's right to ask questions of those in power. That's Jared's job as a journalist. It's President Graham's job to understand his very real obligations under the Constitution."

### A NATIONAL PROBLEM: WATCH OUT FOR THE SEVEN WARNING SIGNS OF PRESS CENSORSHIP — HINU IS ENGAGING IN THREE

FIRE, NAJA, and SPLC's **letter** reminds the university that its directive goes against student journalists' constitutional rights and that threatening or carrying out retaliation against Nally or the Leader for their free expression violates the First Amendment.

HINU is an educational institution **operated by the federal government** and bound to uphold students' rights — not only by the Constitution, but by a **1989 settlement agreement** between the university and the student newspaper.

HINU, for its part, does not make it particularly easy for students to understand their rights on campus. HINU's student rights office website **helpfully points out** that "[l]orem ipsum dolor sit amet, consectetuer adipiscing elit, sed diam nonummy nibh euismod tincidunt ut laoreet dolore magna aliquam erat volutpat." (Lorem ipsum is **placeholder text**.)

"It appears that HINU is spending their time crafting nastygrams instead of giving at least a begrudging nod to students' rights on their website," Rank said. "These are not the actions of a university that understands its binding legal obligations to honor student rights."

FIRE requested a response by Nov. 2 and is committed to using all the resources at its disposal to ensure student rights are protected at HINU.

Exhibit 3
Page 2 of 4

USA000400

11/5/2020

Case 2:21-cv-02113-JAR-TJJ   Document 29-2   Filed 07/19/21   Page 401 of 528

University president threatens student newspaper editor for asking questions, not treating administration with 'highest respect'

"The Indian Leader is the oldest Native American student newspaper and one of HINU's oldest continued legacies," Nally said. "We are an award-winning publication, and it's disappointing to feel like this amazing student legacy is not supported by our university."

Last month, the Leader **won 11 awards** from the Native American Journalists Association, including first place for general excellence.

This isn't the first time HINU left its students' rights out in the cold: Earlier this year, they actually forced a student out into the cold, banishing him from campus, and leaving him to live in his car during a global pandemic. In April, HINU **charged** student Russell Parker with "threatening a federal employee" when he said a campus employee was "being an asshole" for threatening to tow his car. The university then suspended him without a hearing or any due process — leaving him homeless during the state's stay-at-home order and forcing him to live in his car until he found temporary housing 800 miles away.

The Foundation for Individual Rights in Education (**FIRE**) is a nonpartisan, nonprofit organization dedicated to defending and sustaining the individual rights of students and faculty members at America's colleges and universities. These rights include freedom of speech, freedom of association, due process, legal equality, religious liberty, and sanctity of conscience — the essential qualities of liberty.

**CONTACT:**

Daniel Burnett, Director of Communications, FIRE: 215-717-3473; media@thefire.org

Ronald Graham, President, HINU: 785-749-8497; president@haskell.edu

**Tell Haskell President Ronald Graham to respect freedom of the press**

Exhibit 3
Page 3 of 4

USA000401

11/5/2020                University president threatens student newspaper editor for asking questions, not treating administration with 'highest respect'

Case 2:21-cv-02113-JAR-TJJ   Document 29-2   Filed 07/19/21   Page 402 of 528

Schools:   Haskell Indian Nations University

Cases:   Haskell Indian Nations University: President Sends "Directive" to Student Newspaper Editor About "Respect" for Administrators

11/5/2020          Haskell president warns student editor against 'attacks,' threatens discipline; groups denounce action as First Amendment violation | New…



# Haskell president warns student editor against 'attacks,' threatens discipline; groups denounce action as First Amendment violation



photo by: Jared Nally

Jared Nally is the editor in chief of the student newspaper at Haskell Indian Nations University.

The editor in chief of the student newspaper at Haskell Indian Nations University says the university president is threatening his First Amendment rights and teaching Native American scholars that they don't have voices.

Exhibit 4
Page 1 of 5

USA000403

Case 2:21-cv-02113-JAR-TJJ  Document 29-2  Filed 07/19/21  Page 404 of 528

11/5/2020          Haskell president warns student editor against 'attacks,' threatens discipline; groups denounce action as First Amendment violation | New…

Jared Nally, a Haskell junior and editor of The Indian Leader student newspaper, received a "directive" from Haskell President Ronald Graham on Oct. 16 with specific instructions about what he is–and is not–allowed to do.

*In the letter*, Graham tells Nally, "you will NOT" attack any student, faculty member or staff member with letters or in public, make demands of any governmental agency while claiming to represent the student newspaper, attempt to countermand decisions of Haskell personnel or record anyone at Haskell in interviews unless first advising them and receiving their permission.

"Henceforth, you will conduct yourself in accordance with the Haskell Student Code of Conduct — now and in the future; and you will treat fellow students, University staff, and University officials with appropriate respect," Graham wrote. "Failure to do so, may result in disciplinary action."

Nally said he was upset when he received the directive from Graham, because he felt it was "negative" and painted an image of him that was in conflict with his own self-image. But after looking more at the directive, Nally realized it was "finally some proof of the retaliation I've been feeling for months."

Graham did not respond to a request for comment for this story, nor did Haskell's spokesperson, Stephen Prue.

*As the Journal-World has reported*, Nally said that responses from the Haskell administration have become increasingly sparse since the departure of former interim president Daniel Wildcat. He also stated that he has received comments from administrators criticizing his newspaper's coverage. Now, he feels the directive is a concrete example of the university president violating his First Amendment rights.

"Haskell is an all Native American school and if the mentality of the administration is to not allow students to have free speech, then they are teaching these native scholars and these native youth that they don't have voices," he said.

Representatives of the Foundation for Individual Rights in Education (FIRE), Native American Journalists Association and Student Press Law Center agree that Graham is violating the First Amendment. *In a letter to Graham*, they wrote that his directive "forbids Nally from carrying on normal journalistic activities, such as requesting information from government agencies, recording interviews, and criticizing members of the HINU community."

USA000404

Case 2:21-cv-02113-JAR-TJJ   Document 29-2   Filed 07/19/21   Page 405 of 528

11/5/2020          Haskell president warns student editor against 'attacks,' threatens discipline; groups denounce action as First Amendment violation | New…

In the letter, they tell Graham to rescind the directive, restore the newspaper's rights to university resources and access to its bank account, and to clarify that the university will not impede the free expression rights of students in the future.

"The only 'attack' here is Ronald Graham's egregious and unconstitutional attack on the free press," Lindsie Rank, a program officer with FIRE, said in *a press release from FIRE*. "President Graham must immediately disavow his threats against Jared's right to ask questions of those in power. That's Jared's job as a journalist. It's President Graham's job to understand his very real obligations under the Constitution."

**The directive**

In his directive to Nally, Graham brings up examples of ways Nally's behavior has "discredited" him and the university, and "brought yourself, The Indian Leader, Haskell, and me unwarranted attention."

In the directive, Graham mentions that Nally had recently contacted the Lawrence Police Department, "demanding information." *Nally emailed the Lawrence Police Department* on Oct. 5, identified himself as a student journalist at Haskell, and requested confirmation and information about the death of a Haskell employee.

"Under no circumstances do you have the authority to contact the police department (or any other governmental agency) and demand anything on behalf of the University," Graham's directive to Nally states.

That wasn't the only action of Nally's to which Graham took offense. Graham also mentions in his letter that Nally attempted to remove the faculty adviser of the student newspaper this August.

Joshua Falleaf was assigned as the faculty adviser of the student publication this summer, which Nally and other members of the newspaper staff did not agree with, due to Falleaf's current administrative position as an acting dean. The change came, Nally said, after the university decided faculty members must be removed from all advisory positions to focus on remote learning efforts. And it's a change, Nally said, that really only affects the student newspaper, as most other clubs and associations on campus are not happening this semester, since *Haskell opted to be entirely remote due to the COVID-19 pandemic*.

Exhibit 4
Page 3 of 5

USA000405

Graham also disagreed with Nally's actions of recording a conversation with a university official without her permission. Nally did not identify himself as a reporter during the conversation — which he said was because the university has repeatedly refused to answer press questions. He did use information from the conversation to write a piece for the paper, which he labeled as commentary, not news.

According to Kansas law, however, only one person in a conversation must consent to that conversation being recorded.

But "in many states, this would be considered a felony," Graham writes. "You invoked Kansas law to justify disrespectful behavior toward a university official."

**The rights of the student newspaper**

*A 1989 settlement agreement* between The Indian Leader and the United States Department of the Interior, which runs Haskell, notes that students have editorial control of the newspaper.

It states that no officer, agent, instructor or employee of Haskell may "censor, edit or modify the contents of The Indian Leader newspaper in violation of the First Amendment of the United States Constitution."

The agreement also states that while the faculty adviser of the student publication has the right to offer advice and assistance, that person does not have the right to censor, edit or modify the content of the paper.

Another issue brought up by Nally and mentioned in the letter from FIRE, the Native American Journalists Association and the Student Press Law Center is that Nally has not been able to access the paper's funding because the group has not yet been sanctioned, or recognized, by the university this year. Normally, the newspaper gets sanctioned at the beginning of every year after having its first meeting, recording meeting minutes and electing officials, Nally said. This year, despite multiple attempts to receive sanctioning and thus get funding, Nally said he has not received any responses.

According to the 1989 settlement agreement, a monthly account statement prepared by the student bank must be presented to the leader of the student newspaper. Nally said he has not received any monthly account statements so far this year. The settlement agreement also notes that federal funding may be withdrawn from The Indian Leader, but that notice of the withdrawal of funding

Exhibit 4
Page 4 of 5

USA000406

must be given 30 days in advance. And removing funding from the paper must not be exercised "in response to, or as a result of, articles, photographs or any other content of The Indian Leader."

Thus, in addition to calling on Graham to rescind the directive and not violate the First Amendment, Nally and members of FIRE, the Native American Journalists Association and the Student Press Law Center are calling on Haskell to restore the newspaper's rights to university resources and access to its bank account.

A press release from the Native American Journalists Association (NAJA) states that instead of condemning student journalists, Haskell should be commending them for their "dogged work."

"Graham's attempt to suppress student inquiry is fundamentally anti-Indigenous, and perpetuates the colonial goals of ignorance, isolation, and subjugation," NAJA's statement said. "NAJA joins the Foundation for Individual Rights in Education in urging Haskell officials to respect student reporters and calls on President Graham to rescind his authoritarian-style threats at Nally for upholding his obligations to the Haskell community with persistent, thorough reporting."

Graham, a former division dean of instruction at Victor Valley College in Victorville, Calif., began his presidency of Haskell in May of this year.

Exhibit 4
Page 5 of 5

USA000407

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS
SEP 19  11 44 AM '89

RALPH ___ ___

BY ___ ___ DEPUTY
AT TOPEKA, KS.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THE INDIAN LEADER ASSOCIATION, ET AL.,

                              Plaintiffs,

vs.                                          Case No. 89-4063-R

UNITED STATES DEPARTMENT OF THE INTERIOR,
ET AL.,

                              Defendants.

## ORDER APPROVING SETTLEMENT AGREEMENT

     NOW ON this 18th day of September 1989, the parties appear
before the Court to announce a settlement of the claims of the
Plaintiffs herein.  The Plaintiffs appear through their attorney,
Patrick R. Nichols; the Defendants appear through their attorney,
David Cooper.

     WHEREUPON, the parties announce to the Court that they have
settled and resolved their differences, and entered into a
settlement agreement in writing, which is appended hereto.

     WHEREUPON, the Plaintiffs move orally to dismiss without
prejudice all parties hereto, with the exception of Haskell Indian
Junior College.  The Court sustains said motion.

     THEREUPON, the Court reviews the settlement agreement between
the parties, guaranteeing the rights of free expression to the
Indian Leader Association and the student journalist Plaintiffs,
and find said agreement is valid, just and equitable.  The Court
approves the agreement.

     Pursuant to paragraph 14 of the settlement agreement, the
Plaintiffs move to dismiss the remaining party, Haskell Indian
Junior College of the Bureau of Indian Affairs, subject to the
provisions and terms of the settlement agreement.  The Court
sustains the motion and orders that the action be dismissed upon
the terms of said motion.

     The Court orders that hereafter the settlement agreement shall
immediately bind the parties to all of its provisions and govern
their conduct accordingly.

                              /s/ RICHARD D. ROGERS
                              Honorable Richard D. Rogers
                              United State District Judge

Exhibit 5
Page 1 of 19

USA000408

APPROVED:

_____

Patrick R. Nichols
Attorney at Law
700 Jackson, Suite 703
Topeka, Kansas  66603
(913) 357-4050
Ks. S. Ct. No. 09396
Attorney for Plaintiffs


_____

David Cooper
Assistant United States Attorney
U.S. Department of Justice
444 S.E. Quincy
Topeka, Kansas  66603

-2-

Exhibit 5
Page 2 of 19

USA000409

## SETTLEMENT AGREEMENT

This Settlement Agreement is made between the Indian Leader Association, Marcel Stevens, Laurey Chapman, Ardina Glenn, Cynthia Grant, Tina Melton, Harvey Ross, Cordell Whitetree and Catherine Williams and Haskell Indian Junior College of the Bureau of Indian Affairs of the United States Department of Interior to settle and compromise issues before the United States District Court for the District of Kansas in Indian Leader Association v. United States Department of the Interior, Case No. 89-4063-R (filed March 30, 1989).

1.    Parties to Settlement Agreement.    The parties to this Settlement Agreement are the plaintiff, Indian Leader Association, an unincorporated student association which publishes The Indian Leader (the "Association"), and plaintiffs Marcel Stevens, Laurey Chapman, Ardina Glenn, Cynthia Grant, Tina Melton, Harvey Ross, Cordell Whitetree and Catherine Williams, individually and in their capacities as editors, reporters and representatives of the Association ("Plaintiffs"), and defendant Haskell Indian Junior College of the Bureau of Indian Affairs of the United States Department of the Interior ("Haskell"), which enters into this Settlement Agreement through the agency of Jim Baker, Acting President of Haskell.

Nothing in this Settlement Agreement shall have any bearing on the academic standing of the named plaintiffs or any member of the Indian Leader Association. Nor shall this Settlement Agreement bear on the eligibility of a student to serve as an officer of the Indian Leader Association under the college's rules governing extracurricular activities.

2.    Student Editorial Control.    The parties agree that the members of the Association and the Editorial Board of The Indian Leader have the right to editorial control of the contents of The Indian Leader newspaper as described in the attached Plan of Operation of the Indian Leader Association ("Plan of Operation").

3.    No Prior Restraint or Censorship.    Haskell agrees that no officer, agent, instructor or employee of Haskell shall:

(a) censor, edit or modify the contents of The Indian Leader newspaper in violation of the First Amendment of the United States Constitution;

(b) restrain, obstruct or prohibit the publication of The Indian Leader newspaper or otherwise inhibit the free expression of members of the Association in violation of the First Amendment of the United States Constitution; however, nothing in this Settlement Agreement shall prevent Haskell, the BIA, the Department of the Interior, or Congress from withdrawing any federal funding for The Indian Leader, or from disposing of the printing press on

1

Exhibit 5
Page 3 of 19

USA000410

the Haskell campus pursuant to the provisions of the Federal
Property and Administrative Services Act or other applicable law;

(c) suspend the publication of The Indian Leader newspaper
~~on the ground that a vacancy has arisen in the position of faculty~~
adviser to the Indian Leader newspaper or the Association.

(d) refuse any written request for the disbursement of
funds, reasonably related to the management or publication of The
Indian Leader, from the Indian Leader Association Activity Fund,
the Club Fund or any other Indian Leader Association account
containing student monies in the Haskell Student Bank which is
supported by a written resolution of the Editorial Board of The
Indian Leader or the full membership of the Association finding
"First Amendment Grounds for Funds Withdrawal by Students" as
described in the attached Plan of Operation;

(e) refuse to approve a Plan of Operation for the
Association substantially similar to the attached Plan of
Operation, which is incorporated herein by reference and made an
integral part hereof, and which shall be the Plan of Operation in
effect for the 1989-1990 school year, or suspend the publication
of The Indian Leader on the grounds that the Plan of Operation has
not been approved; provided, that nothing in this Settlement
Agreement shall prevent Haskell from establishing a journalism or
communications department and incorporating The Indian Leader into
the curriculum of such an academic program; that if such an
academic program is established, Haskell and the members of The
Indian Leader Association may revise the Plan of Operation of The
Indian Leader Association to reflect incorporation of The Indian
Leader under the curriculum of that program; provided further, that
nothing in this Settlement Agreement is intended to prevent the
members of The Indian Leader Association from adopting a Plan of
Operation, or other organic operating charts or substantially
dissimilar to the attached Plan of Operation; or

(f) have the right to excise any material from The Indian
Leader on the grounds that it is either libelous or obscene.

4.   Role of Faculty Adviser.   The parties agree that the
faculty adviser shall discharge his or her responsibilities
consistent with the following guidelines:

(a) The faculty adviser to the Association may freely
advise and instruct student editors and reporters in the subject
of journalism and relevant professional standards, commend and
critique the work product of student journalists, offer fiscal and
technological guidance to the newspaper staff in business and
production operations and provide whatever assistance to the
newspaper and the student journalists the faculty adviser deems
appropriate.

2

Exhibit 5
Page 4 of 19

USA000411

(b) A faculty adviser may make nonbinding recommendations to the student editors which they may, in their sole discretion, take into consideration in the free exercise of their independent editorial judgment.

(c) Although a faculty adviser of the Association may freely offer advice and assistance to student members of the Association, neither the faculty adviser nor any other Haskell officer or employee has the right to censor, edit or modify in any way the content of The Indian Leader.

(d) The faculty adviser is under an affirmative duty to facilitate the disbursement of such funds allocated to the Association as directed by the Editorial Board and the Association by majority vote, supported by written resolution, which are reasonably related to the management and publication of The Indian Leader.

(e) The faculty adviser shall, to the best of his or her ability, adhere to the ethical standards set forth in the attached Code of Ethics of College Media Advisers.

5. Responsibility of Student Journalists. Sole legal responsibility for the contents of The Indian Leader shall rest with the individual members of the Indian Leader Association as recognized in 25 C.F.R. § 42.3 (1998). No legal responsibility for the contents of The Indian Leader shall be imputed to Haskell or the faculty adviser, the Bureau of Indian Affairs or the United States Department of the Interior. Plaintiffs understand that they may be held personally accountable for the contents of The Indian Leader in a court of law, if those contents are libelous or obscene, or infringe copyrights or trademarks, or otherwise give rise to civil liability.

6. Newspaper Account in the Student Bank. Those monies which may be received or collected by Haskell on behalf of the Association, such as the Association's allocation of student activity fees, if any, shall be maintained in the Haskell Student Bank in strict compliance with the applicable rules contained in the Bureau of Indian Affairs Manual ("BIAM"), this section of the Settlement Agreement and the Plan of Operations. Such monies shall be:

(a) the subject of a separate accounting in the Haskell Student Bank and assigned a separate account number;

(b) the subject of a monthly account statement prepared by the Haskell Student Bank which shall be presented to the President of the Indian Leader Association; and

(c) disbursed in accordance with this Settlement Agreement and the attached Plan of Operations.

3

Exhibit 5
Page 5 of 19

7. Off-Campus Bank Account. Those monies which are received, collected or raised off campus by the Association, without any intermediation by Haskell, may be deposited, at the election of the Association, in either the Student Bank account or in an off-campus account maintained at a local bank in Lawrence, Kansas. No disbursement from an off-campus bank account shall be made, however, without the signature of at least two officers of the Association on the draft drawn on such local bank. A copy of the monthly accounts of such off-campus bank account shall be published regularly in The Indian Leader. Nothing in this Settlement Agreement shall be read to prohibit Haskell from devising and implementing procedures for managing and accounting for on-campus revenue-raising activities of students.

8. Elections. As soon as possible following the execution of this Settlement Agreement, the President of the Association shall call a meeting of the membership of the Association for the purpose of electing the editors of The Indian Leader and the officers of the Association for the 1989-1990 academic year. This meeting shall be called within the first 30 days of the beginning of the fall 1989 semester at Haskell.

9. Control of Contributions for Subscriptions. Voluntary contributions made by individuals for subscriptions to The Indian Leader shall no longer be paid to the Haskell Indian Junior College Foundation and shall instead be paid directly to the Association Club Account in the Student Bank.

10. Waiver of Claims. This Settlement Agreement represents the final understanding between the parties concerning the resolution of the issues before the United States District Court for the District of Kansas in Indian Leader Association v. United States Department of Interior, Case No. 89-4063-R (filed March 30, 1989). All parties to this Settlement Agreement hereby release the others from any claims or causes of action, and the parties and their counsel agree not to initiate or cause to be initiated, any further proceedings between any of the parties or their counsel, or make any further requests regarding the facts of this case.

11. Covenant of Good Faith and Fair Dealing. The parties agree to interpret and implement this Settlement Agreement in good faith and with due regard for both the First Amendment rights of student journalists and the legitimate educational and administrative interests of Haskell. It is the central purpose of this Settlement Agreement to secure the regular publication of The Indian Leader free from any prior restraint or censorship. This Settlement Agreement is contingent upon the reciprocal performance of the specified obligations by all of the parties. In the event that any party acts in bad faith or breaches this Settlement Agreement, the aggrieved party shall be free to pursue appropriate legal remedies in a court of law. Nothing in this Settlement

4

Exhibit 5
Page 6 of 19

USA000413

Agreement shall be construed to restrict or limit the right of any of the parties to commence litigation if any party fails to comply with all of the terms and conditions of this Settlement Agreement.

~~12.   Use of Printing Press.   The parties agree that the use~~ of the federally authorized printing press at Haskell is subject to the Government Printing and Binding Regulations published by the Joint Committee on Printing of the U.S. Congress.  See 44 U.S.C. §§ 103, 501, 502.

13.   Recognition of Mutual Rights.  Any and all rights and responsibilities under this Agreement are set forth in recognition of the mutual rights of the defendant Haskell, and the rights of the students to free speech, press and expression.  The Agreement recognizes various rights of Haskell hereunder to alter the Plan of Operation in conjunction with the student journalists (3)(e), to reduce or eliminate funding (3)(b), and to dispose of or sell the printing presses under various provisions of this Agreement (12).  These rights may not be exercised by Haskell in response to, or as a result of, articles, photographs or any other content of The Indian Leader.  Further, such actions may not legitimately be performed under this Agreement as a form of prior restraint, or otherwise as intended to limit or restrict the free expression of ideas or rights to the students as recognized in this Agreement. Any exercise by Haskell of the rights noted in this paragraph shall be done following notice to The Indian Leader Association, stating the action to be taken and the reasons therefor.  Such notice shall be delivered to the editor-in-chief and posted on the Student Activities bulletin board at least thirty (30) days prior to any such contemplated action.

14.   Signature and Court Approval.  This Agreement shall be signed by all the parties named in Section 1 of this Settlement Agreement or their duly authorized representatives.   This Settlement Agreement shall be submitted to the Honorable Richard D. Rogers, Judge for the United States District Court for the District of Kansas, for final approval and shall not become effective until such final approval is obtained.  After such final approval has been obtained, the Plaintiffs shall agree to the dismissal without prejudice of the action against all named defendants except Haskell.  The Settlement Agreement shall then immediately bind the remaining parties to all of its provisions, and a judgment of dismissal of the action, subject to the terms of the Settlement Agreement, shall then be jointly submitted to the court by the remaining parties.

IN WITNESS WHEREOF, the parties have caused this Settlement Agreement to be executed by their duly authorized representatives on this _____ day of _____, 1989.

5

Exhibit 5
Page 7 of 19

USA000414

THE INDIAN LEADER ASSOCIATION                    HASKELL INDIAN JUNIOR COLLEGE

_(signature)_                                    _(signature)_

MARCEL STEVENS                                   JIM BAKER
Managing Editor and President                    Acting President
The Indian Leader Association                    Haskell Indian Junior College

_(signature)_                                    _(signature)_

CYNTHIA GRANT                                    DAVID M. COOPER
Student Journalist                               Assistant U.S. Attorney
                                                   Counsel for the Defendant

_(signature)_

HARVEY ROSS
Student Journalist

_(signature)_

CORDELL WHITETREE
Student Journalist

_(signature)_

DARIO F. ROBERTSON
Counsel for Plaintiffs

_(signature)_

PATRICK R. NICHOLS
Counsel for Plaintiffs

6

Exhibit 5
Page 8 of 19

USA000415

THE INDIAN LEADER ASSOCIATION
Haskell Indian Junior College
Lawrence, Kansas 66046

PLAN OF OPERATION

I.   NAME

The name of this organization is The Indian Leader Association
and shall hereafter be referred to as the Association.

II.   PURPOSE

The purpose of the Association is to produce The Indian Leader
newspaper, an independent student publication, and the Haskell
Yearbook.   The Indian Leader newspaper will be produced and
published approximately six times each semester and the Haskell
Yearbook will be produced and published the spring semester of each
school year.  The Association will also maintain a separate account
to accept funds and donations on behalf of the newspaper and for
disbursing cash payments as incentives to students who contribute
articles, photographs and illustrations to The Indian Leader.

The Indian Leader is a nationally distributed Native American
newspaper edited and published by students at Haskell Indian Junior
College for the purpose of promoting the free and informed debate
and discussion of (1) topics of special interest to Haskell
students and alumni, (2) issues of special importance to Native
Americans generally and (3) all newsworthy topics and public issues
of general interest to American citizens.

