## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JARED NALLY, et al.,**

      **Plaintiffs,**

      **v.**　　　　　　　　　　　　　　　　**Case No. 21-2113-JAR-TJJ**

**RONALD GRAHAM, et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiffs Jared Nally and the Indian Leader Association filed this civil rights lawsuit against Defendants Ronald Graham, Haskell Indian Nations University, Tony Dearman, and the Bureau of Indian Education, seeking redress for various constitutional violations and for breach of a 1989 Settlement Agreement governing editorial control and management of the student newspaper, *The Indian Leader*. Before the Court is Defendant Graham's Motion to Dismiss Individual Capacity Claims Against Him Under Fed. R. Civ. P. 12(b)(6) (Doc. 19). The motion is fully briefed and the Court heard oral argument on July 22, 2021. Having fully considered the briefs and the parties' oral arguments, the Court grants Defendant Graham's motion as described more fully below.

## I.　　Standard

To survive a motion to dismiss brought under Rule 12(b)(6), "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[1] The plausibility standard does not require a showing of probability

---

[1] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

that a defendant has acted unlawfully, but requires more than "a sheer possibility."[2]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[3]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[4]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all of the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[5]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[6]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[7]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8]

## II.    Factual Allegations

The following material facts are alleged in the Complaint and assumed to be true for purposes of resolving this motion.

---

[2] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[4] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

[5] *Id.* (quoting *Twombly*, 550 U.S. at 555).

[6] *Id.* at 678−79.

[7] *Id.* at 679.

[8] *Id.* at 678.

*Parties and Claims*

Haskell Indian Nations University ("HINU") is one of two tribal colleges that is wholly funded and operated under the control and management of the Bureau of Indian Education ("BIE"), an agency within the U.S. Department of the Interior.  Plaintiffs in this case are HINU student Jared Nally and the Indian Leader Association ("ILA"), an unincorporated student organization that publishes HINU's student newspaper, *The Indian Leader*.  Since January 2020, Nally has been the editor-in-chief of *The Indian Leader*.

On March 2, 2021, Plaintiffs filed this Complaint against HINU, BIE, BIE Director Tony L. Dearman in his official capacity, and then-HINU President Graham in both his official and individual capacities.[9]  Plaintiffs allege the following claims: (1) First Amendment retaliation against Nally under the Administrative Procedures Act ("APA") for declaratory and injunctive relief against all Defendants in their official capacities; (2) First Amendment retaliation against the ILA under the APA for declaratory and injunctive relief against all Defendants in their official capacities; (3) First Amendment retaliation under *Bivens* against Graham in his individual capacity; (4) First Amendment overbreadth challenge to the HINU Campus Expression Policy under the APA for declaratory and injunctive relief against all Defendants in their official capacities; (5) First Amendment vagueness challenge to the HINU Campus Expression Policy under the APA for declaratory and injunctive relief against all Defendants in their official capacities; (6) Fifth Amendment due process violation under the APA for declaratory and injunctive relief against all Defendants in their official capacities; and (7)

---

[9] According to Defendants' opposition to the pending preliminary injunction motion, Dr. Graham served as President of HINU until May 7, 2021, when he resigned and was replaced with Acting President Dr. Tamarah Pfeiffer.  Doc. 21 at 2 n.1.

violation of 1989 Settlement Agreement under the APA for declaratory and injunctive relief against all Defendants in their official capacities.

### 1989 Settlement Agreement

More than 30 years ago, the ILA and several student journalists sued HINU under 42 U.S.C. § 1983 for violating their First Amendment rights after a faculty advisor of *The Indian Leader* rested editorial control of the paper from students.[10]  United States District Judge Richard Rogers granted the ILA a temporary restraining order prohibiting publication of the newspaper issue put together by the faculty advisor.  In September 1989, HINU entered into a Settlement Agreement with the ILA, which Judge Rogers approved.  Under the Settlement Agreement, the ILA and the editorial board of the newspaper have the right to editorial control over the contents of the newspaper.  The Settlement Agreement prohibits prior restraint and sets forth requirements for allocation of moneys received by HINU on behalf of the ILA, including student activity fees.

### Code of Conduct

In 2014, Haskell adopted the university's "CIRCLE" values.  CIRCLE is an acronym that stands for "Communication, Integrity, Respect, Collaboration, Leadership, and Excellence."  Haskell maintains a Code of Conduct that applies to all students.  The CIRCLE values are incorporated into the Code of Conduct and each word is further defined therein.  The Code of Conduct contained a Campus Expression Policy that provided: "Discussion and expression of all views is permitted, consistent with Haskell's CIRCLE values and subject only to requirements for the maintenance of order."[11]

---

[10] Case No. 89-4063-RDR.

[11] Doc. 1 ¶ 39.

Additionally, in its section detailing the "Student Grievance Process," Haskell's Code of Conduct references the Office of Student Rights and instructs students to access its Student Complaint Policy and Procedures and the Student Complaint form on its website. Since at least October 19, 2020, the text of Haskell's Office of Student Rights website simply repeats the classic placeholder text "lorem ipsum" and related filler text.

