**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JARED NALLY and
THE INDIAN LEADER ASSOCIATION,

            Plaintiff,

v.

TAMARAH PFEIFFER, in her official capacity as the Acting President of Haskell Indian Nations University,[1]

HASKELL INDIAN NATIONS UNIVERSITY,

TONY L. DEARMAN, in his official capacity as Director of the Bureau of Indian Education, and

BUREAU OF INDIAN EDUCATION,

            Defendants.

No. 21-2113-JAR-TJJ

**MEMORANDUM IN SUPPORT OF THE FEDERAL DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST, FOURTH, FIFTH, SIXTH, AND SEVENTH CLAIMS**

Under Fed. R. Civ. P. 12(b)(1) and (b)(6), Defendants Tamarah Pfeiffer, as Acting President of Haskell Indian Nations University, in her official capacity, Haskell Indian Nations University ("HINU"), Tony L. Dearman, in his official capacity, and Bureau of Indian Education ("BIE"), (collectively, "Federal Defendants"), move to dismiss as moot Plaintiffs' fourth and fifth causes of action concerning the constitutionality of HINU's former Campus Expression policy

---

[1] Dr. Ronald Graham is no longer the President of Haskell Indian Nations University. Tamarah Pfeiffer became the Acting President of Haskell Indian Nations University on May 7, 2021. *See* University Administration | Haskell Indian Nations University. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Tamarah Pfeiffer, in her official capacity as the Acting President of Haskell Indian Nations University, should be substituted for Dr. Graham in his official capacity as the former President of Haskell Indian Nations University as a defendant in this suit.

("Policy"), as well as Plaintiffs' first, sixth, and seventh causes of action concerning the "Directive" issued to Plaintiff Jared Nally ("Nally") on October 16, 2020. Plaintiffs allege the Policy is overbroad and facially vague in violation of the First Amendment, and that the Directive violated Nally's constitutional rights and the terms of a 1989 Settlement Agreement between HINU and The Indian Leader Association ("Settlement Agreement"). Plaintiffs seek injunctive and declaratory relief for these purported violations.

Their requests for relief, however, are moot because HINU officially and publicly withdrew the Directive and Policy. Because the Court cannot grant any meaningful relief as to the withdrawn Directive or Policy, Plaintiffs' relevant claims for relief are moot on both constitutional and prudential grounds. To the extent Plaintiffs seek injunctive relief against purely speculative future policies, they allege no concrete, imminent risk of future injury that would entitle them to such relief. There is no likelihood that the policies Plaintiffs have challenged will be reinstated and, as discussed below, the exceptions to the mootness doctrine are inapplicable. The Court should therefore dismiss as moot Plaintiffs' first, sixth, and seventh causes of action concerning the Directive, as well as Plaintiffs' fourth and fifth causes of action concerning the Policy, for lack of subject matter jurisdiction under Rule 12(b)(1).

## Background

On March 2, 2021, Plaintiffs filed a Complaint against HINU, BIE, BIE Director Tony L. Dearman in his official capacity, and then-HINU President Dr. Graham[2] in both his official and individual capacities. *See* Doc. 1. The Complaint alleges seven separate causes of action. *See*

---

[2] As of May 7, 2021, Dr. Ronald Graham is no longer employed with HINU or the Department of the Interior. On July 29, 2021, this Court entered a Memorandum and Order dismissing Plaintiffs' First Amendment *Bivens* claims against Dr. Graham in his individual capacity. (Doc. 33).

Doc. 1 ¶¶ 172-274.  Relevant here are Plaintiffs' first, sixth, and seventh causes of action, which allege various violations arising out of the Directive, and Plaintiffs' fourth and fifth causes of action, which challenge the Campus Expression Policy as unconstitutionally overbroad and facially vague.

## I.      The October 16, 2020 Directive.

In their first, sixth, and seventh causes of action, Plaintiffs rest their allegations—either wholly or in part—on a Directive issued by Dr. Graham on October 16, 2020, which Plaintiffs acknowledge was rescinded on January 13, 2021.  *See id.* at ¶ 141.  The Directive is addressed to Nally with the subject heading "Directive," *see id.* at ¶ 81, and reminds Nally of his duty as a HINU student to "treat fellow students, University staff, and University officials with appropriate respect" in accordance with the Code of Student Conduct, and that "[f]ailure to do so may result in disciplinary action."  *Id.* at ¶ 89.  The Directive then directs Nally to comply with the following mandates:

> **You will NOT:**
>
> - Attack any student, faculty, or staff member with letters or in public, or any public forum, thus bringing unjustified liability to this campus or anyone on this campus,
> - Make demands on any governmental agency—or anyone else from HINU—while claiming to represent *The Indian Leader.*
> - Attempt countermanding decisions of HINU personnel assigned by me or anyone else to positions in an effort to replace them,
> - Record anyone at HINU in your interviews unless you advise them first and they grant you permission.
>
> **You WILL:**
>
> - Treat all faculty members, staff, and students with the highest respect.
> - Conduct yourself as a student under the umbrella of Code of Conduct.
> - Understand that no one has the obligation to answer your questions or adhere to any timelines you may attempt to impose on them.

*Id.* at ¶ 90.  On January 13, 2021, Nally received a letter from Dr. Graham rescinding the Directive.  *Id.* at ¶ 141.

In their first cause of action, Plaintiffs allege the Directive was issued in retaliation for Nally's constitutionally protected journalistic activities.  *See id.* at ¶¶ 177-80.  Plaintiffs claim the Directive "was substantially motivated by Nally's protected activity," *id* at ¶ 180, and that "President Graham cannot identify any non-retaliatory reason for the Directive."  *Id.* at ¶ 181. Plaintiffs acknowledge the Directive was rescinded by President Graham, but allege that "Nally reasonably fears similar retaliatory action in the future and is continuing to refrain from exercising his right to engage in constitutionally protected expression and activity."  *Id.* at ¶ 186. As redress for "the continuing irreparable harm to [Nally's] First Amendment rights," Plaintiffs seek declaratory and injunctive relief under the Administrative Procedure Act ("APA").  *Id.* at ¶ 187.

Plaintiffs' sixth and seventh causes of action also seek declaratory and injunctive relief under the APA for alleged injuries arising under the Directive.  *See id.* at ¶ 253.  In their sixth cause of action, Plaintiffs allege Dr. Graham issued the Directive "unilaterally" and without any process in violation of Nally's constitutional rights under the Fifth Amendment.  *Id.* at ¶¶ 255-56.  Plaintiffs allege in their seventh cause of action that Defendants violated the Settlement Agreement by issuing the Directive and taking other retaliatory actions against them.  *See id.* at ¶ 269.

## II.    Campus Expression Policy.

Plaintiffs' fourth and fifth causes of action challenge HINU's former Campus Expression Policy as unconstitutionally overbroad and facially vague.  *See id.* at ¶¶ 218-51.  The challenged Policy contained in the now-repealed version of the Code of Student Conduct stated: "Discussion

and expression of all views is permitted, consistent with Haskell's CIRCLE values and subject

only to requirements for the maintenance of order." *Id.* at ¶ 39.  The Code of Conduct defined

the "CIRCLE values" as follows:

**Communication**

> To successfully convey ideas, opinion, information, results, images and creative expression using multiple strategies for diverse groups and stakeholder.