The Indian Leader is published by the students at Haskell
Indian Junior College and the members of the Association in the
exercise of their individual rights to free speech and freedom of
the press guaranteed by the First Amendment of the United States
Constitution.  These fundamental First Amendment rights have been
expressly recognized as rights which individual students enjoy who
attend Bureau of Indian Affairs schools in Part 42 of Title 25 of
the Code of Federal Regulations.  Student Rights and Due Process
Procedures, 25 C.F.R. § 42.3(e)-(f) (1988).  These basic rights
have also been reaffirmed in Part III of the Code of Student Rights
and Responsibilities of Haskell Indian Junior College (1988).

The Indian Leader Association is committed to improving the
ability of Native Americans to determine their own destiny by
providing an open public forum in which all concerned citizens,
regardless of race, creed, color, sex, religion or national origin,
might freely discuss the important public issues of the day.  The
members of the Association believe that by providing such a public
forum, readers and contributors alike will improve their
understanding of the true meaning of leadership, citizenship and
democracy in contemporary American society through an open, honest

1

Exhibit 5
Page 9 of 19

USA000416

## III. MEMBERSHIP AND OFFICERS OF THE ASSOCIATION

### A. General

To qualify as a member of the Association, an individual must:

(a) be an enrolled student at Haskell Indian Junior College;

(b) submit a news story, essay, proposed editorial, poem, short story, photograph or any other journalistic or literary work, not including advertisements, letters to the editor and notices, for publication in The Indian Leader, or participate in the production or circulation of The Indian Leader or the Haskell Yearbook.

(c) receive written notice that the submission has been accepted for publication in The Indian Leader; and

(d) inform the Association, orally or in writing, of an intention to become a member of the Association.

The Editor-in-Chief shall be responsible for keeping a current list of Association members and publishing said list at least once per semester in The Indian Leader.

In the event that any member fails to attend three consecutive meetings of the Association, without excuse, that person may be removed from the membership rolls of the Association by majority vote.

### B. Officers

The officers of the Association shall include a President, Vice President, Treasurer and Secretary.  The person elected President of the Association shall also serve as Editor-in-Chief of The Indian Leader and the person elected Vice-President shall also serve as Executive Editor of The Indian Leader.

Officers must maintain "academic good standing," as defined on page 35 of the Haskell Bulletin, 1988-1990, in order to receive a salary as specified in Appendix I containing the 1989-1990 Budget for The Indian Leader.  Decisions made at duly convened meetings of the Association are binding on members.

All officers of the Association shall have taken or shall be currently enrolled in at least one course in English or Journalism at Haskell Indian Junior College at the time his or her term of office shall commence in order to be eligible to hold such office.

2

Exhibit 5
Page 10 of 19

USA000417

The President shall be the Editor-in-Chief and shall be responsible for the general operation of the paper and the Association.   The President shall pick up and distribute mail daily.

The Editor-in-Chief shall conduct regular and special meetings of student reporters, assign stories, edit manuscripts, oversee reporters and lay out The Indian Leader.

The Executive Editor shall assist the Editor-in-Chief in carrying out his or her assigned duties and shall succeed to the position of Editor-in-Chief in the event of a vacancy in that office prior to next regularly scheduled election.

The circulation manager shall (1) recommend to the printers the approximate number of issues of the newspaper to be published, (2) coordinate the distribution of issues on the day of publication, (3) maintain a current mailing list, (4) make additions, deletions, corrections and other appropriate changes in mailing list, (5) make labels or have labels made, (6) coordinate the process of labeling The Indian Leader for mailing, (7) keep a file of correspondence, and (8) make a weekly report, oral or written, to the Association.

Other positions in the Association shall be established upon the majority vote of the members of the Association.   The Association shall make the guidelines and prescribe the duties of all new positions.   Officers may be removed from office upon the vote of two-thirds of the members of the Association.

IV.   PARLIAMENTARY AUTHORITY

The rules contained in the current edition of Robert's Rules of Order Newly Revised shall govern the Association in all cases to which they are applicable and in which they are not inconsistent with this Plan of Operation and any special rules of order the Association may adopt.

V.   MEETINGS

Meetings of the Association shall be held weekly and will be open to all Haskell students and to the public.

At the beginning of each semester, the Association shall decide upon a day, time and place for such regular weekly meetings. Once the day, time and place has been decided by the Association and notice of such has been posted on the bulletin board at the Student Senate Building, no further notice shall be required for the Association to conduct business at such regular weekly meetings.

Any meeting of the Association not held on the day, time and

3

Exhibit 5
Page 11 of 19

PAGE.10                     U S A TOPEKA   3:00 88, 19 SEP

USA000418

(Washington, D.C.:   Student Press Law Center, 1985):   31-38 (on libel), 38-41 (on obscenity);

     (d) make a final, independent determination of whether to publish the identified material; and

     (e) report its determination to the faculty adviser within 24 hours following such decision.

Any student who has submitted an article for publication may withdraw that article prior to publication upon reasonable written notice to the Editor-in-Chief, provided that such withdrawal can be accomplished without a substantial delay in publication.

## VII. FACULTY ADVISER

One or more faculty advisers may be appointed by Haskell Indian Junior College to assist students in the publication of The Indian Leader.

The faculty adviser to the Association may freely advise and instruct student editors and reporters in the subject of journalism and relevant professional standards, commend and critique the work product of student journalists, offer fiscal and technological guidance to the newspaper staff in business and productions operations and provide whatever assistance to the newspaper and the student journalists the faculty adviser deems appropriate.

A faculty adviser may make nonbinding recommendations to the student editors which they may, in their sole discretion, take into consideration in the free exercise of their independent editorial judgment.

Although a faculty adviser of the Association may freely offer advice and assistance to student members of the Association, neither the faculty adviser nor any other Haskell officer or employee has the right to censor, edit or modify in any way the content of The Indian Leader.

The faculty adviser is under an affirmative duty to facilitate the disbursement of such funds belonging to the Association as directed by the Editorial Board and the Association by majority vote, supported by written resolution, which are reasonably related to the management and publication of The Indian Leader.

The faculty adviser shall, to the best of his or her ability, adhere to the ethical standards set forth in the attached Code of Ethics of College Media Advisers.

The right of the Association to publish The Indian Leader shall not be conditioned upon the prior appointment of a faculty adviser by Haskell Indian Junior College.   Consequently,

5

Exhibit 5
Page 13 of 19

USA000420

publication by The Indian Leader shall be noted. In the result of the inability or unwillingness of Haskell Indian Junior College to appoint a faculty adviser to work with the Association in the event of a vacancy in that position.

The faculty adviser has no power to refuse to facilitate the disbursement of funds reasonably related to the management and publication of The Indian Leader as determined by the Editorial Board or the Association by majority vote.

## VIII. SALARIED POSITIONS OF THE INDIAN LEADER

### A. Officers With Salaries

Salaried positions in the Association shall be those of President, Vice President, Copy Editor, Circulation Manager, Darkroom Manager. The Typesetter shall also receive a salary.

### B. Assistant Officers

Assistant officers shall be elected by majority vote of the members of the Association at the beginning of the last semester prior to the graduation of each salaried officer of the Association. Such assistant officers shall serve as apprentices to the graduating officers for the purpose of receiving the necessary training and experience to assume the responsibilities of the graduating officer after commencement. The assistant officers shall assume the office and responsibilities of the graduating officers on the date of the next commencement at Haskell Indian Junior College following their appointment as assistant officers. Any office not so filled by an assistant officer shall be filled by majority vote of the members of the Association in a regular or special election.

## IX. COMPENSATION AND AWARDS

Compensation and awards shall be as specified in this Section VIII.

Salaried positions shall be compensated according to the rates and amounts specified in Appendix I containing the 1989-90 Budget for The Indian Leader. Students holding salaried positions shall not be paid any other compensation specified in this section.

Student reporters shall be paid $1.25 per column inch for articles published. Student photographers shall be paid $5.00 for each photograph published. Student artists shall be paid an amount to be determined by majority vote of the Association for each published illustration or cartoon.

The amount and disbursement of monies for any type of contest sponsored by The Indian Leader must be approved by majority vote

6

Exhibit 5
Page 14 of 19

USA000421

of the Association.

X.   ACCOUNTS

A.   Activity Fund

Any funds allocated to The Indian Leader Association from the student activity fee, paid by each student of Haskell Indian Junior College each semester, shall be deposited in The Indian Leader Association Activity Fund in the Student Bank.   Other monies received or collected by Haskell on behalf of the Association shall also be deposited in that Activity Fund.

Any officer, editor or any other member of the Association or any currently enrolled student or alumnus of Haskell Indian Junior College may, upon written request, examine the records of account of The Indian Leader Association Activity Fund in the Student Bank and may obtain a copy of any such records of account at his or her own expense.

A summary of the records of account shall be published annually in The Indian Leader.

In the absence of a finding by the Association of "First Amendment Grounds for Funds Withdrawal by Students" as described in the following paragraph, withdrawal from the Indian Leader Association Activity Fund shall be made by a faculty adviser, supported by signatures from a student member of the Editorial Board and the Association President.

In the event that the Association or the Editorial Board passes by 2/3 (two-thirds) vote a resolution finding "First Amendment Grounds for Funds Withdrawal by Students," withdrawal from the Indian Leader Association Activity Fund shall be made by President of Haskell Indian Junior College, if the request is reasonably related to the management or publication of The Indian Leader, supported by the signatures of the Association President and another member of the Editorial Board.   "First Amendment Grounds for Funds Withdrawal by Students" exist whenever Haskell Indian Junior College has failed to appoint at least one faculty adviser to the Association or whenever the Association, by 2/3 (two-thirds) vote, reasonably determines that a faculty adviser (1) is in any way obstructing the publication of The Indian Leader, (2) refuses to comply with requests from the Association or the editorial board for disbursements reasonably related to the management or publication of The Indian Leader, or (3) attempts in any way to censor, edit or modify the content of The Indian Leader.

Each withdrawal from The Indian Leader Association Activity Fund must be approved by a majority vote of the Editorial Board or the Association and supported by written resolution.   Each such resolution must explain the purpose of every withdrawal of funds.

7

Exhibit 5
Page 15 of 19

SEP 19 '89  9:03   U S A TOPEKA                     PAGE.14

USA000422

Receipts shall be collected within five (5) days following the disbursement of all funds. A full written accounting of any monies withdrawn pursuant to a resolution finding "First Amendment Grounds for Funds Withdrawal by Students" shall be given to a faculty adviser or, if there is no faculty adviser, to the President of Haskell Indian Junior College within five (5) days following the withdrawal transaction.

Nothing herein binds the federal government (or Haskell) to spend federal appropriated funds to publish The Indian Leader.

B.   Club Fund

Money raised by members may, at the election of the Association, be deposited into a Club Fund at the Student Bank or in an off-campus account at a local bank in Lawrence, Kansas. Such money may be withdrawn for (1) student entertainment, (2) contracting outside services and (3) such other uses benefiting the Association as the Editorial Board may, in its sole discretion, determine to be necessary or appropriate.

In the absence of a determination by the Association of "First Amendment Grounds for Funds Withdrawal by Students" as described in the following paragraph, withdrawal from a Club Fund maintained at the Student Bank shall be made by faculty adviser, supported by signatures from any two student officers of the Association.

In the event that the Association or the Editorial Board passes by majority vote a resolution finding "First Amendment Grounds for Funds Withdrawal by Students," withdrawal from the Club Fund shall be made by the President of Haskell Indian Junior College, supported by the signatures of the Association President and another officer of the Association. "First Amendment Grounds for Funds Withdrawal by Students" exist whenever Haskell Indian Junior College has failed to appoint at least one faculty adviser to the Association or whenever the Association, by majority vote, reasonably determines that a faculty adviser (1) is in any way obstructing the publication of The Indian Leader, (2) refuses to comply with requests from the Association or the editorial board for disbursements reasonably related to the management or publication of The Indian Leader, or (3) attempts in any way to censor, edit or modify the content of The Indian Leader.

Each withdrawal from the Club Fund must be approved by a majority vote of the Editorial Board or the Association and supported by written resolution. Each such resolution must explain the purpose of every withdrawal of funds. Receipts shall be collected following the disbursement of all funds. A full written accounting of any monies withdrawn pursuant to a resolution finding "First Amendment Grounds for Funds Withdrawal by Students" shall be given to a faculty adviser or, if there is no faculty adviser, to the President of Haskell Indian Junior College within five (5)

8

Exhibit 5
Page 16 of 19

SEP 19 '89  9:04   U S A TOPEKA                    PAGE.15

USA000423

days following the withdrawal transaction.

### C.   Contributions for Mailed Subscriptions

The Indian Leader shall be distributed free of charge to anyone interested in receiving a copy.   Any person wishing to receive a mailed subscription to The Indian Leader will be asked to make a $5.00 contribution directly to The Indian Leader Association Activity Fund by check or money order.   The next edition of the Haskell Bulletin shall be amended to provide for the payment of such $5.00 contributions directly into The Indian Leader Association Activity Fund, rather than the Haskell Foundation, a tax exempt organization which has not direct relationship with and provides no funding to The Indian Leader Association.

### D.   Off-Campus Bank Account

Those monies which are received, collected or raised off campus by the Association, without any intermediation by Haskell, may be deposited, at the election of the Association, in either the Student Bank account or in an off-campus account maintained at a local bank in Lawrence, Kansas.   No disbursement from an off-campus bank account shall be made, however, without the signature of at least two officers of the Association on the draft drawn on such local bank.   A copy of the monthly accounts of such off-campus bank account shall be published regularly in The Indian Leader.

9

Exhibit 5
Page 17 of 19

USA000424

425 of 528

## APPENDIX I

### 1989-90 BUDGET FOR THE INDIAN LEADER

| Position | Salary | Times 12 Issues |
|---|---|---|
| Editor-in-Chief | $33.50 | 402.00 |
| Executive Editor | 33.50 | 402.00 |
| Copy Editor | 33.50 | 402.00 |
| Circulation Manager | 33.50 | 402.00 |
| Darkroom Manager | 33.50 | 402.00 |
| Typesetter | 33.50 | 402.00 |
| Assistant Circulation | 33.50 | 402.00 |
| Assistant Darkroom | 33.50 | 402.00 |
| Assistant Typesetter | 33.50 | 402.00 |
| Freelance Compensation | 500.00 (per sem.) | $1,000.00 (x2 sem.) |
| Miscellaneous | 300.00 (per sem.) | 600.00 (x2 sem.) |
| Travel Expense | 750.00 (per sem.) | 1,500.00 (x2 sem.) |

TOTAL  $3,158.00 (per sem.)   $6,718.00 (x2 sem.)

10

Exhibit 5

Exhibit 5
Page 18 of 19

SEP 19 '89 9:06   U S A TOPEKA

PAGE.17

USA000425

PLAN OF OPERATION APPROVAL

College Officials                                     Date Approved

_(signature)_                                         _9/14/89_
PRESIDENT                                             DATE


_____                             _____
DIRECTOR OF STUDENT ACTIVITIES                        DATE

_Kindall D. McHenry_                                  _9 - 15 - 89_
STUDENT SENATE PRESIDENT                              DATE

_(signature)_                                         _9/15/89_
SPONSOR                                               DATE


Organization Officers                                 Date Approved

_Marcel Stevens_                                      _9 - 14 - 89_
PRESIDENT                                             DATE


(POSITION VACANT)                                     _____
VICE PRESIDENT                                        DATE


_Harvey E Ross J._                                    _15 Sept 89_
SECRETARY                                             DATE


_Harvey E Ross J._                                    _15 Sept 89_
TREASURER                                             DATE



11

Exhibit 5
Page 19 of 19

USA000426

# Haskell Indian Nations University
# Student Handbook
# Code of Student Conduct

Humankind has not woven the web of life.
We are but one thread within it.
Whatever we do to the web, we do to ourselves.
All things are bound together.
All things connect.
*~ Chief Seattle, 1854 ~*

Exhibit 6
Page 1 of 98

(1)

USA000427

**I. Introduction**……………………………………..........……..pg. 5
      A. Preamble……………………………………........……..pg. 6
      B. Mission of Haskell Indian Nations University……….. pg 6
      C.  Vision Statement …………………………………… pg 7
      D. Authority………………………………….........……..pg 7
      E. Jurisdiction…………………………........ …….pg. 7
      F. Violation of Law and University Discipline….……...pg. 8
      G. Student Rights…………………………………….pg. 8
      H. Student Responsibilities……………………………pg. 9
      I. Classroom Expression……………………....... …….pg. 10
      J. Campus Expression……………………………...…….pg. 11
      K. Student and Campus Organizations………........……..pg. 11
      L. Publications……………………………........ …….pg. 12
      M. Freedom of Protest…………………………........……..pg. 12
      N. Student FERPA Rights……………………………. pg. 13
      O.  Campus Safety and Security Survey……………….pg. 14

**II. Code of Student Conduct…………………………... ……. pg. 15**
      A. Code of Conduct and Definitions………………..………pg. 15

**III. Student Conduct Process…………………………...……..pg. 23**
      A. Due Process…………………………………………pg. 24
      B. Advocates……………………………………………pg. 24
      C. Alternative Dispute Resolution……………….............pg. 25
      D.  Restorative Justice Conference………………………pg. 25
      E. Adjudication Process………………………………pg. 25
      F. Appeal Process…………...…………………....……..pg. 26
      G. Appeal Process following Expulsion……...………. pg. 27
      H. Personal Safety during the SC Process……………. pg. 27
      I. Major/Minor Violations……………………………. pg. 28
         University Process Flow chart
      J. Sanctions…………………………………...………..pg. 30
      K. Emergency Suspension……………………………. pg. 32
      L. Trespassing Procedures……………………........ pg. 32
      M. Diversion……………………………………. pg. 33

**IV. Substance Abuse……………………………………….pg. 36**

**V. Violence Policy………………………………………pg. 42**

Exhibit 6
Page 2 of 98

USA000428

**VI. Campus Sexual Assault/Harassment and Title IX...……... pg. 45**

**VII. Fire Safety……………………………………………….. pg. 55**

**VIII. Residential Life Policies… ………………….............…. pg. 58**

**IX. Parking and Traffic Program Policies and
Procedures………………………………………….......……..pg. 67**

**X. Student Grievance Process……………………………..  pg. 74**

**XI. Definitions and Appendices………………………………..pg. 79**
      A. Policy and General Definitions…..………........ ……..pg. 80
      B. Interpretation and Revision …………………... ……..pg. 83
      C. Sources ……………………………………………..pg. 83
      D. Acknowledgements...………………………………..pg. 84

**XII. Forms……………………………………………...…..  pg. 85**

Exhibit 6
Page 3 of 98

USA000429

## Statements of Accreditation, Mission, and Vision





### National Accreditation

Haskell Indian Nations University is accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools to award associate and baccalaureate degrees



### Professional Accreditation

The Haskell Indian Nation University, School of Education is accredited by National Council for Accreditation of Teacher Education (NCATE).



### Haskell Indian Nations University Mission Statement

The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the leading institution of academic excellence, cultural and intellectual prominence, and holistic education that addresses the needs of Indigenous communities.

### Haskell Indian Nations University Vision Statement

Haskell is a unique and diverse intertribal university committed to the advancement of sovereignty, self-determination, and the inherent rights of tribes.

Exhibit 6
Page 4 of 98

(4)

USA000430

# I. Introduction

Exhibit 6
Page 5 of 98

USA000431

## A.  Preamble

The mission of Haskell Indian Nations University is to build the leadership capacity of our students by serving as the leading institution of academic excellence, cultural and intellectual prominence and holistic education; in order to address the needs of Indigenous communities.

Haskell has established a Code of Student Conduct in order to promote healthy decision-making and to protect the rights of all students.  Each student is responsible for contributing to the values of Haskell through support and adherence to the Code of Student Conduct.  By forming this Code of Student Conduct, Haskell affirms students' rights to freedom, due process and impartiality in decision-making.  Haskell also prides itself on the focus of learning for students as they relate to self, friends, family, tribe, country, and world.

Sanctions are meant to help students reflect on their actions and learn to make better choices in the future to ensure they retain the opportunity to reach their academic potential. Students will be treated with fairness and respect throughout the processes of Student Conduct.  The Code of Student Conduct helps students understand the conduct expectations of the university and the consequences of your decision-making as a role in student learning.  We hope you will think about your choices and decisions and the impact they can have on your leadership potential and ability to complete your degree at Haskell before you engage in actions that violate our standards of conduct.

In October 2014, Haskell adopted new Institutional Values, commonly referred to in the document as "CIRCLE" values.

### *Communication*

> To successfully convey ideas, opinion, information, results, images and creative expression using multiple strategies for diverse groups and stakeholder.

### *Integrity*

> To conduct ourselves in ways that honor the sacrifices of our tribes on which treaty and trust responsibilities are based; and to carry out our responsibilities as students, staff, faculty, administrators, and regents by engaging in action based on the highest standard of conduct.

### *Respect*

> To honor and promote the diversity of beliefs, rights, responsibilities, cultures, accomplishments of self and others, including our non-human relations.

Exhibit 6
Page 6 of 98

(6)

USA000432

### *Collaboration*

The willingness and ability to work successfully with others to accomplish the goals of the university and to meet the needs of our students, the tribes we represent and serve as well as our mission.

### *Leadership*

The willingness to acquire the knowledge and skills required to advocate for, and to advance the sovereignty and self-determination of tribes, Haskell and the students.

### *Excellence*

To strive toward the strongest level of accomplishment in our respective roles on behalf of Haskell, as students, staff, faculty, administration, and the Board of Regents.

## B.  Vision Statement

Haskell is a unique and diverse intertribal university committed to the advancement of sovereignty, self-determination, and the inherent rights of tribes.

## C.  Authority

The President of Haskell Indian Nations University has delegated the responsibility and authority for resolving all issues of student conduct with the Student Conduct Administrator.  It will be presumed that Haskell employees will act in good faith when performing their duties and shall use a reasonable person standard to make discretionary decisions.

The Student Conduct Administrator shall determine the composition of Student Conduct Committees and Alternative Dispute Resolution Boards.

The Student Conduct Administrator shall develop internal policies and procedural rules for the Student Conduct Process and for Student Appeals Committees that are consistent with the provisions of the Code of Student Conduct.

Decisions made by a Student Appeals Committee, Alternative Dispute Resolution Board or the Student Conduct Administrator shall be final pending appeal, if any.

## D.  Jurisdiction

You are responsible for your conduct from the time of application to Haskell for admission through the actual awarding of a degree.  You are accountable for conduct that occurs before classes begin, after classes end, on or off campus, during the academic year or during periods between semesters of actual enrollment.  You are responsible for your

Exhibit 6
Page 7 of 98

USA000433

conduct throughout your education at Haskell, even if your conduct is not discovered until after a degree is awarded or you have left the university.

While representing the university in off-campus events, you are held accountable for actions that may violate the Code of Conduct.  The Code of Student Conduct shall apply to your conduct even if you withdraw from school while a disciplinary matter is pending.

The Student Conduct Adminstrator shall decide whether the Code of Student Conduct shall be applied to conduct occurring off campus.

Anyone can file a written report against a student for violation of the Code of Student Conduct.  The report shall be submitted to the Office of Student Conduct within five (5) business days from the date the situation occurred.  The 5 business days rule does not apply to any complaints alleging sexual misconduct.  To learn more about processing sexual misconduct complaints and procedures, please go to page 45.

## E.   Violation of Law and University Discipline

You can be sanctioned for violation of the Code of Student Conduct, even if you receive a sanction for a violation of local, state or federal law arising from the same situation.  Your Student Conduct Process can happen before, during, or after the on or off campus legal matter.  The sanctions you receive in the legal matter **will not** determine the sanctions given by the Office of Student Conduct or the Student Conduct Committee.

In order to be clear, if you get in trouble on or **off campus** and it is determined that you have violated the Code of Student Conduct, the outcome of the legal matter will have no effect on the Student Conduct process.  You can be found not guilty in criminal court and still be found responsible for violation of the Code of Student Conduct.

## F.   Student Rights

Part 42 of Title 25 of the Code of Federal Regulations applies to Haskell, which is funded by the Bureau of Indian Education.

Haskell recognizes that students have:
1. The right to understand the grading process at Haskell.
2. The right to an education that may take into consideration Native American or Alaska Native values and that incorporates applicable Federal and Tribal constitutional and statutory protections for individuals.
3. The right to be free from unreasonable search and seizure of their persons or property, to a reasonable degree of privacy, and to a safe and secure environment.
4. The right to make decisions for themselves where appropriate.
5.  The right to freedom of religion and culture.
6. The right to freedom of speech and expression so long as the expression does not unreasonably disrupt the educational process or endanger the health or safety of the students or others.
7. The right to freedom of the press, except where material in student publications is libelous, slanderous, or obscene.