### *Nally's Conduct and Graham's Response*

Highly summarized, Nally engaged in the following newsgathering, reporting, and advocacy activities on behalf of himself and *The Indian Leader* in 2020: (1) investigated, reported, and criticized HINU's reporting of student data to the United States Census Bureau, including its reporting of student racial identifiers; (2) while investigating a story about HINU's increase in student fees, recorded a conversation with a HINU financial aid officer without first obtaining consent and used the recording in an editorial he authored and published; (3) objected, along with the ILA, to the replacement of the newspaper's faculty advisor with an advisor from the administration, including by altering its Plan of Operations to allow the ILA to nominate advisors for appointment by HINU and remove an advisor by a majority vote of the ILA's officers; and (4) requested information from local government about the death of a beloved HINU cafeteria worker.

On October 16, 2020, Graham emailed Nally a written memorandum on official university letterhead from the Office of the President with the subject line "Directive." Director Dearman and "BIE Legal" were copied on the Directive. In the memorandum, Graham accused Nally of "attacking" HINU employees, and referred to Nally's criticism or unfavorable coverage of HINU, its administration, or faculty. The memorandum concluded with the following:

> Let me make myself clear. You are being directed, as a Haskell student. [sic] To comply with the following:

**You will NOT**:

- Attack any student, faculty, or staff member with letters or in public, or in any public forum, thus bringing unjustified liability to this campus or anyone on this campus,
- Make demands on any governmental agency—or anyone else from Haskell—while claiming to represent *The Indian Leader*.
- Attempt countermanding decisions of Haskell personnel assigned by me or anyone else to positions in an effort to replace them,
- Record anyone at Haskell in your interviews unless you advise them first and they grant you permission.

**You WILL**:

- Treat all faculty members, staff, and students with the highest respect.
- Conduct yourself as a student under the umbrella of the Code of Conduct.
- Understand that no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them.[12]

Nally understood the Directive to mean that if he continued to engage in routine journalistic activities, he could be subject to discipline under the Code of Conduct. He claims it had a chilling effect on his expression as a student and a journalist: he chose not to pursue an issue with a missing scholarship credit, and he declined to report on or publish stories critical of the HINU administration. Other student journalists were similarly chilled.

On October 26, 2020, Lindsie Rank, an attorney for the Foundation for Individual Rights in Education ("FIRE") wrote a letter marked "URGENT," to Graham explaining that his Directive was unlawful. Despite providing him with a November 2, 2020 deadline to respond,

---

[12] *Id.* ¶ 90.

Graham did not respond until January 13, 2021, when he rescinded the Directive and explained that the delay in doing so was an "administrative mishap."[13]

In the meantime, on October 27, 2020, Nally emailed Dearman to report Graham for issuing the Directive.  Dearman responded the next day that he referred the matter to BIE's human resources department.  On December 28, 2020, Sandra Wylie, an independent contractor hired by the government to investigate allegations of harassment and Equal Opportunity violations, contacted Nally and told him she was investigating Graham's alleged harassment. She informed Nally that violations of constitutional rights were outside the scope of her investigation.

### *Financial and Administrative Burdens on the ILA*

In 2020, just before Graham's Directive, Haskell imposed financial and administrative hurdles that interfered with the ILA's operations.  First, HINU made it difficult for Nally and the ILA to receive an accounting of the paper's student bank account.  Despite repeated requests in 2020, Nally finally received an accounting in 2021, and he discovered that the account was short more than $10,000; the last three deposits of student activity fee funds were smaller than anticipated.  The portion of the student activity fee allocated to the ILA is part of its yearly Plan of Operations under the 1989 Settlement Agreement, which provided that the ILA receive one-third of the total amount of student activity fees collected.  Due to Nally and the ILA's concerns about overdrawing their account, they were forced to forego certain expenditures such as printing hard-copy issues, hosting virtual events, and investing in technology, including for the intended development of a podcast.  The ILA was forced to publish its graduation issue in an online-only format.

---

[13] *Id.* ¶¶ 2, 140–41.

Second, HINU prevented the ILA from enacting its Plan of Operations. In the summer of 2020, Nally and the ILA learned that HINU would require faculty to cease acting as advisers to student organizations for the remainder of the summer term. Instead, HINU appointed Interim Dean of Humanities Joshua Falleaf to advise the newspaper. At this time, the ILA was the only student organization that was active; therefore, the ILA was the only organization impacted by HINU's faculty advisor decision. Nally and the ILA attempted to remove Falleaf as advisor and operate without an advisor for the remainder of the summer term, relying on terms in the 1989 Settlement Agreement. Thus, Plaintiffs modified the ILA's 2020–21 Plan of Operations to include new procedures for HINU's appointment of advisers that allowed ILA to nominate advisers for appointment by HINU, and to remove an advisor by majority vote.