**Integrity**

> To conduct ourselves in ways that honor the sacrifices of our tribes on which treaty and trust responsibilities are based; and to carry out our responsibilities as students, staff, faculty, administrators, and regents by engaging in action based on the highest standard of conduct.

**Respect**

> To honor and promote the diversity of beliefs, rights, responsibilities, cultures, accomplishments of self and others, including our non-human relations.

**Collaboration**

> The willingness and ability to work successfully with others to accomplish the goals of the university and to meet the needs of our students, the tribes we represent and serve as well as our mission.

**Leadership**

> The willingness to acquire the knowledge and skills required to advocate for, and to advance the sovereignty and self-determination of tribes, Haskell and the students.

**Excellence**

> To strive toward the strongest level of accomplishment in our respective roles on behalf of Haskell, as students, staff, faculty, administration, and the Board of Regents.

*Id.* at ¶ 37.

Plaintiffs' fourth cause of action alleges that the Policy is "unconstitutionally broad on its face because it allows Defendants to punish a broad range of protected speech," and "circumscribes students' First Amendment rights by requiring adherence to subjective CIRCLE values." *Id.* at ¶ 221-22.  Plaintiffs argue Defendants "cannot restrict the right to free expression by making [the Policy] contingent on compliance with subjective CIRCLE values, like integrity and respect." *Id.* at ¶ 223.  Plaintiffs' fifth cause of action alleges the Policy is "unconstitutionally vague because it fails to give ordinary students fair notice of what expression complies with subjective CIRCLE values," thereby "encourag[ing] arbitrary and erratic enforcement. *Id.* at ¶ 239-40.  On May 19, 2021, Plaintiffs filed a Motion for Preliminary Injunction on Claims 4 and 5, "request[ing] that this Court preliminarily enjoin Defendants from enforcing the portion of the Campus Expression Policy that makes students' expressive rights contingent upon compliance with the CIRCLE values."  Doc. 13 at ¶¶ 2-3.

However, on May 21, 2021, the HINU Faculty Senate, Student Senate, Vice President of University Services, and Acting President Tamarah Pfeiffer approved amendments to the Code of Student Conduct repealing the Policy in its entirety and clarifying that the CIRCLE values "are *aspirational* and reflect Haskell's ideals for the conduct of Haskell students, faculty, administrators, and the Board of Regents."[3]  Revised Code of Student Conduct, at 7 (emphasis

---

[3]   The public version of the revised Code of Student Conduct ("Revised Code of Student Conduct"), which can be found at https://www.haskell.edu/wp-content/uploads/2021/05/2021.05.20-Revised-Haskell-Code-of-Student-Conduct-2-1.pdf, is attached hereto as Exhibit A.  The Court may take judicial notice of the Revised Code of Student Conduct as a government website posting.  *See New Mexico ex rel Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of two federal agency websites); *accord Schmidt v. Int'l Playthings LLC*, No. CIV 19-0933, 2021 WL 1701883 at *42 n.58 (D.N.M. April 29, 2021); *Buhendwa v. Reg'l Transp. Dist.*, 82 F. Supp. 3d 1259, 1262 n.1 (D. Colo. 2015) (citing *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005)).

added).  HINU also affirmed its commitment to protecting the First Amendment rights of its students by adopting the following "Free Expression Statement":

### I.  Free Expression Statement

Haskell is committed to protecting the right to freely communicate ideas and fully supports the freedom of all members of the Haskell community to engage in robust, uninhibited discussion and deliberation on any and all topics. However, freedom of expression at Haskell is not without limits. Haskell reserves the right to reasonably restrict student speech and conduct in accordance with longstanding Supreme Court precedent concerning on-campus speech, incitement, defamation, threats and harassment, and any other applicable subject area. Haskell will strive to implement any of these restrictions in a manner consistent with Haskell's foundational commitment to a free and open discussion of ideas.

*Id.* at 12.

The amendments to the Code of Student Conduct took effect on May 21, 2021.  The revised Code of Student Conduct ("Revised Code") was uploaded to HINU's website on May 24, 2021, and distributed via email to all HINU students, faculty, and staff that same day.

### Rule 12(b)(1) Standard of review

Rule 12(b)(1) of the Federal Rules of Civil Procedure empowers a court to dismiss a complaint for lack of jurisdiction over the subject matter.  Fed. R. Civ. P. 12(b)(1).  "Because '[f]ederal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute,' subject matter jurisdiction 'must be established in every cause under review in the federal courts."  *Eager v. Drake*, 829 Fed. App'x 878, 882 (10th Cir. 2020) (quoting *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 877 (10th Cir. 2017)).  The plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  *See id.* ("The 'burden of establishing' a federal court's subject matter jurisdiction 'rests upon the party asserting jurisdiction.'") (quoting *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015)).  "[B]ecause parties cannot waive subject-matter jurisdiction, they

can challenge it 'at any time prior to final judgment.'" *City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1093 (10th Cir. 2017) (citation omitted).

The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). Relevant here, a facial attack assumes the allegations in the complaint are true and argues they fail to establish jurisdiction. *Pueblo of Jemez v. United States*, 790 F.3d at 1148 n.4 (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)). In the case of a facial attack, the Court must accept the allegations in the Complaint as true and apply the same standards it would in a Rule 12(b)(6) motion to dismiss. *See Muscogee (Creek) Nation v Okla. Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010) (construing motion to dismiss as a facial challenge and thus "apply[ing] the same standards under Rule 12(b)(1) that are applicable to a Rule 12(b)(6) motion to dismiss for failure to state a cause of action").

A complaint may be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim if there is a lack of a cognizable legal theory or there are insufficient facts alleged under a cognizable legal theory. *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012). Applying the holdings in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Tenth Circuit has stated that to withstand a motion to dismiss "a complaint must have enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (citation and internal quotation marks omitted). While "a court must accept as true all of

the allegations contained in a complaint," this rule is "inapplicable to legal conclusions." *Id.* (citation and internal quotation marks omitted).  "[A] plaintiff must offer specific factual allegations to support each claim.  And . . . only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . [A] plaintiff must offer sufficient factual allegations to raise a right to relief above the speculative level." *Id.* (citations and internal quotation marks omitted).

"Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  "Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming*, 656 F.3d at 1214.

## Analysis

"Article III of the Constitution permits federal courts to decide only 'Cases' or 'Controversies.'" *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 879 (10th Cir. 2019).  The "related doctrines" of standing and mootness "keep federal courts within their constitutional bounds." *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016).  "Standing concerns whether a plaintiff's action qualifies as a case or controversy when it is filed; mootness ensures it remains one at the time a court renders its decision." *Id*.  Mootness "is a threshold issue," *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996), and federal courts do not have subject matter jurisdiction over cases that are constitutionally moot.  *See Schnell v. OXY USA Inc.*, 814 F.3d 1107, 1114 (10th Cir. 2016) ("If a case is moot, we have no subject-matter jurisdiction.").