Exhibit 6
Page 8 of 98

(8)

USA000434

8. The right to peaceably assemble and to petition for the redress of grievances.
9. The right to freedom from harassment or discrimination based on sex, race, color, national origin, religion, ancestry, sexual orientation, disability, or, as specified by law, age, veteran status, marital or parental status, or degree of Indian blood.
10.  The right to due process.  Every student, student organization, and campus organization is entitled to due process and appeal in every instance of disciplinary action for alleged violation of Haskell expectations.  Please see Code of Conduct section on page 24.  A student or organization may waive the right to a hearing and use the alternative dispute resolution system or may choose to admit responsibility for misconduct and accept disciplinary sanctions from Haskell.
11. The right to reschedule examinations and tests, other than final examinations, which occur on mandated religious holidays or during traditional cultural ceremonies, provided that the students notify their instructors at the beginning of the semester.
12. The right to have respect for his/her property.
13.  The right to have student representation in the decision-making and policy forming groups.
14.  The right to be notified of proposed changes to student responsibility and academic policies.

The following rights are retained by students who live in the residential halls:
1. The right to read, study, and relax in one's room free from undue interference; unreasonable noise and other distractions that may inhibit the exercise of this right.
2. The right to sleep without undue disturbance from guests of roommate(s) and/or other residents.
3. The right to expect that a roommate will respect others' personal belongings.
4.  The right to a clean living environment.
5. The right to host guests with the expectation that guests are to respect the rights of the host's roommate(s) and other hall residents.

## G.   Student Responsibilities

Students shall have these responsibilities so as not to infringe upon the rights of others in the Haskell community.  Students assume an obligation to obey all rules and regulations made by properly constituted authorities to preserve all property provided for their education and to discharge their duties as students with diligence, fidelity and honor.

1.  Obtain an Education. Students shall regard the opportunity of obtaining an education as a duty to the community. Students have the responsibility to attend all their classes regularly.
2. Conform to Haskell rules. Students shall obey recognized rules and procedures developed by the school community, order and use of school property.
3. Exercise self-control. Students shall refrain from inflicting bodily harm on other students or other persons and respect the privacy of property and mail.
4. Understand the grievance process. Students shall inform themselves of the proper methods and channels for complaints and make use of them.
5.  Disclose any information regarding convictions of felonies.  Failure to disclose will result in immediate dismissal and loss of enrollment status.

Exhibit 6
Page 9 of 98

(9)

USA000435

6.   Obtain and regularly check campus mailbox and e-mail.  This pertains to students living on-campus and off-campus.  This is the primary way that Haskell corresponds with the student body.

7.   Respect the rights of others and behave in accordance with expectations regulating student conduct and guidelines established by this Code of Student Conduct.

8.   Make decisions that do not infringe upon the rights of others.

9.   Express opinions and ideas in a respectful manner that does not slander, hurt or harm others.

10.  Respect the beliefs of others.

11.  Arrange a time and place for peaceable assembly that does not interfere with Haskell's normal operations.

12.  Recognize Haskell's authority to check student rooms for safety and health reasons.

13.  Respect the freedom of expression exercised by others.

14.  Maintain updated contact information at Haskell consistent with the application for admission in compliance with the Family Educational Rights and Privacy Act (FERPA).

**RESPONSIBILITIES CONCERNING CAMPUS E-MAIL**

1.  Haskell e-mail is a U.S. Government resource and, as such, all rules and regulations pertaining to use/misuse of Federal resources shall apply.

2.  Passwords are confidential and shall not be shared with any other individual.

3.  Haskell students shall not use the e-mail system for chain letters, junk mail, or any use of distribution lists such as campus-wide emails sent to the Haskell community.

4.  Haskell students shall not transmit through the e-mail system any unlawful, harassing, libelous, abusive, threatening, harmful, vulgar, obscene or otherwise objectionable material of any kind or nature.

5.  Haskell students shall not use the e-mail system for any illegal or commercial purposes, this includes compliance with Haskell's copyright policy.

6.  Haskell students shall provide true and accurate information on the e-mail application form.

7.  Failure to abide by the above terms will result in revocation of Haskell's e-mail privileges for the remainder of the semester in which the violation occurs.

## H.   Classroom Expression

Discussion and expression of all views relevant to the subject matter are permitted in the classroom subject to Haskell's CIRCLE values.  The responsibility of the instructor is to maintain order.

> a. Students are responsible for learning the content of any course for which they are enrolled.
>
> b. Requirements of participation in classroom discussion and submission of written exercises are consistent with this section.

Students are expected to conduct themselves with communication, respect, cooperation, leadership and excellence.  Disruptive, disrespectful behavior which poses a threat to the student or others, *or disrupts the learning environment of the classroom,* may result in

Exhibit 6
Page 10 of 98

(10)

USA000436

sanctions and will be enforced through the Office of Vice President of Academics. Please refer to the Haskell Catalog for more information.

## I.  Campus Expression

Discussion and expression of all views is permitted, consistent with Haskell's CIRCLE values and subject only to requirements for the maintenance of order.  Support of any cause by orderly and peaceful means that does not disrupt Haskell's operations is permitted.

Students, groups, and organizations may invite and hear any persons of their choosing, subject only to the requirements for use of Haskell facilities.

## J.  Student and Campus Organizations

Organizations may be established for any legal purpose, including, but not limited to, religious, political, educational, economic, social, or recreational purposes.

    **a.** Affiliation or disaffiliation with an extramural organization shall not disqualify the Haskell-based branch or chapter from registering as a student or campus organization.

    **b**. Members in all Haskell-related organizations shall follow the guidelines established by the Constitution of the Student Senate.  The right of organizations to establish standards for membership is acknowledged, provided that all students are afforded equal opportunity to meet those standards.  Nothing in this section shall be interpreted as imposing a requirement that would violate the principle of selection on the basis of individual merit.

    **c.** A student may not be denied the rights of access to and participation in any Haskell-sponsored or Haskell-approved activity because of race, religion, sex, color, disability, national origin, ancestry, sexual orientation, political affiliation, marital or parental status, and to the extent specified by law, age or veteran status.

In order for an organization to apply for student activity funds, the organization shall register annually as an organization with the Student Senate and file a list of officers and plan of operation indicating that the organization shall abide by the rules and regulations of the Constitution of the Student Senate.

The Student Senate delegates to each organization, residential hall, fraternity, sorority or living group responsibility for establishing rules concerning social conduct.  Such rules shall be consistent with this Code of Student Conduct, rules of the Board of Regents, and local, state and federal law.

Residential rules of social conduct shall not be adopted that conflict with the Student Housing contract entered into as a condition of residency in facilities operated by the Department of Student Housing.

An organization or living group may discipline any member for violation of rules of social conduct, provided that any disciplinary action taken shall not affect a member's rights and privileges as a Haskell student.

Exhibit 6
Page 11 of 98

(11)

USA000437

Haskell facilities shall be available to registered student and campus organizations for regular business meetings, social functions, recreational activities, and for programs open to the public.  Reasonable conditions, as outlined in Haskell space utilization process, may be imposed to regulate the timeliness of requests, to determine the appropriateness of the space assigned, time of use, and to insure proper maintenance of the facilities. Haskell facilities may be made available to individuals or groups composed of members of the Haskell community, even though not formally registered.  Preference may be given to programs designed for audiences consisting primarily of members of the Haskell community.  The Space Utilization form can be attained at the Vice-President for University Services Office in Pushmataha Hall.

An organization alleged to have violated provisions of this code is entitled to alternative dispute resolution (ADR), restorative justice conference or a hearing in accordance with procedures established by the Office of Student Conduct.  For more information about alternative dispute resolutions, please go to page 25.

## K.  Publications

A student, group, or organization may hand out written material on campus without prior approval.

The student press shall be free of censorship.  Its editors, managers, and contributors shall be protected from arbitrary sanctions because of what is written.  Similar freedom shall be assured for the oral statement of views on all Haskell-controlled radio or television stations.  Slanderous speech or libelous writing is not protected.  Slander is spoken words that are meant to defame another person or institution and that are untrue or unverified. Libel is a written, printed, or pictorial statement that defames one's character or reputation or exposes one to public ridicule.

## L.  Freedom of Protest

Students have the right of orderly and peaceful protest within the Haskell community. Haskell retains the right to assure the safety of individuals, the protection of property, and the continuity of the educational process including the maintenance of entrance to and from all Haskell buildings and offices, conduct of regular class meetings and other Haskell functions.

Orderly picketing and other forms of peaceful protest are protected activities on Haskell premises in the absence of interference with free passage through areas where members of the Haskell community have a right to be or the orderly conduct of Haskell business.

Peaceful picketing and other orderly demonstrations are permitted in public areas of Haskell buildings, including corridors, outside the auditorium and other places set aside for public meetings.

Exhibit 6
Page 12 of 98

(12)

USA000438

Any student or group of students has the right to protest against the appearance on campus of any organization provided that the protest does not interfere with any other student's opportunity to communicate with the organization.

## M.   Student FERPA Rights

Haskell, in compliance with the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C.§1232g, ensures that students have the following rights relative to their education records.

1.  The right to inspect and review their education records within a reasonable period of time, and in no case longer than 45 days after a request has been made.  If any material or document in the education record of a student includes information on more than one student, each student shall have the right to inspect and review only such part of such material or document as relates to that student or to be informed of the specific information contained in such part of such material or document.  Copies are not to be distributed to students at any time.
2.  The right to request the amendment of their education records and to have the records amended within a reasonable period of time to ensure that the records are not inaccurate, misleading, or otherwise in violation of privacy or other rights.
3.  The right to confidentiality of personally identifiable information contained in their education records, except (a) to the extent that FERPA authorizes disclosure without consent; or (b) the information is disclosed to Haskell staff pursuant to Haskell policy; or (c) the information is disclosed to other persons, as provided by law, to comply with a judicial subpoena or a requirement of law or government regulation or to appropriate persons in a health or safety emergency.
4.  The right to have personally identifiable information withheld from Haskell directories, if the student informs Haskell within two weeks of public notice of the categories of information that will be included in the directories.
5.  The right to file a complaint with the US Department of Education concerning alleged failures by Haskell to comply with the requirements of FERPA.  For more information regarding the process for filing a complaint, you can find it on Haskell's website in the Office of Admissions.
6.  Except to the extent allowed by law or when acting on behalf of Haskell, those parties to whom personally identifiable information is given are not permitted to disclose that information to others without the written consent of the student.  A release of information form can be found on Haskell's website with the Office of the Registrar.
7.  Haskell must maintain a record of each disclosure of personally identifiable information about the student.
8.  Excluded from the category of education records, and to which the law does not guarantee the right of student access, are records that are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in his or her professional or paraprofessional capacity, or assisting in that capacity, and which are made, maintained, or used only in connection with the provision of treatment to the student, and are not available to persons other than those providing treatment, except that such records may be personally reviewed

Exhibit 6
Page 13 of 98

(13)

USA000439

by a physician or other appropriate professional of the student's choice and with the student's written consent.

Any requests to view or obtain records should be made to the Office of the Registrar. For more information about students under the age of 21 in violation of the Substance Abuse Policy, please see page 37.

## N.   Campus Safety and Security Survey

Haskell Indian Nations University is required to comply with the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (The Clery Act) as amended in 1998, which requires all post-secondary institutions to publish and distribute certain information regarding campus crimes, including reports of campus sexual assault, sexual assault policies and security programming to all current students, employees and to any applicant who so requests. A copy of the annual report can be requested at the Student Conduct Office or it can be found on our website at www.haskell.edu.

In compliance with the Jeanne Clery Act, Haskell has the Daily Crime Logs that are maintained in the Office of Student Conduct.  Please refer to the Haskell website at the Office of Student Conduct for more information.

Exhibit 6
Page 14 of 98

(14)

USA000440

# II. Code of Student Conduct

Exhibit 6
Page 15 of 98

(15)

USA000441

**Haskell Student Code of Conduct and definitions:**
**1-A. Being under the influence of Alcohol**
Reasonable grounds for a person to be considered under the influence of alcohol: odor of alcohol, slurred speech, bloodshot eyes, watery eyes, staggering, incoherence, inability to stay focused on conversation and maintains concentration due to consumption of alcohol. When a person exhibits 2 or more of the above-mentioned descriptions or their Blood Alcohol Content (BAC) is greater than 0.01%, a person may reasonably be considered to being under the influence of alcohol and in violation of this Article.
**1-B. Possessing Alcohol and/or Alcohol Containers**
Possession is when alcohol and/or alcohol containers such as cans, bottles, flasks, etc. are present, or in one's possession, whether full, empty, or partially filled. If these items are found on a student's person while anywhere on campus, in their dorm room, vehicle, or sites off campus as designated by the Haskell Administration, the student is in violation of this Article. All students who are in the immediate vicinity will be issued violation notices.
All alcohol and containers are subject to confiscation and will not be returned.
**1-C. Transporting and trafficking Alcohol**
To manufacture, supply, transport, or sell alcohol on campus as evidence by the alcohol itself, ingredients, packaging and distribution material, statements and/or witnessed by those items or transport alcoholic beverages onto campus. This also includes violation of laws or ordinances prohibiting the manufacture, sale, transporting, furnishing, maintaining unlawful drinking places; bootlegging; operating a still; furnishing liquor to a minor person; using a vehicle for illegal transportation of liquor; and all attempts to commit any of the aforementioned. All items associated with alcohol are subject to confiscation and will not be returned.
**2-A. Being Under the Influence of Drugs or Inhalants**
Reasonable grounds for a person to be considered under the influence of drugs or inhalants: odor of marijuana, slurred speech, bloodshot eyes, watery eyes, staggering, incoherence, inability to stay focused on conversation and maintain concentration due to use of drugs. When a person exhibits 2 or more of the above-mentioned descriptions, he/she may reasonably be considered to be in violation of this Article.
**2-B. Possession of Drugs and/or Paraphernalia**
Possession is having illegal drug(s) and/or prescription medication without a valid prescription, from a doctor or pharmacist, or drug paraphernalia or inhalants are present, or in one's possession. If these items are found on a student's person while anywhere on campus, dorm room, vehicle, or areas off campus as determined by the Haskell Administration and if in the vicinity where these items are present, the student is in violation of this Article. All who are in the immediate vicinity will be issued violation notices. All drugs, suspected drugs, and drug paraphernalia may be turned over to law enforcement agencies. Students in possession of drugs, suspected drugs, and/or drug paraphernalia, may be temporarily detained by Haskell Staff, pending an immediate criminal investigation by appropriate law enforcement agencies.
**2-C. Transporting and/or Trafficking of Drugs or Inhalants**
To manufacture, supply, transport, or sell illegal drugs, prescription medication or inhalants on the Haskell campus, or to bring on to campus, as evidence by the drug(s)

Exhibit 6
Page 16 of 98

(16)

USA000442

and/or inhalant(s) itself, ingredients, packaging and/or distribution paraphernalia, statements and/or witnessed by those items or action. This also includes violation of laws or ordinances prohibiting the manufacture, sale, transporting, maintaining places to manufacture drugs; furnishing drugs or inhalants to a minor person; using a vehicle for illegal transportation of drugs; and all attempts to commit any of the aforementioned. Any drug packaging and/or distribution paraphernalia may be turned over to law enforcement agencies.  Haskell Staff may temporarily detain students that are found in possession of drug packaging and/or distribution paraphernalia, pending an immediate criminal investigation.

**2-D.  Contributing to the delinquency of a Minor**
Encouraging, abetting, permitting or assisting a person under the age of 21 to violate any of these articles or to otherwise commit any delinquent act. Persons over the age of 21 who allow such acts performed in their presence without objections are in violation of this article.

**3-A.  Violation of Haskell policy, federal, state or local laws.**
Any assisting, violating or having knowledge of a violation of Haskell policy, federal, state and local laws and not reporting it is prohibited at Haskell.

**3-B.  Violating any part of the Code of Student Conduct while on Haskell Probation.**

**4.  Violence**
Having knowledge of or facilitating violence without reporting the incident.

**4-A. Intimidation or Threat**
Any willful conduct, which creates a fear of bodily harm, or is verbally abusive, including gesturing, name-calling, threatening, by word or action of a perceived threat to inflict bodily harm.

**4-B. Simple Assault**
Assaults and attempted assaults where no weapon is used and which do not result in serious or aggravated injury to the victim.

**4-C. Aggravated Assault**
An unlawful attack by one person, upon another, that inflicts severe or aggravated bodily injury. This type of assault may be accompanied by the use of a weapon or by means likely to produce death or great bodily harm.

**4-D. Negligent Manslaughter**
The killing of another person through gross negligence.

**4-E. Murder/ Non-Negligent Manslaughter**
The willful (non-negligent) killing of one human being by another.

**4-F. Self-Destructive Behavior**
Inflicting harm on one's self by cuts, burns, or other harmful acts. These include ingesting harmful substances to cause self-injury. This includes statements of suicide, as evidenced by statements and/or witnessed by an individual. A student refusing medical attention could jeopardize his/her residence privileges due to the safety of himself/herself and others involved.

**5-A. Domestic violence** includes felony or misdemeanor crimes of violence committed by a current or former spouse or intimate partner of the victim.

**5-B. Dating violence** means violence committed by a person who is or has been in a romantic or intimate relationship with the affected party.

Exhibit 6
Page 17 of 98

(17)

USA000443

**6-A. Bringing a Weapon on Campus**
All weapons are prohibited on the Haskell campus. Weapons are defined as any item whose primary use is to cause death or injury. Any use of, or having in one's possession or concealing, an instrument or substance, which by nature or use is an offensive or a combative object, even if otherwise legal, is prohibited. All weapons are subject to confiscation and will not be returned.

**6-B. Illegal Weapons Violation**
The violation of city, county, state, or federal laws or ordinances dealing with weapon offenses, regulatory in nature, such as: manufacture, sale, or possession of deadly weapons; carrying deadly weapons, concealed or openly; furnishing deadly weapons to minors; and all attempts to commit any of the aforementioned.

**7.   Haskell Property**
Attempting to damage or actually damaging property belonging to Haskell. Willfully marring, destroying, injuring or disturbing any real or personal property of Haskell.  This includes moving any property belonging to Haskell or others without permission.

**7-A. Robbery**
The taking or attempting to take anything of value from the care, custody, or control of a person or persons by force or threat of force or violence and/or by putting the affected person in fear.

**7-B. Burglary**
The unlawful entry of a structure, or room to commit a felony or a theft. Attempted forcible entry is included.

**7-C. Larceny/ Theft**
The unlawful taking, carrying, leading or riding away of property, from the possession of another. It includes crimes such as shoplifting, pocket picking, purse snatching, thefts from motor vehicles, thefts of motor vehicle parts and accessories, bicycle thefts, etc., in which no use of force, violence or fraud occurs.

**7-D. Motor Vehicle Theft**
The theft or attempted theft of a motor vehicle. A motor vehicle is self-propelled and runs on surface streets and roads. Construction equipment and farming equipment are excluded.

**7-E. Fraud**
Fraud consists of the intentional misappropriation or taking of anything of value, which belongs to another, by means of fraudulent conduct, practices or representations.

**7-F. Embezzlement**
Embezzlement consists of the embezzling or converting to his own use of anything of value, with which he has been entrusted, with fraudulent intent to deprive the owner thereof.

**7-G. Vandalism**
Any willful act that defaces, breaks, disables, or destroys any property not belonging to that person.

**7-H. Unauthorized Possession of School Property**
Students are not to be in possession of keys to any room or campus office, except for their assigned room in the residence lodge or mailbox key. Other prohibited items include cafeteria utensils, maintenance tools, equipment or other Haskell property.

Exhibit 6
Page 18 of 98

(18)

USA000444

**8-A.  Harassment**

Harassment is prohibited at Haskell Indian Nations University. Harassment is defined as systematic and/or continued unwanted actions directed towards an individual or group of students by another student. Harassment may include, but is not limited to threats, demands, intimidation, coercion, suppression, and cruelty. Haskell Indian Nations University values the individual's right to live, work, and study without fear of intimidation, coercion, or exploitation regardless of race, gender, national origin, tribal affiliation, religion, disability, or sexual orientation. Indicators of harassment include but are not limited to:

- Any action or communication that would cause a reasonable person to fear for his/her safety.
- Any action or communication that causes any reasonable person harm or distress.
- Any repeated attempt to make contact with anyone over his or her objections.
- Intentionally, maliciously, and repeatedly following another person on campus.
- Haskell Indian Nations University prohibits bullying. Bullying behavior is any pattern of gestures or written, electronic or verbal communications, or any physical act or any threatening communication that:
  1. Places a student or school employee in actual and reasonable fear of harm to his or her person or damage to his or her property; or
  2. Creates or is certain to create a hostile environment by substantially interfering with or impairing a student's educational performance, opportunities or benefits.
- Cyber bullying, defined as sending threatening or aggressive texts, e-mails, or phone messages, posting insulting rumors, information, or pictures on a blog or social networking site, or using someone else's username to spread rumors or post insulting comments or pictures.

**9.  Sexual Harassment**

Sexual harassment can consist of the actions just described, but also creates an environment that is intolerable and incompatible with the mission and goals of the university; sexual harassment is a form of discrimination and is illegal.  Any unwelcomed sexual advances, requests for sexual favors, sexually motivated physical conduct, or gender-based verbal or physical threats that are explicit or implicit terms or conditions of employment (hire/fire, benefits) and/or substantially or unreasonably interferes with, limits or deprives an individual's ability to participate in or benefit from the university's educational program and/or activities creates a hostile environment and is prohibited at Haskell.

**10. Stalking**

To intentionally, maliciously, repeatedly follow or harass another person in person, by correspondence, or by electronic means.

**11. Lewd, Indecent, or Inappropriate Public Behavior**

Acts, words, or gestures which cause anger, shock, embarrassment or humiliation,

Exhibit 6
Page 19 of 98

(19)

USA000445

including electronic communication is prohibited. Included is the excessive public display of affection.

**12.  Sexual Assault/Misconduct**
Sexual assault can be any form of forced sexual contact. Force can be physical or emotional (threat, intimidation, pressure, coercion). Rape is a type of sexual assault usually involving sexual intercourse which is initiated by one or more persons against another person without that person's consent.

**12-A. Forcible Rape**
The carnal knowledge of a person, forcibly and/or against that person's will; or not forcibly or against the person's will where the victim is incapable of giving consent because of his/her temporary or permanent mental or physical incapacity.

**12-B. Forcible Sodomy**
Oral or anal sexual intercourse with another person, forcibly and/or against that person's will; or not forcibly against the person's will where the affected person is incapable of giving consent because of his/her youth or because of his/her temporary or permanent mental or physical incapacity.

**12-C. Sexual Assault with an Object**
The use of an object or instrument to unlawfully penetrate, however slightly, the genital or anal opening of the body of another person, forcibly and/or against that person's will; or not forcibly or against the person's will where the affected person is incapable of giving consent because of his/her youth or because of his/her temporary or permanent mental or physical incapacity.

**12-D. Forcible Fondling**
The touching of the private body parts of another person for the purpose of sexual gratification, forcibly and/or against that person's will; or, not forcibly or against the person's will where the affected person is incapable of giving consent because of his/her youth or because of his/her temporary or permanent mental incapacity.

**13.  Non-Forcible Sexual Misconduct**
Unlawful, non-forcible sexual intercourse including Incest (non-forcible sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law) and Statutory Rape (non-forcible sexual intercourse with a person who is under the statutory age of consent.)

**13-A. Incest**
Non-forcible sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.

**13-B. Statutory Rape**
Non-forcible sexual intercourse with a person who is under the statutory age of consent. The statutory age of consent in Kansas is 16 years of age.

**14.  Fire Safety**
**14-A. Arson**
Any willful or malicious burning or attempt to burn, with or without intent to defraud, a dwelling, building, motor vehicle, personal property of another, etc.

Exhibit 6
Page 20 of 98

(20)

USA000446

**14-B. Activating and/or Tampering with a Safety Device**
Any willful attempt to block, hinder, or disable or activate a safety device, or use without just cause, such as fire alarms, smoke detectors, fire extinguisher, fire escape route, or any other safety device. Objects are not to be placed with-in 24-inches (2-feet) of a fire suppression device.

**14-C. Burning of Material, Use of Tobacco, and Fireworks**
Burning of any material in the residence lodge is strictly prohibited as it may endanger the health and the safety of occupants.
Burning of material means either open flame or smoldering material such as candles, medicinal plants and herbs, cigarettes or pipes containing tobacco or illegal substances, except when authorized by the Director of Housing, or designee, under Haskell's Smudging policy.  Please see the Residential Housing Student Handbook for more information.  Smoking of tobacco products on campus is allowed only outside of each building, except within 25-feet of entrances and ventilation air intake systems. Fireworks, of any type, are prohibited from use and/or storage on Haskell campus at all times.

**14-D. Opening Exit Doors**
Opening an exit door to admit persons or keeping an exit door propped open for any reason, other than emergency, will be in violation of this policy.
At no time will any type of furniture or other item be placed within 24-inches (2-feet) of an automatic sprinkler head used for fire suppression. Students may be held financially liable for any damage caused by the movement of furniture or other object, with or without prior authorization.

**15.  Hazing**
Hazing constitutes doing, requiring or encouraging any act, whether or not the act is voluntarily agreed upon, in conjunction with initiation or continued membership or participation in any group, that causes or creates a substantial risk of causing mental or physical harm or humiliation. Such acts may include, but are not limited to, use of alcohol, creation of excessive fatigue, and paddling, punching or kicking in any form.

**16.  Residential Hall Policies**
This is not an all-inclusive list.  Please refer to the Residential Housing Student Handbook for more detailed information.

**16-A. Unauthorized Visitation**
Bringing or allowing into the residence lodge unauthorized person in a restricted areas of the residential hall, such as a member of the opposite sex in the living areas of the hall or allowing visitors to remain in the unauthorized areas past visiting hours.