In September 2020, Nally attempted to submit the ILA's required 2020–21 Plan of Operations with these new procedures to HINU's Student Bank Administrator for approval, but the administrator did not respond to the request, or to subsequent email requests for information on the status of the Plan of Operations. Finally, on January 11, 2021, the administrator confirmed receipt and told Nally that the Plan had not been circulated for approval. As of the date of the Complaint, HINU has not approved the ILA's 2020–21 Plan of Operations. Without such approval, the paper does not have an official adviser, it cannot receive additional funds to which it would be entitled, and it does not have regular, reliable access to its bank account.

## III.   Discussion

Defendant Graham moves to dismiss Plaintiffs' *Bivens* claim in Count 3 on two grounds: (1) Plaintiffs' do not have a cognizable claim for First Amendment retaliation against Graham under *Bivens*; and (2) even if there is a cognizable *Bivens* claims, Graham is entitled to qualified

immunity.  The Supreme Court describes the first issue as "antecedent."[14]  If a *Bivens* remedy is unavailable, qualified immunity is not relevant.[15]  Therefore, the Court first considers whether a *Bivens* remedy is available for First Amendment retaliation claims against administrators of federally administered universities like HINU.

A *Bivens* action is an implied cause of action for damages under the Constitution against federal officials.[16]  The Supreme Court has only recognized three such implied causes of actions over the past 50 years: (1) unreasonable search and seizure under the Fourth Amendment,[17] (2) gender discrimination under the Fifth Amendment against a Congressman by a member of his staff,[18] and (3) cruel and unusual punishment under the Eighth Amendment by prisoners alleging failure to provide adequate medical treatment.[19]  In *Ziglar v. Abbasi*, the Court held that extension of *Bivens* liability beyond these three contexts is now a "disfavored" judicial activity.[20]  Last year, the Court affirmed this principle in *Hernandez v. Mesa* when it declined to recognize a

---

[14] *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) (citing *Wood v. Moss*, 572 U.S. 744, 757 (2014)).  The Court does not agree with Plaintiffs' sweeping claim that "[i]n cases where the Supreme Court has confronted a qualified immunity defense to a claim under *Bivens*, it has assumed a Bivens claim, while first evaluating qualified immunity."  Doc. 22 at 23.  Plaintiffs cite a single case for this proposition: *Wood v. Moss*, 572 U.S. 744 (2014).  The Supreme Court later explained that while it "has taken that approach on occasion, . . . [t]he Fourth Amendment question in this case, . . . is sensitive and may have consequences that are far reaching.  It would be imprudent for this Court to resolve that issue when, in light of the intervening guidance provided in [*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017)] doing so may be unnecessary to resolve this particular case."  *Hernandez*, 137 S. Ct. at 2007 (citing *Wood*, 572 U.S. 744).

[15] *See Wilkie v. Robbins*, 551 U.S. 537, 549 n.4 (2007) (noting that whether a cause of action is available is "directly implicated by the defense of qualified immunity" (quoting *Hartman v. Moore*, 547 U.S. 250, 257 n.5 (2006))); *Williams v. United States*, 780 F. App'x 657, 664 n.7 (10th Cir. 2019) ("We need not address the government's qualified immunity argument because of how we dispose of the *Bivens* claim." (citing *Hill v. Dep't of Air Force*, 884 F.2d 1318, 1320 (10th Cir. 1989))).

[16] *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009).

[17] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971).

[18] *Davis v. Passman*, 442 U.S. 228, 248–49 (1979).

[19] *Carlson v. Green*, 446 U.S. 14, 19 (1980).

[20] 137 S. Ct. 1843, 1857 (2017) (citation omitted).

*Bivens* action for alleged Fourth and Fifth Amendment violations premised on a cross-border shooting by a Border Patrol Agent at the United States-Mexico border.[21]

The parties agree that under *Abbasi*, a two-step inquiry applies when determining whether to extend *Bivens* liability.[22] The first question is whether the claim "arises in a 'new context' or involves a 'new category of defendants.'"[23] If the claim arises in a new context, the second step considers "whether there are any special factors that counsel hesitation" in expanding the remedy.[24] If there are special factors that counsel hesitation, the court should decline to expand *Bivens* to the new context.[25]

## A.     New Context

The Complaint alleges that Graham engaged in First Amendment retaliation against Nally by issuing the Directive, which subjected Nally to a prior restraint on protected expression. The Complaint alleges that Graham engaged in First Amendment retaliation against the ILA by: (1) refusing to complete the normal recognition process, leading to the ILA's denial of access to its student bank account; (2) withholding more than $10,000 in student fee funds to which the ILA was entitled; and (3) targeting the ILA with a policy that removed its chosen faculty adviser.

The Supreme Court's "understanding of a 'new context' is broad. We regard a context as 'new' if it is 'different in a meaningful way from previous *Bivens* cases decided by this Court.'"[26] "A claim may arise in a new context even if it is based on the same constitutional

---

[21] 140 S. Ct. 735 (2020).