9

The Tenth Circuit recognizes "two kinds of mootness: constitutional mootness and prudential mootness." *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011) (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121 (10th Cir. 2010)).  The constitutional mootness doctrine requires a suit to "present a real and substantial controversy with respect to which relief may be fashioned" in order to survive a mootness challenge.  *Jordan*, 654 F.3d at 1024.  As the Tenth Circuit has stated, "[t]he crucial question is whether granting a present determination of the issues offered will have some effect in the real world."  *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005) (quoting *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000)).

The doctrine of prudential mootness "'addresses not the *power* to grant relief[,] but the court's *discretion* in the exercise of that power,'" *Jordan*, 654 F.3d at 1024 (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1121) (emphasis in original), and permits "'the court to stay its hand, and to withhold relief it has the power to grant.'"  *Rio Grande Silvery Minnow*, 601 F.3d at 1121-22 (quoting *Fletcher v. United States*, 116 F.3d 1315, 1321 (10th Cir. 1997)).  This doctrine "has particular applicability in cases . . . where the relief sought is an injunction against the government," *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997), and the government has already changed its policies or taken the requested action.  *See id.* at 727.

Here, Plaintiffs' claims based on the Directive and Policy are both constitutionally and prudentially moot.  HINU has fully and unequivocally withdrawn the Directive and Campus Expression policy, making it "impossible for a court to grant any effectual relief whatever to the prevailing party."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2017).

**I.       Plaintiffs' claims based on the Directive and Policy are constitutionally moot.**

Under Article III of the Constitution, the power of the federal courts extends to "'actual, ongoing cases or controversies.'" *Wyoming*, 414 F.3d at 1211 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). The case and controversy "must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997); *United States v. Seminole Nation of Okla.*, 321 F.3d 939, 943 (10th Cir. 2002). A case is constitutionally moot, and thus not justiciable, if "'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Wyoming*, 414 F.3d at 1211 (quoting *City of Erie v. Pap's A.M*, 529 U.S. 277, 287 (2000)).

Constitutional mootness is "grounded in the requirement that 'any case or dispute that is presented to a federal court be definite, concrete, and *amenable to specific relief*." *Jordan*, 654 F.3d at 1024. To satisfy the Article III case or controversy requirement, a litigant must "suffer[] actual injury that can be redressed by a favorable judicial decision." *Brown v. Buhman*, 822 F.3d 1151, 1166 (quoting *Indiana v. Colo. Dep't of Corrs.*, 801 F.3d at 1213). If an actual or threatened injury from a challenged government action no longer exists, or a change in circumstances makes it impossible for the Court to grant meaningful or effective relief, the matter is moot and must be dismissed for lack of jurisdiction. *See Colo. Off Highway Vehicle Coal. v. U.S. Forest Serv.*, 357 F.3d 1130, 1133-35 (10th Cir. 2004).

The Court must judge a plaintiff's entitlement to "each form of relief sought." *Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) (explaining the plaintiff's "burden to demonstrate standing for each form of relief sought . . . exists at all times throughout the litigation") (quotations omitted)). "Where a plaintiff requests equitable relief, a mere showing that he maintains a personal stake in the outcome of the controversy is insufficient." *Jordan*, 654 F.3d

at 1024.  Plaintiffs seeking *prospective* equitable relief must "demonstrate a good chance of being likewise injured in the future." *Beattie v. United States*, 949 F.2d 1092, 1093 (10th Cir. 1991).  The "plaintiff seeking prospective relief 'must show more than past harm or speculative future harm.'" *Sellers v. Cline*, No. 13-3076, 2014 WL 4129526, at *3 (D. Kan. Aug. 19, 2014) (quoting *Riggs v. City of Albuquerque*, 916 F.2d 582, 586 (10th Cir. 1990)).

Plaintiffs' claims for relief here with respect to the Directive and Campus Expression Policy are constitutionally moot because no case or controversy exists and they have no standing to seek any prospective equitable relief.

### A.  Dr. Graham's rescission of the Directive constitutionally moots Plaintiffs' claims for declaratory relief.

In their first, sixth, and seventh causes of actions, Plaintiffs allege the Directive violated (1) Nally's First Amendment rights (first cause of action); (2) Nally's due process rights (sixth cause of action); and (3) the terms of the 1989 Settlement Agreement (seventh cause of action). As redress for these alleged violations, Plaintiffs seek both injunctive and declaratory relief, specifically, an order "permanently enjoin[ing] Defendants . . . from reinstating the October 16, 2020 Directive or any other prior restraint or promulgating any substantially similar directive," and declaring that the "Directive constituted an unconstitutional prior restraint."  Doc. 1 at ¶¶ 49-50.  The Court, however, cannot order any of the relief sought by Plaintiffs because the Directive has been rescinded, and as a result, Nally "no longer suffers actual injury that can be redressed by a favorable judicial decision." *Brown*, 822 F.3d at 1166 (quoting *Dep't of Corrs.*, 801 F.3d at 1213).

The federal courts of appeal have repeatedly held that withdrawing, replacing, or superseding an agency action moots any controversy over such action.  *See, e.g.*, *Citizens for Responsible Gov't*, 236 F.3d at 1182 (concluding that a challenge to the constitutionality of

certain sections of a statute were moot because those sections had been repealed); *accord Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 930 (7th Cir. 2003) ("[W]e, along with all the circuits to address the issue, have interpreted Supreme Court precedent to support the rule that repeal of a contested ordinance moots a plaintiff's injunction request absent evidence that the City plans to . . . reenact[] the challenged law or one substantially similar"); *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994) (holding that "[a]s a general rule, if a challenged law is repealed or expires, the case becomes moot" except where "it is virtually certain that the repealed law will be reenacted"). HINU's rescission of the Directive has likewise mooted any controversy by eliminating the asserted injuries giving rise to Plaintiffs' claims for relief. *See Wyoming*, 414 F.3d at 1212 ("By eliminating the issues upon which this case is based, adoption of the new rule has rendered the appeal moot.").

Plaintiffs indeed acknowledge the Directive was rescinded before they filed suit. *See* Doc. 1 at ¶ 141. Thus, no case or controversy existed with respect to the Directive when Plaintiffs filed suit, and any claims for relief from the Directive were already moot by the time Plaintiffs filed their Complaint. Plaintiffs therefore cannot obtain the declaratory relief sought in this action. Plaintiffs ask this Court to declare that "the October 16, 2020 Directive constituted an unconstitutional prior restraint," and that "Defendants unconstitutionally retaliated against Nally" for his protected activities. Doc. 1 at ¶ 49. But Plaintiffs lost their personal interest in obtaining that declaration when the Directive was rescinded on January 13, 2020.