**16-B. In the Private Living Area of the Opposite Sex**
Being anywhere in the private living areas of the opposite sex. This includes dorm rooms, showers, restrooms, windows, and dorm wing hallways.

**16-C. Failure to Maintain a Clean Room or Failure to Clean Assigned Area**
Students residing in the Haskell residential halls that fail to maintain a neat and clean room and/or are assigned to clean an area and fail to do so, or properly complete the assignment, will be in violation of this policy. Repeated violations will result in suspension of housing privileges.

**16-D. Gambling**
All gambling is prohibited on Haskell campus.

Exhibit 6
Page 21 of 98

(21)

USA000447

**16-E. Littering**
Leaving trash or litter on campus except in appropriate receptacles. Residents who place their room trash in hall waste receptacles instead of the dumpster are in violation of this article.

**16-F. Excessive Noise**
Quiet hours are observed starting 10:00 p.m. to 8:00 a.m. All those making loud, excessive, obnoxious, repeated, or unnecessary noise, which interferes with the rights of those who want to sleep, study, or relax, even if outside the posted quiet hours are considered in violation of this article.

**16-G. Failure to Identify and/or Give False Identity**
At all times Haskell students are required to visibly display their Haskell Student Identification cards while on the Haskell Campus. Students are required to show identification upon demand, or when entering/exiting the campus.
Failure to visibly display their Haskell Student Identification Card; being in possession of another person's Haskell student Identification Card; allowing someone else to use your Haskell Student Identification Card and refusing to provide your name or providing a false name, are all violations of this policy.  Persons refusing or unable to provide suitable identification may be detained by Haskell employees until their identification can be satisfactorily verified by law enforcement authorities.

**17. Trespassing**
Entering on or loitering in unauthorized areas on campus is a violation of this policy. Students that have been suspended from the residential halls are not allowed in either residential areas including balconies, patios, windows, exit doors, and all other areas immediately adjacent to the dorm. Students that have been expelled from Haskell are in violation of a current Emergency Suspension (any levels), Notice to Vacate, or are on the  ineligible for housing master list.

**18. Cooperation with Haskell Employees**
Any attempt to misdirect, delay, misinform, hinder, or obstruct in any way Haskell staff in the performance of their duties will be in violation of this article.

**19.  Cooperation with Haskell Students**
Any attempt to misdirect, delay, misinform, hinder, or obstruct in any way Haskell students in the right to gaining an education will be in violation of this article.

**20. Harboring**
Harboring a person, such as a student who has been suspended from the dormitories or former student expelled from Haskell, or other person who has been evicted/ banned for disciplinary reasons from the campus.

**21. Misuse of Technology**
a. Violation of Haskell policy on proper use of E-mail or Internet while on the Haskell server.
b. Downloading or transferring of illegal downloaded media files, including illegal downloading of music and movies.

Exhibit 6
Page 22 of 98

(22)

USA000448

# III. Student Conduct Process

Exhibit 6
Page 23 of 98

(23)

USA000449

## A. Due Process

Every Haskell student has the following rights to due process in a formal disciplinary proceeding pursuant to 25 C.F.R. 42.8:

1. **Notice.** Written notice of charges within a reasonable time before a hearing. Notice of charges shall include reference to the regulations allegedly violated, the facts alleged to constitute the violation, and notice of access to all statements related to the charge and to those parts of the student's school record which will be considered in rendering a disciplinary decision.
2. **Hearing.** A fair and impartial hearing.  In an emergency situation that seriously and immediately endangers the health and safety of the student or others, a Haskell official may temporarily suspend a student, but shall immediately report in writing the facts (not conclusions) giving rise to the emergency.  The official shall afford the student a hearing which fully comports with due process as soon as practicable thereafter.  Please see Student Conduct Office regarding 25 CFR mandate.
3. **Representation.** The right to have an Advocate at the hearing.  An attorney will be allowed to present the student's case, but only at the student's expense.
4. **Confrontation.** The right to confront and examine all witnesses and to produce and have produced witnesses on the student's behalf and to confront and examine all witnesses.
5. **Records.** The right to the minutes and record of all disciplinary proceedings (including appeal hearings) and to written findings of fact and conclusions in all cases.  All Information will follow Family Educational Rights and Privacy Act (FERPA) guidelines.
6. **Appeal.** The right to an administrative review and appeal.
7. **Non self-incrimination.** The student shall not be compelled to testify against himself/herself.
8. **Expunged.** The right to have the allegations of misconduct and information pertaining thereto expunged from the student's school record in the event the student is found not guilty of the charges.

## B. Advocates

1. Students who wish to have an "Advocate" must submit a "Release of Information" form to the Office of Student Conduct to allow the Advocate to have access to records and documentation associated with the case.
2. A Haskell employee must have permission from his or her immediate supervisor to act as an Advocate.  The Student Conduct Administrator will investigate potential "conflicts of interest" before a hearing.
3. A Haskell student must be in good academic and social standing to be and Advocate.  A student Advocate must notify the Office of Student Conduct and withdraw from being an Advocate if he/she is no longer in good academic and/or social standing OR if he/she has pending a disciplinary matter.
4. The Advocate is responsible for scheduling his/her own investigative interviews.
5. The student is responsible for providing the Advocate with all information that pertains to his/her case.

Exhibit 6
Page 24 of 98

(24)

USA000450

6. The Presiding Officer will state on the record at each hearing that the student is represented by an Advocate and that a signed release form, allowing the Advocate access to records and documentation associated with the student's case, is in the student's case file.

## C.  Alternative Dispute Resolution

Haskell may address a student violation using an Alternative Dispute Resolution (ADR) process or the Adjudication process.

(1) When appropriate, Haskell will first attempt to use the ADR process.

(2) When the ADR process does not resolve matters or cannot be used, Haskell must address the alleged violation through the Adjudication process.

ADR process may:
(1) Include peer adjudication, mediation, and conciliation; and

(2) Involve appropriate customs and practices of the Indian Tribes or Alaska Native Villages to the extent that these practices are readily identifiable.

## D. Restorative Justice

Haskell may offer another alternative to addressing a student violation using the Restorative Justice model.  This model focuses on understanding and repairing the harms created by inappropriate conduct.  The Student Rights Specialist and the Dean of Students can determine if the Restorative Justice model will work in situations, and will be dealt with on a case by case basis.

Haskell may address an alleged violation through the ADR process or Restorative Justice Process unless one of the following conditions apply:

- the act requires immediate removal or emergency suspension.
- **OR**
- all parties do not agree to using an ADR process.

## E. Adjudication Process

1. An Incident Report shall be filed with the Student Conduct Administrator within five (5) business days of the incident.
2. The Student Conduct Administrator shall send a letter to the accused student through campus mail informing the student of the appointment date and time to meet with the Student Conduct Administrator or assigned housing staff.  Minor violations are handled by the Housing staff.  Major violations are handled by the Student Conduct Administrator with the exception of Fire Safety violations.  Fire Safety violations are handled by the Safety Officer.

Exhibit 6
Page 25 of 98

(25)

USA000451

3.  At this meeting, the decision maker shall determine whether the student has committed a violation and shall impose sanctions based on preponderance of the the evidence.  If the student is found not responsible, then no sanctions will be given.
4.  Alternative Dispute Resolution (ADR) may be used when the accused student and the decision maker agree to it.  Situations may arise where the alternative dispute resolution process would resolve a problem in an informal manner.

## F. Appeal Process

1. A student may appeal based on the following:
    a)  Deprivation of Due Process.
    b)  Inadequate evidence to justify decision.
    c)  Sanction not in keeping with the gravity of the violation.
2. The student shall submit a written request for appeal that lays out the reason for appeal.  The written request shall be submitted to the Student Conduct Office, Minoka Hall, Room 106, no later than 5:00 p.m. and no later than 12:00pm noon five (5) business days after the Student Conduct Administrator's decision.
3. The student shall have the opportunity for an appeals hearing before a Student Appellate Board.  The Student Appellate Board is made up of at least three to five Haskell employees and/or students, selected by the Student Conduct Administrator.  The student shall be notified through campus mail of the time and date of the hearing.
4. The student is allowed a 15-minute waiting time from the time that the hearing is to begin.  Failure to report to the hearing before the waiting time ends will result in the Student Conduct Committee making a determination from the material before it.
5. At the hearing, the student may present a case, including witnesses and documents, and may ask questions of the accuser.
6. The Student Conduct Committee may interview the accuser, the accused student, and the witnesses.
7. The Office of Student Conduct shall record all hearings.  Minutes of the hearing shall be available upon written request to the accused student.  Students and witnesses are not allowed to record hearings.
8. Students are allowed to have an Attorney at Law present as an advocate at their appeal but at their own expense.
9. Parents have no standing in the appeal process.
10. After the Student Conduct Committee has deliberated in private, only the accused student and the student's authorized Advocate will be called before the Student Conduct Committee to be informed of the decision, a final decision will be made at this hearing.
11. The Student Conduct Committee has the authority to retract or alter any sanctions that were applied by the Student Conduct Administrator, the Housing Staff, an Alternative Dispute Resolution Board or a Restorative Justice Conference.
12. The decision of the Student Conduct Committee is final and there are no additional appeal rights to pursue.

Exhibit 6
Page 26 of 98

(26)

USA000452

## G.   Appeal Process following Expulsion

Given the serious nature of expulsions, Haskell has established specific procedures for the appeal of an expulsion.

1. If a student appeals an expulsion, the appeal will be referred to a Student Appellate Board. The student has five (5) business days from receiving notice of expulsion to file an appeal with the Student Conduct Administrator. The Student Conduct Administrator is responsible for convening the Student Conduct Committee and shall preside as the chair during the review hearing.

2. The Student Conduct Administrator shall schedule a review hearing after receiving an appeal and the student will be notified through campus mail. Such notice shall contain:

   a. A specific statement of the violation(s) for which the student is being expelled.
   
   b. A statement of the time, date, and location of the Student Conduct Committee hearing to review the expulsion.
   
   c. A statement specifying the student's right to have an Advocate (or student paid attorney) to assist him/her.  A "Release of Information" form must be completed by the Advocate and filed by the student or the Advocate.
   
   d. A statement advising that the student may voluntarily waive the right to be present at the review hearing. Such statement shall advise that the student may not be forced to sign such waiver. Failure to report to a Student Conduct Committee review hearing shall constitute a waiver.

3. The Student Conduct Committee shall have access to all materials used at the hearing that resulted in an expulsion order, including audiotapes of the proceeding. Additional material(s) provided by the student shall be allowed.

4. The Student Conduct Committee shall issue a decision.  The Student Conduct Committee may uphold the expulsion; reverse the expulsion and order other appropriate sanctions; or, on a finding of serious procedural error below, reverse the expulsion and remand the case to the Student Conduct Administrator for further proceedings.

5. The Student Conduct Administrator shall notify the student in writing of the Student Conduct Committee's decision.

6. The Student Conduct Committee's decision is a final decision.

7. Students expelled from Haskell forfeit their right to attend Haskell. They may not return to Haskell and are not permitted to be on campus grounds or in buildings without permission from Haskell's President.

## H.   Personal Safety during the Student Conduct Process (Affected Person's Rights)(25 C.F.R. 42.9)

In formal disciplinary proceedings, each school must consider affected person's rights when appropriate.

(a) The affected person's rights may include a right to:

   (1) Participate in disciplinary proceedings either in writing or in person;
   
   (2) Provide a statement concerning the impact of the incident on the affected person; and
   
   (3) Have the outcome explained to the affected person and to his or her parents or guardian by a school official, consistent with confidentiality.

Exhibit 6
Page 27 of 98

USA000453

**(b)** For the purposes of this part, the affected person is the actual affected person, not his or her parents or guardians.

The decision maker may accommodate concerns for the personal safety, well-being, and/or fears of confrontation of the Complainant, Respondent, and/or other witness during the hearing by providing separate facilities, by using a visual screen, and/or by permitting participation by telephone, closed circuit television, video conferencing, videotape, audio tape, written statement, or other means, where and as determined in the sole judgment of the Director of the Office of Student Conduct.  Students should contact the Title IX Coordinator Tonia Salvini at Pushmataha Hall for a listing of affected person's rights.

## I.   Major/Minor Violations

**Major Violations -** Major violations will be adjudicated by the Student Conduct Administrator.
- Substance Abuse pg. 17
- Weapons pg. 18
- Haskell Property pg. 18
- Haskell Policy, State, and Local Laws pg. 17
- Intimidation pg. 17
- Violence pg. 17
- Harassment pg. 19-20
- Sexual Misconduct pg. 19
- Fire Safety pg. 20
- Haskell Property pg. 18
- Cooperation with Haskell employee pg. 21
- Cooperation with Students pg. 22


**Minor Violations -** Minor violations will be documented by the Housing staff.
- Residential Halls Violations (visitation and room checks) pg. 19-20

> **STUDENT NOTIFICATION PROCEDURE (Minor Violations):**  The following procedure will apply to students who are found in violation of the visitation and room check procedure.
> - First offense- written Student Notification warning is presented to the student.  A copy is forwarded on to the Student Life Director.
> - Second offense- $25.00 fine and 10 hours community service (In order for a violation to be considered at 2nd offense, the staff must include a copy of the first offense notification along with the incident report)
> - Third offense- eviction

Exhibit 6
Page 28 of 98

USA000454

**Haskell University Conduct Flow Chart**



Exhibit 6
Page 29 of 98

USA000455

## J. Sanctions

A decision maker has discretion to impose disciplinary, educational and/or restorative sanctions for a violation.

**Disciplinary Sanctions**

1. Warning and Probation- A notice in writing to the student that the student is found to have violated specific Haskell regulations and that more severe disciplinary sanctions may be imposed if the student is found to violate Haskell regulations during the designated probationary period.

2. Notice to Vacate:  A Notice to vacate means that a student must vacate their residential hall.  Typically a Notice to Vacate (NTV) is in place for one year of the issuance.

3. Loss of Privileges- Denial of specified privileges for a designated period of time.

4. Loss of Good Social Standing- Loss of Good Social Standing bars the student from being an officer in a student organization or representing Haskell.  It is regained once other sanctions are completed.

5. Fines- Previously established and published fines may be imposed.

6. Residential Hall Removal- This may be either temporary or permanent.  Temporary removal is separation of the student from the residential halls for a definite period of time, after which the student is eligible to return.  Conditions for return must be specified under a temporary removal.  Permanent removal is a permanent separation of the student from the residential halls with no eligibility for return.  Conditions for return will not be specified under a permanent removal since the student is ineligible to return.

7. University Removal- This may be either temporary or permanent.  Temporary University Removal is separation of the student from Haskell for a definite period of time, after which the student is eligible to return.  Conditions for return must be specified under a temporary removal.  Permanent removal is a permanent separation of the student from Haskell with no eligibility for return.  Conditions for return will not be specified under a permanent removal since the student is ineligible to return.  A student that has been removed will automatically receive a notice of trespassing if the student is found to enter or loiter on Haskell premises without prior authorization from Haskell's President.

8. Revocation of Admission and/or Degree- Admission to or a degree awarded from Haskell may be revoked for fraud, misrepresentation, or violation of Haskell standards for obtaining the degree or for other specified violations committed by a student before graduation.  Revocation of admission and/or degree may be coupled with temporary or permanent University banishment.

9. Withholding Degree- The University may withhold awarding a degree otherwise earned until the completion of the process set forth in this Code of Student Conduct, including the completion of all sanctions imposed.

10. Loss of Organizational Recognition: Student organizations that violate the Code of Student Conduct may lose their status as a student organization.

Exhibit 6
Page 30 of 98

(30)

USA000456

`11. "No Contact Order" - A "no contact order" may be imposed to prohibit a student from being in contact with another student or Haskell employee.  This includes personal, electronic, postal, or any other types of contact.  The no-contact order may be temporary or permanent.

12. Guest Restriction: A student may be restricted from hosting guests in the residential halls if the student violates the guest policy.  The guest restriction may be temporary or permanent.

**Educational Sanctions**

1. Reflection Essay: A reflection essay may be assigned to help a student reflect on what choices he or she has made to get into a situation, what he or she could do instead to avoid situations like this in the future, and what he or she learned in this situation. The essay cannot serve to blame others for the actions of the student.  Length will be assigned by the Student Conduct Administrator or Housing staff.

2. Policy Review: A policy review may be assigned in order to help students understand the motivation behind the Code of Student Conduct.  In this essay, the student must reflect on why the policies he or she violated exist in Code of Student Conduct and what would happen if the policy did not exist.  The review cannot be used to argue against the Code of Student Conduct.  It is meant to challenge the student to think from many perspectives.  Length will be assigned by the Student Conduct Administrator or Housing staff.

3. General Essay: A General Essay may be assigned about any topic the Student Conduct Administrator deems appropriate for the violation.  Length will be assigned by the Student Conduct Administrator or Housing staff.

4. Interview: An interview with a relevant campus resource may be assigned to help the student learn from this situation and relevant campus resources.  The length and number of questions will be assigned by the Student Conduct Administrator or Housing staff.

5. Flyer: An 8.5"x11" flyer about the violations committed may be assigned in order to help the student better explain a policy and to educate the Haskell or residential hall community about the violation.

**Restorative Sanctions**

1. Letter of Apology: A letter of apology will be assigned as a sanction when the student showed disrespect to other members of the Haskell community.  The letter must be sincere and will be reviewed by the Student Conduct Administrator before it is delivered.

2. Community Connection Activities: Community Connection hours will be assigned to help the student to repair harm done through his or her actions, but more importantly will help the student find better connections to help the student be successful at Haskell.  The Student Conduct Administrator will assign the specific location where hours are to be completed and specify a date by which the community connection hours must be completed.

3. Recommended Counseling: Counseling will be recommended in writing to students for assistance in resolving any potential mental or emotional issues.  The recommendation will be maintained in the student's file.

Exhibit 6
Page 31 of 98

(31)

USA000457

4. Haskell Chemical Abuse Prevention Program (HCAPP): HCAPP or another licensed and/or certified Alcohol Assessment program will be required of students for severe alcohol violations.  This program assists students in understanding if they have problems with alcohol.
5. Conference: A conference between the person harmed and the person who violated the Code of Student Conduct will be assigned in cases where the person harmed agrees to have a conference with the student who violated the code.  The main objective of a conference is to have the student who violated the code understand how his or her choices have affected others.
6. Restitution- Compensation for loss, damage, or injury.  This may take the form of appropriate service and/or monetary or material replacement.
7. Haskell Mental Health Assessment (HMHA) - HMCA or another licensed and/or certified mental health assessment program will be required of students for severe incidents involving violence and other threatening behavior. This program assists students in understanding if they have problems with anger management, and/or patterns of behaviors associated with violence.

## K.  Emergency Suspension

Any action to separate a student from the campus before a hearing is known as emergency suspension. An emergency suspension can only come from the Student Conduct Administrator.  The forms for the Emergency suspension can be found on the website under the Student Conduct Office.  There are three levels of Emegency Suspension.  Please refer to page 94 for more information.

The emergency suspension may be imposed only: a) to ensure the safety and wellbeing of members of the Haskell community; b) to ensure the student's own physical or emotional safety and wellbeing; or c) if the student poses an ongoing threat of serious disruption of, or interference with, Haskell's normal operations.

During the emergency suspension, a student shall be denied access to the residential halls and/or to the campus (including classes), food service, community activities and all other Haskell activities or privileges for which the student might otherwise be eligible, as the Student Conduct Administrator determines to be appropriate.

## L.  Trespassing Procedures

A temporary, interim, or permanent "University Banishment" order will include a "no trespassing notice." The notice shall state that (a) the student will be charged with trespassing if he or she is found to enter or loiter on Haskell premises without prior authorization from Haskell's President and (b) Haskell will notify local, state or federal law enforcement units to enforce the law if the student violates a "no trespassing notice." The "no trespassing notice" will expire when the "University Banishment" order is lifted, expired or dismissed.

Similarly, a temporary, interim, or permanent "Residential Hall Banishment" order will include a "no trespassing notice." The notice shall state that (a) the student will be charged with trespassing if he or she is found to enter or loiter on the residential hall

Exhibit 6
Page 32 of 98

USA000458

premises without prior authorization from Haskell's President and (b) Haskell will notify local, state or federal law enforcement units to enforce the law if the student violates a "no trespassing notice." The "no trespassing notice" will expire when the "Residential Hall Banishment" order is lifted, expired, or dismissed.

## M. Diversion

The Office of Student Conduct for Haskell Indian Nations University has established the following guidelines for the Diversion Application process. This program is a service that is available only once during a student's enrollment at Haskell, and is designed to be a learning experience for students to help them be successful in their educational endeavor.

Diversion is a <u>privilege</u> and not a <u>right</u>. No presumption in favor of diversion exists in any case, and the burden of proof rests with the student to establish that a diversion agreement will best serve the student, the interests of the university, public safety and the rights of the victim(s).

In determining whether to grant a diversion, the Student Services Department will consider whether the student demonstrates a genuine sense of remorse and is prepared to acknowledge the offense(s) charged and accountability for consequences for his/her actions. Other factors to consider are the nature of the offense and the circumstances surrounding it, the probability that the student will cooperate and benefit from the program, the impact of diversion of the student on the university, the recommendations of the involved parties and that of the victim(s), the amount of restitution/damages which is owed, and any mitigating and aggravating circumstances surrounding the incident/offense.

It is not required that the student have a representative for the purpose of the diversion. However, each student has the right to secure counsel and have him/her represent them through the application process. If the student chooses to hire an attorney or seek legal advice, those costs are assessed to the student.

### Eligibility

The Office of Student Conduct will consider a number of factors in determining whether or not diversion is appropriate, which shall include but not be limited to the following:
1. Prior offense(s) and nature of incident.
2. Academic standing.
3. Recommendations or letters of support.
4. Letter of intent by student.
5. Completed application and all materials related to application received in timely manner.

It is presumed by these guidelines that a diversion is **NOT appropriate** in the circumstances that follow:
1. If the student has been found in violation of a substance abuse offense within the last five years.
2. If the incident involved violence and/or weapons that resulted in arrest.

Exhibit 6
Page 33 of 98

USA000459

3.  If the student was placed on emergency suspension as a result of the incident.
4.  If the student received any prior diversions or has pending incident reports not including matters covered by this application.
5.  If the student has been suspended from residential housing within the last five years.
6.  If the student had an incident report processed through Office of Student Conduct.

## Procedures

The student must attend all conferences set by the Office of Student Rights in regards to the application process.  During the initial conference regarding the incident report a determination will be made as to the disposition of the incident.  If the student meets the eligibility criteria an application may be obtained and the diversion process initiated.  The student will be need to complete the diversion application within 5 working days of formal adjudication, all necessary documents and materials must be submitted with the application.  Partial applications will not be accepted.

Assessments

- If the incident involves alcohol or drugs, the student may need to obtain an alcohol or drug evaluation from the Haskell Health Center prior to a final decision.

- If the incident involves violence, the student may be required to obtain an anger management assessment which may be done through the Haskell Health Center.

Notification of the application's approval or denial will be issued to the student during a conference to be set by the Student Services Department.  In the event the application is denied, due process will continue for the offense.

## Requirements

Once the student has been notified of the approval of the application, an appointment will be set for the student to review the requirements and conditions of the diversion.

- If an assessment was required, the recommendations of the assessment must be completed fully by the student as prescribed.
- Monitoring of academic progress by student and Office of Student Rights, or designee.
- Establish individualized plan for monitoring.
- Failure to adhere to conditions and requirements, or a second report involving substance abuse or similar offense will end diversion and loss of residential housing will be immediate with no appeal process.
- Failure to comply or any requests for extensions will result in the doubling of the fines and community service hours.

Diversion provides an opportunity for students to maintain Good Social Standing and remain eligible for housing.  Students may participate in a drug or alcohol treatment program while fulfilling the sanctions for violating the Substance Abuse Policy. For more information please turn to page 37.

Exhibit 6
Page 34 of 98

(34)

USA000460

**NOTE**: If a student is in an Honor Residential Hall and violates the Substance Abuse Policy and/or Violence Policy, he/she will have to vacate immediately and move to a regular residential hall.  The Haskell Chemical Abuse Prevention Program (HCAPP) and/or Haskell Mental Assessment (HMHA) may be utilized.  Students can choose to use other certified and/or licensed diversion programs at their own expense.  Failure to complete a diversion program will result in an immediate "Notice to Vacate" a residential hall and the student will no longer be considered in Good Social Standing.  All sanctions must be completed before the student is considered to be in Good Social Standing once again.

Student will need to apply for a diversion, and have that request granted in order to secure it as an option.  The Student Conduct Administrator will review all diversion applications and make a determination to approve, or deny.  Failure to complete application process, or having the diversion application denied can result in eviction from housing, a notice-to-vacate being issued, or other consequence deemed appropriate.

Application includes:
Completed Diversion Application
Personal Statement
Letter of Support from Instructor

A diversion application needs to be filed within 5 working days of formal adjudication.

Exhibit 6
Page 35 of 98

(35)

USA000461

# IV. Substance Abuse

Exhibit 6
Page 36 of 98

(36)

USA000462

## A. Standards of Conduct

Haskell's substance abuse policy prohibits the possession, use, or transporting/trafficking of alcohol, illegal drugs, non-prescribed prescription drugs, and other mind-altering substances by students. Haskell does not accept abuse of alcohol or drugs by students and behaviors that occur as a result of such abuse. The most serious consequences of this behavior are the loss of housing and suspension or expulsion from the University.