[22] *Id.* at 743.

[23] *Id.* (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)).

[24] *Id*. (alterations omitted) (quoting *Abbasi*, 137 S. Ct. at 1857).

[25] *Id.*

[26] *Id.* (quoting *Abbassi*,137 S. Ct. at 1859).

provision as a claim in a case in which a damages remedy was previously recognized."[27]  For example, the Court in *Mesa* found that the *Bivens* claims "assuredly arise in a new context," despite the fact that *Bivens* and *Davis* recognized implied causes of action under the Fourth and Fifth Amendments.[28]  The Court found "[t]here [was] a world of difference between those claims and petitioners' cross-border shooting claims, where 'the risk of disruptive intrusion by the Judiciary into the functioning of other branches' is significant."[29]

Here, the government correctly argues that Plaintiffs' *Bivens* claim arises in a new context because (1) the Supreme Court has never recognized a First Amendment *Bivens* claim in any context; (2) this action involves a new category of defendants—school administrators of a federally owned and operated university; and (3) the Supreme Court has never recognized a *Bivens* claim by a non-individual plaintiff such as the ILA.  Plaintiffs agree that their claim arises in a new context "insofar as the Supreme Court has not recognized a *Bivens* cause of action for violation of the First Amendment."[30]  Indeed, even before *Abbasi*, the Supreme Court expressly declined to extend *Bivens* to the First Amendment context.[31]  Because Plaintiffs' claim arises in a

---

[27] *Id.*

[28] *Id.*

[29] *Id.* at 744 (quoting *Abbasi*, 137 S. Ct. at 1860).

[30] Doc. 22 at 37.

[31] *Bush v. Lucas*, 462 U.S. 367, 390 (1983) ("[W]e do not decide whether or not it would be good policy to permit a federal employee to recover damages from a supervisor who has improperly disciplined him for exercising his First Amendment rights.  As we did in *Standard Oil*, we decline 'to create a new substantive legal liability without legislative aid and as at the common law' because we are convinced that Congress is in a better position to decide whether or not the public interest would be served by creating it." (quoting *United States v. Standard Oil*, 332 U.S. 301, 302 (1954))); *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) ("Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment." (citing *Bush*, 462 U.S. at 390)); *see also Pahls v. Thomas*, 718 F.3d 1210, 1226 n.6 (10th Cir. 2013) (assuming that a *Bivens* claim was available on a First Amendment viewpoint-discrimination claim against a federal officer because no argument was presented on the issue, but acknowledging that "the Court has never held that a *Bivens* action is available against federal officials for a claim based upon the First Amendment" (citations omitted)).

new context, the Court proceeds to consider whether special factors counsel hesitation in extending the *Bivens* remedy to Plaintiffs' claim.

### B.  Special Factors

The special factors component of the *Bivens* inquiry

> must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.  Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative.[32]

Special factors that may be relevant in determining whether to extend *Bivens* liability include an "assessment of its impact on governmental operations systemwide,"[33] "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself,"[34] whether "there is an alternative remedial structure present in a certain case,"[35] and, one of the most important factors—the consideration of the separation-of-powers principle in the case.[36]

Defendant argues that the following special factors counsel against recognizing a *Bivens* remedy here: (1) alternative, existing processes; (2) congressional silence in the face of robust legislative activity concerning Native American education; (3) separation-of-powers concerns; and (4) practical concerns such as system-wide costs and the difficulty of creating a workable cause of action.  The Court finds that the first three special factors relied on by Defendant counsel hesitation in extending *Bivens* in this context, as explained below.

---

[32] *Abbasi*, 137 S. Ct. at 1857–58.

[33] *Id.* at 1858.

[34] *Id.*

[35] *Id.*

[36] *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (citing *Abbasi*,137 S. Ct. at 1857).

### 1.      Alternative,  Existing Processes

"[I]f Congress has created any alternative, existing process for protecting the injured party's interest that itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."[37]  The Tenth Circuit has explained that "[t]he point of examining the existing process is to determine whether Congress has explicitly or implicitly indicated 'that the Court's power should not be exercised.'"[38]  And "[w]hile there is no need for congruent remedies or even money damages to deny a *Bivens* remedy, there must be more than nothing."[39]

Defendant points to the following alternative remedies available to Plaintiffs: (1) the APA; and (2) HINU's Code of Conduct, which provides a grievance process under which Nally could file a complaint.  Plaintiffs respond that these measures would not deter future violations because they would not address Defendant's past, completed conduct by awarding damages.  But under *Abbasi*, the lack of a damages remedy does not necessarily mean that an alternative process fails to counsel hesitation in extending *Bivens*.  Plaintiffs seek relief for First Amendment retaliation in Counts 1 and 2 under the APA.  If Plaintiffs succeed on Counts 1 and 2, they will be able to enjoin the Directive "or any other prior restraint or . . . similar directive that interferes with Plaintiffs' First Amendment rights," including by Graham's successors, and obtain a declaratory judgment that the Directive constituted an unconstitutional prior restraint.[40]

---

[37] *Abbasi*, 137 S. Ct. at 1858 (quotation marks and citations omitted).