Where a plaintiff requests declaratory relief, the court must "look beyond the initial controversy which may have existed at one time and decide whether the facts alleged show that there is a substantial controversy of *sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 891 (10th

Cir. 2008) (quotation marks and citations omitted) (emphasis added).  A claim for declaratory relief that does not "settl[e] . . . some dispute which affects the behavior of the defendant toward the plaintiff is moot," *Rio Grande Silvery Minnow*, 601 F.3d at 1110 (quotations omitted), because it fails to "seek[] more than a retrospective opinion that [the plaintiff] was wrongly harmed by the defendant." *Jordan*, 654 F.3d at 1025 (citation omitted).  "It is not enough that a plaintiff wishes to have the moral satisfaction of a judicial ruling that he was right and his adversary was wrong; the relief sought must have legal effect in determining the present and future rights and obligations of the parties." *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1263 (10th Cir. 2004).

Here, Plaintiffs are no longer subject to the challenged, and now withdrawn, Directive. They can claim no injury from the Directive. *Rio Grande Silvery Minnow*, 601 F.3d at 1112 (requiring evidence of a "concrete ongoing injury").  Thus, a declaratory judgment in Plaintiffs' favor will provide them with no more than a "retrospective opinion that [they were] wrongly harmed by the defendant." *Jordan*, 654 F.3d at 1025 (citing *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (per curiam) (concluding that a claim for declaratory relief was moot where appellee's "primary claim of a present interest in the controversy is that he will obtain emotional satisfaction from a ruling that his son's death was wrongful").  The "satisfaction of a declaration that a person was wronged" does not fulfill the purpose of declaratory relief, which is to have some effect on the defendant's conduct toward the plaintiff. *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994) (*superseded on other grounds as recognized in Walker v. United Parcel Serv., Inc.,* 240 F.3d 1268, 1278 (10th Cir.2001)).  Were the Court to enter a declaratory judgment in Plaintiffs' favor, it would amount to nothing more than an advisory opinion with no real world impact. *See North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (noting that federal

courts have "no power to issue advisory opinions"); *United States v. Burlington N. R.R. Co.*, 200 F.3d 679, 699 (10th Cir. 1999) ("It is fundamental that federal courts do not render advisory opinions and that they are limited to deciding issues in actual cases and controversies.") (citation and quotation marks omitted).

### B. Plaintiffs have no standing to obtain the injunctive relief requested in the Complaint.

To the extent Plaintiffs seek *prospective* injunctive relief to prevent Federal Defendants from reinstating the Directive (or something similar) at some future point, *see* Doc. 1 at ¶ 50, they lack the standing to do so absent a showing of some "credible threat of future injury." *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)). As this Court has stated previously, "[a] plaintiff lacks standing to seek prospective injunctive relief if he cannot demonstrate a real or immediate threat of future harm." *Clark v. Lynch*, 213 F. Supp. 3d 1347, 1352-53 (D. Kan. 2016) (citing *Lyons*, 461 U.S. at 105-06. "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Jordan*, 654 F.3d at 1024 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).

Here, Plaintiffs claim Federal Defendants' *past* conduct in issuing the Directive "continues to cause Plaintiffs injury by chilling their speech and other activity protected by the First Amendment." Doc. 1 at ¶ 153. But Plaintiffs' alleged injury is no more than a "subjective chill," which this Court has recognized as insufficient to maintain a claim for injunctive relief. *See Massachusetts v. Oakes*, 491 U.S. 576, 583 (1989) ("Because it has been repealed, the former version of [the challenged law] cannot chill protected expression in the future."); *Hoedel v. Kirk*, 480 F. Supp. 3d 1218, 1232 n.16 (D. Kan. 2020) (rejecting Plaintiffs' request for prospective injunctive relief based on alleged ongoing constitutional violations, but noting that

even if plaintiffs had "s[ought] prospective injunctive relief based on an ongoing chilling to their First Amendment activity, based on the *past* conduct of Defendants . . . the Court would not find it sufficient to maintain a claim for injunctive relief" because "a subjective chilling is not enough").

In *Hoedel*, this Court noted that "[a]lthough chilling can create a judicially cognizable injury, a subjective chilling is not enough" because "[t]he chilling must arise from an objectively justified fear of consequences." *Hoedel*, 480 F. Supp. 3d at 1232 n.16 (citing *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006)).  Plaintiffs here allege no facts showing that the alleged ongoing chilling arises from "an objectively justified fear of real consequences."  *Id.*  Plaintiffs merely speculate that, at some point in the future, Federal Defendants "*could* reinstate the Directive, issue another prior restraint, or take substantially similar retaliatory action against them."  *See* Doc. 1 at ¶ 153 (emphasis added).  This alone does not satisfy the requirement that Plaintiffs show a "continued susceptibility to injury" that is "reasonably certain" for purposes of injunctive relief.  *Citizens Ctr. v. Gessler*, 770 F.3d 900, 907 (10th Cir. 2014); *see Jordan*, 654 F.3d at 1024 (explaining that "plaintiff's continued susceptibility to injury must be reasonably certain; a court will not entertain a claim for injunctive relief where the allegations '[take[] [it] into the area of *speculation and conjecture*'") (emphasis added) (quoting *O'Shea*, 414 U.S. at 497).  Indeed, as discussed below, there is no reasonable likelihood that HINU will reinstate the challenged (and now withdrawn) Directive or issue any other similar directive or policy.  As the Tenth Circuit observed, "[i]f all it took to summon the jurisdiction of the federal courts were a bare assertion that, as a result of government action, one is discouraged from speaking, there would be little left of the Article III

threshold in First Amendment cases." *Clark v. Unified Sch. Dist. No. 287*, 822 Fed. App'x 706, 709 (10th Cir. 2020) (quoting *Initiative and Referendum*, 450 F.3d at 1089).

Plaintiffs therefore do not face any "continuing, present adverse effects" or ongoing injury resulting from the Directive. *Jordan*, 654 F.3d at 1024. Plaintiffs' request for injunctive relief against *possible* retaliatory acts is based on Nally's subjective and speculative fear of "similar retaliatory actions in the future," rather than an injury that is actual, threatened, or imminent. Doc. 1 at ¶ 153. For these reasons, Plaintiffs cannot allege the "credible threat of future injury" required to pursue prospective relief. *Mink*, 482 F.3d at 1253 (citing *Lyons*, 461 U.S. at 103).

Plaintiffs' claims for relief with respect to the Directive are accordingly moot and were moot long before the Complaint was filed. Under these circumstances, any relief granted by the Court with respect to the Directive "would be wholly without effect in the real world." *Rio Grande Silvery Minnow*, 601 F.3d at 1112. Absent "'a live, concrete controversy, [this Court] lack[s] jurisdiction to consider claims no matter how meritorious.'" *Hacbecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir. 2008) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007)). Plaintiffs' claims relating to the Directive under the first, sixth, and seventh causes of action must therefore be dismissed for lack of subject matter jurisdiction.