Haskell seeks to enrich the lives of students by employing programs and services to assist them, referring them to counseling, and having staff conferences with them. See the Counseling Center for information about campus programs to prevent the possession, use or distribution of alcohol and drugs.

Haskell will contact the parents/guardians of students under the age of 21 in regards to violation of the "Substance Abuse Policy."

## B.   Medical Release for Substance Abuse

Abuse of alcohol and/or drugs is a serious threat to the wellbeing of students and the Haskell community. Accordingly, students who abuse alcohol or drugs to the extent that they become incapacitated and/or require monitoring shall be referred to the Counseling Center. The Counseling Center shall determine if students should be medically released from Haskell. Any student who is medically released must provide proof of treatment at a certified or licensed treatment facility and a written recommendation for return to Haskell from a licensed mental health professional before readmission to Haskell. In some cases, violations of the code of conduct for medical reasons could be removed from the record.

## C.   Sanctions for Violation of the Substance Abuse Policy

**1. First Violation:**
> • Student can participate in a Diversion Program in order to maintain housing.
> • A student who does not participate in a Diversion Program will receive a "Notice to Vacate", or "Eviction" resulting in immediate loss of housing for one year from the date of issuance.
> • Any time a student is found in violation of the Substance Abuse Policy, he/she will lose their housing privilege. However, a student may appeal the loss of housing on their first violation only. The student shall remain in housing pending the outcome of the appeal. Should the student lose the appeal, the previous "Notice to Vacate" will go into effect immediately.

**2. Second Violation**: This sanction is mandatory; however a student may appeal to the appellate board for review. The Student will receive an order that includes the items below:
Notice to Vacate, resulting in immediate loss of housing for one year from the date of issuance, also includes:
> • Loss of the privilege of visiting in the residential halls.

Exhibit 6
Page 37 of 98

(37)

USA000463

- Loss of the privilege of being on campus after regular business hours, unless student is attending a class.
- Loss of the privilege to participate in any extracurricular activities, including athletic teams, intramural sports, etc. and loss of the use of Haskell facilities (i.e., Tecumseh Gym, Coffin Sports Complex, and Stidham Union). Student shall inform the Office of Student Conduct when the student has a class or class assignment or project in any of these facilities.
- Loss of privilege to Curtis Hall.
- Loss of Good Social Standing.
- Requirement to complete an Alcohol Assessment and Treatment Plan.
- Double the fine and community service hours from the diversion program.

**3. Third Violation:**

- Referral to Student Appellate Board with a recommendation of mandatory suspension for two academic years with a double fine and community service hours from the previous violation.
- Completion of an alcohol/drug treatment program or other appropriate treatment program before readmission to Haskell, or depending on the severity, expulsion from Haskell.

## D. Medical Amnesty

The Medical Amnesty Program (MAP) represents the Haskell's commitment to increasing the likelihood that community members will call for medical assistance when faced with an alcohol or drug-related emergency. Every student, as a part of the Haskell community, has a responsibility for caring for self and others. In alcohol or drug related incidents, the primary concern of the University is the well-being, health, and safety of students.

Haskell has an obligation to make mandatory administrative referrals of students for incidents related to alcohol and other drug-related emergencies. The potential for student conduct action by the University against the student in need of medical attention and/or the student reporting the incident may act as a barrier to students getting the immediate medical attention they need. In order to alleviate the behavioral consequences associated with these alcohol and other drug-related emergencies, and increase the likelihood that students will get the medical attention they need, Haskell has developed a Medical Amnesty Program. This policy applies to all students who call on behalf of themselves or another student in need of immediate medical assistance including being transported by EMS.

In order to receive Medical Amnesty, students must use the policy proactively. This means that students must take the initiative to get assistance and that asking for medical amnesty after being confronted for possible alcohol or drug policy violations will not result in application of MAP.

If a student calls on behalf of another student, he or she is REQUIRED to remain with the student experiencing the medical emergency until medical personnel arrive.

Medical amnesty applies only to possession or consumption of alcohol and drugs.  In addition, the policy does not prevent action by police or other law enforcement personnel.

Exhibit 6
Page 38 of 98

(38)

USA000464

## Frequently Asked Questions about the Medical Amnesty Program
**Why do we have a Medical Amnesty Program?**

At Haskell, the health and safety of every student is of primary importance and all students are strongly encouraged to be empowered bystanders who respond in a potentially dangerous situation without fear of reprisal from Haskell.  Haskell supports students who act responsibly by reaching out for assistance in the case of a medical emergency, as well as supports the student who is helped.

A student or student organization seeking medical treatment for him/herself, or for any other student who is in immediate medical need, or any student who is the recipient of this emergency medical help, will not be subject to disciplinary sanctions related to the violation of using or possessing alcohol or other drugs, as defined in the Substance Abuse Policy.  This rule applies to emergencies both on and off campus.

A student is eligible to use the Medical Amnesty Program on more than one occasion and students are always strongly encouraged to report a medical emergency.  The positive impact of reporting a medical emergency will always hold the highest priority when determining the appropriate response for Haskell policy violations.  In a situation where there are repeated violations, Haskell reserves the right to take disciplinary action on a case by case basis.

Because parents are vital partners in the educational process and because the student can be best supported from home, Haskell typically contacts parents of students under 21 years of age in instances where there is evidence of risk to health, welfare or safety.  In addition, the University reserves the right to record names of those students involved to enable the University to follow up with the students as deemed necessary to ensure a student's well-being.

A student who receives medical assistance for alcohol use under the Medical Amnesty Program will be referred by the Student Conduct Office or their representative to a mandatory intervention program, such as the Red Road Program at the University Counseling Center.  Additionally, a student who qualifies for the Medical Amnesty Program by calling for medical assistance for another student may be referred to this program at the discretion of the Student Conduct Office.

**Frequently Asked Questions**

*Q. What if I am underage and drunk when I call for help for a friend?*
A. In this situation, emergency personnel might want to ask you a few questions about how much the sick person had to drink or if they mixed the alcohol with any other drugs, for example. This

Exhibit 6
Page 39 of 98

(39)

USA000465

information will be critical to helping your friend.  In such a case, Haskell will not refer you or the person you called for an alcohol violation.

**Q. *Will my name be recorded if I call for help for my friend?***
A. In most situations, if you are level-headed enough to call for help and you are not showing signs of alcohol or other drug overdose, emergency personnel will thank you for your assistance and simply help your friend.

**Q. *How will anyone know I was the one who called for help?***
A. In most cases, a professional staff members from Residential Halls will know that you called for help. If they do not know, you can simply inform them of your role in helping your friend or yourself.

**Q. *Does the Medical Amnesty Program apply if I call for help for myself?***
A. Yes

**Q. *Does Haskell contact my parents if I am transported to the hospital?***
A. Haskell does not automatically contact your parents when you are transported to the hospital. However, your parents would eventually be notified by mail if you are under 21 and had a hospital transport for alcohol or drug use.

**Q. *What happens if I am transported to the hospital for the second time – does the Medical Amnesty Program apply?***
A. While the main concern is the health and safety of every student, a pattern of behavior for hospital transports will require a staff member to review the situation and follow up using professional judgment for each individual situation.

**Q. *What should I do if a friend is showing signs of alcohol poisoning or overdose?***
A. Remember to **Check**, **Call** and **Care**. Alcohol overdose can be scary, but getting help is not.

**CHECK:** Watch out for your friends throughout the night. Encourage healthy choices. If someone you know has consumed too much alcohol, check for signs of overdose.

**CALL:** If you discover any one of the above problems, call for medical help immediately. Call 911. The above indicators of alcohol overdose are very serious and time is of the essence.  If you are unsure and are on campus, call Haskell Security at 785-760-6192.

Exhibit 6
Page 40 of 98

(40)

USA000466

**CARE:** Continually talk to the person and monitor their skin color, temperature and breathing. Turn and keep the person on his/her left side as this will help to keep the person from choking should they vomit. Wait with your friend until help arrives; never leave a sick friend alone.

Exhibit 6
Page 41 of 98

(41)

USA000467

# V. Campus Violence Policy

Exhibit 6
Page 42 of 98

(42)

USA000468

**A. Purpose of the Policy**
Haskell Indian Nations University and its respective entities are committed to maintaining a safe working and learning environment for all members of the Haskell community.   In this regard, HINU will take reasonable action to provide an environment free from violence, threats of violence, harassment, intimidation, and other disruptive behavior.

**B.  Policy Statement**
HINU will not tolerate violence, threats, harassment, intimidation and other disruptive behavior on its campus or in its programs, whether by students, faculty, staff or visitors. Such behavior may include oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm or intimidation.  Individuals who commit such acts may be subject to sanctions including, but not limited to, removal from the premises; exclusion from the premises; criminal prosecution; corrective and/or disciplinary action; and suspension or expulsion.
Haskell seeks to enrich the lives of students by employing programs and services to assist them, referring them to counseling, and having staff conferences with them.  See the Counseling Center for information about campus programs of harassment and violence.

**C.   Sanctions for Violation of the Violence  Policy (That does NOT involve an arrest or emergency medical personnel)**

**1. First Violation:**
• Student will have an opportunity to participate in a Level I Violence Diversion Program in order to maintain housing.
• A student who does not participate in a Level I Violence Diversion Program will receive a "Notice to Vacate", or "Eviction" resulting in immediate loss of housing for one year from the date of issuance.
• Any time a student is found in violation of the Violence Policy, he/she will lose their housing privilege.  However, a student may appeal the loss of housing.  The student shall remain in housing pending the outcome of the appeal.  Should the student lose the appeal, the previous "Notice to Vacate" will go into effect immediately.

**2. Second Violation:**  This sanction is mandatory; however a student may appeal to the appellate board for review.  The Student will receive an order that includes the items below:
Notice to Vacate, resulting in immediate loss of housing for one year from the date of issuance, also includes:
• 　　　Loss of the privilege of visiting in the residential halls.
• 　　　Loss of the privilege of being on campus after regular business hours, unless student is attending a class.
• 　　　Loss of the privilege to participate in any extracurricular activities, including athletic teams, intramural sports, etc. and loss of the use of Haskell facilities (i.e., Tecumseh Gym, Coffin Sports Complex, and Stidham Union). Student shall

Exhibit 6
Page 43 of 98

(43)

USA000469

inform the Office of Student Conduct when the student has a class or class assignment or project in any of these facilities.
- Loss of use of Curtis Hall.
- Loss of Good Social Standing.
- Requirement to complete a Mental Health Assessment and Treatment Plan.

**3. Third Violation:**
•Referral to Student Appellate Board with a recommendation of mandatory suspension for one academic year.
• Completion of an anger management treatment program or other appropriate treatment program before readmission to Haskell, or depending on the severity, expulsion from Haskell.

Exhibit 6
Page 44 of 98

(44)

USA000470

# VI. Campus Sexual Assault and Sexual Harassment and Title IX

Exhibit 6
Page 45 of 98

(45)

USA000471

## Jurisdiction

Haskell shall adjudicate cases involving alleged violators who are students or Haskell employees.  <u>There is no "statute of limitation" for violation of the sexual misconduct policy</u>.  This is in recognition of the severe psychological harm that sexual misconduct can have and to empower those against whom sexual misconduct is perpetrated to report when they have been harmed.

## Campus Sexual Assault

The following actions are violations of the sexual assault/harassment policy of Haskell.
1. Non-Consensual Sexual Touching
2. Non-Consensual Sexual Intercourse
3. Non-Consensual Sexual Contact (sexual contact without effective consent).
4. Sexual Exploitation.
5. Any attempt or aiding in attempt of any of the actions listed in this policy.

## Definitions

1. Intercourse: includes vaginal or anal penetration by penis, object, tongue, or finger; or contact between genitals and mouth).

2. Sexual Touching: any *intentional* contact with breasts, buttocks, groin, genitals, mouth, or other bodily orifice of another, or touching another with any of these body parts, or making another touch you or himself or herself with or on any of these body parts.

3. Consent: is informed agreement to do the same things, at the same time, in the same way, with each other, is freely given without coercion, uses mutually understood words or actions.  One cannot engage in sexual intercourse or sexual touching, without violating the sexual misconduct policy, if one knows the other cannot give consent.

4. Sexual Misconduct includes non-consensual sexual contact, non-consensual sexual intercourse, sexual exploitation, and sexual harassment.

5. Non-Consensual Sexual Intercourse is any sexual intercourse (vaginal, anal, or oral), however slight, between persons of whatever sex, without consent.

6. Non-Consensual Sexual Contact is any sexual touching, however slight, between persons of whatever sex, without consent.

7. Sexual Exploitation includes prostitution, posting images on social media without consent, video taping without consent, peeping tommery, intentional transmission of any sexually transmitted diseases, and inducing incapacitation for the purpose of having sex with a person.

8. Initiator: The person, of whatever sex, who initiates any sexual touching, contact, or intercourse.

Exhibit 6
Page 46 of 98

USA000472

9. Respondent: The person, of whatever sex, who must consent before any sexual touching, contact, or intercourse may occur.

## What does consent mean?

1. In the absence of mutually understood actions or words, it is the responsibility of the initiator of any sexual contact to ensure consent is given by another person.
2. Consent to one form of sexual activity does NOT imply consent to other types of sexual activity.
3. Past consent to sexual activity does NOT imply consent to future sexual activity.
4. Consent must be given at each stage of sexual contact.
5. Consent given under the threat of physical force, any form of coercion, or intimidation is not effective consent.
6. Consent cannot be given by minors (persons under age 18), mentally disabled persons, or physically incapacitated persons.

## How do I know if someone cannot give consent?

Is the other person:
1. Unconscious?
2. Under the legal age of consent?
In these two cases, the other person cannot give consent.

Do you perceive in the other person:
1. Slurred speech
2. Bloodshot eyes
3. Smell of alcohol on breath
4. Inability to stand up straight
5. Vomiting
6. Outrageous or unusual behavior
Or, is the other person:
7. Physically impaired?
8. Physically incapacitated?
9. Mentally disabled?

This is not a comprehensive list.  None of these characteristics necessarily means that the person cannot give consent.  However, it is the responsibility of the initiator of sexual contact to ensure that the respondent can consent and that he or she gives consent. Sexual misconduct does NOT necessarily have to be intentional.  If the initiator does not ensure consent, the initiator can be found in violation of the sexual misconduct policy.

In other words, **<u>it is always the responsibility of the initiator of sexual contact to ensure that consent can be and is given</u>**.  It does not matter if the initiator is incapacitated or not; it is always the responsibility of the initiator to get consent from the partner.

Exhibit 6
Page 47 of 98

(47)

USA000473

## Other Important Information to Consider

1. Any person is not required to resist sexual advances.  Silence is NEVER implied consent.
2. Silence, previous sexual relationship, current relationship, style of dress, or money spent on the respondent does not imply consent to any sexual activity.
3. Intentional or unintentional use of alcohol or drugs does not imply consent on the part of the respondent.
4. Consent may be revoked at any time by any party involved.
5. Consent has an expiration date.  Consent only lasts for a reasonable amount of time.  Reasonable amount is defined by circumstances.  If a person consents to sexual activity, but no sexual activity occurs, the initiator should reconfirm consent before again initiating sexual activity.

## Possible Sanctions for Sexual Assault

1. Any student found responsible for violating the Sexual Exploitation, the Non-Consensual Sexual Contact or the Non-Consensual Sexual Touching policy will face sanctions ranging from warning and probation to expulsion, depending on the severity of the incident and previous conduct records.
2. Any student found responsible for violating the Non-Consensual Sexual Intercourse policy will face sanctions ranging from suspension to expulsion, depending on the severity of the incident and previous conduct records.  The recommended sanction will normally be expulsion.

### Definition of Sexual Harassment

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when either:

(1) submission is either explicitly or implicitly a condition affecting academic or employment decisions; (2) the behavior is sufficiently severe or pervasive as to create an intimidating, hostile or repugnant environment; or (3) the behavior persists despite objection by the person to whom the conduct is directed. The University considers such behavior, whether physical or verbal, to be a breach of its standards of conduct and will seek to prevent such incidents and take corrective action when sexual harassment occurs.

### Types of Sexual Harassment

Generally speaking, there are two types of sexual harassment, *"quid pro quo"* and *hostile environment.*

*Quid pro quo* (meaning "this for that") sexual harassment occurs when it is stated or implied that an academic or employment decision about a student or employee depends upon whether the student or employee submits to conduct of a sexual nature. Quid pro quo sexual harassment also occurs when it is stated or implied that an individual must submit to conduct of a sexual nature in order to participate in a University program or

Exhibit 6
Page 48 of 98

USA000474

activity. So, for example, if an employee is made to believe that a promotion is likely if the employee goes on a date with the employee's supervisor, the employee is possibly being subjected to "quid pro quo" sexual harassment.

*Hostile environment* sexual harassment occurs when unwelcome conduct of a sexual nature creates an intimidating, threatening or abusive working or learning environment or is so severe, persistent or pervasive that it affects a person's ability to participate in or benefit from a University program or activity.  While a person engaging in harassing behavior most often has some form of power or authority over the person being harassed, that is not always the case. The harasser can be a peer of the person being harassed. Sometimes the harasser is harassing a person who has power over them. For example, a supervisee can sexually harass a supervisor or a student can sexually harass a faculty member.

**Examples of Sexual Harassment**

The following descriptions, while not all-inclusive, will help you understand the types of behavior that are considered "conduct of a sexual nature" and that, if unwelcome, may constitute sexual harassment:

*Unwanted sexual statements:* Sexual or "dirty" jokes, comments on physical attributes, spreading rumors about or rating others as to sexual activity or performance, talking about one's sexual activity in front of others and displaying or distributing sexually explicit drawings, pictures and/or written material. Unwanted sexual statements can be made in person, in writing, electronically (email, instant messaging, blogs, web pages, etc.) and otherwise.

*Unwanted personal attention:* Letters, telephone calls, visits, pressure for sexual favors, pressure for unnecessary personal interaction and pressure for dates where a sexual/romantic intent appears evident but remains unwanted.

*Unwanted physical or sexual advances:* Touching, hugging, kissing, fondling, touching oneself sexually for others to view, sexual assault, intercourse or other sexual activity.

**Possible Sanctions for Sexual Harassment**

1. Any student found responsible for violating the Sexual Harassment policy will face sanctions ranging from warning and probation to expulsion, depending on the severity of the incident and previous conduct records.

# TITLE IX REQUIREMENTS:
# NON-DISCRIMINATION AND ANTI-HARASSMENT POLICY

**A. Title IX Statement**
It is the policy of the College to comply with Title IX of the Education Amendments of 1972 through E.O. 13160, which prohibit discrimination

Exhibit 6
Page 49 of 98

(49)

USA000475

based on sex (which includes sexual harassment and sexual violence) in Haskell's educational programs and activities. Title IX and its implementing regulations also prohibit retaliation for asserting claims of sex discrimination. Haskell has designated the following Title IX Coordinator for the entire university system to coordinate its compliance with Title IX and to receive inquiries regarding Title IX.

Interim Title IX Coordinator/Student Rights Specialist
155 Indian Avenue
Lawrence, KS  66046
(785)749-8457

Students who wish to report sex discrimination or sexual harassment should file a complaint with the Title IX Coordinator Tonia Salvini at 785-749-8457.

**B. Policy Statement**

Haskell Indian Nations University is committed to providing a learning, working, and living environment that promotes personal integrity, civility, and mutual respect in an environment free of discrimination on the basis of sex. Haskell considers sex discrimination in all its forms to be a serious offense. Sex discrimination constitutes a violation of this policy, is unacceptable, and will not be tolerated.  Sexual harassment (as defined below), whether verbal/sexual, physical/rape unwanted touching, or visual, is inconsistent with the expectations of Haskell and may constitute a form of sex discrimination prohibited by this policy. Sexual harassment also includes sexual violence/assault (as defined below). Examples of specific conduct that constitutes sexual harassment and sexual violence/assault are set forth below.

**C. Content of the Complaint**

So that the Haskell has sufficient information to investigate a complaint, the complaint should include: (1) the date(s) and time(s) of the alleged conduct; (2) the names of all person(s) involved in the alleged conduct, including possible witnesses; (3) all details outlining what happened; and (4) contact information for the complainant so that the Haskell may follow up appropriately.

A complainant will be given a copy of the document titled "Explanation of Rights and Options After Filing a Complaint Under the Title IX: Non-Discrimination and Anti-Harassment Policy."

Conduct that Constitutes a Crime
Any person who wishes to make a complaint of sex discrimination or sexual harassment that also constitutes a crime—including sexual violence/assault, domestic violence, dating violence, or stalking—is encouraged to make a complaint to local law enforcement. If requested, Haskell will assist the complainant in notifying the appropriate law enforcement authorities. A victim may decline to notify such authorities.

Exhibit 6
Page 50 of 98

(50)

USA000476

Special Guidance Concerning Complaints of Sexual Violence/Assault, Domestic Violence, Dating Violence, and Stalking

If you are the victim of sexual violence/assault, domestic violence, dating violence, or stalking, do not blame yourself. These crimes are never the victim's fault. Haskell recommends that you immediately go to the emergency room of a local hospital and contact local law enforcement, in addition to making a prompt complaint under this policy.

A victim may decline to notify such authorities.  A victim is NOT required to report to law enforcement as a prerequisite for filing a Title IX complaint through Haskell.  The Title IX complaint can proceed regardless of whether there is any simultaneous law enforcement reporting.

If you are the victim of sexual violence/assault, domestic violence, or dating violence, do everything possible to preserve evidence by making certain that the crime scene is not disturbed. Preservation of evidence may be necessary for proof of the crime or in obtaining a protection order. Victims of sexual violence/assault, domestic violence, or dating violence should not bathe, urinate, douche, brush teeth, or drink liquids until after they are examined and, if necessary, a rape examination is completed. Clothes should not be changed. When necessary, seek immediate medical attention at an area hospital and take a full change of clothing, including shoes, for use after a medical examination.

It is also important to take steps to preserve evidence in cases of stalking, to the extent such evidence exists. In cases of stalking, evidence is more likely to be in the form of letters, emails, text messages, etc. rather than evidence of physical contact and violence.

Once a complaint of sexual violence/assault, domestic violence, dating violence, or stalking is made, the complainant has several options such as, but not limited to:

· contacting parents or a relative

· seeking legal advice

· seeking personal counseling (always recommended)

· pursuing legal action against the perpetrator

· pursing disciplinary action

· requesting that no further action be taken

**1.Protecting the Complainant**

Pending final outcome of an investigation, Haskell will take steps to protect the complainant from any further harassment or retaliation regardless of whether the victim chooses to report the crime to campus police or local law enforcement.  Steps may

Exhibit 6
Page 51 of 98

(51)

USA000477

include assisting and allowing the complainant to change his or her academic, transportation, work, or living situation if options to do so are reasonably available.

If a complainant has obtained a temporary restraining order or other no contact order against the alleged perpetrator from a criminal, civil, or tribal court, the complainant should provide such information to the Title IX Coordinator or appropriate deputy Title IX Coordinator for their campus. Haskell will take all reasonable and legal action to implement the order.

## 2. Timing

Haskell encourages persons to make complaints of sex discrimination and sexual harassment as soon as possible because late reporting may limit Haskell's ability to investigate and respond to the conduct complained of.

## 3. Investigation and Confidentiality

All complaints of sex discrimination and sexual harassment will be promptly and thoroughly investigated in accordance with the Title IX Procedure. The interim Title IX Coordinator will investigate and any recommendations for adjudication will be referred to the Title IX Team. For more information regarding the Title IX process, please see page 54.

Haskell will make reasonable and appropriate efforts to preserve an individual's privacy and protect the confidentiality of information when investigating and resolving a complaint. However, because of laws relating to reporting and other state and federal laws, Haskell cannot guarantee confidentiality to those who make complaints. In the event a complainant requests confidentiality or asks that a complaint not be investigated, Haskell will take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name not be disclosed to the alleged perpetrator, Haskell's ability to respond may be limited. Hskell reserves the right to initiate an investigation despite a complainant's request for confidentiality in limited circumstances involving serious or repeated conduct or where the alleged perpetrator may pose a continuing threat to the Haskell community.

## 4. Resolution

If a complaint of sex discrimination or sexual harassment is found to be substantiated, Haskell will take appropriate corrective action. Students, faculty, and staff found to be in violation of this policy will be subject to discipline up to and including termination, expulsion, or other appropriate institutional sanctions; affiliates and program participants may be removed from the university programs and/or prevented from returning to campus. Remedial steps may also include counseling for the complainant, academic, transportation, work, or living accommodations for the complainant, separation of the parties, and training for the respondent and other persons.

Exhibit 6
Page 52 of 98

(52)

USA000478

**5. Bad Faith Complaints**
While Haskell encourages all good faith complaints of sex discrimination and sexual harassment, Haskell has the responsibility to balance the rights of all parties. Therefore, if the investigation at Haskell reveals that a complaint was knowingly false, the complaint will be dismissed and the person who filed the knowingly false complaint may be subject to discipline.

**D. Retaliation**
It is a violation of this policy to retaliate against any person for making a good faith complaint of sex discrimination or sexual harassment and/or cooperating in the investigation of (including testifying as a witness to) such complaint.