[38] *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 860 (10th Cir. 2016).

[39] *Id.* at 862–63.

[40] Doc. 1 at 50.

This is exactly the sort of challenge to "large-scale policy decisions" that can be addressed through injunctive relief.[41]

Plaintiffs argue that the Tenth Circuit's decision in *Big Cats of Serenity Springs, Inc. v. Rhodes* stands for the proposition that the APA is not an adequate alternative remedy, but they misconstrue that case. Setting aside the fact that it was decided before *Abbasi*, the Tenth Circuit explicitly stated that "judicial review under the APA may, in some circumstances, foreclose a *Bivens* claim."[42] And, as United States District Judge J. Thomas Marten has explained when applying *Big Cats* to another case involving HINU, "the inquiry is whether the alternative, existing procedure shows 'Congress's *intent* to exclude a damages remedy,' which may exist if the procedure encompasses both 'adequate deterrence and . . . at least *some* form of relief for the harm.'"[43]

The court's conclusion in *Big Cats* that the APA did not provide an adequate alternative remedy was case-specific and does not readily apply to the APA remedy in this case. In *Big Cats*, the court considered a procedure under the Animal Wildlife Act whereby a licensee may administratively challenge an adverse inspection report under the APA.[44] The court found that this procedure was not adequate to protect the plaintiff against an alleged violation of its constitutional right to be free from an unreasonable search under the Fourth Amendment; it only allowed for a challenge to the propriety of the licensing citation.[45] Here, Plaintiffs' APA claims seek injunctive and declaratory relief based on the same allegations of First Amendment

---

[41] *Abbasi*, 137 S. Ct. at 1862.

[42] *Big Cats*, 843 F.3d at 862 & n.4.

[43] *Doe H. v. Haskell Indian Nations Univ.*, 266 F. Supp. 3d 1277, 1286 (D. Kan. 2017) (quoting *Big Cats*, 843 F.3d at 862); *see also Abbasi*, 137 S. Ct. at 1863 (discussing deterrence).

[44] *Big Cats*, 843 F.3d at 861–62.

[45] *Id.* at 862.

retaliation—Count 1 alleges that the Directive is a prior restraint used by Graham to punish Nally and Count 2 alleges retaliation against the ILA through administrative and financial hurdles.  Unlike in *Big Cats*, the requested relief under the APA in this case would constitute adequate deterrence for the alleged First Amendment violations—federal actors would be subject to an injunction and declaration tethered specifically to the same constitutional violations alleged in the *Bivens* claim.  And, unlike in *Big Cats*, the APA claims would provide "at least some" relief for the alleged harm.

Plaintiffs' argument that the APA is inadequate because it does not address past wrongs conflicts with the clear guidance from the Supreme Court in *Abbasi* that the lack of a damages award does not itself render an alternative remedy inadequate.  Plaintiffs maintain that they seek redress for Graham's "completed actions," rather than protection from some future act.  In fact, they seek both, as evidenced by the claims in Counts 1 and 2.  And this argument would apply to most purported *Bivens* actions.  If the failure to address past wrongs doomed an alternative remedy, it would extend the implied cause of action far beyond what *Abbasi* counsels—anytime an alternative process lacked a damages remedy, it would fail to counsel hesitation according to Plaintiffs.

The rationale for finding in *Bivens*, *Davis*, and *Carlson* that it was "damages or nothing," was in part because those Plaintiffs had no avenue to pursue injunctive relief.  As Defendant aptly notes,

> Webster Bivens never had an opportunity to file suit to cease the officers' conduct, there was no job for Shirley Davis to return to after she was fired and her boss retired from Congress, and Joseph Jones died as a result of the allegedly indifferent conduct.  For

them, 'equitable relief . . . would [have] be[en] unavailing' at any time.[46]

Here, Plaintiffs seek injunctive and declaratory relief in Counts 1 and 2 for First Amendment retaliation based on the Directive. They also seek relief under the APA for Defendants' violation of the Settlement Agreement, which is an alternative remedy for the First Amendment retaliation alleged by the ILA regarding student fees and faculty advisors. The Supreme Court simply does not require that an existing alternative process provide a complete or even "adequate" remedy—only "some" remedy.[47] The APA provides some remedy and will adequately deter future tribal university administrators from violating the First Amendment—the declaratory relief sought by Plaintiffs under the APA would deem Graham's past activity in violation of the First Amendment. And the injunctive relief would apply both to Graham's Directive, and to future directives by successor administrators. On these facts, the APA provides an alternative remedy that counsels in favor of restraint in providing a new remedy in damages in this context.