## II.   HINU's repeal of the Policy constitutionally moots Plaintiffs' claims for relief.

In their fourth and fifth causes of action, Plaintiffs allege the Policy contained in the now-repealed version of the Code of Student Conduct violates their First Amendment rights and has caused them "irreparable injury, including being deprived of their constitutional rights to free expression." Doc. 1 at ¶ 232. Their fourth cause of action asserts the Policy is "unconstitutionally overbroad on its face because it allows Defendants to punish a broad range of

17

protected speech." *Id.* at ¶ 221.  And in their fifth cause of action, Plaintiffs claim the Policy is "unconstitutionally vague because it fails to give ordinary students fair notice of what expression complies with CIRCLE values." *Id.* at ¶ 239.

Plaintiffs seek both injunctive and declaratory relief for these alleged violations. Specifically, Plaintiffs ask the Court to "preliminarily and permanently enjoin[] enforcement of Defendants' Campus Expression policy," and issue a declaration that the Policy "is facially overbroad on its face under the First Amendment," as well as "void for vagueness under the First and Fifth Amendments." *Id.* at ¶ 50.  However, because the Policy has been repealed and superseded, Plaintiffs' fourth and fifth causes of action no longer present a live case or controversy, and must accordingly be dismissed as constitutionally moot. *See Rio Grande Silvery Minnow*, 601 F.3d at 1116-17.

It is settled law that university policies become moot upon withdrawal. *See, e.g.*, *Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (per curiam) (holding private university's "substantial[] amend[ment]" of challenged regulation mooted controversy over its validity); *Students for a Conservative Am. v. Greenwood*, 378 F.3d 1129, 1131 (9th Cir. 2004) (holding case moot "[b]ecause the University has withdrawn the challenged provisions and committed not to reenact them unless federal law changes"); *Coll. Standard Magazine v. Student Ass'n of State Univ. of N.Y. at Albany*, 610 F.3d 33 (2d Cir. 2010) (per curiam) (finding First Amendment claim was moot where student association of state university amended its constitution to require viewpoint-neutral distribution of university funds); *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 550 (4th Cir. 2010) (holding facial challenge to university policy was moot because "[i]f the policy was indeed facially overbroad, UMBC's permanent revisions cured this defect and removed any threat of content-based enforcement in the future").  HINU's repeal of the

Policy and amendments to the Code of Student Conduct have likewise "removed any threat" to Plaintiffs.  The Revised Code no longer contains the language challenged by Plaintiffs, and in fact codifies the free speech rights of HINU students in the precise manner prescribed by Plaintiffs.  *See* Doc. 3 at 5 (suggesting revisions to cure the alleged constitutional defects in the Campus Expression Policy, including revisions "to reflect that the university's CIRCLE values do not limit students' First Amendment rights," and "make clear that [the CIRCLE values] are merely aspirational and will no longer be invoked to punish students").

HINU's repeal of the Policy thus constitutionally mooted the fourth and fifth causes of action "[b]y eliminating the issues upon which [Plaintiffs' claims are] based."  *Wyoming*, 414 F.3d at 1212.  The conduct that Plaintiffs challenge—enforcement of the Policy—will not, and indeed cannot, occur because the Policy has been superseded and is no longer of any force or effect.  Plaintiffs' request for injunctive relief is accordingly moot, as Plaintiffs cannot show any continuing adverse effects from a policy that has been repealed and is no longer operable.  *See Gessler*, 770 F.3d at 906-07.  Injunctive relief prohibiting the enforcement of the Policy would be meaningless because "'the event to be enjoined has come and gone,'" *Prison Legal News v. Federal Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (quoting *Gessler*, 770 F.3d at 907), and Plaintiffs have received "all the relief the federal court could have given [the]m." *Wyoming v. U.S. Dep't of Interior*, 587 F.3d 1245, 1250 (10th Cir. 2009).  There is no need for injunctive relief to force Federal Defendants to do what they have already done voluntarily.

Plaintiffs' request for declaratory relief is likewise moot.  Given that the challenged policy has been withdrawn with no likelihood of being reinstated, the Court could only "declare principles or rules of law which cannot affect the matter in issue in the case before it."  *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (citations and quotation marks omitted).

19

Since the Policy no longer exists, the entry of a declaratory judgment in Plaintiffs' favor would amount to nothing more than a declaration that they were wronged, and would have no effect on Federal Defendants' behavior towards them, much less any "effect in the real world." *Rio Grande Silvery Minnow*, 601 F.3d at 1112.  That would not fulfill the purpose of declaratory relief, which is to have some effect on the defendant's conduct toward the plaintiff, not "simply the satisfaction of a declaration that a person was wronged." *Cox*, 43 F.3d at 1348; *see also Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997) (finding as moot claims against a former prison institution because a declaratory judgment would "amount to nothing more than a declaration that [the plaintiff] was wronged, and would have no effect on the defendant['s] behavior towards him").  Advising on the validity of the now nonexistent Policy would thus constitute an impermissible advisory opinion with no practical effect.  *See, e.g.*, *Rio Grande Silvery Minnow*, 601 F.3d at 1111-12; *Southern Utah Wilderness Alliance*, 110 F.3d at 730.

Under the circumstances present here, it is impossible for the Court to render any constitutionally meaningful relief on Plaintiffs' claims involving the Campus Expression Policy. The fourth and fifth causes of action must accordingly be dismissed for mootness.

III.    **No exception to the constitutional mootness doctrine applies.**

Plaintiffs' claims regarding the Directive and the Policy are moot for the reasons discussed above, unless some exception applies.  The Tenth Circuit recognizes two exceptions to the mootness doctrine: (1) "voluntary cessation of the challenged activity"; and (2) an action that is "capable of repetition, yet evading review." *Chihuahuan Grasslands Alliance*, 545 F.3d at 892-94 (quotation marks and citations omitted).  Neither exception applies here.

### A.  The voluntary cessation exception does not apply.

Under the "voluntary cessation exception" to mootness, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013); *see also Buhman*, 822 F.3d at 1166.  "This exception is based on "the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'"  *See Chihuahuan Grasslands Alliance*, 545 F.3d at 892 (quoting *City News & Novelty Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)).  As the Tenth Circuit explained, "this [voluntary cessation] exception is designed to counteract gamesmanship, such as a defendant ceasing illegal action long enough to render a lawsuit moot before resuming the illegal conduct." *N.M. Health Connections v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1138, 1159 (10th Cir. 2019) (citation and internal quotation omitted).

A party's voluntary cessation will be found to moot a case where (1) it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur"; and (2) "[i]nterim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Equal Empt. Opportunity Comm'n v. CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1173-74 (10th Cir. 2017) (quotation marks omitted).  The burden of satisfying this two-prong test is a "heavy" one, but "not insurmountable, especially in the context of government enforcement." *Brown*, 822 F.3d at 1167; *see also Rio Grande Silvery Minnow*, 601 F.3d at 1116 ("[This] heavy burden frequently has not prevented governmental officials from discontinuing challenged practices and mooting a case.").  The Tenth Circuit has held that "the withdrawal or alteration of administrative policies can moot an attack on those policies," *Rio Grande Silvery Minnow*, 601 F.3d at 1117 (quoting *Bahnmiller v. Derwinski*, 923 F.2d 1085, 1089 (4th Cir. 1991) (internal alterations and quotations omitted), unless there are "*clear showings* of reluctant

submission [by governmental actors] and a desire to return to the old ways." *Rio Grande Silvery Minnow*, 601 F.3d at 1117 (brackets and emphasis in original).