**E. Vendors, Contractors, and Third Parties**
This policy applies to the conduct of vendors, contractors, and third parties. If a member of the Haskell community believes that he or she has been subjected to sex discrimination or sexual harassment by a vendor, contractor, or third party, the person should make a complaint in the manner set forth in the above procedure. Haskell will respond to the complaint as appropriate, given the nature of its relationship to the vendor, contractor, or third party.

**F. Academic Freedom**
While Haskell is committed to the principles of free inquiry and free expression, sex discrimination and sexual harassment are neither legally protected expression nor the proper exercise of academic freedom.

**G. Education**
Because Haskell recognizes that the prevention of sex discrimination, sexual harassment, sexual violence/assault, domestic violence, dating violence, and stalking is important, it offers educational programming to a variety of groups such as: campus personnel; incoming students and new employees participating in orientation; and members of student organizations. Among other elements, such training will cover relevant definitions, procedures, and sanctions; will provide safe and positive options for bystander intervention and will provide risk reduction information, including recognizing warning signs of abusive behavior and how to avoid potential attacks. To learn more about education resources, please contact the Title IX Coordinator.  All forms can be found at the end of this book in the "Forms" Section.

Exhibit 6
Page 53 of 98

(53)

USA000479

# HASKELL INDIAN NATIONS UNIVERSITY
## Title IX Coordinator's Office
## COMPLAINT PROCEDURE



**Complaint Filed with Title IX Coordinators Office**

Within **7 working days** Title IX office will acknowledge complaint reciept to Complainant.

**15 working days** to determine whether or not the complaint falls within the jurisdiction of the Title IX Office . The Title IX Office will contact the Complainant to clarify thier complaint allegations.

**Notification of Investigation**

The Title IX Office will make efforts, as appropriate and with written authorization from the complainant, to achieve an informal resolution to the complaint. If not authorized or not achievable, the Title IX Office will inform the complainant in writing whether or not an investigation is warranted.

The Title IX Office will open all complaints determined to fall within the Title IX Office jurisdiction for investigation within **30 days** of reciept. Advise parties that the Tiitle IX Office is **nuetral fact** and retaliation prohibited

**Investigation**

Schedule meeting with respondent(s) to discuss allegations and investigation process.

Provide notice to appropriate unit heads.

Conduct investigation-interview witnesses, review documentation.

Prepare written report **within 60 working days** after complaint file with the Title IX Office.

**STATUS Updates on Investigations**

Review report with appropriate university officials

Maintain communication with the parties advising them of the status of the investigation.

**Investigative Findings and Recommendations**

Provide written investigation summary and findings to complainant, respondent and director, chair, dean or vice president within **60 working days** after complaint filed.

Exhibit 6
Page 54 of 98

(54)

USA000480

# VII. Fire Safety

Exhibit 6
Page 55 of 98

(55)

USA000481

## A. MAJOR VIOLATIONS

1. **Fire Protection Equipment** – Fire extinguisher's, pull stations, smoke detectors, automatic sprinkler systems, and fire alarms are located throughout the campus for the protection of human life and property. To use this equipment for non-emergency purposes is prohibited. Immediate action will be taken against anyone who falsely, whether intentionally or negligently, activates or tampers with fire safety equipment, exit signs, horns, strobes, notification devices, and fire exit doors. Tampering means to intentionally disable, alter, or change the fire alarm system, fire protective device, the station or signal box. Fire doors and any door with a closing mechanism must not be propped open or disabled.  In addition, initiating, causing or contributing to a false report, warning or threat of fire, explosion, or other emergency is grounds for disciplinary action.
   Typical Sanctions: Emergency suspension, $100 fine plus all costs associated with the repair or replacement of misused or damaged equipment, cleaning of the facility, possible eviction from University housing and/or possible criminal charges.

2. **Fire Hazards** – All campus facilities, including student rooms and balconies, are smoke-free.  Smoking of tobacco products is permitted only in designated outdoor smoking areas (50 feet from buildings).  Cigarette butts and ashes shall be considered *prima facia* evidence of smoking. Open and smoldering flames, including lit candles, incense, plants/herbs, pipes, grills, e-cigarettes and hookahs are prohibited in all campus facilities, including student rooms and balconies. A student must receive prior approval from the Director of Housing to burn material for religious purposes.  No heat-producing appliances will be permitted in student rooms, unless authorized by the Haskell Safety Office.  This includes hot plates, coffee pots, popcorn poppers, electric skillets, heaters, air fresheners ("Sensies"), etc.  Any items confiscated WILL NOT be returned.
   Typical Sanction: $50 fine.

3. **Endangerment (Emergency Evacuation)** – When a fire alarm is sounded, residents must assume that there is a fire in the building and are expected to evacuate the building. Residents may return to the building only when instructed to do so by Residential hall staff or Haskell Security/Safety personnel. Endangerment includes failure to follow these procedures for fire safety, as well as failure to take cover during severe weather upon notification by Residential Hall staff, Haskell officials, tornado siren, or television/radio severe weather instructions.
   Typical Sanction: $50 fine.

4. **Fires (Intentional – Arson)** – Any willful or malicious burning or attempt to burn any building or government property on or around campus, any motor vehicle, and/or personal property of another is subject to expulsion from Haskell, as well as criminal charges.
   Typical Sanction: Expulsion from Haskell as well as criminal charges.

Exhibit 6
Page 56 of 98

(56)

USA000482

5. **Fires (Unintentional)** – All other fires will be handled on a case-by-case basis, based on fire department reports.  If it is determined that the fire was the result of violations listed above, sanctions will be at minimum: emergency suspension, $50 fine plus all costs associated with the repair or replacement of the damaged area, cleaning of the facility and other damaged property, possible eviction from Haskell housing, and possible criminal charges.
Typical Sanctions: Emergency suspension, $50 fine plus all costs associated with the repair and replacement of the damaged area and property, and cleaning of the facilities. Possible eviction from Haskell housing and possible criminal charges may apply.

Exhibit 6
Page 57 of 98

USA000483

# VIII. Residential Life Policies

Exhibit 6
Page 58 of 98

(58)

USA000484

## A. Authority to Enter Rooms

Residential hall staff or other non-law enforcement employees may enter rooms for several reasons as described below. **As a courtesy,** these officials will knock and will identify themselves and verbally request entry before entering the room. **Not hearing a knock or verbal request to enter is not a viable defense in disciplinary proceedings.**

1. For reasonable suspicion that a violation of the Code of Student Conduct or local, state, or federal law has occurred in the room or that evidence of the violation is in the room (see details below).
2. For emergencies such as fire drills.
3. For pre-announced health and safety checks.
4. For maintenance requested by the student or pre-announced requests by staff for maintenance work.
5. To conduct room inspections every two weeks.
6. To accompany a police officer who has a search or arrest warrant.
7. To ensure the safety of the student or others, if there is no response to the staff's knock or verbal request to enter.

## B. Search and Seizure in Student Rooms

**General Procedures:** These procedures apply when Residential Hall staff and other Haskell officials enter a room because of an emergency, or for a room check (every two weeks), or to determine the location of a repair job.

**1**. Residential Hall staff and other Haskell officials shall use prudent judgment to determine if Security should be present.
**2**. Illegal items in "plain view" shall be seized.
**3**. Violations of the Code of Student Conduct that are in "plain view" shall be written into an incident report.
**4**. Care shall be taken to ensure that the student's room is left in the same shape as it was found.

**Procedures Related to Search Based on Reasonable suspicion of Violation of the Code of Student Conduct:** Residential Hall staff and other Haskell officials have authority to search a room when there is **reasonable suspicion that** a violation of the Code of Student Conduct has occurred and there is reasonable suspicion that evidence of the violation will be found in the room. Reasonable suspicion: A school official must have specific and articulable facts or inference, obtained from either personal observation or a reliable informant, that leads him/her to conclude – based on his/her experience the totality of the circumstances – that the search will lead to a discover of a violation of the Student Code of Conduct.

**1**. Residential Hall staff and other Haskell officials shall use prudent judgment to determine if non-law enforcement staff should be present. Upon entering, if occupants are present, the occupants must be informed of the intent to search the room.
**2**. The article/item must be defined before a search begins. (i.e. alcohol, drugs, weapons, etc.)

Exhibit 6
Page 59 of 98

(59)

USA000485

**3**. After beginning the search, an illegal item in "plain view," even if unrelated to the purpose of the search, shall be seized and included in the incident report.

**4**. The area to be searched is the area where the article could be found. For example: if the article was a jacket, only those spaces of the student's room where a jacket could be found can be searched; e.g., closet, under the bed, suitcases; however, the search cannot extend to a small purse or makeup cases.

**5**. Care shall be exercised to leave the room in the same shape as it was found.

**Procedures Related to reasonable suspicion Search for Lost or Stolen Property:**

If there is reasonable suspicion to believe that a room contains lost or stolen student or Haskell property, the following procedure is to be followed to locate the property and to return it to its owner.

**1**. The Vice President of University Services may authorize Haskell officials with Reasonable suspicion to search the room after a reasonable attempt is made to inform the student whose room is being searched and to have the student present for the search.

**2**. Residential Hall staff and other Haskell officials shall use prudent judgment to determine if non-law enforcement should be present. Upon entering, if occupants are present, the occupants must be informed of the intent to search the room.

**3**. The complaining party must clearly identify the property before the search begins.

**4**. The complaining party must request the particular room(s) to be searched or name(s) of residents whose rooms are to be searched. A BLANKET SEARCH OF A RESIDENTIAL HALL OR WING IS NOT ALLOWED.

**5**. The area searched is the area where the article likely could be found. If the article was a jacket, only those spaces of the student's room where a jacket could be found can be searched; e.g., closet, under the bed, suitcases; however, the search cannot extend to a small purse or makeup cases.

**6**. After beginning the search, illegal items in "plain view," even if unrelated to the purpose of the search, shall be seized and included in the incident report.

**7**. Care shall be taken to ensure the student's room is left in the same shape as it was found.

**8**. Violations of the Code of Student Conduct that are in "plain view" shall be written into an incident report.

**9**. In the event the searched-for contraband is found, it will be held in the Security Office until the matter is disposed of.

## C. Search of Belongings

**Scope of Policy**

This policy concerns search of a student's belongings by Haskell officials in the residential hall or anywhere on campus grounds. **This policy does not cover room searches or searches of vehicles.**

Exhibit 6
Page 60 of 98

(60)

USA000486

**Procedure**

**1.** No Haskell employee shall search a student's personal belongings unless there is reasonable suspicion based on the five senses to believe that a student has items subject to confiscation in a closed container, belongings, etc.

**2.** Examples of where there is **not** reasonable suspicion:
   a. Sound of cans, bottles, visual shape of cans, bottles in back pack, purse, bag, etc.
   b. Prior substance abuse write-ups
   c. Walking to or from a known drinking area with a bag, backpack or purse
   d. Walking across campus late at night with a bag, backpack, etc.

**3.** Examples of reasonable suspicion:
   a. Odor of alcohol clearly emanating from the bag, purse, backpack
   b. Clear view of beer can or other alcohol container through clear or slightly opaque bags evidenced by a name brand, labels and/or color of can or bottles clearly identified to be that of a known brand
   c. Open container of liquid smelling of alcohol
   d. Combinations of the above

**4.** The Student Conduct Administrator will dismiss incident reports where there are violations of a student's right of privacy.

**5.** A request to search an item (back pack, purse, bag, luggage) may be done with phrases, "May I have your consent to search (item such as backpack, purse, etc.)?" If a student refuses and there is not reasonable suspicion, a search cannot be conducted.

## D. Visitation and Guests

Hosts and visitors who violate the Residential Halls visitation policy and other visitation conditions will be subject to Haskell disciplinary process. Non-student visitors may be subject to formal charges under local, state, or federal law.

**Visitation Hours will be:**
**Sunday through Thursday 12 p.m. – 12 a.m.**
**Friday and Saturday 12 p.m. – 2 a.m.**
**Holidays 12 p.m. – 2 a.m.**
**Spring Break 12 p.m. – 2 a.m.**

## E. Frequently Asked Questions about Visitation

**1. Who is a Visitor?**
A visitor is any individual who is not a resident of the residential hall visited or occupant of the room visited.

**2. What if I live in a Co-ed hall?**
Residents of co-ed residential halls also have to abide by "inter-visitation" rules.

**3. What is "inter-visitation" and are there specific rules?**

Exhibit 6
Page 61 of 98

(61)

USA000487

This term is used to describe visitation between/among residents of that specific co-ed hall. Co-ed hall residents must not only adhere to the rules of visitation but also follow "inter-visitation" regulations. Students residing in co-ed housing may visit in their residential hall without signing the visitation logbook during the designated time for visitation.  Residents in co-ed halls are not allowed to be on wings/floors/rooms or study areas before and/or after visitation hours or in areas delegated to members of the opposite sex.

**4. What do I need to do to sign in the visitor?**
Present your Haskell Student Identification card to staff.  Staff will secure and return it after **you** have signed out your visitor.

**5. Where can I take my visitors once they are signed in?**
Visitors may visit in the floor lounges and, with the consent of roommate(s), in the private room of a student.

**6. Are minors allowed to visit?**
Under state law, minor children are those under the age of eighteen (18). Minor children are not permitted in residential halls without the supervision of parents, legal guardians or other appropriate adult supervision.

## F. Visitation Shall Be Governed by the Following Stipulations:

**1**. Student Services will poll students and determine those who prefer visitation and those who do not. From this data residential halls and residential hall wings will be identified for visitation or not. Student Services will assign students based upon their preference to the maximum extent practical.

**2**. All student-hosts and visitors shall be required to abide by the Code of Student Conduct and residential rules related to hours of visitation, areas in which visitation is allowed and procedures for visitation.

**3.** The student-**host** shall be responsible for his/her visitor's behavior. **The student-host must escort their visitors at all times.**

4. **Every visitor** must be **checked/signed in** at the residential hall's office before visitation and **checked/signed out** when leaving. Students currently enrolled at Haskell will leave their Haskell identification card when checking in to visit and may retrieve their Haskell identification card upon leaving. Non-student visitors will be required to be signed in by student-host. **Student-hosts** are responsible for checking/signing in visitor(s).

5. All visitors are required to enter through the main (front) entrance of the residential hall.

6. Residential hall staff have the authority to make reasonable decisions on who should/should not be in the residential hall subject to due process for currently enrolled students.

7. For purposes of this section, sleeping areas are defined as individual rooms and corridors/hallways adjacent to individual rooms. Common areas are defined as TV rooms and lounges.

8. Failure to adhere to or abide by this or other Residential Housing policies for visitation will result in disciplinary action, which could include an official warning and/or incident report.

9. Non-Students who continually violate residential rules and/or campus rules

Exhibit 6
Page 62 of 98

(62)

USA000488

may be subject to criminal trespassing charges and/or banishment from the campus. (Also see Residential Housing Policies and Procedures Handbook).

## G. Prohibited Items in the Residential Halls

Due to fire hazard, safety, and energy use, the following items are prohibited while in the residential halls.

- More than one refrigerator per room.
- Any appliance with an open heating coil.
- Broiler ovens, toasters/toaster ovens
- Alcohol
- Candles, incense, candle warmers
- Air fresheners ("Sensies")
- Four-way or cheater plugs
- Any type of extension cord without breaker
- Sun or heat lamps
- Any appliance not clearly marked as U/L approved
- Tacks or nails in walls or ceilings
- Electronic items that cause electrical outages
- Contact paper on walls/furniture
- Any type of grill
- Electric blankets
- Electric sauce pans
- Laser pointers
- Halogen lamps
- Hot plates
- Space heaters
- Paint ball, BB-guns, or other weapons
- Oil popcorn poppers
- Flammable liquids and chemicals
- Cut Christmas trees or boughs
- Extension cords
- Firearms and fireworks
- Hookahs

## H. Other Policies

The following are general regulations common to all of the residential halls. **Students violating these regulations are subject to the disciplinary process.**

1. **Authority of Staff to Enter Rooms** – See Authority to Enter Rooms (Section II Authority to Enter Rooms p. 13).

2. **Baby-Sitting**: Baby-sitting is not allowed in the residential hall.

3. **Checkout Items**: Student identification cards shall be left with residential hall staff to ensure the return of items checked out from the office.

Exhibit 6
Page 63 of 98

(63)

USA000489

**4. Door Opening Charge:** All requests to open doors will be $3.00. Student doors will be opened two (2) times before they are required to buy another key.

**5. House Meetings**: Attendance at the initial house meeting each semester is mandatory. Failure to obtain attendance by 75% of residents will result in no visitation privileges for all residents until after the first successful meeting is held. In addition, the Residential Housing Supervisors will host House Meetings to provide information related to changes in policy or other areas of concern for students and staff.

**6. Laundry:** Clothes may not be left unattended while doing laundry. The University is not responsible for lost or stolen articles. Doing laundry of non-residents is prohibited.  Any student unauthorized to use the laundry facilities will be automatically charged for the residential hall fee.

**7. Leave**: Residents shall sign out when leaving for holiday and/or long weekends or any extended leave of absences.

**8. Paging and Intercom**: Paging in the residential halls will be allowed only during the hours of: Monday through Friday- 8 a.m. to 10 p.m., Saturday & Sunday – 10 a.m. to 10 p.m.

**9. Pets**: No pets are permitted in the residential halls including, but not limited to, fish, reptiles, birds, gerbils, spiders, and insects. Students will be responsible for removal of pets from the residential hall and for any damages caused by pets.  Every individual with a disability has the right to be accompanied by a guide dog, signal dog, or service dog, trained and certified for the purpose. However, the individual shall be liable for any damage done to the premises or facilities by his/her dog. Guide Dog means any guide dog or Seeing Eye Dog that was trained and certified by a licensed person. Signal Dog means any dog trained or certified to alert a deaf person, or a person whose hearing is impaired, to intruders or sounds. Service Dog means any dog trained and certified to do work or perform tasks for the benefit of an individual with a disability, including but not limited to, minimal protection work, rescue work, pulling a wheelchair, or fetching dropped items.

**10. Proper Use Of Entrances**: The back and side entrance(s) will be locked at 10:00 P.M. The front entrance will be used to enter and exit the building after these hours. The front entrance will be locked on Monday-Friday at midnight and Saturday and Sunday at 2:00 A.M. Staff is available to open the front entrance after closing hours. The use of other entrances after those times is a code violation. Windows are not to be used to get in or out of a building except for life-

Exhibit 6
Page 64 of 98

(64)

USA000490

threatening situations. Use of windows for entrance or exit in other situations is a code violation.  Identification may be requested by staff to assure residency within the hall.

11. **Public Displays**: Public displays of behavior such as fondling, passionate kissing and exposure are potentially embarrassing to other students. Visitors may lose visiting privileges if they do not properly respond to official warnings received.

12. **Quiet Hours**: The observance of quiet hours in all residential halls will begin at 11:00 P.M. and end at 11:00 A.M. Each residential hall will decide quiet hours during holidays and spring break sessions.

13. **Residential Room Keys:** Each student will be assigned a key to his/her residential hall room. If this key is lost or stolen, residents are responsible for reporting the loss immediately to the Residential Hall staff. Replacement keys will cost $25.00. Entry/room doors should be locked at all times to secure valuables and enhance individual safety. The University is not responsible for lost or stolen articles. Student must present a receipt from the Business Office to the Residential Hall staff before a key is given to the student. If a key is not available from the locksmith, the student will not be charged until the key is received. All funds collected will be transferred to the House Council account of each respective hall.

14. **Room Clearance**: Students are expected to check out of residential halls and follow procedures that include, but are not limited to, clean room/bathroom, return of key and payment for damages and repairs to room. Failure to do so may result in an assessment of charges to cover such costs.

15. **Study Room**: The study room is available 24 hours a day and is to be utilized for STUDYING ONLY (See inter-visitation in Code Violation). Eating or smoking is not allowed nor are radios or stereos permitted, unless using earphones and audio material is related to study material. Non-residents may study with a resident within the designated visitation hours and must sign in.

16. **Telephone Use**: The office phone is for official use only. Only emergency calls and official calls will be allowed from the office phone. No collect calls shall be accepted from any University telephone. All travel arrangements will be made on the public telephone.

Exhibit 6
Page 65 of 98

(65)

USA000491

17. **Tobacco (Any products)**: Use of smokeless tobacco, snuff, and Cigarettes (including e-cigarettes and other vapor products) are prohibited in residential hall. Use of these product(s) is a Code violation (See Fire Hazard Code in Code Violation Section).

18. **Room Inspections**: Housing reserves the right to conduct room inspections every two weeks to ensure a level of cleanliness, order, and safety are maintained.

19. **Harboring**:  Harboring a person, such as a current student or a student who has been suspended from the dormitories or even a former student expelled from Haskell, or other person who has been evicted/barred for disciplinary reasons is prohibited.

## I.  Haskell Not Responsible for Student Property

Haskell will not be responsible for any damaged, lost, or stolen property.  All personal property must be removed from the residential hall on the last day of the student's occupancy.  Personal property remaining in residential halls, after the student is no longer residing there, may be discarded.  It is recommended that all personal property be appropriately labeled to prevent loss or theft.  It is also recommended that all students obtain renter's insurance for their personal property or be insured through their parent's homeowner's insurance.

Exhibit 6
Page 66 of 98

(66)

USA000492

# IX. Parking and Traffic Program Policies and Procedures

Exhibit 6
Page 67 of 98

(67)

USA000493

# GENERAL REGULATIONS

Haskell is authorized to establish campus parking and traffic regulations and to provide parking fines and penalties for infractions of these regulations.   Any motorized vehicle, including motorcycles, operated on Haskell property is subject to all campus parking and traffic regulations.

These regulations have been promulgated for the safety, welfare, and health of students, employees, and visitors and to govern traffic on campus.  The operation and/or parking of any vehicle on Haskell property is a privilege, not a right.

**Vehicle Registration:**
All privately owned motorized vehicles operated by Haskell students and employees on Haskell property must be registered at the time of enrollment, employment and/or acquisition. The following information is required to register a motorized vehicle: Name, address, vehicle year, vehicle make, vehicle color, license tag number, and state in which vehicle is registered.

A registration decal will be issued which must be affixed to the inside lower driver side windshield.  There is no cost for the initial decal; however, **replacement decals are $20.00** payable at the University Business Office.

Any students or employee's motorized vehicle not registered with the University Parking and Traffic Office will be subject to ticketing and towing.

**Responsibility for Vehicles**
Any person operating or parking a vehicle on campus shall be fully responsible for that vehicle and its contents. An individual shall be held responsible for violations by a vehicle registered to him/her either through Haskell registration or tracing through the state Motor Vehicle Department, regardless of the operator at the time of the violation. There will be a $20 fee if a trace through the Motor Vehicle Department is necessary.

Notify Parking and Traffic if a registered vehicle is sold.  If the vehicle remains on campus, any fines or fees incurred will be charged to the person on record and registered with Parking and Traffic.

**Regulations – Hours in Effect**
Regulations are in effect 24 hours a day and 365 days a year. All parking spaces are available for "open" parking between 5:00pm and 7:00am, except parking for the physically impaired, fire lanes, and where otherwise posted.

# <u>PARKING</u>

Subject to modification, the parking permit classifications and parking privileges are shown below. **All zones have color coded signs.**

Exhibit 6
Page 68 of 98

(68)

USA000494

**GOLD/YELLOW** Student Parking Permit is valid in all **Green** areas, except for spaces designated for the physically impaired, visitors parking, loading zones, fire lanes, roadways, and other marked and designated "no parking" zones.

**PURPLE** Employees Parking Permit. Valid in all **Blue** and **Green** areas except for spaces designated for the physically impaired, visitors parking, loading zones, fire lanes, roadways, and other marked and designated "no parking" zones.

**Open Parking Lots**
There are two large open parking lots on campus.  The lots are located at Coffin Complex and the Cultural Center.

**Visitor Lot**
The visitor lot is located in the center of campus, between Tecumseh Hall and Hiawatha Hall.  Visitors may also park in any open parking lot.  A sign indicating either "visitors only" or "visiting staff" is not considered open parking.

**Parking for the Physically Impaired**
Certain parking spaces have been designated for the physically impaired. Parking in those spaces is reserved for individuals whose vehicle displays either:

A.  A specially issued license plate displaying the international symbol of access to the physically impaired.
B.  A specially issued state identification card with the international symbol of access to the physically impaired clearly displayed in the vehicle.

The permit is only valid for the individual to whom the tag is issued and that individual must be an occupant of the vehicle.

Persons desiring special parking consideration because of permanent disability are advised to obtain a Parking Permit for the Physically Impaired by making application at the State of Kansas, Department of Motor Vehicles.

**Prohibited Parking**
Parking violation notices may be issued to all vehicles, including GSA, and vehicles may be immobilized and/or removed from campus for:

A.  Double parking or in streets or roads
B.  Parking on sidewalks or grass
C.  Parking in service roads or restricted areas
D.  Parking across drive entrances or sidewalk crossings
E.  Parking outside of marked parking spaces and/or taking up two spaces
F.  Parking in fire lane/fire hydrant zones
G.  Parking over length/oversize vehicle without permit
H.  Parking in an area designated by signs and/or curb markings as a "no parking" zone
I.  Parking in a lot or space for which vehicle is not permitted

Exhibit 6
Page 69 of 98

(69)

USA000495

J.   Unauthorized parking in physically impaired parking zone
K.   Blocking vehicles, roadway, or trash containers
L.   Parking in an area designated by signs as "visitors only" or "visiting staff only"

**Parking of Large Vehicles**
Over-length or oversized vehicles, such as buses, trucks, and campers cannot be parked in regular parking spaces.  Visiting groups and charter buses may arrange for a special parking assignment and permit with the Parking and Traffic Office.