Likewise, the grievance procedure in the HINU Code of Conduct provided Plaintiffs with an avenue to challenge the Directive. In its section detailing the "Student Grievance Process," HINU's Code of Conduct references the Office of Student Rights and instructs students to access its Student Complaint Policy and Procedures and the Student Complaint form on its website. The Complaint alleges that the text of HINU's Office of Student Rights website simply repeats the classic placeholder text "lorem ipsum" and related filler text, yet there is no indication that

---

[46] Doc. 27 at 12 (first citing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971); then citing *Davis v. Passman*, 442 U.S. 228, 245 (1979); and then citing *Carlson v. Green*, 446 U.S. 14, 16 n.1 (1980)) (quoting *Davis*, 442 U.S. at 245).

[47] *United States v. Stanley*, 483 U.S. 669, 683 (1987) ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford Stanley, or any other particular serviceman, an 'adequate' federal remedy for his injuries."); *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988) (finding alternative remedy despite the fact that "Congress has failed to provide for 'complete relief': respondents have not been given a remedy in damages for emotional distress or for other hardships suffered because of delays in their receipt of Social Security benefits.").

Nally or the ILA attempted to contact the Office of Student Rights to obtain a Student Complaint.  Instead, the Complaint alleges that Nally filed a complaint directly with the BIE, which informed him that First Amendment retaliation was outside its scope of investigation. Although there is little information about the details of the grievance process, it appears that this would have been an additional method for Plaintiffs to challenge the Directive and Graham's conduct toward the ILA.

"[T]he existence of just one alternative remedy is generally the end of the inquiry."[48] Here, there is at least one alternative remedy, which alone should end the inquiry according to the Court's decision in *Abbasi*.  But as discussed in the next several sections, these potential alternative remedies especially counsel hesitation when considered along with the other special factors that apply in this case.

### 2.      Legislative Activity in the Area of Indian Education

Defendant points to several statutes enacted by Congress in the area of Native American education, including but not limited to the Snyder Act,[49] the Johnson-O'Malley Act,[50] and the Native American Education Improvement Act of 2001,[51] in which Congress established federal standards for and in support of Native American education, "declar[ing] that the Federal Government has the sole responsibility for the operation and financial support of the Bureau of Indian Affairs funded school system that it has established," and that "[i]t is the policy of the United States to fulfill the Federal Government's unique and continuing trust relationship with

---

[48] *Boule v. Egbert*, 998 F.3d 370, 382 (9th Cir. 2021) (Bumatay, J., dissenting to denial of rehr'g en banc) (citing *Abbasi*, 137 S. Ct. at 1865).

[49] Ch. 115, 42 Stat. 208 (1921) (codified as amended at 25 U.S.C. § 13) (authorizing the Secretary of the Interior to make contracts with any state to provide Indian education).

[50] Ch. 147, 48 Stat. 596 (1934) (codified as amended at 25 U.S.C. §§ 5342–5348).

[51] Pub. L. 107-110, tit. 10, § 1042, 115 Stat. 2007 (codified at 25 U.S.C. § 2000).

and responsibility to the Indian people for the education of Indian children and for the operation and financial support of the Bureau of Indian Affairs-funded school system."[52]  Defendant further notes that Congress enacted the Haskell Indian Nations University and Southwestern Indian Polytechnic Institute Administrative Systems Act of 1998, which authorized HINU to implement demonstration projects aimed at improving personnel management policies and practices.[53]  In its findings, Congress stated its intent to "giv[e] a greater degree of autonomy to [HINU and the Southwestern Indian Polytechnic Institute], while maintaining them as an integral part of the Bureau of Indian Affairs."[54]

Despite being an area that Congress heavily regulates, there is no private damages remedy against officials at these federally run universities.  Plaintiffs argue that the Court should not assume congressional silence counsels hesitation because to do so would bar virtually every *Bivens* case.  But the Supreme Court instructs this Court to consider the relevance of congressional silence when looking at an area of the law that Congress has regulated heavily. "[I]n any inquiry respecting the likely or probable intent of Congress, the silence of Congress is relevant . . . ."[55]  Given the amount of regulation Congress has imposed on Indian education, "Congress' failure to provide a damages remedy might be more than mere oversight, and . . . congressional silence might be more than 'inadvertent.'"[56]  Congress has heavily regulated the area of Native American affairs, including education, yet did not provide for a right of action

---

[52] *Id.*; *see also* 25 U.S.C. § 5302 ("The Congress declares that a major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure of self-determination essential to their social and economic well-being.").

[53] Pub. L. No. 105-337, 112 Stat. 3171 (codified at 25 U.S.C. § 3731 notes).

[54] 25 U.S.C. § 3731, note § 2.

[55] *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862 (2017).