The voluntary cessation exception does not apply here because there is no reasonable expectation the alleged violations will recur and the effects of the alleged violations have been completely eradicated, both with respect to the Directive and the Policy.

### i. The voluntary cessation exception does not apply to claims based on the Directive.

Plaintiffs acknowledge the Directive has been rescinded, but assert that such action "constitutes voluntary cessation by Defendants." Doc. 1 at ¶ 257. The voluntary cessation doctrine, however, does not apply in this context where the decision to cease the challenged activity was made for reasons unrelated to the litigation. *See, e.g.*, *Jordan*, 654 F.3d at 1037 ("noting that 'where the cause of the cessation was *obviously unrelated* to the litigation, the cases have been dismissed' on mootness grounds") (citation omitted); *Sze v. I.N.S.*, 153 F.3d 1005, 1008 (9th Cir. 1998) ("For the exception to apply, however, the [defendant's] voluntary cessation 'must have arisen *because of* the litigation.'") (citation omitted). Indeed, in "every case applying the voluntary cessation doctrine, the decision to stop the disputed activity was made while the litigation was pending." *Clarke v. United States*, 915 F.2d 699, 705 (D.C. Cir. 1990).

The challenged activity here—the Directive—was rescinded on January 13, 2021, and Plaintiffs did not file suit until nearly two months *after* the Directive had been rescinded. Because the rescission occurred well before the Complaint was filed, it could not have possibly been "the result of an attempt by the government to evade review." *Suarez-Tejeda v. United States*, 85 Fed. App'x 711, 716 (10th Cir. 2004). Rather, it is representative of government "self-correction," which "provides a secure foundation for mootness so long as it seems genuine." *Rio Grande Silvery Minnow*, 601 F.3d at 1136 (citation omitted). The timing of the Directive's

rescission *before* the Complaint was filed refutes any claim that the voluntary cessation was somehow a "sham for continuing possibly unlawful conduct." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009).

But even if the Court were to apply the Tenth Circuit's two-prong voluntary cessation test, Plaintiffs' claims still fail for mootness because there is no reasonable likelihood that Federal Defendants will reissue the Directive or a substantially similar directive in the future.  As an initial matter, where, as here, the defendant is a government actor, not a private litigant, there is less concern about the recurrence of the challenged activity.  *See, e.g.*, *Prison Legal News*, 944 F.3d at 881 ("Courts may accord 'more solicitude' to government officials' claims that their voluntary conduct moots a case.") (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1116 n.5); *Sossamon*, 560 F.3d at 325 ("[G]overnment actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties.").

More importantly, events subsequent to the filing of this litigation make clear that Federal Defendants' past practices under the Directive could not reasonably be expected to recur.  To begin, the source of the alleged retaliatory motive that Plaintiffs assert is now gone since Dr. Graham is no longer associated with HINU.  "[W]here the conduct challenged is personal to the original named defendant, even though he was sued in his official capacity, a request for prospective injunctive relief is mooted when the defendant resigns."  *Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 788 (D.C. Cir. 1981); *see also Network Project v. Corp. for Pub. Broad.*, 561 F.2d 963, 967 (D.C. Cir. 1977) (dismissing as moot claim when "the wrongful conduct charged is personal to the named defendant," the named defendant had left office, and the plaintiffs "ha[d] not averred that it is departmental policy to follow the practices charged").

23

There is no reasonable expectation that HINU will reinstate the Directive or issue a similar directive to Nally.  To the contrary, following Dr. Graham's departure, HINU made a commitment in its Free Expression Statement not to enforce any speech policy that may run counter to "Haskell's foundational commitment to a free and open discussion of ideas."  Revised Code at 12.  The Free Expression Statement alone defeats any claim that HINU has shown "reluctan[cy]" or a "desire to return to the old ways."  *Rio Grande Silvery Minnow*, 601 F.3d at 1117; *see also Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 56 (1st Cir. 2013) (noting the government's shift in policy and "giv[ing] some weight in [the voluntary-cessation] analysis to the fact that the defendants . . . have, as a matter of policy, abandoned the prior practice and adopted a concededly constitutional replacement").

Turning to the second prong of the Tenth Circuit's voluntary cessation test, the rescission of the Directive "ha[s] completely and irrevocably eradicated the effects of the alleged violation."  *Equal Employment Opportunity Commission*, 869 F.3d at 1174.  There can be "no lingering effects" of a Directive that no longer exists.  Any injury that may have resulted from alleged violations relating to the Directive has been completely eliminated by the rescission.

The voluntary cessation doctrine is therefore inapplicable to Plaintiffs' claims regarding the Directive, and cannot save Plaintiffs' claims from a mootness determination.

> ## ii.  The voluntary cessation exception does not apply to claims based on the Policy.

The voluntary cessation exception also does not apply to Plaintiffs' claims regarding the Policy in their fourth and fifth causes of action.  Under the first prong of the voluntary-cession test, "[o]ne factor in determining whether the challenged action could not be expected to recur is whether the action has been formally withdrawn or whether defendants have issued a 'mere informal promise or assurance . . . that the challenged practice will cease.'"  *Wilderness Watch v.*

*Ferebee*, 445 F. Supp. 3d 1313, 1321 (D. Colo. 2020) (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1118); *see also Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004) (finding claim moot because defendant provided documents showing that the policy had been officially discontinued). For example, in *Rio Grande Silvery Minnow*, the Tenth Circuit held "there [was] no reasonable expectation that Reclamation will revert to using the same consulting process which resulted in the [opinions giving rise to the lawsuit]" because the challenged opinions had been superseded by a new biological opinion. 601 F.3d at 1117. The Tenth Circuit noted that the new opinion "establishe[d] a new regulatory framework under which the propriety of [defendant's] actions must be judged," *id.* at 1111, rather than "a mere informal promise or assurance . . . that the challenged practice will cease." *Id.* at 1118 (internal quotations and citations omitted).

Similarly, here, HINU's repeal of the Policy is not an "informal promise or assurance" to change, but rather a permanent change in policy that has been codified and published in the Revised Code of Student Conduct. *See Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d at 1182 ("In general, the repeal of a challenged statute is one of those events that makes it 'absolutely clear that the allegedly wrongful behavior . . . could not reasonably be expected to recur.'") (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 171 (2000)). The decision to repeal the Policy was made not by a single administrator, but in collaboration with key HINU stakeholders, including the HINU Faculty Senate, Student Senate, Vice President of University Services, and the Office of the President. Upon approving the repeal and other changes, HINU uploaded the Revised Code to its website and circulated an electronic copy to all HINU students and faculty. These steps were taken to ensure that the changes "c[annot] be easily abandoned or altered in the future." *See*

*Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014) (noting that "we are less inclined to find mootness where the 'new policy . . . could be easily abandoned or altered in the future.'") (quoting *Bell v. City of Boise*, 709 F.3d 890. 901 (9th Cir. 2013)).