**Overnight Camping or Sleeping**
Parking for camping or overnight sleeping in vehicles is prohibited. Designated personnel conduct periodic patrols of the campus in an effort to safeguard all vehicles from vandalism and to protect the health and welfare of any vehicle occupants. The personnel conducting the security patrols are authorized to remove any student, staff or faculty found loitering or sleeping in the parking areas.

**Vehicle Storage**
All student motorized vehicles on Haskell property must be removed from the campus 72 hours after the closure of residential halls at semester's end. Any individual violating these policy guidelines will have his/her vehicle removed from the campus by commercial vendor at the student's expense.

Permission for vehicle storage over the Christmas Holiday period must be obtained from the Parking and Traffic Office. All vehicles stored on campus must be parked in the Blalock Hall parking lot(s) during this period.

Employees' motorized vehicles may not be stored on campus with the exception of those employees on official travel, business, or by permission from the Parking and Traffic Office. Any individual violating these policy guidelines will have his/her vehicle removed from the campus by commercial vendor at the owner's expense.

**Abandoned Vehicles**
A vehicle will be considered abandoned if it appears to be un-drivable (i.e. flat tires, broken windows, damaged, etc.) and has not been moved for five or more days.  Vehicle owners will be notified by mail stating the date the vehicle must be moved.  If the vehicle is not moved or proven to be drivable, the vehicle will be removed from the campus by commercial vendor.

# FINES
**Payment of fines for Parking Violations**
A fine of **$50.00** shall be charged for parking without authorization in parking areas for the physically impaired, parking on the patio of the Coffin Sports Complex, and parking in fire lanes/fire hydrant zones. The traffic circles located at Roe Cloud, Osceola/Keokuk, and Winona-Pocahontas Hall are designated as fire lanes, as well as the area north of Coffin Complex. A fine of **$25.00** shall be charged for all other prohibited parking or for operation of a motor vehicle contrary to the provisions of these regulations.

Exhibit 6
Page 70 of 98

(70)

USA000496

In the event that there is more than one violation on a parking violation notice, the secondary fine(s) will be **$10.00** each. Such fines are due and payable at the University Business Office within ten (10) school days following the date the citation is issued.

**Late Payment of Parking Violation Fines**
If the parking violation fine is not paid within ten (10) school days following the date the violation is issued, a late payment fee of $10.00 for a physically impaired parking zone violation and $5.00 for all other prohibited parking or traffic violations shall be assessed on the eleventh school day and thereafter.

**Student Parking Violation Fines – Failure to Pay**
Students with unpaid parking violation fines at of the end of any fall, spring, or summer semester shall not be permitted to re-enroll, graduate, or transfer, and a "hold" shall be placed on the student's transcript or transfer records until such fees are paid in full.

**Employee Parking Violation Fines – Failure to Pay**
Employees with unpaid parking violation fines shall be subject to administrative review. If, after administrative review, fines remain unpaid, the vehicle will either be immobilized or removed from the campus by a commercial vendor. An immobilized vehicle may be recovered by obtaining a release from the University Business Office, which will be issued only upon payment of a $25.00 fee for the removal of the wheel lock and payment of all outstanding fines.

**Excessive Unpaid Parking Violations**
Excessive unpaid parking violations exist whenever three or more parking violation notices have been posted to the record of the vehicle's registered driver.  Vehicles will be subject to immobilization or removal from campus.

**Towing and Impound of Vehicles**
Vehicles may be towed from the campus or immobilized by a wheel lock at any time if they interfere with the efficient operation of the traffic and parking on the Haskell campus or if they are parked in an area not specifically designated for or designed as a parking area. All charges for commercial towing and/or storage are the responsibility of the registered owner.  An immobilized vehicle may be recovered by obtaining from the University Business Office a release which will be issued only upon payment of a $25.00 fee for the removal of the wheel lock and all unpaid fines levied for parking violations posted to the registered owner.

## VEHICLE OPERATION
The provisions of the state highway traffic code, Chapter 8 of the Kansas Statutes Annotated (K.S.A. 8-2001) and the Standard Traffic Ordinance for Kansas Cities are applicable to the operation and condition of motor vehicles operated on the University campus except as may be otherwise provided for in these regulations.

Exhibit 6
Page 71 of 98

(71)

USA000497

Haskell is within the city limits of the City of Lawrence. The Lawrence Police Department and Douglas County Sheriff's Office have the authority to enforce all traffic laws of the State of Kansas and any general ordinances of the City of Lawrence on the University campus.

**Vehicles, Pedestrians and Bicyclists**
Vehicles shall stop and/or yield to all pedestrians and bicyclists on all campus roadways and crosswalks.

**Vehicle Speed Limits**
All vehicles shall be driven prudently and not in excess of **20 MPH** on the streets and roads on the University campus. Except as may be otherwise posted, speed limits for vehicles operated in the University parking lots shall not exceed **10 MPH**.

**Vehicle Operation – Prohibited Acts**
The following is prohibited and may be subject to ticketing:
A. Driving over the curbs or sidewalk
B. Driving on grass or seeded areas
C. Driving in excess of the speed limits
D. Reckless Driving or speeding
E. Failing to yield to a pedestrian in a crosswalk or at an intersection
F. Failure to stop at a posted stop sign
G. Driving in violation of the provisions of Chapter 8 of the Kansas Statutes Annotated

**Note:** Delivery and/or service vehicles must notify the Parking and Traffic office before driving or parking in non-designated parking areas for loading or unloading purposes.

**Reporting of Accidents**
Any accident involving a motor vehicle on the Haskell campus should be reported to the Lawrence Police Department which has jurisdiction over all accidents occurring within the City of Lawrence. A report of an accident should also be made to the Parking and Traffic Office.

**Appeals**
A parking citation may be appealed in writing within 10 calendar days of receipt of the ticket. Forms may be obtained in the Parking and Traffic Office or in the Outlook Public Folders under "Safety Information."

# IDENTIFICATION CARDS (ID'S)
All students and employees are required to obtain an official Haskell Identification Card (ID) at the time of enrollment or employment. IDs are required to be readily available upon request from any university official.

Exhibit 6
Page 72 of 98

(72)

USA000498

**Obtaining an ID**
ID photos are taken in the Parking and Traffic Services office located in Winnemucca during posted hours.  Proper identification/credentials are needed to obtain a photo ID:
**A**.  Employees: Verification from supervisor or Human Resources of your appointment.
**B**.  Students: Current registration, class schedule, or paid receipt.

IDs are valid for:
**A.**  Employees:  Duration of employment.
**B**.  Students: A period of four years.  For example:  Fall 2015 IDs will be valid from Fall 2015-Spring 2019.

Initial IDs are free of charge.  There is a **$20** charge for replacement IDs.  Payment for a replacement ID is to be made at the Haskell Business Office.
**A**.  Replacement charges are waived when the information on the ID is incorrect or has been changed (documentation needed) or ID is broken or magnetic strip is damaged due to normal usage and wear and tear (must bring broken ID).
**B.**  Replacement charges will not be waived for lost or stolen IDs or if the ID is broken because of a hole punch.  It is recommended that holes not be punched into IDs.

## DEFINITIONS

**Employees -** individuals who are currently employed at Haskell. When an employee resigns or has been relieved of his/her position, without another assignment, his/her parking permit and ID become invalid.

**Parking and Traffic Office** is under the direction of the Facilities Management Department.  The office is located in Winnemucca, Building #118.  All questions or concerns and/or appeals should be directed to this office.

**Parking Space -** a space where an automobile or motorized vehicle can be parked and so indicated by two parallel white stripes on the ground.  Refer to the campus map.

**Students -** individuals who are currently enrolled at Haskell. For Parking and Traffic purposes, one can not be a student and employee at the same time.

**University Business Office** is located in Navarre Hall, Building #121.  All fine payments must be paid at this office.

**Visitors -** individuals who are not students or employees of Haskell.  Visitor parking passes may be obtained from the Parking and Traffic Office and the President's Office located in Navarre Hall, Building #121.

Exhibit 6
Page 73 of 98

(73)

USA000499

# X. Student Grievance Process:

Exhibit 6
Page 74 of 98

USA000500

In the interest of better serving students, Haskell has established and published a Student Grievance Process whereby students can be assured a prompt, impartial and fair hearing of their complaints. More specifically, a complaint is a written concern or formal charge of dissatisfaction with a person, service, or process that requires clarification, investigation, and resolution. If a student has attempted to work out an issue or problem by first discussing it with those most involved [individual(s) and/or office(s)] in a calm and honest way, but continues to feel that the issue or problem continues to exist, then the student may submit a written complaint to the supervisor of the various departments where the issue or concern took place.

The grievance can be submitted during normal operation hours (7:45am- 4:30pm M-F) within five (5) business days from the date of the occurrence or matter. The complaint shall be routed to the appropriate official for review and response within five (5) business days in receipt of the complaint. The official-within the department- to whom the complaint was forwarded to review and address, will submit a response to the person who wrote the complaint within five (5) business days in receipt of the complaint. A student may pick up a copy of the Student Complaint Policy and Procedures and a copy of the Student Complaint form on the Haskell website under University Services or in the Office of Student Rights. For questions or additional information contact the Student Conduct office at (785)749-8415. Haskell will not allow any form of retaliation against individuals who file a complaint to Haskell management, or who cooperate in the investigation of such reports. To the extent possible, the confidentiality of the reports will be maintained.

**SPECIAL NOTE:** Conversely, sometimes Haskell students find they are particularly pleased with how something has been handled for them, how they were assisted by a particular staff member, the positive experience they had in a specific class, or some other outstanding thing that happened to them at Haskell. As a student you should know that you are also encouraged to submit a written compliment or note of appreciation through the Vice President of University Services.

Exhibit 6
Page 75 of 98

(75)

USA000501

# Contact Persons and Areas of Concern

**Instructors**
The instructors are located at:
College of Arts & Sciences- Sequoyah Hall
School of Business Blue- Eagle Hall
School of Education- Parker Hall
They receive concerns about classroom activity, for example: invasion of privacy, grades, not grading papers, excessive canceling of classes, and proselytizing (imposing one's religious belief).

**Academic Deans**
The Academic Deans are located at:
College of Arts & Sciences- Sequoyah Hall
School of Business Blue- Eagle Hall
School of Education- Parker Hall
They receive less severe concerns that are not initially resolved by Instructors.

**Vice President, Academic Affairs**
This office is located at Navarre Hall.  This office receives concerns not resolved by the Academic Deans.

**Director of Athletics**
This office is located at Coffin Sports Complex.  The Director of Athletics receives concerns about the athletic program.

**Office of the Chief Information Officer (OCIO)**
This office is located at Pontiac Hall.  The Chief Information Officer receives concerns about Computer Services.

**Admissions**
This office is located at Navarre Hall.  The Director of Admissions receives concerns about enrollment policies and discrimination in Admissions.

**Counseling Center**
This office is located at Stidham Union.  The Director of the Counseling Center receives concerns about the counseling programs, services or staff.

**Financial Aid Office**
This office is located at Navarre Hall.  The Director of the Financial Aid Office receives concerns about financial aid appeals and concerns about office staff.

**Food Service Department:**
This office is located at Curtis Hall.  The Director of the Food Service Department receives concerns about food service, kitchen employees, and student helpers.

Exhibit 6
Page 76 of 98

USA000502

**Residential Hall Program:**
This office is located at Osceola-Keokuk Hall.  The Director of Housing receives concerns not resolved by the residential hall supervisors and security personnel concerns.

**Residential Hall Supervisor**
The residential hall supervisor receives concerns about pest control, Residential Aides, supplies, and physical operation of residential halls.

**Office of Student Conduct**
The Office of Student Conduct is located at Minoka Hall.  The Student Conduct Administrator receives concerns about the Student Conduct process in disciplinary matters; violation of the right of privacy; and the behavior of students, such as theft, sexual harassment, and substance abuse.

**Student Recruitment/Placement**
The Career Planning/Placement & Recruitment Office is located at Navarre Hall. The Office supervisors receive concerns about college work study.

**Finance Office**
The Finance Office is located in Navarre Hall. The main number is 749-8451.  The Finance Office receives concerns involving the following services: Business Office, Student Bank, Post Office, and Property & Supply.

**Director, Academic Support Center**
This office is located at Tommaney Hall.  The Director of the Academic Support Center receives concerns about library policies or hours, library staff, unpaid book fines, book orders, tutors, the Learning Center, peer tutors.

**Vice President of University Services**
The Office of the Vice President of University Services is located in Pushmataha Hall. The telephone number is 830-2753. This office receives concerns not resolved by: Admissions Office, Counseling Center, Financial Aid Office, Food Services, Registrar, Residential Housing Program, and the Office of Student Conduct.

**Office of the President**
This office is located in Navarre Hall-North. Office hours are Monday-Friday, 8 a.m. to 5 p.m. The telephone number is 749-8497. The President's Office receives concerns not resolved by the University Services, Division of Academic Affairs, Director of Athletics, Administrative Services, or Facilities Management.

**Title IX Office (Sexual Harassment and Sexual Violence)**
Interim Title IX Coordinator Ms. Tonia Salvini is located in Pushmataha hall, 785-749-8457.  Students can file a complaint and talk with the Title IX Coordinator about concerns involving sexual harassment, sexual assault, and domestic violence.

Exhibit 6
Page 77 of 98

(77)

USA000503

Office of Civil Right, Public Civil Rights, Washington, DC

No individual, on the basis of race, sex, color, national origin, disability, religion, age, sexual orientation, or status as a parent, shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination in, a federally conducted education or training program or activity.  (Executive Order 13160)

If a student believes he or she has been discriminated against because of a violation of Executive Order 13160, he or she may, personally or through a representative, file a written complaint with the Public Civil Rights Office, U.S. Department of the Interior, 1849 C. Street, NW Washington, DC 20240.  All written complaints must cite EO 13160, include the complainant's name, address, and phone number, and must describe the alleged discriminatlry conduct in sufficient detail to inform the Civil Rights Office as to the nature and approximate date of the alleged violation.

Department of Interior, 1849 C. Street, NW Washington, DC, 20240 (Sloan Farrell, Director, Public Civil Rights 202-208-3455)

Exhibit 6
Page 78 of 98

(78)

USA000504

# XI. Definitions and Appendices

Exhibit 6
Page 79 of 98

USA000505

## A. Definitions

1. The term "**University**" means Haskell Indian Nations University
2. The term "**student**" means any person taking courses at Haskell either full-time or part-time, pursuing undergraduate, or professional studies. Persons who withdraw after allegedly violating the Code of Student Conduct, who are not officially enrolled for a particular term but who have a continuing relationship with Haskell or who have been notified of their acceptance for admission are considered "students." The term "student" includes any person with respect to whom Haskell maintains education records or personally identifiable information, but does not include a person who has not been in attendance at Haskell for the purpose of academic study.
3. The term "**faculty member**" means any person hired by Haskell to conduct classroom or teaching activities or who is otherwise considered by Haskell to be a member of its faculty.
4. The term "**Haskell official**" means any person employed by Haskell.
5. The term "**member of the Haskell community**" means any person who is a student, faculty member, or Haskell official, as well as any person employed by Haskell or any person living in Haskell residential halls, although not enrolled at Haskell. A person's status in a particular situation shall be determined by the Director of the Office of Student Conduct.
6. The term "**Haskell premises**" means all land, buildings, facilities, and other property in the possession of or owned, used, or controlled by Haskell (including adjacent streets and sidewalks).
7. The term "**organization**" means a group of persons that has been registered and approved by Haskell and that is either:
   a. A registered student organization, which is defined as a group of individuals of which at least 75% of the members are currently enrolled students.  The officers of a student organization must be currently enrolled students; or
   b. A registered campus organization, which is defined as a group of individuals of which at least 75% of the members are from the Haskell community, including currently enrolled students, employees, or spouses of these persons.  The officers of a campus organization must be members of the Haskell community as defined in this paragraph.
8. The term "**Student Appeals Committe for Hearings**" means a group of persons authorized by the Student Conduct Administrator to determine appeals after initial adjudication.  The Student Appeals Committee can determine whether a student has violated the Code of Student Conduct and to recommend sanctions that may be imposed when a violation has been committed in situations where the Student Conduct Administrator is unable to do so.  The Student Appeals Committee for Hearings is comprised of a cross-section of employees and students from the Haskell community.
9. The term "**Student Conduct Administrator**" means the Haskell official designated by the Haskell President to be responsible for the initial adjudication of violations of the Code of Student Conduct.  The Student Conduct Administrator is authorized to resolve all issues of student conduct and to impose or monitor sanctions upon any student(s) found to have violated the Code of Student Conduct.
11. The term "**shall**" is used in the imperative sense.

Exhibit 6
Page 80 of 98

(80)

USA000506

12. The term "**may**" is used in the permissive sense.

14. The term "**policy**" means written Haskell regulations as found in, but not limited to, the Code of Student Conduct, Residential Life Handbook, the Haskell web page and computer use policy, and Graduate/Undergraduate Catalogs.

15. The term "**Affected Person or Parties**" or "**Complainant**" means any person who submits a charge alleging that a student violated this Code of Student Conduct. When a student believes that s/he has been an affected person of another student's misconduct, the student who believes s/he has been an affected person will have the same rights under this Code of Student Conduct as are provided to the Complainant, even if another member of the Haskell community submitted the charge itself

16. The term "**Respondent**" means any student accused of violating this Code of Student Conduct.

17. The term "**Student Conduct Process**" means the procedures for conducting investigations, hearings, and appeals related to alleged violations of the Code of Student Conduct.

18. The term "**Alternative Dispute Resolution**" means a method to resolve disputes outside of the normal SC process.  Involves the use of neutral third parties to increase the effectiveness of settlement discussions.

19. The term "**Student Appeals Committee**" means any person or persons authorized to impose or monitor sanctions on any student(s) found to have violated the Code of Student Conduct.

21. The term "**education records**" means records, files, documents, and other materials that contain information directly related to a student and that are maintained by Haskell.  The term does not include: **(i)** records of instructional, supervisory, and administrative personnel and educational personnel ancillary thereto which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute; **(ii)** records maintained by a law enforcement unit of Haskell that were created by that law enforcement unit for the purpose of law enforcement; **(iii)** in the case of persons who are employed by Haskell but who are not in attendance at Haskell, records made and maintained in the normal course of business which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose; or **(iv)** records on a student that are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in his professional or paraprofessional capacity, or assisting in that capacity, and which are made, maintained, or used only in connection with the provision of treatment to the student, and are not available to anyone other than persons providing such treatment, except that such records can be personally reviewed by a physician or other appropriate professional of the student's choice.

22. The term "**directory information**" relating to a student includes the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational institution attended by the student.

23. The term "**disorderly conduct**" means petty offense chiefly against public order and decency that falls short of an indictable misdemeanor

Exhibit 6
Page 81 of 98

(81)

USA000507

24. **ADJUDICATION** – The action of hearing and deciding a complaint of a violation of the Code of Student Conduct based on information in an incident report, evidence and /or testimony.

25. **ADVOCATE** – One who pleads for someone's cause, or in support of something. See Student Advocate Policy.

26. **APPEAL** – A request by a party to a disciplinary matter to have another designated Haskell official or officials review a disciplinary decision.

27. **BUSINESS DAYS** –Days that Haskell is in full operation. Excludes weekends and holidays.

28. **CALENDAR DAYS** – All days of the week are considered calendar days including weekends and holidays.

29. **CODE VIOLATIONS** –Violations of the rules of the Code of Student Conduct, which subjects students to the Student Conduct Process and which may result in sanctions; see Sanctions on pg. 28-30.

30. **CRIMINAL TRESPASS NOTIFICATION** – A form issued by Haskell staff to an Individual(s) who trespasses on Haskell property or who has been issued a Notice to Vacate or Emergency Suspension. Once a Criminal Trespass Notification is in place, the person who violates the notice may be referred to local authorities and may incur arrest and charges for Criminal Trespass.

31. **DISPOSITION** – A written decision following adjudication.

32. **DISCIPLINARY (Social) PROBATION** –One or more of the following sanctions: **A**. Restriction, for the duration of probation, from holding any student offices and from representing Haskell in any manner.
**B.** Monitoring of student's behavior, with a requirement that the student report to a counselor as directed. Any violations while a student is on social probation could result in a Notice to Vacate, removal from campus and Emergency Suspension or expulsion.

33. **DIVERSION PROGRAM** –An alcohol and/or drug program or campus violence program that allows a student to maintain "Good Social Standing," and/or maintain housing eligibility.  Usually applied as a sanction.

34. **EVICTION** – A sanction whereby the student is ineligible for housing for a specified period of time.

35. **EXPULSION** – A sanction that prevents a student from attending Haskell or being on its grounds or in its buildings without permission from the Haskell President. Violators may be referred to local authorities and may incur arrest and charges for Criminal Trespass.

36. **GOOD SOCIAL STANDING** – All students at Haskell have good social standing upon admission.  Good social standing can be lost by a violation of the Code of Student Conduct that results in removal, suspension or expulsion from Haskell; not to be confused with good academic standing. The student is restricted, for duration of loss of good social standing, from holding any student offices and from representing Haskell in any manner. Representation of Haskell includes all athletic programs and intramural activities.  Good social standing can be regained by completing the sanctions, fulfilling conditions of probation or by re-admission after suspension.

Exhibit 6
Page 82 of 98

(82)

USA000508

**37. OFFICIAL WARNING** – A written warning on a disposition form notifying the student that he/she has not maintained acceptable standards of conduct by not complying with sanctions given.  Failure to comply will result in immediate "Notice to Vacate" from housing.

**38. PREPONDERANCE OF INFORMATION** – Evidence which is of greater weight or more convincing or more believable than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not.

**39. REASONABLE SUSPICION -** :  A school official must have specific and articulable facts or inference, obtained from either personal observation or a reliable informant, that leads him/her to conclude – based on his/her experience the totality of the circumstances – that the search will lead to a discover of a violation of the Student Code of Conduct.

**40. SOCIAL PROBATION-** A period of time when a student may be faced with more severe disciplinary sanctions if the student is found to violate the Haskell regulations while in the designated probationary period.

**41. SUSPENSION** – A sanction that prevents the student from attending Haskell for a specified time frame.  For substance abuse, if the student is found to have committed the violation, the suspension is for a minimum of one (1) full year but not more than two (2) full years.

**42. NOTICE TO VACATE (NTV) -** An immediate loss of housing for one year from the date of issuance and:
- Loss of the privilege of visiting in the residential halls.
- Loss of the privilege of being on campus after regular business hours, unless student is attending a class.
- Loss of the privilege to participate in any extracurricular activities, including athletic teams, intramural sports, etc. and loss of the use of Haskell facilities (i.e., Tecumseh Gym, Coffin Sports Complex, and Stidham Union). Student shall inform the Office of Student Conduct when the student has a class or class assignment or project in any of these facilities.
- Loss of Good Social Standing.
- Requirement to complete an Alcohol Assessment and Treatment Plan if NTV was issued for a Substance Abuse Violation.

## B. Interpretation and Revision

Any question of interpretation or application of the Code of Student Conduct shall be referred to the Student Conduct Administrator or his or her designee for final determination.

The Code of Student Conduct shall be reviewed every 3 years under the direction of the Student Conduct Administrator.

## C. Sources

These sources may be found in the Student Service Policy and Procedures Manual at the Office of the Vice President of University Services. A brief description of each source is provided.

Exhibit 6
Page 83 of 98

(83)

USA000509

**1. Drug Free School and Communities Acts Amendments of 1980 – P.L. 101-226**
A federal law that requires Haskell to notify students and employees about campus programs that prevent the unlawful possession, use, or distribution of illicit drugs and alcohol and the standard of conduct.

**2. E-Mail Regulations**
The Haskell Information Technology Department governs the use of e-mail for Haskell students. All U.S. government rules and regulations pertaining to use/misuse of Federal resources apply.

**3. Family Educational Rights and Privacy (FERPA)**
A federal law that protects the privacy of student education records.

**4. Health Insurance Portability and Accountability Act (HIPPA)**
A federal law that requires physicians to ensure they are protecting the privacy and security of patients' medical information and using a standard format when submitting electronic transactions, such as submitting claims to payers.

**5. Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act**
A federal law that requires all universities to report statistics on murder, sex offenses, robbery, aggravated assault, burglary, and motor vehicle theft, along with statistics on arrests for drug and alcohol violations and weapons violations.

**6.Violence Against Women Act**
A federal law that requires all universities to report statistics on any crimes committed concerning violence against women.  Although this mandate does state women, the jurisdiction covers any victims of violence.

## D. Acknowledgements

This Code of Student Conduct is based on the work done by Edward Stoner and John Lowery and their work, "A Twenty-First Century Model Student Conduct Code with a Model Hearing Script."  The Code of Student Conduct section was based on the code at the University of Denver, Haskell's core values, and the August 2007 Haskell Indian Nations University Code of Student Conduct.  The sexual misconduct policy was based on Brett Sokolow's work, "Creating a Proactive Campus Sexual Misconduct Policy." The "Classroom Expression," "Campus Expression," "Publications," "Freedom of Protest," and "Student and Campus Organizations" sections are based on Dr. Venida Chenault's document, "Haskell Indian Nations University Development of Comprehensive Code of Student Conduct." All other sections are based on the 2008/2009 Haskell Indian Nations University Student Code of Conduct and the August 2007 Haskell Indian Nations University Code of Student Conduct.
Revised 2-14-2015.