[56] *Id.* (citing *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)).

against university officials for violations of constitutional rights.  Rather than assume Congress'
failure to provide such a remedy was mere oversight, as Plaintiffs urge, the Court follows the
guidance that "when Congress fails to provide a damages remedy in circumstances like these, it
is much more difficult to believe that 'congressional inaction' was 'inadvertent.'"[57]

Plaintiffs respond that most of the legislation on Native American education deals with
K-12 education, and thus the Court should not assume from Congress' silence that it intended to
foreclose a remedy for adult students at one of only two federally operated tribal universities.
The Court does not read the statutes pertaining to Native American education as narrowly as
Plaintiffs.  As stated above, Congress' delegation of authority to the BIE to direct and supervise
"all personnel directly and substantially involved in the provision of education program services
by the Bureau," is not limited to K-12 education.[58]  And the general provisions in the statutes and
regulations refer to Bureau-funded schools in general.[59]

Plaintiffs urge that these students should not have fewer protections than students of state
colleges and universities who can vindicate the same rights with a damages remedy under
§ 1983.  The Court finds this comparison unavailing.  Plaintiffs start with the overly broad
statement of law that Congress "sanctioned the *Bivens* remedy in 1988 by passing the Westfall
Act," and that "the *only* option for vindicating constitutional rights is *Bivens*."[60]  Plaintiff urge
that the only reasonable interpretation of Congress' intent in creating an exception to the broad
preemption language for tort claims against federal officers in the Westfall Act[61] is that Congress

---

[57] *Id.* (quoting *Schweiker*, 487 U.S. at 423).

[58] 25 U.S.C. § 2006.

[59] *See, e.g., id*; § 2000; 25 C.F.R. pt. 42.

[60] Doc. 22 at 45.

[61] 28 U.S.C. § 2679(b)(2) (creating an exception to sovereign immunity under the Federal Tort Claims Act
against federal agencies for constitutional violations).

did not intend to foreclose a *Bivens* remedy.  Defendant correctly replies that this argument would extend the *Bivens* remedy to any claim for which state actors may be liable under § 1983, which was not Congress' intent under the Westfall Act.

Plaintiffs conflate two '"analytically distinct inquiries': (1) "whether there has been a waiver of sovereign immunity" and, if so, then (2) "whether the source of substantive law upon which the claimant relies provides an avenue for relief."[62]  In other words, the fact that Congress waived its sovereign immunity for constitutional violations does not mean that it endorsed or created a cause of action against federal officials for all constitutional violations.  Indeed, if this were the law, the inquiry under *Abbasi* would not be necessary—there would be no need to consider whether special factors counsel hesitation in creating what the Supreme Court has repeatedly called an "implied" right of action.[63]  The Court explicitly acknowledged that despite its decision to create an exception to sovereign immunity for violations of constitutional rights by state actors, "Congress did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government," and the only source of substantive law upon which such claims can be based is "what has come to be called an implied cause of action" under *Bivens*.[64]  The Court explained that while *Bivens* itself "in the search-and-seizure context in which it arose . . . is settled law," expanding it further is "disfavored."[65] "Indeed, the Court has refused to do so for the past 30 years."[66]  Thus, the fact that the remedies

---

[62] *FDIC v. Meyer*, 510 U.S. 471, 483–44 (1994).

[63] *See, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017).

[64] *Id.*; *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020).

[65] *Abbasi*, 137 S. Ct. at 1856–57.

[66] *Id.* at 1857.

against federal and state officers for certain constitutional violations are not congruent does not persuade the Court that the *Bivens* remedy should be extended in this context.

### 3. Separation of Powers

Defendant next argues that Congress has delegated substantial authority to the Secretary of the Department of the Interior and the BIE to implement statutes involving Native American affairs.  Defendant aptly points to Congress's broad delegation of authority in 25 U.S.C. § 2, providing that "[t]he Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior . . . have the management of all Indian affairs and all matters arising out of Indian relations."  Specifically, Congress vested with the Assistant Secretary for Indian Affairs the authority to perform "all functions with respect to formulations and establishment of policy and procedure and supervision of programs and expenditures of Federal funds for the purpose of Indian education administrated by the [BIE]."[67]  And under 25 U.S.C. § 2006(b)(1), Congress expressly delegated to the BIE the authority to "direct and supervise the operations of all personnel directly and substantially involved with the provision of education services by the Bureau."  Indeed, the BIA regulates this area in Title 25, subchapter E of the Code of Federal Regulations.

Congress' explicit deference to the Executive Branch in matters of Native American affairs generally and education specifically counsels hesitation in authorizing an implied right of action for damages by students or outside groups like the ILA against officials employed by BIE-funded schools.  Similar to the Supreme Court's reasoning in *Bush v. Lucas*, where it declined to extend *Bivens* to a First Amendment claim by a federal employee to recover damages from a supervisor who disciplined him for exercising his First Amendment rights, this Court "declines

---

[67] 25 U.S.C. § 2006.

'to create a new substantive legal liability without legislative aid and as at the common law' because we are convinced that Congress is in a better position to decide whether or not the public interest would be served by creating it."[68]

## IV.    Conclusion

As one circuit court has noted, the bar for what constitutes a special factor counseling hesitation in extending a *Bivens* remedy is "remarkably low."[69]   The Supreme Court instructs that if this Court has "reason to pause before applying *Bivens* in a new context or to a new class of defendants—[it] must reject the request."[70]   As described above, several special factors counsel such a pause here, so the Court must decline to extend *Bivens* to this new context of First Amendment retaliation by students or outside groups against tribal university officials.