Moreover, HINU has not shown any "reluctan[cy]" or a "desire to return to the old ways." *Rio Grande Silvery Minnow*, 601 F.3d at 1117. Rather, HINU has taken steps to protect "the freedom of all members of the Haskell community to engage in robust, uninhibited discussion and deliberation on any and all topics" by adopting the Freedom of Expression Statement. Revised Code at 12. *See Gessler*, 770 F.3d at 908 (explaining that "a defendant's voluntary cessation moots a case when a challenged regulation is repealed and the government does not openly express intent to reenact it" (citing *Camfield v. City of Okla. City*, 248 F.3d 1214, 1223-24 (10th Cir. 2001)). Like the new, superseding biological opinion issued in *Rio Grande Silvery Minnow*, the Revised Code "establish[es] a new regulatory framework under which the propriety of [Federal Defendants'] actions must be judged." *Rio Grande Silvery Minnow*, 601 F.3d at 1111.

"[A]bsent evidence the voluntary cessation is a sham, the mere possibility a successor official may shift course does not necessarily keep a case live." *Prison Legal News*, 944 F.3d at 881; *see Brown*, 822 F.3d at 1167 (clarifying that "in the government enforcement context," courts will not "require some physical or logical impossibility that the challenged policy will be reenacted absent evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct") (quoting *Rio Grande Silvery Minnow*, 601 F.3d at 1117-18). There is nothing to suggest here that HINU's amendments to the Code of Student Conduct were anything other than a genuine and good-faith effort to protect the First Amendment rights of its students – and an effort taken in accordance with Plaintiffs' precise recommendations. *See Rio Grande Silvery*

*Minnow*, 601 F.3d at 1117 (noting that "although governmental defendants might take action as a direct response to litigation, '[a]t any rate, self-correction again provides a secure foundation for mootness so long as it seems genuine.'") (quoting 13C Wright, Miller & Cooper, Federal Practice & Procedure § 3533.7 at 326 (3d ed. 2008)).

Indeed, the circumstances of this case are distinguishable from those cases in which the court found that the university's policy did *not* become moot upon voluntary withdrawal.  In *DeJohn v. Temple University*, the United States Court of Appeals for the Third Circuit held that the university's policy change did not moot the case because the change occurred "more than a year after the commencement of litigation and then only near the end of discovery," and because the school "defended and continues to defend not only the constitutionality of its prior sexual harassment policy, but also the need for the former policy." 537 F.3d 301, 309 (3d Cir. 2008). The United States Court of Appeals for the Sixth Circuit similarly found in *Speech First, Inc. v. Schlissel* that the university's modification of the challenged definitions did not moot the case because the university continued to defend the constitutionality of the definitions in the litigation. 939 F.3d 756, 770 (6th Cir. 2019).

Here, HINU withdrew the Campus Expression Policy a little over two months after the Complaint was filed, unlike in *DeJohn*, where the parties were well into the litigation and concluding discovery by the time the university modified the challenged policy. *See DeJohn*, 537 F.3d at 309.  Further, at no point has HINU ever defended either the constitutionality of or need for the Campus Expression Policy.  The circumstances here are thus distinguishable from *DeJohn* and *Schlissel* in that are no "clear contraindications that [HINU's] change [wa]s not genuine" for purposes of the voluntary cessation test. *Schlissel*, 939 F.3d at 768.  The voluntary cessation doctrine "[wa]s designed to counteract gamesmanship, such as 'a defendant ceasing

illegal action long enough to render a lawsuit moot,'" not to interfere with government "self-correction." *New Mexico Health Connections*, 946 F.3d at 1159 (citations omitted).

As to the second prong of the voluntary-cessation test, HINU has "completely and irrevocably eradicated" the effects of the alleged violation by withdrawing the challenged Policy and clarifying that the CIRCLE values are aspirational and will not be applied to limit the First Amendment rights of HINU students. *Equal Employment Opportunity Commission*, 869 F.3d at 1174. There is no version of the challenged Policy to enforce, and as a result, Plaintiffs face no present or future harm in connection with the Policy.

Because Plaintiffs' claims relating to the Policy are moot and do not satisfy either prong of the Tenth Circuit's voluntary cessation test, the Court should dismiss Plaintiffs' fourth and fifth causes of action.

### B. The "capable-of-repetition-yet-evading" exception does not apply.

The second exception, that a case is not moot when it is "capable of repetition, yet evading review," also does not apply. *N.M. Health Connections*, 946 F.3d at 1159. The "capable of repetition yet evading review" exception "is only to be used in exceptional situations," when two factors are present: "(1) the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party . . . [will] be subjected to the same action again." *Chihuahuan Grassland All.*, 545 F.3d at 892. The party asserting the exception bears the burden of establishing both prongs. *Jordan*, 654 F.3d at 1035.

Plaintiffs here cannot carry their burden to establish the applicability of this narrow exception.

#### i. Plaintiffs' claims relating to the Directive are not capable of repetition yet evading review.

The first element of the capable of repetition yet evading review exception applies where there is "an *inherent* problem of limited duration that will cause it to evade review in future litigation." *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 997 (10th Cir. 2005) (internal quotation marks omitted) (emphasis added).  Here, Plaintiffs cannot establish that there is something inherent in the nature or structure of the Directive that makes it necessarily of short duration, or that a similar directive issued in the future would evade judicial review.  *See Wyoming*, 414 F.3d at 1212 (concluding that if the challenged agency action "were to reappear in the future, there would be ample opportunity to challenge the rule before it ceased to exist").

The Directive did not establish any time limits or deadlines, nor did it present any time-sensitive issues.  *See, e.g.*, *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (addressing the application of the "capable of repetition yet evading review" exception in cases involve election deadlines); *Nathan M. by and through Amanda M. v. Harrison Sch. Dist. No. 2*, 942 F.3d 1034, 1040-41 (10th Cir. 2019) (finding that the first prong of the capable-of-repetition-yet-evading-review exception was satisfied because individual education plans are short-lived and "[t]his timing discrepancy virtually guarantees that an [individual education plan] will expire before its challenge reaches us").  Plaintiffs had sufficient time to file suit, and would have sufficient time to file suit again if a similar directive was issued against Nally in the future. There is nothing about the Directive that is, "by nature, so ephemeral as to elude the processes of judicial review."  *See Beattie*, 949 F.2d at 1094 n. 2.

The second element of the capable of repetition yet evading review exception requires either a "'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party."  *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (*quoting Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).  Here, again, for the reasons

discussed above, there is no reasonable expectation that the Directive would be reinstated at some future point.  The Directive was fully withdrawn and the source of the alleged retaliatory action, Dr. Graham, is no longer associated with HINU.  Plaintiffs can offer nothing more than "a mere physical or theoretical possibility" that HINU will issue the Directive or a substantially similar policy against Nally in the future, which is insufficient to invoke this narrow exception. *Id.*; *see also Libertarian Party v. Dardenne*, 595 F.3d 215, 217 (5th Cir. 2010) (holding that a "physical or theoretical possibility" that the government actor would repeat challenged actions is insufficient to demonstrate that the challenged action is "capable of repetition").

### ii.  Plaintiffs' claims relating to the Policy are not capable of repetition yet evading review.

The "capable of repetition, yet evading review" exception also does not apply to Plaintiffs' otherwise moot claims regarding the Policy.  Plaintiffs' wholesale "[r]epeal of the [Policy] means the injury is not capable of repetition."  *Naturist Soc., Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) (citing *Diffenderfer v. Cent. Baptist Church*, 404 U.S. 412, 414-15 (1972)).  But even if it were, Plaintiffs' challenge to the Policy—or any policy in the Code of Student Conduct for that matter—does not present an issue that is of such an inherently short duration that it would evade review in future litigation.  Plaintiffs had ample time to challenge the constitutionality of the Policy while it was in place.  Indeed, Nally himself was subject to the Policy when he first started reporting for *The Indian Leader* in the fall of 2019, and at no point did Plaintiffs seek to challenge the Policy on any grounds until the Complaint was filed nearly a year and a half later.  *See* Doc. 1 at ¶¶ 12-13.  Like the Directive, the policies in the Code of Student Conduct are not subject to any time limits or deadlines.

Moreover, even if at some future point HINU were to reinstate the Policy or something similar, Plaintiffs would have the opportunity to challenge that action in a subsequent lawsuit.

There is no reason to believe that Plaintiffs could not again file suit and seek a preliminary injunction against the enforcement of that policy, as they have done here.  *See, e.g.*, *Rio Grande Silvery Minnow v. Keys*, 355 F.3d 1215, 1220 (10th Cir. 2004) (declining to apply the "capable of repetition, yet evading review" exception to mootness where an issue "will once again be subject to review, and sufficient time for the appellate process to run will be available); *Missouri ex rel. Nixon v. Craig*, 163 F.3d 482, 485 (8th Cir. 1998) (declining to apply "capable of repetition" exception where "judicial processes such as preliminary injunctions" would "be available to [plaintiff] if the need arises in the future").

Nor is there any reasonable expectation that the same injury alleged here will recur.  As discussed above, the "very controversy [Plaintiffs] sought to adjudicate has been eliminated" with the repeal of the Policy.  *Chihuahuan Grasslands Alliance*, 545 F.3d at 894 (finding no reasonable expectation that the plaintiff there would be subject to the challenged oil and gas leases because there were no existing leases nor any proposed sales).  It is not reasonable to expect that HINU will reinstitute the Policy or a substantially similar policy given the recent changes to the Code of Student Conduct, which make clear that the CIRCLE values are aspirational and legally unenforceable against HINU students.  *See* Revised Code of Student Conduct, at 7.

Plaintiffs' fourth and fifth causes of action therefore do not present the type of "exceptional situation" where the narrow capable-of-repetition exception applies.

### IV.     In the alternative, Plaintiffs' claims based on the Directive and Policy should be dismissed under the doctrine of prudential mootness.

Even if this Court were to find Plaintiffs' claims relating to the Directive and Policy are not constitutionally moot, the Court should exercise its discretion and dismiss Plaintiffs' claims under the doctrine of prudential mootness.  Prudential mootness is closely related to Article III

mootness and arises from the doctrine of remedial discretion.  *Southern Utah Wilderness Alliance*, 110 F.3d at 727.  Prudential mootness addresses not the power to grant relief, but instead addresses "the court's *discretion* in the exercise of that power.'"  *Jordan*, 654 F.3d at 1024 (quoting *Southern Utah Wilderness Alliance*, 110 F.3d at 724) (emphasis in original).

The prudential mootness doctrine "has particular applicability in cases . . . where the relief sought is an injunction against the government," *Southern Utah Wilderness Alliance*, 110 F.3d at 727, and the government has already changed its policies or taken the requested action. *See, e.g.*, *id.* at 727; *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1525 (10th Cir. 1992).  The Tenth Circuit has recognized that in such cases, "the remedial commitments of the coordinate branches of the United States government bear special gravity," both because those commitments are generally trustworthy and because courts should avoid "needless inter-branch disputes" over a problem the agency may solve itself.  *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1211 (10th Cir. 2012).

Here, prudential considerations warrant dismissal of Plaintiffs' requests for relief for the same reasons as discussed above.  Because the Directive and Policy have both been withdrawn, there is no cognizable injury, nor is there an available remedy or specific relief available to Plaintiffs.  *See Gessler*, 770 F.3d at 909 (holding that the prudential mootness doctrine does not apply because "a judgment for [plaintiff] could provide meaningful relief").  That a court should decline to "add the promise of a judicial remedy to the heap" is especially true when a plaintiff "seek[s] an order forcing [the government] to take an action that it eventually agrees to take voluntarily," as Federal Defendants have done here.  *Winzler*, 681 F.3d at 1208.

Moreover, adjudicating the merits of the Directive and Policy would not serve any judicial interests.  With respect to the Directive, "the anticipated benefits of a remedial decree no

longer justify the trouble of deciding the case on the merits" because the Directive has been rescinded, the issuer of the Directive is no longer employed by the Department, and Federal Defendants have not expressed any intent to reenact it. *Winzler*, 681 F.3d at 1210. As for the Policy, any relief the Court could grant here would be largely duplicative as Federal Defendants have already issued the relief requested by withdrawing the policy and clarifying the aspirational nature of the CIRCLE values. In the interests of judicial economy, the Court should stay its hand and decline to render relief on policies that are no longer extant.

The prudential mootness doctrine is intended to permit courts to avoid wasting judicial resources on precisely the type of claims at issue here—claims for which no meaningful relief can ever be granted. *See Southern Utah Wilderness Alliance*, 110 F.3d at 727. Under the circumstances present here, dismissal is the only equitable solution. *See Winzler*, 681 F.3d at 1210 ("After all, if events so overtake a lawsuit that the anticipated benefits of a remedial decree no longer justify the trouble of deciding the case on the merits, equity may demand not decision but dismissal.").

## Conclusion

For the foregoing reasons, Plaintiffs' claims based on the Directive and the fourth and fifth causes of action are constitutionally and prudentially moot, and should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

Respectfully submitted,

DUSTON J. SLINKARD
Acting United States Attorney
District of Kansas

*s/ Terra D. Morehead*
Terra D. Morehead
Assistant United States Attorney
Ks. S. Ct. No. 12759

500 State Ave., Suite 360
Kansas City, KS 66101
Tele: (913) 551-6730
Fax: (913) 551-6541
E-mail: terra.morehead@usdoj.gov

*s/ Christopher Allman*
CHRISTOPHER ALLMAN
Assistant United States Attorney
Ks. S. Ct. No. 14225
500 State Avenue, Suite 360
Kansas City, Kansas 66101
PH: (913) 551-6730
FX: (913) 551-6541
Email: chris.allman@usdoj.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2021, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of filing to all CM/CMECF participants for this case.

s/ Christopher Allman
CHRISTOPHER ALLMAN
Assistant United States Attorney