Exhibit 6
Page 84 of 98

(84)

USA000510

# XII. Forms

Exhibit 6
Page 85 of 98

USA000511

Haskell Indian Nations University
**INCIDENT REPORT**

## STUDENT INFORMATION

_____          **A00000**
Student Full Name (LAST, First Middle Initial)     Complete Haskell ID Number

_____          _____
Residential Hall or Local Address            Date of incident

**OFFENSE INFORMATION** – Check the appropriate boxes for the offense and then give a brief description of the account answering who, what when, where, how and why. **Attach narrative to this form.**

| Violations | |
|---|---|
| ☐ | 1.Alcohol Misuse |
| ☐ | 2.Drug Misuse |
| ☐ | 3.Haskell Policies and Fed., State, and Local Laws |
| ☐ | 4.Violence |
| ☐ | 5.Domestic/Dating Violence |
| ☐ | 6.Weapons |
| ☐ | 7.Haskell Property |
| ☐ | 8. Harassment |
| ☐ | 9.Sexual Harassment |
| ☐ | 10.Stalking |
| ☐ | 11.Lewd, Indecent, or Inappropriate Public Behavior |
| ☐ | 12.Sexual Assault/Misconduct |
| ☐ | 13.Non-Forcible Sexual Misconduct |
| ☐ | 14.Fire |
| ☐ | 15.Hazing |
| ☐ | 16.Residential Hall Policies |
| ☐ | 17.Trespassing |
| ☐ | 18.Cooperation with Haskell Employees |
| ☐ | 19.Cooperation with Students |
| ☐ | 20.Harboring |
| ☐ | 21.Misuse of Technology |

Facts-

Place-

Time-

Reporting Party-

Witness(es)-

Victim-

Others Involved-

| Substance Abuse Behavior Indicators | |
|---|---|
| ☐ | Odor |
| ☐ | Slurred Speech |
| ☐ | Impaired Coordination |
| ☐ | Bloodshot/Watery Eyes |
| ☐ | Incoherence |
| ☐ | Inability to Stay Focused/Concentrate |
| ☐ | Other |

List items confiscated:_____

_____

Was Lawrence Police contacted? ☐ Yes ☐ No Was student arrested? ☐ Yes ☐No
Comments:_____
Was Lawrence Emergency Medical Services contacted? ☐ Yes☐ No
If yes, was student hospitalized? ☐ Yes   ☐ No
Was malicious destruction of property incurred? ☐ Yes   ☐ No (list of damages and fines attached)
**FOR OFFICIAL USE BELOW:**

Date reviewed by Department Supervisor:_____     _____
                                                          Supervisor's Signature
Comments/Recommendations:_____

_____

Referrals made or recommended: ☐ Counseling Center ☐ Safety Officer ☐ Other: (ie. Haskell Health, Bert Nash, etc.)
Date of Birth:_____/_____/_____   ☐ Over 21 yrs old   ☐ Under 21 yrs old

Date/Time rec'd in SCO:_____
Revised 02/19/2015                         SCO Signature

Exhibit 6
Page 86 of 98

USA000512

**HASKELL INDIAN NATIONS UNIVERSITY**
**Student Disposition Summary Form**

_____     **ID# A00000**_____     _____
**Student Name**                                                                                          Date

_____   _____
Date of Incident Report        Offense

_____   _____
Date of Incident Report        Offense

**Adjudication/Disposition**
_____Student did not appear for conference on_____
_____Report is pending or under investigation until_____
_____Student follow-up appointment is scheduled for_____
_____Student Conduct Officer made finding of code violation_____
_____Student admitted to facts of incident report as being true
_____Evidence utilized by Student Conduct Officer _____
_____Allegations from incident report_____

**Sanction**
_____Informal Disposition initiated_____
_____Official Warning_____
_____Loss of _____
_____
_____
_____*Damages/Fines: Amount $_____type_____due by_____
         *To be determined by Department or Division incurring the damage, fine or loss.
_____Community Service Hours:  Number of hrs._____due by_____
         Report to:_____
         Follow-up appointment:_____

**Referrals (Failure to comply may result in further disciplinary action).**
_____Student Conduct Committee, reason:_____
_____Counseling Center/Student Assistance Program_____
_____Safety Office:  Report to:_____By date of:_____
         Follow-up appointment:_____
_____TRIO_____
_____Diversion Program/Alcohol and or Drug Assessment:_____

**Dismissal**
_____Due to insufficient evidence               _____Lack of probable cause
_____Procedural Error:_____   _____Other:_____

**Appeal**
_____**Appeal is due by 4:30 pm on:_____at the Office of Student Conduct,**
         **Minoka Hall, Room 106.  See Appeal Process in Codebook.**

I am aware that information will be released and/or obtained from referral service providers to verify my compliance with
disposition. I consent to this release and/or obtaining of particular information for my case incident report.

_____     _____
Student                                    Date          Student Conduct Administrator        Date

Revised 06/2014                Original-Student Conduct Office        Copy - Student

Exhibit 6
Page 87 of 98

(87)

USA000513

**Haskell Indian Nations University**
**NOTICE TO VACATE FORM (sample)**

TO:

FROM:        NAME, Student Conduct Administrator

SUBJECT:     Notice to Vacate Residential Hall

DATE:

You did/did not appear for your scheduled conference on _____.     You are hereby notified
that you must vacate your residential hall room effective when the Director of Housing determines you must leave.

## *You are no longer eligible for housing because of reason(s) listed below:*

**You must comply with the Notice to Vacate (NTV) terms and conditions as follows:**

1. You are not allowed visitation in the residential halls.  You are not permitted to participate in extracurricular activities
   including athletic teams, intramural sports, etc. and loss of the use of Haskell facilities.   You are not allowed to eat at
   Curtis Hall.

2. You are able to attend classes, check your campus mailbox, utilize the library and Academic Support Center, and conduct
   legitimate business on campus during regular office hours.

3. If you are found on campus in areas where you are not supposed to be, the Lawrence Police may  be called and you
   could be arrested for criminal trespass under Kansas Law KSA 21-3721.

## *In order to regain Good Social Standing and Re-admission into Housing, you must meet the following conditions:*

1. Present proof of completion to the Student Conduct Office of a substance abuse assessment and proof of completion of
   treatment recommendations.

2. Loss of housing for one year from the date of incident.

   You may be able to continue attending classes if you have not been suspended or expelled from the university.
   You should check with the Registrar's Office for you academic standing.

3. Petition for re-admission into the residential hall after completion of a substance abuse program ; a decision will
   be made after you have submitted the request.

4. Pay a $_____ fine and complete ____hours of community connection before you can apply for re-entry into the residential
   hall.

_____          _____
Student Conduct Administrator                                          Date

cc: Director of Housing, Financial Aid, Food Service, Security, Student Activities, Residential Hall Staff, Athletic Director,
Business Office, Registrar, Admissions, Counseling, File

Exhibit 6
Page 88 of 98

USA000514

**HASKELL INDIAN NATIONS UNIVERSITY**
**Office of Student Conduct**

**RELEASE OF INFORMATION**

I, _____ give permission
                    Print Name

To the Student Conduct Office to release and/or obtain information from referral resources or programs on my attendance and progress.

The sole purpose of this release/obtain information is for the Student Conduct Office to determine and verify whether I am complying with the sanctions and referrals ordered in the disposition hearing.

The person/department this information is released to or to be obtained from is:

_____

My permission is from today's date:

_____ to _____

Or until I consent otherwise in writing.

_____      _____
**Student Signature**                                        **Date**

_____      _____
**Witness Signature**                                       **Date**

Exhibit 6
Page 89 of 98

USA000515

**HASKELL INDIAN NATIONS UNIVERSITY**
*Release of Information Form for Student Advocate*

I, _____, student give
     Print Name

_____
Name of Advocate

Permission to act as my advocate/representative concerning my disciplinary matter of

_____ concerning_____

violation(s).

I understand that no information on my case will be given to anyone unless I have authorized it by signing a "Release of Information" form.

I understand that any investigative interviews conducted by my Advocate will be scheduled with the Student Conduct Administrator.  There will be no walk-in appointments.

I understand that by signing a "Release of Information," my advocate will be provided information from the Student Conduct Office.

I understand that Haskell Indian Nations University is not responsible for the acts of the Advocate in handling my case.

I understand that this release applies only to the Student Conduct hearings.

**Advocate Statement:**  I, _____, Advocate, state that I have no disciplinary matters pending against me at this time.  I understand that I may be charged with fraud under the Code of  Student Conduct policy in the event the university discovers that I have misrepresented my status.  I agree to notify the Student Conduct Administrator and withdraw from representing the above student in the event I have a pending disciplinary matter.

_____          _____
Student Signature                                          Date

_____          _____
Advocate Signature                                        Date

Exhibit 6
Page 90 of 98

(90)

USA000516

### *Application for Diversion Program*

Name_____Date of Birth_____

Home
Address_____City_____State_____

On campus mail box number_____Student Identification Number_____

Do you reside on campus? (circle answer) yes   no   If yes, which hall ?_____

If no, please list current
address_____

List the offense for which this application is being
submitted_____

How long have you attended Haskell?_____List your advisor_____

What is your major?_____When do you expect to graduate?_____

Do you know your GPA (Grade Point Average)?  Current:_____   Cumulative:_____
Are you involved in any organizations or clubs on campus?  _____yes  _____no
If yes, please list and include any offices you hold.
_____
_____
_____

Are you currently employed?  _____yes  _____no   If yes, please list employer_____

List all offenses for which you have been written up for during your enrollment at Haskell.  Include charges that
were dismissed:_____
_____
_____

If you are under 21 years of age, and the charge involved alcohol, answer the following questions in

detail (Note: any information will be used solely for this application).

From where was the alcohol obtained:_____

How did you receive the alcohol (i.e., did you or someone else purchase)_____

Were you required to show I.D.?  _____yes _____no   Did you use your real I.D.?_____

State any facts concerning the incident which in your opinion might excuse your
actions:_____
_____
_____

Explain why you feel you could successfully complete the Diversion Program:_____
_____

Exhibit 6
Page 91 of 98
(91)

USA000517

_____

_____


**The following items will be due within 5 days of formal adjudication to the Office of Student Conduct.**

_____Letter of intent regarding your academic goals.
_____Letter of support from Haskell staff or faculty.
_____Affected Parties Concept Map.
_____Completed diversion application.

I understand that if I fail to submit the above 4 items on the due date – appeal process will begin.

I solemnly swear that I have read the Diversion Program Guidelines and completed the application and all the information contained is true and correct to the best of my knowledge   I understand that if any of this information is not true and correct, this will be a basis for denial of diversion or revocation of diversion.

I understand that if the Diversion Application is denied, the disciplinary process will be continued.

I hereby authorize the Student Services Department to release any information to the agency which is performing the drug, alcohol and/or anger management assessment, or any other such agency or persons for use in determining whether I am a suitable candidate for the Diversion Program.


_____          _____
Signature of Student                                                                Date


_____

Date complete application rec'd:_____

Rec'd by: _____

Reviewed by:_____

Approved/Denied:_____

NOTES:_____

_____

_____

_____

_____


Revised 08/2015

Exhibit 6
Page 92 of 98

USA000518

# Haskell Indian Nations University

## GRIEVANCE REPORT FORM

**Directions:** (1) Please complete the following information, use additional paper if necessary;
(2) Give this form to the Supervisor of the person/office related to the complaint.

PLEASE PRINT:

| | |
|---|---|
| To | Date |
| From | Complete Haskell ID Number |
| Residential Hall | Haskell Mailbox |

GRIEVANCE SUBJECT: (Use additional paper if necessary)
Who or What is the complaint about?

What office or person is responsible for this problem?

Have you gone directly to the person or office you are unhappy with and talk to them about the problem?
☐ Yes   ☐ No  If no, why?

If yes, what did the person tell you to do?

Have you done that yet?   ☐ Yes      ☐ No  If no, why?

DESCRIPTION OF COMPLAINT: (Use additional paper if necessary)
What are you unhappy about?

When did this happen?
Where did this happen?
What would be a satisfactory resolution?

| | |
|---|---|
| Name (Please Print) | Complete Haskell ID Number |
| Signature | Date |

**For official use below:**

Supervisor's Signature                                    Date Supervisor Received Form
Date Request for Status Form:
Date Rec'd:                                    Date Reply Sent:
Action Taken:

Exhibit 6
Page 93 of 98

(93)

USA000519

# HASKELL INDIAN NATIONS UNIVERSITY
# EMERGENCY SUSPENSION NOTIFICATION

TO: _____Student

FROM: _____Student Conduct Administrator

RE:  **EMERGENCY SUSPENSION**

DATE: _____

The following is to inform you that you are hereby placed on temporary emergency suspension as outlined in 25 CFR 42.7 Due Process and the Haskell Code of Conduct.  The facts that support your placement on Emergency Suspension, which we believe are creating an immediate danger of risk to the campus community or yourself are:

_____

_____

_____

_____

*The conditions of your Emergency Suspension are:*

_____     **Level 1** – Emergency Suspension (in-house) where student is confined to their residential hall but, may attend classes, use the library and go to the dining room.  Visitation privileges are suspended and student is not allowed to attend any activities on-campus until suspension status is withdrawn.  Must sign in as scheduled by residential hall staff. NOTE:  Student may or may not be moved to another room or even building in cases of violence.

_____     **Level 2** – Emergency suspension where student must be out of residential hall room, but still can attend classes, eat meals, use the library and be on the Haskell grounds for other school related purposes.

_____     **Level 3** – Emergency suspension where the student MUST BE OFF CAMPUS COMPLETELY; they cannot eat meals, attend classes, use the library or be on the Haskell grounds for any reason.

**Any violations of the above will automatically result in an off campus suspension.  If you come back on campus during your emergency suspension at times that you are not supposed to be here, you may be prosecuted for criminal trespassing under Kansas Law KSA 21-3721.**

You will remain on suspension until such time as you are offered a hearing.  This will require a conference with the Student Conduct Administrator.  A mutual agreement will be reached by the Housing Director and the Student Conduct Administrator for lifting of the Emergency Suspension or for placing conditions for on campus housing privileges.

Please check your campus mailbox daily for a notice from the Student Conduct Office regarding a disciplinary conference.  If you are on a Level 3 suspension, you may make contact with the Student Conduct Office by calling 785-749-8415 for an appointment.

_____          _____
Student Conduct Administrator          Date          Student Signature          Date
Revised 08/2015

Exhibit 6
Page 94 of 98

USA000520

## Haskell Indian Nations University
## CODE OF STUDENT CONDUCT FORM

The Haskell Indian Nations University Code of Student Conduct emphasizes each student's individual responsibility for maintaining behavior while attending and representing the university.  These are guidelines based on regulations and laws of the State of Kansas, ordinances of the City of Lawrence, and regulations found in the **Haskell Code of Student Conduct.  Knowledge of these regulations, laws, ordinances, and Haskell Code of Student Conduct are the responsibility of the individual student.**

Students found in violation of the Substance Abuse policy related to being intoxicated, possession and/or transportation and trafficking of alcohol or illegal drugs risk the loss of residential housing and/or suspension or expulsion. The university will inform parents/guardians of students under the age of 21 of incidents involving substance abuse.

Violent or disruptive actions such as fighting, intimidation, and unlawful assembly are not permitted on the Haskell campus and may result in Emergency Suspension and/or expulsion from the campus.  The use of possession of firearms or other lethal weapons are prohibited on campus and in the residential halls and could result in emergency suspension and/or expulsion.  Harassment based on gender, tribal affiliation, degree of Indian blood, sexual orientation, disability, martial or parental status or age is not tolerated.  All cases involving issues of gender and discrimination, dating and domestic violence, stalking, sexual harassment and sexual assault will fall under the Title IX and Violence Against Women Act.

Theft of personal, private and/or institutional property will not be tolerated and may lead to legal prosecution.

Show respect for property by not engaging in its defacement or destruction.  Student will be liable for all costs associated with damage.

Gambling is prohibited on the campus at Haskell activities.

Each student will receive the Code of Student Conduct handbook and follow regulations.

Trespassing on Haskell campus may result in issuance of Criminal Trespass Form, which could result in arrest and/or prosecution.

Abide by all residential housing rules.  Attend all scheduled classes.

Student must present university ID upon request by staff.

I have read and understand the above-mentioned regulations; I agree to abide by them.  **I further understand that failure to observe the regulations of the Haskell Code of Student Conduct could affect my status in the residential housing program and/or student at the university.**


_____          _____
Student Print Name                                Student Signature


_____
Date


Revised 07/2015

Exhibit 6
Page 95 of 98

(95)

USA000521

# HASKELL INDIAN NATIONS UNIVERSITY
## Title IX Coordinator's Office
Complainant Rights and Responsibilities

This form documents the information shared with the Complainant regarding an investigation by the Title IX Coordinators Office, into a claim of discrimination, harassment, and/or retaliation.

Date:                      Topic Discussed:

_____     Discrimination Complaint Resolution Process (Copy Provided)

_____     Applicable University policies

_____     Timeframe for Investigation

_____     Correspondence regarding investigation

_____     Opportunity to provide information verbally and/or in writing

_____     Opportunity to submit supporting documentation, identify witnesses, and/or provide witness statements

_____     Policy prohibiting retaliation

_____     Opportunity to bring a representative to meetings

_____     Abuse of Discrimination Complaint Resolution Process

_____     Confidentiality

_____     Anonymity (limitation on investigation) – if applicable

_____     Right to file a criminal complaint – if applicable

_____     Campus and community resources – if applicable

 I acknowledge that the information identified above was communicated to me by the Title IX Coordinators Office and that I have had the opportunity to ask questions about the Discrimination Complaint Resolution Process and the information provided to me. I also acknowledge that I have received a copy of the Discrimination Complaint Resolution Process.

Name of Complainant:   _____

Signature of Complainant:  _____   Date:   _____

This information was communicated and the signature witnessed by the undersigned Title IX representative:


_____

Exhibit 6
Page 96 of 98

(96)

USA000522

# HASKELL INDIAN NATIONS UNIVERSITY
## Title IX Coordinator's Office
Respondent Rights and Responsibilities

This form documents the information shared with the Respondent regarding the Respondent's rights and responsibilities in an investigation by the Title IX Coordinators Office, into a claim of discrimination, harassment, and/or retaliation.

Date:                    Topic Discussed:

_____        Discrimination Complaint Resolution Process (Copy Provided)

_____        Applicable University policies

_____        Timeframe for Investigation

_____        Correspondence regarding investigation

_____        Opportunity to provide information verbally and/or in writing

_____        Opportunity to submit supporting documentation, identify witnesses, and/or provide witness statements

_____        Policy prohibiting retaliation

_____        Opportunity to bring a representative to meetings

_____        Confidentiality

_____        Campus and community resources – if applicable

 I acknowledge that the information identified above was communicated to me by the Title IX Coordinators Office and that I have had the opportunity to ask questions about the Discrimination Complaint Resolution Process and the information provided to me. I also acknowledge that I have received a copy of the Discrimination Complaint Resolution Process.

Name of Respondent:        _____

Signature of Respondent: _____ Date: _____

This information was communicated and the signature witnessed by the undersigned Title IX representative:

_____

Exhibit 6
Page 97 of 98

(97)

USA000523

# HASKELL INDIAN NATIONS UNIVERSITY
## Title IX Coordinator's Office
Title IX No Contact Directive

Name: (enter name)

Address: (enter date)

Date: (enter date)

**NO CONTACT DIRECTIVE**

Hand Delivered and Electronic Mail to: (enter name)

Dear (enter name),

Haskell Indian Nations University Title IX Coordinators Office has received information about an allegation that you violated the University's Sexual Harassment Policy by engaging in sexual battery and/or sexual assault with (Name) . Specifically, it has been reported to the Title IX Coordinators Office that sometime during the early morning of (Date) you took Ms/Mr. (Name) to your room and sexually assaulted her/him. The purpose of this letter is to provide written notice that a "No Contact" Directive has been placed on you with respect to (Name). You are to refrain from any attempts to contact Ms. (Name), personally or through any person.

You are hereby informed that this "No Contact" Directive means that you are prohibited from initiating, or contributing through third-parties, by any physical, verbal, electronic, or written communication with (Name), her/his family, or her/his acquaintances. This prohibition includes messaging through Facebook, Twitter, Instagram, Tumblr or other social media. You are also to refrain from interfering with or damaging any of her/his personal possessions. The "No Contact" Directive will remain in effect until further notice from the Title IX Coordinators Office. Moreover, retaliation against persons who may pursue or participate in a University investigation, whether by you directly or by your associates, is a violation of the University policy. While I understand you have the right to communicate with your family and friends about this matter, please understand that those discussions should not be intended to reach (Name) in order to intimidate or further harass her/him.

Please further understand that any violation of this "No Contact" Directive with regard to (Name) will negatively reflect on any conduct case that may involve you relating to this matter, which may also put your student status in jeopardy. Retaliation is also against University policy and I want to make it clear that subjecting anyone you believe to be involved in an investigation could also be considered retaliation is against

University policy and could also lead to more serious disciplinary action taken against you, up to and including expulsion from the University.

The designated Title IX Investigator assigned to this case will be in touch with you in the near future to discuss this complaint. Please do not hesitate to contact me if you have any immediate questions. Also, if you are unclear about any of the directives in this letter please contact my office immediately at 785-749-8457.

Sincerely,

_____

Tonia Salvini, Title IX Coordinator

Exhibit 6
Page 98 of 98

(98)

USA000524

# Haskell



## About

School History

Operating Principles

Institution Values & Code

# Institutional Values 2020 and Code

The **CIRCLE** values recommended by Faculty Senate in 2007 were adopted by the National Haskell Board of Regents on October 8, 2014. These values reflect traditional Native American teachings that place the circle of life at the center of all knowledge. The circle philosophy is symbolic of a medicine wheel, used to represent a range of tribal teachings, including concepts of balance, the sacredness and power in the universe and the spirituality and cultures of Native peoples.

This philosophy was the basis for the creation of the Haskell Medicine Wheel during the Nation's quincentennial in 1994. The Haskell Medicine Wheel is adjacent to the Haskell-Baker wetlands on the southern edge of campus and has a long history of being a site for meditation, prayer and ceremony. Since 1992, Haskell has embraced the inclusion of the diverse cultural philosophies, world views, knowledge and experiences of Indigenous Peoples in curricular and co-curricular programs available to students at Haskell.

## Institutional Values – CIRCLE

### Communication

To successfully convey ideas, opinion, information, results, or creative expression using multiple strategies.

### Integrity

To conduct ourselves in ways that honor the sacrifices of tribes on which treaty and trust responsibilities are based; and to carry out our responsibilities as students, staff, faculty,

Exhibit 7
Page 1 of 4

USA000525

administrators and regents by engaging in actions based on the highest standards of conduct.

### Respect

To honor and promote the diversity of beliefs, rights, responsibilities, cultures, accomplishments of self and others, including all of our relations.

### Collaboration

The willingness and ability to work successfully with others in accomplishing the goals of the university, our students, the mission of Haskell and the tribes we serve.

### Leadership

The willingness to acquire the knowledge and skills required to advocate for, and to advance the sovereignty and self-determination of tribes, our university and the students we serve in a variety of diverse venues.

### Excellence

To strive toward the strongest level of accomplishment in our work, in every facet of the university and community, as students, staff, faculty, administration and the regents.

# Institutional Code

Haskell Indian Nations University supports a campus environment in which traditional American Indian/Alaska Native cultural values of respect, cooperation, honesty, and responsibility are modeled by all University employees and students in day-to-day activities, conduct, behavior, and attitudes.

All employees, students, and representatives of Haskell Indian Nations University will:

1. Treat all other employees, students and others with respect.
2. Work together to improve and strengthen communications; employee, administrative, and student relations; institutional processes and procedures; and the learning environment of Haskell Indian Nations University.
3. Be truthful in conduct behavior, and attitudes and trust others to do the same.
4. Be accountable for words, thoughts, and deeds and engage in conduct and behavior that reflects the institutional values of the University.

### Contact & Info

Exhibit 7
Page 2 of 4

https://www.haskell.edu/about/values-code/                                                    2/5

USA000526

Haskell Indian
Nations University
Attn: President's Office
155 Indian Ave
Lawrence, KS
66046-4800

📞 785-749-8497

**Office Hours:**
8AM - 5PM | M-F

## Scheduling

Academic Calendars

Course Schedules

Course Catalog

Master Calendar

## Resources

Directory

Orientation Website

Student Success Center

Pay Online

Technology

TRiO

## Opportunities

Athletics

Career Opportunities

Sponsored Programs

Student Senate

## Information

Accreditation

Consumer Disclosure

Haskell Foundation

The Indian Leader

Map & Directions

Tribal College Journal

Haskell CARES Act Funds

✓ **APPLY** Now

📅 **Visit** HINU

Exhibit 7
Page 3 of 4

USA000527

 **Give** to HINU

Copyright ©2017 Haskell Indian Nations University

155 Indian Avenue, Lawrence, KS 66046

(785) 749-8404

 

Exhibit 7
Page 4 of 4

USA000528