The Tenth Circuit has not extended *Bivens* to First Amendment retaliation claims in any context before or after *Abbasi* was decided.[71]   And the clear majority of circuits to decide the issue since *Abbasi* have declined to extend *Bivens* to First Amendment retaliation claims.[72]   The

---

[68] 462 U.S. 367, 390 (1983) (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 302 (1947)).

[69] *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc).

[70] *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2017).

[71] *See Pahls v. Thomas*, 718 F.3d 1210, 1226 n.6 (10th Cir. 2013).

[72] *Vega v. United States*, 881 F.3d 1146 (9th Cir. 2018) (acknowledging that circuit's prior extension of *Bivens* to First Amendment claims but declining to expand to prisoner's First Amendment access-to-court claim); *Bistrian v. Levi*, 912 F.3d 79, 96 (3d Cir. 2018) (declining to extend *Bivens* to prisoners asserting First Amendment retaliation because it "implicates separation-of-power concerns, and threatens a large burden to both the judiciary and prison officials"); *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520 (6th Cir. 2020) (declining to extend *Bivens* due to special factors including silence in the Prison Litigation Reform Act, an alternative remedy through the administrative grievance system, and the need to defer to prison officials on issues of prison management); *Earle v. Shreves*, 990 F.3d 774 (4th Cir. 2021) (declining to extend *Bivens* due to special factors including an alternative remedy through the administrative grievance system and the need to defer to prison officials on issues of prison management); *Butler v. Porter*, 999 F.3d 287 (5th Cir. 2021) (same); *see also Loumiet v. United States*, 948 F.3d 376, 385 (D.C. Cir. 2020) (declining to extend *Bivens* to First Amendment retaliatory prosecution by Office of the Comptroller of Currency officials); *Black Lives Matter D.C. v. Trump*, –F. Supp. 3d–, 2021 2530722, at *6–8 (D.D.C. June 21, 2021) (finding special factors counseled against extending *Bivens* to constitutional claims, including for First Amendment retaliation, by Black Lives Matter protestors against federal officials for damages associated with abruptly clearing Lafayette Park outside the White House of protesters, causing protesters' physical and psychological damages).

single outlier decision is by the Ninth Circuit in *Boule v. Egbert*, which extended *Bivens* to a First Amendment retaliation claim by the owner and operator of a bed-and-breakfast inn adjacent to the United States-Canada border against Border Patrol agents who allegedly retaliated against him by asking the IRS to look into his tax status.[73]  Plaintiffs also rely on three unpublished district court cases recognizing a First Amendment retaliation claim under *Bivens*.[74]

This Court has considered the appropriate standards under Supreme Court precedent and follows the majority of courts that find special factors counsel hesitation in extending the *Bivens* remedy to the First Amendment retaliation context.  As Judge Bumatay's dissent from the Ninth Circuit's denial of rehearing en banc in *Boule* convincingly argues, the Supreme Court's jurisprudence, as well as the Ninth Circuit's own precedent, dictates hesitation in extending *Bivens* to First Amendment retaliation claims.[75]  The remaining cases cited by Plaintiffs are unpublished district court decisions from outside this circuit and are therefore not binding.  None of these cases involve First Amendment retaliation claims in the context of federally administered university officials. Thus, under the Supreme Court's clear precedent in *Abbasi*, the Court declines to extend a *Bivens* remedy to Plaintiffs' damages claim alleged in Count 3. Because the Court declines to extend a *Bivens* remedy in this context, it need not reach the issue of qualified immunity.

---

[73] 998 F.3d 370, 392 (2021).

[74] *Dyer v. Smith*, No. 3:19-cv-921, 2021 WL 694811, at *1–2 (E.D. Va. Feb. 23, 2021); *Himmelreich v. Fed. Bureau of Prisons*, No. 4:10CV2404, 2019 WL 4694217, at *2 (N.D. Ohio Sept. 25, 2019); *Jerra v. United States*, No. 2:12-cv-1907, 2018 WL 1605563, at *5–6 (C.D. Cal. Mar. 29, 2018).

[75] 998 F.3d at 379–80 (Bumatay, J., dissenting from denial of reh'g en banc).  Two other judges wrote dissenting opinions, one of whom was joined by three additional judges.  Thus, a total of twelve judges dissented from the denial of rehearing en banc in *Boule*.  *Id.* at 384–85 (Owens, J., and Bress, J., dissenting).

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Ronald Graham's Motion to Dismiss Individual Capacity Claims Against Him Under Fed. R. Civ. P. 12(b)(6) (Doc. 19) is **granted**.  Plaintiffs' Count 3 against Defendant Graham in his individual capacity is hereby dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: July 29, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE